07:54:58

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE


 3


 4    UNITED STATES OF AMERICA, ) VOLUME 2
                                )
 5                              ) CRIMINAL ACTION
      v.                        ) NO. 23cr61(MN)
 6                              )
      ROBERT HUNTER BIDEN,      )
 7                              )
                  Defendant.    )
 8


 9

                      Tuesday, June 4, 2024
10                    8:55 a.m.
                      Jury Trial
11


12                    Courtroom 4A
                      844 King Street
13                    Wilmington, Delaware


14


15
      BEFORE:  THE HONORABLE MARYELLEN NOREIKA
16               United States District Court Judge


17


18


19    APPEARANCES:


20
                      SPECIAL COUNSEL'S OFFICE
21                    BY:  DEREK E. HINES, ESQ.
                      BY:  LEO WISE, ESQ.
22

23                            Counsel for the
                              United States of America
24


25
```

1    APPEARANCES CONTINUED:

2

3            DALTON & ASSOCIATES, P.A.
4            BY:  BARTHOLOMEW J. DALTON, ESQ.
             BY:  CONNOR DALTON, ESQ.
5
             -and-
6
             WINSTON & STRAWN LLP
7            BY:  ABBE DAVID LOWELL, ESQ.
             BY:  DAVID KOLANSKY, ESQ.
8            BY:  ISABELLA OISHI, ESQ.

9
                            Counsel for the Defendant
10

11

08:00:38 12                 – – – – – – – – – – –

08:00:38 13

08:01:18 14

08:42:41 15                 THE COURT:  All right, everyone.  Please be

08:54:55 16    seated.

08:54:56 17                 Good morning.  So we lost a juror overnight,

08:55:01 18    number one.

08:55:04 19                 MR. HINES:  Are they okay?

08:55:07 20                 THE COURT:  She sent us an e-mail saying that

08:55:10 21    she should have told us, but didn't, that she lives in

08:55:14 22    Milford.  She doesn't own a vehicle.  She can't come here

08:55:19 23    and she begged to be let off of jury service.  She's not

08:55:26 24    here.

08:55:29 25                 "I cannot travel to Wilmington.  I do not own a

08:55:33 1   vehicle and I live an hour away.  I was only able to make it

08:55:37 2   today because my father took time off of work to do it.  I'm

08:55:43 3   unemployed.  I can't afford parking.  I had no idea I would

08:55:46 4   have to attend every day until I was selected as a juror.

08:55:51 5   If I knew ahead of time I could have planned, but I didn't."

08:55:55 6         So she says she cannot attend.  So that was the

08:56:00 7   first person sitting in the box.  We're still missing four

08:56:12 8   jurors.

08:56:13 9         Okay.  So I thought we could just use this time

08:56:16 10  to talk about the objections.  I have reviewed the

08:56:20 11  objections.  Anybody want to add anything?  I looked at all

08:56:25 12  the papers.

08:56:26 13        MR. HINES:  No, Your Honor, we appreciate you

08:56:28 14  reviewing the submission we submitted this morning.

08:56:32 15        MR. LOWELL:  I want to make sure I'm on the same

08:56:34 16  page with them.  I think in terms of photos, Your Honor,

08:56:36 17  there were three that I think we continued to object to.

08:56:39 18  One is a photo of Mr. Biden apparently lying sleeping,

08:56:44 19  apparently sleeping in bed on August -- sorry, June 18th of

08:56:49 20  '18.  There is nothing there to indicate that that has

08:56:51 21  relevance.  That wire is a phone charger.  So it seems like

08:56:59 22  putting a picture of him half-naked --

08:57:02 23        THE COURT:  Those are the pages of Exhibit 38?

08:57:04 24  I want to make sure I'm looking at the right things.

08:57:07 25        MR. LOWELL:  Yes.  And I can tell you it's by

08:57:11  1    date, I don't know that there is a slide number.

08:57:13  2              THE COURT:  Well, I have them -- I have them by

08:57:16  3    number.

08:57:16  4              MR. LOWELL:  No, no, the date, you're correct as

08:57:18  5    to the government exhibit number.

08:57:20  6              THE COURT:  Oh, okay.

08:57:21  7              MR. LOWELL:  And in that there is so much stuff.

08:57:23  8              THE COURT:  So I was looking at the page

08:57:25  9    numbers.  And I thought it was pages 7, 10 --

08:57:34 10              MR. LOWELL:  And 11.

08:57:35 11              THE COURT:  And 11.

08:57:36 12              MR. LOWELL:  Yes, ma'am.

08:57:36 13              THE COURT:  And page 10, they're not using.

08:57:41 14              MR. HINES:  Correct.

08:57:42 15              THE COURT:  So it's page 7 is the one you're

08:57:45 16    talking about?

08:57:46 17              MR. LOWELL:  Page 7.

08:57:46 18              THE COURT:  I see where it's dated June 18th of

08:57:49 19    2018.  Okay.

08:57:51 20              MR. LOWELL:  So they're not using page 10.  And

08:57:53 21    then page 11 is a picture of Mr. Biden's back with the

08:57:58 22    tattoo he has on it, and nothing else of relevance other

08:58:00 23    than, again, a body shot.

08:58:06 24              THE COURT:  Okay.  So I understand the

08:58:09 25    government's position on the page 7.  Page 11, the

08:58:16 1    government claims it's relevant to the defendant's location

08:58:19 2    at a particular time, which you said is Malibu.  So can you

08:58:24 3    give me a hint why I care what he was doing in Malibu?  Is

08:58:29 4    it because it puts you to a particular time frame?

08:58:32 5              MR. WISE:  Yes.

08:58:33 6              THE COURT:  Him being in Malibu?

08:58:35 7              MR. WISE:  Yes, a witness will testify that he

08:58:37 8    went to Malibu after he had gone through the final rehab

08:58:40 9    before he bought the gun and he relapsed and was using

08:58:45 10   again.

08:58:45 11             THE COURT:  So it's a time and location thing?

08:58:47 12             MR. WISE:  Yeah.

08:58:48 13             MR. LOWELL:  All I say to that is they say the

08:58:50 14   witness will say that, and so consequently I'm not

08:58:55 15   contesting that she was there at the time, and I'll have to

08:58:59 16   cross-examine her of what she saw, but the picture of the

08:59:02 17   tattooed back isn't particularly probative of where he was

08:59:06 18   and what he was doing.

08:59:07 19             THE COURT:  Okay.  Defendant has objected to a

08:59:09 20   number of the government's objections, first, rows 214 to

08:59:14 21   292 of the government's summary chart, Exhibit 18.  Those

08:59:19 22   objections are overruled.

08:59:20 23             Row 215 is a message from the defendant about

08:59:24 24   the disposal of the gun in a trash can in a grocery store,

08:59:29 25   it is an admission and admissible under Rule 801(d)(2).

08:59:34 1          Rows 214 and 216 through 292 are messages

08:59:38 2   probative of defendant's drug addiction.  Although the

08:59:41 3   messages are dated after the date defendant bought the gun,

08:59:44 4   they are not being offered in isolation but rather with

08:59:47 5   other evidence of his addiction before, during, and after

08:59:49 6   the time he purchased the gun.  They are circumstantial

08:59:54 7   evidence as to whether he was an unlawful user of, or

08:59:57 8   addicted to any controlled substance when he purchased and

09:00:00 9   possessed the firearm and so they are admissible under Rules

09:00:04 10  401 and 402.

09:00:06 11         Next, we have a series of photos or videos

09:00:10 12  marked as Exhibits 18C through F.  Those objections are also

09:00:14 13  overruled.  The primary objection to those is they are dated

09:00:17 14  after October of 2018, for the same reasons I allowed the

09:00:21 15  text, I will also allow those exhibits.  They are

09:00:23 16  circumstantial evidence of defendant's addiction and

09:00:25 17  relevant and admissible.

09:00:26 18         As to Exhibit 18C, which defendant also objects

09:00:29 19  to as it shows him unclothed, the clip is redacted so that

09:00:33 20  it only shows him from the chest up, so I will not exclude

09:00:37 21  it on that basis.

09:00:38 22         As to 18D, which defendant also objects to as

09:00:42 23  being his voice, that is an issue of fact for the jury to

09:00:47 24  decide, particularly given that there will be other pieces

09:00:50 25  of evidence with the defendant's voice on it in this case.

09:00:53 1          Next, we have a request to add additional

09:00:56 2  context to the portions of the book that the government has

09:01:00 3  marked as Exhibits 19 and 20A through 20Q.  That request is

09:01:07 4  denied as to pages 5, 135, 142, 154, 196, 212, 213 and 214.

09:01:14 5  The requested passages that are asked to be -- the requested

09:01:19 6  additional passages constitute self serving hearsay

09:01:24 7  statements, they are statements that defendant can make on

09:01:26 8  the stand if he chooses to do so, and then submit to

09:01:29 9  cross-examination.  But they cannot come in through the

09:01:32 10  book.

09:01:32 11          The request to add additional material is

09:01:35 12  granted as to pages 137 and 197.  If defendant wishes to add

09:01:39 13  those portions at some point in the trial, he may.

09:01:42 14          Next, we have objections to the Government's

09:01:46 15  Exhibits 28 through 37 which are defendant's bank

09:01:49 16  statements.  The government has indicated that it produced a

09:01:51 17  summary chart and anticipates only offering the admission of

09:01:56 18  redacted statements.  I will overrule the objection as moot,

09:02:00 19  but to the extent that the government seeks to admit a

09:02:03 20  non-redacted version, defendant may renew his objection.

09:02:06 21          Finally, we have the objections to the three

09:02:08 22  pages of Government's Exhibit 38, which we just addressed.

09:02:13 23  The objection is overruled as to page 7.  There appears to

09:02:17 24  be drug paraphernalia in the picture.  The objection is moot

09:02:21 25  as to page 10, which the government says it will not use,

09:02:24 1    and the objection is overruled as to page 11, which the

09:02:26 2    government claims is relevant to supporting testimony as to

09:02:31 3    defendant's location at a particular time frame.

09:02:36 4         So those are my rulings on the objections.  Is

09:02:40 5    there anything else that we need to address?

09:02:42 6         MR. HINES:  Yes, Your Honor.  Thank you.

09:02:44 7         Actually, as we were walking to the courtroom

09:02:47 8    here, we received counsel's demonstrative for his opening

09:02:51 9    and we received two exhibits that are purely summary charts

09:02:55 10   that he intends to use today, which I assume will be during

09:02:58 11   the testimony of Agent Jensen.  We have objections to those.

09:03:02 12   If the Court will hear me now.

09:03:05 13        MR. LOWELL:  I would think that maybe, Judge, we

09:03:07 14   can save time, we were beginning to go through the

09:03:09 15   demonstratives, we should do that, we may agree or we may

09:03:13 16   disagree as to the summary charts, we provided as the Court

09:03:16 17   asked us to on the morning of or at some times late at night

09:03:21 18   what would be a cross, so I couldn't get it before then.  We

09:03:24 19   didn't need to give it to the government, but we did, so I

09:03:27 20   would like to talk to them about --

09:03:29 21        THE COURT:  Sure.  Why don't I give you guys

09:03:31 22   some time to discuss.  We're still waiting for some jurors,

09:03:35 23   you guys can address it, anything you work out, work out,

09:03:38 24   and anything you don't, let me know, and I'll come back.

09:03:41 25        COURT CLERK:  All rise.

09:03:51  1                    (A brief recess was taken.)

09:09:25  2                    THE COURT:  Just quickly, I told you wrong about

09:09:28  3      the juror, it was juror number three in current jurors, not

09:09:35  4      juror number three in yesterday's juror numbers.  So it was

09:09:38  5      yesterday it was Juror 16, and she was seated as juror

09:09:42  6      number three.

09:09:45  7                    MR. HINES:  Thank you.

09:09:45  8                    MR. LOWELL:  So juror number three in the box?

09:09:48  9                    THE COURT:  Yes.  Apologies for that.

09:09:50 10                    MR. LOWELL:  Juror number three, whatever number

09:09:52 11      that was.

09:09:52 12                    THE COURT:  She was 16.

09:09:54 13                    MR. LOWELL:  Yes.  Got it.

09:09:58 14                    THE COURT:  Sorry about that.

09:10:00 15                    MR. LOWELL:  Judge, we can start going through

09:10:02 16      at least the issues of the demonstratives with you, would it

09:10:05 17      be easier to go up to the bench with them?

09:10:07 18                    THE COURT:  Okay.  Everyone can be seated.

09:38:04 19                    (Side-bar discussion:)

09:38:04 20                    MR. HINES:  Your Honor, in the 59-page

09:38:04 21      demonstrative we received this morning, we have issues with

09:38:04 22      about eight pages.

09:38:04 23                    THE COURT:  Okay.

09:38:04 24                    MR. HINES:  Page 13 is the first page.  It

09:38:04 25      indicates education and work experience.  I don't have a

09:38:04 1    reason to believe that these are not true statements in

09:38:04 2    here, in fact, I think they are.

09:38:04 3                 THE COURT:  How is it going to get into

09:38:04 4    evidence?

09:38:04 5                 MR. HINES:  Exactly, we have asked Mr. Lowell

09:38:04 6    and he won't tell us.

09:38:04 7                 MR. LOWELL:  That's not what I said.

09:38:04 8                 MR. HINES:  He couldn't tell us which witness.

09:38:04 9                 MR. LOWELL:  I said I'm making a proffer and the

09:38:04 10   Court -- I understand the rules, each one of these will be

09:38:04 11   submitted with a witness, I don't have to tell them in

09:38:04 12   advance which witness it is, but I am making a statement to

09:38:04 13   the Court, there is three or four witnesses, including his

09:38:04 14   uncle and his daughter, if need be.

09:38:04 15                 THE COURT:  I think your witnesses know him well

09:38:04 16   enough that this could come in.

09:38:04 17                 MR. HINES:  I'm not sure they had been in these

09:38:04 18   institutions at this time, they might know he went there for

09:38:04 19   this statement.  Page 15 is a different issue, they fixed

09:38:04 20   that.

09:38:04 21                 THE COURT:  That's fixed.

09:38:04 22                 MR. HINES:  Page 33.  So in this slide, the

09:38:04 23   defense has highlighted that the transferee must provide a

09:38:04 24   residence address, and our view is that the argument here is

09:38:04 25   going to be in contravention of this Court's order and

09:38:04  1    they're going to suggest that what the StarQuest folks did

09:38:04  2    that day was improper and Mr. Biden's passport did not have

09:38:04  3    a residence address and therefore he should have never been

09:38:04  4    sold the gun.   That's not the law.   The law is the crime is

09:38:05  5    complete when the defendant actually filled out his section

09:38:05  6    of the form making his representations.   The fact that it's

09:38:05  7    buried in 18(a), the residence address must be provided is

09:38:05  8    not a consequence to the jury's determination in the case.

09:38:05  9          MR. LOWELL:   I invited and told them I'm not

09:38:05 10    arguing that the "sale" shouldn't have been made that day.

09:38:05 11    What is of relevance is who filled out what part of the

09:38:05 12    form, the whole passport part is not filled out by

09:38:05 13    Mr. Biden.   It's filled out by an employee of the gun store,

09:38:05 14    and pointing out that they say when they got it, when they

09:38:05 15    put it in, when it was signed, that is not all agreed upon

09:38:05 16    by them.

09:38:05 17          THE COURT:   But what does this have to do with

09:38:05 18    must provide a residence address?

09:38:05 19          MR. LOWELL:   Because the passport doesn't have

09:38:05 20    an address and they went through.

09:38:05 21          THE COURT:   Yes.   And you're trying to say that

09:38:05 22    they shouldn't have made the sale, which is what his

09:38:05 23    objection is.

09:38:05 24          MR. LOWELL:   Yes, but I'm also allowed, I

09:38:05 25    believe when Mr. Cleveland is on the stand, he's the one

09:38:05  1    talking to him, if it's the issue of both who checked the

09:38:05  2    box and when and what they over looked, remember in our

09:38:05  3    motion, Mr. Cleveland said he didn't pay much attention and

09:38:05  4    Mr. Palimere says that this was done after he told him so,

09:38:05  5    it's a question of if they would over look one thing, which

09:38:05  6    is --

09:38:05  7            THE COURT:  No.  I mean, I get it, but you can't

09:38:05  8    -- the issue is if the gun shop did something wrong, you

09:38:05  9    can't say the gun shop did something wrong and therefore he

09:38:05 10    didn't commit the crime.  That's my problem.

09:38:05 11            MR. LOWELL:  I can say that on the issue of, for

09:38:05 12    example, materiality -- you're shaking your head before I

09:38:05 13    finish.

09:38:05 14            THE COURT:  That doesn't go on the record and

09:38:05 15    I'm not paying attention to it.

09:38:05 16            MR. LOWELL:  Good.  On the issue of materiality,

09:38:05 17    it is a question of whether what was material, what was

09:38:05 18    allowed that day.  I mean, Judge, if they, for example, if

09:38:05 19    the people in the store left something out and they -- there

09:38:05 20    is a witness that might say something was left out by the

09:38:05 21    time there was something signed, then it's not arguing that

09:38:05 22    the gun shouldn't have been sold, it's whether or not they

09:38:05 23    even cared about the check boxes or anything else that day.

09:38:05 24            THE COURT:  But whether they care about it

09:38:05 25    doesn't matter.  Their state of mind, whether they cared

09:38:05 1    about it, whether they thought that the form was just a

09:38:05 2    stupid government form that nobody should have to fill out

09:38:05 3    isn't relevant to whether he checked the box.

09:38:05 4            MR. LOWELL:  But it is relevant to whether he

09:38:05 5    checked the box.  And when he checked the box.  It will be

09:38:05 6    evidence that not all the boxes -- there could be evidence

09:38:06 7    that not all these boxes were checked before he signed them,

09:38:06 8    and whether or not they were signed -- he signed it when.

09:38:06 9            THE COURT:  All right.  If that -- if there is

09:38:06 10   evidence of that, I don't know what it is, but for now, I

09:38:06 11   will sustain the objection to slide 33.

09:38:06 12           MR. HINES:  Page 37, in the form instructions

09:38:06 13   there is a blow up of four provisions -- three provisions

09:38:06 14   the defendant is not charged under.  11G, the relevant

09:38:06 15   portion, I believe it's 11G where he checks a multiple user.

09:38:06 16           MR. LOWELL:  11E.

09:38:06 17           MR. HINES:  11E, sorry, is not included in these

09:38:06 18   instructions, and I believe Mr. Lowell is going to be using

09:38:06 19   this to argue that because there wasn't an instruction, that

09:38:06 20   somehow Mr. Biden didn't know what was permissible.  Which

09:38:06 21   that's inappropriate because the law does not require that

09:38:06 22   there be an instruction to explain to someone that whether

09:38:06 23   or not they are an unlawful user of a controlled substance.

09:38:06 24           THE COURT:  Is that what you're going to do?

09:38:06 25           MR. LOWELL:  Judge, the government can't have it

1  both ways, they say he looked at the form, he read the form,

2  they're going to have somebody say he signed the form, the

3  form is very explicit by telling people what it is.  The

4  fact that it doesn't have any definition or instruction as

5  to what it means to be a user is something that he would

6  have, according to the government, read.  How can you take

7  what is the critical issue you have in this case as to

8  whether he knowingly put a check on a box for a box that

9  says are you a user in a form that has a definition for

10  everything but not a user.

11          THE COURT:  Look, maybe you have an argument on

12  the vagueness issue for, like, Count Three, but ignorance of

13  the law is no defense, right, so if you're going to say he

14  didn't know, he didn't know he didn't use a controlled

15  substance, and they didn't tell him, that's not an

16  appropriate argument.

17          MR. LOWELL:  I agree that that's not an

18  appropriate argument.  I don't understand how you can admit

19  into evidence a form that he signs that they say he checked

20  the boxes of that he would have read and the whole case

21  depends on whether he knowingly put in a box that he was

22  not, and are you a user.  It tells him what it means to be a

23  fugitive, him or the reader, what it means.  But there is no

24  instruction that he could have read that would have advised

25  him and that Mr. Cleveland or nobody else tells him, you're

09:38:07 1    basically taking out of the case a state of mind issue that

09:38:07 2    is right there in black and white.

09:38:07 3              THE COURT:  Why isn't your argument essentially,

09:38:07 4    he didn't have a clue, I mean, would you know that you were

09:38:07 5    an illegal -- would you know what was a controlled user,

09:38:07 6    jury, no, and he didn't know either, so he couldn't have

09:38:07 7    made that statement.

09:38:07 8              MR. LOWELL:  That's not the argument judge.

09:38:07 9              THE COURT:  That is what it sounds like you're

09:38:07 10   telling me, you're saying he doesn't know what it was.

09:38:07 11             MR. LOWELL:  No.

09:38:07 12             THE COURT:  You keep cutting me off, and you

09:38:07 13   want to make your argument, and I know you want to make your

09:38:07 14   argument, but you need to understand it, so you need to

09:38:07 15   understand where I am.  It seems to me the relevance of this

09:38:07 16   is look, they told him what a fugitive is, he could have

09:38:07 17   figured out what a fugitive was, they told him what a

09:38:07 18   fugitive was, they didn't tell him what a user was, and if

09:38:07 19   that's the case, you're saying he would have no idea what a

09:38:07 20   controlled user is, so he couldn't have knowingly done this,

09:38:07 21   that to me seems like ignorance of the law, he didn't know

09:38:07 22   what the law was, and therefore he couldn't have broken it.

09:38:07 23             MR. LOWELL:  If you set it up that way, then

09:38:07 24   you're going to agree with the government, and I think

09:38:07 25   that's an incredible way to characterize what is going to,

09:38:07 1    there -- I'm sorry, I was about to say my next point.

09:38:07 2            THE COURT:  You can make your next point, all

09:38:07 3    you're doing is taking what I'm saying, you're not saying

09:38:07 4    why I am wrong, that's what I need you to do.  The form

09:38:07 5    tells him what a fugitive is, the form tells him what a

09:38:07 6    mental defective is, the form tells him what committed to a

09:38:07 7    mental institution, but it doesn't tell him what a

09:38:07 8    controlled user is, to me you're saying it tells him all

09:38:07 9    this other stuff, but it doesn't tell him the thing that's

09:38:07 10   important here and he had no idea.  I'm saying he didn't

09:38:07 11   know, ignorance of the law is not an excuse.  That's where

09:38:07 12   my logic is, tell me where I'm wrong.

09:38:07 13           MR. LOWELL:  First of all, these sections don't

09:38:07 14   say they cite to a law, it's a forms instructions, it's not

09:38:07 15   ignorance of what the underlying law is.  The person goes

09:38:08 16   into the gun store and has boxes.  If he has any question

09:38:08 17   about what a box means, he goes to the form.  If Mr. Biden's

09:38:08 18   defense is that he didn't knowingly put the word, check the

09:38:08 19   box, when it's in the present tense, Judge, are you a user,

09:38:08 20   are you, the law says a person should have a gun if he isn't

09:38:08 21   a user.  And if he looked to see does that mean ever, does

09:38:08 22   that mean I'm supposed to do it based on a year ago, this is

09:38:08 23   a form that would inform a buyer of a gun, it's not arguing

09:38:08 24   that the law doesn't require it, it's arguing, it's showing,

09:38:08 25   it's relative, it's probative to the person in the store

09:38:08 1    filling out a form saying okay, I don't know what this

09:38:08 2    means, so I'm going to go look and see what it means, there

09:38:08 3    is nothing there, he's on his own to make that decision.

09:38:08 4    He's not arguing that he's ignorant of the law, he's arguing

09:38:08 5    that if he went to look at this form, if that's his

09:38:08 6    testimony or the testimony of Mr. Cleveland or Mr. Palimere

09:38:08 7    or Mr. Turner, they will show there is no such instruction,

09:38:08 8    no way for him to be guided in this decision, I'm not

09:38:08 9    arguing ignorance of the law, I'm arguing what he was told

09:38:08 10   and not told that day by human beings or a form, this is at

09:38:08 11   the heart of his defense, this is it.

09:38:08 12           MR. HINES:  I mean, arguing that he was not told

09:38:08 13   what the law was is another way of arguing ignorance of the

09:38:08 14   law, that's exactly what we're getting back to.

09:38:08 15           THE COURT:  Let me ask how -- you have to show

09:38:08 16   that he knew that what he was saying was false.  And their

09:38:08 17   argument is, well, it says are you using, and he's like

09:38:08 18   well, maybe no, I'm not using right now, and so how -- so is

09:38:08 19   that a response to the knowing aspect, not he didn't know

09:38:08 20   what the law was, but that he knew it was false, could he be

09:38:08 21   looking at it and it says am I, and I'm sober at this very

09:38:08 22   moment, so I'm going to say no.

09:38:08 23           MR. HINES:  The reasons there are notes for

09:38:08 24   other questions on here, the term fugitive from justice or

09:38:08 25   mentally defective is a term that ATF decided needs to be

09:38:09  1    defined for more explanation.  Being a user or a crack

09:38:09  2    addict is not a term that needs definition, by looking at

09:38:09  3    that and by analogy, oh, it wasn't explained to him so he

09:38:09  4    had the right to not know what the law was because it was

09:38:09  5    not in this notation burred read in the back, Mr. Biden

09:38:09  6    didn't know, that gets right back to the ignorance of the

09:38:09  7    law point.

09:38:09  8              MR. LOWELL:  Judge, I want to make a new point,

09:38:09  9    I want to be repetitive.  First of all, the ATF decides what

09:38:09 10    should be in there, fine, I'm not arguing that they did it

09:38:09 11    or didn't do it, the gun shop owner is the one who gives

09:38:09 12    them the form.  The issue is when the form says, are you,

09:38:09 13    are you.  Now Mr. Biden has the right to say if he read that

09:38:09 14    and if he is taking the stand, for example, or if

09:38:09 15    Mr. Cleveland, Palimere, or Turner talk about what they

09:38:09 16    said, that the word "are" to him or what they explained, but

09:38:09 17    the words to him, are you, I know, I used, I used a year

09:38:09 18    ago, the government is putting evidence that goes back

09:38:09 19    years, does that mean I'm disqualified, I know, I'll go to

09:38:09 20    the form definitions, it doesn't say what it is.  It informs

09:38:09 21    what his state of mind is when he checks the box, it's not

09:38:09 22    an argument with what the law requires, it's not an argument

09:38:09 23    about what the ATF says --

09:38:09 24              THE COURT:  Could they in response to that say

09:38:09 25    to Mr. Cleveland, did he look at the back of the form, did

09:38:09  1    he ask you what it meant, you're fine with all that?

09:38:09  2              MR. LOWELL:  I'm not only fine with that, I know

09:38:09  3    what Mr. Cleveland said in his statements to the government

09:38:09  4    about that very subject, that is a good point, that is an

09:38:09  5    excellent subject.

09:38:09  6              MR. HINES:  There is no evidence that he looked

09:38:09  7    at the back of the form.

09:38:09  8              MR. LOWELL:  No, there is no evidence that

09:38:09  9    Mr. Cleveland knows what he looked at, and Mr. Palimere and

09:38:09 10    Mr. Turner have something to say about that.

09:38:09 11              MR. HINES:  Which is different from looking at

09:38:09 12    the back of the form.  I don't know what evidence you have

09:38:09 13    to support the notice someone, that he was looking at 11D,

09:38:09 14    11F committed to men --

09:38:09 15              MR. LOWELL:  You're saying Mr. Cleveland said

09:38:09 16    that he doesn't mean that he didn't, what he did say was he

09:38:09 17    leaves it to the person to read the form in its completeness

09:38:09 18    and then he has them sign it.

09:38:09 19              THE COURT:  Wait.  Just so I'm clear, are you

09:38:09 20    going to suggest that he did in fact read these things or

09:38:09 21    just that if he had chosen to and didn't tell them.

09:38:09 22              MR. LOWELL:  Both.

09:38:09 23              THE COURT:  What is your evidence going to be

09:38:09 24    that he did in fact read all of these things carefully?

09:38:10 25              MR. LOWELL:  If it gets to that judge, then it

09:38:10 1    will be Mr. Biden's job to say that.

09:38:10 2             THE COURT:  And so then if you're going to say

09:38:10 3    this now and he decides not to take the stand, then what

09:38:10 4    happens?

09:38:10 5             MR. LOWELL:  Then they and you -- if there is no

09:38:10 6    evidence that he read the form, then I'm stuck with you

09:38:10 7    instructing the jury on that or the government making a

09:38:10 8    point of it.  But right now in opening I'm making a proffer

09:38:10 9    to the Court that there will be evidence -- it depends on

09:38:10 10   him having -- if their witness doesn't say that he skimmed

09:38:10 11   through every page, than their evidence is the guy doesn't

09:38:10 12   know one way or the other that he did, the form is still the

09:38:10 13   form.  The guy who is going to testify says he relies on

09:38:10 14   people to read the entire form.  He doesn't tell them what

09:38:10 15   to do.  But he relies on them.  And he says that very

09:38:10 16   explicitly, so I should be able to probe him about that and

09:38:10 17   also point out the very heart of one of the knowingly

09:38:10 18   aspects.  It really guts the issue of what --

09:38:10 19            THE COURT:  All right.  Is there more on this

09:38:10 20   issue or is this the only one?

09:38:10 21            MR. HINES:  Not on this issue, this is the only

09:38:10 22   one.

09:38:10 23            THE COURT:  All right.  I need to think about

09:38:10 24   that one.

09:38:10 25            MR. HINES:  Page 45 is a message from the

09:38:10  1    defendant to Hallie Biden, which has no relevance and is

09:38:10  2    hearsay, it says "I'm going to D.C. tonight to see Maisy and

09:38:10  3    she has a senior game Wednesday and they're 11 and 1 and I

09:38:10  4    want to make at least a couple of games."  There is no

09:38:10  5    admissible purpose.

09:38:10  6              MR. LOWELL:  It's a person's intention, it's

09:38:10  7    about future acts, it's about what he intends to do, it's

09:38:10  8    not for the truth that he did it, it's on the intention of

09:38:10  9    what he was doing on the very day the gun is thrown out.

09:38:10 10              MR. HINES:  What's the relevance of going to a

09:38:10 11    senior game on Wednesday?

09:38:10 12              MR. LOWELL:  Where he was on the 23rd is

09:38:10 13    incredibly important because Ms. Hallie Biden will say

09:38:10 14    things and this will also benchmark where Mr. Biden was at a

09:38:10 15    particular time doing what.  So the day the gun is thrown

09:38:11 16    out and discovered, it is important to point out where he

09:38:11 17    was intending to be and then there will be evidence that he

09:38:11 18    was there.

09:38:11 19              THE COURT:  But why do we care that he actually

09:38:11 20    -- I get it and I saw in the police report that he was -- he

09:38:11 21    said he was driving to D.C., I think I saw it in one of our

09:38:11 22    papers or the police report, he was driving to D.C. when he

09:38:11 23    realized the gun was missing.  I get that, but why do we

09:38:11 24    care that he was at the game, what's the relevance of that

09:38:11 25    he went to the game that night?

09:38:11 1        MR. LOWELL: "I am going to D.C. tonight to see

09:38:11 2   Maisy", that's fine, we can keep it at that sentence, that's

09:38:11 3   his intention to match up.

09:38:11 4        THE COURT: You know he was going to D.C., that

09:38:11 5   is in evidence that I've seen. But if you're going to say

09:38:11 6   oh, look how -- what a great dad he was.

09:38:11 7        MR. LOWELL: I get it.

09:38:11 8        THE COURT: That seems wrong.

09:38:11 9        MR. LOWELL: We can take that out.

09:38:11 10       MR. HINES: All right, a couple more. 47, these

09:38:11 11  are stock images from the rap to remember, they do not

09:38:11 12  depict the truck as it existed at the time, and the stock

09:38:11 13  image on the right depicts a lock. We know from witness

09:38:11 14  testimony that the lock was broken, so this is not an

09:38:11 15  accurate representation of the truck at the time.

09:38:11 16       THE COURT: I did notice when I saw one of these

09:38:11 17  earlier, this is like Michigan or something.

09:38:11 18       MR. LOWELL: Yeah, it is a stock photo of what

09:38:11 19  the inside of the truck looks like. Judge, they have a

09:38:11 20  witness that says the lock wasn't working, we have many

09:38:11 21  witnesses who will say that it was. Depicting where he put

09:38:11 22  the gun, even if it is the center lock box, if the issue is

09:38:11 23  one of fact as to whether the box existed and was working, I

09:38:11 24  can take the second one out.

09:38:11 25       MR. HINES: We don't know whether that is a

09:38:11  1   depiction of the stock.  It's a stock photo, it will be

09:38:11  2   different if it was a photo taken at the time or around the

09:38:11  3   time.

09:38:11  4            THE COURT:  The juror is here.  She came.  Now

09:38:11  5   she doesn't have a car, her father has to bring her, and

09:38:11  6   takeoff from work to come here.  So if she asks to be

09:38:11  7   excused, I will consider that and get back to you.  But she

09:38:11  8   did come.

09:38:11  9            MR. LOWELL:  Can I just ask now the obvious

09:38:11 10   point, which is should we just take her out of her problem

09:38:11 11   and not have to worry about this every morning.

09:38:11 12            COURT CLERK:  Let me ask her if she wants to

09:38:12 13   stay.

09:38:12 14            THE COURT:  Ask her if she wants to stay in

09:38:12 15   Wilmington.

09:38:12 16            MR. LOWELL:  Judge, I didn't know that you put

09:38:12 17   up jurors.

09:38:12 18            THE COURT:  I said that to one of them yesterday

09:38:12 19   and he didn't want to.

09:38:12 20            MR. LOWELL:  So the one on the left says

09:38:12 21   Michigan.  There is contesting evidence and this is an

09:38:12 22   accurate depiction of the steal lock box and we have

09:38:12 23   evidence, they have a witness, great, we have two.

09:38:12 24            THE COURT:  Here is my question, the problem is

09:38:12 25   you're going to say the lock was broken.

09:38:12  1              MR. HINES:  Right, but we're not displaying a

09:38:12  2  stock photo of the broken lock.

09:38:12  3              THE COURT:  No, you're going to say the lock

09:38:12  4  wasn't broken and what I'm worried about, is this the lock

09:38:12  5  box here.

09:38:12  6              MR. LOWELL:  Yeah, it's underneath that.

09:38:12  7              THE COURT:  In some ways this one is better

09:38:12  8  because you're just -- if you want to say well this is where

09:38:12  9  it was, it was like next to him in the car, that's fine.

09:38:12 10  But this suggests that -- this suggests that the box was in

09:38:12 11  a particular state, that there is no evidence it was or

09:38:12 12  wasn't, that's for the jury to decide.  This is suggesting

09:38:12 13  something that we don't know what the actual one looked

09:38:12 14  like.  In some ways I wouldn't mind you using this one

09:38:12 15  because it just shows, it was next to him.  This is where it

09:38:12 16  was.

09:38:12 17              MR. LOWELL:  But I can say underneath that is a

09:38:12 18  steal lock box, that the government doesn't dispute, and I

09:38:12 19  can say that it has a lock on it, I can say that.

09:38:12 20              MR. HINES:  So then the next point, and again he

09:38:12 21  hasn't given us any evidence or representation as to how

09:38:12 22  he's going to get his facts in, who is the witness who is

09:38:12 23  going to say it was locked?  There is nothing in our

09:38:12 24  discovery that shows it was locked, if you were to say that

09:38:12 25  in opening, I have no basis to believe that that's coming in

09:38:12  1      in this case.

09:38:12  2                 MR. LOWELL:  Okay, I'll make the proffer now but

09:38:12  3      I don't know that I have to, because it's cross-examination,

09:38:12  4      for example of Ms. Biden.  On the witness list is Naomi

09:38:12  5      Biden, she had the car the day before.

09:38:12  6                 THE COURT:  Okay.

09:38:12  7                 MR. LOWELL:  Or two days before, she had it.

09:38:12  8                 THE COURT:  Okay.  So I don't think you should

09:38:12  9      use this given the proffer and given that we don't know,

09:38:12 10      this is not the actual box.  This one, I mean, it's a stock

09:38:12 11      photo and it looks like you're in the middle of the dessert

09:38:12 12      here, you can do that, but if you want to say orient the

09:38:12 13      jury as to where it was, close by, you can do that.

09:38:12 14                 MR. HINES:  The final one, Your Honor, 57 is an

09:38:12 15      image of their proposed jury verdict form in opening.  The

09:38:12 16      Court has not set a jury form and we believe it's

09:38:12 17      inappropriate.

09:38:12 18                 THE COURT:  No.  I'll get back to you on that

09:38:13 19      one.

09:38:13 20                 MR. LOWELL:  Can I say one more thing about

09:38:13 21      that, Judge, just so that we're clear, or I'm clear.  There

09:38:13 22      is no dispute that a form was given to them, no dispute that

09:38:13 23      it has many pages, no dispute that the pages say what they

09:38:13 24      say, no dispute that this form has various purposes and

09:38:13 25      instructions and definitions.  No dispute that it goes from

09:38:13  1    11D to 11F or whatever that is, yes, right.  And so when

09:38:13  2    witnesses of theirs talk about providing him the form, and

09:38:13  3    Mr. Cleveland says he relies on the person to read through

09:38:13  4    the form and that's his practice, and one or more of them

09:38:13  5    will say that's what they believe he did, or they will have

09:38:13  6    a witness who knows what he did, that's why the state of

09:38:13  7    mind case as to whether he saw that box said I'm not and

09:38:13  8    then looks to see when everything else is defined to him,

09:38:13  9    has to be something that we should be able to point out,

09:38:13 10    just has to be.  You're basically putting him in a position

09:38:13 11    to have to take the stand when there is credible and

09:38:13 12    probative and relevant evidence in the form itself as to

09:38:13 13    what a person would see, what a person would see.

09:38:13 14              THE COURT:  What I want to just try and figure

09:38:13 15    out, and I'll get back to you in a minute, is the issue of

09:38:13 16    is there evidence that he did that?  And if there is, okay,

09:38:13 17    maybe, but I don't -- I don't know, if you're going to put

09:38:13 18    something up there and it's based on well, this is what he

09:38:13 19    would testify and he doesn't testify, do I have to do

09:38:13 20    anything about that or could they just get to say he told

09:38:13 21    you this and there is no evidence.

09:38:13 22              MR. LOWELL:  That's what happens, I think the

09:38:13 23    latter happens occasionally unfortunately, I don't have that

09:38:13 24    happen to me, I think if you're measuring by saying if he

09:38:13 25    takes the stand and says he did, they can tell you all they

09:38:13 1   would about what Mr. Cleveland or Mr. Turner or Mr. Palimere

09:38:13 2   will say until they say it, I don't think they know that

09:38:13 3   until they're on the stand and they have me asking questions

09:38:13 4   as opposed to the government and that's what I'll proffer

09:38:13 5   and I'll take the risk, it's my risk.

09:38:13 6           MR. HINES:  Again, you have not admitted to the

09:38:13 7   fact that Mr. Biden is going to take the stand and say that

09:38:13 8   he actually went through each of those pieces in the back,

09:38:13 9   you said that's a possibility, one of two options, that's

09:38:14 10  not evidence that we can rely on here and believe that this

09:38:14 11  is evidence that is coming in in this case.

09:38:14 12          MR. LOWELL:  We have two witnesses who will make

09:38:14 13  that very point, they will say what they say, that's why I'm

09:38:14 14  taking the risk.

09:38:14 15          MR. HINES:  That's why in an opening if you

09:38:14 16  don't know what the evidence is going to be as Mr. Lowell

09:38:14 17  says, you have to know what the evidence is and then wrap it

09:38:14 18  up in closing and highlight it then if it comes in.

09:38:14 19          THE COURT:  All right.

09:38:14 20          MR. LOWELL:  The form is in evidence, there is

09:38:14 21  no reason to redact and sanitize it, I could read every part

09:38:14 22  of it when I get to that part, see there is no definition,

09:38:14 23  and let the jury decide that on their own, they can't take a

09:38:14 24  form and take apart --

09:38:14 25          THE COURT:  I guess my question -- that's true,

09:38:14 1  instead of giving a demonstrative, he could throw the form

09:38:14 2  up and walk through it on the screen, walk through the form

09:38:14 3  and you wouldn't know any of this.  My question is are you

09:38:14 4  going to suggest that in your opening that they are going to

09:38:14 5  hear evidence that he did that or are you just going to say

09:38:14 6  look, this is what the form says, and there is nothing

09:38:14 7  there?

09:38:14 8          MR. LOWELL:  I am going to say this is what the

09:38:14 9  form says to a person who has been asked to read it and sign

09:38:14 10  it.

09:38:14 11          THE COURT:  That's it?

09:38:14 12          MR. LOWELL:  Uh-huh.  That should be the least.

09:38:14 13  I won't say more than that at this point, but I should be

09:38:14 14  able to say that.

09:38:14 15          MR. HINES:  It's a roundabout way for him to try

09:38:14 16  to argue ignorance of the law.

09:38:14 17          THE COURT:  I understand, but that's an

09:38:14 18  argument, he just made a representation of what he is going

09:38:14 19  to say, he can either back it up or not back it up, if he

09:38:14 20  backs it up, he can make the argument later, as long as it's

09:38:14 21  not ignorance of the law, if there is evidence, let's say he

09:38:14 22  testified, and he says I read every single one of those

09:38:14 23  words and he said gosh, this is present tense, if he

09:38:14 24  testifies that, he has an argument.

09:38:14 25          MR. HINES:  Just because of a couple of

09:38:14  1    questions that he asked in voir dire yesterday that we

09:38:14  2    didn't argue this, to the extent he argues that we will be

09:38:14  3    objecting to the extent the gun seller has an obligation to

09:38:14  4    explain things on the form, that's not what the law

09:38:14  5    requires, this is a form in evidence, and that's all he is

09:38:14  6    saying about it, that is what it is, but if he's going to go

09:38:14  7    one step further and insinuate or argue from that that

09:38:14  8    Mr. Biden wouldn't have known --

09:38:14  9          THE COURT:  Or somebody didn't give him what he

09:38:14 10    was supposed to do, it sounds like you're not going to do

09:38:14 11    that in opening.

09:38:14 12          MR. LOWELL:  Not today, but I don't want to get

09:38:15 13    ahead of him on the issue, I can certainly ask

09:38:15 14    Mr. Cleveland, whether Mr. Cleveland went through any

09:38:15 15    questions with him, I can certainly ask him that because

09:38:15 16    he's testified -- well, he's interviewed to the government

09:38:15 17    about that.  I mean, I can't imagine you're cutting off

09:38:15 18    cross-examination questions of him when you handed him the

09:38:15 19    form, what did you say to him, what did you explain to him.

09:38:15 20          THE COURT:  I would assume that would come in on

09:38:15 21    direct, too.

09:38:15 22          MR. LOWELL:  All right.  So we're ahead of that

09:38:15 23    one.

09:38:15 24          THE COURT:  Don't put words in my mouth about

09:38:15 25    what I'm cutting off because I haven't even been asked.  And

09:38:15 1    I know you're just trying to zealously represent your

09:38:15 2    client, but don't assume my ruling before you give me a

09:38:15 3    chance to make it.

09:38:15 4              MR. LOWELL:  I won't, I was basically assuming

09:38:15 5    his argument, what he jumped to before we need to do it

09:38:15 6    today.

09:38:15 7              THE COURT:  Okay.

09:38:15 8              MR. LOWELL:  I need to make some changes.

09:38:15 9              THE COURT:  Okay.  That's fine.  And so I will

09:38:15 10   let you based on the representation that all you're going to

09:38:15 11   do with that slide is say this is what -- these are some of

09:38:15 12   the provisions of the form that are defined as to what a

09:38:15 13   person would look at, but you cannot -- for now you're not

09:38:15 14   going to say and in fact, he read all these and he was

09:38:15 15   mistaken and he didn't know what he was signing.

09:38:15 16             MR. LOWELL:  I will not argue that.

09:38:15 17             COURTROOM DEPUTY:  Juror 3, she does not feel

09:38:15 18   comfortable staying up here.  She -- her dad is a truck

09:38:15 19   driver and he might not be available tomorrow.  She doesn't

09:38:15 20   think she'll have reliable transportation.  She's very shy

09:38:15 21   and nervous, timid.

09:38:15 22             THE COURT:  Let me go talk to her and then we'll

09:38:15 23   let her go.

09:38:15 24             (A brief recess was taken.)

09:54:05 25             COURTROOM DEPUTY:  All rise.

09:54:15  1              THE COURT:  All right.  Let's bring in the jury.

09:56:32  2              (Jury entering the courtroom at 9:54 a.m.)

09:56:57  3              THE COURT:  All right.  Members of the jury,

09:57:05  4   welcome back.  You may be seated.  Everyone is standing for

09:57:09  5   you in honor of your service, so that's why they're

09:57:12  6   standing, but you all can sit down as soon as you come in.

09:57:18  7              All right.  Everyone else may be seated.

09:57:23  8   Members of the jury, welcome back.  And as I promised, I

09:57:27  9   would ask you in the morning, have any of you read or

09:57:33 10   listened to or participated in any discussions about

09:57:36 11   anything about this case outside of the courtroom?

09:57:43 12              THE JURY:  No.

09:57:43 13              THE COURT:  All right.  Thank you.  All right.

09:57:44 14   With that, let's begin, Mr. Hines.

09:57:47 15              MR. HINES:  Thank you, Your Honor.  May I

09:57:53 16   proceed?

09:57:53 17              THE COURT:  You may.

09:57:55 18              MR. HINES:  No one is above the law.  It doesn't

09:58:00 19   matter who you are or what your name is.  Because in this

09:58:03 20   country, the law applies equally to all people.

09:58:08 21              Each day in court rooms just like this one,

09:58:11 22   defendants who are from all walks of life are tried because

09:58:15 23   of the choices they made, not the people that they are.

09:58:19 24   Choices they made to break the law.  This case is no

09:58:23 25   different.

09:58:23  1    We're here today because the defendant, Robert

09:58:28  2    Hunter Biden, chose to illegally own a firearm.  His

09:58:33  3    ownership of that firearm was illegal because he was a user

09:58:37  4    of crack, and a drug addict.  The law prohibits users and

09:58:42  5    drug addicts from owning a gun.  That law makes no

09:58:47  6    distinction between Hunter Biden and anybody else.

09:58:50  7        But in addition to his choices in this case,

09:58:55  8    we're also here because he chose to lie.  He lied on a

09:58:59  9    federal form that is used in a federal background check.

09:59:04 10    That form in a background check is the only safeguard that

09:59:10 11    exists to screen whether someone can lawfully own a firearm.

09:59:15 12    The defendant lied when he claimed on that form that he was

09:59:17 13    not a drug user or a drug addict, when in fact, he knew he

09:59:21 14    was.

09:59:21 15        No one is allowed to lie on a federal form like

09:59:24 16    that, not even Hunter Biden.

09:59:25 17        So much like any other trial, we're here because

09:59:29 18    of a defendant's lies and his choices.  As Her Honor has

09:59:34 19    instructed you yesterday, the evidence you will hear in this

09:59:36 20    case and consider is the evidence in this courtroom and in

09:59:39 21    this courtroom alone, not anything outside of it.  This is

09:59:42 22    what you will see from that witness stand, the exhibits you

09:59:45 23    will see in evidence, shown on that screen.  And over the

09:59:49 24    course of the next several days, we will show that that

09:59:52 25    evidence supports the charges in this case, and that the

only verdict that is supported by the evidence in this case
is a verdict of guilty.

Now, I would like to take a moment and describe
for you what I expect the evidence will show.  It's my
expectation, because what I say is not evidence, it's
argument, just like as Her Honor has instructed, if
Mr. Lowell chooses to make a statement, what he says is just
argument, it's not evidence.

So what I expect the evidence will show, is that
the defendant walked into a gun store on October 12th, 2018.
That gun store was called StarQuest Shooters and Survival
Supply, located right here in Wilmington, Delaware.
StarQuest has a federal firearms license, they're authorized
by law to sell firearms.  When the defendant walked into the
gun store, he surveyed its large inventory of firearms and
ultimately chose to purchase a Colt Cobra .38 Special
revolver.  A revolver, sometimes called a wheel gun, is a
gun that has a rotating cylinder, in this case you could
load five cartridges of ammunition in the wheel gun.
Revolvers are one of the more dependable guns on the market,
but the only downside is when you load it, you have to load
each cartridge individually, one by one by one, that takes
time when the gun is empty, time can be of the essence.  So
the defendant bought a speed loader.  A speed loader is a
device that allows the gun holder to load the gun quickly,

| | |
|---|---|
| 10:01:26 1 | loading all five cartridges of ammunition at once, instead |
| 10:01:30 2 | of one by one by one.  The defendant also bought a box of |
| 10:01:33 3 | ammunition consisting of 25 cartridges.  The lethal |
| 10:01:33 4 | ammunition he bought was called hollow point ammunition, |
| 10:01:33 5 | also known as full metal jacket.  It's a more expensive |
| 10:01:44 6 | kind, that expands upon impact with its target, creating a |
| 10:01:47 7 | wider diameter channel, and ripping to shreds more of what |
| 10:01:49 8 | it comes into contact with.  After he selected the gun he |
| 10:01:51 9 | wanted to purchase, the defendant had to answer a series of |
| 10:01:54 10 | questions in writing on an official government form to |
| 10:01:59 11 | determine whether he could lawfully purchase the gun.  The |
| 10:02:02 12 | gun salesman, Gordon Cleveland, who you will get to hear |
| 10:02:06 13 | from in this case, provided the defendant with a blank |
| 10:02:09 14 | Form 4473.  Form 4473, you'll hear that number thrown out |
| 10:02:15 15 | throughout this trial, is the official government form that |
| 10:02:17 16 | is used in a gun purchase and a background check.  The |
| 10:02:20 17 | information that the purchaser puts on that form is used to |
| 10:02:23 18 | determine whether or not they can get the gun. |
| 10:02:25 19 | Mr. Cleveland will testify that the defendant |
| 10:02:29 20 | filled out this form right in front of him.  The form states |
| 10:02:33 21 | Section A, you can see that at the top of the screen, about |
| 10:02:36 22 | a third of the way down, Section A must be completed |
| 10:02:40 23 | personally by transferee/buyer, in this case Mr. Biden was |
| 10:02:44 24 | the buyer.  Mr. Cleveland will testify that he watched |
| 10:02:48 25 | Mr. Biden, the defendant, fill out this form, the defendant |

wrote his last name, his first name, and his middle name.
He watched the defendant write his address, number, and
street address, which is under the redaction box.  He
watched the defendant write the city, county, state, and zip
code.  The defendant wrote his place of birth, his height,
weight, sex, birth date, year, and Social Security number.
The defendant checked his ethnicity and race.

Mr. Cleveland will testify that he watched the
defendant proceed through this form getting to the next
section, which is question 11.  Question 11 is an important
question on this form because it can prevent a gun from
being sold to people who are prohibited by law from having
it.  But the question relies on the honesty of the person
filling out the form.  A gun salesman does not have a magic
crystal ball to know whether a buyer's answers are true or
false.  Gordon Cleveland will testify that he watched the
defendant fill out this section of the form, checking the
boxes one by one by one, until he got to question 11E.  That
question asked, are you an unlawful user of, or addicted to
marijuana or any depressant, stimulant, narcotic drug, or
any other controlled substance?

Mr. Cleveland will testify that Mr. Biden filled
out this form, this section, striking the box no on the
left.  On that same form, the defendant certified that his
answers were correct, he certified that he understood the

10:04:26  1    questions, and that if he had answered yes he could not have

10:04:29  2    purchased the firearm.  He certified that his answers were

10:04:32  3    accurate.  He signed the form with his signature.  He dated

10:04:36  4    the form, October 12, 2018, all of this was done in front of

10:04:41  5    Gordon Cleveland, who you'll hear from.  What Mr. Cleveland

10:04:45  6    didn't know was in fact Mr. Biden was an unlawful user and

10:04:48  7    he had lied.  Because he lied, Mr. Biden that day was able

10:04:51  8    to walk out of the gun store with a revolver, speed loader,

10:04:55  9    and ammunition.  The evidence will show that over the course

10:04:58 10    of the next 11 days, the defendant owned that firearm before

10:05:02 11    it was taken from him.  Taken from him by someone he knew

10:05:05 12    who was concerned he had a gun.  That person is Hallie

10:05:09 13    Biden.  His brother's widow, someone with whom he was in a

10:05:13 14    romantic relationship at that time.  The evidence will show

10:05:15 15    that during those 11 days, the defendant continued to use

10:05:19 16    drugs and to talk about his drug use with Hallie.  For

10:05:23 17    example, the day after he bought the gun, he sent a message

10:05:26 18    to Hallie, the message stated, "I'm off Maryland Avenue,

10:05:33 19    behind Blue Rock Stadium, waiting for a dealer named

10:05:38 20    Mookie."  After waiting for the drug dealer, the following

10:05:41 21    day he sent Hallie another message stating, "I was sleeping

10:05:45 22    on a car, smoking crack on 4th Street and Rodney."

10:05:48 23            Hallie will testify about these messages and the

10:05:52 24    other drug messages sent by the defendant during the 11 days

10:05:55 25    he had the gun, before she took it from his truck.  The

10:05:58 1  defendant previously introduced crack to Hallie, and she

10:06:02 2  became a drug user, too, but by October 2018, she had been

10:06:07 3  clean for two months and she remains clean today.  She will

10:06:10 4  testify that she became concerned that the defendant had a

10:06:13 5  gun.  The defendant eventually put his gun in the console of

10:06:16 6  his Ford Raptor truck, and left the truck unlocked with the

10:06:20 7  windows down.  Hallie found the gun, as well as his drug

10:06:24 8  paraphernalia, drug remnants scattered in the truck.

10:06:29 9  Concerned about the gun, she decided to get rid of it.  She

10:06:33 10  panicked, she put the gun in the defendants leather pouch,

10:06:35 11  which was also in his truck, a leather pouch which he used

10:06:38 12  to store his crack cocaine, an accessory, she put the gun,

10:06:45 13  pouch, speed loader and ammunition in a gift bag.  She then

10:06:45 14  drove to a grocery store in the suburbs of Wilmington called

10:06:49 15  Janssen's Market, threw all these items in a trash can just

10:06:54 16  outside of Janssen's Market, you will see evidence of that,

10:06:56 17  including video evidence in this case.

10:06:58 18         When the defendant found out his gun was missing

10:07:02 19  he was angry, he told her to go back and get his gun, she

10:07:06 20  went to the market to retrieve his gun, but by a stroke of

10:07:10 21  luck it was gone.  As it turned out, an older man named

10:07:15 22  Edward Thomas Banner, found the defendants gun, ammunition,

10:07:16 23  his speed loader, and his brown leather pouch.  From time to

10:07:20 24  time, Ed went through trash cans to find recyclables, to

10:07:22 25  recycle.  You get to hear from Ed in this case, we'll

10:07:24 1   anticipate he'll testify near the end of the trial.  After

10:07:27 2   Hallie went back to the store but could not find the gun,

10:07:30 3   the police were called for the missing gun.  You will get to

10:07:34 4   hear from Delaware State Police Corporal Marley, and

10:07:36 5   Delaware State Police Lieutenant Greer.

10:07:39 6          Based on their work, a few days later they were

10:07:42 7   able to locate Mr. Banner, who had gone to the trash can,

10:07:46 8   and they retrieve from Mr. Banner the defendant's gun,

10:07:49 9   ammunition, speed loader, and leather pouch, you will see

10:07:52 10  these items in this case as evidence.

10:07:54 11         We will also prove at trial the defendant was a

10:07:57 12  drug user and a drug addict.  That's because the law

10:08:00 13  requires us to prove that as one piece of the gun charges in

10:08:03 14  this case.

10:08:04 15         The defendant in his own words admitted that he

10:08:08 16  was a drug user and an addict.  He wrote a book called

10:08:11 17  Beautiful Things.  He is the narrator for his book in an

10:08:15 18  audio book form, which you will get to hear portions of in

10:08:19 19  this case.  The book is over 250 pages in length, chronicles

10:08:23 20  his life including his abuse of crack, addiction, and other

10:08:26 21  unsuccessful efforts to get clean.  Special Agent Jensen of

10:08:31 22  the FBI, seated over here at the counsel table, she will be

10:08:33 23  the first witness to testify in this case.  Through her

10:08:36 24  testimony over the course of today, we will introduce

10:08:39 25  portions of the defendant's book, she will summarize those

portions for you, and you'll get to hear them.  In his book
he describes a four-year period of active addiction.  Those
are his words.  The evidence will show that was between 2015
and 2019, again, remember the gun incident fell in 2018,
right inside this period.  The evidence from the book will
show that he was addicted to crack, before, during, and
after his possession of the gun.  For example, the defendant
begins Chapter 9, titled California Odyssey, by stating, "I
used my super power of finding crack any time, anywhere,
less than a day after landing at LAX in the spring of 2018."
As he details the events that occurred in the months that
followed, he describes himself as someone who was "up
smoking every 15 minutes, 7 days a week."

Those are his words.  And the evidence will show
that furthermore, the defendant used his electronic devices
including his iPhone, and iPad to send messages about buying
and using drugs.  You'll get to see these messages and
evidence in this case, and you'll learn in the years that
followed this gun episode, law enforcement obtained from
Apple Inc., a company in California, information from
something called an iCloud, which was the defendant's
iCloud.  For those of you not familiar with Apple products,
an iCloud is a storage medium, it's something that exists on
Apple servers, where somebody can back up their phones or
electronic devices.  Law enforcement received the iCloud

10:10:09 1    directly from Apple, and his messages showed the defendant's

10:10:12 2    drug activity, sometimes in coded language, for example, the

10:10:15 3    defendant said things like "Can you get baby powder?  The

10:10:21 4    really soft stuff?"

10:10:22 5         At the end of the case, you'll hear from a drug

10:10:26 6    expert with the DEA, Special Agent Joshua Romig, who will

10:10:30 7    testify about the coded language in this message.  He'll

10:10:32 8    give you his opinion about the coded drug talk, baby powder,

10:10:37 9    the really soft stuff, is a reference to cocaine in that

10:10:40 10   witness's expert opinion.  In his book, the defendant

10:10:42 11   further explained how he would cook cocaine, into crack

10:10:45 12   cocaine.  But while some of the messages may be coded, some

10:10:48 13   of the messages are not.

10:10:50 14        The evidence will show that the defendant

10:10:52 15   exchanged photographs of crack on a scale, with a drug

10:10:57 16   associate.  You'll see images like these, including the

10:11:00 17   defendant himself with crack and drug paraphernalia and

10:11:03 18   other evidence of the drug activity.  In this case, the

10:11:06 19   evidence will also show that on October 12, 2018, when the

10:11:10 20   defendant filled out that form, he knew he was a drug

10:11:13 21   addict.  The law does not require us to prove that he was

10:11:16 22   using drugs on that very day.  Just that he knew he was a

10:11:19 23   drug user or a drug addict.

10:11:21 24        Now, it may seem obvious that a defendant who

10:11:24 25   said in his book he was smoking crack every 15 minutes knew

he was a drug user, but in every criminal case, the United States bears the burden of proving its case beyond a reasonable doubt.  So we will show you overwhelming evidence that he knew he was a drug addict and a drug user. Throughout 2018, the defendant described himself as such, not only in his book, as I mentioned a moment ago, but in his messages.  For example he texted Hallie just a month after his gun purchase and said "I'm a liar and a thief, and a blamer and a user, and I'm delusional and an addict, unlike the beyond and above all addicts that you know, and I've ruined every relationship that I've ever cherished." Near the end of the time in California, where he had been using drugs every day, in August 2018, the defendant paid for 11 days of drug rehab and for someone called a sober companion to live with him or stay with him.  What this evidence will show is the defendant knew he was an addict, he checked himself into rehab, and it wasn't the first time. He tried to get sober, but was unsuccessful, and those attempts reflected he understood and knew he had an addiction.  In his book, the defendant wrote that he was clean for about two weeks, and this is what he said. "It was great, right up until the moment I relapsed, my lesson after a spring and summer of nonstop debauchery, no lesson at all."  Those are his words.  After this August 2018 visit to a rehab facility in Malibu, California, the defendant

10:12:48 1  continued to use drugs while he was still in California,

10:12:50 2  just like on previous occasions.

10:12:52 3          Zoe Kestan will testify in this case, Zoe was in

10:12:57 4  a romantic relationship with the defendant throughout 2018,

10:13:00 5  and she will testify that she observed him smoking crack

10:13:04 6  every 20 minutes except when he slept.  You'll see

10:13:07 7  photographs from her phone of her and the defendant, and the

10:13:09 8  defendant's crack and drug paraphernalia.  She will testify

10:13:13 9  about her stay with the defendant in September 2018 in

10:13:17 10 Malibu, about one month after his unsuccessful 11 day rehab

10:13:21 11 stint.  She will testify that during this stay, she observed

10:13:24 12 the defendant continuing to use drugs heavily, smoking crack

10:13:28 13 cocaine.  You will also see evidence from the defendant's

10:13:31 14 bank statements and cash withdrawals in this case.  Cash

10:13:35 15 withdrawals from ATMs consistent with someone who is using

10:13:39 16 drugs and purchasing drugs.  Those withdrawals were

10:13:42 17 hundreds, and sometimes thousands of dollars in cash a day

10:13:46 18 in August, September, October, 2018.  Before, during, and

10:13:52 19 after when the defendant possessed the firearm.

10:13:55 20         This includes a $5,000 withdraw on the day of

10:13:58 21 the gun purchase.

10:13:59 22         Finally, the defendant admitted in his book that

10:14:04 23 he knew he was an addict, and at this time period, the

10:14:08 24 defendant described as follows:

10:14:13 25         (Government Exhibit 19 played.)

10:15:05 1          MR. HINES:  We will show you that the defendant

10:15:07 2  flew back to Delaware on October 5th, 2018, one week before

10:15:10 3  he purchased the gun.  As he said in his book, he had the

10:15:13 4  hope of getting clean, not staying clean, getting clean.  He

10:15:17 5  had relapsed in California as he said, and as Zoe Kestan

10:15:21 6  will confirm from that witness stand.  And his cash

10:15:24 7  withdrawals and messages will confirm he continued abusing

10:15:28 8  drugs when he was back in Delaware.  Hallie and Zoe will

10:15:32 9  both testify that the defendant repeatedly discussed with

10:15:32 10 them his addiction.  Hallie and Zoe will both testify under

10:15:35 11 what is referred to as the "grant of immunity".  You will

10:15:37 12 hear that a "grant of immunity" requires them to tell the

10:15:40 13 truth, and if not they could be prosecuted.  Hallie, for

10:15:43 14 example, will testify about her own crack use.  Zoe will

10:15:46 15 testify about being present with the defendant's crack on a

10:15:49 16 number of occasions, although she was not a user herself.

10:15:53 17 They both received subpoenas to testify in this case, and

10:15:55 18 the events they will testify to were embarrassing and will

10:15:58 19 reveal Hallie's own drug use.  The agreement they have

10:16:01 20 simply requires them to tell the truth, nothing more,

10:16:04 21 nothing less.

10:16:05 22          You will also hear from the defendant's ex-wife,

10:16:08 23 Kathleen Buhle, she also saw him use drugs as their marriage

10:16:12 24 unraveled and he talked to her about his drug use in the

10:16:16 25 language of addiction.  Kathleen didn't use drugs and she is

10:16:19 1    not testifying here under a grant of immunity.  Kathleen,

10:16:21 2    Zoe, Hallie, they'll give you an inside account of the

10:16:25 3    defendant's addiction and drug use.

10:16:27 4                Turning to the charges you'll be asked to

10:16:29 5    consider in this case, there are three charges.  The first

10:16:31 6    two relate to the defendant's lie when he bought the gun,

10:16:34 7    the third relates to his ownership during the ensuing 11

10:16:38 8    days.  Count One charges the defendant with making a false

10:16:41 9    statement material to a firearm sale in violation of 18,

10:16:44 10   United States Code, Section 922 and 924.

10:16:47 11               The statement the defendant made was material to

10:16:51 12   the sale because if he had told the truth about his

10:16:53 13   addiction, he would not have been sold the gun, that's what

10:16:57 14   Gordon Cleveland will tell you.

10:16:58 15               Count Two charges the defendant with making a

10:17:01 16   false statement in a firearms transaction record in

10:17:04 17   violation of 18, United States Code, Section 924.  This is a

10:17:09 18   record keeping charge.  Background checks are one of the few

10:17:12 19   protections that exist when it comes to having guns.  The

10:17:16 20   defendant lied on the Form 4473, which you will see in this

10:17:19 21   case.

10:17:19 22               Count Three charges the defendant with

10:17:21 23   possession of a firearm by a drug user or drug addict in

10:17:25 24   violation of 18, United States Code, 922(g)(3) and 924.

10:17:30 25               This count unlike the other two counts, covers

10:17:34 1    the entire 11-day period that the defendant had the gun

10:17:37 2    before it was taken from him.  Thus this count does not just

10:17:41 3    involve the events of October 12th, but everything leading

10:17:44 4    through October 23rd, 2018, when the gun was discarded in

10:17:47 5    the trash can and he could no longer possess it.

10:17:51 6         Again the reason he only had the gun for 11 days

10:17:55 7    was because Hallie took it from him, not because he took any

10:17:58 8    other steps to stop owning it.  The evidence shows beyond a

10:18:02 9    reasonable doubt, the defendant is guilty of three offenses.

10:18:05 10   To prove this we will call the following witnesses.  The

10:18:08 11   first witness you will hear from is Agent Jensen, she'll

10:18:12 12   take the stand today.  We will frame out through her

10:18:14 13   testimony a period of years that cover before, during, and

10:18:18 14   after the gun purchase in this case.  She'll talk to you

10:18:22 15   about the audio book, she'll talk to you about his messages.

10:18:26 16   We'll set those up for you so you have an understanding of

10:18:28 17   where those came from and what they relate to.  Then after

10:18:32 18   Agent Jensen testifies, I anticipate she'll be the

10:18:36 19   lengthiest witness, we'll call individual witnesses who will

10:18:40 20   be able to tell you about their specific personal

10:18:41 21   interactions with the defendant through those years.  The

10:18:44 22   first being Kathleen Buhle, his ex-wife.  We'll also call

10:18:49 23   Zoe Kestan and Hallie Biden, and they'll fill in the events

10:18:53 24   for you of what happened in 2018 and how they observed the

10:18:56 25   defendant and what he said about his addiction.

10:18:58  1          We will call Gordon Cleveland, the man who sold

10:19:02  2  Mr. Biden the gun.  And then we will call law enforcement

10:19:06  3  officers, Corporal Joshua Marley, Lieutenant Millard Greer,

10:19:11  4  they'll tell you what they did to find the gun.  Mr. Banner

10:19:15  5  will testify near the end of the case.  He's the elderly

10:19:18  6  gentleman that found the gun in the trash.  And then

10:19:22  7  finally, we will have DEA Special Agent Joshua Romig testify

10:19:25  8  as well, there may be one other witness, including FBI

10:19:29  9  forensic chemist Jason Brewer.  Now, Jason Brewer, the FBI

10:19:34 10  forensic chemist, he'll testify about the defendant's brown

10:19:37 11  leather pouch and the steps that the FBI took after the fact

10:19:40 12  to analyze that pouch and what they found on it.  As you can

10:19:43 13  see on the screen before you, the FBI observed a white

10:19:48 14  powdery substance on that pouch.  Jason Brewer, Dr. Jason

10:19:53 15  Brewer will testify that he analyzed that substance and

10:19:55 16  he'll give his expert opinion and his expert opinion will

10:19:59 17  be, as we anticipate, that the substance was cocaine.

10:20:02 18          Now, I'll describe for you some of the evidence

10:20:08 19  and how that will be presented in this case, as well as how

10:20:11 20  it relates to the charges.  To be clear, Mr. Biden is not

10:20:14 21  charged with a violent offense, the gun was taken from him

10:20:17 22  just after 11 days before anything like that could occur.

10:20:21 23  But it's important to note that whether the defendant is

10:20:23 24  dangerous is not an issue that's relevant for your

10:20:26 25  determinations in this case.  He's just charged with

10:20:29 1    possession of a gun.  Nevertheless, guns are dangerous and

10:20:32 2    in his book you'll hear him describe how guns were put in

10:20:35 3    his face during drug deals and he'll talk about how he

10:20:39 4    learned to protect himself during drug deals.  As I

10:20:39 5    mentioned, during this trial we must establish the

10:20:43 6    defendants addiction, drug use, that's one element of the

10:20:44 7    gun charge, you'll hear witness after witness discuss this

10:20:47 8    topic, addiction can be a depressing topic.  We all know

10:20:51 9    someone who suffers from addiction.  But I want to be clear

10:20:57 10   about something, the defendant is not charged with

10:21:01 11   possessing drugs.  He is charged with owning a gun.  There

10:21:06 12   are only gun charges in this case.

10:21:08 13           We would not be here today if he was just a drug

10:21:11 14   addict.  He crossed the line when he chose to buy a gun and

10:21:15 15   lied during a federal background check.  Addiction may not

10:21:19 16   be a choice, but lying and buying a gun is a choice.  The

10:21:24 17   defendant's choice to buy that gun is why we're here.

10:21:27 18   Before I conclude, ladies and gentlemen, I would like to

10:21:29 19   introduce my colleague, Leo Wise, he's the other prosecutor

10:21:34 20   in this case, Ms. Vo is a paralegal that will be helping me

10:21:39 21   display exhibits, as I introduce Agent Jensen.  I'm Derek

10:21:44 22   Hines, I'm the other prosecutor.  We work for the United

10:21:47 23   States Department of Justice.  We just want to thank you for

10:21:49 24   your jury service in this case, your attentiveness is

10:21:52 25   appreciated.  We'll proceed through the witnesses to get you

10:21:55  1    the information you need to do your job in an expeditious

10:21:58  2    manner.  I think what we'll see in this case, and I hope the

10:22:01  3    evidence will show, this case is just like any other we try

10:22:04  4    in this courthouse and throughout the country.  It's about a

10:22:07  5    defendant's lies and choices, after you consider the

10:22:10  6    evidence in this case, the United States will have a chance

10:22:12  7    to speak with you again in closing, and we're going to ask

10:22:15  8    that you return the only verdict that is supported by the

10:22:18  9    evidence, and that is a verdict of guilty on all three

10:22:21 10    charges.

10:22:22 11            Thank you.

10:22:26 12            THE COURT:  Thank you.  Mr. Lowell.

10:22:28 13            MR. LOWELL:  May it please the Court, ladies and

10:23:00 14    gentlemen of the jury, counsel, members of the family, as

10:23:05 15    you know, a person who recovers from alcohol or drug abuse,

10:23:13 16    always calls themselves an addict.  Hi, in an AA meeting,

10:23:19 17    I'm Abbe Lowell and I'm an addict.  On October 12th, 2018,

10:23:27 18    Hunter bought a small handgun.  It was sold to him in its

10:23:32 19    own lockbox.  It was never loaded.  He never used it.  And

10:23:38 20    then it was thrown out in the trash 11 days later by the

10:23:43 21    person, Hallie Biden, he was dating at the time.  Just

10:23:49 22    11 days later.

10:23:50 23            In fact, from the time he bought the gun to the

10:23:54 24    time it was thrown away, the evidence will show that it came

10:23:59 25    out of its lockbox, in which it was kept, only one day.  For

these events, the prosecutors have filed three felony

charges.  As they said, in seeing you yesterday and just

now, my name is Abbe Lowell, along with David Kolansky,

Bella Oishi and also Dorothy Bowerfind and our helper Rudy

Regan, we are counsel for Mr. Biden.

Yesterday, Judge Noreika asked you about your

views about the Second Amendment, and you know it has the

right to bear arms and that right of course is subject to

restrictions.  Two of those restrictions are what is at

issue in this case.  Mr. Hines showed you a slide of the

charges.  By the way, they wrote the indictment.  But when

he showed you the slide just minutes ago, he left out the

word "knowingly."  The charges that Hunter Biden "knowingly"

made a false statement, that he "knowingly" made that false

statement, and that he "knowingly" was an unlawful user.

The indictment, and you will find in the instructions, we'll

include what that means.  You will hear that the law forbids

somebody who "is a user."  "Is" an addict, from possessing a

gun.  The form we will talk about asks "are you", and I'll

come back to that.

Two of the charges in this case come from what

you already heard, is the requirement that gun sellers and

purchasers have to fill out a government form that seeks

certain information about the buyer.  This form, as you

heard, is called an ATF 4473.  It requires a person to

10:26:04 1    provide the person's name, address, proof of identification,

10:26:07 2    which would include the proof of the person's address and

10:26:10 3    answer a series of questions.  That law and that form states

10:26:15 4    that a seller, in this case the people who you will hear

10:26:19 5    sold Hunter the gun, are required by law to maintain and

10:26:23 6    keep this record, and who buys it for a good reason.  To

10:26:27 7    always know where the person is or was, and where the gun

10:26:31 8    might be.

10:26:31 9            The form has 13 boxes to check.  And these range

10:26:35 10   from whether the buyer is buying for himself or another

10:26:38 11   person.  Whether a person has a criminal record, or whether

10:26:42 12   someone is a U.S. citizen.  One of those questions, which

10:26:49 13   you have already seen on line 11E, asks are you an unlawful

10:26:53 14   user or addicted, and then it says marijuana and specifies

10:26:57 15   other drugs.  It most clearly uses the word, "are".  It does

10:27:05 16   not say have you ever been, it does not say have you ever

10:27:08 17   used.  The only thing that's bolded as you will see, is the

10:27:17 18   issue of marijuana.  But notice on the same page with

10:27:21 19   questions that you see the box was checked, that other

10:27:24 20   questions have the phrase, "have you ever been convicted",

10:27:33 21   "have you ever been adjudicated."  When the form wants to

10:27:37 22   ask somebody buying a gun, have you ever done something, the

10:27:42 23   form knows how to do that.

10:27:44 24            Also, when you hear the evidence about Hunter's

10:27:48 25   use of alcohol, the law in this case does not prevent and

10:27:51  1    the form does not ask if someone is an alcoholic.  Under the

10:27:55  2    law, and the form in this case, a person can even be drunk

10:28:00  3    and still, under this law and this form, be able to walk in

10:28:04  4    a gun store and buy it.

10:28:06  5          What is common to all the three charges is the

10:28:09  6    requirement that the prosecutors left off their slide.  They

10:28:13  7    have to prove beyond a reasonable doubt that Hunter

10:28:17  8    knowingly violated the law.  Proof beyond a reasonable doubt

10:28:22  9    is the highest burden of proof in our legal system, and

10:28:25 10    knowingly, and in one of the charges with an intent to

10:28:31 11    deceive is a very high state of mind.  The law and these

10:28:35 12    high standards which Judge Noreika explained a little

10:28:38 13    yesterday and will at the end of the case, are to make sure

10:28:41 14    people in the country are not charged, or especially for

10:28:45 15    your purposes, convicted of crimes for mistakes, confusion,

10:28:50 16    or for the lack of the required knowledge.  And another

10:28:56 17    thing to start with this state of mind requirement is about

10:29:00 18    what Hunter thought at the time in 2018, not what somebody

10:29:07 19    else thought of him then, not what the government witnesses

10:29:10 20    might think hearing the evidence today, not what he wrote in

10:29:13 21    a book in 2021 looking back at his years, but what was his

10:29:20 22    state of mind when he walked into the gun store and did what

10:29:23 23    you heard happened.

10:29:25 24          There are two parts to this case that we would

10:29:29 25    like you to focus on.  The first is what Hunter did and did

10:29:32  1    not do in 2018, around the time of the gun purchase.  And

10:29:37  2    the second is whether the evidence that you heard the

10:29:42  3    government will present and Mr. Hines spelled out for you is

10:29:46  4    reliable and actually supports the charges.  As to the first

10:29:49  5    topic, you already heard Mr. Hines tell you about the proof

10:29:53  6    they have, that Hunter has been a user, in this case of

10:29:56  7    alcohol and drugs, at many times in his life.

10:29:59  8            I want to stop right here and right now.  And

10:30:02  9    tell you something to save time.  There is no disagreement

10:30:06 10    about that.  None.  Like literally millions of people in our

10:30:12 11    country, Hunter dealt with the traumas of his life, in his

10:30:16 12    case from the death of his mother and sister and the serious

10:30:19 13    injury to himself and his brother when he was three years

10:30:23 14    old in a terrible tragic car crash.  And then the death of

10:30:27 15    his brother in 2015, who died of cancer.  And Hunter

10:30:32 16    succumbed to those traumas and grief in an escape to alcohol

10:30:37 17    and drugs.

10:30:38 18            The prosecutors plan to call witness after

10:30:41 19    witness who will tell you, and they plan to show you dozens

10:30:45 20    of e-mails or texts which reference what Hunter does not

10:30:50 21    dispute, he had abused alcohol since he was a teenager and

10:30:56 22    drugs as an adult.  As Mr. Hines said, not the charges in

10:31:01 23    the case.  But pay attention to the dates and the pictures

10:31:05 24    of what you will see, and for example, the picture of the

10:31:10 25    text that you just saw Mr. Hines show you, and have that be

10:31:15  1    accordioned down as if all that happened in the day, the

10:31:20  2    week, or the month Hunter went into the gun store.

10:31:24  3            When Mr. Hines tells you he'll show you a text

10:31:28  4    referring to "baby powder" or "the soft stuff", you will

10:31:32  5    look to see that was months before October of 2018.

10:31:37  6            They can show that use before, they will

10:31:42  7    certainly show after the incidents in October Hunter

10:31:45  8    relapsing, but the question is when he walked in the store,

10:31:50  9    after you will hear what had just happened with him and what

10:31:53  10   he had just done for the previous weeks, did he knowingly

10:31:57  11   think of himself as that person who should not buy a gun or

10:32:02  12   check the box?  Because what the prosecutors cannot show

10:32:06  13   close to beyond a reasonable doubt is when on October 12th,

10:32:11  14   Hunter went into the StarQuest Shooters and Survival store,

10:32:15  15   where the evidence will be that he was already waiting to

10:32:18  16   get a new cell phone in a store across the parking lot.

10:32:22  17   That he went there with the intention to buy a gun.  But

10:32:26  18   most importantly, that when he and salesperson Gordon

10:32:30  19   Cleveland spoke, Hunter knowingly and with an intention to

10:32:34  20   deceive violated any law because at that time he himself

10:32:40  21   believed as the law pervade, that he "is a user or an

10:32:46  22   addict," or when the form says "are you".  Remember the

10:32:50  23   form, when it asks, "have you ever been", it's there.

10:32:54  24            In jury selection, you were asked about whether

10:32:57  25   you or members of your family may have had any issues with

10:33:01 1    drug abuse.  If you have or even if not, the evidence will

10:33:05 2    show you that like so many people, including Hunter, until

10:33:10 3    they finally come to terms with their problems, are in a

10:33:13 4    deep state of denial about their use.  Over the years in

10:33:16 5    which Hunter used alcohol and then in his later years when

10:33:20 6    he used drugs, he also lived many long periods without doing

10:33:24 7    so.  So he had various times of what we call sobriety.  And

10:33:29 8    in all of these periods, using or not, Hunter lived a very

10:33:34 9    successful life.  He went to and did well at schools.  At

10:33:41 10   Archmere Catholic Academy here in Delaware, Georgetown

10:33:43 11   University in Washington, went to Yale Law School, was on

10:33:47 12   the board of a large bank you know, MBNA, he was on his own

10:33:53 13   law firm that he started in Washington, called Oldaker,

10:33:59 14   Biden & Belair, he became a member of Amtrak's Board of

10:34:02 15   Directors, he then joined an international law firm called

10:34:06 16   Boies Schiller, he taught at Georgetown's School of Foreign

10:34:10 17   Service, and he became the chair of the USUN World Food

10:34:13 18   Program.  And you see all that in the periods of time that

10:34:17 19   the evidence will show that he could and did abuse alcohol,

10:34:22 20   and in some occasions drugs.

10:34:25 21          Over the years, you will see the evidence that

10:34:28 22   Hunter sought treatment for the cause of his grief and

10:34:32 23   trauma that had led him to his abuse of alcohol and drugs.

10:34:37 24   In fact, you will see in the evidence the various times that

10:34:40 25   he himself recognized his issues and sought to become a

10:34:45  1    recovered addict.  But always calling himself an addict.

10:34:50  2    And especially will be important in the periods of time

10:34:53  3    before the gun sale where you have already heard Mr. Hines

10:34:58  4    tell you about his rehab in California, in August and

10:35:02  5    September of 2018.

10:35:06  6                So why is this evidence that I just showed you

10:35:09  7    important?  Evidence of his accomplishments, evidence of his

10:35:13  8    seeking treatment.  It is because of that requirement that

10:35:20  9    Hunter knowingly and with an intention to deceive violated

10:35:24 10    the laws about which he is charged.  Remember, the one that

10:35:28 11    says you shouldn't have a gun if, and "if" is the word, if

10:35:33 12    you are a user, and if you are checking the box.  The way

10:35:37 13    Hunter lived in the years of his alcohol and his drug abuse

10:35:41 14    will inform you about how he viewed himself and that will

10:35:45 15    inform you that he did not knowingly violate those laws.

10:35:49 16    Especially important will be the weeks before October 18th

10:35:54 17    of 2018.  Hunter's substance abuse was always alcohol.

10:36:03 18    People like his ex-wife, Kathleen, his brother's widow,

10:36:08 19    Hallie, his uncle Jimmy Biden, and his own daughter can tell

10:36:13 20    you that.  And you will see actual documents that that's

10:36:17 21    what was happening, including during the period of time of

10:36:19 22    the handgun.  Hunter's use of drugs did not start until

10:36:23 23    later when he was an adult.

10:36:25 24                All the texts and evidence the prosecutors will

10:36:28 25    take, I don't know how many hours to show you, including

10:36:31 1  their agent who will explain how cocaine is made, what drug

10:36:35 2  terms and texts mean, were written in years or months

10:36:40 3  outside the period of when he left California and came back

10:36:44 4  to Delaware.  And all of those texts from 2015, '16, '17,

10:36:50 5  the early part of '18, into '19 when this episode was done,

10:36:55 6  will not tell you anything other than what he admits, that

10:37:00 7  at various times, he did abuse.

10:37:08 8       Hunter has never asked anyone to excuse or

10:37:12 9  forgive him for his mistakes using alcohol or drugs to dull

10:37:17 10  his pain or his trauma.  In fact, the prosecutors told you

10:37:20 11  and you will see that he wrote about this in his book, after

10:37:24 12  he finally came to terms with it so that others could be

10:37:28 13  inspired.  But as you will hear, Hunter never came to those

10:37:32 14  terms with the true depth of his trauma and his abuse of

10:37:36 15  alcohol and drugs until he met his wife, Melissa, in 2019.

10:37:43 16  Before that, you will hear from many people who knew him

10:37:46 17  best that Hunter followed a pattern you may know and the

10:37:50 18  evidence will show that was part of a person's common denial

10:37:55 19  about what they're doing.

10:37:58 20       In the summer of 2018, after his divorce from

10:38:02 21  Kathleen was finalized, and he was in an intense

10:38:06 22  relationship with Hallie Biden, who had been married to his

10:38:09 23  deceased brother, Hunter's uncle, Jimmy Biden, got him to go

10:38:14 24  to a rehab facility in California, it was called The View.

10:38:19 25       In fact, uncle Jimmy paid for some of that

10:38:23  1    treatment and Hunter paid for all the rest.  Jimmy Biden
10:38:28  2    will explain why he is so close to Hunter.  He was the
10:38:32  3    person on the scene literally hours after that fatal car
10:38:36  4    crash.  Jimmy took care of Hunter and Beau after that, and
10:38:40  5    became more than an uncle, he was a friend, and he became a
10:38:44  6    business partner.

10:38:45  7         Hunter spent twelve days in August into
10:38:50  8    September at The View, detoxing and in recovery.  After
10:38:55  9    that, he was assigned something called a "sober coach", who
10:39:00 10    literally then lived with him in California for another
10:39:04 11    three to four days to make sure he kept it up.  Then other
10:39:10 12    counselors came while he was living there doing the exact
10:39:14 13    same thing in the period of time that Hunter, while in
10:39:17 14    California, was visited both by his daughter, Naomi, and by
10:39:23 15    the witness Mr. Hines told you about, Zoe Kestan.  And it
10:39:29 16    was after that that Hunter moved back to Delaware, where he
10:39:32 17    sometimes lived with his parents, sometimes with Hallie,
10:39:34 18    sometimes in nearby hotels, he did not have a permanent
10:39:38 19    residence in Delaware at the time.  Giving up drugs was not
10:39:42 20    easy.  Giving up alcohol, much harder.

10:39:47 21         On October 12th, as they did in showing you
10:39:52 22    texts from earlier in 2018, the prosecutors will show you
10:39:56 23    lots of evidence from various years where Hunter is talking
10:39:59 24    to his brother's widow Hallie or others about drug use.
10:40:04 25    They will show you how after what happened at the end of

10:40:07 1   October, when Hallie threw out the gun she found, and his

10:40:12 2   interaction with Delaware State Police in late October, and

10:40:15 3   then after he relapsed.

10:40:18 4        Also people around Hunter, including those who

10:40:21 5   the prosecutors will ask to be their witnesses, were so used

10:40:25 6   to seeing him and the patterns of his prior years that they

10:40:31 7   might believe that when Hunter was tired or angry or even

10:40:35 8   hung over, that meant he was using drugs when he was not.

10:40:40 9   But the evidence will show you that in the period after he

10:40:43 10  left California and before Hallie created a firestorm by

10:40:47 11  throwing out the handgun, Hunter was doing things totally

10:40:51 12  inconsistent with his previous habit of using crack cocaine.

10:40:55 13  He returned to Delaware and as Mr. Hines has already told

10:41:00 14  you in his own words when he was using crack cocaine, he was

10:41:04 15  using it so frequently, every fifteen, every twenty minutes.

10:41:09 16  You will hear what happens when he leaves California, how he

10:41:12 17  lives, who he interacts with, and whether that's consistent

10:41:17 18  with the way Mr. Hines described his use.

10:41:20 19       When he came back, he came back early so that he

10:41:27 20  could actually help Hallie with her recovery at a visit that

10:41:31 21  she had asked that he attend.  During this period of time,

10:41:34 22  he spoke with his father, his uncle, and his daughters, and

10:41:37 23  you will see not the actions of the person who believes what

10:41:45 24  the form asked him of himself.  There may be high

10:41:49 25  functioning alcoholics, but there is no such thing as a high

functioning crack addict, and to hear what the witnesses have to say about what Hunter was like and what he was doing when he came back.  In this difficult relationship with Hallie, filled with hurt and rage and angst about their shared love for Hunter's brother and her husband, they did talk meanly to each other.  Hunter will surely seek to hide where from time to time he was and what he was doing by claiming, for example, that on one occasion, he says he was "on a car smoking crack at 1:00 in the afternoon", when in reality he did not want to see Hallie, or when he was with someone else, or after the blow up after she threw the gun, after he and she had to deal with the police, when he chastises himself putting himself back in a different rehab later, is when he called himself and basically says he has ruined every relationship he ever treasured, berating himself as a liar, thief, blamer, user and addict.  Once a person comes to terms with themselves, they always call themselves an addict.

In addition, because of Hunter's decades long battle with alcohol, when he or Hallie or someone else refers to him as being sober or in recovery or detoxing in this period of getting off crack, he did continue to use alcohol until he finally stopped in 2019.  But alcohol abuse is not something the law here forbids nor the form even asks about.  As examples, let me show you what happened before

10:43:48  1  and after the time he walked into StarQuest Shooters on

10:43:53  2  October of 2018.  October 1st, purchase of alcohol.

10:43:59  3  October 6th, October 17th, October 18th, October 19th,

10:44:05  4  October 21st, October 24th, October 30th.  On October 12th,

10:44:18  5  you will see documents that Hunter was getting a new cell

10:44:21  6  phone at an AT&T store located on Route 202 in Wilmington

10:44:25  7  around 3:30 in the afternoon.  He drove in his father's

10:44:28  8  black Cadillac to that store.  If you knew what getting a

10:44:31  9  new cell phone is like on a replacement plan, it requires a

10:44:36  10  person to fill out forms for the person to find a phone and

10:44:39  11  the ability to get your data downloaded to the new phone, it

10:44:43  12  can take time.

10:44:43  13          Across the parking lot from the AT&T store was

10:44:48  14  another business.  StarQuest Shooters and Survival.  An

10:44:56  15  interesting name.  Later, from the AT&T store, as you'll see

10:45:01  16  in documents with time stamp, he went in, and you will see

10:45:05  17  when he went into StarQuest, this is what he saw.  You will

10:45:11  18  see the evidence of what happened next.  On the display you

10:45:16  19  will see in the front are a number of utility tools and

10:45:20  20  knives, there were flash lights, and there were BB type

10:45:24  21  guns.  You will see that on that day, he bought one of each.

10:45:30  22  So how did the purchase of the handgun come about?

10:45:34  23          As he walked around, a salesperson named Gordon

10:45:38  24  Cleveland approached him.  Mr. Cleveland will be a witness

10:45:41  25  that Mr. Hines said will be theirs.  Mr. Cleveland asked

10:45:45 1  Hunter if he was looking for anything in particular.  Hunter

10:45:48 2  said he was browsing.  Mr. Cleveland led Hunter to a display

10:45:52 3  on the wall where the handguns were.  Mr. Cleveland showed

10:45:57 4  him the wall and asked if he was interested in buying a gun.

10:46:00 5  The only time Hunter had any guns before was when he and his

10:46:05 6  brother Beau went skeet shooting with shot guns.

10:46:09 7  Mr. Cleveland explained what could be used at a range and

10:46:12 8  selected a handgun for Hunter to see.  Later, Mr. Cleveland

10:46:18 9  also explained to Hunter the need for bullets and a speed

10:46:21 10  loader.  Hunter wouldn't have known what a speed loader was

10:46:26 11  until Mr. Cleveland told him.

10:46:28 12        But Hunter also confirmed that the gun came with

10:46:32 13  a lockbox to carry it in.  Mr. Cleveland then handed Hunter

10:46:39 14  a blank form to fill out, that is the 4473 form.  That form

10:46:45 15  as you will hear is required by the government for gun

10:46:48 16  sales.  It also provides if needed the government with a

10:46:51 17  record of who was buying guns, at least in this proper

10:46:55 18  manner.

10:46:55 19        It also requires the seller to get a person's

10:46:58 20  address, and ID, confirming the address, and that would make

10:47:02 21  sense because you need to know where the person lives.

10:47:04 22        Here is what you need to focus on.  Hunter

10:47:07 23  filled out the top part of the form and put his parent's

10:47:11 24  address, he did not have that permanent address at the time.

10:47:14 25  When he came to confirming what the I.D. he had was, he did

10:47:18 1    not have a driver's license.  He did have a passport because

10:47:21 2    of that, and as you know, the one thing a passport doesn't

10:47:25 3    have is a person's address, so what to do.  Mr. Cleveland

10:47:28 4    went to speak to the gun shop owner Ron Palimere, and a

10:47:33 5    coworker Jason Turner in the office of the store.  He

10:47:37 6    explained who was out front and that Hunter had only a

10:47:40 7    passport in his possession.  Listen carefully to what

10:47:44 8    Mr. Cleveland says he did with that passport or whether he,

10:47:47 9    Mr. Palimere, or Mr. Turner told Hunter what he needed to do

10:47:51 10   next in order to complete the sale.  Both Mr. Cleveland and

10:47:55 11   Mr. Palimere of course wanted to make a sale.  In fact,

10:48:00 12   Mr. Cleveland refers to himself as "a whale hunter."

10:48:06 13   Someone who can bring in the big one.  Mr. Palimere also

10:48:10 14   wanted to get this sale done as quickly as he could.

10:48:13 15           So on the form on the 4473 on page 2, it reads,

10:48:19 16   "before a licensee may sell or transfer a firearm to a

10:48:23 17   non-licensee, meaning seller and buyer, the transferor, the

10:48:26 18   buyer, that's Mr. Biden, must provide a valid

10:48:30 19   government-issued photo ID to the transferor, a valid driver

10:48:35 20   license or identification card issued by the state in the

10:48:38 21   place of license is acceptable, social security cards are

10:48:41 22   not acceptable because no address, date of birth, or

10:48:44 23   photographs.

10:48:44 24           Then the boxes are a list of questions -- sorry,

10:48:55 25   then the box -- sorry, sorry.  Both Mr. Cleveland and

10:49:01  1    Mr. Palimere will testify as to what and who gave Mr. Biden
10:49:05  2    the form to fill out.  And you will see on this page 18(a),
10:49:11  3    that was not filled out by Hunter.  It was filled out by the
10:49:15  4    gun seller, indicating what he presented to identify
10:49:19  5    himself.  Then the boxes are a list of questions and he
10:49:23  6    checked -- sorry, the boxes are all there, you saw that
10:49:25  7    already and all of them were checked and they were all
10:49:28  8    checked no.  The boxes that ask if a person was an actual
10:49:33  9    buyer, those that ask if a person had ever done something,
10:49:37 10    and 11E, which asks the person whether that person is, or in
10:49:41 11    this case, are a user.

10:49:43 12              How quickly does a person check through those
10:49:47 13    boxes when the sale is being heard?  But here is also a key
10:49:51 14    piece of evidence.  Back to the directions and definitions
10:49:54 15    on the form.  You might think the form has instructions and
10:49:58 16    directions and they do.  While it tells a possible buyer a
10:50:02 17    number of things, like the purpose of the form, the type of
10:50:04 18    I.D., to what it means to be a fugitive, look at the page of
10:50:08 19    the instructions that are in the form itself as to the
10:50:12 20    boxes.  You knew that 11E highlights, bolds the words "are
10:50:18 21    you using marijuana", and then in the rest of the form, it
10:50:22 22    has definitions, 11D talks about what it means to be a
10:50:25 23    fugitive from justice, 11F spells out what it means to be
10:50:29 24    adjudicated as a mental defective or committed.  And you'll
10:50:34 25    see in this form, it goes from 11D to 11F, and you know the

10:50:40 1   box in question is 11E.  And there is nothing on the form

10:50:44 2   about that.

10:50:44 3         Listen to whether Mr. Cleveland took Hunter

10:50:50 4   through each part of the questions to explain or to ask any

10:50:54 5   questions to see whether or not he or anyone understands the

10:51:00 6   terms.  You might think that others who took the form that

10:51:05 7   Mr. Cleveland gave like Mr. Palimere or the other employee

10:51:10 8   you will hear about Mr. Turner must have done hundreds of

10:51:13 9   sales in their lives, and see whether they ask Hunter

10:51:17 10  anything about anything that happened that day, about his

10:51:22 11  passport use, about what he put on the form, or about even

10:51:27 12  as to when it was signed.

10:51:29 13        A sale is a sale, and that was their goal that

10:51:36 14  day.  And you will hear that they wanted it done quickly.

10:51:41 15  As Hunter did not have a credit card, he paid in cash.  And

10:51:44 16  by the way, Mr. Hines already told you that Hunter had

10:51:48 17  numerous withdrawals of cash in various years, including in

10:51:52 18  2018.  And there of no doubt as his suggestion as he said to

10:51:58 19  you that that cash withdrawals must have been for his use of

10:52:02 20  drugs.  Well first again, Hunter does not run away from the

10:52:06 21  fact that when he was abusing, be it alcohol or especially

10:52:10 22  drugs, he did that, and of course sometimes that would be,

10:52:13 23  or all times of the latter it will be cash.  But you will

10:52:18 24  see records that show that Hunter did not have a credit card

10:52:21 25  at this time, and withdrew and used cash all throughout this

period for lots of things that you will see are the opposite of using it for drugs, including spending thousands and thousands of dollars on his recovery and rehabilitation right before he came back to Delaware.

And again, note that something else is important. The BB gun which he saw, the utility tool and the flashlight, along with what Mr. Cleveland had discussed with him about the gun, they were all purchased with cash. And as to Hunter's intentions that day, who goes into a gun store and says I would like a handgun, a speed loader, a box of bullets, and by the way, give me a side of BB gun.

So the form was filled out, given to another store person, Jason Turner, who was in charge of running a background check on Hunter through a computer system. He apparently did that, but he too did not come to ask Hunter for any information. That's what happened on October 12th, ladies and gentlemen. What happened next? Almost nothing. What I mean is that Hunter left the store in his father's Cadillac, he had the BB gun, the utility tool, the flashlight, and the gun Mr. Cleveland picked out for him. The gun was in its own lockbox. Hunter went back to what his family refers to as mom mom's house, which is his grandmother's house living close by to his parents, that's where Hunter was staying. We will show you where Hunter was from the day he bought the gun on October 12th to the day

10:54:13 1    Hallie found it and threw it into the trash in front of

10:54:18 2    Janssen's grocery store on October 23rd, he was in Delaware,

10:54:20 3    Washington, Pennsylvania, and New York.  He was with his

10:54:24 4    parents.  He was with his daughters, and he was with his

10:54:28 5    friends.  Again, not the conduct of somebody who was smoking

10:54:31 6    crack every 20 minutes.

10:54:34 7              And in all this time when he was doing that, the

10:54:37 8    evidence will be that the gun never came out of its lockbox,

10:54:41 9    until October 12th -- sorry, October 22nd, 10 days later.

10:54:47 10   When Hunter was in Delaware, he usually did not use his

10:54:50 11   father's Cadillac.  Instead he used a truck that he and his

10:54:54 12   father bought, a Ford 150.  That truck was also shared by

10:55:00 13   his daughters, Finnegan and Maisy in D.C. and then his

10:55:05 14   daughter Naomi and her then boyfriend, now husband, Peter to

10:55:10 15   bring things to New York where they were going to live.  You

10:55:12 16   will see exactly where and when Hunter got that truck back

10:55:17 17   before October 22nd.

10:55:20 18              On October 22nd, after days of arguing and

10:55:24 19   tension with Hallie, which you can see in the messages, some

10:55:27 20   of which you have already seen, Hunter was staying at a Best

10:55:32 21   Western hotel here in Wilmington.  He was staying there as

10:55:34 22   well, because as I showed you before, he had begun to use

10:55:40 23   alcohol again and did not do that in front of his parents.

10:55:44 24              You will see evidence that Hunter was going on

10:55:47 25   that day in question, to drive to Washington D.C. to be with

10:55:52  1    his daughter, Maisy, who was seventeen at the time and in a

10:55:56  2    D.C. high school.  So on October 22nd, you will see that he

10:56:02  3    prepared to leave Delaware to go to Washington that very

10:56:06  4    next morning on the 23rd.  That is when the handgun left the

10:56:11  5    blue lockbox for the first time and the last time.  The Ford

10:56:16  6    Raptor truck as you'll see has a center console.  Under that

10:56:21  7    center console is not open.  You will see that it has a

10:56:24  8    steel box, which has its own lock, which was where the gun

10:56:29  9    was put.

10:56:30 10            I told you he was staying at the Best Western.

10:56:35 11    This is not a place that you would consider leaving a good

10:56:39 12    truck to be broken into and especially if you knew there was

10:56:43 13    a gun locked in its steel case inside.

10:56:47 14            So at that point, the evidence will be that on

10:56:52 15    the evening of October 22nd, Hunter drove the truck to a lot

10:56:58 16    next to Hallie and his brother, Beau's house, and he parked

10:57:04 17    it there overnight in a private place before picking it up

10:57:07 18    the next morning to drive to Washington to see Maisy.  He

10:57:11 19    did not see Hallie that night.

10:57:13 20            Then on October 23rd, when Hunter was still at

10:57:16 21    the Best Western, Hallie took her kids, Hunter and Natalie

10:57:22 22    to school at around 8:00 a.m., she came back at 8:30 and saw

10:57:27 23    the truck.  She saw the truck in the back and went into it

10:57:30 24    and opened the locked steel box and saw a hand gun and

10:57:34 25    bullets.  To use a phrase, she freaked out.  She was worried

10:57:37  1    about Hunter might harm himself or that someone might find

10:57:41  2    the gun and harm themselves.  By the way, Mr. Hines said

10:57:45  3    something about in Hunter's book that he had been confronted

10:57:49  4    sometimes in his past by somebody with a gun and that, "he

10:57:53  5    knew how to protect himself."  That had nothing to do with

10:57:57  6    this period of time.

10:57:58  7              She was worried, as I said, and what she did was

10:58:01  8    as follows:  She took it on herself to take the gun and the

10:58:08  9    bullets -- no, not ready yet, sorry ---she took it on

10:58:13 10    herself to take the gun and the bullets and the loader and

10:58:17 11    first put it in a bag from her house, and now, we've already

10:58:29 12    seen this, she took the gun out of the truck, she took the

10:58:34 13    bullets out of the truck, she went into her house, she found

10:58:38 14    a bag, she put it in a bag.  Mr. Hines told you the pouch

10:58:44 15    was Hunter's pouch where he "kept cocaine".  We'll see what

10:58:50 16    the evidence says about that.  But that pouch wasn't in the

10:58:53 17    truck that morning.  It had just returned from New York

10:58:56 18    where his daughter was using it.

10:59:00 19              The prosecution wants to show you this pouch,

10:59:03 20    because when they finally got around to looking at it five

10:59:06 21    years after the gun sale, they tested residue on it and the

10:59:10 22    lab report came back saying it was cocaine.  I'll come back

10:59:14 23    to that.

10:59:14 24              She then put the bag behind the trash of her own

10:59:19 25    home, but thought better of it.  On her own, still without

10:59:23 1    telling Hunter, at around 11:15 in the morning, she decided

10:59:27 2    to drive the car that she had, with the bag she put the

10:59:32 3    materials in, to Janssen's grocery store in Wilmington, and

10:59:39 4    then she took the bag with what she had taken out of the

10:59:42 5    truck, and put it in the trash can in front of the store and

10:59:51 6    left.  After Hallie had left that morning, Hunter took an

10:59:55 7    Uber to pick up his truck in that lot.  And at that point,

11:00:01 8    start on his journey to Washington to see Maisy.  He started

11:00:07 9    driving to D.C. and about twenty minutes later, he opened

11:00:11 10   the locked steel box and saw the gun and bullets were inside

11:00:15 11   and missing.  Sorry, they were missing.  He pulled over to a

11:00:19 12   rest stop and texted Hallie at 11:45 in the morning.  He

11:00:23 13   then called her a minute later at 11:46.  She told him what

11:00:28 14   she had done.

11:00:30 15          Hunter told Hallie what you would tell her, go

11:00:33 16   back to the store and get the gun she had thrown out.  And

11:00:37 17   Hallie did that at 11:52 that morning.  Mr. Hines said but

11:00:42 18   as luck would have it, in this case, it's as bad luck would

11:00:47 19   have it, the gun was gone, the bag was gone, to use a

11:00:52 20   phrase, Hallie freaked out again.  At 11:53 she then called

11:00:56 21   Hunter to tell him about the bag she had thrown out and that

11:01:00 22   it was gone.  Hunter told her what you would tell her, find

11:01:03 23   out what happened to it, go into the store, find out from

11:01:07 24   the people if they know.  Hallie went into the store, and

11:01:09 25   the Janssen's store people, and then together they called

| | |
|---|---|
| 11:01:12 1 | the police, and Delaware State Trooper Vincent Clemons, and |
| 11:01:16 2 | later Joshua Marley arrived.  Trooper Clemons interviewed |
| 11:01:22 3 | Hallie and asked her to ask Hunter to come as well.  Hunter |
| 11:01:25 4 | was 20 minutes away and had stopped to call Hallie and find |
| 11:01:29 5 | out what was going on, and also did that.  And at the time |
| 11:01:32 6 | gave the troopers a statement, at the time the police put |
| 11:01:36 7 | out a report and called Hunter a victim of crime.  Hallie |
| 11:01:39 8 | and Hunter left the store around 3:30, and the events of |
| 11:01:43 9 | that day certainly did not help their relationship and he |
| 11:01:44 10 | went back to the Best Western, already too late to get to |
| 11:01:47 11 | D.C. as planned.  From October 12th to October 23rd, the gun |
| 11:01:51 12 | was never loaded, it was never carried around, it was never |
| 11:01:55 13 | in public, nor was it used in any fashion.  On October 23rd |
| 11:01:58 14 | and the next days, the police and the store owners went to |
| 11:02:01 15 | review video surveillance of the cameras outside of the |
| 11:02:05 16 | grocery store and to see if they could figure out what |
| 11:02:08 17 | happened.  They saw her throw out the bag and come back to |
| 11:02:11 18 | look for it, but they did not see who might have taken it |
| 11:02:14 19 | from the trash.  Eventually, Delaware Trooper Millard Greer |
| 11:02:18 20 | tracked down the man the people had identified as someone |
| 11:02:22 21 | who went through the trash looking for recyclables in order |
| 11:02:26 22 | to sell them.  The police identified that person as Edward |
| 11:02:29 23 | Banner.  They saw Mr. Banner do that on October 29th and |
| 11:02:33 24 | they asked him what he had done.  He told them.  And then he |
| 11:02:36 25 | and the police went back to Mr. Banner's house to recover |

11:02:39  1    the gun.  When they did that, Mr. Banner also had a

11:02:43  2    different gun in the same box which he told the police at

11:02:50  3    the time, he was keeping for a friend whose brother was in

11:02:54  4    some type of trouble.

11:02:55  5         The police took both those guns and that's what

11:02:59  6    happened to Mr. Banner.

11:03:00  7         On October 29th, the police contacted Hunter to

11:03:03  8    tell him that they had recovered the gun, he told them he

11:03:07  9    did not want it back, and that was it, until years later,

11:03:11 10    until today.  When the prosecutors decided to file these

11:03:14 11    charges in 2023, they recovered the gun and the evidence

11:03:17 12    that Hallie had thrown out that had been kept by the

11:03:20 13    Delaware State Police for five years.  And then for the

11:03:23 14    first time they tested one of the things, that brown leather

11:03:26 15    pouch that Hallie had put the gun in and thrown out.  The

11:03:29 16    prosecutors told you already that the pouch had white

11:03:32 17    residue, which they tested and found to be cocaine.  But

11:03:36 18    what they did not tell you and what a test did tell you is

11:03:41 19    they didn't test for fingerprints, they didn't figure out

11:03:44 20    who could have handled that pouch or when, they didn't

11:03:49 21    figure out and couldn't figure out when any residue was put

11:03:52 22    on it by whom, they didn't figure out where that pouch had

11:03:56 23    been before, during, or after Hallie put the gun in it and

11:04:01 24    threw it out, or for how long any residue had been there.

11:04:05 25         But the pouch and the evidence about it is going

11:04:10  1    to come into evidence as if to suggest it had anything to do

11:04:13  2    with the gun purchase that day.  But remember, Hunter put

11:04:17  3    the gun in the locked box of a Ford truck.  Hallie put it in

11:04:24  4    the pouch and the bag.

11:04:26  5              That's the story about the gun that Hunter

11:04:29  6    bought on October 12th, which existed for some places for

11:04:34  7    11 days.  That's the story about the form using the words is

11:04:39  8    a user.  That's the story about what people at StarQuest

11:04:44  9    told, or more importantly, did not tell Hunter at the time

11:04:47 10    he bought the gun.  And that's the story of what people

11:04:50 11    other than Hunter, Mr. Cleveland, Mr. Palimere, Mr. Turner,

11:04:55 12    Hallie Biden, Mr. Banner, and Mr. Clemons did and that's the

11:05:00 13    story that leads to the three felony charges against Hunter.

11:05:03 14              In a case like this, I think it's especially

11:05:09 15    important that before you hear even the first word of

11:05:12 16    evidence, you understand the things the prosecutors have to

11:05:15 17    prove beyond a reasonable doubt.  Judge Noreika will explain

11:05:19 18    depending on which charge the prosecutors have to prove

11:05:23 19    beyond a reasonable doubt that Hunter knowingly and with an

11:05:26 20    intention to deceive violated the law because he believed

11:05:28 21    himself at the time to be what the law permits.  You'll see

11:05:34 22    for all the reasons that I have indicated, that they cannot

11:05:39 23    do that, because the better evidence is that Hunter was not

11:05:42 24    using drugs when he bought the gun.  Times before, times

11:05:45 25    after, especially after the events of October 23rd, but not

11:05:48 1  during, and especially because you will hear about his

11:05:53 2  extraordinary time at the rehab facility before he came back

11:05:57 3  to Delaware.

11:05:58 4         Ladies and gentlemen, as jurors, you have

11:06:04 5  enormous power, the most we can have in our judicial system

11:06:08 6  to judge another person and to determine the rest of that

11:06:11 7  person's life.  The charges against Hunter are not minor,

11:06:15 8  they're serious.  But with this power comes tremendous

11:06:19 9  responsibility.  You could have tried to get out of jury

11:06:22 10  service, especially how hard it is and given the events that

11:06:25 11  we are living through in the last months or years, but you

11:06:28 12  accepted this important job in our democracy, and you were

11:06:33 13  chosen to be jurors in this case because you promised to be

11:06:37 14  fair and impartial and consider all the evidence carefully,

11:06:42 15  and to follow the law and the rules.  Those laws require

11:06:46 16  that you hear all the evidence before you make up your minds

11:06:48 17  and not just start with the idea that if the prosecutors

11:06:52 18  brought those charges, they might be right or else why would

11:06:56 19  they bring them.  The judge mentioned and you know the trial

11:06:59 20  rules, the first one is the indictment is not evidence.  You

11:07:03 21  heard that a number of times.  The indictment was actually

11:07:06 22  written by the prosecutors without Hunter's or his attorneys

11:07:10 23  involvement.  Judge already told you a little bit about it

11:07:14 24  yesterday and when she did, she said the indictment is not

11:07:16 25  evidence of anything, and you should not give any weight to

11:07:21 1    it having been filed.

11:07:22 2            The next trial rule is the presumption of

11:07:25 3    innocence.  When presented with the indictment, Hunter came

11:07:28 4    to court and declared that he was not guilty and you will

11:07:31 5    see that he is not guilty.  But if you start this case

11:07:35 6    thinking, starts even a little bit behind, then you have

11:07:38 7    violated this most important rule of our judicial system,

11:07:42 8    and the promise you made when you decided you would become

11:07:45 9    jurors, because the presumption of innocence means the

11:07:48 10   charges are a mistake, until and unless each one of you are

11:07:52 11   convinced beyond a reasonable doubt that each element has

11:07:56 12   been proven.  In fact, if I gave you a verdict form today

11:08:00 13   and it had the three counts, you must have to check not

11:08:04 14   guilty because of that.

11:08:05 15           The next is the burden of proof.  As the judge

11:08:10 16   has explained to you, that burden of proof that each and

11:08:17 17   every one of you individually, that each and every element

11:08:19 18   is always on the prosecutors.  While he will point out the

11:08:24 19   flaws in the prosecutors's evidence, Hunter, just as if this

11:08:29 20   was a case for you or your sister or your brother or your

11:08:34 21   father or your mother, he doesn't have to prove anything.

11:08:36 22   He does not have to make you believe his side is right, he

11:08:40 23   does not have to call any witnesses or testify himself.  And

11:08:43 24   if you think you would not vote not guilty unless he proves

11:08:48 25   something, then you would violate this rule of our law as

11:08:50 1    well.  And the promise you made yesterday.

11:08:52 2              And finally, the burden of the prosecutors is

11:08:56 3    not a small one.  Indeed it is the heaviest burden that we

11:09:01 4    have in our system.  They must convince each of you

11:09:05 5    individually beyond a reasonable doubt, which we'll explain

11:09:08 6    to you again as the judge did yesterday as to what it means,

11:09:11 7    but remember what she said when she was instructing you,

11:09:15 8    that that phrase means that, "it would cause an ordinary

11:09:20 9    reasonable person to act in matters, of importance in his or

11:09:26 10   her life."  Because a person, if in the most important part

11:09:34 11   of a person's life.  This is such a matter.  And finally our

11:09:39 12   system is so concerned about an innocent person not being

11:09:43 13   wrongly convicted that it requires all of you, unanimously

11:09:48 14   to hold the prosecutors to their burden of proof beyond a

11:09:53 15   reasonable doubt.  Applying these laws and rules to our

11:09:56 16   system to protect people, you do not have to figure out why

11:09:59 17   the prosecutors see the evidence differently to support the

11:10:03 18   three felony charges that they have brought for those

11:10:06 19   11 days.  What you will hear is that the gun sale started on

11:10:10 20   October 12th.  You will see what directions were and were

11:10:14 21   not on the form.  You will see that the form asks what I

11:10:17 22   already pointed out to you in the phrases of "is" and "are",

11:10:22 23   and when it wants to, it says "have you ever been".

11:10:26 24             You will see that after he bought the gun,

11:10:29 25   Hunter did nothing with it, nothing, and this became an

11:10:32  1   issue only because of what Hallie Biden did.  The evidence

11:10:37  2   like the pouch will tell you nothing that supports the

11:10:41  3   charge, because it cannot tell you when the cocaine was put

11:10:45  4   there, by who, whether it was ever Hunter's, and certainly

11:10:50  5   you will hear it was Hallie and not Hunter to put the gun in

11:10:54  6   it.  And the evidence the prosecutors will present will

11:11:00  7   often from witnesses who they have given immunity to, taking

11:11:04  8   no actions against them for things that they admit they did

11:11:08  9   wrong, or taking no actions against others.

11:11:10 10          Judge Noreika will instruct you that that means

11:11:14 11   you have to take special care in weighing their testimony.

11:11:18 12   And because Hunter did not buy that gun knowingly, that he

11:11:23 13   fit into a category of people who should not do so, and did

11:11:27 14   not do so with an intent to deceive in checking the boxes

11:11:32 15   that you will see about a person who is defined in the way

11:11:37 16   the form defines it.  There is going to be far from the one

11:11:42 17   thing this case requires of you, which is to hold the

11:11:47 18   prosecutors to that burden, the highest burden of proof

11:11:51 19   beyond reasonable doubt.

11:11:53 20          So like Mr. Hines, at the end of the case, I

11:11:58 21   will have the opportunity to come back and stand at this

11:12:01 22   podium again, summarize the evidence that you will have

11:12:06 23   heard, and then based on those reasonable doubts, all of

11:12:12 24   which have and will be identified to you, the only verdict

11:12:17 25   that will be appropriate are three not guilty's.

| 11:12:25 | 1 | Thank you for your time. |

11:12:25  1            Thank you for your time.

11:12:29  2            THE COURT:  All right.  Thank you.  Why don't we

11:12:34  3  take our morning break.  It's been a long day.  Take our

11:12:41  4  morning break, take 15 minutes, and then come back and start

11:12:45  5  our first witness before lunch.

11:12:48  6            COURTROOM DEPUTY:  All rise.

11:12:50  7        (Jury exiting the courtroom at 11:12 a.m.)

11:13:22  8            THE COURT:  All right.  Anything we need to

11:13:25  9  discuss before the break?

11:13:26 10            MR. HINES:  No, Your Honor.

11:13:27 11            MR. LOWELL:  No.

11:13:28 12        (A brief recess was taken.)

11:34:28 13            COURTROOM DEPUTY:  All rise.

11:34:45 14        (Jury entering the courtroom at 11:34 a.m.)

11:34:50 15            THE COURT:  All right.  Everyone, welcome back.

11:34:53 16  You can sit as soon as you get in, you're welcome to sit.

11:35:04 17            All right, everyone.  Welcome back.  Everyone

11:35:08 18  else, please be seated.  Mr. Hines.

11:35:10 19            MR. HINES:  Your Honor, the United States calls

11:35:13 20  Special Agent Erika Jensen of the FBI.

11:35:20 21            COURTROOM DEPUTY:  Please raise your right hand.

11:35:29 22  Please state and spell your full name for the record.

11:35:32 23            THE WITNESS:  Erika Jensen, E-R-I-K-A,

11:35:35 24  J-E-N-S-E-N.

11:35:38 25            ERIKA JENSEN, having been duly sworn as examined

Jensen - direct

11:35:43  1    and testified as follows:

11:35:49  2                     DIRECT EXAMINATION

11:35:49  3    BY MR. HINES:

11:35:56  4    Q.       Agent, what is your full title?

11:35:58  5    A.       I'm Special Agent.

11:35:59  6    Q.       How long have you been a Special Agent?

11:36:00  7    A.       I have been a Special Agent with the FBI for 20 years

11:36:03  8    this July.

11:36:04  9    Q.       What are your duties and responsibilities as a FBI

11:36:07 10    Special Agent?

11:36:07 11    A.       My duties are to investigate violations of federal

11:36:13 12    criminal law.

11:36:14 13    Q.       Can you describe the types of crimes you have

11:36:16 14    investigated during the course of your career?

11:36:18 15    A.       I am primarily a criminal agent, so I have worked

11:36:22 16    matters such as drugs, gangs, firearm offenses.  I have done

11:36:27 17    white collar, which is bank related crime, corruption, and

11:36:31 18    other criminal matters.

11:36:32 19    Q.       Were you assigned to a criminal investigation of the

11:36:35 20    defendant, Robert Hunter Biden?

11:36:37 21    A.       Yes.

11:36:37 22    Q.       Approximately when were you assigned?

11:36:39 23    A.       In the fall of 2023.

11:36:40 24    Q.       Are you testifying today to summarize certain

11:36:43 25    evidence collected during the investigation?

Jensen - direct

11:36:45  1    A.      Yes.

11:36:45  2    Q.      What kind of evidence are you summarizing today?

11:36:48  3    A.      It's going to be evidence of addiction and the use of

11:36:51  4    illegal controlled substances.

11:36:53  5    Q.      Did Hunter Biden write a book?

11:36:55  6    A.      Yes.

11:36:55  7    Q.      What is the title of his book?

11:36:57  8    A.      Beautiful Things, a Memoir.

11:36:59  9    Q.      Is there an audio version of the book?

11:37:02 10    A.      Yes.

11:37:02 11    Q.      Who is the narrator of the audio book?

11:37:06 12    A.      Mr. Biden.

11:37:07 13    Q.      How do you know that?

11:37:08 14    A.      I listened to his voice, on public interviews that

11:37:12 15    were done compared to the voice of the narrator.

11:37:16 16    Q.      And is it the same voice?

11:37:18 17    A.      Yes, sorry, it's the same voice.

11:37:21 18    Q.      What year was the book published?

11:37:23 19    A.      2021.

11:37:24 20    Q.      What year was the audio book released?

11:37:26 21    A.      2021.

11:37:27 22    Q.      Have you reviewed all of the government's exhibits in

11:37:29 23    this case?

11:37:30 24    A.      I have.

11:37:30 25    Q.      Before you on the stand is a binder and I'm going to

Jensen - direct

11:37:33 1   show you what's been marked as Government's Exhibit 19.

11:37:38 2   What is Government's Exhibit 19?

11:37:40 3   A.      Exhibit 19 is paper copies of the book, containing

11:37:49 4   excerpts from the book, it's approximately

11:37:52 5   fifty-seven pages.

11:37:52 6   Q.      Did you and other investigators select these

11:37:55 7   excerpts?

11:37:56 8   A.      Yes.

11:37:56 9   Q.      Did you read these excerpts?

11:37:58 10  A.      I did.

11:37:58 11  Q.      How did you go about selecting them?

11:38:00 12  A.      The focus was on excerpts that evidence addiction of

11:38:05 13  -- evidence of addiction and a use of narcotics or drugs.

11:38:08 14  Q.      Approximately how long -- how many pages is the book?

11:38:12 15  A.      The book itself is just over 250 pages.

11:38:15 16  Q.      Approximately how many pages are the excerpts?

11:38:17 17  A.      Fifty-seven.

11:38:18 18  Q.      Why did you select excerpts, rather than the full

11:38:22 19  book?

11:38:22 20  A.      The volume of the book would have taken a lot of time

11:38:25 21  and it contained information that was not related to the

11:38:28 22  charges we're here with today.

11:38:30 23  Q.      Did you select audio excerpts that mirror the

11:38:33 24  excerpts in Exhibit 19, the physical book?

11:38:36 25  A.      Yes.

Jensen - direct

11:38:36  1    Q.      Are these audio excerpts marked Exhibits 20A

11:38:42  2    through 20Q?

11:38:42  3    A.      Yes.

11:38:43  4    Q.      Do these audio excerpts 20A through 20Q fairly and

11:38:48  5    accurately reflect portions of the audio book that Hunter

11:38:51  6    Biden narrated?

11:38:52  7    A.      Yes.

11:38:53  8    Q.      Now that I have asked you some foundational questions

11:38:55  9    about the authenticity of the exhibits, I would like to ask

11:38:58 10    you about each audio exhibit, okay?

11:39:00 11    A.      Sure.

11:39:00 12    Q.      What is the first audio excerpt you selected at

11:39:04 13    Exhibit 20A?

11:39:06 14    A.      20A is a section of the prologue, which is the very

11:39:08 15    beginning of the book.

11:39:09 16    Q.      Does it identify when Hunter Biden began writing the

11:39:12 17    book?

11:39:13 18    A.      It does.

11:39:13 19    Q.      Does it identify a period of time involving his

11:39:16 20    addiction?

11:39:17 21    A.      Yes, it does.

11:39:17 22    Q.      Does that period of time cover October 2018?

11:39:20 23    A.      It does.

11:39:21 24            MR. HINES:  Your Honor I move for the admission

11:39:22 25    of the audio portion 20A and the corresponding portions of

Jensen - direct

11:39:27  1    Exhibit 19.

11:39:28  2              MR. LOWELL:  No objection.

11:39:29  3              THE COURT:  All right.  Thank you.  It's

11:39:30  4    admitted.

11:39:31  5              (Exhibit Nos. 19 and 20A were admitted into

11:39:31  6    evidence.)

11:39:35  7              MR. HINES:  At this time can we please play

11:39:37  8    Exhibit 20A?

11:39:42  9              (Exhibit 20A was played.)

11:39:57 10    BY MR. HINES:

11:39:58 11    Q.       So when did Mr. Biden begin writing the book in

11:40:02 12    relation to the gun charges in this case?

11:40:04 13    A.       According to the book it was November of 2019, which

11:40:07 14    was about a year after the purchase of the firearm.

11:40:11 15              MR. HINES:  Please continue playing the exhibit.

11:40:13 16              (Exhibit 20A was played.)

11:40:47 17    BY MR. HINES:

11:40:48 18    Q.       In that excerpt, did the defendant describe events

11:40:51 19    occurring over the last five years?

11:40:53 20    A.       That's correct.

11:40:53 21    Q.       Based on that statement, what is the beginning date

11:40:56 22    of those five years?

11:40:56 23    A.       Late 2014.

11:40:59 24    Q.       Through when?

11:41:00 25    A.       Through -- make sure I get this right.  Through --

Jensen - direct

11:41:12  1    Q.      The beginning of the prologue?

11:41:14  2    A.      I'm sorry, November 19th.

11:41:17  3    Q.      Is there another section of his book where Hunter

11:41:20  4    Biden identifies a time period for his addiction?

11:41:22  5    A.      Yes.

11:41:22  6    Q.      Is that, in Chapter 11?

11:41:24  7    A.      That is.

11:41:25  8    Q.      Does he discuss a trip to Los Angeles in 2019 and a

11:41:29  9    four-year period of addiction that preceded that date?

11:41:33 10    A.      Yes, he does.

11:41:34 11    Q.      Are those discussions in Exhibit 20O and 20P?

11:41:37 12    A.      Yes they are.

11:41:38 13            MR. HINES:  Your Honor, I move for the admission

11:41:39 14    of 20O and 20P and the corresponding pages of Exhibit 19.

11:41:44 15            MR. LOWELL:  No objection, I think one of these

11:41:46 16    might be where we have a conflict, we'll go over there, but

11:41:51 17    no objection.

11:41:52 18            THE COURT:  No objection.  It's admitted.

11:41:58 19            MR. HINES:  Can you please play this first

11:42:00 20    portion?

11:42:00 21            (Exhibit Nos. 19, 20O and 20P were admitted into

11:42:00 22    evidence.)

11:42:01 23            (Exhibit 19 played.)

11:42:17 24    Q.      Can we just pause it there for one moment.  Did you

11:42:20 25    look at any records to see when Mr. Biden actually went to

Jensen - direct

11:42:23  1   Los Angeles?

11:42:24  2   A.      Yes.

11:42:25  3   Q.      What kind of records did you look at?

11:42:26  4   A.      I reviewed some bank records.

11:42:29  5   Q.      And I'm showing before you Exhibit 37A.  What is 37A?

11:42:37  6   A.      37A is an April 30th, 2019 bank statement for an

11:42:49  7   account for Mr. Biden.

11:42:51  8   Q.      Does that exhibit include transactions that show when

11:42:54  9   he was in Los Angeles?

11:42:56 10   A.      Yes.

11:42:57 11   Q.      And is that exhibit redacted?

11:43:00 12   A.      Yes.

11:43:01 13   Q.      What part?

11:43:03 14           MR. HINES:  I move for the admission of 37(a),

11:43:06 15   Your Honor.

11:43:27 16           MR. LOWELL:  As agreed, no objections.

11:43:31 17           THE COURT:  All right.  With no objection it's

11:43:34 18   admitted.

11:43:35 19           (Exhibit No. 37A was admitted into evidence.)

11:43:37 20   BY MR. HINES:

11:43:38 21   Q.      Looking at page 1 of this document, what is the bank

11:43:41 22   listed?

11:43:42 23   A.      This is Wells Fargo.

11:43:44 24   Q.      And who's account is it?

11:43:47 25   A.      The account is in the name of Robert H Biden.

Jensen - direct

11:43:50  1    Q.      What is the statement period for this account?

11:43:53  2    A.      It's statement ending April 30th, so it would be the

11:43:57  3    month of April 1st to April 30th.

11:43:59  4    Q.      What are the ending four numbers of the account?

11:44:01  5    A.      4929.

11:44:03  6    Q.      Are there transactions in this document which

11:44:07  7    indicate the location of cash withdrawals from Hunter

11:44:10  8    Biden's account?

11:44:11  9    A.      Yes.

11:44:11  10   Q.      Directing your attention to page 43 of 56, page 45 of

11:44:15  11   the PDF document, do you see that document in front of you,

11:44:34  12   agent?

11:44:34  13   A.      Yes.

11:44:34  14   Q.      Are there transactions on this screen which indicate

11:44:38  15   the whereabouts of the person using this account?

11:44:39  16   A.      Yes, on this particular page you can see ATM

11:44:43  17   withdrawals showing the location of the ATM.

11:44:45  18   Q.      If we zoom in, Ms. Vo, on that middle section.  When

11:44:51  19   was the ATM withdrawal and where was it?

11:44:54  20   A.      This particular withdrawal was authorized on 4/24 and

11:44:57  21   it was on 1447 P Street Northwest in Washington D.C.

11:45:02  22   Q.      What is the next with withdrawal?

11:45:05  23   A.      Two below that there is an ATM withdrawal on 4/25.

11:45:11  24   Q.      And where is the location of that ATM withdrawal?

11:45:14  25   A.      This one is 169 E Saint Charles street, San Andreas,

11:45:20  1   California.

11:45:20  2   Q.      On April 24th on the East Coast in D.C., April 25th

11:45:25  3   in California?

11:45:25  4   A.      Yeah.

11:45:26  5   Q.      Turning back to Exhibit 20O, were you able to confirm

11:45:39  6   that the period of time when he arrived in California

11:45:41  7   appears based on his financial transactions to actually be

11:45:45  8   April of 2019?

11:45:46  9   A.      Correct, late April.

11:45:48 10   Q.      Continuing to play this exhibit with the following

11:45:50 11   section, please.

11:45:52 12            (Exhibit audio was played.)

11:46:07 13            MR. HINES:  And the next exhibit is 20P.  Turn

11:46:12 14   to that exhibit.  Please play that exhibit, Ms. Vo.

11:46:20 15            (Exhibit 20P audio played.)

11:46:32 16   BY MR. HINES:

11:46:32 17   Q.      Based on Mr. Biden's statement about nearly four

11:46:35 18   years of active addiction that preceded this trip, what is

11:46:39 19   the time period you identified for his active addiction?

11:46:42 20   A.      That would put that back in the spring of 2015.

11:46:45 21   Q.      Through when?

11:46:46 22   A.      The spring of 2019.

11:46:47 23   Q.      Based on this four-year period between 2015 and 2019,

11:46:51 24   did you do anything with identifying other excerpts in his

11:46:55 25   book?

Jensen - direct

11:46:55  1   A.      We focused on that period, that's the frame of one

11:46:59  2   end and the other, we looked for excerpts that evidenced the

11:47:02  3   addiction and use of drugs within that four-year period.

11:47:05  4   Q.      Are those audio excerpts 20B through 20Q?

11:47:10  5   A.      Yes.

11:47:10  6   Q.      Do each of those audio excerpts 20B through 20Q

11:47:16  7   contain admissions from the defendant about his addiction?

11:47:19  8   A.      Yes.

11:47:20  9           MR. HINES:  Your Honor, I move for the admission

11:47:21 10   of Exhibits 20B through 20Q, and the full remaining pages of

11:47:24 11   Exhibit 19, so that Exhibit 19 is also admitted.

11:47:30 12           MR. LOWELL:  No objection.

11:47:31 13           THE COURT:  It's admitted.

11:47:35 14           (Exhibit Nos. 20B through 20Q were admitted into

11:47:35 15   evidence.)

11:47:35 16   BY MR. HINES:

11:47:36 17   Q.      Agent, what is the first excerpt within this

11:47:40 18   four-year period of addiction you selected?

11:47:42 19   A.      We move to Chapter 7 in the book, it is a discussion

11:47:46 20   of events that occurred over the weekend of Memorial Day

11:47:50 21   2016.

11:47:50 22   Q.      What's the title of that chapter?

11:47:52 23   A.      Cracked.

11:47:58 24   Q.      All right.  Before we play this exhibit, just so the

11:48:01 25   jury understands, is part of this page redacted?

11:48:04  1    A.       Yes.

11:48:04  2    Q.       And so is that the white portion at the top between

11:48:08  3    Cracked and the first blurb?

11:48:09  4    A.       Correct, you would expect to see text further up

11:48:12  5    again on most books.

11:48:14  6    Q.       And was that the redacted portions that did not

11:48:16  7    relate to his evidence of addiction?

11:48:18  8    A.       Yes.

11:48:20  9    Q.       Please play the Exhibit 20B.

11:48:23  10              (Exhibit 20B audio played?

11:48:42  11   BY MR. HINES:

11:48:42  12   Q.       And turning to the next exhibit, did that actually

11:48:45  13   begin on page 141 of this same chapter?

11:48:47  14   A.       Yes.

11:48:48  15   Q.       The next excerpt will mention a couple of things I

11:48:53  16   would like to ask you about before they're read.   For

11:48:56  17   clarification, who is Zlochevsky?

11:48:59  18   A.       Zlochevsky is Mykola Zlochevsky, who was the owner of

11:49:06  19   the Ukrainian energy company called Burisma.

11:49:11  20   Q.       In your investigation, did Hunter Biden sit on the

11:49:13  21   board of that entity?

11:49:14  22   A.       Yes.

11:49:15  23   Q.       There is a reference to Kathleen, what is Hunter

11:49:17  24   Biden's ex-wife's name?

11:49:19  25   A.       Kathleen, her last name is Buhle.

Jensen - direct

11:49:22  1    Q.       Please play Exhibit 20B.

11:49:27  2                  (Exhibit 20B audio was played.)

11:50:22  3    BY MR. HINES:

11:51:14  4    Q.       In this next paragraph, will we see the highlighting

11:51:17  5    jump around in a different order than the audio?

11:51:20  6    A.       Yes.

11:51:21  7    Q.       Is that because the audio was read at a different way

11:51:24  8    than the actual book is written?

11:51:25  9    A.       Yes.

11:51:27 10                  MR. HINES:   Please continue playing that

11:51:29 11    passage.

11:51:30 12                  (Exhibit audio continued.)

11:56:52 13    BY MR. HINES:

11:56:53 14    Q.       Agent Jensen, for the next three years based on the

11:56:58 15    beginning date of that chapter, what is the ending date of

11:57:01 16    those three years?

11:57:01 17    A.       Memorial Day 2019.

11:57:04 18    Q.       Turning to Exhibit 20D, does the next excerpt begin

11:57:08 19    on the bottom of page 46?

11:57:10 20    A.       It does.

11:57:11 21    Q.       Would you please play that exhibit?

11:57:14 22                  (Exhibit audio continued to be played.)

11:58:07 23    BY MR. HINES:

11:58:08 24    Q.       Agent Jensen, after the defendant said all that was

11:58:10 25    ahead, does the defendant then next recount an episode with

Jensen - direct

11:58:14  1   a woman he describes as Rea?

11:58:17  2   A.      Yes.

11:58:17  3   Q.      Is that a period of time when she began to stay with

11:58:20  4   him according to him in his book?

11:58:22  5   A.      Yes.

11:58:23  6   Q.      Does Exhibit 20E, that excerpt pick up with a portion

11:58:27  7   of that time period that she was staying with him?

11:58:29  8   A.      Yes, it does.

11:58:30  9   Q.      Could you please play Exhibit 20E.

11:58:33 10              (Exhibit 20E audio played.)

11:59:22 11   BY MR. HINES:

12:01:07 12   Q.      And is that the final excerpt selected from Chapter 7

12:01:12 13   of Cracked?

12:01:12 14   A.      Yes.

12:01:12 15   Q.      After Chapter 7 in Cracked, beginning Memorial Day

12:01:17 16   2016, when does the next chapter begin?

12:01:20 17   A.      Chapter 8, Into the Desert, begins in October of

12:01:24 18   2016.

12:01:27 19   Q.      And turning to--  is Exhibit 20F, the start of this

12:01:35 20   chapter beginning October 2016?

12:01:37 21   A.      Yes.

12:01:38 22   Q.      In the next section there are a couple of names

12:01:46 23   mentioned.

12:01:47 24   A.      Yes.

12:01:48 25   Q.      And is Hallie one of those names?

12:01:52  1    A.      Yes.

12:01:52  2    Q.      Who is that a reference to based on your

12:01:55  3    investigation?

12:01:55  4    A.      Hallie Biden.

12:01:58  5              MR. HINES:  Can you please play Exhibit 20F.

12:02:01  6              (Exhibit 20F audio played.

12:03:08  7    BY MR. HINES:

12:03:13  8    Q.      Is the next excerpt Exhibit 20G, also in this same

12:03:17  9    chapter?

12:03:18 10    A.      Yes, it is.

12:03:18 11    Q.      Does it begin on page 158?

12:03:20 12    A.      It does.

12:03:23 13    Q.      Is this a longer audio segment, about 11 minutes in

12:03:28 14    length?

12:03:28 15    A.      Yes, it is.

12:03:31 16              MR. HINES:  Could you please play Exhibit 20G.

12:03:36 17              (Exhibit 20G audio played.)

12:14:33 18    BY MR. HINES:

12:14:55 19    Q.      Agent Jensen, just to recap, we're still in

12:14:58 20    Chapter 8, correct?

12:14:59 21    A.      Yes.

12:14:59 22    Q.      And that's still described events from the fall of

12:15:03 23    2016, beginning in that time frame, right?

12:15:05 24    A.      Beginning in that time frame.

12:15:06 25    Q.      We're not at the next chapter yet, which is spring of

Jensen - direct

12:15:10   1   2018, correct?

12:15:11   2   A.      That's correct.

12:15:11   3   Q.      Turning to the next exhibit, 20H, is that still in

12:15:15   4   the same chapter of events in the fall of 2016?

12:15:18   5   A.      Yes, you can actually start at the bottom of the same

12:15:21   6   page, 165.

12:15:23   7               MR. HINES:  Could you please play that exhibit,

12:15:26   8   20H.

12:15:27   9               (Exhibit 20H audio played.)

12:18:46  10   BY MR. HINES:

12:22:08  11   Q.      Agent Jensen, is the next segment Exhibit 20I?

12:22:12  12   A.      Yes.

12:22:12  13   Q.      Is this the final segment from Chapter 8, Into the

12:22:16  14   Desert?

12:22:16  15   A.      Yes.

12:22:16  16   Q.      This is the final segment from the time frame between

12:22:19  17   fall of 2016 and spring of 2018, correct?

12:22:23  18   A.      Yes.

12:22:24  19               MR. HINES:  Can you please play Exhibit 20I.

12:22:27  20               (Exhibit 20I audio played.)

12:22:46  21   BY MR. HINES:

12:30:59  22   Q.      Agent Jensen, is that excerpt in which the defendant

12:31:01  23   discusses the driving under the influence of crack, the

12:31:05  24   final excerpt you selected from that chapter?

12:31:07  25   A.      Yes.

Jensen - direct

12:31:08 1    Q.      The next chapter we'll be moving to is Chapter 9.

12:31:12 2            Agent Jensen what is Chapter 9 called?

12:31:14 3    A.      The title of Chapter 9 is California Odyssey.

12:31:18 4    Q.      What is the timing of the next chapter?

12:31:20 5    A.      This chapter begins in the spring of 2018.

12:31:23 6    Q.      Now are we in the same year as the gun purchase?

12:31:26 7    A.      Yes.

12:31:29 8            MR. HINES:  I would like to play for you please

12:31:31 9    Exhibit 20J, which has been admitted.

12:31:35 10           (Exhibit 20J audio played.)

12:34:31 11   BY MR. HINES:

12:41:11 12   Q.      All right, Agent Jensen, so we're still in 2018,

12:41:14 13   correct?

12:41:14 14   A.      Yes, correct.

12:41:15 15   Q.      And I have one more audio excerpt I would like to

12:41:18 16   play from this chapter and then I'll be moving on to another

12:41:22 17   topic and returning to the audio excerpts later.  Okay,

12:41:26 18   agent?

12:41:26 19   A.      Yes.

12:41:26 20   Q.      In the next excerpt, Exhibit 20K, did that begin on

12:41:31 21   page 194?

12:41:32 22   A.      Yes.

12:41:32 23           MR. HINES:  Please play Exhibit 20K.

12:41:37 24           (Exhibit 20K audio played.)

12:44:28 25   BY MR. HINES:

Jensen - direct

12:50:13  1    Q.        Agent, is that the end of Exhibit 20K?

12:50:16  2    A.        Yes.

12:50:17  3              MR. HINES:  And at this time, we will be

12:50:19  4    shifting to another topic in a moment.

12:50:21  5              THE COURT:  Can we take our lunch break?

12:50:23  6              MR. HINES:  That would be fine, Your Honor.

12:50:25  7              THE COURT:  Let's take our lunch break.  We'll

12:50:27  8    break for about an hour.

12:50:29  9              COURTROOM DEPUTY:  All rise.

12:50:30  10             (Jury exiting the courtroom at 12:50 p.m.)

12:51:03  11             THE COURT:  All right.  Anything we need to

12:51:07  12   address?

12:51:08  13             MR. HINES:  No, Your Honor.  When would you like

12:51:09  14   us back?

12:51:10  15             THE COURT:  How about, unless there is something

12:51:13  16   I need to do before the witness resumes, ten to 2:00.

12:51:18  17             MR. HINES:  Thank you.

13:46:02  18             (A luncheon recess was taken.)

13:55:50  19             THE COURT:  All right.  Everyone can be seated

13:55:52  20   for a minute.  Can I see just counsel at side-bar for one

13:55:55  21   minute?

13:59:05  22             All right.  We're going to bring in the jury.

13:59:19  23             (Jury entering the courtroom at 1:59 p.m.)

13:59:36  24             THE COURT:  All right, everyone.  Welcome back.

13:59:52  25   Please be seated.  Everyone else can be seated.  Mr. Hines,

Jensen - direct

13:59:55 1    what's next?

13:59:57 2                    MR. HINES:  Thank you, Your Honor.

13:59:58 3    BY MR. HINES:

14:00:00 4    Q.      Agent Jensen, before the break we were discussing

14:00:07 5    Chapter 9; correct, California Odyssey?

14:00:10 6    A.      Yes.

14:00:11 7    Q.      And that was an Exhibit 20K, Mr. Biden was describing

14:00:16 8    events in the year 2018, correct?

14:00:19 9    A.      Yes.

14:00:19 10   Q.      Now at this point I would like to ask you if during

14:00:23 11   the course of your investigation you sought to obtain

14:00:27 12   information that corroborated his admission in this chapter?

14:00:31 13   A.      Yes, we did.

14:00:32 14   Q.      What kinds of information did you obtain?

14:00:35 15   A.      Some of the records we obtained were phone records,

14:00:38 16   subscriber records with phone records, and bank records.

14:00:43 17   Q.      If we could move that microphone a little bit closer

14:00:46 18   to you, if possible.

14:00:47 19                    Did you prepare a summary chart that summarizes

14:00:50 20   all the electronic evidence?

14:00:52 21   A.      Yes.

14:00:52 22   Q.      We're going to take a few minutes to get there.  I

14:00:56 23   would like you to help us explain how we got to that

14:00:59 24   electronic evidence, okay?

14:01:00 25   A.      Yes.

14:01:00  1   Q.      What phone records did law enforce initially obtain?

14:01:04  2   A.      We had phone records, subscriber and call records,

14:01:09  3   which show the back and forth between numbers for three

14:01:12  4   phone numbers that were used by Mr. Biden.

14:01:14  5   Q.      And I'm showing you Exhibit 22A, 23A, and 24A.  Take

14:01:21  6   a moment to look at those.  What are those three exhibits,

14:01:32  7   Agent Jensen?

14:01:34  8   A.      So this is wireless subscriber information from AT&T

14:01:41  9   for three telephone numbers, subscribed to Robert Biden.

14:01:49 10           MR. HINES:  Move for the admission of 22A, 23A

14:01:52 11   and 24A.

14:01:53 12           MR. LOWELL:  No objection.

14:01:54 13           THE COURT:  All right.  Thank you, they're

14:01:56 14   admitted.

14:01:56 15           (Exhibit Nos. 22A, 23A and 24A were admitted

14:01:57 16   into evidence.)

14:01:57 17           MR. HINES:  Ms. Vo, if you could display 22A.

14:02:01 18   BY MR. HINES:

14:02:02 19   Q.      Agent Jensen, can you describe what this record

14:02:04 20   shows?

14:02:04 21   A.      So this record, which does have some redaction boxes

14:02:08 22   for personal information shows on the top, you can see,

14:02:11 23   financial liable party, billing party, this is information

14:02:17 24   for a telephone number, 202-552-9396.

14:02:23 25   Q.      And Ms. Vo, if we zoom in on the middle of that page

Jensen - direct

14:02:26  1    where it says user information.  Is that the phone number

14:02:29  2    you read right there under MSISDN?

14:02:32  3    A.      Yes.

14:02:33  4    Q.      Is this a record you received in response to a

14:02:36  5    subpoena your investigators received?

14:02:37  6    A.      Yes, this is a record we received approximately

14:02:41  7    April 5th of 2019.

14:02:42  8    Q.      It identifies the defendant's name, as well

14:02:45  9    associated with that number?

14:02:47 10    A.      Yes.

14:02:48 11    Q.      Turning to the next record, 23(a), is this another

14:02:52 12    response to a subpoena from AT&T?

14:02:55 13    A.      Yes, so this came back as part of the same subpoena

14:02:58 14    return, so as part of the same subscriber record.  This

14:03:02 15    phone number is 302-377-3313.  Also user name Robert H.

14:03:09 16    Biden.

14:03:12 17    Q.      That's a second phone number that you learned was

14:03:14 18    affiliated with Mr. Biden?

14:03:16 19    A.      Yes.

14:03:16 20    Q.      Turning to Exhibit 24A, what is the phone number

14:03:23 21    listed here?

14:03:24 22    A.      This is a telephone number 202-285-2473.

14:03:30 23    Q.      Who is it listed under?

14:03:32 24    A.      Robert Biden.

14:03:33 25    Q.      And is this the party that's the listed financial

Jensen - direct

14:03:38  1    liable party?

14:03:39  2    A.      It's both, so at the top it shows Robert Biden as

14:03:42  3    well, and then the user information will typically be the

14:03:46  4    person the phone number is associated with, at least per the

14:03:49  5    AT&T record.

14:03:50  6    Q.      If we zoom out a second Ms. Vo, and look at the date

14:03:55  7    on the top left-hand corner of this document.  When were

14:03:58  8    these records provided to law enforcement?

14:04:00  9    A.      On or about, they were generated on 4/5 of 2019, so

14:04:05 10    we would have received them on or just after that date.

14:04:08 11    Q.      After receiving this information from AT&T about the

14:04:11 12    defendant's phone numbers, did investigators issue other

14:04:15 13    subpoenas?

14:04:16 14    A.      Yes.

14:04:16 15    Q.      What is an example of an entity that the investigator

14:04:20 16    issued a subpoena to?

14:04:21 17    A.      After that April 16th of 2019 there was a subpoena

14:04:25 18    issued to Apple Incorporated.

14:04:26 19    Q.      What is Apple Incorporated?

14:04:28 20    A.      Apple as in Apple iPhones, iPads, MAC computers.

14:04:33 21    Q.      Did Apple provide a response?

14:04:34 22    A.      Yes.

14:04:35 23    Q.      What did that response show?

14:04:36 24    A.      It showed -- it would be considered supplier records,

14:04:42 25    so it showed purchase history by device associated with

14:04:46  1   Apple ID's, which are associated with a person, and

14:04:49  2   registration information for devices, and other subscriber

14:04:53  3   information for devices associated with Robert H. Biden or

14:04:58  4   Hunter Biden.

14:04:59  5   Q.    Did those records correlate in some respects to the

14:05:02  6   phone records you received from AT&T?

14:05:04  7   A.    Yes.  You could see in the records that the phone

14:05:07  8   numbers that came back from AT&T were associated with

14:05:12  9   various devices every time.

14:05:14 10   Q.    Was there an iCloud account associated with the Apple

14:05:17 11   records that Apple provided?

14:05:19 12   A.    They didn't provide at that time contents, so it was

14:05:22 13   just subscriber records, but you can see in some of the

14:05:25 14   records that there were iCloud like services, subscribed to.

14:05:29 15   Q.    What is an iCloud service?

14:05:31 16   A.    So iCloud is essentially a way to replicate your data

14:05:37 17   across your devices, for those who have multiple devices, or

14:05:41 18   as a way to back up your phone and get your -- you can find

14:05:44 19   your phone, you can get your information put back on your

14:05:48 20   new phone, it's essentially a remote server controlled by

14:05:51 21   Apple where you can subscribe to and leave your data on a

14:05:55 22   server.

14:05:55 23   Q.    So as opposed to needing to physically plug it into

14:06:00 24   something, there is a way to also upload it to the cloud?

14:06:02 25   A.    Right.  The service changed overtime, but essentially

Jensen - direct

14:06:06  1    you can back up your devices to a cloud, and the other

14:06:10  2    option is you can back up a device to a computer, any

14:06:13  3    computer actually that uses iTunes in that case to back up a

14:06:17  4    device on a mobile computer.

14:06:19  5    Q.    So the subpoena did not provide content at that time,

14:06:23  6    correct?

14:06:23  7    A.    Correct.

14:06:23  8    Q.    Did it provide an e-mail address or iCloud address

14:06:28  9    for Mr. Biden?

14:06:29 10    A.    Yes.  So there were Apple ID's, which are typically

14:06:33 11    an e-mail address, sometimes it's not an e-mail address, but

14:06:36 12    you can use your e-mail address, your Apple ID, and there

14:06:41 13    was some provided.

14:06:41 14    Q.    What was one of those iCloud addresses?

14:06:45 15    A.    RHBDC@iCloud.com.

14:06:50 16    Q.    Did investigators ultimately obtain content from

14:06:54 17    Mr. Biden's iCloud account?

14:06:56 18    A.    Yes.

14:06:56 19    Q.    How did they do that?

14:06:57 20    A.    They sought and obtained a search warrant from this

14:07:01 21    court house actually for content for the iCloud account,

14:07:08 22    RHBDC@iCloud.com.

14:07:11 23    Q.    So a judge issued a search warrant for that

14:07:14 24    information?

14:07:14 25    A.    I believe that was August 29th of 2019 that warrant

Jensen - direct

14:07:18  1    was issued.

14:07:18  2    Q.      How did the investigators get the data?

14:07:21  3    A.      Apple requested a hard drive for the data, so the

14:07:24  4    investigators sent a clean or new hard drive to Apple, Apple

14:07:29  5    provided the data, and sent it back to the investigators.

14:07:32  6             MR. HINES:  Your Honor, may I approach the

14:07:33  7    witness?

14:07:49  8    BY MR. HINES:

14:07:49  9    Q.      Agent Jensen, I'm showing you what's been marked as

14:07:52 10    government's Exhibit 15.  Do you recognize that?

14:07:54 11    A.      Yes.

14:07:54 12    Q.      What is it?

14:07:55 13    A.      This is the hard drive that was sent to Apple and

14:07:58 14    then returned to the investigators with the search warrant

14:08:02 15    returned.

14:08:03 16             MR. HINES:  I move Exhibit 15 into evidence.

14:08:06 17             MR. LOWELL:  No objection.

14:08:07 18             THE COURT:  Thank you.  It's admitted.

14:08:09 19             (Exhibit No. 15 was admitted into evidence.)

14:08:10 20    BY MR. HINES:

14:08:10 21    Q.      Can you please hold that up, Agent Jensen, for a

14:08:13 22    moment?  Did investigators ultimately review data from

14:08:18 23    Government's Exhibit 15, that hard drive from Apple?

14:08:21 24    A.      Yes.

14:08:23 25    Q.      What kind of data did investigators derive from that

Jensen - direct

14:08:26  1    hard drive?

14:08:27  2    A.       There were e-mails that were obtained from the iCloud

14:08:31  3    returned for iCloud back ups, so basically a back up for

14:08:36  4    four different devices was recovered or extracted from the

14:08:39  5    data.

14:08:40  6    Q.       Did these back ups, these extractions have evidence

14:08:44  7    of the defendant's addiction on them?

14:08:46  8    A.       Yes.

14:08:47  9    Q.       Did that include evidence of addiction in the year

14:08:50 10    2018?

14:08:50 11    A.       Yes.

14:08:51 12    Q.       Are there two back up files that investigators

14:08:54 13    utilized for evidence in this case?

14:08:56 14    A.       Yes.

14:08:57 15    Q.       What back up files were those?

14:08:59 16    A.       So we named them Apple back up one, two, three and

14:09:03 17    four.  Three is a back up of an iPad pro.  So that one was

14:09:07 18    one that we used.  The second one we used was Apple back up

14:09:13 19    four, which was an iPhone SR.

14:09:17 20    Q.       Were both of these devices registered to the

14:09:20 21    defendant based on the Apple records?

14:09:21 22    A.       Yes, so the extraction report that comes from these

14:09:26 23    back ups show that there were information, including things

14:09:28 24    like the phone number and MIMEI that associated these

14:09:33 25    devices to Mr. Biden.

Jensen - direct

14:09:35  1    Q.      Did you independently verify the Apple records to

14:09:39  2    make sure they correlated with the AT&T phone records that

14:09:42  3    we saw produced by AT&T?

14:09:45  4    A.      Yes.

14:09:48  5    Q.      Separately, did law enforcement also later obtain the

14:09:53  6    defendant's laptop and an external hard drive?

14:09:57  7    A.      Yes.

14:09:57  8    Q.      How did they come to receive it?

14:09:59  9    A.      So in late 2019, the FBI received a tip that there

14:10:03 10    was a laptop at a computer repair shop called the MAC Store,

14:10:08 11    here in Wilmington, Delaware, that had been abandoned by its

14:10:12 12    owner, and they ultimately obtained a subpoena and recovered

14:10:17 13    the equipment from the computer store.

14:10:33 14                MR. HINES:  May I approach, Your Honor?

14:10:36 15                THE COURT:  You may.  You may freely approach.

14:10:38 16                MR. HINES:  Thank you, I appreciate that.

14:10:40 17    BY MR. HINES:

14:10:41 18    Q.      I'm showing you what has been marked as Government's

14:10:44 19    Exhibit 16.  Can you look at Government's Exhibit 16?  What

14:10:50 20    is Government's Exhibit 16, Agent Jensen?

14:10:52 21    A.      This is a laptop that was recovered from the computer

14:10:56 22    store.

14:10:57 23    Q.      Did investigators ultimately extract data from that

14:11:03 24    laptop?

14:11:03 25    A.      Yes.

Jensen - direct

14:11:03  1    Q.      How?

14:11:04  2    A.      So they used forensics, FBI and other federal

14:11:08  3    officials used forensic tools.  Actually I think it was just

14:11:11  4    the FBI that used forensic tools to extract data from the

14:11:16  5    laptop.

14:11:17  6    Q.      And was the FBI or law enforcement authorized to look

14:11:20  7    in that laptop?

14:11:22  8    A.      Yeah, so after the -- after this laptop was received,

14:11:26  9    the search warrant was obtained for data on the laptop.

14:11:30 10    Q.      Ultimately in examining that laptop, were

14:11:34 11    investigators able to confirm that it was Hunter Biden's

14:11:37 12    laptop?

14:11:37 13    A.      Yes.

14:11:38 14    Q.      How?

14:11:38 15    A.      Among other things, there was a serial number that's

14:11:42 16    on the back of this laptop that matches the Apple subpoena

14:11:46 17    records that they obtained in 2019, so it matches the

14:11:49 18    registration of this particular device to the iCloud account

14:11:53 19    at a particular date.

14:11:57 20    Q.      And is that serial number FVFXC2MMHB29?

14:12:07 21    A.      Yes.

14:12:08 22    Q.      And that's also in the Apple records, you said?

14:12:11 23    A.      Yes.

14:12:15 24    Q.      So from the data from the laptop and the hard drive,

14:12:20 25    did you -- what did you do next, or what did the FBI do next

Jensen - direct

14:12:24  1    when assessing the addiction evidence?

14:12:27  2    A.       So from the data that was extracted from both the

14:12:30  3    iCloud back ups and this -- the laptop, investigators were

14:12:35  4    able to go through largely WhatsApp messages, iMessages, and

14:12:41  5    text messages, and found evidence of addiction within the

14:12:45  6    messages.

14:12:47  7             MR. HINES:  Move for the admission of Exhibit 16

14:12:49  8    and 15 if I did not already, Your Honor.

14:12:52  9             MR. LOWELL:  As we discussed, yes, we understand

14:12:55 10    what that is, so we have that preliminarily, I have no

14:13:00 11    objection.

14:13:01 12             THE COURT:  Okay.  It's admitted.

14:13:03 13             (Exhibit Nos. 15 and 16 were admitted into

14:13:04 14    evidence.)

14:13:04 15    BY MR. HINES:

14:13:04 16    Q.       Now, you mentioned being able to corroborate that

14:13:08 17    that was in fact the defendant's laptop.  Did you also see

14:13:11 18    information on the laptop when it was examined that showed

14:13:14 19    that he had dropped it off at the MAC shop?

14:13:17 20    A.       So, there was an e-mail that was obtained from the

14:13:24 21    iCloud warrant returned, that showed an invoice from the MAC

14:13:30 22    Shop to Mr. Biden with the -- yes.

14:13:34 23    Q.       I'm showing you Exhibit 40.  Is that the e-mail you

14:13:41 24    just referenced?

14:13:44 25    A.       One second.  Yes.

Jensen - direct

14:13:49  1                    MR. HINES:  Move for the admission of

14:13:51  2    Exhibit 40.

14:13:52  3                    MR. LOWELL:  No objection.

14:13:53  4                    THE COURT:  Thank you.  It's admitted.

14:13:55  5                    (Exhibit No. 40 was admitted into evidence.)

14:13:56  6    BY MR. HINES:

14:13:58  7    Q.        Agent Jensen, what does Exhibit 40 show?

14:14:00  8    A.        So this is an invoice coming from The MAC Shop, on

14:14:06  9    April 17th, 2019, to RHBDC@iCloud.com, showing there was an

14:14:18 10    $85 charge due on April 17, 2019.  The second half shows an

14:14:24 11    invoice number, date and then customer as Hunter Biden,

14:14:28 12    RHBDC@iCloud.com.

14:14:31 13    Q.        You said Apple Inc. Provided that with the production

14:14:35 14    from the iCloud?

14:14:36 15    A.        Yes.

14:14:36 16    Q.        Is that correct?

14:14:37 17    A.        Yes.

14:14:38 18    Q.        Using the data now from two sets, the iCloud, that's

14:14:41 19    the hard drive, and the laptop, did you prepare a summary

14:14:45 20    chart?

14:14:46 21    A.        Yes.

14:14:49 22    Q.        Why did you prepare a summary chart?

14:14:52 23    A.        In total, when the data is provided to us from

14:14:55 24    forensic examiners, it comes back in a report form, so we

14:14:58 25    have very large PDF's that contain thousands of pages of

Jensen - direct

14:15:02  1   messages, primarily, along with other photos and videos, so

14:15:06  2   the total between the six files that we have is over 18,000

14:15:11  3   pages.

14:15:12  4   Q.      So it's voluminous?

14:15:14  5   A.      Very voluminous.

14:15:16  6   Q.      And were the full files of the 18,000 pages provided

14:15:21  7   to the defense in this case?

14:15:22  8   A.      Yes.

14:15:23  9   Q.      And I'm showing you Exhibit 18.  Is Exhibit 18 the

14:15:33 10   summary chart that you and other investigators worked to

14:15:37 11   prepare?

14:15:51 12   A.      Yes.

14:15:52 13   Q.      Approximately how many pages is that exhibit?

14:15:56 14   A.      Approximately 75 pages, single sided.

14:16:00 15   Q.      And in a moment, I'll move for the admission, but

14:16:03 16   just generally, can you describe what the summary chart

14:16:07 17   summarizes?

14:16:08 18   A.      Sure, it's-- some of it is timeline, timeline values

14:16:13 19   of certain times, most of it is evidence of either addiction

14:16:16 20   or use of drugs.  And then there is some -- a little bit of

14:16:22 21   evidence of possession of a firearm.

14:16:25 22   Q.      Do your entries in your summary chart fairly and

14:16:28 23   accurately describe the underlying data?

14:16:32 24   A.      Yes.

14:16:32 25           MR. HINES:  Your Honor, I move for the admission

Jensen - direct

14:16:34  1   of Government's Exhibit 18.

14:16:36  2              MR. LOWELL:  Gladly, no objection.

14:16:37  3              THE COURT:  All right.  It's admitted.

14:16:39  4              (Exhibit No. 18 was admitted into evidence.)

14:16:39  5   BY MR. HINES:

14:16:40  6   Q.    Could you please display Government's Exhibit 18?

14:16:43  7   Thank you.

14:16:43  8              So does this summary chart now include both data

14:16:47  9   from Apple Inc. and from the defendant's laptop?

14:16:51 10   A.    Yes.

14:16:51 11   Q.    In some instances was there an overlap?

14:16:55 12   A.    Yes.

14:16:55 13   Q.    Let's turn to page 1 of this Exhibit 18.  Before we

14:16:59 14   go over the content of the messages, can you please describe

14:17:02 15   for the jury how the exhibit is set up at the top?

14:17:05 16   A.    Sure.  So the exhibit is set up, first of all, set up

14:17:08 17   in chronological order, so it begins at the beginning of

14:17:11 18   time and goes to the end.  The columns represent the row

14:17:16 19   number, there is a date of the message, time that the

14:17:19 20   message was sent or received.  That time will shift a

14:17:22 21   little, it's not based on east coast time or Pacific coast

14:17:27 22   time, but rather the time provided by the provider, which in

14:17:29 23   some cases was UTC.  It is from column and to column.  And

14:17:35 24   then the consent of the message and that largely looks like

14:17:39 25   what we see in our extraction reports, so it has a little

Jensen - direct

14:17:42 1    bit of what we call metadata in it.  There is an

14:17:46 2    authorization column, that is a warrant.  I think in all

14:17:48 3    cases, it is a warrant number, so the warrants that we

14:17:52 4    discussed that allowed us to look at the data.  And then a

14:17:55 5    source, so the file, how we have named them in our naming

14:17:59 6    convention.  And this page of that source document.

14:18:02 7    Q.    So taking this first row as an example, what is the

14:18:07 8    date of this message?

14:18:08 9    A.    So this message is 4/17/2018.

14:18:14 10   Q.    I'm not going to ask you to say the specific times,

14:18:16 11   so we'll skip that column, I want to ask you questions,

14:18:21 12   unless -- unless I have a specific question.  Who is this

14:18:24 13   message from?

14:18:25 14   A.    This message is from Hunter Biden.

14:18:26 15   Q.    Who is it to?

14:18:27 16   A.    It's to an account in the name of Clifford O'Brien.

14:18:31 17   Q.    Why do you say an account in the name of Clifford

14:18:34 18   O'Brien?

14:18:34 19   A.    This is a WhatsApp account, this is a WhatsApp

14:18:38 20   message, and you can set your message name up to be whatever

14:18:41 21   you like.

14:18:42 22   Q.    What was the message that Hunter Biden sent?

14:18:44 23   A.    "Yes, I do buddy, I'm asking you to tell me, in light

14:18:48 24   of the fact you can't come this minute, when can you come?"

14:18:51 25   Q.    And then where it says 20-165M, is that the search

Jensen - direct

14:18:56  1    warrant that a judge authorized in this court house?

14:18:59  2    A.      Yes.

14:18:59  3    Q.      Where it says iCloud 04, what is that iCloud 04?

14:19:03  4    A.      This is iCloud, this came from the back up file from

14:19:07  5    Apple for the iPhone XR.

14:19:09  6    Q.      And refers to page 442, is that is the voluminous

14:19:13  7    documents you were referring to earlier?

14:19:14  8    A.      Yes.

14:19:15  9    Q.      So for the first 28 pages of this chart, is the

14:19:21 10    source of the data entirely the data that came from Apple

14:19:31 11    Inc?

14:19:31 12    A.      I believe so.  Let me double-check.  Yeah, I think in

14:19:49 13    addition to that it's Apple Inc. and all from iCloud.

14:19:56 14              THE COURT:  Do you hear that noise?

14:19:59 15              MR. HINES:  I do.

14:20:08 16              THE COURT:  All right.

14:20:13 17    BY MR. HINES:

14:20:13 18    Q.      So turning to Row 2, on that same day, April 17th,

14:20:20 19    2018, did Clifford O'Brien respond to Mr. Biden's text?

14:20:24 20    A.      Yes, you can see that's just about a minute later

14:20:27 21    maybe.

14:20:28 22    Q.      By 7:30, correct?

14:20:33 23    A.      Yes.

14:20:34 24    Q.      Turning to Row 3, what is the next message?

14:20:38 25    A.      This is a response back from Mr. Biden to the same

Jensen - direct

| | | |
|---|---|---|
| 14:20:40 | 1 | Clifford O'Brien, saying "if you can be here by 6:45, I can |
| 14:20:46 | 2 | do another 1.4 on top, it's okay, oh D, but what you owe is |
| 14:20:53 | 3 | what you owe." |
| 14:20:53 | 4 | Q.    What did Mr. O'Brien say in response to Mr. Biden? |
| 14:20:57 | 5 | A.    "Been on the free way for 20-minutes, I knew I should |
| 14:21:00 | 6 | have waited and shit, now I'm stuck in traffic bro, with all |
| 14:21:04 | 7 | your shit, ha ha ha." |
| 14:21:06 | 8 | Q.    During the course of your investigation, did you take |
| 14:21:08 | 9 | messages like these and send them off to an expert with the |
| 14:21:12 | 10 | United States Drug Enforcement Administration? |
| 14:21:14 | 11 | A.    Yes. |
| 14:21:14 | 12 | Q.    Is that expert Joshua Romig? |
| 14:21:17 | 13 | A.    Yes, it is. |
| 14:21:18 | 14 | Q.    Do you anticipate he will testify in this case? |
| 14:21:21 | 15 | A.    Yes, I do. |
| 14:21:22 | 16 | Q.    Turning to page 2 of the summary chart, continuing on |
| 14:21:25 | 17 | April 18th, how did Mr. Biden respond, and if you can go |
| 14:21:28 | 18 | ahead and read those series of three messages? |
| 14:21:31 | 19 | A.    "WRU."  Clifford O'Brien account, "on the free way." |
| 14:21:37 | 20 | And then "almost there, six minutes." |
| 14:21:39 | 21 | Q.    Turning to the following page, page 3. |
| 14:21:44 | 22 | A.    "WYA."  "Here."  "Where do I go." |
| 14:21:49 | 23 | Q.    So Mr. Biden is saying "here", and the account |
| 14:21:53 | 24 | affiliated with Clifford O'Brien is saying "where do I go?" |
| 14:21:57 | 25 | A.    Yes. |

Jensen - direct

14:21:57  1    Q.      Turning to the next page, what are the messages?

14:22:01  2    A.      O'Brien account, "same place?"  And then Mr. Biden

14:22:07  3    says "yes", and then the O'Brien account says "??"

14:22:12  4    Q.      Turning to page 6.

14:22:13  5    A.      O'Brien account says "okay."  Mr. Biden says "when?"

14:22:19  6    The O'Brien accounts says "four min."

14:22:22  7    Q.      That was page 5 we just read, now to page 6.  What

14:22:26  8    are the next series of messages from April 18, 2018?

14:22:30  9    A.      All three from the O'Brien account, "there's traffic

14:22:33 10    on sunset.  Pulling up."  And then "come out."

14:22:38 11    Q.      And then the following page, page 7.  Are there

14:22:43 12    messages from approximately -- well, in that same month of

14:22:50 13    April 2018, between Clifford O'Brien and Hunter Biden that

14:22:56 14    exchange photographs?

14:22:56 15    A.      Yes, this is later in April, on April 27, 2018.

14:23:00 16    Q.      If we could just zoom out a second, Ms. Vo.  What are

14:23:06 17    the messages and who sends them to who?

14:23:10 18    A.      So the top message is a photograph that was sent from

14:23:14 19    the O'Brien account to Mr. Biden.  Depicted in the picture

14:23:20 20    is a white substance on the green card.  And then about

14:23:26 21    eight minutes later -- sorry, it is the next day in the

14:23:30 22    morning, there is a message returned from Mr. Biden to the

14:23:33 23    O'Brien account with a picture on a digital scale, and the

14:23:39 24    title of the photo says "yes, which under any value known to

14:23:43 25    any market in the world, what I paid is 60 percent greater."

Jensen - direct

14:23:46  1   Q.        So that's a message that Hunter Biden sent to

14:23:49  2   Clifford O'Brien?

14:23:51  3   A.        Yes.

14:23:52  4   Q.        And are these photographs also in Exhibits 18A and

14:23:56  5   18B?

14:23:58  6   A.        Yes.

14:24:05  7             MR. HINES:  Move for the admission of 18A and

14:24:08  8   18B.

14:24:09  9             MR. LOWELL:  No objection.

14:24:09 10             THE COURT:  Thank you.  It's admitted.

14:24:11 11             (Exhibit Nos. 18A and 18B were admitted into

14:24:12 12   evidence.)

14:24:12 13   BY MR. HINES:

14:24:12 14   Q.        Page 7, Agent Jensen, continuing the summary chart.

14:24:22 15   Page 8, sorry.  Page 8.  What is the next series -- well, is

14:24:28 16   there another message on that day, April 28, 2018, between

14:24:31 17   Mr. O'Brien and Mr. Biden?

14:24:34 18   A.        Yes.  A few minutes later on the 28th, the O'Brien

14:24:40 19   account responds with, "bro, that it don't, bro that's it, I

14:24:46 20   don't want to do this no more, I go out my way to get you

14:24:49 21   the best out here, driving taking away from my kids, time

14:24:53 22   disappointing my family not being there, all leaving on your

14:24:57 23   call, I love you bro, but if this is what it is, it is not

14:25:00 24   worth it to me, I will always be here for you and your

14:25:03 25   friend, your family, but this is petty and I think we are

Jensen - direct

14:25:06  1   beyond this, trust me when I say I appreciate you, you know

14:25:09  2   I do bro, no, just a slang word, maybe we need to talk to

14:25:14  3   work this out, we family."

14:25:16  4   Q.      Does this follow the exchange of messages and one of

14:25:19  5   them involving a digital scale that had a weight on it?

14:25:22  6   A.      Yes.

14:25:23  7   Q.      Turning to page 9 after those two messages.  Does

14:25:30  8   Mr. Biden continue to speak with Mr. O'Brien after these

14:25:34  9   events?

14:25:34 10   A.      Yes.  These messages begin dating 5/5/2018 and moving

14:25:39 11   to 5/6/2018.

14:25:41 12   Q.      What does Mr. Biden say?

14:25:43 13   A.      Both these are from Mr. Biden to the O'Brien account,

14:25:48 14   "come get - how much I owe?"  And then "can you get baby

14:25:53 15   powder?"

14:25:53 16   Q.      Turning to the following page, page 10?

14:25:55 17   A.      Another message, the green, the green is going to be

14:25:59 18   from Mr. Biden and the blue is from the Clifford O'Brien.

14:26:02 19   So the first message says "the really soft stuff."  And then

14:26:06 20   the O'Brien account responds, "yes."  And then "but I'm at

14:26:09 21   hospital, can you meet up out here, got X pills, too."

14:26:13 22   Q.      And then continuing on to page 11 on May 6, 2018, the

14:26:18 23   same day, is there another individual that Mr. Biden begins

14:26:22 24   texting with or messaging with?

14:26:24 25   A.      This is about just under an hour later, there is a

Jensen - direct

14:26:24  1    message from an account I'll call the Vladimir Peteov

14:26:33  2    account, to Mr. Biden saying "what favor you need?"

14:26:37  3    Mr. Biden responds "party favor", and then the Peteov

14:26:41  4    account responds "oh, tomorrow."

14:26:46  5    Q.    Turning to the following page, page 12.  What are the

14:26:49  6    messages on this page?

14:26:50  7    A.    Mr. Biden responds now.  And then the Peteov account

14:26:54  8    says, "I have a guy."  And "I can give you his phone number

14:26:57  9    but he only bring five at the time for 500."

14:27:01 10    Q.    So is this series of messages another set of messages

14:27:05 11    that you gave to Joshua Romig, Agent Joshua Romig with the

14:27:11 12    DEA?

14:27:11 13    A.    Yes.

14:27:12 14    Q.    Turning to the following page, page 13?

14:27:14 15    A.    At the top, there are two messages from the Peteov

14:27:17 16    account, "I can give you his phone number.  You want?"

14:27:21 17              Mr. Biden responds a couple minutes later, "yes

14:27:24 18    please."

14:27:24 19    Q.    On the following page, page 14?

14:27:26 20    A.    This continues about in the same, a minute later, so

14:27:29 21    the Peteov account says first, "okay."  And then provides

14:27:34 22    "714-676-6538."  And then the name "Cameron."

14:27:40 23    Q.    There is a message with Peteov, and then stops, and

14:27:43 24    then someone named Killa Cam begins texting with the

14:27:48 25    defendant?

14:27:48 1    A.        Yes, you can see the number provided on the second

14:27:51 2    message in the text will match the chart bottom message.  So

14:27:55 3    this is a message a half-an-hour later from that same set of

14:27:59 4    numbers, entitled Killa Cam.  To Mr. Biden saying "14 away.

14:28:07 5    This is Cam."

14:28:08 6    Q.        Turning to page 15.

14:28:12 7    A.        Then the Killa Cam account to Mr. Biden saying, "I'll

14:28:16 8    text when five away so we can meet at De Longpre, just south

14:28:21 9    of you."

14:28:24 10   Q.        So the messages are arranging some kind of a meet?

14:28:27 11   A.        Correct.

14:28:28 12   Q.        Turning to page 16?

14:28:30 13   A.        So four messages, all from -- the first two are from

14:28:36 14   the Killa Cam account to Mr. Biden saying "ten away."  And

14:28:40 15   then "seven away."

14:28:41 16   Q.        And then page 17?

14:28:43 17   A.        And then it's a missed voice call, two missed voice

14:28:47 18   calls.  And I do think that is from the Biden, Mr. Biden

14:28:52 19   reaching out to the system saying there was a missed call.

14:28:58 20   Q.        Now on page 17, what are the next messages?

14:29:02 21   A.        So this is a few minutes later and it's from the

14:29:04 22   Killa Cam account saying "2-3 away, black Jeep."  And then a

14:29:09 23   minute later saying, "about to pull up."

14:29:12 24   Q.        What's the next message?

14:29:14 25   A.        It skips ahead a little to now we're in 5/7/2018, at

Jensen - direct

14:29:23  1  12:06 a.m., again this is probably not a local time where

14:29:26  2  they were, it's from Mr. Biden to the O'Brien account and it

14:29:29  3  says, "tell me ETA Pls."

14:29:32  4  Q.    What's on the following page, page 18?

14:29:34  5  A.    O'Brien account responds, "bro, I'm waiting on the

14:29:40  6  dude to bring your shit, he said about 30 min out."

14:29:43  7  Q.    How did Mr. Biden respond?

14:29:45  8  A.    "K."  And then "ETA?"

14:29:48  9  Q.    Page 19?

14:29:53 10        What does Mr. O'Brien say?

14:29:56 11  A.    So Mr. O'Brien responds saying "white boy bringing it

14:30:00 12  to you", and then there is a redacted portion.

14:30:02 13  Q.    Does that redacted portion describe something that

14:30:07 14  doesn't relate to potential drug use?

14:30:09 15  A.    Yes.

14:30:10 16  Q.    Now, what's the following message from Mr. O'Brien?

14:30:14 17  A.    So that reads, "he just picked up your stuff, he's

14:30:19 18  gonna *blank* call you right now."

14:30:21 19  Q.    And the following message?

14:30:22 20  A.    So this is about seven days, a week later, 5/14/2018,

14:30:29 21  and that's Mr. Biden texting or sending a message to the

14:30:33 22  O'Brien account, saying "what's up buddy?  WRU."

14:30:37 23  Q.    Turning to page 20.  What are these messages?

14:30:43 24  A.    This is a series of -- a message from the O'Brien

14:30:46 25  account to Mr. Biden saying "what's up bro, I'm in Carson."

Jensen - direct

14:30:50  1   And there is a missed voice call to the O'Brien account.

14:30:53  2   And then the O'Brien account responds, "you want me to drop

14:30:59  3   off?"  And then "send the address."

14:31:01  4   Q.      And the following page?

14:31:04  5   A.      Two missed voice calls to the O'Brien account, and

14:31:08  6   then the O'Brien account responds, "I just picked up your

14:31:12  7   stuff bro, what's the addrrss?"  ADDRRSS for the address.

14:31:18  8   Q.      Let me ask you a question, Agent Jensen.  To the

14:31:21  9   extent there were phone contacts between Hunter Biden and

14:31:24 10   these individuals, Clifford O'Brien, Killa Cam, Peteov, are

14:31:31 11   those phone conversations, audio phone conversations

14:31:34 12   recorded on iCloud?

14:31:36 13   A.      I did not receive any kind of extraction report that

14:31:39 14   contained any phone, recorded phone conversations.

14:31:42 15   Q.      What we're looking at are just the actual messages

14:31:45 16   that someone writes, and there may be verbal communications

14:31:51 17   in between those messages?

14:31:52 18   A.      Correct.

14:31:53 19   Q.      Now, on page 21, the last message again was "I just

14:31:57 20   picked up your stuff bro, what's the address?"  Correct?

14:32:00 21   A.      Yes.

14:32:00 22   Q.      Page 22.

14:32:04 23   A.      Mr. Biden says, "you coming this way?"  And then

14:32:07 24   "ASAP, if you can."

14:32:10 25   Q.      And then how does Mr. O'Brien respond?

14:32:13  1    A.      It's month later, so this is going from now May 15,

14:32:18  2    2018, to June 19, 2018.  The first message in this series is

14:32:21  3    from Mr. O'Brien to Mr. Hunter saying "bro, I got it where

14:32:25  4    do I drop it bro?"

14:32:26  5    Q.      The following page.

14:32:28  6    A.      "I picked up your stuff, I'll hold it until you call

14:32:31  7    for it bro."

14:32:34  8    Q.      And then how does Mr. Biden respond?

14:32:37  9    A.      This is 6/22/2018, so it's about a day later, he says

14:32:44 10    "can you come this way now?"  And the same day, 6/22/18,

14:32:52 11    about 40 minutes later, the O'Brien account responds and

14:32:56 12    says "yes."

14:32:57 13    Q.      This is another example of messages where Mr. Biden

14:32:59 14    is arranging to meet with Mr. O'Brien?

14:33:03 15    A.      Yes.

14:33:03 16    Q.      Page 24, what are these messages?

14:33:06 17    A.      This is now about an hour and ten minutes or so

14:33:10 18    later, from Mr. Biden to the O'Brien account saying "you

14:33:13 19    come, send white boy, if it's faster."

14:33:17 20            And then right after that, a message from

14:33:21 21    Mr. Biden to the O'Brien account saying "dude?????"

14:33:26 22    Q.      And what does Mr. O'Brien say?

14:33:28 23    A.      About 20 minutes later or so, he responds, "okay

14:33:33 24    sorry I'm sending him now."

14:33:35 25    Q.      And then the following page, page 25?

Jensen - direct

14:33:37  1    A.       This moves into July 25th of 2018, and this is a

14:33:42  2    different account, so these are three messages from the

14:33:45  3    account with the name Michael, the 602 number, and the three

14:33:49  4    messages read, from this account to Mr. Biden, "hey I just

14:33:53  5    got the app.  You want ten grams???"  Three question marks.

14:33:57  6    Q.       Is the "you want ten grams" message one of the

14:34:00  7    messages that you sent to the DEA expert?

14:34:04  8    A.       Yes.

14:34:04  9    Q.       Turning to the next page?

14:34:05 10    A.       So about 20 minutes later there is a "Y" from

14:34:10 11    Mr. Biden to the Michael account.

14:34:11 12    Q.       Is "Y" yes in your experience?

14:34:13 13    A.       Yes.

14:34:14 14    Q.       What is the next message?

14:34:15 15    A.       About a minute later he sends, Mr. Biden sends

14:34:18 16    another message to the Michael account saying "sorry phone

14:34:22 17    died."

14:34:22 18    Q.       How does Michael respond?

14:34:24 19    A.       Three minutes later the Michael account responds "he

14:34:28 20    said 600."

14:34:29 21    Q.       Turning to the following page, page 27?

14:34:31 22    A.       About five minutes later the Michael account responds

14:34:34 23    saying "cool??"  About a minute-and-a-half to two-minutes

14:34:40 24    later Mr. Biden responds "okay."  And then the Michael

14:34:44 25    account responds, "send me your address."

Jensen - direct

14:34:46  1    Q.      Turning to page 28.

14:34:49  2    A.      The next series of four messages are from the Michael

14:34:52  3    account and they occur, just a couple of minutes to a few

14:34:55  4    minutes after that exchange, saying "he's actually down to

14:34:58  5    meet you.  Here's his number.  424-278-8201."  And then

14:35:06  6    "you're welcome LOL."

14:35:08  7    Q.      And the following page, page 29.

14:35:11  8            Now, let me ask you a question first.  Up until

14:35:14  9    this page, have we gone over messages from and to Mr. Biden

14:35:18 10    from April 2018, May 2018, June 2018 and July 2018?

14:35:23 11    A.      Yeah.

14:35:25 12    Q.      Are those just a sampling of messages from the 18,000

14:35:28 13    pages of records that you said you have?

14:35:31 14    A.      Yes.

14:35:32 15    Q.      Now in August of 2018, do we see a message here that

14:35:35 16    says the source is laptop messages across the top?

14:35:38 17    A.      Yes.

14:35:38 18    Q.      Up until this point, have we reviewed any laptop

14:35:42 19    messages, et cetera, so far?

14:35:43 20    A.      No, that was all iCloud data.

14:35:45 21    Q.      If you look at the format of Row 86, there is a

14:35:49 22    slightly different on the laptop message than it is on the

14:35:53 23    iPhone messages?

14:35:53 24    A.      Yes, for this particular set of messages, there was a

14:35:56 25    different forensic tool that generated a different format of

Jensen - direct

14:36:00 1    report.

14:36:01 2    Q.      What is the first message on Row 86?

14:36:03 3    A.      It's a message dated August 8, 2018.  This one is an

14:36:08 4    SMS message, so it's a text message versus an iMessage.  It

14:36:12 5    is from a telephone number that begins with 702 to

14:36:16 6    Mr. Biden.  And it reads, "Z baby, I am so sorry, listen I'm

14:36:22 7    not trying to take advantage of you but I spent all the

14:36:25 8    money that you got me on black.  I really needed it and I

14:36:28 9    also went to Wal-Mart and bought some things.  But I wasn't

14:36:31 10   able to get a pipe anywhere, is there anywhere else I can

14:36:34 11   get brillo pad?  I will do what I can, babe, I'll spend the

14:36:39 12   entire night with you if you want, but will you please

14:36:41 13   please pay me more money?  Please don't think I'm taking

14:36:44 14   advantage and if you say no, I'll still come over.  I like

14:36:49 15   you a lot Hunter and I really understand you and see you in

14:36:52 16   a way I feel that others don't.  You are an amazing person

14:36:57 17   inside and you have a beautiful heart."

14:36:59 18   Q.      How did Mr. Biden respond then?

14:37:01 19   A.      So this response to this phone number is

14:37:04 20   forty-five minutes almost later and he says "I need more

14:37:07 21   chore boy, but regardless come back and yes."

14:37:09 22   Q.      Was "chore boy" a description you heard earlier from

14:37:12 23   Mr. Biden's audio book of something that is used to smoke

14:37:16 24   crack?

14:37:16 25   A.      Yes.

14:37:17  1   Q.       So at this point we're in August of 2018, I would

14:37:22  2   like to turn back to a couple of the audio exhibits, Exhibit

14:37:28  3   20L.  Does Exhibit 20L continue with California Odyssey,

14:37:34  4   that being Chapter 9, and events in 2018 leading up to the

14:37:38  5   gun purchase?

14:37:41  6   A.       Just give me one second.  Yes.

14:37:59  7                MR. HINES:  Could you please play Exhibit 20L,

14:38:03  8   Ms. Vo?

14:38:04  9                (Exhibit 20L audio played.)

14:38:20 10   BY MR. HINES:

14:38:39 11   Q.       So prior to the relapse he describes in his book,

14:38:42 12   were investigators able to locate records of the rehab and

14:38:46 13   sober coach that he's described?

14:38:47 14   A.       Yes.

14:38:48 15   Q.       I'm showing you Exhibit 25.  What is Exhibit 25?

14:39:00 16   A.       25 is a series of e-mails with attached invoices and

14:39:07 17   PDF files from a place called The View.

14:39:14 18   Q.       Does this exhibit contain records showing the

14:39:17 19   defendant's stay at a rehab center and with a sober coach?

14:39:21 20   A.       Yes.

14:39:22 21                MR. HINES:  Your Honor I move for the admission

14:39:24 22   of Exhibit 25.

14:39:27 23                MR. LOWELL:  Is it 25 or 25E?  No objection.

14:39:38 24                THE COURT:  Thank you.  It's admitted.

14:39:40 25                (Exhibit No. 25 was admitted into evidence.)

Jensen - direct

14:39:41  1   BY MR. HINES:

14:39:44  2   Q.      So is this the first page of Exhibit 25?

14:39:47  3   A.      Yes.

14:39:47  4   Q.      What does the top show, page 1?

14:39:52  5   A.      So the top shows where the e-mail was received from

14:39:58  6   at The View, and it's sent to RHBDC@iCloud.com, and the date

14:40:04  7   of 8/22/2018, the time and the attachment of invoice.

14:40:09  8   Q.      What is The View?

14:40:10  9   A.      The View is a detox center, rehab center.

14:40:15 10   Q.      Where is it located?

14:40:16 11   A.      In Los Angeles, in an area called Brentwood.

14:40:20 12   Q.      Did the, so the business, The View, was invoicing

14:40:26 13   Mr. Biden by sending these records to his iCloud account, is

14:40:31 14   that right?

14:40:31 15   A.      Yes.

14:40:32 16   Q.      Now, turning to page 3 of this document, is this the

14:40:37 17   first invoice in this exhibit?

14:40:41 18   A.      Yes.

14:40:42 19   Q.      Does it cover something called DTX stabilization from

14:40:48 20   8/21 to 8/22 for two days?

14:40:50 21   A.      Yes.

14:40:51 22   Q.      Does DTX in your experience stand for "detox"?

14:40:56 23   A.      Yes, detoxification.

14:40:57 24   Q.      Page 6.  Does it then go to the next date, 8/23/2018?

14:41:05 25   A.      Yes.

Jensen - direct

14:41:06  1   Q.      Page 9, is there then an invoice for DTX

14:41:11  2   stabilization for 8/24/18?

14:41:15  3   A.      Yes.

14:41:15  4   Q.      Page 12.  Is there then an invoice for DTX

14:41:21  5   stabilization from 8/24/18 to 8/26/18 for a three-day

14:41:27  6   period?

14:41:27  7   A.      Yes.

14:41:27  8   Q.      And page 15 is there an invoice for DTX stabilization

14:41:32  9   for 8/27/18?

14:41:33 10   A.      Yes.

14:41:33 11   Q.      So in some total, Mr. Biden appears to have been

14:41:37 12   invoiced for DTX/stabilization for the period of 8/21 to

14:41:43 13   8/27, correct?

14:41:44 14   A.      Yes.

14:41:44 15   Q.      Roughly 6 or 7 days there, right?

14:41:47 16   A.      Correct.

14:41:47 17   Q.      Now the following page, page 20, is there a record on

14:41:56 18   page 20 of Mr. Biden also being invoiced for services called

14:41:59 19   a sober companion?

14:42:01 20   A.      Yes.

14:42:02 21   Q.      Was that for the time period 8/27 to 9/2?

14:42:08 22   A.      Yes.

14:42:09 23   Q.      So in total, was this roughly 12 days for the

14:42:14 24   stabilization services plus the sober companion that

14:42:18 25   Mr. Biden was invoiced for?

14:42:19   1   A.      Yes.

14:42:20   2   Q.      Now, September 2nd, 2018, the date of this service

14:42:24   3   ending, approximately four days before the day of the gun

14:42:28   4   purchase?

14:42:29   5   A.      Yes.

14:42:30   6   Q.      And in the audio passage we just listened to, did the

14:42:34   7   defendant say I stayed clean for about two weeks?

14:42:37   8   A.      Yes.

14:42:37   9   Q.      Did he also say he relapsed?

14:42:40  10   A.      Yes.

14:42:40  11   Q.      Did you interview any witnesses who interacted with

14:42:44  12   the defendant after his relapse?

14:42:45  13   A.      Yes.

14:42:46  14   Q.      Who are those witnesses?

14:42:47  15   A.      Ms. Zoe Kestan and Ms. Hallie Biden.

14:42:52  16   Q.      Have they been served with a trial subpoena?

14:42:55  17   A.      They have.

14:42:56  18   Q.      After the relapse, does the defendant write another

14:42:59  19   chapter in his book, called Chapter 10, Lost Highway?

14:43:03  20   A.      Yes.

14:43:04  21   Q.      In this chapter, does he describe when he returned to

14:43:07  22   the east coast?

14:43:08  23   A.      Yes, he does.

14:43:10  24   Q.      Does he describe it as the fall of 2018?

14:43:14  25   A.      Yes.

Jensen - direct

14:43:15  1   Q.      Were you able to locate a record of when he actually
14:43:18  2   returned to the East Coast?
14:43:19  3   A.      Yes.
14:43:20  4   Q.      I'm showing you Government's Exhibit 26A.  What is
14:43:29  5   26A?
14:43:30  6   A.      This is a portion of a subpoena response from Alaska
14:43:34  7   Airways, showing a flight record for Robert Biden, departing
14:43:40  8   Los Angeles International Airport on October 5th at
14:43:44  9   8:55 p.m. into Philadelphia International Airport, scheduled
14:43:49 10   arrival 5:02 a.m. on October 6th, so a red eye.
14:43:55 11               MR. HINES:  Move for the admission of 26A.
14:43:58 12               MR. LOWELL:  No objection.
14:43:59 13               THE COURT:  Thank you.  It's admitted.
14:44:01 14               (Exhibit No. 26A was admitted into evidence.)
14:44:01 15   BY MR. HINES:
14:44:02 16   Q.      If we look at the header there, Agent Jensen, does
14:44:05 17   that include the dates that you just described for the jury?
14:44:08 18   A.      Yes.
14:44:08 19   Q.      And that date is October 5th, 2018?
14:44:10 20   A.      Correct.  Yes.
14:44:11 21   Q.      This is the return from the West Coast to the East
14:44:13 22   Coast?
14:44:13 23   A.      Yes.
14:44:14 24   Q.      And is this about one week prior to the gun purchase?
14:44:17 25   A.      Yes.

Jensen - direct

14:44:19  1   Q.      Now, the next segment I would like to play is Exhibit

14:44:27  2   20M.  Is this the next chapter in his book, Lost Highway?

14:44:32  3   A.      Yes.

14:44:35  4            MR. HINES:   Could you please play that Exhibit

14:44:38  5   20M.

14:44:39  6            (Exhibit 20M audio played.)

14:45:28  7   BY MR. HINES:

14:45:33  8   Q.      In the third full paragraph, Agent Jensen, does the

14:45:36  9   defendant say he had the hope of getting clean or staying

14:45:39 10   clean?

14:45:39 11   A.      "With the hope of getting clean."

14:45:41 12   Q.      Now, turning to Exhibit 19, page 165, Ms. Vo, an

14:45:50 13   exhibit already in evidence, I just want to highlight one

14:45:56 14   item.  Agent Jensen, do you remember listening to the audio

14:45:59 15   earlier, where Mr. Biden described paying $1,500 to a drug

14:46:04 16   associate for drugs?

14:46:05 17   A.      Yes.

14:46:07 18   Q.      And is that on this exhibit right here before us,

14:46:09 19   Exhibit 19, page 165?

14:46:12 20   A.      Yes.

14:46:15 21   Q.      Did investigators conduct a financial investigation

14:46:19 22   of the defendant to look at any records that may corroborate

14:46:24 23   whether he was actually paying this kind of cash to drug

14:46:28 24   associates?

14:46:28 25   A.      Yes.

Jensen - direct

14:46:29  1   Q.      Did you and other investigators prepare a chart that

14:46:35  2   summarizes some of the cash withdrawals that were made from

14:46:38  3   the defendant's bank accounts?

14:46:40  4   A.      Yes.

14:46:40  5   Q.      Is that Exhibit 27A?

14:46:45  6   A.      Yes, it is.

14:46:47  7   Q.      What is the time period of the records summarized in

14:46:49  8   this chart?

14:46:51  9   A.      So we summarized records from September, October, and

14:46:56 10   November of 2018.

14:46:59 11   Q.      And do they summarize bank statements?

14:47:01 12   A.      Yes.

14:47:02 13   Q.      Are the bank statements hundreds of pages?

14:47:05 14   A.      Yes.

14:47:05 15   Q.      Would it be inconvenient to examine all of them here

14:47:10 16   in court today?

14:47:10 17   A.      Yes.

14:47:11 18   Q.      Were the defendant's bank statements made available

14:47:13 19   to the defense?

14:47:14 20   A.      Yes, they were.

14:47:15 21   Q.      And does your chart fairly and accurately depict and

14:47:19 22   summarize those withdrawals from the bank statements?

14:47:22 23   A.      Yes.

14:47:23 24          MR. HINES:  Move for the admission of 27A.

14:47:25 25          MR. LOWELL:  No objection.

Jensen - direct

14:47:26  1                THE COURT:  Thank you.  It's admitted.

14:47:28  2                (Exhibit No. 27A was admitted into evidence.)

14:47:28  3     BY MR. HINES:

14:47:29  4     Q.     If we look at 27A, Agent Jensen, can you please

14:47:32  5     describe for the jury what the row across the top says and

14:47:35  6     how the chart is set up?

14:47:37  7     A.     Sure.  So this is a chart that lists the account that

14:47:44  8     the records were pulled from, the bank account that is.  And

14:47:47  9     then the authorized date of the withdrawal.  The date it was

14:47:51 10     actually posted to the account.  And then whether it was an

14:47:55 11     ATM withdrawal, or some other kind of cash withdrawal, and

14:48:00 12     the amount.

14:48:02 13     Q.     And so turning to the first entry, what is Owasco LLC

14:48:10 14     account, what does that mean?

14:48:11 15     A.     That was an account that was used by Mr. Biden for a

14:48:14 16     business entity.

14:48:15 17     Q.     Was it an account that the banks provided statements

14:48:19 18     for that showed he had access to that account?

14:48:22 19     A.     Yes.  Correct.

14:48:22 20     Q.     Is that the same with the Owasco PC account?

14:48:26 21     A.     Correct, that's just a separate bank account in the

14:48:28 22     name of Owasco PC, also utilized by Mr. Biden.

14:48:33 23     Q.     The Robert H. Biden account, is that an account in

14:48:36 24     his name personally?

14:48:37 25     A.     Yes.

Jensen - direct

14:48:37  1  Q.      Does your chart add up all of the cash withdrawals

14:48:41  2  between September and November of 2018 across those three

14:48:45  3  accounts?

14:48:45  4  A.      Yes.

14:48:46  5  Q.      Looking at the first page here, we're not going to go

14:48:49  6  through all them individually, but is there large cash

14:48:52  7  withdrawals nearly every day in the month of September?

14:48:57  8  A.      For this first page, through the 16th, yes there are

14:49:02  9  a couple of days where there aren't any recorded.

14:49:05 10  Q.      And the range of those cash withdrawals range between

14:49:08 11  $403 and $14,000.

14:49:14 12  A.      And the one at the bottom, "204.95".

14:49:18 13  Q.      Thank you, agent.  Now turning to the next page of

14:49:24 14  27(a), are there continual withdrawals of cash throughout

14:49:28 15  the remainder of September and into early October?

14:49:32 16  A.      Yes.

14:49:32 17  Q.      Directing your attention to the October 5th entry at

14:49:37 18  the bottom, what account was that withdrawn from?

14:49:41 19  A.      The last line is withdrawn from the personal account.

14:49:48 20  Q.      And what's the amount that was withdrawn from

14:49:51 21  Mr. Biden's personal account?

14:49:53 22  A.      A $5,000 withdrawal.

14:49:55 23  Q.      Turning to page 3, are there continual cash

14:50:01 24  withdrawals on an almost daily basis with some exceptions

14:50:05 25  throughout the month of October, 2018?

Jensen - direct

14:50:08  1    A.      Yes.  There are 3 or 4 days where there was none.

14:50:13  2    Q.      Directing your attention specifically to

14:50:16  3    October 12th, 2018, was that the date of the gun purchase in

14:50:20  4    this case?

14:50:20  5    A.      Yes.

14:50:21  6    Q.      What is the cash withdrawal from Mr. Biden's account

14:50:24  7    on October 12th, 2018?

14:50:30  8    A.      It is 10/12.

14:50:35  9    Q.      What's the amount that was withdrawn?

14:50:38  10   A.      $5,000.

14:50:41  11   Q.      Zooming out a second, Ms. Vo.  Let's look at page 4.

14:50:50  12   Are there continual cash withdrawals from Mr. Biden's

14:50:53  13   account on an almost daily basis through the remainder of

14:50:57  14   October?

14:50:58  15   A.      Yes.

14:50:59  16   Q.      And turning to page 5, are there continual large cash

14:51:04  17   withdrawals from Mr. Biden's account from October into early

14:51:09  18   November?

14:51:09  19   A.      Yes.

14:51:10  20   Q.      Page 6.  Are there continual large cash withdrawals

14:51:15  21   from Mr. Biden's accounts from November, in the month of

14:51:19  22   November?

14:51:20  23   A.      Yes.

14:51:21  24   Q.      Now turning to page 7, what was the total amount of

14:51:27  25   withdrawals that Mr. Biden withdrew cash from his accounts

428
Jensen - direct

14:51:33  1   from September through November of 2018?

14:51:35  2   A.     $151,640.45.

14:51:40  3   Q.     Does this chart show he was withdrawing roughly

14:51:44  4   $50,000 in cash a month between the months of September,

14:51:47  5   October, and November?

14:51:48  6   A.     Yes.

14:51:49  7   Q.     Now, we looked at that $5,000 withdrawal on

14:51:56  8   October 12th, 2018.  I would like to show you that exhibit,

14:51:59  9   the withdrawal slip, which is Exhibit 29E.  Do you see 29E?

14:52:06 10   A.     Yes.

14:52:07 11          MR. HINES:  May I move for the admission of 29E?

14:52:41 12          MR. LOWELL:  No objection.

14:52:42 13          THE COURT:  Thank you.  It's admitted.

14:52:45 14          (Exhibit No. 29E was admitted into evidence.)

14:52:46 15   BY MR. HINES:

14:52:48 16   Q.     Is this the cash withdrawal slip from October 12th,

14:52:53 17   2018?

14:52:53 18   A.     Yes, it's been provided by the bank.

14:52:55 19   Q.     Do you see a signature there next to the name Robert

14:53:00 20   Hunter Biden?

14:53:00 21   A.     Yes.

14:53:01 22   Q.     I'm going to come back to that signature later, Agent

14:53:06 23   Jensen.  Did you also create an exhibit that shows in a

14:53:11 24   calendar snapshot the frequency of these withdrawals, and

14:53:15 25   the amounts of these withdrawals, between September,

Jensen - direct

14:53:19  1    October, and November 2018?

14:53:20  2    A.      Yes.

14:53:20  3    Q.      Showing you Exhibit 27B.

14:53:27  4            MR. LOWELL:  No objection.

14:53:29  5            MR. HINES:  Move to admit.

14:53:30  6            MR. LOWELL:  I'm getting ahead of myself.

14:53:32  7            MR. HINES:  Move to admit.

14:53:33  8            MR. LOWELL:  You say move to admit.

14:53:36  9            No objection.

14:53:38 10            THE COURT:  Thank you.  It's admitted.

14:53:40 11            (Exhibit No. 27B was admitted into evidence.)

14:53:40 12    BY MR. HINES:

14:53:40 13    Q.      Is this a visual depiction of the other chart we just

14:53:43 14    looked at, 27A?

14:53:45 15    A.      Yes, this is just adding up all of the withdrawals on

14:53:48 16    a particular day regardless of the account, of the three

14:53:51 17    accounts by day.

14:53:52 18    Q.      If we turn to October of 2018, the month of the gun

14:53:56 19    purchase, does the chart show that there were only four days

14:54:01 20    during the entire month of October where Mr. Biden didn't

14:54:05 21    withdrawal cash from his accounts?

14:54:07 22    A.      Yes.

14:54:08 23    Q.      And leading up to October 12th, those twelve days,

14:54:13 24    did Mr. Biden withdrawal cash in ten of those days up to

14:54:19 25    October 12th?

Jensen - direct

14:54:19  1    A.      Yes.

14:54:20  2    Q.      What was the amount that he withdrew on the 10th and

14:54:23  3    the 11th?

14:54:24  4    A.      1,600 on the 10th, 1,600 on the 11th.

14:54:37  5    Q.      Two more financial records I would like to show you,

14:54:41  6    Agent Jensen.  30A and 36A.

14:54:59  7                MR. LOWELL:  No objection, Judge.

14:55:02  8                THE COURT:  Thank you.  It's admitted.

14:55:02  9                (Exhibit Nos. 30A and 36A were admitted into

14:55:03 10    evidence.)

14:55:03 11    BY MR. HINES:

14:55:03 12    Q.      Turning to 30A, is this one of the bank statements

14:55:07 13    that is in Mr. Biden's name?

14:55:09 14    A.      Yes.

14:55:10 15    Q.      Looking at page 3 of the PDF, do the bank statements

14:55:16 16    show inflows and spending during the year 2018?

14:55:20 17    A.      Yes.

14:55:20 18    Q.      And if you look at the total inflows column, do you

14:55:26 19    see the amount for the year is $1.4 million and change?

14:55:32 20    A.      Yes.

14:55:32 21    Q.      If you look at the ATM and check card activity, do

14:55:36 22    you see $494,000 and change on that list?

14:55:39 23    A.      Yes.

14:55:40 24    Q.      Now, that's not the only bank account that he had

14:55:43 25    access to, correct?

Jensen - direct

14:55:44  1   A.        Correct.

14:55:44  2   Q.        If you look at Exhibit 36A, which is admitted, is

14:55:54  3   this one of the business accounts that Mr. Biden had access

14:55:58  4   to?

14:55:58  5   A.        Yes.

14:55:59  6   Q.        Turning to page 2 of that exhibit, page 4 of the PDF.

14:56:08  7   Does this also show a snapshot for this account?

14:56:10  8   A.        Yes.

14:56:11  9   Q.        Does it show when it says cash deposited for the

14:56:24 10   year, roughly $3.4 million?

14:56:27 11   A.        Yes.

14:56:28 12   Q.        And then does it show cash withdrawn in that year,

14:56:33 13   also roughly $3.4 million?

14:56:35 14   A.        Yes.

14:56:41 15   Q.        Could you go ahead and highlight those, Ms. Vo?

14:56:44 16             So then amongst the net subtractions from cash,

14:56:51 17   does it breakdown the ATM withdrawals and check card

14:56:55 18   activity to approximately $399,000?

14:56:59 19   A.        Yes.

14:56:59 20   Q.        That's in addition to the other account that we just

14:57:02 21   looked at as well?

14:57:03 22   A.        Yes.

14:57:10 23   Q.        So we're now in October of 2018.  Moving forward.

14:57:19 24   Did investigators obtain business records from StarQuest

14:57:23 25   Shooters and Survival Supply?

Jensen - direct

14:57:26  1    A.      Yes.

14:57:26  2    Q.      I'm showing you what's been marked as Government's

14:57:33  3    Exhibit 8.

14:57:42  4                 MR. LOWELL:  What number was it?

14:57:45  5                 MR. HINES:  8.

14:57:59  6    BY MR. HINES:

14:57:59  7    Q.      Do you see Exhibit 8?

14:58:00  8    A.      Yes.

14:58:01  9    Q.      What is Exhibit 8?

14:58:02 10    A.      This is a business record certification from

14:58:06 11    StarQuest.

14:58:12 12                 MR. HINES:  I move for the admission of

14:58:14 13    Exhibit 8.

14:58:14 14                 MR. LOWELL:  No objection.

14:58:15 15                 THE COURT:  Thank you.  It's admitted.

14:58:17 16                 (Exhibit No. 8 was admitted into evidence.)

14:58:17 17    BY MR. HINES:

14:58:18 18    Q.      Could you just read only the first paragraph there,

14:58:21 19    Agent Jensen?

14:58:21 20    A.      Sure.  I, Kenneth Fuchs, attest under penalties of

14:58:27 21    perjury by the laws of the United States of America,

14:58:30 22    pursuant to 28 USC Code Section 1746 that the information

14:58:35 23    contained in this certification is true and correct.  I am

14:58:38 24    employed by StarQuest Shooters and Survival supply and my

14:58:42 25    title is manager.  I am qualified to authenticate the

Jensen - direct

14:58:46  1   records attached hereto because I am familiar with how the

14:58:49  2   records are created, managed, stored, and retrieved.  I

14:58:52  3   state that the records attached hereto are true duplicates

14:58:56  4   of the original records in the custody of StarQuest Shooters

14:59:00  5   and Survival Supply.

14:59:02  6   Q.     Is this the first page of the production of

14:59:05  7   documents?  A response to the subpoena?

14:59:06  8   A.     Yes.

14:59:06  9   Q.     Directing your attention to Government's Exhibit 6,

14:59:10 10   is Government's Exhibit 6, one of the pages of documents

14:59:15 11   provided by StarQuest Shooters?

14:59:17 12   A.     Yes.

14:59:17 13          MR. HINES:  Move for the admission of

14:59:19 14   Government's Exhibit 6.

14:59:20 15          MR. LOWELL:  No objection.

14:59:21 16          THE COURT:  Thank you.  It's admitted.

14:59:22 17          (Exhibit No. 6 was admitted into evidence.)

14:59:23 18   BY MR. HINES:

14:59:24 19   Q.     Is this an e-mail from

14:59:28 20   StarQuestShootersSupply@Gmail.com to James Reisch?

14:59:33 21   A.     Yes.

14:59:33 22   Q.     Who is James Reisch?

14:59:35 23   A.     He is an ATF special agent.

14:59:38 24   Q.     What is the date of this e-mail on the top right-hand

14:59:41 25   corner?

14:59:41   1    A.       It's cut off on the overhead but on the version I'm

14:59:44   2    looking at Friday, October 26, 2018.

14:59:49   3    Q.       And then scrolling down the page, is there an

14:59:52   4    attachment to this e-mail?

14:59:53   5    A.       Yes.

14:59:53   6    Q.       Did you independently verify with James Reisch that

14:59:57   7    he did receive this e-mail?

14:59:58   8    A.       Yes.

14:59:59   9    Q.       Is that Government's Exhibit 9, his receipt of that

15:00:02  10    e-mail?

15:00:03  11    A.       Yes.

15:00:04  12              MR. HINES:  Move for the admission of

15:00:06  13    Government's Exhibit 9.

15:00:24  14              MR. LOWELL:  No objection, Judge.

15:00:34  15              THE COURT:  Thank you.  It's admitted.

15:00:36  16              (Exhibit No. 9 was admitted into evidence.)

15:00:37  17    BY MR. HINES:

15:00:38  18    Q.       And is this the e-mail that actually shows the time

15:00:41  19    now, because it's not cut off, and shows it was sent on

15:00:44  20    Friday, October 26, 2018, 5:36 p.m.?

15:00:48  21    A.       Yes.

15:00:48  22    Q.       So this is roughly -- exactly two weeks after the gun

15:00:52  23    purchase; correct?

15:00:53  24    A.       Yes.  That's correct.

15:00:54  25    Q.       Now the attachment to that e-mail, is that

Jensen - direct

15:00:56  1   Government's Exhibit 10?

15:01:03  2   A.      Yes.

15:01:03  3   Q.      And did you take Government's Exhibit 10 and apply

15:01:10  4   redactions to certain personal identifying information of

15:01:13  5   the defendant in Government's Exhibit 10A?

15:01:16  6   A.      Yes.

15:01:19  7          MR. HINES:  I'm going to move for the admission

15:01:21  8   of 10 and ask to display 10A.

15:01:23  9          MR. LOWELL:  No objection to doing it that way.

15:01:26 10          THE COURT:  Thank you.  It's admitted.

15:01:28 11          (Exhibit No. 10 was admitted into evidence.)

15:01:30 12          MR. HINES:  I, just for the record move for the

15:01:33 13   admission of 10A, as well.

15:01:34 14          MR. LOWELL:  No objection to 10A, either.

15:01:37 15          (Exhibit No. 10A was admitted into evidence.)

15:01:37 16   BY MR. HINES:

15:01:38 17   Q.      Is this the form that was sent from StarQuest

15:01:41 18   Shooters to agent Reisch?

15:01:44 19   A.      Yes.

15:01:44 20   Q.      Across the top, does that say Section A must be

15:01:48 21   completed personally by transferee/buyer?

15:01:51 22   A.      Yes.

15:01:52 23   Q.      Does that include the defendant's information?

15:01:53 24   A.      Yes.

15:01:56 25   Q.      Does it list his name, city, county, zip code, place

Jensen - direct

15:02:01 1    of birth, height, weight, birth date, Social Security

15:02:07 2    number, and other personal information?

15:02:09 3    A.    Yes.

15:02:09 4    Q.    There are other series of questions in question 11?

15:02:13 5    A.    Yes.

15:02:13 6    Q.    Turning to question 11E, can you just read this into

15:02:17 7    the record?

15:02:17 8    A.    Question E reads, "are you an unlawful user of, or

15:02:22 9    addicted to marijuana, or any depressant, stimulant,

15:02:26 10   narcotic drug, or any other controlled substance?"

15:02:30 11   Q.    And turning to page 2 of this exhibit, is -- is there

15:02:42 12   a signature on the top of that page on line 14?

15:02:47 13   A.    Yes.

15:02:48 14   Q.    Have you seen that signature before?

15:02:51 15   A.    Yes.

15:02:53 16        MR. HINES:  I would like if Ms. Vo can put up

15:02:56 17   side by side Exhibit 10A, that signature, and Exhibit 29E,

15:03:01 18   which is admitted into evidence.

15:03:08 19   BY MR. HINES:

15:03:09 20   Q.    Does the signature on the left in 10A appear to be

15:03:15 21   consistent with the signature on the right in 29E?

15:03:19 22   A.    It is similar.

15:03:21 23   Q.    And back to 10A for one moment.  On page 1, the

15:03:28 24   question that I intended to ask you and forgot, with respect

15:03:31 25   to 11E, how did the defendant answer that question, 11E on

Jensen - direct

15:03:36  1  page 1?

15:03:37  2  A.      The box is checked, "no."

15:03:48  3  Q.      Turning to the final page of this exhibit, the final

15:03:57  4  page of Exhibit 10A.  Is this a passport identification for

15:04:04  5  Hunter Biden that was also included in this document that

15:04:09  6  was sent in this e-mail?

15:04:10  7  A.      Yes.

15:04:12  8  Q.      And under the redaction box does it list his personal

15:04:16  9  information, including his date of birth and his specific

15:04:19 10  passport number?

15:04:20 11  A.      Yes.

15:04:21 12  Q.      But the version you received does not have those

15:04:23 13  redaction boxes applied, correct?

15:04:25 14  A.      Right.  Correct.

15:04:27 15  Q.      Now, we're still in October of 2018, and I would like

15:04:30 16  to show you Government's Exhibit 12.  Is this another record

15:04:34 17  provided by StarQuest Shooters?

15:04:39 18  A.      Yes.

15:04:41 19  Q.      What is Government's Exhibit 12?

15:04:43 20  A.      This is the -- a response from the background check.

15:04:51 21  Q.      Is 12A a redacted version of that exhibit?

15:04:55 22  A.      Yes.

15:04:57 23          MR. HINES:  Move into evidence Exhibit 12A.

15:05:00 24          MR. LOWELL:  No objection.

15:05:01 25          THE COURT:  All right.  Thank you.  It's

Jensen - direct

15:05:02  1    admitted.

15:05:03  2                    (Exhibit No. 12A was admitted into evidence.)

15:05:03  3    BY MR. HINES:

15:05:04  4    Q.      So looking at the background check paperwork, what

15:05:08  5    does this document appear to show, could you explain it?

15:05:12  6    A.      This is a response for a check of a subject's

15:05:18  7    background in order to see if they qualify to purchase a

15:05:22  8    firearm.

15:05:22  9    Q.      And when you look at the status on the bottom, what

15:05:26 10    is the status for whether or not Mr. Biden passed the

15:05:30 11    background check?

15:05:31 12    A.      The status response is proceed.

15:05:35 13    Q.      And is that after -- that was in the production after

15:05:42 14    the Form 4473; correct?

15:05:45 15    A.      Yes.

15:05:46 16    Q.      Now, turning to page, Government's Exhibit 13A,

15:05:53 17    page 1, Government's Exhibit 13A, page 1, is that a receipt

15:06:11 18    -- take it down.

15:06:13 19              Is that a receipt that you received from

15:06:16 20    StarQuest?

15:06:16 21    A.      This is a receipt I received in response to the

15:06:19 22    subpoena to StarQuest.

15:06:21 23                    MR. HINES:  Move for the admission of 13A.

15:06:24 24                    MR. LOWELL:  No objection.

15:06:25 25                    THE COURT:  Thank you.  It's admitted.

Jensen - direct

15:06:26  1                    (Exhibit No. 13A was admitted into evidence.)

15:06:27  2    BY MR. HINES:

15:06:28  3    Q.      If we zoom in on the top.  Can you please list what

15:06:31  4    the items are that are listed on this receipt?

15:06:34  5    A.      The first item was an Item Number 18654, was a Colt

15:06:44  6    Cobra .38 Special, Talo Classic, with a serial number

15:06:46  7    RA551363.

15:06:50  8    Q.      What is the next item?

15:06:52  9    A.      The next item is Item number 10958, is an HKS speed

15:06:57 10    loader .38 Special.

15:07:01 11    Q.      And the next item?

15:07:02 12    A.      This is a BB gun, Gamo was the manufacturer.

15:07:09 13    Q.      And then the following item, the Hornady?

15:07:14 14    A.      Yes, Item 17540 is a box of ammunition.

15:07:23 15    Q.      Okay.  And then is there a NEBO True Utility

15:07:29 16    Fishface?

15:07:30 17    A.      Yes.

15:07:30 18    Q.      And a NEBO Firelight light?

15:07:35 19    A.      Yes.

15:07:35 20    Q.      In total if you look at the receipt, how much was the

15:07:40 21    purchase?

15:07:41 22    A.      The purchase total was $886.81.

15:07:50 23    Q.      What was tendered?

15:07:51 24    A.      $900 in cash.

15:07:54 25    Q.      How much was returned?

Jensen - direct

15:07:55  1    A.      $13.19.

15:07:58  2    Q.      This was the day $500 was withdrawn from the ATM?

15:08:02  3    A.      This was on October 12, 2018.

15:08:06  4    Q.      Looking at the bottom, does it say Robert Biden?

15:08:09  5    A.      Yes.

15:08:10  6    Q.      Did you redact the address that's listed there?

15:08:12  7    A.      Yes.

15:08:14  8    Q.      Government's Exhibit 14 --

15:08:15  9            THE COURT:  Mr. Hines is this a good time to

15:08:17 10    take our afternoon break?

15:08:19 11            MR. HINES:  Yes, Your Honor.  Thank you.

15:08:20 12            THE COURT:  Let's take our afternoon break and

15:08:22 13    pick up in fifteen minutes.

15:08:23 14            COURTROOM DEPUTY:  All rise.

15:08:26 15            (Jury exiting the courtroom at 3:08 p.m.)

15:08:59 16            THE COURT:  All right.  Fifteen minutes.

15:08:59 17            (A brief recess was taken.)

15:26:41 18            COURTROOM DEPUTY:  All rise.

15:26:46 19            (Jury entering the courtroom at 3:26 p.m.)

15:27:14 20            THE COURT:  All right, everyone, welcome back.

15:27:30 21            All right, everyone.  Everyone else can be

15:27:40 22    seated.

15:27:40 23            Mr. Hines, please continue.

15:27:42 24            MR. HINES:  Thank you, Your Honor.

15:27:43 25    BY MR. HINES:

Jensen - direct

15:27:44  1  Q.      Agent Jensen, before we went to the break, you were

15:27:47  2  summarizing records that showed the defendant's choice to

15:27:50  3  buy a gun on October 12, 2018, correct?

15:27:54  4  A.      Yes.

15:27:54  5  Q.      Now, turning to Government's Exhibit 14, is

15:27:57  6  Government's Exhibit 14 an official record maintained by the

15:28:02  7  ATF that certifies that StarQuest was licensed to sell

15:28:05  8  firearms on October 12th, 2018?

15:28:07  9  A.      Yes.

15:28:08  10            MR. HINES:  Move for the admission of

15:28:10  11  Government's Exhibit 14.

15:28:11  12            MR. LOWELL:  No objection.

15:28:12  13            THE COURT:  Thank you.  It's admitted.

15:28:13  14            (Exhibit No. 14 was admitted into evidence.)

15:28:14  15  BY MR. HINES:

15:28:15  16  Q.      Displaying the first page of Government Exhibit 14,

15:28:18  17  is this the sealed record provided by the ATF that

15:28:21  18  officially shows that StarQuest was licensed?

15:28:23  19  A.      Yes.

15:28:24  20  Q.      Turning to page 2, could you please read the

15:28:27  21  paragraph that begins, I do hereby?

15:28:30  22  A.      "I do hereby certify that StarQuest Shooters and

15:28:35  23  Survival Supply Incorporated, StarQuest Shooters and

15:28:38  24  Survival Supply was licensed as a dealer in firearms other

15:28:44  25  than destruction devices, license number

Jensen - direct

15:28:45  1   8-51-003-01-2E-00996, and was licensed with the Bureau of

15:28:53  2   Alcohol, Tobacco, Firearms, and Explosives during the period

15:28:57  3   of September 1, 2018, through December 31, 2018."

15:29:03  4   Q.      Now I would like to, with the Court's permission,

15:29:05  5   read a stipulation into the record between the parties?

15:29:08  6                THE COURT:  Of course.

15:29:09  7                MR. HINES:  The stipulation will be marked as

15:29:11  8   Government's Exhibit 43.

15:29:12  9                Display 43 please, Ms. Vo.

15:29:19 10                Stipulation reads, the parties agree that the

15:29:22 11   following facts are true and correct.  You may accept these

15:29:25 12   facts and require the government to produce no further proof

15:29:28 13   upon the matters:

15:29:29 14                1.  On October 12, 2018, StarQuest Shooters and

15:29:34 15   Survival Supply, located in Wilmington, Delaware, possessed

15:29:36 16   a federal firearms license, and was authorized to deal in

15:29:40 17   firearms under federal laws.  Therefore, StarQuest Shooters

15:29:44 18   and Survival Supply was a licensed dealer as defined in

15:29:47 19   Title 18, United States Code, Section 921(a)(11).

15:29:51 20                2.  The Colt Cobra .38 Special revolver, with

15:29:56 21   serial number RA551363, is a firearm as defined in Title 18,

15:30:04 22   United States Code, Section 921(a)(3).

15:30:07 23                3.  The frame of the Colt Cobra .38 Special

15:30:13 24   revolver, with serial number RA551363, was manufactured in

15:30:19 25   the state of Massachusetts, and Colt's manufacturing company

Jensen - direct

15:30:23  1    assembled the frame and remaining components of the Colt

15:30:26  2    Cobra .38 Special revolver, with serial number RA551363, at

15:30:33  3    their facilities in the State of Connecticut.  By virtue of

15:30:37  4    its presence in the State of Delaware, the Colt Cobra .38

15:30:41  5    Special revolver, with serial number RA551363, traveled in

15:30:45  6    interstate commerce.

15:30:48  7              So agreed, signed by myself and Mr. Weiss on

15:30:50  8    behalf of the U.S. Department of Justice, Mr. Biden with his

15:30:54  9    signature, Abbe Lowell, counsel for Mr. Biden.

15:30:59 10    BY MR. HINES:

15:31:00 11    Q.    Agent Jensen, we talked about October 12th, 2018, in

15:31:05 12    the defendant's gun purchase.  I would like to turn back to

15:31:09 13    some of the exhibits we were working through earlier in the

15:31:15 14    summary chart, Exhibit 18, okay?

15:31:17 15    A.    Yes.

15:31:17 16    Q.    I would like to direct your attention to

15:31:20 17    October 13th, 2018, the day after the gun purchase.  Would

15:31:23 18    you please look at Row 119 on page 37?

15:31:36 19    A.    For --

15:31:42 20    Q.    Row 119 on page 37?

15:31:53 21    A.    Yes.

15:31:55 22    Q.    What is the message that Mr. Biden sent the day after

15:31:58 23    the gun purchase?

15:32:01 24    A.    "Yes, Bernard, who hangs at 7-11 on Greenhill and

15:32:06 25    Lancaster, I'm now off MD avenue behind Blue Rocks Stadium

Jensen - direct

15:32:11  1    waiting for a dealer named Mookie."

15:32:17  2    Q.      Is this a message between Mr. Biden and Hallie Biden?

15:32:20  3    A.      Yes.

15:32:21  4    Q.      As you testified earlier, Ms. Biden was served with a

15:32:24  5    subpoena in this case, correct, and will testify later?

15:32:27  6    A.      Yes.

15:32:27  7    Q.      So does the summary chart include a number of

15:32:30  8    messages with Ms. Biden?

15:32:31  9    A.      It does.

15:32:32 10    Q.      We're not going to go through all them with your

15:32:35 11    testimony, we'll save most of them for hers, looking to

15:32:40 12    Row 125.  Can you read that message, which is now two days

15:32:43 13    after Mr. Biden's gun purchase?

15:32:45 14    A.      It reads, "I was sleeping on a car smoking crack on

15:32:49 15    4th Street and Rodney."

15:32:51 16    Q.      Who sent that message?

15:32:52 17    A.      This was a message sent October 14, 2018, from

15:32:56 18    Mr. Biden to Hallie Biden.

15:33:00 19    Q.      Directing your attention now to Row 134.  Is row --

15:33:08 20    what does Row 134 show?

15:33:12 21    A.      So this is at a date and time, again we're back to

15:33:18 22    this is something that's pulled right out of one of the

15:33:21 23    extraction records I referenced earlier, it includes some

15:33:25 24    metadata, it is showing a photograph with some, we call

15:33:30 25    metadata, but data that is associated with the photograph.

Jensen - direct

1   Q.      So are all the messages on page 41 that we're looking

2   at essentially messages that just establish Mr. Biden's

3   location in the month of October for the three-day period?

4   A.      This is explicitly that third message, that

5   photograph, location data, and the last one is depicting

6   something on October 19th.

7   Q.      I see.  So the third message on page 136, Row 136,

8   what does Mr. Biden say?

9   A.      "Thanks man.  How are you holding up.  I'm here in DE

10  the last few days boy headed up to NY for next few.

11  Call/text to let me know a good time to catch up."

12  Q.      After Mr. Biden says he's heading up to New York for

13  the next few, what is the next -- what is the next item

14  summarized on October 19th, 2018?

15  A.      This is an item, this is some data that's part of

16  internet searches, some of the data that we got from, I

17  believe the laptop, iTune messages, and it shows some Safari

18  searches that were done, so --

19  Q.      What are the Safari searches that Mr. Biden did?

20  A.      So the left column is showing the search, searches

21  that were done, clear and tight of the Ford Raptor, Roush,

22  R-O-U-S-H, is a model of the Ford Raptor or version.

23  Q.      And that first version says minimum parking garage

24  height, is that correct?

25  A.      Yes, first one is minimum parking garage height.

15:35:24 1   Q.      In your experience, does someone look up what the

15:35:27 2   height of their car is when parking in a parking garage that

15:35:31 3   has a height limitation?

15:35:33 4   A.      Yes, I just did that here last weekend.

15:35:36 5   Q.      Again, this was after Mr. Biden said he was going up

15:35:39 6   to New York when he referenced one of the search engine

15:35:44 7   history for a Ford Raptor, correct?

15:35:46 8   A.      Yes, these are on October 19th.

15:35:48 9   Q.      Now, turning to Row 138, is this another row that

15:35:56 10  shows location information for Mr. Biden?

15:35:59 11  A.      Yes.

15:35:59 12  Q.      Does it show location information for him in Delaware

15:36:02 13  on October 22nd, 2018?

15:36:05 14  A.      Yes.

15:36:10 15  Q.      Now, directing your attention to the next message,

15:36:18 16  what does Mr. Biden say on October 23rd, 2018, the date that

15:36:24 17  -- what does he say on that date?

15:36:26 18  A.      This message is sent at 11:45 a.m. to Hallie Biden,

15:36:31 19  it says:  "Did you take that from me Hallie?  Are you

15:36:36 20  insane.  Tell me now.  This is no game.  And you're being

15:36:39 21  totally irresponsible and unhinged."

15:36:44 22  Q.      Now, looking at the following page, page 43, Row 145,

15:36:49 23  what did Mr. Biden send to Hallie Biden?

15:36:54 24  A.      This message beyond the part that's redacted says

15:36:58 25  "the fucking FBI Hallie.  It's hard to believe anyone is

Jensen - direct

15:37:02  1   that stupid, so what's my fault here Hallie that you speak

15:37:06  2   of.  Owning a gun that's in a locked car hidden on another

15:37:10  3   property?  You say I invade your privacy.  What more can I

15:37:14  4   do than come back to you to try again.  And you do this???

15:37:19  5   Who in their right mind would trust you, would help me get

15:37:24  6   sober?"

15:37:26  7   Q.      Now turning to page 147, than Row 147, does Hallie

15:37:31  8   Biden respond, "I'm sorry, I just want you safe, that was

15:37:36  9   not safe."

15:37:37 10   A.      Yes.

15:37:38 11   Q.      What does Hallie Biden say next to Mr. Biden in

15:37:42 12   response?

15:37:42 13            MR. LOWELL:  Objection, I think he said

15:37:44 14   Ms. Biden is going to testify, and I don't know why the

15:37:47 15   agent is reading what she's going to say if she's going to

15:37:51 16   take the stand.  It's not an admission by Mr. Biden --

15:37:55 17            THE COURT:  That's not an objection, so are you

15:37:57 18   objecting?

15:37:57 19            MR. LOWELL:  I am objecting.

15:37:59 20            MR. HINES:  Like I said, I will only read a few

15:38:02 21   messages, this is actually the end of what I was intending

15:38:04 22   to read.

15:38:04 23            THE COURT:  Overruled.

15:38:09 24   BY MR. HINES:

15:38:09 25   Q.      What does that message say that Ms. Biden sent to

Jensen - direct

15:38:12  1  **Mr. Biden?**

15:38:12  2  **A.       "It was opened, unlocked, and windows down, and the**

15:38:15  3  **kids search your car."**

15:38:17  4  **Q.       Turning to Row 150, is this another location message?**

15:38:22  5  **A.       Yes.**

15:38:22  6  **Q.       Or photograph, I should say.  Where does it show his**

15:38:27  7  **location?**

15:38:27  8  **A.       This photograph had location data embedded in it that**

15:38:32  9  **showed Delaware.**

15:38:32 10  **Q.       How about Row 151, does that also have a location**

15:38:36 11  **data showing in Delaware?**

15:38:37 12  **A.       Same, this is embedded in the metadata, the**

15:38:41 13  **photograph in Delaware.**

15:38:47 14  **Q.       Row 164, is this a message between Hunter Biden and**

15:38:58 15  **someone named Ally Kenedy?**

15:39:00 16  **A.       Yes.**

15:39:01 17  **Q.       Can you read that message, please?**

15:39:04 18  **A.       "And do you really care that little about me that you**

15:39:07 19  **say shit like, "good to know you're alive", "hope you didn't**

15:39:12 20  **kill yourself", why do you get to be so mean Ally, what did**

15:39:17 21  **I ever do to you but tell you how beautiful and smart you**

15:39:20 22  **are.  You want me to be so callous with you, Ally, because I**

15:39:25 23  **can be mean when it really matters.  I thought you were**

15:39:27 24  **someone special Ally, and I didn't mind the way you took**

15:39:30 25  **advantage of me, you did it with finesse.  But I was**

Jensen - direct

15:39:34  1  surprised to see you act so petty and small.  That's not the

15:39:37  2  woman I thought you were, I know I have my flaws but I'm

15:39:40  3  proud of who I am, flaws and all and I was surprised to be

15:39:44  4  so wrong about someone I really thought had become a friend.

15:39:48  5  You tell all these girls you introduce me to that I'm a

15:39:53  6  crack head loser, WTF Ally, I'm a better fucking man than

15:39:53  7  that."

15:40:00  8  Q.    How does Ms. Ally Kenedy respond?

15:40:03  9  A.    "That's all very true except to part where I said I

15:40:06 10  tell all these girls you're a crack head loser, I have never

15:40:10 11  called you a loser, I obviously have to heads up on the

15:40:13 12  crack, but in no way are you a loser."

15:40:15 13  Q.    The next message?

15:40:16 14  A.    "I was upset, I was mean because I was betrayed by

15:40:20 15  both of you, I went into defense mode and I'm sorry for

15:40:23 16  being hurtful."

15:40:24 17  Q.    And the next message at row 167?

15:40:27 18  A.    The response, reading from Mr. Biden, "see that's the

15:40:33 19  Ally I know.  Motherfucking motherfucker."

15:40:35 20  Q.    Skipping 168.  That's from Hallie Biden.  Let's go to

15:40:42 21  169.  What is that series of messages?

15:40:45 22  A.    This is a series of messages, October 27th, 2018,

15:40:50 23  from Mr. Biden, they start with a telephone number, 401.

15:40:54 24  "Hey we spoke the week before Thanksgiving.  Met your

15:41:00 25  cousin.  Can we arrange to do the same thing, same exact

Jensen - direct

15:41:04  1  thing tonight? " And then he sends "raw."

15:41:10  2  Q.      What's the following message on row 171?

15:41:14  3  A.      "What did you need" is the response.  And a couple of

15:41:17  4  hours later "it might be around 8-9."

15:41:21  5  Q.      And then the following messages still on

15:41:25  6  November 27th, 2018?

15:41:28  7  A.      "Yeah.  Okay."  And then "ounce."

15:41:32  8  Q.      Is "ounce" a message that you also sent to the DEA

15:41:36  9  Special Agent who will testify in this case?

15:41:38 10  A.      Yes.

15:41:38 11  Q.      How does the individual respond in Row 175?

15:41:42 12  A.      "A couple hours", two-and-a-half hours later, "so

15:41:45 13  it's only going to be 1450."  And then "instead of the 16."

15:41:51 14  And then "when will you be ready, though?"

15:41:54 15  Q.      And how does Mr. Biden respond?

15:41:56 16  A.      Half an hour later, "send me a general address to put

15:42:01 17  in GPS."

15:42:03 18  Q.      And then does he respond questioning ounce?

15:42:06 19  A.      Yes.

15:42:06 20  Q.      And then what is the next message at 180?

15:42:10 21  A.      Two hours later.  "Yes and it's 17G pure give him

15:42:16 22  1,100 you'll be happy."

15:42:18 23  Q.      And did you send these messages to Agent Romig

15:42:22 24  because this appears to be another drug transaction?

15:42:24 25  A.      Yes, I sent these messages.

Jensen - direct

15:42:26  1   Q.      Turning to the following row, 181 -- sorry, let me

15:42:31  2   move forward.  The next message I would like to show you is

15:42:42  3   on page 56, Row 195.

15:42:51  4   A.      This is a message on December 9, 2018.

15:42:56  5   Q.      What does it say?

15:42:57  6   A.      It says "hey wondering if you're around."

15:43:00  7   Q.      That's from Mr. Biden to a number beginning 401?

15:43:04  8   A.      The same 401 number yes.

15:43:06  9   Q.      How did the 401 respond?

15:43:08 10   A.      "Who is this?"

15:43:10 11   Q.      And then?

15:43:11 12   A.      "We met at the gas station.  I have the big truck."

15:43:14 13   "The Raptor."  And they said Raptor later.

15:43:19 14   Q.      And then page 57, what did Mr. Biden say after he

15:43:23 15   said he had the Raptor?

15:43:24 16   A.      "You have the mini.  You helped your buddy out

15:43:29 17   hooking me up."

15:43:30 18   Q.      Hooking me up, I'm sorry, I didn't hear that?

15:43:33 19   A.      Hooking me up.

15:43:34 20   Q.      And then how does the individual respond?

15:43:36 21   A.      "What's up?"

15:43:37 22   Q.      How does Mr. Biden respond?

15:43:38 23   A.      "Any chance you can help me out?"

15:43:40 24   Q.      Row 203, how does -- what does Mr. Biden say next?

15:43:44 25   A.      Same.

Jensen - direct

15:43:45  1   Q.      And then what did he say?

15:43:47  2   A.      "But you have anyone who can meet me halfway in

15:43:50  3   Boston or I'll pay well for anyone who can bring to me here

15:43:54  4   in 20 minutes north of Boston."

15:43:57  5   Q.      Turning to Row 205?

15:44:00  6   A.      "No can't make that trip LOL."  "Got come out here."

15:44:07  7   Q.      And turning to 207.

15:44:11  8   A.      This is a message on December 18th, 2018, from

15:44:15  9   Mr. Biden to a number, with an account in the name Liz

15:44:21 10   Secundy, "because I'm insane and an addict and I'll obsess

15:44:26 11   over it."

15:44:26 12   Q.      And then the following item on Row 208, actually a

15:44:31 13   video?

15:44:31 14   A.      Yes.

15:44:31 15   Q.      Is that video Exhibit 18C?

15:44:38 16   A.      Yes.

15:44:44 17             MR. HINES:  Play 18C.

15:44:46 18             (Exhibit 18C was played.)

15:44:52 19   BY MR. HINES:

15:44:52 20   Q.      Was there an item in Mr. Biden's hand in that video,

15:44:55 21   18C?

15:44:55 22   A.      Yes.

15:44:56 23   Q.      Is this a video that you provided to agent Romig of

15:45:00 24   the DEA?

15:45:01 25   A.      Yes.

Jensen - direct

15:45:02  1          MR. HINES:  Move for the admission of 18C.

15:45:04  2          MR. LOWELL:  I think that was one we discussed,

15:45:06  3   so I objected and it was overruled.

15:45:10  4          THE COURT:  All right.  No need for -- yes, but

15:45:14  5   no need for commentary.  All right, it's admitted.  Thank

15:45:18  6   you, Your Honor.

15:45:19  7              (Exhibit No. 18C was admitted into evidence.)

15:45:20  8   BY MR. HINES:

15:45:20  9   Q.      Row 209?

15:45:22 10   A.      This is December 28, 2018, from the account for

15:45:28 11   Mr. Biden, "why can't you admit you are unhappy in the

15:45:31 12   throws of addiction and need help coupled with love?"

15:45:35 13   Q.      How does Mr. Secundy respond?

15:45:38 14   A.      Mr. Biden responds "I admit it completely."

15:45:41 15   Q.      Sorry that was Mr. Biden's response.  What's on the

15:45:44 16   following page, Row 211?

15:45:46 17   A.      That's when Mr. Biden says, "I blame her for being a

15:45:52 18   selfish self-righteous *C-word* that actually truly works

15:45:57 19   against my getting sober."

15:45:58 20   Q.      What does Mr. Biden say?

15:46:00 21   A.      "I'll fucking get sober when I want to get fucking

15:46:07 22   sober."

15:46:08 23   Q.      Is the following item on Row 213 a video?

15:46:11 24   A.      Yes.

15:46:12 25          MR. HINES:  I move for the admission of the

Jensen - direct

15:46:13  1    Government's Exhibit 18D, which is that video.

15:46:18  2                    MR. LOWELL:  Objection.

15:46:27  3                    THE COURT:  I'm sorry, which number is it?

15:46:31  4                    MR. HINES:  18D.

15:46:32  5                    THE COURT:  Overruled.

15:46:36  6                    (Exhibit 18D was played.)

15:46:41  7    BY MR. HINES:

15:46:52  8    Q.      And is that a video from Mr. Biden's electronic

15:46:56  9    devices?

15:46:57 10    A.      Yes.

15:46:59 11    Q.      And the voice on the video, did you compare that to

15:47:03 12    the voice on the audio book?

15:47:06 13    A.      Yes.  I heard two voices in the video, which sounded

15:47:10 14    like a female's voice and then a male's voice.  The male's

15:47:14 15    voice I did compare.

15:47:15 16    Q.      How did it compare?

15:47:16 17    A.      It's similar to the voice of Mr. Biden.

15:47:19 18    Q.      Turning to Row 214 on page 61.  Is that an image that

15:47:42 19    was on Mr. Biden's laptop?

15:47:44 20    A.      Yes.

15:47:45 21    Q.      And is there a device in Mr. Biden's hand or in the

15:47:52 22    hand displayed in the image I should say?

15:47:54 23    A.      It's so hard to see, it's a hand from this way and

15:47:58 24    looking this way at it, so the fingertip up close and some

15:48:02 25    items to the wrist in the background and there is an item

Jensen - direct

15:48:06  1    there.

15:48:06  2              MR. HINES:  Move for the admission of 18E which

15:48:09  3    is that photograph.

15:48:11  4              MR. LOWELL:  No objection.

15:48:12  5              THE COURT:  All right.  Thank you.  It's

15:48:14  6    admitted.

15:48:15  7              (Exhibit No. 18E was admitted into evidence.)

15:48:18  8    BY MR. HINES:

15:48:19  9    Q.      Turning to Row 216.  Row 216, is that an image that

15:48:38 10    was on Mr. Biden's laptop?

15:48:41 11    A.      Yes.

15:48:42 12    Q.      And is the corresponding image 18F?

15:48:45 13    A.      Yes.

15:48:47 14              MR. HINES:  Move to admit 18F.

15:48:49 15              MR. LOWELL:  No objection.

15:48:51 16              THE COURT:  It's admitted.

15:48:52 17              (Exhibit No. 18F was admitted into evidence.)

15:48:53 18    BY MR. HINES:

15:48:53 19    Q.      And if you zoom in on that glass looking object in

15:48:59 20    the back, is this a photograph that you provided to agent

15:49:04 21    Romig of the DEA?

15:49:05 22    A.      Yes.

15:49:06 23    Q.      Now, we're going to begin looking at a series of

15:49:09 24    messages starting in Row 217.  Are these messages in the

15:49:16 25    format you described earlier because they originated with

Jensen - direct

15:49:19   1    the defendant's laptop?

15:49:21   2    A.      Yes.   The forensic tool presented them in a different

15:49:26   3    format.

15:49:26   4    Q.      Are we now in the period of February 2019?

15:49:30   5    A.      Yes.

15:49:30   6    Q.      Are the remaining rows summarizing messages between

15:49:34   7    February of 2019 and March 7th, 2019?

15:49:39   8    A.      Yes.

15:49:41   9    Q.      Could you please begin with Row 217 and describe what

15:49:45  10    the message says?

15:49:50  11    A.      Yes.   So the text is at the bottom.   You can see the

15:49:55  12    sender participant, sender receiver, this is an iMessage or

15:50:01  13    SMS, the first message "ILL LYK when he calls me back."

15:50:07  14    Q.      What is the next message?

15:50:08  15    A.      This is from Mr. Biden to the 401 number, "what am I

15:50:12  16    doing tonight buddy, head to Providence or might not."

15:50:16  17    Q.      How does the 401 number respond?

15:50:18  18    A.      "You got it."

15:50:18  19    Q.      How does Mr. Biden respond?

15:50:20  20    A.      "Be around if I get the usual take out order."

15:50:27  21    "Buddy you understand my question?"

15:50:29  22    Q.      Is this a message you provided to the DEA?

15:50:31  23    A.      Yes.

15:50:33  24    Q.      Turning to next Row, 223?

15:50:35  25    A.      "How long until you get there?"

Jensen - direct

15:50:36  1    Q.      What's the next message?

15:50:37  2    A.      Biden response is "one hour and 30-minute, tops."

15:50:43  3    And then "what am I sending you?"

15:50:45  4    Q.      And the following page, page 64 at the top, what does

15:50:49  5    the individual say to Mr. Biden?

15:50:51  6    A.      "15."

15:50:52  7    Q.      What's next?

15:50:53  8    A.      "Rather sooner so I can make sure it all works."

15:50:57  9    Q.      And then what does that individual say?

15:50:59 10    A.      Let me -- "LMK" (or let me know) "when you 30-minute

15:51:03 11    away."

15:51:04 12    Q.      How does Mr. Biden respond?

15:51:05 13    A.      "I'm about 25 minutes out, send me the address

15:51:08 14    again."

15:51:09 15    Q.      How did the individual reply?

15:51:11 16    A.      "184 Preston."

15:51:13 17    Q.      What else does he say?

15:51:14 18    A.      "Send Venmo now to eliminate the confusion."

15:51:17 19    Q.      Turning to page 65, Row 262.  What does the

15:51:21 20    individual state?

15:51:22 21    A.      "I'm calling."

15:51:23 22    Q.      How does Mr. Biden respond?

15:51:25 23    A.      "I'm 15 minutes out."  "Okay" is the response.  And

15:51:31 24    then about seven minutes later, "five minutes out."  And the

15:51:36 25    401 number responds "can you send so I can pay him?"  And

Jensen - direct

15:51:40 1  then "LMK as soon as you handle it."

15:51:44 2  Q.    What are the messages on page 66?

15:51:49 3  A.    401 number says "just tell him you wanna try it."

15:51:53 4  Q.    How does Mr. Biden respond?

15:51:55 5  A.    "Supposed to be 31.  And barely registers as

15:51:59 6  anything."  The chart.  And then "hard to believe."

15:52:06 7  Q.    How does the 401 number reply?

15:52:09 8  A.    "This is complete bullshit, I don't like doing these

15:52:12 9  things when I'm not in town, I have to be there to oversee

15:52:16 10 shit because everybody is trying to get over."

15:52:19 11 Q.    What does the 401 number say next?

15:52:22 12 A.    "I can get you $200 back TM" (tomorrow).  "For sure."

15:52:30 13 And then says "out of my own pocket, it's not fair to you."

15:52:34 14 Q.    How does Mr. Biden respond?

15:52:35 15 A.    "Tell him I'm coming back with it and he can refund

15:52:38 16 me 1K, min I have his shit still."

15:52:42 17 Q.    How does the individual respond?

15:52:43 18 A.    "Bring it TM" tomorrow.  And "he's sleeping."

15:52:49 19 Q.    And on page 68, what does the individual say to

15:52:52 20 Mr. Biden?

15:52:53 21 A.    "I'll arrange it for you."

15:52:56 22 Q.    How does Mr. Biden respond?

15:52:57 23 A.    "Problem here is that I made assurances to someone I

15:53:02 24 now owe back the full 15, or 15."  And then he says "and

15:53:08 25 this guy ain't sleeping."

Jensen - direct

15:53:10  1    Q.      And then what does the individual say?

15:53:11  2    A.      "Okay.  I'll fix it TM."

15:53:14  3    Q.      How does Mr. Biden respond?

15:53:15  4    A.      "And he's not someone I can keep waiting, bro."  And

15:53:20  5    then he says "I told him I'd test, told him don't bring it

15:53:25  6    if it's not too, and I told him I'd have to eat this if it

15:53:29  7    wasn't."

15:53:30  8    Q.      What's the next message beginning on page 69?

15:53:34  9    A.      He says, what the Biden 401 number, "what the duct

15:53:40 10    man it's not even five percent."

15:53:42 11    Q.      How does the individual respond?

15:53:43 12    A.      "This is weird."  And then "what's going around right

15:53:46 13    now.  It's never like that."

15:53:49 14    Q.      What does Mr. Biden say?

15:53:50 15    A.      "Maybe he didn't know what he was getting.  I will do

15:53:54 16    the test again in front of him."

15:53:56 17    Q.      And how does the individual respond on page 70?

15:53:59 18    A.      "He just called him, I didn't pick up."

15:54:03 19    Q.      What does Mr. Biden say?

15:54:05 20    A.      "But want about the weight."  And then "okay."  401

15:54:12 21    number responds saying "IDK, I don't know that's what I'm

15:54:16 22    confused about too".  And then Mr. Biden says "LMK buddy."

15:54:22 23    The 401 number then responds "maybe he grabbed the wrong

15:54:27 24    bag."

15:54:29 25    Q.      I just have a couple of pages left Agent Jensen.  The

Jensen - direct

15:54:32  1   top of page 71, Mr. Biden says "I know you can't make

15:54:37  2   promises from 2,500 miles away" and how does the individual

15:54:40  3   respond?

15:54:40  4   A.     "I'll arrange you to bring it back."  And then says

15:54:45  5   "TM."

15:54:45  6   Q.     What does Mr. Biden then say?

15:54:47  7   A.     "I think it may be Fentan... and mix."  401 number

15:54:58  8   says "seriously?"

15:55:00  9   Q.     Is this a message you provided to the DEA?

15:55:02 10   A.     Yes.

15:55:03 11   Q.     Starting on page 72, what is the first message?

15:55:06 12   A.     "Or something."

15:55:08 13   Q.     How does the individual respond?

15:55:10 14   A.     "Fontanel kill PPL."  People.  "I heard about it."

15:55:17 15   Q.     What does Mr. Biden say?

15:55:19 16   A.     It doesn't even show as one of the quotes on that

15:55:22 17   chart man."

15:55:22 18   Q.     What's next:

15:55:23 19   A.     "I DNT" don't "think that's that."

15:55:27 20   Q.     That was sent to Mr. Biden correct?

15:55:29 21   A.     Correct.

15:55:29 22   Q.     And then what's the next message?

15:55:31 23   A.     Mr. Biden then says, "the little piece tested there

15:55:34 24   was at least a medium yellow but it didn't come from the bag

15:55:38 25   he gave me."

15:55:39  1    Q.      And what does Mr. Biden say in this next message?

15:55:43  2              MR. LOWELL:  Can you tell me which line, because

15:55:45  3    I don't know the date.

15:55:46  4              MR. HINES:  Row 280.

15:55:49  5              MR. LOWELL:  Okay.  Thank you.

15:55:50  6    BY MR. HINES:

15:55:50  7    Q.      What does Mr. Biden say in this next text message on

15:55:55  8    February 26, 2019?

15:55:56  9    A.      He says "no more texts, okay."

15:55:58 10    Q.      Turning to Row 281, how does -- what is the next

15:56:02 11    series of messages with this 203 number?

15:56:05 12    A.      This is a series of messages that are on March 4,

15:56:09 13    2019, with a 203 number.

15:56:10 14    Q.      What is said, what does the 203 number say first?

15:56:15 15    A.      "How much was he wanting."

15:56:16 16    Q.      What does Mr. Biden respond?

15:56:18 17    A.      "400 worth."

15:56:20 18    Q.      What does the 203 number say?

15:56:22 19    A.      "Okay, send me the address."

15:56:23 20    Q.      Does Mr. Biden send the address?

15:56:26 21    A.      "Yes, we're at Comfort Inn, 716 New Haven Rd.

15:56:30 22    Naugatuck."

15:56:30 23    Q.      What does the 203 number say?

15:56:32 24    A.      "Okay, I'll be there soon."

15:56:34 25    Q.      What is next to page 74, Row 206.

15:56:38   1   A.      203 number, "he wants to know if you can come here."

15:56:42   2   And then "I have a ball on me."

15:56:45   3   Q.      What does Mr. Biden say?

15:56:48   4   A.      A couple days later on 3/7/2019, "did you just scam

15:56:54   5   me -- it feels like it!"  And then "no."  This is from the

15:57:03   6   302 number.

15:57:06   7   Q.      And then on the 203 number, how does he respond to

15:57:09   8   Mr. Biden's text, that said "dude, did you just scam me?"

15:57:13   9   A.      Minutes later he said "no way dude, how do you feel

15:57:16  10   like I sold a 30 just now."

15:57:19  11   Q.      What does he say next, the 203 number?

15:57:22  12   A.      He says "you gave me 200 that what I brought you the

15:57:26  13   first time, the second time I sold some and brought you 60."

15:57:30  14   Q.      Page 75, the final page, what's the final message on

15:57:33  15   the summary chart?

15:57:35  16   A.      "Dude, I like you, I won't scam you!"

15:57:40  17   Q.      Agent Jensen, this is just a snapshot of some of the

15:57:44  18   messages that you pulled out and put in a summary chart, it

15:57:47  19   doesn't summarize all of the messages this defendant had

15:57:49  20   during this time period, correct?

15:57:52  21   A.      That's correct.

15:57:52  22   Q.      We're going to return to the book before we conclude.

15:57:55  23   We talked about messages now up through March of 2019;

15:57:59  24   correct?

15:58:00  25   A.      Yes.

15:58:00  1   Q.       Now, turning back to the book, the final chapter is

15:58:11  2   called what, that's included in your excerpt?

15:58:16  3   A.       I believe it's Saved.

15:58:19  4   Q.       Is that Chapter 11?

15:58:21  5   A.       Yes.

15:58:22  6   Q.       And I'm going to play this again, just to stick with

15:58:26  7   the chronology, is there the chapter in which Mr. Biden

15:58:30  8   indicated he landed in LA in March of 2019, but your

15:58:34  9   investigation showed it was actually in April of 2019?

15:58:36 10   A.       Yes.

15:58:37 11   Q.       And on 20P, which we've already played, does he then

15:58:41 12   describe his four years of active addiction that preceded

15:58:44 13   this trip to California?

15:58:45 14   A.       Yes.

15:58:46 15   Q.       I'm showing you what has been admitted into evidence

15:58:48 16   but not yet played, this is the final audio clip of Exhibit

15:58:53 17   20Q.   Could you please play 20Q?

15:58:59 18              (Exhibit 20Q audio was played.)

15:59:06 19   BY MR. HINES:

15:59:36 20   Q.       Agent Jensen, have you -- we're finished summarizing

15:59:39 21   today the evidence of the defendant's drug addiction for

15:59:42 22   that four-year period leading up to the spring of 2019?

15:59:46 23   A.       Yes.

15:59:46 24              MR. HINES:  No further questions at this time.

15:59:48 25              THE COURT:  All right.  Thank you.

Jensen - cross

| | | |
|---|---|---|
| 15:59:49 | 1 | Cross-exam. |
| 15:59:50 | 2 | MR. LOWELL:  Yes, Your Honor.  We're trying to |
| 16:00:25 | 3 | switch the monitor, Your Honor. |
| 16:00:40 | 4 | CROSS-EXAMINATION |
| 16:00:46 | 5 | BY MR. LOWELL: |
| 16:01:22 | 6 | Q.    Good afternoon, Agent. |
| 16:01:24 | 7 | A.    Good afternoon. |
| 16:01:25 | 8 | Q.    I would like to start a little bit about where you |
| 16:01:28 | 9 | ended and I'll come back to that, but it's about text |
| 16:01:32 | 10 | messages.  Okay? |
| 16:01:33 | 11 | A.    Sure. |
| 16:01:33 | 12 | Q.    Could you put up government Exhibit 18, which was |
| 16:01:40 | 13 | just admitted.  And will you turn to the end of that |
| 16:01:50 | 14 | exhibit, starting at page -- line 214.  Row 214. |
| 16:02:15 | 15 | Just using that, what's the date of that |
| 16:02:23 | 16 | exchange? |
| 16:02:26 | 17 | A.    On 1/14. |
| 16:02:28 | 18 | Q.    Of what year? |
| 16:02:29 | 19 | A.    2019. |
| 16:02:31 | 20 | Q.    Right.  How many months after the gun sale is that? |
| 16:02:34 | 21 | A.    That would be almost exactly three months to the day. |
| 16:02:38 | 22 | Q.    And as you then were able to go through with |
| 16:02:43 | 23 | Mr. Hines, the texts that come after, all that was either at |
| 16:02:47 | 24 | the date of January of 2019 or the month after or the month |
| 16:02:52 | 25 | after or the month after? |

Jensen - cross

16:02:54  1    A.      Correct.

16:02:54  2    Q.      So that would mean 4 or 5 months after the gun sale,

16:02:59  3    right, April of 2019?

16:03:02  4    A.      To March, correct.

16:03:04  5    Q.      And then one in particular --

16:03:06  6    A.      March 7th, actually.

16:03:08  7    Q.      Would you go to the next page where it starts

16:03:15  8    February 26th.  Page 62, please.  Starting on 219.

16:03:27  9            You identified back and forth and back and forth

16:03:32 10    starting on Row 219, correct?

16:03:37 11    A.      Yes.

16:03:38 12    Q.      Can you skim through 219, would you go to -- the next

16:03:44 13    page, the same date, right?  February 26th, the same date?

16:03:51 14    A.      Yes.

16:03:51 15    Q.      All the way down, same date; right?

16:03:55 16    A.      Yes.

16:03:56 17    Q.      Okay.  Next page, please.

16:03:58 18            The whole page, still February 26th?

16:04:05 19    A.      They're all from February 26th.

16:04:07 20    Q.      Of 2019?

16:04:09 21    A.      Yes.

16:04:09 22    Q.      Many, many text messages.

16:04:12 23            Also, February 26th, 2019; correct?

16:04:16 24    A.      Yes.

16:04:22 25    Q.      Still same day back and forth, back and forth,

Jensen - cross

16:04:25 1    February of 2019, correct?

16:04:27 2    A.    Yes.

16:04:27 3    Q.    And the 26th, same day?

16:04:30 4    A.    The 26th.

16:04:31 5    Q.    Did you have the time to count how many texts

16:04:35 6    Mr. Biden was exchanging with the people that you have

16:04:38 7    identified on that day, how many of them?

16:04:42 8    A.    No.

16:04:43 9    Q.    Would the number 62 surprise you?  We can count it?

16:04:49 10   A.    I don't know that I can estimate.  I don't recall.

16:04:52 11   Q.    It's dozens as you can see right here, right?

16:04:55 12   A.    Sure, we see there are several pages.

16:04:58 13   Q.    And they're all on February 26th?

16:05:01 14   A.    Yes.

16:05:01 15   Q.    And they're all about getting some drugs or something

16:05:04 16   like that?

16:05:05 17   A.    I don't know that I was interpreting what they were

16:05:08 18   --

16:05:08 19   Q.    But you had references to an ounce or whatever you

16:05:11 20   had identified for Mr. Hines, correct?

16:05:13 21   A.    Correct.

16:05:14 22   Q.    Would you now go back to the row of October of 18.

16:05:24 23   Would you now go backwards to Row 92, please.  To Row 92.

16:05:40 24           What's the date of Row 92?

16:05:47 25   A.    October 13th, 2018.

Jensen - cross

16:05:49 1    Q.      In the period of time of October of '18, which is the

16:05:52 2    month of the gun sale; right?

16:05:54 3    A.      Yes.

16:05:54 4    Q.      Do you see 62 texts back and forth with anybody that

16:06:01 5    you have identified as being a person or people like on

16:06:05 6    February 26th, 62 in a day that has any reference at all to

16:06:09 7    things like drugs, do you see that in your summary chart?

16:06:12 8    A.      Not in the chart, what we have gone through, of what

16:06:17 9    I have, if you're asking have I done tabulations of the

16:06:21 10   amount of messages back and forth, I haven't.

16:06:23 11   Q.      Right.  I'm asking that in the period of October of

16:06:26 12   18?

16:06:27 13   A.      Sure.

16:06:27 14   Q.      Do you see anything like a day in which there were 62

16:06:31 15   backs and forth's with somebody who might be a drug dealer,

16:06:35 16   do you see that, and if so, did you put it on your chart if

16:06:38 17   it's there?

16:06:39 18   A.      What I have on the chart?

16:06:40 19   Q.      Yeah?

16:06:40 20   A.      I haven't counted to see if there are messages back

16:06:45 21   and forth that total 62.  I understand what you're saying, I

16:06:48 22   can speak to what's in the chart, I'm happy to do that.

16:06:51 23   Q.      What's in the chart is not a day in the period of the

16:06:54 24   gun sale that looks like -- 62 messages in February of 2019,

16:07:00 25   right?

Jensen - cross

16:07:00 1    A.        If you want to give me a moment, I'm happy to go

16:07:03 2    through and count.

16:07:04 3    Q.        Please take as much time as you want, looking at the

16:07:07 4    day of, for example, October 13th?

16:07:08 5    A.        Probably the bulk of the messages that are the ones

16:07:11 6    we didn't go over.

16:07:12 7    Q.        I'm sorry, I didn't hear that.

16:07:12 8    A.        The bulk of the messages that we didn't go over

16:07:15 9    today, a lot may have occurred on the same day.

16:07:19 10   Q.        I'm asking you to take your time and present to the

16:07:24 11   summary chart that you presented to the jury, and see if you

16:07:27 12   can find 62 messages between a person in a day that

16:07:30 13   references to what you just said?

16:07:33 14   A.        You're asking if there is an exchange similar to what

16:07:36 15   we read through for February.

16:07:38 16   Q.        I'm talking about for example, the number, 62?

16:07:41 17   A.        The number 62.   (Witness reviewing document.)   There

16:08:19 18   are -- not over a single day, no, there were several

16:08:25 19   messages maybe on the 13th but they were with Hallie Biden.

16:08:28 20   Q.        And they don't mention anything about drug --

16:08:30 21   A.        I didn't count.

16:08:32 22   Q.        And the one on the 13th, before you turn to a

16:08:35 23   different date, that doesn't say anything about drugs that

16:08:37 24   day, does it, on the 13th, "that freaked me out, hello," the

16:08:41 25   ones on the screen?

Jensen - cross

16:08:43  1    A.      I don't know that I --

16:08:50  2    Q.      I'm looking at the 13th just as an example.

16:08:53  3    A.      Give me a line number, that would help.

16:08:57  4    Q.      90, 91, 92, 93?

16:08:59  5    A.      And you're asking if any of these messages are

16:09:02  6    talking about drugs?

16:09:03  7    Q.      On the 13th, whether there are 62 or 38 or 20 or any

16:09:08  8    of them that do that?

16:09:09  9    A.      I didn't count them, but I don't think there are that

16:09:12 10    volume of messages, and I don't think I can interpret all

16:09:15 11    these messages exactly, but no, if you're trying to say are

16:09:19 12    there as many, roughly --

16:09:23 13    Q.      On the 13th, just using the screen, I know you will

16:09:27 14    have others that I'll ask you about, but is there any

16:09:31 15    reference, for example, to the number or the subject matter

16:09:34 16    being as you identified it 4 or 5 months later in 2019

16:09:40 17    talking about drugs?

16:09:41 18    A.      If we're including anything in 2013.

16:09:44 19    Q.      Yeah, on October 13th, just using that as an example?

16:09:50 20    A.      Sure.

16:09:52 21    Q.      I'll withdrawal the question, I'll come back to it

16:09:55 22    when we do this again, I'm sorry, I just wanted to start?

16:09:58 23    A.      I'm sorry?

16:09:59 24    Q.      You're not doing anything, it's my poor question.

16:10:03 25            In the beginning of your testimony you indicated

16:10:05  1   that we know that the gun sale took place on October of

16:10:10  2   2018.  When you started testifying before lunch, you said

16:10:13  3   that the book you were talking about from which there were

16:10:18  4   excerpts played, was written in 2021?

16:10:20  5   A.      I think it was published in April of 2021.

16:10:23  6   Q.      I'm sorry, I should have said the word published?

16:10:25  7   A.      Yes.

16:10:26  8   Q.      And I think you said you were assigned to this case

16:10:29  9   then a few years later than that in 2023?

16:10:33  10  A.      Correct, I was not assigned to this investigation

16:10:36  11  until last fall.

16:10:37  12  Q.      So meaning you were assigned this investigation after

16:10:40  13  the gun was purchased in 2018; right?

16:10:43  14  A.      Yes.

16:10:43  15  Q.      And after the book was written; correct?

16:10:47  16  A.      Yes.

16:10:47  17  Q.      And after the book was published, is that right?

16:10:50  18  A.      Yes.

16:10:50  19  Q.      And therefore, you weren't there at the time to

16:10:53  20  witness any of the events?

16:10:55  21  A.      No.

16:10:58  22  Q.      And when -- you read the book to pick out the

16:11:03  23  excerpts, correct?

16:11:04  24  A.      Yes.

16:11:05  25  Q.      When you read the book and picked out the excerpts

Jensen - cross

16:11:08 1    that was written after the event and published in 2021, it

16:11:12 2    says in the book as you read, this was what he wrote after

16:11:15 3    the fact looking back, correct?

16:11:17 4    A.    Correct, I think the book states from the beginning

16:11:20 5    it was November of '19 when he sat down and started writing.

16:11:23 6    Q.    So this was a backwards look of what he was saying,

16:11:26 7    right, it's not a diary?

16:11:28 8    A.    Yeah, so it would have been about a year after the

16:11:31 9    purchase of the gun, yes.

16:11:32 10   Q.    And after, in the book you read and picked excerpts

16:11:36 11   out, he said he had finally gotten clean and sober, right?

16:11:40 12   A.    Ask me that one more time, it's been a long day.

16:11:44 13   Q.    After, in the book you read and picked excerpts out,

16:11:47 14   it says in the book that's after he got clean and sober that

16:11:51 15   he wrote the book?

16:11:52 16   A.    Yes, I believe it's -- yes.

16:12:02 17   Q.    As I asked you before, the book itself and nothing

16:12:05 18   you saw indicates it was a contemporaneous diary of what was

16:12:11 19   happening in each of those prior years, right?

16:12:13 20   A.    You mean was it written at the time of the event, it

16:12:16 21   was written in hindsight.  I read the book and I did not get

16:12:20 22   that from the book.

16:12:21 23   Q.    In addition to which when you picked out the excerpts

16:12:23 24   from the book and from ultimately the texts, I think you did

16:12:27 25   mention that you saw references to when Hunter talks about

Jensen - cross

16:12:32  1    his alcohol use, right?

16:12:32  2    A.      Yeah, that was read in some of the excerpts.

16:12:36  3    Q.      He talked about being in a hotel and drinking more or

16:12:40  4    he even mentions other occasions in which he was confessing

16:12:43  5    in his book that he also used alcohol, correct?

16:12:46  6    A.      Yes, I think even the last excerpt we played was the

16:12:49  7    drinking and drug reference.

16:12:51  8    Q.      Some of the excerpts that you picked and that were

16:12:54  9    played for the jury said things like, that we just heard,

16:12:57 10    that when he was using crack, he could hardly do anything

16:13:00 11    else, do you remember him saying that in the book?

16:13:03 12    A.      My recollection is that there are excerpts where he

16:13:07 13    was principally occupied with smoking crack cocaine, I

16:13:13 14    didn't get the sense that it was the entire history.

16:13:17 15    Q.      That's one of the questions, then.  So in the period

16:13:20 16    that you were asked about that by Mr. Hines, from 2015

16:13:24 17    through the spring of 2019, you weren't saying in your

16:13:27 18    testimony of what you read or what you investigated that he

16:13:30 19    was using crack cocaine throughout that whole period; right?

16:13:35 20    A.      I think the excerpts reflected periods of time that

16:13:38 21    he was using crack cocaine.

16:13:40 22    Q.      Periods of time, right?

16:13:41 23    A.      Correct.

16:13:41 24    Q.      Meaning that there were periods of time that he was

16:13:44 25    not?

Jensen - cross

16:13:45 1    A.        I think there -- including the period in August where

16:13:50 2    we have some invoices for rehab, that there were periods

16:13:55 3    where there was not.

16:13:56 4    Q.        How about in earlier years, there were periods that

16:14:00 5    do not reflect on what you saw and what you read and what

16:14:03 6    the jury heard that there were no references to using crack

16:14:07 7    cocaine, correct?

16:14:08 8    A.        I do believe the excerpts refer to periods where

16:14:12 9    there was no usage.

16:14:14 10   Q.        And in the part that was picked out by you and played

16:14:18 11   to the jury, there were ones where this morning, maybe this

16:14:25 12   is right before lunch, he said as it was played, he could

16:14:29 13   hardly pack and get out of his room or get on a plane.  Do

16:14:33 14   you remember that?

16:14:33 15   A.        Yes.

16:14:37 16   Q.        When you were looking at the book and in the texts,

16:14:41 17   for the period of September through November, he did get on

16:14:46 18   a plane, didn't he?

16:14:48 19   A.        You mean -- --

16:14:49 20   Q.        Coming from California to Delaware, that's an

16:14:52 21   example?

16:14:52 22   A.        Which year do you mean, September and October '18?

16:14:55 23   Q.        Between September and October of 2018?

16:14:58 24   A.        Yes.

16:14:58 25   Q.        And he did do that?

Jensen - cross

16:15:00  1    A.      Yes, there are records of him flying back on

16:15:04  2    October 5th.

16:15:04  3    Q.      And in what you played for the jury earlier, he said

16:15:09  4    in one of the excerpts that were played, that he would hold

16:15:12  5    up on a hotel room and wouldn't see anybody else.  Do you

16:15:16  6    remember him saying that, other than the people he was

16:15:18  7    dealing with or the people that were supplying him, or the

16:15:20  8    people that were freeloading, do you remember that part?

16:15:23  9    A.      Yeah, my sense of some is that there were periods

16:15:27 10    where he was in those positions, where -- yes.

16:15:29 11    Q.      And then from both the book and your investigation,

16:15:32 12    you knew that after he flew back to Delaware on October 5th,

16:15:37 13    he was seeing people, including his family and friends, you

16:15:41 14    saw that too, right?  In October of 2018?

16:15:45 15    A.      In October of 2018?  Are you asking if I am aware

16:15:49 16    through our evidence if he had contact with other people?

16:15:52 17    Q.      Including the book that you read from?

16:15:55 18    A.      I especially can recall him messaging, he did have

16:15:59 19    contact with family members.

16:16:00 20    Q.      And you remember that in the book that you read

16:16:03 21    excerpts from, he described his use of crack cocaine

16:16:07 22    sometimes of every 15 minutes, do you remember that?

16:16:10 23    A.      Yes.

16:16:10 24    Q.      And after he returned from California being at that

16:16:14 25    rehab center, there was no reference of that in the book or

Jensen - cross

16:16:18 1  any of the texts on using every 15 minutes, is there?

16:16:23 2  A.      No, I think the book does not make a reference of the

16:16:26 3  every 15 minutes, correct.

16:16:28 4  Q.      When you were explaining the trip he took that you

16:16:31 5  read, going to Arizona, I think you would have seen or I'm

16:16:37 6  going to ask you, did you see that that was going to a rehab

16:16:41 7  center there?

16:16:41 8  A.      Yes.

16:16:46 9  Q.      In the period of time about which you were reading

16:16:48 10  from the book, you read and was played that there were

16:16:52 11  occasions where he said he didn't sleep for three days;

16:16:55 12  right?

16:16:58 13  A.      I don't know about the number three, but I do know

16:17:02 14  that I do recall where he wouldn't sleep at all or only nod

16:17:07 15  off and I think he referenced one period where there was

16:17:11 16  only ten hours of the week that he slept.

16:17:13 17  Q.      After he came back to Delaware on October, the fifth

16:17:16 18  into the sixth, you don't see any periods in which the book

16:17:20 19  or our texts was indicating that he was doing the same kind

16:17:23 20  of behavior, not sleeping for days or ten hours, you didn't

16:17:27 21  see that in that period, did you?

16:17:29 22  A.      No.

16:17:29 23  Q.      You took an excerpt and played it for the jury, in

16:17:33 24  which he says when he got to California, and I want to come

16:17:36 25  back to when he got to California, so the date can be clear,

Jensen - cross

16:17:39  1  that's in the early part or the first few months of 2018,

16:17:44  2  the first time that you're reading the excerpts, correct?

16:17:47  3  A.    The first California trip?

16:17:49  4  Q.    Yes.

16:17:50  5  A.    Can I flip to that just to make sure we're talking

16:17:54  6  about that initial --

16:17:56  7  Q.    Sure.  Of course?

16:17:58  8  A.    But yeah, I think you're right.

16:18:19  9        (Witness reviewing document. )  We're talking

16:18:25 10  after the Arizona trip, right?

16:18:28 11  Q.    Yes.

16:18:28 12  A.    Yes.  Chapter 9.

16:18:30 13  Q.    So when he says that he went to California, it was in

16:18:32 14  the beginning of '19, and then he said, you read an excerpt

16:18:37 15  and played for the jury the part that said, "and then I was

16:18:40 16  doing what I was doing for a few months later."  That few

16:18:44 17  months would take him into the summer of 2018, right?

16:18:47 18  A.    I want to make sure I'm in the same place as you.

16:18:50 19  Q.    He got there in 2018 and you read excerpts about him

16:18:55 20  saying 2018, I said 2018, I'm sorry.  So the first trip --

16:18:59 21  well, whichever the name of the title of the chapter is?

16:19:02 22  A.    Yeah, I think --

16:19:03 23        THE COURT:  Don't talk over each other so that

16:19:05 24  my court reporter can get it down.  Let him finish and then

16:19:08 25  he will let you finish your answer.

477

Jensen - cross

BY MR. HINES:

Q.     So let me start again.  So the trip that we are talking about that he says he went for the first time is in the beginning of 2018?

A.     Yes.

Q.     Okay.

A.     He says spring of 2018 is the California Odyssey.

Q.     And then when you pointed out and it was played for the jury that he was using for months thereafter, that would take him into the summer of 2018, correct?

A.     Yes, I think it was four or five months.

Q.     And that would be the summer?

A.     Yes, through July.

Q.     August was when you identified a record that indicated that was when he went to a place called The View in California?

A.     Yes.

Q.     Correct?

A.     Yes.

Q.     I'm sorry.  And that you identified a government exhibit, I think it's Government Exhibit 25.  Do you remember identifying this?

A.     Yes.

Q.     And can you go to the next page.  It says August 21st.  Can you go to the next page?  With the amount

Jensen - cross

16:20:22  1   5,000.  Can you go to the next page, please?

16:20:25  2                   And then the next page.

16:20:27  3                   And you see the dates, August 23rd of '18, do

16:20:33  4   you see that?

16:20:33  5   A.      Yes.

16:20:34  6   Q.      Okay.  The next page, please?

16:20:36  7                   And there is another amount.  And then the next

16:20:39  8   page.  And it says stabilization, there is another amount.

16:20:46  9                   Do you know who paid those invoices?

16:20:50 10   A.      I think I know who paid part of them.

16:20:55 11   Q.      Go ahead.

16:20:56 12   A.      But I don't -- I'm trying to think of my source of

16:21:00 13   information, I think it was partially paid, I seen a record

16:21:03 14   in Mr. Biden's bank account for at least a payment, yes, and

16:21:08 15   I think there were family assisting.

16:21:10 16   Q.      When you were pointing out, for example, the issues

16:21:13 17   of his bank account and the $5,000 that you then talked with

16:21:22 18   Mr. Hines and the other amounts of a few thousand dollars,

16:21:25 19   did you match up those withdrawals to these invoices?

16:21:30 20   A.      No.

16:21:34 21   Q.      Can you take that down, please.

16:21:37 22                   Your understanding of The View when it talks

16:21:41 23   about detoxing, DTX I think you indicated, as you understand

16:21:47 24   it, that's not a place that you just detox from drugs,

16:21:50 25   alcohol is part of detoxing in your understanding, isn't it?

Jensen - cross

16:21:55  1    A.      I believe that's right.  It looks like they provided

16:22:00  2    multiple services.

16:22:02  3    Q.      So, for example, when Mr. Hines had you read from the

16:22:07  4    chapter, and for this one to save time, do you remember you

16:22:13  5    said and read and then you heard Mr. Biden's voice say

16:22:17  6    "everything is fine until I relapsed."  Do you remember him

16:22:21  7    saying the phrase, "and then I relapsed?"

16:22:24  8    A.      Yes.

16:22:24  9    Q.      When he was referring to that in his book, was he

16:22:27 10    talking about relapsing to drugs and alcohol, or do you know

16:22:32 11    what he meant?

16:22:34 12    A.      I can only state what was stated.

16:22:38 13    Q.      Which is "then I relapsed?"

16:22:40 14    A.      Just what it says, "I relapsed."

16:22:43 15    Q.      And so if he's at The View, and then he says then I

16:22:47 16    relapsed and The View was basically dealing with both parts

16:22:51 17    of his abuse, do you have any basis today to know what that

16:22:56 18    word relapse meant?

16:22:58 19    A.      I also don't know what treatment he received at The

16:23:03 20    View, as far as records.  I don't think I can answer that.

16:23:08 21    Q.      But you have investigated this case since the fall of

16:23:12 22    2023, correct?

16:23:13 23    A.      Correct.

16:23:13 24    Q.      And you have seen his bank records, some of which you

16:23:17 25    testified about?

Jensen - cross

16:23:17  1    A.      Yes.

16:23:17  2    Q.      And you saw in his bank records, the debits for a

16:23:21  3    variety of liquor stores in the period that we're talking

16:23:26  4    about, haven't you?

16:23:27  5    A.      Yes, I have seen liquor store debits, yes.

16:23:30  6    Q.      And there were quite a number in October of 2018,

16:23:34  7    weren't there?

16:23:35  8    A.      I think there were -- including October 2018.

16:23:52  9    Q.      You mentioned that you knew that he left California

16:23:57 10    in October of 2018, precisely on October 5th.  He went over

16:24:04 11    there, right?

16:24:04 12    A.      Yes.

16:24:05 13    Q.      And you referenced from the book and played a portion

16:24:09 14    where the book says "His agenda was to get clean."  Is what

16:24:14 15    you heard him say?  Do you remember that phraseology, "my

16:24:19 16    agenda was to get --

16:24:21 17    A.      Let me just check the reference.

16:24:23 18    Q.      Did you look at -- do you have in front of you, can

16:24:26 19    you look at?

16:24:27 20    A.      Give me the page.

16:24:29 21    Q.      Page 204 of the book.

16:24:31 22            THE COURT:  Talking over each other.  Can you

16:24:33 23    give her the page?

16:24:34 24    BY MR. LOWELL:

16:24:35 25    Q.      I'm having a hard time hearing you because of the

16:24:37  1    monitor.  That would make it easier for me to know you're

16:24:40  2    talking.

16:24:40  3                THE COURT:  The monitor unfortunately is fixed.

16:24:46  4    And so is the chair because we've had people who backed the

16:24:49  5    chair up and they go off the step.  It's funny sounding,

16:24:55  6    it's not so funny when it happens.

16:24:59  7                MR. LOWELL:  Yeah, please don't do that.

16:25:05  8    BY MR. LOWELL:

16:25:06  9    Q.      So when the phraseology was again, to try to save

16:25:10 10    time, when he is in talking about some of the excerpts that

16:25:15 11    you read from the chapter called the Last Highway,

16:25:20 12    Chapter 10, right?

16:25:21 13    A.      Okay.

16:25:22 14    Q.      That's when he left Delaware to go to Massachusetts

16:25:26 15    for another form of rehab.  Isn't that what happened in the

16:25:30 16    chapter?  Isn't that the date?  After --

16:25:36 17    A.      I have a date when he went to Massachusetts, that I

16:25:41 18    saw -- I'm not going to pull that from the excerpts though,

16:25:45 19    I don't know that we have that, but it was November, mid

16:25:47 20    November is what I believe.

16:25:48 21    Q.      So after the October incidents, he goes to

16:25:51 22    Massachusetts and there he is entering another form of

16:25:55 23    rehabilitation, is that your understanding of the timeline?

16:25:59 24    A.      Yes.  Yes.

16:26:01 25    Q.      And then the texts that I started with when I was

16:26:04  1   asking you questions start in the end of 2018 after

16:26:11  2   November, to 2019, we established that timeline; right?  I'm

16:26:31  3   sorry, we established that timeline -- sorry, we established

16:26:34  4   that timeline, that the --

16:26:37  5   A.      Yeah.  Yes, we went over messages from February of

16:26:41  6   2019.

16:26:42  7   Q.      Following his going to Massachusetts which you and I

16:26:46  8   just established was in November of 2018?

16:26:50  9   A.      Correct.

16:26:50 10   Q.      And that was after the October purchase of the gun?

16:26:54 11   A.      Yes.

16:26:55 12   Q.      And that was after the gun was no longer in his

16:26:59 13   possession?

16:26:59 14   A.      Yes.

16:27:02 15          MR. LOWELL:  So I need your guidance, I have

16:27:04 16   another topic, would it be a time to -- it's close --

16:27:10 17          THE COURT:  Is this a good time for you to end?

16:27:12 18          MR. LOWELL:  It would be a good time because I

16:27:14 19   could move to a different topic in the morning.

16:27:16 20          THE COURT:  What we'll do is we'll take our

16:27:18 21   break for the evening.  I will remind each of you not to do

16:27:21 22   any research, not to talk to anyone, not to listen to any

16:27:24 23   discussions about anything about this case outside of the

16:27:26 24   courtroom and thank you for your attention today and we'll

16:27:28 25   see you tomorrow at 9:00 a.m.

16:27:32  1          COURTROOM DEPUTY:  All rise.

16:27:33  2          (Jury exiting the courtroom at 4:27 p.m.)

16:28:01  3          THE COURT:  All right.  You may step down.

16:28:04  4          And everyone be seated for one moment.

16:28:09  5          I have reviewed the Press Coalition motion for

16:28:13  6   contemporaneous access to trial exhibits, Docket Item 199.

16:28:19  7   I will grant the motion in part, the court is in the process

16:28:22  8   of setting up a website with links to the exhibits that are

16:28:25  9   entered into evidence.  We are working with the AO to get

16:28:28 10   that done expeditiously.  We will not make them available in

16:28:32 11   realtime, but we will update each morning after we've had a

16:28:36 12   chance to confirm with both sides that we are not putting

16:28:39 13   something up that should have been a redacted version.

16:28:43 14          And information about the website will be posted

16:28:47 15   by the court when it's available.  So that is my ruling on

16:28:51 16   that.

16:28:51 17          Now the parties, anything that we need to

16:28:54 18   discuss?

16:28:55 19          MR. HINES:  Not from the United States, Your

16:28:57 20   Honor.  Thank you.

16:28:58 21          MR. LOWELL:  Nothing from us.

16:28:59 22          THE COURT:  All right.  Then I will see everyone

16:29:01 23   in the morning.

16:29:14 24          COURTROOM DEPUTY:  All rise.  Court is in

16:29:17 25   recess.

1            (Court adjourned at 4:29 p.m.)

2

3            I hereby certify the foregoing is a true and

accurate transcript from my stenographic notes in the proceeding.

4

5                              /s/ Dale C. Hawkins
                              Official Court Reporter

6                              U.S. District Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25