08:15:47

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA, ) VOLUME 3
                               )
5                              ) CRIMINAL ACTION
     v.                        ) NO. 23cr61(MN)
6                              )
     ROBERT HUNTER BIDEN,      )
7                              )
              Defendant.       )
8

9

10                   Wednesday, June 5, 2024
                     9:00 a.m.
11                   Jury Trial

12                   Courtroom 4A
                     844 King Street
13                   Wilmington, Delaware

14

15

16   BEFORE:  THE HONORABLE MARYELLEN NOREIKA
              United States District Court Judge
17

18

19   APPEARANCES:

20
                     SPECIAL COUNSEL'S OFFICE
21                   BY:  DEREK E. HINES, ESQ.
                     BY:  LEO WISE, ESQ.
22

23                        Counsel for the
                          United States of America
24

25

1   APPEARANCES CONTINUED:

2

3

            DALTON & ASSOCIATES, P.A.
4           BY:  BARTHOLOMEW J. DALTON, ESQ.
            BY:  CONNOR DALTON, ESQ.
5
            -and-
6
            WINSTON & STRAWN LLP
7           BY:  ABBE DAVID LOWELL, ESQ.
            BY:  DAVID KOLANSKY, ESQ.
8           BY:  ISABELLA OISHI, ESQ.

9
                    Counsel for the Defendant
10

11

12              _ _ _ _ _ _ _ _ _ _ _

13

08:26:38 14

08:47:25 15          COURTROOM DEPUTY:  All rise.

09:03:08 16          THE COURT:  All right.  Good morning, everyone.

09:03:10 17  We're going to bring in the jury.  One quick point before we

09:03:15 18  do.

09:03:15 19          Mr. Lowell, yesterday I asked you not to make a

09:03:18 20  speech when you did -- when you said you've already ruled on

09:03:22 21  my objection, and then I realized you were saying it because

09:03:25 22  you didn't want to raise your objection.

09:03:28 23          So let me say this, anything that I have already

09:03:30 24  ruled on, your objections are preserved, and if you want to

09:03:33 25  just say something like no further objection, nothing like

Jensen - cross

09:03:36  1    that, then I think it will make it easier.

09:03:39  2              MR. LOWELL:  And you exactly understood why I

09:03:40  3    did.

09:03:42  4              THE COURT:  I realized it the next time you said

09:03:46  5    objection.  That's the way I typically handle it.

09:03:49  6              Anything else we need before the jury comes in?

09:03:52  7              MR. HINES:  No, Your Honor.

09:03:53  8              THE COURT:  Okay.

09:04:06  9              (Jury entering the courtroom at 9:04 a.m.)

09:04:12 10              THE COURT:  All right.  Everyone can be seated.

09:04:30 11              Members of the jury, welcome back.  Thank you

09:04:32 12    for being here promptly and on time and at this point, I'm

09:04:37 13    going to ask you my morning question, which is, has anyone

09:04:42 14    -- have you talked with anyone, has anyone tried to talk to

09:04:45 15    you, have you done any research, have you heard any reports,

09:04:49 16    seen anything on social media about this case, or anyone

09:04:52 17    involved in this case?

09:04:54 18              JURY: (All said no.)

09:04:55 19              THE COURT:  All right.  Okay.  Thank you.

09:04:57 20              Mr. Lowell, please continue.

09:04:59 21              MR. LOWELL:  Good morning, Judge.  Good morning

09:05:00 22    ladies and gentlemen.

09:05:03 23    BY MR. LOWELL:

09:05:03 24    Q.    Good morning, Agent.

09:05:03 25              Yesterday when you were testifying, you

09:05:05  1    testified first as I started to ask you some questions about

09:05:08  2    the book that Mr. Biden wrote.

09:05:11  3    A.      Yes.

09:05:11  4    Q.      And that's called Beautiful Things?

09:05:14  5    A.      Yes.

09:05:15  6            THE COURT:  And could I just ask, I think that

09:05:17  7    some of the jurors may have problems hearing you, so can you

09:05:20  8    make sure you talk into the microphone.

09:05:24  9    Q.      You read from various chapters -- sorry, there were

09:05:27 10    various chapters presented and played for the jury?

09:05:30 11    A.      Yes.

09:05:30 12    Q.      One of them was Chapter 8 and -- I'm sorry,

09:05:37 13    Chapter 7, that was called Cracked?

09:05:38 14    A.      Yes.

09:05:39 15    Q.      And that covered a period of 2016?

09:05:42 16    A.      Yes.

09:05:42 17    Q.      And then Chapter 8, Into the Desert, that one covered

09:05:47 18    the period of 2017?

09:05:51 19    A.      I thought it might have been October of '16, but I

09:05:55 20    can check if you would like.

09:05:56 21    Q.      It certainly included 2017?

09:06:00 22    A.      Can I check?

09:06:02 23    Q.      You can check.

09:06:09 24    A.      Yeah, I'm not sure.

09:06:11 25            (Witness reviewing document.)

Jensen - cross

Q.      That chapter, if I'm looking correctly, starts at
2016 and proceeds into parts of 2017, if you're looking?

A.      I can see the October '16, I'm just not sure it's
clear it goes all the way, I'm not sure it says -- I'm just
trying to get the context --

Q.      Nonetheless it's before 2018, we can establish that?

A.      Yes.

Q.      Chapter 8 called Into the Desert, that also starts in
2016, correct?

A.      Yes, Chapter 8 looks like it starts October 2016.

Q.      And that one as I said was called Into the Desert?

A.      Yes.

Q.      And then Chapter 9 would be after that, talks about
the beginning of 2018; right, California Odyssey?

A.      Yes.

Q.      And in those previous chapters as you heard, and I
think it was maybe a few hours, there was granular detail
that Mr. Biden is recounting about, among other things, his
periods of abuse of drugs?  By granular, I mean he tells you
where he was, he tells you what he was doing, he tells you
what hotel, he tells you that he's in the car, he tells you
which airport he's at, he tells you the names of people he's
dealing with, that's what I mean in those chapters?

A.      Yes, specific details in stories that he's telling,
yes.

09:08:08  1    Q.      And then I wanted to turn your attention to Chapter 9

09:08:11  2    again, which is the beginning of 2018, and go through that.

09:08:16  3    And then Chapter 10 is called, Lost Highway.  And then that

09:08:25  4    starts at the end of the summer of 2018 and into the fall.

09:08:42  5    A.      I think after the first sentence he basically says --

09:08:45  6    I can read it.  "I come back east", and he references "fall

09:08:49  7    2018", so I think fall 2018.

09:08:51  8    Q.      Yes.

09:08:52  9    A.      Yes.

09:08:53 10    Q.      So when he is writing that that you looked at and

09:08:55 11    part of which the jury heard yesterday, he comes back after

09:09:00 12    the summer of 2018; right?

09:09:02 13    A.      Yes.

09:09:02 14    Q.      And when you looked at the book and picked selections

09:09:07 15    for that period of time, were you also looking for

09:09:10 16    references to that same kind of thing you looked at when you

09:09:15 17    were doing 2016 and 2017 and the beginning of '18, looking

09:09:19 18    for his description of the drug use?

09:09:22 19    A.      Yes, evidence of addiction, yes.

09:09:24 20    Q.      And/or of addiction, right?

09:09:26 21    A.      Yes.

09:09:27 22    Q.      And it is true, isn't it, that in the chapter that

09:09:30 23    you have reviewed and just talked about, as you looked at it

09:09:34 24    from the period of time he came back from California to

09:09:37 25    Delaware, there are no descriptions of his using drugs, of

Jensen - cross

09:09:41  1   his having a person that he's waiting to hear from, that

09:09:45  2   he's held up in a hotel room, that he's smoking crack every

09:09:49  3   15 minutes, that doesn't exist in this book from the period

09:09:53  4   of time he came back until later in 2018 when he goes to

09:09:57  5   Massachusetts, right?  In terms of that description?

09:10:01  6   A.     I can't recall every page of the chapter, so I'm not

09:10:05  7   trying to be difficult, but I'll just -- what we used were

09:10:09  8   those -- items that evidence the addiction.

09:10:12  9   Q.     So that if you didn't play any for that period, you

09:10:15 10   didn't find any?

09:10:17 11   A.     I don't recall every page of the book, but we used

09:10:23 12   items that were evidence of addiction, yes.

09:10:25 13   Q.     Okay.  So in the book that you reviewed, you and I

09:10:30 14   agree that you were looking for and played for the jury that

09:10:34 15   which would, as you called it, the evidence of his using or

09:10:37 16   addiction?

09:10:38 17   A.     Yes.

09:10:38 18   Q.     That we can agree about?  And then I asked you

09:10:43 19   whether or not did you see any like the ones in chapters 7,

09:10:46 20   8, 9, and your answer is if we found it, it would have been

09:10:54 21   it?

09:10:55 22   A.     It would have been added, I think that's fair.  I

09:10:58 23   just want to be careful to say, I don't remember every page

09:11:02 24   of that chapter, that's all.

09:11:03 25   Q.     So I know what you were looking for then, right?  You

Jensen - cross

09:11:08  1    were looking for those passages?

09:11:10  2    A.      Correct.

09:11:10  3    Q.      And do you remember any of those descriptions or

09:11:13  4    details or ways he describes what he's doing when he's using

09:11:19  5    drugs to be part of what was played yesterday in that period

09:11:23  6    of time?

09:11:23  7    A.      So in Chapter 10, I have no specific recollection

09:11:27  8    beyond what's in -- what we used in our excerpts.

09:11:32  9    Q.      Yesterday you identified, and I think it was

09:11:38 10    admitted, government Exhibit 29.  Mr. Radic, would you put

09:11:43 11    government Exhibit 29 on the screen.

09:11:44 12            And you identified this as a bank record in the

09:11:47 13    account of Mr. Biden.  And at Wells Fargo, do you recall

09:11:52 14    doing that?

09:11:53 15    A.      Yes.

09:11:53 16    Q.      Would you please turn, Mr. Radic, and it will be on

09:11:58 17    the screen, to page 20.  And the third entry on the page.

09:12:07 18    And you see on that page it indicates a purchase to an

09:12:11 19    entity called liquor time liquor?

09:12:14 20    A.      Yes.

09:12:14 21    Q.      And it says a Visa check card; right?

09:12:19 22    A.      Yes.

09:12:19 23    Q.      That's like a debit card right?

09:12:22 24    A.      Yes, that would be my thinking.

09:12:25 25    Q.      Because it indicates cash on the left-hand side?

Jensen - cross

| | | |
|---|---|---|
| 09:12:27 | 1 | A.     Yes. |
| 09:12:28 | 2 | Q.     And that's for $48 and 74 cents? |
| 09:12:32 | 3 | A.     Yes. |
| 09:12:33 | 4 | Q.     And the date of that indicates the purchase is on |
| 09:12:35 | 5 | October 1st, and it hits the bank on October 4th.  Do you |
| 09:12:39 | 6 | see that? |
| 09:12:39 | 7 | A.     Yes. |
| 09:12:43 | 8 | Q.     Mr. Radic, would you please turn to page 26 and go to |
| 09:12:47 | 9 | the fifth entry. |
| 09:12:49 | 10 |          Can you see that on your screen? |
| 09:12:51 | 11 | A.     Yes.  It comes up as Wine and Spirits. |
| 09:12:55 | 12 | Q.     And you see that that is again a Visa check card, and |
| 09:12:58 | 13 | it's a purchase to an entity known as Wine and Spirits, do |
| 09:13:03 | 14 | you see that? |
| 09:13:04 | 15 | A.     Yes. |
| 09:13:04 | 16 | Q.     The purchase date seems to be -- indicates that it's |
| 09:13:07 | 17 | on the 9th, and it hits to the 10th.  Do you see that? |
| 09:13:11 | 18 | A.     Yeah, I think it was authorized on the sixth, so that |
| 09:13:14 | 19 | -- |
| 09:13:14 | 20 | Q.     It was authorized on the 6th? |
| 09:13:16 | 21 | A.     Yes. |
| 09:13:16 | 22 | Q.     Thank you.  And that's to a liquor store and that's |
| 09:13:20 | 23 | for $19.07? |
| 09:13:22 | 24 | A.     Yes. |
| 09:13:23 | 25 | Q.     And that's October the 6th. |

Jensen - cross

09:13:27 1    A.       I would interpret that as a liquor store, although

09:13:33 2    I'm not familiar with the particular liquor store.

09:13:36 3    Q.       I understand you don't know, but its title is clearly

09:13:39 4    Wine and Spirits, the "spirits" would be alcohol, that's the

09:13:43 5    general definition of the word spirits, no?

09:13:45 6    A.       Yes, I know it means that, yes.

09:13:50 7    Q.       Would you turn to page 31, and go to the fifth entry,

09:13:53 8    and you can see that one is to an entity known as Boxwood

09:13:59 9    Liquors, do you see that?

09:13:59 10   A.       Yes.

09:13:59 11   Q.       And it indicates a date I think of purchase perhaps

09:14:03 12   of October 19th.  Do you see that date?

09:14:05 13   A.       Might have -- maybe, if you go to the next page, the

09:14:11 14   --

09:14:11 15   Q.       Under 18th?

09:14:12 16   A.       It might have bled over to the next page.

09:14:15 17   Q.       I see that, too.  You see it hits the account on the

09:14:19 18   22nd?

09:14:19 19   A.       Yes.

09:14:20 20   Q.       That's for $26.48?

09:14:23 21   A.       Yes.

09:14:24 22   Q.       Would you please turn to page 31, and go to the third

09:14:29 23   entry.  And you see that this authorized on October 18th?

09:14:37 24   A.       Yes.

09:14:38 25   Q.       By the way, the October 6th and the October 18th thus

Jensen - cross

09:14:42  1    far is when he's back on the East Coast; right?

09:14:45  2    A.    Sorry, say that one more time.

09:14:47  3    Q.    Sure.   The dates of October 6th and October 18th of

09:14:52  4    2018, he's back in Delaware?

09:14:53  5    A.    Yes.

09:14:54  6    Q.    And so on this date, or wherever he is, he's on the

09:14:59  7    East Coast I should say, he's not in California any longer?

09:15:02  8    A.    Yes, he's on the East Coast.

09:15:04  9    Q.    So on this one the authorization date being the 18th?

09:15:09 10    Do you see that?

09:15:09 11    A.    Yes.

09:15:09 12    Q.    To an entity called Central Wine and Spirits?

09:15:13 13    A.    Yes.

09:15:13 14    Q.    And it hits the account on the 22nd?

09:15:16 15    A.    Yes.

09:15:16 16    Q.    And that's for $52.25?

09:15:21 17    A.    Yes.

09:15:22 18    Q.    Mr. Radic, would you please turn to page 37, and go

09:15:27 19    to the fourth entry?   On this one you see that this is a

09:15:31 20    purchase, the authorization date is the 19th?

09:15:33 21    A.    Yes.

09:15:36 22    Q.    And it hits the account on the 23rd?

09:15:38 23    A.    Yes.

09:15:38 24    Q.    And that one is for $10.88?

09:15:43 25    A.    Yes.

Jensen - cross

09:15:44  1    Q.      And it's for an entity called Central Perk Wine?

09:15:48  2    A.      Yes.

09:15:49  3    Q.      Mr. Radic, would you turn on that same page to the

09:15:54  4    first entry?  You see that entry?

09:15:57  5    A.      Yes.

09:15:57  6    Q.      And it says authorized on the 21st, but it also hits

09:16:01  7    on the 23rd.  Do you see that?

09:16:03  8    A.      Yes.

09:16:04  9    Q.      And that is to an entity called Dunkirk Liquors?

09:16:09 10    A.      Yes.

09:16:09 11    Q.      And that one is for $33.98?

09:16:13 12    A.      Yes.

09:16:15 13    Q.      Mr. Radic, could you please turn to page 40, and look

09:16:18 14    at the last entry?  And that one indicates an authorization

09:16:23 15    of October the 24th of 2018?

09:16:29 16    A.      Yes.

09:16:30 17    Q.      And it hits the account the next day on the 25th?

09:16:34 18    A.      Yes.

09:16:34 19    Q.      And that is to an entity called State Line Liquors,

09:16:38 20    right?

09:16:38 21    A.      Yes, it is a blown up portion of that whole entry.

09:16:42 22    Q.      I think there might be a little bit, it says

09:16:47 23    Wilmington, Delaware, and then the card.  That's what it

09:16:49 24    says, State Line Liquors?

09:16:51 25    A.      Yes.

Jensen - cross

09:16:52  1    Q.      And it's still using that debit card, right?

09:16:54  2    A.      Yes.

09:16:55  3    Q.      And that one is for $38.30?

09:16:58  4    A.      Yes.

09:16:58  5    Q.      And finally would you turn to page 48, the second

09:17:02  6    entry, do you see that one?

09:17:03  7    A.      Yes.

09:17:03  8    Q.      And that one has an authorization of October 30th;

09:17:08  9    right?

09:17:08 10    A.      Yes.

09:17:08 11    Q.      And it indicates a place in Wilmington; is that

09:17:12 12    right?

09:17:12 13    A.      Yes.

09:17:13 14    Q.      And it looks like it hits the account on the 31st,

09:17:16 15    which is the day after, right?

09:17:18 16    A.      Yes.

09:17:18 17    Q.      And that is for $22.49?

09:17:22 18    A.      Yes.

09:17:22 19    Q.      And so what I have just taken you through, just in

09:17:25 20    the month of October, from the time he comes back to the end

09:17:28 21    of the month, I have with you identified eight separate

09:17:32 22    purchases of alcohol?

09:17:34 23    A.      Yes.

09:17:38 24    Q.      Yesterday I think in one of the chapters that was

09:17:41 25    played to the jury, you had indicated a line or a play to a

Jensen - cross

09:17:48 1    line where Mr. Biden was saying at a certain point he had

09:17:52 2    separated from his then wife, Kathleen Buhle?

09:17:55 3    A.    Yes.

09:17:55 4    Q.    And said that that had been a year ago when he was

09:18:00 5    writing?

09:18:00 6    A.    Yes.

09:18:01 7    Q.    They were not married in 2018, or at least they

09:18:05 8    weren't living together, they were divorced?

09:18:08 9    A.    I believe that's right, I don't have a date in my

09:18:11 10   mind.

09:18:11 11   Q.    You have no indication that they were living together

09:18:15 12   or were seeing each other frequently?

09:18:17 13   A.    I don't -- that I don't know.

09:18:18 14   Q.    But you do know that prior to 2018 they had been

09:18:22 15   divorced?

09:18:22 16   A.    Yes.  I believe -- yes, I know at some time, I don't

09:18:27 17   know the years, maybe between '15 and '18, but I don't have

09:18:31 18   exact dates, sorry.

09:18:31 19   Q.    I would like to turn to the next set of things that

09:18:34 20   you identified yesterday, please, and that would be the

09:18:38 21   government exhibit with all the texts?

09:18:40 22   A.    Yes.

09:18:40 23   Q.    Can we pull up Government Exhibit 18?

09:18:43 24   A.    May I go to the full version?

09:18:46 25   Q.    Sure.  Do you still have that in front every you?

499

Jensen - cross

09:18:49  1    A.    Yes.

09:18:49  2    Q.    Great.  Is that more convenient?

09:18:52  3    A.    Perhaps.

09:18:54  4    Q.    Tell me when you're ready.

09:18:56  5    A.    Ready.

09:18:56  6    Q.    You read a number of the texts from this chain of

09:19:00  7    communications yesterday, right?

09:19:01  8    A.    Yes.

09:19:02  9    Q.    And then you said at one point in your testimony,

09:19:04 10    "the texts said that it was evidence of his being addicted

09:19:10 11    or using", but by that you meant that the words in the text

09:19:15 12    indicate the words "addicted" or has a reference to a

09:19:18 13    dealer, et cetera, that's what you read from yesterday,

09:19:22 14    right?

09:19:22 15    A.    Yeah, but the summary chart in total was evidence of

09:19:25 16    addiction.

09:19:26 17    Q.    Yes, I understand.

09:19:27 18    A.    Yes.

09:19:27 19    Q.    And your chart starts in April of 2018; is that

09:19:31 20    right?

09:19:31 21    A.    Yes.

09:19:32 22    Q.    And that's months before the purchase of the gun in

09:19:36 23    October?

09:19:37 24    A.    Yes.

09:19:37 25    Q.    And then it ends in March of 2019, doesn't it?

09:19:40 1    A.      Yes.

09:19:41 2    Q.      And that would be almost a half year after the

09:19:44 3    purchase of the gun?

09:19:45 4    A.      Yes, five months.

09:19:47 5    Q.      Sorry, five months.  Okay.  And in that period of

09:19:51 6    time, there are references to his drug use, dealers, names,

09:19:54 7    et cetera?

09:19:55 8    A.      Yes.

09:19:55 9    Q.      But you also, I think you said yesterday, but let me

09:20:00 10   ask you, there are references in that same exhibit that you

09:20:03 11   did similar to what I showed you in this bank about his use

09:20:07 12   of alcohol?

09:20:12 13   A.      Yes.

09:20:13 14   Q.      You could, for example, turn to Row 157 if you would

09:20:23 15   like.  Do you see that one?  I'm sorry?

09:20:41 16   A.      Yes.

09:20:42 17   Q.      So there are references to that as well?  And in that

09:20:47 18   chart as well as what you read, I think you said yesterday,

09:20:50 19   there were various periods of time that he was neither using

09:20:53 20   alcohol or drugs in the period that you were looking at?

09:20:56 21   A.      I believe that was in response to a question about

09:20:58 22   the book in total.

09:20:59 23   Q.      Yes.

09:21:00 24   A.      Yes.  That's from my reading of the book, yes.

09:21:06 25   Q.      You specifically yesterday in your direct testimony

Jensen - cross

09:21:10  1    read from two texts in your chart about the time of the

09:21:15  2    second week of October of 2018, the time of the purchase.  I

09:21:20  3    would like to turn to those.

09:21:22  4             Mr. Radic, could you turn to Row 119?

09:21:29  5             Do you see that?

09:21:30  6    A.    Yes.

09:21:31  7    Q.    That's October the 13th of 2018 at 10:30 p.m.  Now,

09:21:37  8    to start with, are the listings in this chart when it says a

09:21:42  9    time, is that an Eastern time, or I think you mentioned the

09:21:46 10    phrase UTC?

09:21:47 11    A.    Yes.  I think there was a mixture.  In this case,

09:21:51 12    based on the bottom right portion where it says 10:30 p.m.

09:21:57 13    UTC minus four, I think that would indicate East Coast time,

09:22:00 14    so I think it's four hours off during daylight savings.

09:22:04 15    Q.    So UTC is sort of like a standard geography time

09:22:09 16    thing which is measured, I think, from some location around

09:22:12 17    England, and then you figure it out from there?

09:22:14 18    A.    Like Greenwich Meantime, but a little different.

09:22:20 19    Q.    So depending on whether the United States is in

09:22:23 20    Eastern, Standard, or Savings time, it could either be four

09:22:26 21    or five hours?

09:22:27 22    A.    Yes.

09:22:27 23    Q.    This one it says 10:30 p.m.  And it says to

09:22:31 24    Ms. Biden, "yes, Bernard, who hangs at 7-11!  On Greenhill

09:22:37 25    and Lancaster.  I'm now off Maryland Avenue behind Blue

Jensen - cross

09:22:43  1    Rocks stadium waiting for a dealer named Mookie."  You read

09:22:47  2    that right?

09:22:47  3    A.      Yes.

09:22:47  4    Q.      Do you have any idea when he wrote this he was

09:22:50  5    actually at the 7-11 on Greenhill and Lancaster, dealing

09:22:54  6    with a guy named Mookie?

09:22:55  7    A.      No.

09:22:56  8    Q.      Do you know if there is a person named Mookie?

09:22:58  9    A.      No.

09:22:59 10    Q.      Would you turn, please, to Row 125?  This is on

09:23:05 11    October 14th of 2018 and this again says 5:37 p.m., and then

09:23:10 12    in the corner it says UTC minus four, so this might be

09:23:15 13    actual Eastern time?

09:23:16 14    A.      Yes.

09:23:16 15    Q.      And this one you read said, "I was sleeping on a

09:23:20 16    car" -- not in -- "on a car smoking crack on 4th and

09:23:24 17    Rodney."  You read that yesterday?

09:23:25 18    A.      Yes.

09:23:25 19    Q.      Do you have any idea whether he was on a car smoking

09:23:28 20    crack on 4th Street and Rodney when this was written to

09:23:33 21    Ms. Biden?

09:23:33 22    A.      No.

09:23:35 23    Q.      And then I think you read Row 152, please, Mr. Radic.

09:23:43 24    And this is after the gun had been purchased, after the gun

09:23:45 25    had been recovered, after Mr. Biden was about on his way to

Jensen - cross

09:23:49  1    Massachusetts, given the timeline?

09:23:52  2    A.     Yes.

09:23:52  3    Q.     Then he writes Ms. Biden and says, "I'm a liar and a

09:23:56  4    thief, and a blamer, and a user, and I'm delusional and an

09:24:00  5    addict, unlike beyond or above all other addicts that you

09:24:05  6    know and I've ruined every relationship I've ever

09:24:08  7    cherished."  That's when that was written?

09:24:11  8    A.     Yes.

09:24:11  9    Q.     The week after the incident in which he and Ms. Biden

09:24:14 10    were interviewed by the Delaware State Police?

09:24:17 11    A.     Yes.  About a week.

09:24:21 12    Q.     You read a lot of texts, and Mr. Hines asked you "is

09:24:25 13    that a text that you sent to DEA Agent Romig?"  Do you

09:24:30 14    remember saying that?

09:24:30 15    A.     Yes.

09:24:31 16    Q.     I would like to go through those.  If you will turn

09:24:33 17    on this same exhibit.  Mr. Radic, would you turn to Row 3 on

09:24:41 18    page -- so on April of 2018, again, six months before the

09:24:49 19    gun incident; right?

09:24:50 20    A.     Yes.

09:24:51 21    Q.     It says -- and he's in Los Angeles?

09:24:55 22    A.     Yes.

09:24:58 23    Q.     And this says, by the way on the right it's at 12:47,

09:25:04 24    but I notice in the parentheses it is UTC plus zero, does

09:25:10 25    that mean this one needs to be converted to Los Angeles

Jensen - cross

09:25:14 1    time?

09:25:14 2    A.    Correct.  So this time of year I think would have

09:25:17 3    also been daylight savings, so I think seven hours.

09:25:20 4    Q.    So this might be seven hours earlier?

09:25:23 5    A.    Yes, I think that's right.

09:25:24 6    Q.    Because he says if you can be hereby 6:45, I can do

09:25:29 7    another 1.4 on T O P K O D what you owe.  Do you see that?

09:25:34 8    A.    Yes.

09:25:34 9    Q.    Mr. Radic, would you turn to Row 20 and 21, please?

09:25:40 10   Do you see those?

09:25:40 11   A.    Yes.

09:25:41 12   Q.    And those are pictures that you identified yesterday

09:25:43 13   that you said you also sent on to DEA agent Romig?

09:25:47 14   A.    Yes.

09:25:47 15   Q.    The date of that is also in April of 2018, when he is

09:25:51 16   in California?

09:25:52 17   A.    Yes.

09:25:52 18   Q.    If you would turn please to Row 26.  That's May 6th

09:25:57 19   of 2018, and you read that and you read, "can you get baby

09:26:01 20   powder?"

09:26:02 21   A.    Yes.

09:26:02 22   Q.    And that's in May of 2018; right?

09:26:05 23   A.    Yes.

09:26:06 24   Q.    And then if you'll turn to Row 31, please?  And

09:26:12 25   that's dated May 6th as well, right?

Jensen - cross

09:26:14 1   A.      Yes.

09:26:14 2   Q.      And it says "party favor"?

09:26:18 3   A.      Yes.

09:26:18 4   Q.      Still in Los Angeles; right?

09:26:21 5   A.      Yes.

09:26:21 6   Q.      And if you'll turn to Row 74, and this one says "you

09:26:28 7   want ten grams?"  Do you see that?

09:26:30 8   A.      Yes.

09:26:30 9   Q.      That's now in July of 2018, correct?

09:26:34 10  A.      Yes.

09:26:34 11  Q.      And that's when he's still in Los Angeles?

09:26:37 12  A.      Yes.

09:26:37 13  Q.      It's also before you identified the time that he

09:26:40 14  entered himself, or enrolled in, or went to spend time at a

09:26:44 15  place called The View?

09:26:45 16  A.      Yes.

09:26:46 17  Q.      And if you'll look at August 8th on Row 87, and

09:26:52 18  that's the one you read that says, "I need more chore boy

09:26:56 19  but regardless come back in, yes"?

09:26:58 20  A.      Yes.

09:26:58 21  Q.      That was August 8th of 2018?

09:27:01 22  A.      Yes.

09:27:02 23  Q.      And again, right before he went into The View, right?

09:27:05 24  A.      Yes.

09:27:05 25  Q.      And then, if you'll look at Row 174, please, that

Jensen - cross

09:27:09  1    skips all the way to November of 20 -- November 27th of

09:27:14  2    2018, where he says "ounce"?

09:27:16  3    A.    Yes.

09:27:16  4    Q.    And that's after the incident of the gun when he was

09:27:20  5    in Massachusetts?

09:27:23  6    A.    Yes.

09:27:24  7    Q.    And it was Massachusetts where he was getting some

09:27:28  8    kind of therapy, do you remember that?

09:27:31  9    A.    Yes.  I'm only pausing, I do believe he went back and

09:27:35 10    forth a couple of times in that time frame, so don't hold me

09:27:39 11    to that actual day, but yes, generally.

09:27:41 12    Q.    And nevertheless, this is now six weeks after the gun

09:27:45 13    purchase?

09:27:46 14    A.    Yes.

09:27:46 15    Q.    And then on Row 222.  This one is one that you read,

09:27:53 16    and it is the back and forth with 62 texts on February 26th;

09:28:03 17    right?

09:28:04 18    A.    Yes.

09:28:04 19    Q.    And that's in 2019, not 2018 at all?

09:28:08 20    A.    Yes.

09:28:08 21    Q.    So that's November, December, January, February,

09:28:11 22    that's four months after the gun incident?

09:28:13 23    A.    Yes.

09:28:14 24    Q.    And then if you'll look at Row 271.  And you see it

09:28:21 25    says the message, "I think it may be Fentan", yes?

Jensen - cross

09:28:28  1    A.      Yes.

09:28:29  2    Q.      And you sent that on to DEA agent Romig?

09:28:32  3    A.      Yes.

09:28:32  4    Q.      And that date is February 26, 2019?

09:28:35  5    A.      Yes.

09:28:36  6    Q.      So that's the end of the month, now approaching five

09:28:39  7    months after the gun purchase, correct?

09:28:40  8    A.      Yes.

09:28:41  9    Q.      And then finally, will you turn to Row 287, and that

09:28:45 10    one is, "I have a ball on me."  Do you see that?

09:28:48 11    A.      Yes.

09:28:48 12    Q.      And that's in March of 2019?

09:28:52 13    A.      Yes.

09:28:53 14    Q.      So that is the full five months later, isn't it?

09:28:56 15    A.      Yes.

09:28:56 16    Q.      And when you looked at the period of time in -- now

09:29:02 17    if you'll turn, Mr. Radic, to Row 88.

09:29:17 18            So to your book, do you have your book in front

09:29:21 19    of you?

09:29:22 20    A.      Yes.

09:29:22 21    Q.      Can you glance through Row 88 through 149, those are

09:29:31 22    a few pages.  Go slow, Mr. Radic.

09:30:21 23            Are you ready?  Looking through those, you don't

09:30:27 24    see any references to another 1.4 in that period of time, do

09:30:31 25    you?

508

Jensen - cross

09:30:32 1    A.    No.

09:30:32 2    Q.    You don't see any references to having a photo --

09:30:35 3    there is no photos of white rocks in that period of time?

09:30:38 4    A.    No.

09:30:39 5    Q.    There is no reference to "baby powder" in that period

09:30:42 6    of time is there?

09:30:43 7    A.    No.

09:30:43 8    Q.    Or "really soft stuff"?

09:30:45 9    A.    No.

09:30:46 10   Q.    Or getting a "party favor"?

09:30:48 11   A.    No.

09:30:48 12   Q.    Or anything that talks about "grams"?

09:30:52 13   A.    No.

09:30:53 14   Q.    Or "chore boy"?

09:30:56 15   A.    No.

09:30:56 16   Q.    Or ounce?

09:30:58 17   A.    No.

09:30:59 18   Q.    Or one full?

09:31:02 19   A.    No.

09:31:03 20   Q.    Or "Fentan"?

09:31:05 21   A.    No.

09:31:06 22   Q.    Or "a ball"?

09:31:10 23   A.    No.

09:31:11 24   Q.    There is, in that period of time, no picture of a

09:31:14 25   scale?

Jensen - cross

09:31:15  1   A.      No.

09:31:16  2   Q.      No pictures of drugs?

09:31:22  3   A.      No.

09:31:23  4   Q.      And the two that you identified yesterday, that I

09:31:26  5   asked you to reidentify today is the one with Mookie behind

09:31:29  6   the 7-11, and being on a car, that's the only references you

09:31:34  7   read that has, as you called it, evidence of drug use?

09:31:47  8   A.      Let me scan one more time.  Yeah, I think as far as

09:31:52  9   specific, literally specific numbers, no.

09:31:55 10   Q.      Yesterday you identified a line, would you go,

09:31:59 11   Mr. Radic, to Row 137.

09:32:05 12           And in this I think you identified this as being

09:32:09 13   a Safari search?

09:32:13 14   A.      Yes.

09:32:13 15   Q.      And it was looking for a parking garage?

09:32:16 16   A.      Yes.

09:32:17 17   Q.      Specifically mentions Ford Raptor?

09:32:20 18   A.      Yes.

09:32:21 19   Q.      And it indicates that this indication is that there

09:32:25 20   was research being done for the height of garages, I guess

09:32:30 21   to see if that car or truck would fit, right, is that your

09:32:34 22   interpretation?

09:32:34 23   A.      That would be my interpretation.

09:32:36 24   Q.      The entry as I said is looking at that.

09:32:39 25           Do you know whether the Ford Raptor was in New

Jensen - cross

09:32:42  1  York at that time?

09:32:43  2  A.    No.

09:32:44  3  Q.    If it was, do you know who got it there?

09:32:48  4  A.    No.  I know -- no.

09:32:51  5  Q.    Do you know how Mr. Biden got to New York in that

09:32:56  6  period of time?

09:32:59  7  A.    No.

09:32:59  8  Q.    You know his phone was at least in New York, because

09:33:02  9  of your location data, right?

09:33:05 10  A.    Based on bank statements and car usage, is the

09:33:10 11  primary way.

09:33:13 12  Q.    He was in New York?

09:33:14 13  A.    Yes.

09:33:14 14  Q.    You don't know how he got there?

09:33:16 15  A.    No.  I'm pausing in my -- no.

09:33:19 16  Q.    You don't know, for example, whether he drove any car

09:33:22 17  or if he did, which car?

09:33:25 18  A.    No.

09:33:28 19  Q.    Now, if you will, turn to page 138 -- I'm sorry,

09:33:33 20  Row 138.

09:33:34 21        Now, on this one, on October the 22nd of 2018,

09:33:38 22  there is another entry about a location.  Do you see that?

09:33:42 23  A.    Yes.

09:33:42 24  Q.    Here I notice that you wrote, I don't think it's in

09:33:46 25  there, but you see at the bottom location data:  Delaware.

Jensen - cross

09:33:52  1    Do you see that?

09:33:52  2    A.     Yes.

09:33:53  3    Q.     Mr. Radic, would you go back to Row 137.

09:33:56  4           You didn't put the location of that one here,

09:33:59  5    that location indication in the row I just showed you,

09:34:04  6    that's something that either you or one of your team members

09:34:07  7    added to the chart, right, as part of your summary?

09:34:09  8    A.     Yes.  That is right.  That is exactly that.

09:34:13  9    Q.     But on 137, nobody put the location data there?

09:34:16 10    A.     Yes.

09:34:17 11    Q.     Why?

09:34:18 12    A.     I don't believe there is location data, so as part of

09:34:20 13    the metadata in the search.

09:34:24 14    Q.     Itself?

09:34:24 15    A.     Correct.  It just happened that this particular photo

09:34:28 16    had a Lat/Long associated with the metadata.

09:34:31 17    Q.     I see, but you knew from your other records, as you

09:34:34 18    just indicated before, that he was in New York at the time?

09:34:36 19    A.     Correct.  Yeah, so I didn't put location:  Delaware,

09:34:39 20    or location:  New York, on Row 137.

09:34:41 21    Q.     So we can go back to 138.  The 22nd, and that is at

09:34:50 22    1:51 p.m.  So that would be the day before the incident in

09:34:57 23    which Ms. Biden took the gun that she found and brought it

09:35:02 24    to Janssen's?

09:35:03 25    A.     Yes.

Jensen - cross

09:35:04  1    Q.      And then let me ask you this.  Does that indicate
09:35:14  2    that Mr. Biden was back in Delaware?
09:35:18  3    A.      On its face, it does not.  What it indicates is that
09:35:21  4    the camera used to take that photo, sometimes you take your
09:35:27  5    picture, you get a location with your photo, it just shows
09:35:30  6    that that picture had a location.
09:35:31  7    Q.      And that location was in Delaware?
09:35:33  8    A.      Correct.
09:35:33  9    Q.      And it indicates that on the summary chart?
09:35:37 10    A.      Correct.
09:35:37 11    Q.      And if you'll then go to Row 150, that's on the 24th;
09:35:43 12    right?
09:35:48 13    A.      Yes.
09:35:49 14    Q.      And that indicates on the 24th, at that time,
09:35:56 15    3:53 p.m., the location data as you put down says Delaware?
09:35:59 16    A.      Yes.
09:36:00 17    Q.      However, this is UTC time?
09:36:15 18    A.      I believe that's going to be UTC minus four.
09:36:19 19    Q.      So that would be 11:53?
09:36:21 20    A.      No, I think it's saying that the 3:53 --
09:36:24 21    Q.      I see, you think that --
09:36:26 22    A.      I think that's probably --
09:36:27 23            THE COURT:  Can you please stop talking over
09:36:30 24    each other, she was talking.  Go ahead.
09:36:33 25    A.      I believe that's going to be local East Coast time.

Jensen - cross

09:36:37  1    Q.    Okay, so we know on that day, on the 24th, the day

09:36:39  2    after, that's where this data indicates Mr. Biden is

09:36:42  3    located?

09:36:43  4    A.    Yes.

09:36:46  5    Q.    Did you seek to identify on the 23rd, the day that

09:36:53  6    Ms. Biden was involved in finding the gun and bringing it to

09:36:58  7    Janssen's, did you do any location identification for that

09:37:00  8    day, as to whether in the morning Mr. Biden got into a car,

09:37:05  9    drove a bit down, and then came back, did you do that?

09:37:09 10    A.    No.

09:37:16 11    Q.    I would like to go back to some of the texts that you

09:37:20 12    identified.  Let's look again at text Row 171.  The date of

09:37:25 13    this is November 27th of '18, and this is one where the

09:37:30 14    person whose writing says "what did you need?"  And the date

09:37:36 15    is November, correct?

09:37:37 16    A.    Yes.

09:37:37 17    Q.    And that was one that you read yesterday, that's a

09:37:42 18    full month-and-a-half after the gun incident -- I'm sorry,

09:37:46 19    the purchase?

09:37:47 20    A.    Yes.

09:37:48 21    Q.    I'm sorry?

09:37:50 22    A.    Yes.

09:37:50 23    Q.    And the rest of the page is in that same month of

09:37:55 24    November of 2018; right?

09:37:57 25    A.    Yes.

Jensen - cross

09:37:58 1   Q.     Okay.  Then if you'll go to 176, Mr. Radic, please?

09:38:03 2   That's later -- that's the next day in November; right?

09:38:06 3   A.     Yes.  November 28th.

09:38:08 4   Q.     And the rest of that page is also at the end of

09:38:15 5   November 2018?

09:38:16 6   A.     Yes.

09:38:16 7   Q.     And then if you look at pages 51 through 58, if

09:38:19 8   you'll just scan over your book and look through all of

09:38:23 9   those.  Mr. Radic, can you scan down through all that?  51,

09:38:28 10  52, 53, 54, 55, 56, 57, and 58.  Do you see all those?

09:38:43 11  That's now getting into December of 2018, correct?

09:38:46 12  A.     Yes, I just focus on the dates, but yes they're all

09:38:51 13  December 9, 2018.

09:38:52 14  Q.     And that's now two months after the gun was

09:38:54 15  purchased?

09:38:54 16  A.     Yes.

09:38:55 17  Q.     Now, if you'll go to Row 213?  And that's the one

09:39:04 18  that you identified as the scale?

09:39:05 19  A.     Yes.

09:39:06 20  Q.     That might be a video?

09:39:08 21  A.     Yes.

09:39:09 22  Q.     And that's at the end of December?

09:39:12 23  A.     Yes.

09:39:12 24  Q.     So that's now another, almost getting to three

09:39:18 25  months, but certainly more than two-and-a-half months after

Jensen - cross

09:39:21  1    the gun purchase?

09:39:22  2    A.      Yes.

09:39:22  3    Q.      And then if you'll go to Row 214.  That one is dated

09:39:28  4    January 14th of 2019.  That's the picture of him holding

09:39:31  5    something in his hand that you identified?

09:39:33  6    A.      Yes.

09:39:34  7    Q.      And that's into the next year of 2019, isn't it?

09:39:38  8    A.      Yes.

09:39:39  9    Q.      And that's now three months after the gun was

09:39:42 10    purchased?

09:39:43 11    A.      Yes.

09:39:43 12    Q.      And almost three months after it was recovered?

09:39:49 13    A.      Yes.

09:39:50 14    Q.      And if you'll look at Row 216, please.  That one is

09:39:55 15    dated January 31st of '19.  That's a picture that it has

09:40:00 16    some sort of pipe event, and you identified yesterday,

09:40:06 17    right?

09:40:07 18    A.      Yes.

09:40:07 19    Q.      That's a full month after December, which makes it

09:40:10 20    now four plus months from the time the gun was purchased?

09:40:13 21    A.      Three-and-a-half --

09:40:17 22    Q.      Three-and-a-half, almost four, I'm sorry.

09:40:20 23    A.      Yes.

09:40:20 24    Q.      And then 220, Row 220.  Do you see that one?  That's

09:40:24 25    the end of February?

Jensen - cross

09:40:25  1    A.      Yes.

09:40:26  2    Q.      And that one is now -- and if we look down from that

09:40:31  3    page, that's now a month after the January date I just

09:40:34  4    identified?

09:40:35  5    A.      Yes.

09:40:36  6    Q.      And if you'll look at rows 220, and now skim all the

09:40:40  7    way to rows 292.  If you'll do that, too, Mr. Radic, scan

09:40:48  8    the page slowly to the next line, 63 to 75?

09:40:58  9    A.      To scan for dates?

09:40:59 10    Q.      Yes, just look at the dates, I mean yesterday you

09:41:02 11    read some, so I think you knew that.  All the way to the

09:41:15 12    end.  Did you see that?

09:41:16 13    A.      Yes.

09:41:16 14    Q.      That set that I just reacquainted you with is the

09:41:22 15    period of time where it had the 62 texts back and forth with

09:41:25 16    somebody?

09:41:25 17    A.      Yes.

09:41:25 18    Q.      On that one day of February 26th of '19?

09:41:28 19    A.      Yes.

09:41:29 20    Q.      That's nearly half-a-year after the gun was

09:41:32 21    purchased?

09:41:32 22    A.      Yes.

09:41:33 23    Q.      Take that down, Mr. Radic.

09:41:34 24            Yesterday you started talking about some cash

09:41:39 25    withdrawals.  I would like to turn to that subject if I

Jensen - cross

09:41:43  1   might.  If you'll put up Government Exhibit 27A, please.

09:41:47  2           You read from several of the bank statements

09:41:50  3   from 2018, do you recall doing that?

09:41:53  4   A.      Yes.

09:41:53  5   Q.      And the accounts that you used to compile the chart,

09:41:58  6   I think you identified as being more than one account?

09:42:02  7   A.      Yes.

09:42:02  8   Q.      So that would include his account that's in his name,

09:42:06  9   Robert Hunter Biden?

09:42:07 10   A.      Yes.

09:42:08 11   Q.      And it would include a business account?

09:42:10 12   A.      Yes.

09:42:10 13   Q.      The name of that entity was Owasco PC?

09:42:15 14   A.      Yes.

09:42:15 15   Q.      Do you know what Owasco PC is?

09:42:18 16   A.      It was, what I know, it was an entity, a business

09:42:21 17   entity.  I believe that one, at least at some point

09:42:25 18   Mr. Biden had 100 percent shareholder status in, that's

09:42:29 19   about all I know.

09:42:32 20   Q.      Yesterday when you read portions of his book, and he

09:42:36 21   was talking about his time in California especially, do you

09:42:39 22   remember reading, or hearing, I'm sorry, the excerpts in

09:42:43 23   which he said people took his wallet, took his cards, he was

09:42:47 24   ripped off?

09:42:48 25   A.      Yes.

Jensen - cross

09:42:48  1    Q.      On any occasion when that is the case, when somebody

09:42:52  2    took his wallet or his card, can you tell whether it's he

09:42:55  3    making the withdrawal, or somebody who has his card, or

09:42:58  4    somebody who has his card to whom he gave the number when he

09:43:02  5    said he gave people money, can you tell that?

09:43:05  6    A.      No, you just know the card was used, as any of us

09:43:08  7    would know, and the pin was used, so you would have had to

09:43:13  8    have the card and that pin number.

09:43:14  9    Q.      On page 8, for example, you identified a couple of

09:43:21 10    these entries, September the 13th, five up from the bottom,

09:43:25 11    do you see that?  The one that says 14,000?

09:43:28 12    A.      Yes.

09:43:29 13    Q.      And then, will you turn to the next page, Mr. Radic,

09:43:32 14    I think there is one in the middle of the page of 10,000, do

09:43:35 15    you see that?

09:43:36 16    A.      Yes.

09:43:36 17    Q.      And for example that one comes from the Owasco

09:43:39 18    account to the left, do you see that?

09:43:41 19    A.      Yes.

09:43:41 20    Q.      And then down the page, you see there is one for

09:43:44 21    5,000?

09:43:45 22    A.      Yes.

09:43:45 23    Q.      Yesterday Mr. Hines asked you whether or not those

09:43:49 24    conform to certain dates, including the date on

09:43:52 25    October 12th, in which the gun was purchased.  Do you

Jensen - cross

09:43:55 1 remember being asked and answering that question?

09:43:58 2 A.    Yes.

09:43:58 3 Q.    I take it you don't have any idea what that cash, and

09:44:03 4 whether that cash was used for the gun, right?

09:44:05 5 A.    All I can testify to is that I know the cash was

09:44:08 6 withdrawn, and that the gun was purchased with cash on the

09:44:11 7 same day, that's it.

09:44:12 8 Q.    When you looked at his personal account, and when you

09:44:17 9 looked at the Owasco account, it has entries for deposits,

09:44:23 10 correct?

09:44:24 11 A.    Yes.

09:44:27 12 Q.    And it has entries for withdrawals?

09:44:29 13 A.    Yes.

09:44:29 14 Q.    It has entries for checks written, if there is checks

09:44:33 15 written?

09:44:33 16 A.    Yes.

09:44:33 17 Q.    So you can, if you wanted to, see what money was

09:44:36 18 coming in, and it might indicate from where; correct?

09:44:39 19 A.    Yes.

09:44:39 20 Q.    And you can see if money was withdrawn, and again, it

09:44:44 21 might indicate to where?

09:44:46 22 A.    Yes.

09:44:47 23 Q.    In the period of time we're talking when Mr. Biden

09:44:51 24 was still in California right before he came back to

09:44:53 25 Delaware, you identified yesterday some of the invoices from

09:44:57  1   a place called The View; right?

09:44:59  2   A.      Yes.

09:45:00  3   Q.      And you indicated yesterday that you also read from,

09:45:03  4   or heard read from the book that Mr. Biden was staying at a

09:45:07  5   house he rented in Malibu?

09:45:09  6   A.      Yes.

09:45:09  7   Q.      And so when you were doing the economic analysis, did

09:45:15  8   you at the time try to as I asked match whether or not a

09:45:21  9   withdrawal of cash or a debit matched a payment to The View?

09:45:27 10   A.      I did do a full economic analysis of the bank

09:45:31 11   records, but to answer your question, I did not do a match

09:45:33 12   between the withdrawals.  My only recollection yesterday was

09:45:37 13   that I did see one debit, but it was maybe only for 1,400.

09:45:43 14   Q.      How about to the Malibu house that he rented, did you

09:45:47 15   try to find what house that was, how much it cost per month,

09:45:51 16   whether or not any of these matched that?

09:45:53 17   A.      The only thing I can speak to is I did see -- and

09:45:56 18   again, it's out of context, there were Airbnb charges that I

09:46:01 19   have seen, but beyond that I don't have Airbnb records to go

09:46:05 20   further.

09:46:05 21   Q.      If you would go back a page, Mr. Radic, to September

09:46:10 22   the 13th.  Do you see the 14,000 on that page?

09:46:16 23   A.      Yes.

09:46:17 24   Q.      And you did look at various of the records that came

09:46:23 25   about when you testified that the government obtained data

Jensen - cross

09:46:27 1    from the Cloud, data from what was seized as a laptop at the

09:46:32 2    end of '19, you did see that?  You did do that, you looked

09:46:36 3    through that material in order to concrete the chart you

09:46:39 4    did?

09:46:39 5    A.    So the material I was able to access that we based

09:46:42 6    our chart on was a snapshot of extracted data from the --

09:46:48 7    from the Cloud and from the laptop.  So the 18,000 pages

09:46:54 8    were primarily, almost and primarily, messages.

09:46:59 9    Q.    So when you looked through the materials that you

09:47:02 10   just reviewed -- just described, do you recall that, for

09:47:06 11   example, you see an entry to an Airbnb?  Did you see e-mails

09:47:11 12   which reflected the rental of an Airbnb, or a rental house

09:47:15 13   in that period of time, did you look at that?

09:47:17 14   A.    I did not review e-mails, but beyond that --

09:47:21 15   Q.    So beyond -- don't be sorry, I was just asking what

09:47:26 16   you did?

09:47:26 17          THE COURT:  She was apologizing because you two

09:47:29 18   are still talking over each other, let me ask again, please,

09:47:32 19   both of you have a habit of doing that.

09:47:35 20   Q.    Agent, I'm going to do better starting right now.

09:47:38 21          To be clear, if -- you didn't see any e-mails?

09:47:45 22   A.    I did not review e-mails, beyond the few that we

09:47:49 23   discussed yesterday.

09:47:50 24   Q.    Okay.  I'm sorry.  So you did review -- where did

09:47:54 25   those e-mails come from?

Jensen - cross

A.      So the e-mails that I -- from The View, came from the Cloud.  There were e-mails from the Cloud.  I did not review the entire set of e-mails.

Q.      So meaning you were looking for e-mails from the Cloud that said The View?

A.      No.  I didn't review the full set that would have been provided to investigators after the forensic analysis.

Q.      So you got from somebody else the e-mails that 102, which you identified yesterday?

A.      Yes.

Q.      So showing you an e-mail -- sorry, strike that.

        Whoever it was that provided you the e-mails, did they give you e-mails in the period of time we're talking in September that reflected his renting any of the houses that the jury heard about in California when he was staying there?

A.      No.

Q.      So, for example, on your chart of this 14,000 on October the 13th, do you see that?  I'm sorry, September the 13th, of 14,000, do you see that one?

A.      Yes.

Q.      That reflects he was in -- you know he was in California then?

A.      Yes.

Q.      Where was he living?

Jensen - cross

09:49:19  1    A.      I don't know.

09:49:20  2    Q.      And if you'll turn to September, the next page,

09:49:28  3    please?  The 27th.  Do you see a $10,000 withdrawal?  Do you

09:49:35  4    see that one?

09:49:35  5    A.      Yes.

09:49:36  6    Q.      Again, did you see any invoice or rental agreement

09:49:41  7    for a house he was staying in at that period of time?

09:49:45  8    A.      No.

09:49:46  9    Q.      Do you know on September 27th where he was living?

09:49:52 10    A.      No, just generally, not an address.

09:49:55 11    Q.      Still in Los Angeles?

09:49:57 12    A.      Yes.

09:49:57 13    Q.      Not back yet?

09:50:02 14            Then yesterday I think I asked -- doing it now,

09:50:07 15    sorry.  Do you know whether Hunter had any responsibility

09:50:10 16    when he mentioned those invoices to The View, to be paying

09:50:14 17    for his own rehabilitation, recovery, and treatment?

09:50:23 18    A.      No.

09:50:25 19    Q.      Okay.  I think yesterday, did you hear the phrase

09:50:31 20    "sober coach"?

09:50:32 21    A.      Yes.  A companion.

09:50:34 22    Q.      Say it again?  I didn't hear you?

09:50:38 23    A.      Companion.

09:50:39 24    Q.      Sober companion?

09:50:40 25    A.      Yes.

Jensen - cross

09:50:41  1    Q.      You understand what that is?

09:50:43  2    A.      Yes.

09:50:44  3    Q.      A person that after a person is in treatment will be

09:50:47  4    the companion of that person in the continued process of

09:50:51  5    that person's recovery?

09:50:52  6    A.      Yes.

09:50:54  7    Q.      And did you do an analysis to find out how much those

09:50:59  8    individuals or treatment programs charged?

09:51:02  9    A.      I have seen an invoice for the charge.  I believe it

09:51:06 10    was part of the packet yesterday.

09:51:08 11    Q.      Back to that.  So then did you try to match that with

09:51:12 12    any of the entries on your summary chart?

09:51:16 13    A.      No.

09:51:16 14    Q.      One yesterday -- could you please put up Mr. Radic,

09:51:25 15    Government Exhibit 29E.  You see the date of this is now

09:51:29 16    later in October of 2018?

09:51:30 17    A.      Yes.

09:51:30 18    Q.      And you identified that one yesterday as being the

09:51:34 19    day of the gun sale, right?

09:51:37 20    A.      Yes.

09:51:38 21    Q.      But as I asked you before, you have no idea whether

09:51:41 22    that was cash that he used to purchase the gun?

09:51:43 23    A.      I do not know.

09:51:45 24    Q.      Did you trace whether or not somebody on that same

09:51:49 25    day deposited that $5,000?

Jensen - cross

09:51:51  1    A.       No.

09:51:51  2    Q.       Do you know -- did you look at members of his family,

09:51:56  3    his daughters, his sister, his former sister-in-law, to

09:52:00  4    determine whether they got that money that day?

09:52:03  5    A.       No, I've never seen any records for anybody else.

09:52:07  6    Q.       In what you did see in terms of financial records,

09:52:11  7    you did see transfers that Hunter made to members of his

09:52:15  8    family; right?

09:52:16  9    A.       Yes.

09:52:18 10    Q.       We can take that down, please.

09:52:20 11             I would like to call back up Government

09:52:23 12    Exhibit 36A.  You identified this yesterday as a bank

09:52:29 13    statement from Wells Fargo ending November 30th of 2018?

09:52:36 14    A.       Yes.

09:52:37 15    Q.       From the Owasco account?

09:52:41 16    A.       Yes.

09:52:44 17    Q.       And you identified what you understood Owasco to be,

09:52:48 18    a professional, PC stands for professional corporation,

09:52:52 19    right?

09:52:52 20    A.       Yes.

09:52:52 21    Q.       It's an entity in which people do business.  Yes?

09:52:57 22    A.       Yes.

09:52:57 23    Q.       And I think yesterday, you remember that Mr. Hines

09:53:00 24    asked you for the total year, how much money this bank

09:53:06 25    account reflected came in.  Do you remember that?  If you

Jensen - cross

09:53:13  1    turn to probably the next page, Mr. Radic, well, you have it

09:53:16  2    in front of you.  Turn to the next page.  Mr. Radic, can you

09:53:21  3    turn to the next page?  No, that's not it.  Keep going.

09:53:28  4    Yes.  On that page.  Do you see on the right you identified

09:53:31  5    a figure of 3,439,000 et cetera?

09:53:35  6    A.    Yes.

09:53:42  7    Q.    First, I don't think you were intending, but let me

09:53:44  8    make it clear, you're not suggesting that all that money was

09:53:47  9    used by him to buy drugs?

09:53:49  10   A.    No.

09:53:49  11   Q.    And you are describing the account as the business

09:53:54  12   account that he was using with whomever at that time?

09:53:58  13   A.    Yeah, I know it to be a business account.

09:54:01  14   Q.    From that analysis, you looked to see the deposits in

09:54:06  15   that year that accounted for that amount of money?

09:54:10  16   A.    No, I did not.

09:54:11  17   Q.    The record would reflect those, right?

09:54:16  18   A.    I believe there have been records provided.

09:54:19  19   Q.    But that, you understand, Owasco would be where his

09:54:22  20   income would be deposited?  I mean for Owasco?

09:54:28  21   A.    Yes.

09:54:28  22   Q.    And where if Owasco was doing investments, investment

09:54:33  23   money would be deposited?

09:54:34  24   A.    I have a very limited understanding of the inflows

09:54:37  25   and outflows of this account, so I don't want to over state

Jensen - cross

09:54:41  1   my knowledge.

09:54:42  2   Q.      If you know it, great, if not, I will move on.

09:54:45  3           You did know, however, that in that amount,

09:54:49  4   there is money that's going out to other people and other

09:54:52  5   entities; right?

09:54:54  6   A.      My review of the bank statements were confined

09:54:58  7   largely to this three-month period, and largely to the

09:55:01  8   exhibits that we put in, so beyond that, you know, I'm not

09:55:06  9   all that familiar.

09:55:07 10   Q.      So not to belabor this, at that time, do you know who

09:55:11 11   his business partners were that he was sharing proceeds from

09:55:15 12   Owasco?

09:55:16 13   A.      No.

09:55:16 14   Q.      Do you know how much money he was then paying in

09:55:18 15   alimony?

09:55:19 16   A.      No.

09:55:20 17   Q.      Do you know how much money he was providing his

09:55:23 18   daughters for tuition or housing?

09:55:26 19   A.      No.

09:55:26 20   Q.      Do you know how much money he was using for his own

09:55:29 21   living expenses back on the East Coast?

09:55:32 22   A.      No.

09:55:32 23   Q.      Do you know how much money he was providing other

09:55:35 24   members of his family to help them?

09:55:37 25   A.      No.

Jensen - cross

09:55:38  1  Q.      So when Mr. Hines yesterday asked you for the total

09:55:42  2  amount that went into this business account, that doesn't

09:55:46  3  reflect where it went?

09:55:48  4  A.      No.

09:55:49  5  Q.      It's a big number, though?

09:55:53  6  A.      Yes.

09:55:55  7  Q.      That big number has any particular connection to what

09:55:59  8  happened on October 12th, as far as you can tell?

09:56:03  9  A.      The size alone, no.

09:56:06 10  Q.      No.

09:56:08 11          I would like to show you another document that I

09:56:10 12  was going to offer, but I think I would offer it if you

09:56:13 13  don't disagree, government's new Exhibit 44A, that you

09:56:17 14  provided this morning.  Is that okay?

09:56:22 15              MR. HINES:  Yes.

09:56:24 16              MR. LOWELL:  Your Honor, I would like to move

09:56:27 17  the Government's Exhibit 44A into evidence, please.

09:56:30 18              THE COURT:  Any objection?

09:56:30 19              MR. HINES:  No objection.

09:56:31 20              THE COURT:  Thank you.  It's admitted.

09:56:33 21              (Government's Exhibit No. 44A was admitted into

09:56:34 22  evidence.)

09:56:34 23  BY MR. LOWELL:

09:56:34 24  Q.      So this is a similar bank statement, isn't it?

09:56:38 25  A.      Yes.

Jensen - cross

09:56:38 1    Q.      And this one is for the Owasco LLC?

09:56:43 2    A.      Yes.

09:56:43 3    Q.      Which you identified.  And this is for the period

09:56:46 4    ending October 31st, do you see that?

09:56:49 5    A.      August 31st.

09:56:50 6    Q.      I'm sorry.  This period that this reflects is

09:56:56 7    activity ending August 31st of 2018?

09:57:00 8    A.      Yes.

09:57:00 9    Q.      Could you please turn to page 27, to the first entry?

09:57:12 10   A.      Do you have a Bates number?

09:57:13 11   Q.      Yes, the Bates number is 006.  Do you see that?

09:57:21 12   A.      Yes.

09:57:22 13   Q.      That indicates that an authorization date of August

09:57:29 14   the 22nd, hitting the account on the 24th, do you see that?

09:57:33 15   A.      Yes.

09:57:34 16   Q.      And it's that same kind of card; right?

09:57:37 17   A.      Yes.

09:57:37 18   Q.      In the amount of $5,000?

09:57:41 19   A.      Yes.

09:57:42 20   Q.      Is going to a place called The View?

09:57:44 21   A.      Yes.

09:57:45 22   Q.      And we identified The View as the rehab, recovery,

09:57:48 23   and treatment place?

09:57:49 24   A.      Yes.

09:57:50 25   Q.      And that is out of Mr. Biden's account?

Jensen - cross

09:57:54  1    A.        Yes.

09:57:55  2    Q.        Or Owasco, as the case may be?

09:57:58  3    A.        Yes.

09:57:58  4    Q.        On page 27, if you'll go to the third entry?

09:58:03  5    A.        Yes.

09:58:03  6    Q.        That is an authorization date of the 23rd.

09:58:10  7    A.        Yes.

09:58:11  8    Q.        And it is hitting the account, to use the phrase I'm

09:58:15  9    using, on August 27th, do you see that?

09:58:18 10    A.        Yes.

09:58:18 11    Q.        And that is also a debit to that same account, yes?

09:58:22 12    A.        Yes.

09:58:22 13    Q.        $2,500?

09:58:23 14    A.        Yes.

09:58:24 15    Q.        Going to The View?

09:58:26 16    A.        Yes.

09:58:27 17    Q.        If you please turn to page 28.  Bates would be 007,

09:58:32 18    the next one.   Look at the second -- yeah, the second full,

09:58:43 19    entry, please.   You see the authorization on the 24th of

09:58:46 20    August?

09:58:46 21    A.        Yes.

09:58:46 22    Q.        And you see it hits the account on the 28th?

09:58:49 23    A.        Yes.

09:58:49 24    Q.        And it's from the same account going to The View?

09:58:52 25    A.        Yes.

Jensen - cross

09:59:03  1    Q.      Please look at the next entry on page 28.  It

09:59:07  2    indicates an authorization also on the 24th, do you see

09:59:12  3    that?

09:59:12  4    A.      Yes.

09:59:13  5    Q.      And hitting the account on the 28th, like the one

09:59:17  6    before?

09:59:20  7    A.      Yes.

09:59:20  8    Q.      And that's for $2,500, coming out for The View?

09:59:26  9    A.      Yes.

09:59:26 10    Q.      And then if you'll look at page 29, which will be the

09:59:30 11    next page, 008, I mean the Bates number is 008?

09:59:34 12    A.      Yes.

09:59:34 13    Q.      And look at the fourth entry down.

09:59:38 14    A.      Yes.

09:59:39 15    Q.      That authorization is the 27th of August?

09:59:42 16    A.      Yes.

09:59:43 17    Q.      And this one says to Transcend Ment.  Do you see

09:59:47 18    that?

09:59:47 19    A.      Yes.

09:59:48 20    Q.      And I think earlier you identified that as a location

09:59:51 21    for the sober companion entity?

09:59:54 22    A.      Yes.

09:59:54 23    Q.      And that's $4,000?  Coming out of his account?

10:00:03 24    A.      Yes.

10:00:04 25    Q.      And then if you'll turn to page 29, which is also

Jensen - cross

10:00:08  1   there, the next entry, authorization on the 27th?

10:00:14  2   A.      Yes.

10:00:15  3   Q.      And the account hitting at the 29th, two days later?

10:00:20  4   A.      Yes.

10:00:20  5   Q.      That's another $2,000 going to Transcend Ment.,

10:00:25  6   right?

10:00:25  7   A.      Yes.

10:00:26  8   Q.      And then if you'll look at the same page, the last

10:00:29  9   entry, on the 29th on the left, authorization on the 28th?

10:00:35 10   A.      Yes.

10:00:35 11   Q.      That is a $1,200 going to The View from that same

10:00:41 12   account?

10:00:44 13   A.      Yes.

10:00:45 14   Q.      And if, Mr. Radic, could you put up Government

10:00:49 15   Exhibit 31?

10:00:51 16           And if you'll go to page 14.  The last entry,

10:01:09 17   page 14 -- I just saw it, maybe it's the one before it.

10:01:18 18   Here it is right there.  Would you highlight that, please?

10:01:22 19           And you see that it is to an entity called

10:01:28 20   Transcend Ment, again?

10:01:28 21   A.      Yes.

10:01:29 22   Q.      And it's authorized on the sixth, the left side says

10:01:34 23   on the seventh, do you see that?

10:01:36 24   A.      Yes.

10:01:37 25   Q.      That's another $2,400?

Jensen - cross

10:01:39  1    A.        Yes.

10:01:39  2    Q.        If you add up what I just did, for example, 5,000

10:01:43  3    plus 2,500, plus 5,000, plus 2,400, plus 2,500, plus 4,000,

10:01:50  4    plus 2,000, plus 1,200, plus $2,400, quite a lot of

10:01:55  5    thousands, right, in that period of time?

10:01:57  6    A.        Yes.

10:01:58  7    Q.        From his account?

10:01:59  8    A.        Yes.

10:01:59  9    Q.        Going to that facility for recovery?

10:02:02 10    A.        Yes.

10:02:03 11    Q.        Can you take that down now, please?

10:02:07 12              Yesterday in your testimony you identified

10:02:11 13    Government Exhibit 6.  Would you put that up?

10:02:14 14              You identified this as an e-mail.  You said that

10:02:18 15    you had seen a few e-mails, I think this is one.

10:02:21 16    A.        Yes.

10:02:23 17    Q.        Sorry, what did I say wrong?

10:02:25 18    A.        Yes, this is an e-mail separate from an iCloud

10:02:28 19    e-mail, this is an e-mail that was recovered from StarQuest

10:02:33 20    Shooters.

10:02:33 21    Q.        I didn't ask where that's from, but you just

10:02:38 22    clarified that.  Thank you.  You see this is an e-mail that

10:02:40 23    you identified, right?

10:02:41 24    A.        Yes.

10:02:42 25    Q.        You see the top right it says October 26, 2018?

Jensen - cross

10:02:45 1   A.      Yes.

10:02:45 2   Q.      Does that indicate the date it was sent?

10:02:49 3   A.      I believe it does.  But I'm basing that on the other

10:02:52 4   e-mail that's contained in Exhibit 8 or 9.

10:02:56 5   Q.      And the gun purchase itself was on the 12th, right?

10:02:59 6   A.      Yes.

10:02:59 7   Q.      That was 14 days before?

10:03:02 8   A.      Yes.

10:03:03 9   Q.      So this is sent 14 days after; right?

10:03:06 10  A.      Yes.

10:03:06 11  Q.      This is sent three days after the incident in which

10:03:11 12  the gun was thrown out and then recover -- no, not recovered

10:03:15 13  that day, that's the day it was thrown out, three days?

10:03:18 14  A.      Yes.

10:03:19 15  Q.      Now, do you know whether the form as it was sent on

10:03:24 16  October 26th was the way it was filled out on October 12th?

10:03:31 17           MR. HINES:  Objection.

10:03:34 18           THE COURT:  She can answer that.  What was the

10:03:38 19  question?

10:03:39 20  Q.      The question was:  Did she know whether the form that

10:03:42 21  was sent on the 26th is the same as it was on October 12th?

10:03:47 22           THE COURT:  Okay.  You can answer that yes or

10:03:51 23  no.

10:03:51 24           THE WITNESS:  Yes.

10:03:53 25  BY MR. LOWELL:

Jensen - cross

10:03:54  1    Q.     You know that?  How would you know what happened to a

10:03:59  2    form between the 12th and the 26th, unless you saw it on the

10:04:02  3    12th?

10:04:03  4                 MR. HINES:  Objection, hearsay.

10:04:05  5                 THE COURT:  Okay.  So let's just have a quick

10:04:08  6    side-bar.

10:06:41  7                 (Side-bar discussion:)

10:06:41  8                 MR. HINES:  So she's interviewed witnesses who

10:06:41  9    have described this form, so you're not asking a question

10:06:41 10    that's clear, it's hearsay, she knows it because of her

10:06:41 11    experiences with these witnesses and reviewing other

10:06:41 12    information in this case, she wasn't there, she wasn't a

10:06:41 13    percipient witness at the time, so if question is causing

10:06:41 14    that answer.

10:06:41 15                 THE COURT:  What do we do now, because she said

10:06:41 16    yes, and he's saying well you don't actually know, and she's

10:06:41 17    going to say I do know because of hearsay, so where do we go

10:06:42 18    from now because --

10:06:42 19                 MR. LOWELL:  I can strike the question and ask

10:06:42 20    her was she there at the time to know what was done on the

10:06:42 21    12th, or I don't mind going into it, but that would get us

10:06:42 22    into a shaky area, I'm happy --

10:06:42 23                 MR. HINES:  It's been excluded.

10:06:42 24                 MR. LOWELL:  So then I will --

10:06:42 25                 THE COURT:  Well, no, he's asking between the --

Jensen - cross

10:06:42  1    the form that was on the 12th.

10:06:42  2              MR. HINES:  Right.

10:06:42  3              THE COURT:  We know what the form on the 26th

10:06:42  4    is.

10:06:42  5              MR. HINES:  Right.

10:06:42  6              THE COURT:  So what I'm not understanding is

10:06:42  7    what's been excluded is a form that at some point it was not

10:06:42  8    the one on the 26th, was edited.  So what I'm not

10:06:42  9    understanding is why does this get into that, when you say

10:06:42 10    it was excluded.  I didn't think I excluded anything between

10:06:42 11    the 12th and the 26th.

10:06:42 12              MR. HINES:  There is no evidence of alteration

10:06:42 13    between the 12th and the 26th, and Ms. Jensen has talked to

10:06:42 14    the witness, Mr. Cleveland, who was there to say the form

10:06:42 15    exists on the 26th as it did the same on the 12th, I think

10:06:42 16    the issue is it's going to elicit hearsay, anything beyond

10:06:42 17    that, I want to make sure we're not getting into the altered

10:06:42 18    form.

10:06:42 19              MR. LOWELL:  If it makes it clear, what she

10:06:42 20    knows, she knows from witnesses or I'm just striking the

10:06:42 21    question, and asking her was she there to know what happened

10:06:42 22    on the 12th.

10:06:42 23              MR. HINES:  I think making it clear like you

10:06:42 24    have interviewed witnesses so you know that's the same form

10:06:42 25    but beyond that you weren't there on the 12th.

Jensen - cross

10:06:42  1          MR. LOWELL:  Okay.  I can strike it.

10:06:44  2          THE COURT:  Thank you.

10:06:45  3  BY MR. LOWELL:

10:06:46  4  Q.      Agent, where we left off was I asked you whether or

10:06:48  5  not between the 12th and the 26th, is the form on the 26th,

10:06:54  6  and I asked I think is it the same as it was on the 12th,

10:06:58  7  and you answered -- whatever you answered, you know based on

10:07:01  8  what witnesses say, but not your own observations, is that

10:07:06  9  right?

10:07:06 10  A.      Yes.

10:07:07 11  Q.      Do you know on October 26th, when this form was sent

10:07:11 12  to Mr. Reisch, as we identified yesterday, why that was sent

10:07:17 13  on that particular day?  That's three days after the gun was

10:07:24 14  reported having been stolen, missing, right?

10:07:26 15  A.      I believe it was in relation to the investigation

10:07:28 16  into the gun.

10:07:30 17  Q.      To try to find the serial number of the gun, to try

10:07:33 18  to figure out where it was?

10:07:34 19  A.      That, I don't know.

10:07:35 20  Q.      But you know it was three days later?

10:07:38 21  A.      Yes.

10:07:38 22  Q.      And yesterday you also went through some of the form

10:07:42 23  that Mr. Hines showed you.  Could you pull up Government

10:07:45 24  Exhibit 7A?  Do you remember identifying this yesterday?

10:07:51 25  A.      Yes.

10:07:53 1          MR. HINES:  Objection.  This exhibit should be
10:07:56 2   10.
10:07:57 3          MR. LOWELL:  I don't mind doing 10A.
10:08:00 4          MR. HINES:  Not 7A.
10:08:01 5          MR. LOWELL:  7A is what was attached to --
10:08:06 6          I'm sorry, Judge, I just got confused.  Would
10:08:10 7   you take down 7A and would you put up 10A.
10:08:13 8   BY MR. LOWELL:
10:08:14 9   Q.     Okay.  This page looks as you identified it
10:08:18 10  yesterday?
10:08:20 11  A.     Yes.  Yes.
10:08:23 12  Q.     On this page, yesterday you said, "the defendant
10:08:28 13  checked the boxes."  Do you see that -- I mean, do you
10:08:31 14  remember saying that?  Do you know whether the defendant
10:08:39 15  checked those boxes?  I mean, from your own observation, not
10:08:45 16  from a witness who says that's what happened?
10:08:47 17  A.     No.  Not from my own observation.
10:08:52 18  Q.     Okay.  Mr. Hines, yesterday, had you compare the
10:08:56 19  signature on page 2 of 10(a).  Can we go to page 2?  And you
10:09:02 20  saw that; right?
10:09:04 21  A.     Yes.
10:09:04 22  Q.     And then he had you compare that to the signature on
10:09:07 23  the bank form of the $5,000, do you remember that?
10:09:14 24  A.     Yes.
10:09:15 25  Q.     And he asked you whether or not, I don't remember

Jensen - cross

10:09:17  1   what the question was, but you said they were similar right?

10:09:20  2   A.      Yes.

10:09:20  3   Q.      Did you do a handwriting analysis of that?

10:09:22  4   A.      No, I'm not qualified as a handwriting expert, it's

10:09:26  5   just an individual observation, as anyone else would make.

10:09:30  6   Q.      If you go back to the previous page.  Mr. Hines and

10:09:33  7   you -- and he identified for you question number E, letter

10:09:38  8   E, where it says "are you an unlawful user or", do you see

10:09:42  9   that?

10:09:43 10   A.      Yes.

10:09:43 11   Q.      And asked if the box was checked, and you indicated

10:09:46 12   it was, and it was checked "no".  Right?

10:09:49 13   A.      Yes.

10:09:50 14   Q.      Do you see on the form the letter C?

10:09:57 15   A.      Yes.

10:09:57 16   Q.      That one reads, "have you ever been".  Do you see

10:10:00 17   that one?

10:10:01 18   A.      Yes.

10:10:01 19   Q.      And if you'll look at F, does that one say "have you

10:10:05 20   ever been"?

10:10:05 21   A.      Yes.

10:10:07 22   Q.      And G says, "have you", right?

10:10:11 23   A.      Yes.

10:10:11 24   Q.      And I says "have you"?

10:10:15 25   A.      Yes.

Jensen - cross

10:10:16  1    Q.      But E says, "are you"?

10:10:20  2    A.      Yes.

10:10:27  3    Q.      If you'll turn to page 10 of 10A.  This is -- yes,

10:10:35  4    okay.

10:10:36  5            Now, on this form I would like you to look at

10:10:40  6    it, you see the top part is in black ink, do you see that?

10:10:46  7    A.      Yes.

10:10:46  8    Q.      And you see that next to the signature is a date?

10:10:49  9    A.      Yes.

10:10:50 10    Q.      And you see that the date says 10.12.18?

10:10:58 11    A.      Yes.

10:10:59 12    Q.      And now if you'll look at 18(a), where it says U.S.

10:11:04 13    passport, do you see that?

10:11:06 14    A.      Yes.

10:11:07 15    Q.      And you see there is a 01?

10:11:10 16    A.      Yes.

10:11:10 17    Q.      05?

10:11:13 18    A.      Yes.

10:11:13 19    Q.      2027?

10:11:16 20    A.      Yes.

10:11:16 21    Q.      Do you see the way the zero is written there?

10:11:20 22    A.      Yes.

10:11:20 23    Q.      Do you see it has a slash in it?

10:11:22 24    A.      Yes.

10:11:22 25    Q.      If you look back to the date next to the signature.

Jensen - cross

10:11:27  1    Do you see the see there?

10:11:28  2    A.    No.

10:11:28  3    Q.    I'm sorry, do you see the zero?

10:11:30  4    A.    I see the zero, I do not see the slash.

10:11:33  5    Q.    But it does not have the slash in it, right?

10:11:36  6    A.    Yes.

10:11:36  7    Q.    And then you see the date above where the

10:11:38  8    certification is, it just uses the last two numbers, 18?

10:11:42  9    A.    Yes.

10:11:42 10    Q.    And then the U.S. passport line, it has the full

10:11:46 11    year, do you see that?

10:11:50 12    A.    Yes.

10:11:51 13    Q.    And then in 19a, do you see a date, and it's

10:12:01 14    10/12/2018, do you see that?

10:12:01 15    A.    Yes.

10:12:02 16    Q.    And then next to it is numbers; right?

10:12:04 17    A.    Yes.

10:12:04 18    Q.    And it includes zeros?

10:12:06 19    A.    Yes.

10:12:06 20    Q.    And those zeros have that slash mark, too?

10:12:09 21    A.    Yes.

10:12:09 22    Q.    And it's written in red ink?

10:12:13 23    A.    Yes.

10:12:13 24    Q.    And it says Proceed?

10:12:15 25    A.    Yes.

Jensen - cross

10:12:16 1   Q.      And that is a different ink color than the date

10:12:21 2   above?

10:12:21 3   A.      Yes.

10:12:22 4   Q.      And it's a different -- I'm sorry, but it has that

10:12:26 5   same slashes in both?

10:12:29 6   A.      Yes.

10:12:30 7   Q.      The slash across the O?

10:12:31 8   A.      Yes.

10:12:32 9   Q.      And then in 19G it has a name.  What's that name?

10:12:35 10  A.      Jason V. Turner.

10:12:38 11  Q.      Do you know whether Jason V. Turner wrote Jason V.

10:12:42 12  Turner on this document, or somebody else?

10:12:47 13  A.      I can answer that with that same basis.

10:12:50 14  Q.      Yeah, if you know the answer?

10:12:51 15  A.      Yes.

10:12:51 16  Q.      Is that based on what a witness said?

10:12:55 17  A.      Yes.

10:12:55 18  Q.      Can we go further down?  And we go to the next page.

10:13:02 19  And do you see the entry there, it has Colt MFG Co.?

10:13:11 20  A.      Yes.

10:13:12 21  Q.      And that -- does that, given what you said yesterday

10:13:15 22  about comparing, does that look like the same handwriting as

10:13:18 23  the person who wrote the 100 with the slash?  If you can.

10:13:40 24  A.      I don't know.

10:13:41 25          MR. HINES:  Your Honor, I would object, I don't

Jensen - cross

10:13:43  1   see a zero in there.

10:13:45  2               MR. LOWELL:  I didn't ask about a zero, I asked

10:13:48  3   about any of it, can she look at that and indicate whether

10:13:52  4   or not it looks like the same handwriting as the person who

10:13:55  5   wrote the other one, and if she can, great.

10:14:04  6   A.      I don't think I can say what I think --

10:14:07  7   Q.      I'm sorry, I can't hear you in the mic?

10:14:09  8   A.      I'm sorry, I don't think I can say either way.

10:14:12  9   Q.      Would you keep on going down the page, Mr. Radic.

10:14:16 10   And then at the bottom, you'll see line 34.  Do you see that

10:14:19 11   one?

10:14:19 12   A.      Yes.

10:14:19 13   Q.      Now that's not in the same color as the other two, is

10:14:24 14   it?

10:14:24 15   A.      No.

10:14:25 16   Q.      That's blue?

10:14:26 17   A.      Yes.

10:14:26 18   Q.      And that says Gordon T. Cleveland; right?

10:14:30 19   A.      Yes.

10:14:30 20   Q.      Signature, right?

10:14:32 21   A.      Yes.

10:14:32 22   Q.      Transfer's a title of sale, right?

10:14:38 23   A.      Yes.

10:14:39 24   Q.      And then you see the ink color changes again to red,

10:14:44 25   do you see that?

Jensen - cross

10:14:44  1    A.      Yes.

10:14:45  2    Q.      If you look at that 10102018, Mr. Radic, if you go up

10:14:51  3    the page to where that 0 is slashed again to the page

10:14:54  4    before, looks like that one, right?

10:14:57  5    A.      Yes.

10:14:59  6    Q.      From other than what people have told you, do you

10:15:03  7    know the sequence of events that occurred on October 12th,

10:15:07  8    2018, when Hunter went into the StarQuest Shooters, other

10:15:11  9    than what people have told you?

10:15:12 10    A.      No.

10:15:13 11    Q.      Take that down.

10:15:14 12            Yesterday when you were going through the data

10:15:21 13    from which you compiled your summary charts, you indicated

10:15:26 14    the sequence of events in which it was acquired by, from

10:15:31 15    Apple, right?

10:15:31 16    A.      Yes.

10:15:31 17    Q.      And you described the Cloud, right?

10:15:34 18    A.      Yes.

10:15:34 19    Q.      And you mentioned the subpoena and a laptop device

10:15:39 20    that was obtained at the end of 2019?

10:15:41 21    A.      Yes.

10:15:42 22    Q.      And that found its way on to the -- I'm not good at

10:15:47 23    this, the media, the hard drive, et cetera, that Mr. Hines

10:15:50 24    held up to you and asked you to identify?

10:15:52 25    A.      The iCloud, right, the iCloud returned from Apple

Jensen - cross

10:15:56  1    ended up on that hard drive.

10:15:57  2    Q.      What about the data that came from what was retrieved

10:16:01  3    at the end of 2019, where did that go?

10:16:03  4    A.      The data that -- there was a laptop and an external

10:16:08  5    hard drive seized that day.  They were ultimately analyzed

10:16:13  6    by the FBI, and then -- I know an image of the external hard

10:16:22  7    drive was done, an image file was made.  And then there were

10:16:30  8    extractions down from the laptop and a regional forensic

10:16:35  9    computer lab in Philadelphia.

10:16:36 10    Q.      You have no reason to believe the time the FBI

10:16:41 11    acquired the data from Apple, or what you just described,

10:16:44 12    they changed any part of it, right?

10:16:46 13    A.      Forensic examiners?

10:16:49 14    Q.      Yes, the FBI, they didn't change anything that you

10:16:52 15    know of, did they?

10:16:53 16    A.      No, I have a small basis of my understanding of how

10:16:56 17    they work, I know they do a lot -- they create images files

10:16:59 18    of what would be considered the original data, so it doesn't

10:17:03 19    change the original data, but beyond that, I'm providing

10:17:06 20    what I know.

10:17:07 21    Q.      And the material that came into evidence that you

10:17:09 22    discussed with Mr. Hines yesterday, as far as you know is

10:17:12 23    the way the FBI obtained it?

10:17:14 24    A.      Yes.

10:17:14 25    Q.      And you indicated what you know about what they did

Jensen - cross

10:17:18 1    with it, but you have no reason to believe the material that

10:17:21 2    you just described yesterday, and I asked you about today,

10:17:25 3    had been changed, altered, it was authentic as you

10:17:29 4    understood it?

10:17:30 5    A.      What I can speak to is when we obtain the data.

10:17:33 6    Q.      Yes?

10:17:34 7    A.      It was authentic from that point forward.

10:17:36 8    Q.      And then when you provided it to us in discovery,

10:17:39 9    discovery meaning you provided material to the defense,

10:17:42 10   that's the way it was sent, in the same way that you

10:17:46 11   retrieved it?

10:17:47 12   A.      My understanding is you received copies both of our

10:17:51 13   extraction reports and of the full forensic images of the

10:17:55 14   original data.

10:17:56 15   Q.      I think you said, I don't know that you identified,

10:17:59 16   that as to the device, the laptop, it came into the

10:18:03 17   possession of the government in December of 2019?

10:18:06 18   A.      Yes.

10:18:07 19   Q.      You understand that from the invoice that you showed

10:18:13 20   about a repair shop that it was brought, according to the

10:18:19 21   owner, in April of that year?

10:18:21 22   A.      Yes.  The invoice is dated in April.

10:18:25 23   Q.      So can you tell what happened between the time the

10:18:32 24   invoice indicates that device was brought to the shop and

10:18:37 25   when the FBI acquired it six months later?

Jensen - cross

10:18:42  1  A.      No.

10:18:47  2  Q.      You are aware from your investigation that the person

10:18:52  3  who claims to have gotten it in April indicates he made

10:18:56  4  copies --

10:18:56  5              MR. HINES:  Objection.

10:18:58  6              MR. LOWELL:  I'll withdraw the question.

10:19:02  7              THE COURT:  Sustained.

10:19:05  8  BY MR. LOWELL:

10:19:06  9  Q.      Will you put up Government Exhibit 40?  So this is an

10:19:13 10  invoice you identified yesterday, and I referred to, dated

10:19:16 11  the 17th; right?

10:19:18 12  A.      Yes.

10:19:19 13  Q.      And you indicated that that's one of the things you

10:19:22 14  obtained from the data that was recovered and that was

10:19:26 15  extracted and that you had reviewed?

10:19:28 16  A.      Yes.

10:19:28 17  Q.      And the date of this is the 17th; right?

10:19:32 18  A.      The date of the e-mail is the 17th.

10:19:35 19  Q.      But you know from your investigation that the person

10:19:38 20  who sent this indicates that he got this device five days

10:19:42 21  before?

10:19:43 22  A.      I know from the investigation that yes, it was

10:19:48 23  reported that it was April 12th.

10:19:53 24  Q.      Do you have any notion of what happened in that

10:19:58 25  device between April he 12th, where your investigation

Jensen - cross

10:20:02  1   indicates that's when the person acquired it, and April 17th

10:20:05  2   when he sent the invoice?

10:20:09  3   A.      I have some knowledge, but it's through somebody

10:20:13  4   else's statements.

10:20:14  5   Q.      So no firsthand knowledge?

10:20:16  6   A.      No firsthand knowledge.

10:20:24  7   Q.      Now, the last point on this.  If the person acquired

10:20:29  8   it in April, and the FBI says it acquired that in December,

10:20:36  9   six months later, did your investigation indicate whether

10:20:41 10   what was put on that machine in April was the way it was

10:20:46 11   originally done by Hunter before then?

10:20:52 12   A.      I'm sorry, ask that one more time.

10:20:54 13   Q.      I didn't say that right.  Benchmarks.  April 2019,

10:20:59 14   the person says "I got the device."  Right?

10:21:02 15   A.      Yes.

10:21:02 16   Q.      December of 2019, the FBI acquires it?

10:21:06 17   A.      Yes.

10:21:06 18   Q.      What I'm asking is, did you do an analysis to

10:21:10 19   determine whether on the date that this person says he got

10:21:13 20   it, the data he got was in the format, content, or in any

10:21:19 21   way what had originally been put there by Mr. Biden?

10:21:23 22   A.      You're asking if on the 12th the person that received

10:21:27 23   it?

10:21:27 24   Q.      I'm asking whatever that person got on the 12th, was

10:21:32 25   the way it was originally put, do you know?  Did you do an

Jensen - redirect

10:21:36  1  analysis?  Did you find out whether any of the files had

10:21:39  2  been tampered with, added to, or subtracted?

10:21:43  3  A.      I did not.  Right, I did not.

10:21:45  4  Q.      At the end, I ask you agent, so you came on the

10:21:50  5  investigation in the fall of 2023?

10:21:52  6  A.      Yes.

10:21:53  7  Q.      That was five years after the gun was purchased;

10:21:56  8  right?

10:21:56  9  A.      Yes.

10:21:56 10  Q.      And discarded; right?

10:21:59 11  A.      Yes.

10:22:00 12  Q.      Two years after Mr. Biden wrote -- sorry, two years

10:22:04 13  after Mr. Biden published Beautiful Things; right?  But to

10:22:09 14  be clear on the things you testified, none of that is what

10:22:12 15  you know from your firsthand knowledge about what happened

10:22:15 16  in 2018; is that right?

10:22:17 17  A.      I --

10:22:19 18  Q.      None of that is from what you knew firsthand in 2018,

10:22:23 19  from what you saw in 2018?

10:22:26 20  A.      Correct.

10:22:28 21              MR. LOWELL:  Pass the witness, Judge.

10:22:30 22              THE COURT:  Thank you.  Redirect.

10:22:33 23                      REDIRECT EXAMINATION

10:22:34 24  BY MR. HINES:

10:22:37 25  Q.      Agent Jensen, picking up where Mr. Lowell left off,

Jensen - redirect

10:22:40  1    yesterday you introduced Government Exhibit 16, the laptop;

10:22:44  2    correct?

10:22:45  3    A.      Yes.

10:22:45  4    Q.      And Mr. Lowell was asking you some questions there

10:22:48  5    about whether you knew anything about tampering or something

10:22:51  6    like that, for all his questions just now?

10:22:55  7    A.      Yes.

10:22:55  8    Q.      Have you seen any evidence whatsoever from the data

10:22:58  9    you reviewed from this laptop to suggest that there was

10:23:02 10    tampering?

10:23:02 11    A.      No.

10:23:03 12    Q.      Does the serial number on the laptop, as you

10:23:05 13    discussed in your testimony yesterday, match the serial

10:23:08 14    number registered with Mr. Biden's iCloud account?

10:23:12 15    A.      Yes.

10:23:12 16    Q.      Now, we also discussed yesterday the iCloud account,

10:23:21 17    and you indicated the data you received from that has been

10:23:24 18    derived from Government's Exhibit 15; correct?

10:23:27 19    A.      Yes.

10:23:28 20    Q.      When was Apple directed to preserve this data?

10:23:32 21    A.      I believe the initial preservation was April 11th,

10:23:37 22    2019.

10:23:37 23    Q.      So even the day before Mr. Biden dropped off his

10:23:41 24    laptop at the MAC Store for a repair, correct?

10:23:45 25    A.      The day before April 12th, yes.

Jensen - redirect

10:23:47  1    Q.      And this is an independent source from the laptop, it

10:23:51  2    comes from Apple directly, right?

10:23:53  3    A.      Yes.  Unrelated to the laptop.

10:23:55  4    Q.      Now, turning to the summary chart we showed you

10:23:58  5    yesterday, which Mr. Lowell asked you some questions about,

10:24:01  6    Exhibit 18, we can display the first page of that, please.

10:24:10  7    We discussed yesterday the first 20 some pages of this, are

10:24:15  8    all from Apple; correct?

10:24:21  9    A.      Yes.

10:24:24 10    Q.      And now the messages beginning on page 31, between

10:24:34 11    Mr. Biden and Ms. Biden, Hallie Biden, the source says

10:24:39 12    laptop.  Is that what it says there for the source?

10:24:41 13    A.      Yes.

10:24:41 14    Q.      Now we skipped over those yesterday, you understand

10:24:45 15    that Ms. Biden has been served with a subpoena, correct?

10:24:50 16    A.      Yes.

10:24:50 17    Q.      Is it your understanding she's going to testify about

10:24:53 18    those messages that come from the laptop?

10:24:56 19    A.      Yes.

10:24:59 20    Q.      Mr. Lowell asked you some questions between yesterday

10:25:02 21    and today about messages that preceded October 2018, and

10:25:09 22    then postdated October 2018.  Do you remember those series

10:25:13 23    of questions?

10:25:14 24    A.      Yes.

10:25:14 25    Q.      He was asking you about some of the language that you

Jensen - redirect

10:25:17  1    sent off to Agent Romig, ball, Fentanyl, 1.4, 10 grams,

10:25:26  2    things of that nature, correct?

10:25:28  3    A.      Yes.

10:25:28  4    Q.      Now, the summary chart you prepared, Government's

10:25:34  5    Exhibit 18, these are just a summary of some of the

10:25:37  6    messages, right?

10:25:37  7    A.      Yes.

10:25:38  8    Q.      Some of the messages you didn't need to send off to

10:25:41  9    Agent Romig for interpretation; correct?

10:25:44 10    A.      Yes.

10:25:45 11    Q.      Now, directing your attention to Government's

10:25:47 12    Exhibit 18, Row 125, page 38, was the message in which

10:26:06 13    Mr. Biden told Hallie Biden, "I was sleeping on a car

10:26:10 14    smoking crack on 4th Street and Rodney", one that you needed

10:26:14 15    to send off to the DEA for interpretation?

10:26:16 16    A.      We sent it off for interpretation.

10:26:19 17    Q.      But you understand what that means right there,

10:26:21 18    right?

10:26:22 19    A.      I have a drug investigation background, so yes.

10:26:24 20    Q.      Crack is crack?

10:26:26 21    A.      Yes.

10:26:27 22    Q.      Now, Mr. Lowell, between yesterday and today, asked

10:26:33 23    you a series of questions about the financial analysis that

10:26:36 24    you and investigators did in Exhibit 27A.  And the cash

10:26:42 25    withdrawals.  Do you remember those series of questions both

553

Jensen - redirect

10:26:45  1   about potential payments to The View, and possible payments

10:26:50  2   for liquor?

10:26:51  3   A.      Yes.

10:26:52  4           MR. LOWELL:  Objection to the use of possible

10:26:54  5   and potential, given what we have identified on the bank

10:26:57  6   record.

10:27:02  7           MR. HINES:  I can rephrase.

10:27:04  8           THE COURT:  Please rephrase.

10:27:06  9   BY MR. HINES:

10:27:06 10   Q.      Can we pull up 27(a) please?  As Mr. Lowell said, you

10:27:10 11   were shown some bank records by him today during your

10:27:13 12   testimony; right?

10:27:14 13   A.      Yes.

10:27:15 14   Q.      And those bank records show payments to The View;

10:27:18 15   right?

10:27:19 16   A.      Yes.

10:27:19 17   Q.      Are any of those payments that we went over in the

10:27:23 18   bank records reflected in the cash withdrawals in

10:27:26 19   Exhibit 27A?

10:27:29 20   A.      I believe those are debits in August, primarily.

10:27:33 21   Like check card payments versus cash withdrawals.

10:27:36 22   Q.      We're going to go through them right now.  So let's

10:27:40 23   go to 44A, please, the new exhibit that Mr. Lowell

10:27:45 24   introduced today that we added.  Could you please go to

10:27:51 25   page 29 of the PDF?  And could you zoom in on the $5,000

Jensen - redirect

10:28:01 1   payment on the top, the whole row, please.

10:28:10 2           Now, when Mr. Lowell asked you about this

10:28:13 3   question, he didn't ask you about what kind of transaction

10:28:15 4   it was.  What does the transaction reflect for this payment

10:28:19 5   to The View?

10:28:20 6   A.     It says type, Visa check card.

10:28:23 7   Q.     Is that different from a cash withdrawal, as

10:28:27 8   reflected in your analysis 27(a)?

10:28:31 9   A.     Yes.

10:28:32 10   Q.     Now, directing your attention to the next payment to

10:28:35 11   The View, do you see page 29 of the PDF, which is page 27 of

10:28:44 12   the statement.  You had it a second ago, Ms. Vo?

10:28:48 13   A.     The entry two below.

10:28:50 14   Q.     Yeah, the entry two below, can you zoom in on that.

10:28:54 15   How is this next payment to The View played?

10:28:56 16   A.     Similar, it's a Visa check card.

10:28:59 17   Q.     So is this another card transaction, as opposed to an

10:29:03 18   ATM withdrawal?

10:29:05 19   A.     Yes.

10:29:05 20   Q.     Turning to the next payment to The View on 8/24,

10:29:12 21   looking at page 29 of the PDF, page 27 of the payment, of

10:29:17 22   the statement.  Do you see a transaction for $1,200 there?

10:29:32 23   A.     Yes.

10:29:33 24   Q.     What kind of transaction is that?

10:29:36 25   A.     Visa check card.

Jensen - redirect

10:29:37  1    Q.    So again, is this a transaction that isn't reflected

10:29:40  2    in your cash withdrawal analysis because this is a Visa

10:29:44  3    check card payment?

10:29:45  4    A.    Yes.

10:29:47  5    Q.    And also the dates here, I want to take a moment to

10:29:51  6    look at.  The dates of these transactions we looked at so

10:29:54  7    far are in August of 2018; correct?

10:29:58  8    A.    Yes.

10:29:59  9    Q.    So contemporaneous with his stays at the rehab

10:30:05 10    facility; right?

10:30:06 11    A.    Yes.

10:30:07 12    Q.    The analysis you did in 27(a) is for cash withdrawals

10:30:11 13    between September and November of 2018; correct?

10:30:15 14    A.    Yes.

10:30:15 15    Q.    Now, looking at the next payment, page 30 -- actually

10:30:30 16    page 28 of the statement.  Do you see another payment here

10:30:35 17    for $5,000 and then $2,500 to The View?  Do you see those

10:30:44 18    payments there?

10:30:45 19    A.    Yes.

10:30:46 20    Q.    What kind of payments were those?

10:30:48 21    A.    They both reflect that they were Visa check cards.

10:30:52 22    Q.    So again, not ATM withdrawals; correct?

10:30:56 23    A.    Correct.

10:30:56 24    Q.    Let's look at the next entry.  Do you recall

10:30:59 25    Mr. Lowell asking you questions whether Mr. Biden could have

Jensen - redirect

10:31:03  1  paid with an Airbnb, with all that cash he withdraw in the

10:31:08  2  months that followed, do you remember him asking you a

10:31:11  3  series of questions about that?

10:31:12  4  A.    Yes.

10:31:12  5  Q.    What does that line item show for an Airbnb

10:31:17  6  transaction around the time he's at The View, specifically

10:31:22  7  directing you to the one on 8/28?

10:31:26  8  A.    The one on 8/26, posted on -- posted on 8/28, it's an

10:31:33  9  Airbnb.

10:31:34  10  Q.    What is the amount of that transaction for the

10:31:38  11  Airbnb?

10:31:38  12  A.    $1,712.88.

10:31:42  13  Q.    How did Mr. Biden make that payment for that Airbnb

10:31:45  14  around the time of his rehab?

10:31:47  15  A.    Records also reflect that this was a Visa check card.

10:31:56  16  Q.    So you've seen no evidence in the bank statements

10:31:59  17  that there is cash withdrawals used for any statements to

10:32:03  18  The View or Airbnb, correct?

10:32:07  19  A.    Correct.

10:32:11  20  Q.    And let's go back to 25A as well, the exhibit that we

10:32:16  21  showed you yesterday.  Turning to page 3, please.  Is the

10:32:30  22  date of this invoice 8/21/2018?

10:32:38  23  A.    Yes.

10:32:38  24  Q.    And it's for $5,000 correct?

10:32:40  25  A.    Yes.

Jensen - redirect

10:32:40  1    Q.      And it actually says the balance due is 0; is that

10:32:44  2    right?

10:32:44  3    A.      Yes.

10:32:45  4    Q.      So as of August 21st, 2018, there was a $0 balance in

10:32:50  5    the account?

10:32:50  6    A.      Yes.

10:32:51  7    Q.      And again, the cash withdrawal analysis you did is

10:32:54  8    from September to November of 2018; correct?

10:32:57  9    A.      Yes.

10:32:57 10    Q.      Turning to page -- go to the next invoice, please.

10:33:17 11    Did this invoice, invoice number 1451, reflect that as of

10:33:23 12    August 23rd, 2018, Mr. Biden's DTX/stabilization payments

10:33:28 13    had been paid for, and that there was a $0 balance?

10:33:32 14    A.      Yes.

10:33:32 15    Q.      Can we please go to the next invoice, Ms. Vo?

10:33:37 16            Now this invoice, number 1452, dated

10:33:45 17    August 24th, 2018, what is the balance due as of that date?

10:33:49 18    A.      $0.

10:33:51 19    Q.      Go to the next invoice, Ms. Vo.

10:33:59 20            This invoice for August 24, 2018, which covers a

10:34:04 21    three-day period now for $7,500, what is the balance due as

10:34:09 22    of that date?

10:34:11 23    A.      $0.

10:34:12 24    Q.      And it reflects paid, correct?

10:34:15 25    A.      Yes.

Jensen - redirect

10:34:16  1    Q.       Please go to the next page, please.

10:34:27  2             All right.   DTX/stabilization services for

10:34:40  3    8/27/2018, it says the amount was $1,200.   What was the

10:34:44  4    actual balance due as of August 27, 2018?

10:34:47  5    A.       $0.

10:34:49  6    Q.       Can we go to the last page, please.   This invoice

10:35:05  7    date is August 27th, 2018, for sober companion services,

10:35:12  8    $8,400, what is the balance due as of August 2018?

10:35:17  9    A.       $0.

10:35:18 10    Q.       Now, I would like to direct your attention to

10:35:22 11    Government's Exhibit 28A.   Is this a bank -- is this a bank

10:35:32 12    statement from Wells Fargo for the period of September 2018?

10:35:43 13             MR. HINES:   May I approach the witness, Your

10:35:45 14    Honor?

10:35:46 15             THE COURT:   You may.

10:35:58 16    BY MR. HINES:

10:36:01 17    Q.       Is it in fact a bank statement for the month of

10:36:04 18    September of 2018 for Mr. Biden's account?

10:36:06 19    A.       Yes.

10:36:07 20             MR. HINES:   Move to admit this bank statement,

10:36:11 21    28A.

10:36:11 22             MR. LOWELL:   No objection.

10:36:12 23             THE COURT:   Thank you.   It's admitted.

10:36:14 24             (Exhibit No. 28A was admitted into evidence.)

10:36:14 25    BY MR. HINES:

Jensen - redirect

10:36:15 1   Q.      Let's go to page 9 of the detail ledger.  Mr. Lowell

10:36:25 2   was referring to Airbnb transactions.  If you look at the

10:36:28 3   bottom of this page in September 11th, is there a Visa check

10:36:34 4   card transaction for Airbnb?

10:36:36 5   A.      Yes.

10:36:37 6   Q.      What was the amount of that transaction?

10:36:41 7   A.      $2,965.09.

10:36:47 8   Q.      Was that in cash or by the check card?

10:36:49 9   A.      Paid by Visa check card.

10:36:53 10  Q.      Turning to page 14 of that ledger on September 14th,

10:37:04 11  in the middle of the page, is there another Airbnb

10:37:07 12  transaction?

10:37:08 13  A.      Yes.

10:37:09 14  Q.      And what is the amount of that transaction?

10:37:13 15  A.      $1,003.51.

10:37:18 16  Q.      What is the manner of that transaction?

10:37:21 17  A.      The Visa check card.

10:37:25 18  Q.      Do you know if Airbnb even accepts cash for that

10:37:30 19  amount?

10:37:31 20  A.      I don't know.

10:37:31 21  Q.      But what's reflected on the statement is that

10:37:35 22  Mr. Biden was paying for Airbnb with his check card;

10:37:39 23  correct?

10:37:40 24  A.      Yes.

10:37:40 25  Q.      Did you see any evidence during the course of your

Jensen - redirect

10:37:43 1   investigation that Mr. Biden was taking wads of cash, and

10:37:46 2   putting them in envelopes, and mailing it to Airbnb?

10:37:50 3   A.      No, I have no information for that.

10:37:58 4   Q.      Now, let's go to the liquor that Mr. Lowell was

10:38:02 5   asking you about and those transactions.  For ease of

10:38:08 6   reference, I would like to display the demonstrative --

10:38:16 7              (Discussion off the record.)

10:38:24 8   Q.      Display the demonstrative, the liquor store receipts

10:38:28 9   chart that Mr. Lowell showed in his opening.  He went

10:38:32 10  through these transactions with you in your -- in his

10:38:35 11  cross-examination a little while ago; correct?

10:38:38 12  A.      Yes.

10:38:39 13  Q.      Now, what's not reflected on this chart is how those

10:38:44 14  payments were made; correct?

10:38:46 15  A.      Yes.

10:38:46 16  Q.      For example, is there a column that shows cash versus

10:38:50 17  check card?

10:38:52 18  A.      No.

10:38:53 19  Q.      Let's look at the bank statements and see how they

10:38:56 20  were actually made?

10:38:58 21              MR. LOWELL:  I think I did that.  Basically --

10:39:01 22  I'm sorry, I'm confused, are you using what I --

10:39:04 23              THE COURT:  All right.  You can talk to each

10:39:06 24  other if you want to.

10:39:07 25              (Discussion off the record.)

Jensen - redirect

10:39:14  1          MR. LOWELL:  I understand.

10:39:15  2   BY MR. HINES:

10:39:19  3   Q.      Let's start with 27(a), please, page 2.  Now, this

10:39:37  4   summary chart if you scroll to the end reflects about

10:39:42  5   $151,000 in cash withdrawals, correct?

10:39:45  6   A.      I think that's correct over the three months, yes.

10:39:48  7   Q.      So again, there is nothing in this summary chart that

10:39:51  8   captures credit cards or check card transactions, correct?

10:39:56  9   A.      Correct, this does not include those debits that

10:40:03 10   would be a check card.

10:40:04 11   Q.      If we look at the bank statement that Mr. Lowell

10:40:07 12   displayed, which we -- for October of 2018.  29A.  Let's go

10:40:27 13   to the first liquor transaction that he had on his chart on

10:40:32 14   October 1st, 2018.  I believe it's page 20, Ms. Vo.

10:40:37 15                  If you go halfway down the page, remember

10:40:47 16   Mr. Lowell asking you about this transaction?

10:40:49 17   A.      Yes.

10:40:50 18   Q.      And now that we have a wider scope here than what was

10:40:54 19   displayed for you, do you see what type of transaction that

10:40:57 20   is?

10:40:58 21   A.      Yes.

10:40:58 22   Q.      What type of transaction is it?

10:41:00 23   A.      A Visa check card.

10:41:02 24   Q.      So it's not a cash withdrawal, correct?

10:41:04 25   A.      Correct.

10:41:05  1    Q.       Turning to page 26, on the bottom of the page, is

10:41:11  2    there a transaction for $19.07 to the Wine and Spirits?

10:41:17  3    A.       Yes.

10:41:17  4    Q.       What type of transaction was that?

10:41:19  5    A.       Visa check card.

10:41:21  6    Q.       And the next transaction from October 17th, 2018, to

10:41:26  7    the Boxwood Liquors, it should be for -- there is one that

10:41:39  8    he has listed for $26.48.  Do you see it?

10:42:28  9              MR. HINES:  Court's indulgence for one moment,

10:42:33 10    Your Honor.

10:42:35 11              THE COURT:  Sure.

10:42:37 12    BY MR. HINES:

10:42:37 13    Q.       If we go to Bates 751, please.  Do you see a

10:42:53 14    transaction to the Boxwood Liquors for $26.48?

10:42:58 15    A.       Yes.

10:42:58 16    Q.       What kind of transaction was that?

10:43:00 17    A.       Visa check card.

10:43:01 18    Q.       Turning to the next transaction, Central Wine and

10:43:07 19    Spirits, immediately below that, a $52 transaction?

10:43:11 20    A.       Yes.

10:43:12 21    Q.       In the middle of the page, do you see that?

10:43:15 22    A.       Yes.

10:43:15 23    Q.       $52.25?

10:43:18 24    A.       Yes.

10:43:18 25    Q.       What kind of transaction was that?

Jensen - redirect

10:43:20  1   A.      Visa check card.

10:43:21  2   Q.      So again, not a cash withdrawal, correct?

10:43:24  3   A.      Correct.

10:43:25  4   Q.      Turning to October 19th, 2018, on page 37, there is,

10:43:37  5   the third from the bottom, there is a transaction to Central

10:43:41  6   Perk Wine for $10.88 do you see that?

10:43:44  7   A.      Yes.

10:43:44  8   Q.      What was the type of transaction?

10:43:46  9   A.      Visa check card.

10:43:51 10   Q.      Now, turning to page 40, the bottom of the page,

10:43:59 11   State Line Liquors, $38.38, do you see that?

10:44:01 12   A.      Yes.

10:44:02 13   Q.      What type of transaction was that?

10:44:04 14   A.      Visa check card.

10:44:05 15   Q.      And on the final page -- or the final transaction,

10:44:10 16   page 48, Tally-Ho Liquors, do you see the transaction for

10:44:19 17   $22.49?

10:44:20 18   A.      Yes.

10:44:20 19   Q.      What kind of transaction was that?

10:44:22 20   A.      Visa check card.

10:44:24 21   Q.      So if we can go back to the demonstrative that we

10:44:28 22   displayed a moment ago, Ms. Vo, have you confirmed that

10:44:33 23   actually none of these transactions were paid for in cash?

10:44:36 24   A.      They all appear to be Visa check card purchases or

10:44:40 25   debit cards.

Jensen - redirect

10:44:41  1   Q.      And do the bank statements show that Mr. Biden used

10:44:46  2   his check card to make payments for things like alcohol?

10:44:52  3   A.      Yes.

10:44:57  4   Q.      Liquor stores accept check cards, credit cards; is

10:45:03  5   that right?

10:45:03  6   A.      My experience is they do, yes.

10:45:05  7   Q.      Do drug dealers accept credit cards?

10:45:09  8   A.      Not in my experience.

10:45:25  9   Q.      Now, I would like to shift to the book.  Mr. Lowell

10:45:30 10   asked you a series of questions about the book.  Let's start

10:45:34 11   with one thing right out of the gate.  Does Mr. Biden ever

10:45:38 12   describe his gun purchase on October 12th of 2018?

10:45:42 13   A.      No.

10:45:42 14   Q.      Did he say anything about a pushy gun salesman, or

10:45:46 15   any of the things that Mr. Lowell said in opening?

10:45:49 16             MR. LOWELL:  Objection.  I didn't use pushy

10:45:53 17   salesman, he's mischaracterizing.

10:45:56 18             THE COURT:  The jury can figure that out.

10:45:59 19             THE WITNESS:  No.

10:46:00 20   Q.      So essentially Mr. Biden skips that chapter in his

10:46:03 21   life?

10:46:03 22             MR. LOWELL:  Objection to the characterization

10:46:05 23   of what he skips.

10:46:06 24             THE COURT:  Overruled.

10:46:08 25   A.      No.

Jensen - redirect

10:46:11 1    Q.    Now, October 23rd, 2018, was the day the gun was put

10:46:16 2    in the trash can and the police responded; is that right?

10:46:21 3    A.    Yes.

10:46:21 4    Q.    I would like to direct your attention to Exhibit 18,

10:46:33 5    Row 145, page 43.  We saw this message yesterday; correct?

10:46:42 6    Where Mr. Biden texted Hallie Biden and said, "the fucking

10:46:47 7    FBI", right?

10:46:49 8    A.    Yes.

10:46:49 9    Q.    What's the date of that message?

10:46:52 10   A.    10/23/2018.

10:46:55 11   Q.    So when did Mr. Biden begin writing his book?

10:46:59 12   A.    November of 2019.

10:47:00 13   Q.    That's after he had sent the message about the F-ing

10:47:05 14   FBI?

10:47:05 15   A.    Yes.

10:47:06 16   Q.    Mr. Lowell asked you yesterday about the word

10:47:11 17   "relapsed" that appears in Exhibit 19 at the end of the

10:47:17 18   chapter called, California Odyssey.  Do you remember him

10:47:21 19   asking you that question, the questions about relapse?

10:47:25 20   A.    Yes.  Yes.

10:47:26 21   Q.    And I believe what he asked you was whether or not

10:47:28 22   you knew whether relapse referred to drugs or alcohol;

10:47:33 23   correct?

10:47:33 24   A.    Yes.

10:47:34 25   Q.    And you indicated that you were just reading the

Jensen - redirect

10:47:37 1    words in the book; right, it just said relapse there?

10:47:41 2    A.    Yes.

10:47:41 3    Q.    Now, that was in Chapter 9, California Odyssey, that

10:47:48 4    text about relapsed on page 202; right?

10:47:59 5    A.    Yes.

10:47:59 6    Q.    And if we pull up page 202, this is where Mr. Biden

10:48:18 7    describes being at the rehab center in Brentwood, he said "I

10:48:23 8    stayed clean for two weeks."  Correct?

10:48:26 9    A.    Yes.

10:48:26 10   Q.    And you determined that was in August of 2018, late

10:48:31 11   August, is that right?

10:48:32 12   A.    Yes.  I believe it's the 21st is when it starts.

10:48:37 13   Q.    And now in this chapter, California Odyssey, does

10:48:41 14   Mr. Biden talk about crack use throughout the chapter?

10:48:46 15   A.    Yes.

10:48:46 16   Q.    We're not going to go through it all again, but

10:48:49 17   page 19, or Exhibit 19, page 197, in the third paragraph

10:49:06 18   from the bottom, the third sentence begins, "I was smoking

10:49:15 19   crack every 15 minutes."  Do you remember hearing that

10:49:18 20   yesterday?

10:49:18 21   A.    Yes.

10:49:19 22   Q.    And for pages and pages as he described his crack use

10:49:24 23   and the episode in California over the course of several

10:49:28 24   months beginning in spring of 2018?

10:49:30 25   A.    Yes.

Jensen - redirect

10:49:31  1    Q.      On page 199 does Mr. Biden write, "yet I was so lost

10:49:42  2    in my addiction that I watched the crowd rob me blind and

10:49:46  3    didn't care enough to stop them."

10:49:48  4             Is that what he wrote there?

10:49:50  5    A.      Yes.

10:49:50  6    Q.      And what does he say after that?

10:49:54  7    A.      "Not as long as the cycle of drugs, sex, exhaustion,

10:49:58  8    and exhilaration repeated itself over and over.  It was

10:50:03  9    nonstop depravity."

10:50:05 10    Q.      Does he say alcohol in that sentence?

10:50:07 11    A.      No.

10:50:08 12    Q.      So this is before he checks into rehab, let's now

10:50:11 13    look after that, at the beginning of Chapter 10, page 203 in

10:50:23 14    Exhibit 19.  In the first sentence, does Mr. Biden write "my

10:50:37 15    ultimate odyssey through full blown addiction."  Is that the

10:50:40 16    words he uses?

10:50:41 17    A.      Yes.

10:50:41 18    Q.      Does he say partial addiction?

10:50:43 19    A.      No.

10:50:44 20    Q.      Does he say alcohol only addiction?

10:50:49 21    A.      No.

10:50:49 22    Q.      Is there any chapter in here in which Mr. Biden

10:50:55 23    describes that he was having only drinking issues, but no

10:50:58 24    issues with crack?

10:50:59 25    A.      In this section?

Jensen - redirect

10:51:01 1    Q.      Right.

10:51:02 2    A.      No.

10:51:07 3    Q.      And how about any section in Chapter 9 or Chapter 10,

10:51:11 4    the relevant time period for 2018?

10:51:16 5    A.      No.

10:51:18 6    Q.      And finally, page 208, continuing in the same

10:51:23 7    chapter, after Mr. Biden describes full blown addiction,

10:51:32 8    Exhibit 19, page 208, does Mr. Biden write "crack is a great

10:51:52 9    leveler."  And then he goes on to say "just like in

10:51:58 10   California."  Is that what he goes on to say here?

10:52:01 11   A.      Yes.

10:52:01 12   Q.      If you zoom out, above that, does he say in the first

10:52:06 13   paragraph, "It was me and a crack pipe and a super eight,

10:52:10 14   not knowing which the fuck way was up."  Are those his

10:52:14 15   words?

10:52:14 16   A.      Yes.

10:52:17 17   Q.      And this is in the same chapter when he describes his

10:52:21 18   return in the fall of 2018; correct?

10:52:23 19   A.      Yes.

10:52:29 20           MR. HINES:  No further questions, Your Honor.

10:52:31 21           MR. LOWELL:  Your Honor, may I approach for a

10:52:36 22   moment?

10:52:37 23           THE COURT:  Why don't we take --

10:52:38 24           MR. LOWELL:  It will be very quick, I promise.

10:52:38 25           (Side-bar discussion:)

Jensen - recross

10:53:46  1          MR. LOWELL:  I should have asked in advance but

10:53:46  2  in redirect we introduced a new exhibit, which I didn't have

10:53:46  3  a chance to cross-examine, I would ask that there will be

10:53:46  4  questions available on that new exhibit which I had no

10:53:46  5  ability to question, so I have two questions for recross,

10:53:46  6  and then if there is something that comes up, you can deal

10:53:46  7  with it.

10:53:46  8          THE COURT:  That's fine.

10:53:46  9          MR. LOWELL:  And I'll be real quick, that's why

10:53:46 10  I wanted to deal with it.

10:53:46 11          THE COURT:  Okay.

10:53:46 12          (End of side-bar.)

10:53:48 13                  RECROSS-EXAMINATION

10:53:57 14  BY MR. LOWELL:

10:53:59 15  Q.      Agent, do you see the exhibit that Mr. Hines asked

10:54:01 16  you about that was just admitted after I asked you

10:54:04 17  questions?

10:54:04 18  A.      Yes.

10:54:05 19  Q.      And you had mentioned to him there is entries to an

10:54:08 20  Airbnb, for example, do you see that 129?

10:54:11 21  A.      Yes.

10:54:12 22  Q.      Okay.  And the one before, remember there was one for

10:54:16 23  1,700 and something dollars?

10:54:18 24  A.      Yes.

10:54:18 25  Q.      And that's when he was at The View, that period of

10:54:21 1    that 1,700.  Do you know who this Airbnb was for?

10:54:28 2    A.    It does not show on the records and I do not have

10:54:31 3    Airbnb records, so I do not know.

10:54:33 4    Q.    You don't know if it was for him?

10:54:35 5    A.    I don't know -- I just know that it was paid for.

10:54:38 6    Q.    Right after the one that says Airbnb, do you see

10:54:44 7    Fendi Rodeo Drive for 975, do you know who did that?  Do you

10:54:47 8    know who purchased that, what that was for?

10:54:51 9    A.    I can just speak to what the records show here and

10:54:53 10   that was a debit withdrawal from his account on that day.

10:54:58 11                MR. LOWELL:  That's all the questions.

10:55:02 12                        REDIRECT EXAMINATION

10:55:02 13   BY MR. HINES:

10:55:03 14   Q.    Just two questions in brief re-redirect.

10:55:06 15            The Airbnb transaction that is the $2,965.09.

10:55:11 16   This was in Mr. Biden's personal account, correct?

10:55:14 17   A.    Yes.

10:55:15 18   Q.    And if you look at the next transaction that's Fendi

10:55:21 19   Rodeo Drive, are you aware that you can make online

10:55:25 20   purchases sometimes at various locations?

10:55:27 21   A.    Yes.

10:55:28 22                MR. HINES:  No further questions.

10:55:30 23                THE COURT:  All right.  Thank you.

10:55:32 24                All right.  Let's take our morning break.  We'll

10:55:35 25   come back in about fifteen minutes.

10:55:37 1                    COURTROOM DEPUTY:  All rise.

10:55:39 2                    (Jury exiting the courtroom at 10:55 a.m.)

10:56:08 3                    THE COURT:  All right.  So we'll take our break.

10:56:13 4      But I'm trying to go through -- you guys can sit down for

10:56:16 5      one second.

10:56:17 6                    I'm trying to go through the jury instructions.

10:56:20 7      So I have both sides proposals, and I'm trying to come up

10:56:24 8      with a proposal that I can send out to you and then you all

10:56:28 9      can put whatever objections you want on the record.

10:56:31 10                   This one I thought was a relatively easy

10:56:34 11     question which is I notice there was a some stipulations

10:56:37 12     that the gun at issue for Count Three moved into interstate

10:56:42 13     commerce, yet we have an instruction that kind of asks them

10:56:45 14     if they find it moved in interstate commerce.  Do we need

10:56:49 15     that?

10:56:49 16                   MR. HINES:  I think we need the instruction, but

10:56:50 17     I think it should include the reference to the stipulation,

10:56:53 18     the parties have stipulated to this, because it is an

10:56:56 19     element of the offense.

10:56:57 20                   THE COURT:  I wasn't suggesting we leave it off,

10:56:59 21     but we say if you found beyond a reasonable doubt that the

10:57:02 22     firearm in question was manufactured in the state other than

10:57:05 23     Delaware, and that the defendant possessed the firearm in

10:57:07 24     the State of Delaware, then you may but are not required to

10:57:11 25     find that it was transported across the state line.  Whereas

10:57:14  1   what you actually stipulated to was that this particular

10:57:18  2   firearm did move in interstate commerce.

10:57:21  3             MR. HINES:  I think we can truncate it to a

10:57:23  4   sentence saying the government showed it moved in interstate

10:57:27  5   commerce.

10:57:28  6             THE COURT:  But in this case the parties have

10:57:30  7   stipulated.  Do you have any thoughts on that?

10:57:32  8             MR. LOWELL:  I think that's fine depending on

10:57:34  9   the language, the concept is fine.

10:57:35 10             THE COURT:  Thank you.  We'll see you in

10:57:37 11   fifteen.

10:57:38 12             COURTROOM DEPUTY:  All rise.

10:57:39 13             (A brief recess was taken.)

11:29:30 14             THE COURT:  All right before we bring in jury

11:29:32 15   can I see counsel at side-bar.

11:33:27 16             (Side-bar discussion:)

11:33:27 17             THE COURT:  So during the break, three jurors

11:33:27 18   decided that they didn't want to wait in line in the jury

11:33:27 19   room because there are 16 of them and one bathroom or two,

11:33:27 20   and so they went out in the hall and they went to the

11:33:27 21   bathroom.  It was juror number nine, and it was two of the

11:33:27 22   alternates, I believe it was the remaining -- the first two

11:33:27 23   remaining alternates, not the older woman on the --

11:33:27 24             MR. KOLANSKY:  Younger woman.

11:33:27 25             THE COURT:  Yes, the two younger women.  And so

11:33:27  1    they went to the bathroom and the Marshal saw them in there

11:33:27  2    and came back.  Mr. Biden's wife was in there at the time.

11:33:27  3    And she was in the stall, and she was coming out of the

11:33:27  4    stall when they were -- when they were -- I guess washing

11:33:27  5    their hands or something.

11:33:27  6         So I instructed my deputy that he needs to be

11:33:27  7    much sterner that they -- with all the jury, that they

11:33:27  8    cannot leave unaccompanied.  I then called in each of the

11:33:27  9    jurors one at a time into my chambers to reinforce that, but

11:33:27 10    also to ask them what happened.

11:33:27 11         They each gave very similar stories.  They said

11:33:27 12    you know, didn't want to wait in line, they opened the door

11:33:27 13    from my chambers, there is a hallway back here, my chambers

11:33:27 14    is on the other side, so they walked down this hallway, got

11:33:27 15    to the door, and they saw security.  I assume it was Secret

11:33:27 16    Service, because I think Mrs. Biden stands out there.  They

11:33:27 17    said they waited and someone gave them a thumbs up and they

11:33:27 18    walked to the bathroom, went to the bathroom, were coming

11:33:27 19    out and as they were coming out, they saw Mrs. Biden, the

11:33:27 20    younger Mrs. Biden, coming out of the stall.  That there

11:33:27 21    were no -- there was no discussion, no interaction, but they

11:33:28 22    saw her, and then one of the jurors said when it was -- one

11:33:28 23    of the alternates, she said when she was walking back, she

11:33:28 24    looked sideways, and saw the first lady, that one didn't

11:33:28 25    bother me because you can see the first lady sitting in the

1    courtroom.  That's what happened, if you guys want to do

2    anything, if you want to ask them any questions you can, but

3    I just want to put on the record that happened.

4              MR. LOWELL:  Appreciate you telling us that,

5    there was no verbal interaction?

6              THE COURT:  There was no verbal interaction,

7    were you guys discussing anything you're not supposed to be

8    discussing about the case, were you discussing anything in

9    the bathroom?

10              MR. LOWELL:  There is nothing I need to say.

11              THE COURT:  No, she didn't do anything wrong.

12              MR. LOWELL:  She just went to the bathroom?

13              MR. HINES:  Today?

14              MR. LOWELL:  Right.  I understand.

15              THE COURT:  Tell her to stop doing that or

16    leave.

17              MR. LOWELL:  All right.

18              THE COURT:  But I just wanted everybody to know

19    that that had happened, that I had had that interaction with

20    those three jurors.

21              MR. LOWELL:  I appreciate you telling us that

22    and putting it on the record.

23              (End of side-bar.)

24              THE COURT:  All right.  We can bring in the

25    jury.  Everyone stand up, please.

Buhle - direct

11:33:42  1              (Jury entering the courtroom at 11:33 a.m.)

11:33:47  2              THE COURT:  All right, members of the jury,

11:33:49  3  welcome back.  Everyone else, please be seated.  Mr. Wise,

11:33:53  4  what's next?

11:33:54  5              MR. WISE:  The United States calls Kathleen

11:33:56  6  Buhle.

11:34:09  7              COURTROOM DEPUTY:  Please raise your right-hand.

11:34:15  8  Please state and spell your full name for the record.

11:34:17  9              THE WITNESS:  Kathleen, K-A-T-H-L-E-E-N, Buhle,

11:34:24 10  B-U-H-L-E.

11:34:26 11              (Kathleen Buhle, having been duly sworn, was

11:34:30 12  examined and testified as follows:

11:34:33 13                        DIRECT EXAMINATION

11:34:35 14  BY MR. WISE:

11:34:42 15  Q.      Good morning, Ms. Buhle.

11:34:44 16  A.      Good morning.

11:34:45 17  Q.      Without telling the members of the jury your address,

11:34:48 18  can you say where you live, what city, please?

11:34:51 19  A.      Washington, D.C.

11:34:52 20  Q.      Ms. Buhle, what do you do for a living?

11:34:55 21  A.      I run a nonprofit women's club.

11:34:58 22  Q.      What kind of nonprofit, what kind of work does it do?

11:35:01 23  A.      I'm the CEO, I created it, and run it.

11:35:07 24  Q.      And how long have you done that?

11:35:09 25  A.      Since 2019 I started.

Buhle - direct

11:35:13 1    Q.      And could you please describe your education

11:35:16 2    generally?

11:35:17 3    A.      Bachelor of arts.

11:35:18 4    Q.      In what?  In what degree, I mean, in what area?

11:35:24 5    A.      BA psychology.

11:35:27 6    Q.      Were you subpoenaed to testify here today, Ms. Buhle?

11:35:30 7    A.      Yes.

11:35:31 8    Q.      Ms. Buhle, do you know the defendant?

11:35:34 9    A.      Yes.

11:35:35 10   Q.      And how do you know him?

11:35:37 11   A.      We were married.

11:35:39 12   Q.      And when did you marry?

11:35:42 13   A.      July 2nd, 1993.

11:35:46 14   Q.      And at some point -- you said we were married.  At

11:35:49 15   some point did you divorce?

11:35:51 16   A.      Yes.

11:35:51 17   Q.      And when was that?

11:35:52 18   A.      Good Friday, 2017, I can't remember the date.

11:36:00 19   Q.      Now, Ms. Buhle, at some point during the time you

11:36:04 20   were married to the defendant, did you discover he was using

11:36:08 21   drugs?

11:36:09 22   A.      I did.

11:36:10 23   Q.      And can you -- and approximately when was that?

11:36:16 24   A.      Can you repeat the question?

11:36:17 25   Q.      Sure.  Approximately when was it that you discovered

Buhle - direct

11:36:20  1    that he was using drugs?

11:36:22  2    A.    I found a crack pipe on July 3rd, 2015.

11:36:28  3    Q.    Where did you find a crack pipe on July 3rd, 2015?

11:36:33  4    A.    In an ashtray on the side porch.

11:36:37  5    Q.    On the side porch of what?

11:36:38  6    A.    Our home.

11:36:39  7    Q.    Where was your home at that time?

11:36:42  8    A.    Washington D.C.

11:36:44  9    Q.    What did you do when you found a crack pipe in your

11:36:48 10    side porch on July the 3rd of 2015?

11:36:51 11    A.    I went looking for my husband and asked him what it

11:36:59 12    was.

11:36:59 13    Q.    And what, if anything, did he tell you?

11:37:02 14    A.    He said it was a crack pipe.

11:37:05 15    Q.    What else -- and I'm not looking for an exact quote,

11:37:09 16    what else do you recall about that discussion with him, what

11:37:13 17    else did he tell you, if anything?

11:37:14 18    A.    It was very short, I mean, it was -- he had

11:37:20 19    acknowledged smoking crack.

11:37:22 20    Q.    Was that the first time you had found anything like

11:37:26 21    that?

11:37:26 22    A.    Yes.

11:37:27 23    Q.    Prior to that time, did you believe he was using

11:37:31 24    drugs?

11:37:34 25    A.    Yes.

Buhle - direct

11:37:34  1    Q.      And what was that based on?

11:37:38  2    A.      He had gotten kicked out of the Navy for testing

11:37:46  3    positive for cocaine, and so I worried, but had no proof,

11:37:54  4    but I was definitely worried, scared.

11:38:00  5    Q.      And after that first time finding the drug

11:38:05  6    paraphernalia that you described, were you aware of him

11:38:07  7    using drugs after that?

11:38:09  8    A.      Yes.

11:38:10  9    Q.      And how were you aware of that?

11:38:13 10    A.      By behavior, and I did find other drug paraphernalia

11:38:23 11    and what looked like drugs to me.

11:38:27 12    Q.      I want to take each of those in turn.  What did you

11:38:30 13    observe about his behavior?

11:38:33 14    A.      He was not himself.

11:38:37 15    Q.      What do you mean by that?

11:38:39 16    A.      He was angry, short tempered, acting in ways that he

11:38:46 17    hadn't when he was sober.

11:38:48 18    Q.      Was he also drinking around the time you found the

11:38:53 19    crack pipe, you said?

11:38:55 20    A.      He had just -- he had been sober for maybe a month, I

11:39:05 21    believed.

11:39:06 22    Q.      Prior to when you found it?

11:39:08 23    A.      Yes.

11:39:09 24    Q.      And then at some point was he not sober, based on

11:39:13 25    your observations?

Buhle - direct

11:39:14  1    A.      My understanding is that with smoking crack, the day

11:39:19  2    after our anniversary was July 3rd, that he had relapsed.

11:39:25  3    Q.      And was also drinking again?

11:39:29  4    A.      I don't know.

11:39:31  5    Q.      You said the second thing you said was that you also

11:39:34  6    found, I think, paraphernalia after this first time; is that

11:39:37  7    right?

11:39:37  8    A.      On occasion, yes.

11:39:40  9    Q.      What kind of paraphernalia?

11:39:42 10    A.      A broken pipe.  What looked like something to clean

11:39:49 11    the pipe.  A white powder.

11:39:54 12    Q.      I think you said you also saw drugs?

11:39:57 13    A.      Yes, like a white crystal -- there would be just

11:40:03 14    remnants and little bags that I would find.

11:40:06 15    Q.      Where would you find them?

11:40:08 16    A.      In his car.

11:40:09 17    Q.      Did you ever find them anywhere else other than his

11:40:12 18    car?

11:40:14 19    A.      I don't recall.

11:40:15 20    Q.      What were the size of the pieces, or remnants as you

11:40:20 21    put it, that you found?

11:40:22 22    A.      Small.

11:40:25 23    Q.      You mentioned you found drugs in his car.  Did you

11:40:30 24    see drugs in his car on more than one occasion?

11:40:35 25    A.      Yes.

Buhle - direct

11:40:36  1    Q.      Were you looking for them in his car?

11:40:38  2    A.      Yes.

11:40:38  3    Q.      Why did you do that?

11:40:41  4    A.      When my daughters would use his car, when he would

11:40:45  5    leave it for my daughters to use, I would check the car to

11:40:49  6    make sure that they weren't driving with drugs in it.

11:40:54  7    Q.      And what was the period of time where you were doing

11:40:57  8    that, by year, I'm not asking for specific dates, but

11:41:02  9    perhaps working backwards, when was your youngest daughter,

11:41:05 10    when was she in the house until?

11:41:10 11    A.      2015 to 2019 at some point.

11:41:14 12    Q.      So from 2015 to 2019, that's when you would search

11:41:18 13    the car if your daughters were going to drive it, his car?

11:41:22 14    A.      Yes.

11:41:22 15    Q.      And did you find drugs or paraphernalia on more than

11:41:25 16    one occasion in the car in that period?

11:41:28 17    A.      Yes.

11:41:28 18    Q.      Would that include 2018?

11:41:33 19    A.      Yes.

11:41:35 20    Q.      Now, you said his behavior had changed and that was

11:41:42 21    something you noticed; is that right?

11:41:44 22    A.      Yes.

11:41:44 23    Q.      During the time when you were aware of him using

11:41:48 24    drugs, did he continue to work?

11:41:54 25    A.      Can you say that again?

Buhle - direct

11:41:55 1    Q.      Sure.

11:41:56 2            During the time after July of 2015 when you were

11:42:01 3    -- became aware of him using drugs, did he continue to work

11:42:04 4    in some capacity?

11:42:05 5    A.      Yes.

11:42:05 6    Q.      And did you observe him interacting with other

11:42:09 7    people, for instance your children?

11:42:11 8    A.      Yes.

11:42:11 9    Q.      And other members of his family?

11:42:14 10   A.      Yes.

11:42:15 11   Q.      And friends and acquaintances?

11:42:18 12   A.      Yes.

11:42:18 13   Q.      Did you interact with him outside of the home in

11:42:22 14   places like restaurants or at events?

11:42:25 15   A.      Rarely after 2015 -- I mean after he relapsed.

11:42:31 16   Q.      But were there occasions?

11:42:33 17   A.      Yes.

11:42:34 18   Q.      And in those instances, did you see him, for lack of

11:42:41 19   a better word, function?

11:42:43 20   A.      Yes.

11:42:44 21   Q.      And were there times when you thought he was using

11:42:49 22   drugs based on your observation, based on your observations,

11:42:56 23   but other people didn't seem to notice that?

11:42:58 24   A.      Yes.

11:42:59 25   Q.      Were there times when he tried to hide his drug use

Buhle - direct

11:43:03  1    from you?

11:43:04  2    A.      Yes.

11:43:04  3    Q.      Were you aware of times when he tried to hide his

11:43:08  4    drug use from other people?

11:43:09  5    A.      Yes.

11:43:10  6    Q.      Would that include members of his family?

11:43:12  7    A.      Yes.

11:43:12  8    Q.      Would that include your children?

11:43:14  9    A.      Yes.

11:43:14 10    Q.      Would that include friends and acquaintances of his?

11:43:17 11    A.      Yes.

11:43:18 12    Q.      After you discovered he was smoking crack, did you

11:43:28 13    talk to him about his drug use?

11:43:31 14    A.      Yes.

11:43:32 15    Q.      And again, I'm not looking for specific quotes, but

11:43:36 16    what do you recall talking to him about?

11:43:40 17    A.      Going into rehab.

11:43:43 18    Q.      And what was his reaction to the discussion about

11:43:49 19    going into rehab?

11:43:51 20    A.      He didn't want to.

11:43:53 21    Q.      Why not?

11:43:55 22    A.      I don't know.

11:43:56 23    Q.      Did he ever tell you?

11:43:59 24    A.      I don't recall -- I don't recall exactly what he

11:44:03 25    said, but that was the -- I wanted him to go to rehab and go

Buhle - direct

11:44:12  1    into a program.  Which he did eventually.

11:44:16  2    Q.      In talking about his drug use, did you talk about it

11:44:20  3    with him as an addiction?

11:44:24  4    A.      Yes.

11:44:25  5    Q.      Did he use that word or a word like it?

11:44:32  6    A.      I don't remember specifically the language he used,

11:44:37  7    but we were in therapy together.

11:44:38  8    Q.      And in that therapy, was it talked about as an

11:44:42  9    addiction?

11:44:43 10    A.      Yes.

11:44:52 11    Q.      Now at some point after that first time when you

11:44:56 12    found the drugs, did you become aware of him drinking again?

11:45:02 13    A.      Yes.

11:45:03 14    Q.      And so was he drinking and using drugs to your

11:45:06 15    knowledge at the same time?

11:45:07 16    A.      Yes.

11:45:07 17    Q.      Now moving forward in time from '15, at some point

11:45:18 18    did the defendant start using a phone number that had

11:45:22 19    previously been linked to yours?

11:45:25 20    A.      Yes.

11:45:25 21    Q.      And when about was that?

11:45:28 22    A.      Shortly after our divorce.

11:45:30 23    Q.      And what --

11:45:31 24    A.      Summer of 2017.

11:45:36 25    Q.      And that phone number that had been yours, did it end

Buhle - cross

11:45:39 1    in 2473?

11:45:41 2    A.      Yes.

11:45:41 3    Q.      Why was he then using your phone number -- what were

11:45:45 4    the circumstances under which he then started to use your

11:45:49 5    phone number?

11:45:50 6    A.      My number was part of a family plan, and after the

11:45:54 7    divorce, he wouldn't release the number, so I had to get a

11:46:02 8    different number and he took it over.

11:46:05 9    Q.      Just to be clear then, after sometime in -- I think

11:46:10 10   you said the summer of '17, you were no longer using that

11:46:14 11   phone number, is that right?

11:46:16 12   A.      Correct.

11:46:16 13   Q.      So any messages from that phone number would have

11:46:19 14   been from him, is that right?

11:46:21 15   A.      Yes.

11:46:24 16           MR. WISE:  Nothing further, Your Honor.

11:46:25 17           THE COURT:  Thank you.  Cross-exam.

11:46:29 18                 CROSS-EXAMINATION

11:46:31 19   BY MR. LOWELL:

11:46:33 20   Q.      Good morning, Ms. Buhle.  My name is Abbe Lowell.

11:46:36 21   I'm one of Mr. Biden's attorneys.  We've never met before?

11:46:40 22   A.      No.

11:46:40 23   Q.      You mentioned that you and he were married?

11:46:46 24   A.      Yes.

11:46:46 25   Q.      And I think you said July of 1993?

Buhle - cross

11:46:50  1    A.      Yes.

11:46:51  2    Q.      When did you first meet?

11:46:54  3    A.      August of '92.

11:46:59  4    Q.      And am I right that you two met when you were both

11:47:03  5    working at something called the Jesuit Volunteer Corp?

11:47:08  6    A.      Yes.

11:47:08  7    Q.      Northwest?

11:47:10  8    A.      Yes.

11:47:10  9    Q.      What is that?

11:47:11 10    A.      It's like a domestic Peace corp, it's a year long

11:47:17 11    program to volunteer.

11:47:18 12    Q.      Not highly paid?

11:47:20 13    A.      No.

11:47:20 14    Q.      And that's when you all started dating?

11:47:23 15    A.      Yes.

11:47:24 16    Q.      Did you work in the same part of the Jesuit Volunteer

11:47:29 17    Corps?

11:47:29 18            MR. WISE:  Your Honor, I'm going to object.

11:47:31 19    This is outside the scope of the direct.

11:47:33 20            THE COURT:  Sustained.

11:47:40 21    Q.      That's how you met --

11:47:41 22            THE COURT:  There is an objection, he said it's

11:47:43 23    outside the scope of the direct, I tend to agree.  So --

11:47:48 24            MR. LOWELL:  I'm not asking any other questions

11:47:49 25    about that subject.

Buhle - cross

11:47:50 1                THE COURT:  I'm sorry, I thought you just asked

11:47:52 2    her to finish the answer.

11:47:54 3                MR. LOWELL:  No, I just wanted to place that

11:47:56 4    they married a year later.

11:47:58 5                THE COURT:  Okay.  So it's sustained.  And thank

11:48:00 6    you for clarifying it.

11:48:04 7    BY MR. LOWELL:

11:48:05 8    Q.    When that happened, did you marry out in the West or

11:48:07 9    back in the East?

11:48:08 10   A.    We married in Chicago.

11:48:12 11   Q.    Mr. Wise asked you questions about Mr. Biden's,

11:48:19 12   Hunter's functioning during this period, that was a topic he

11:48:22 13   had asked you about, right?

11:48:23 14   A.    In what period?

11:48:24 15   Q.    While you were married, and he was in the period of

11:48:27 16   either using alcohol or when you defined -- when you learned

11:48:31 17   he was using drugs, you were asked whether he was

11:48:33 18   interacting and he was functioning?

11:48:36 19   A.    I think I was only asked and referred to a period

11:48:40 20   after 2015.

11:48:41 21   Q.    So in that period of time after 2015, he was working?

11:48:45 22   A.    Yes.

11:48:46 23   Q.    What as?

11:48:48 24   A.    He had a business, I don't -- I really don't know

11:48:53 25   exactly what he was working on.

Buhle - cross

11:48:55  1    Q.      Okay.  At that point was he a lawyer?

11:48:58  2    A.      Yes.

11:48:58  3    Q.      And he was a business person?

11:49:00  4    A.      Yes.

11:49:01  5    Q.      Do you know whether he worked in that period you just

11:49:04  6    mentioned where he was functioning in a law firm?

11:49:08  7    A.      I think he was still of counsel to Boies Schiller.

11:49:15  8    Q.      Boies Schiller being an international law firm?

11:49:18  9    A.      Yes.

11:49:18 10    Q.      So in that period when he was functioning, he was

11:49:21 11    there, he also had a business?

11:49:23 12    A.      Yes.

11:49:23 13    Q.      Was the name of that business Owasco PC?

11:49:27 14    A.      I thought it was Rosemont Seneca.

11:49:31 15    Q.      Rosemont Seneca is a name of a business you associate

11:49:35 16    with Hunter?

11:49:36 17    A.      Yes.

11:49:36 18    Q.      And then I think you said that you -- when did you

11:49:40 19    separate, when did he move out?

11:49:42 20    A.      Well, he moved out really after I found the crack

11:49:51 21    pipe, but I didn't consider us separated until I found out

11:49:56 22    about the infidelity.  I wasn't living at home, but we were

11:50:01 23    in therapy, and so I -- I don't know why I feel like I have

11:50:06 24    to make that distinction.

11:50:07 25    Q.      I want to talk about moving out so that you would see

Buhle - cross

11:50:11 1  him and what he was doing?

11:50:12 2  A.      Pardon?

11:50:13 3  Q.      I wanted to know when he moved out and then you said

11:50:15 4  that was in 2015?

11:50:17 5  A.      Yes.  Uh-huh.

11:50:18 6  Q.      And then you divorced in 2017?

11:50:21 7  A.      Yes.

11:50:22 8  Q.      After you -- after he moved out in 2015?

11:50:28 9  A.      Yes.

11:50:28 10  Q.      I imagine your interactions in person were less

11:50:32 11  frequent?

11:50:32 12  A.      Yes.

11:50:33 13  Q.      Often by phone or text or some other communication?

11:50:39 14  A.      Yes.

11:50:39 15  Q.      And after you were divorced in 2017, I would think it

11:50:44 16  was even fewer occasions; is that right?

11:50:49 17  A.      Yes.

11:50:49 18  Q.      And in the period of 2017 when you divorced, you were

11:50:54 19  asked questions about finding paraphernalia or seeing drugs

11:50:58 20  from sometime.  Moving ahead to the fall of 2018, prior to

11:51:06 21  that, did you know that Hunter had come back to Delaware

11:51:09 22  after being in California in the end of the summer of 2018?

11:51:14 23  A.      I was not tracking where he lived.

11:51:17 24  Q.      So one way or the other, you don't know?

11:51:20 25  A.      No.

Buhle - cross

11:51:20  1    Q.      And in the fall of 2018, that's not an occasion in

11:51:24  2    which you were looking into his car or looking into a

11:51:27  3    vehicle or finding paraphernalia or a crack pipe, that's not

11:51:33  4    a period where that happened?

11:51:34  5    A.      I don't recall the exact days when I was doing it.

11:51:38  6    It was just when the girls would use the car.

11:51:41  7    Q.      Right, so you can't place that in time?

11:51:43  8    A.      No.

11:51:44  9    Q.      I'm sorry, I can't hear you?

11:51:46 10    A.      No, I can't recall the exact dates that I checked the

11:51:49 11    car.

11:51:49 12    Q.      Using as benchmarks, did you know that in the first

11:51:52 13    part of 2018, he was living in Los Angeles?

11:51:55 14    A.      No.

11:51:56 15    Q.      You didn't know that at all?

11:51:58 16    A.      I -- no.

11:51:59 17    Q.      If --

11:52:00 18    A.      I knew he was traveling, I don't know if I considered

11:52:03 19    him living in California.

11:52:05 20    Q.      I'm sorry, I used --

11:52:06 21    A.      Yeah.

11:52:07 22    Q.      Let me start again.  Did you know that he was

11:52:09 23    traveling to California?

11:52:11 24    A.      Yes.

11:52:12 25    Q.      Did you know how long a period of time in 2018 he was

590

Buhle - cross

11:52:17  1   in California?

11:52:18  2   A.      No.

11:52:20  3   Q.      Did you have any physical contact with him when he

11:52:23  4   was in California?

11:52:24  5   A.      No.

11:52:26  6   Q.      When he first came back in August of 2018, or

11:52:31  7   September when he first came back, did you have any meetings

11:52:34  8   or physical contact with him that week?

11:52:36  9   A.      I don't recall.

11:52:37 10   Q.      Or the week after?

11:52:38 11   A.      I don't recall.

11:52:39 12   Q.      So you wouldn't be able to place when the next

11:52:42 13   occasion would be?

11:52:43 14   A.      I don't recall.

11:52:50 15   Q.      You were asked questions about starting in that

11:52:54 16   July 2015 when you found the pipe.  Prior to that, you knew

11:52:58 17   that Hunter had a problem with alcohol?

11:53:00 18   A.      Yes.

11:53:01 19   Q.      And that was an issue in your marriage as well,

11:53:05 20   correct?

11:53:06 21   A.      It was an issue, I don't know -- yes.

11:53:10 22   Q.      Okay.  And do you know how far back his use of

11:53:14 23   alcohol went?

11:53:16 24   A.      He went into rehab the first time in 2003.

11:53:21 25   Q.      So prior to that, of course?

591

Buhle - cross

11:53:25 1  A.      Yes.

11:53:26 2  Q.      From the time that you got married, which you said

11:53:29 3  was 1993 to the period, that year you just said 2003, was he

11:53:35 4  using alcohol?

11:53:36 5  A.      Yes.

11:53:37 6  Q.      And you did mention that he went into a rehab program

11:53:42 7  just a moment ago in 2003?

11:53:45 8  A.      Yes.

11:53:46 9  Q.      Was that called Crossroads?

11:53:48 10  A.      Yes.

11:53:50 11  Q.      Did you have a conversation with him at that period

11:53:53 12  of time where he resisted going into any rehab?

11:53:57 13  A.      He didn't resist, it was his idea.

11:54:02 14  Q.      And he did that rehab again before you were divorced

11:54:08 15  in 2010 at the same place, Crossroads, right?

11:54:13 16  A.      I don't remember the year, but he went back.

11:54:15 17  Q.      Again on his choice?

11:54:17 18  A.      Yes.

11:54:19 19  Q.      And do you recall that also --

11:54:22 20  A.      That was 2012.

11:54:24 21  Q.      Do you recall a place called Crossroads?

11:54:26 22  A.      Yes.

11:54:27 23  Q.      What about going to the University of Pennsylvania in

11:54:30 24  2015, prior to the event that you described, do you remember

11:54:34 25  that one?

Buhle - cross

11:54:36  1    A.      I thought that was after.

11:54:39  2    Q.      You know about it, you just can't --

11:54:41  3    A.      Yeah.

11:54:42  4    Q.      Sorry I didn't mean to talk, go ahead?

11:54:44  5    A.      He worked with a program out of the University of

11:54:48  6    Pennsylvania.

11:54:49  7    Q.      When you talked about finding paraphernalia or small

11:54:54  8    amounts of what you described, can you place the year or

11:55:01  9    month to when that happened?

11:55:04 10    A.      No.

11:55:04 11    Q.      When you say it was in a car, can you say which car?

11:55:10 12    A.      No.

11:55:23 13    Q.      In the opening statement by the prosecutors in this

11:55:28 14    case, this is a sentence that was said?

11:55:31 15            MR. WISE:  I'm going to object, Your Honor, it's

11:55:33 16    not evidence what the prosecutor said in opening statement.

11:55:36 17            MR. LOWELL:  Mr. Hines raised with the jury a

11:55:40 18    demonstrative of what I said in opening statement earlier

11:55:42 19    today.

11:55:43 20            MR. WISE:  This witness has no knowledge of the

11:55:45 21    opening statement, he wants to ask a question, he can ask a

11:55:48 22    question.

11:55:48 23            THE COURT:  And the demonstrative I think was

11:55:49 24    also used with the witness, wasn't it?  Maybe not.  Okay.

11:55:54 25    Regardless.  Strike that.  None of what any of us say is

Buhle - redirect

11:55:58  1    evidence.  So please rephrase.

11:56:01  2                MR. LOWELL:  I will rephrase.

11:56:02  3    BY MR. LOWELL:

11:56:06  4    Q.    In the period of time that you were dealing, seeing,

11:56:11  5    speaking, I want you to hear this phrase -- I want to ask

11:56:16  6    you a question.  Did you ever see Hunter using drugs?

11:56:30  7    A.    No.

11:56:30  8                MR. LOWELL:  That's all I have.

11:56:31  9                THE COURT:  Redirect.

11:56:36 10                    REDIRECT EXAMINATION

11:56:36 11    BY MR. WISE:

11:56:39 12    Q.    Just picking up on the last question, Ms. Buhle, I

11:56:42 13    asked you how you were aware of him using drugs.  Do you

11:56:46 14    recall being asked that?

11:56:47 15    A.    Yes.

11:56:48 16    Q.    So if you physically didn't see him smoking, tell us

11:56:51 17    again what you saw, both in terms of his behavior and other

11:56:55 18    things that led you to conclude he was using drugs?

11:56:59 19    A.    Well, he told me when I found the pipe what it was.

11:57:05 20    And I assumed he was continuing to use when I found the

11:57:10 21    pipes in the car.  And because he was acting not himself.

11:57:17 22    Q.    I see.  You were asked if you remember the car where

11:57:21 23    you found drugs and paraphernalia on multiple occasions.  Do

11:57:25 24    you recall being asked that?

11:57:26 25    A.    Yes.

Buhle - redirect

| | | |
|---|---|---|
| 11:57:26 | 1 | Q.    Did he have multiple cars during this period? |
| 11:57:30 | 2 | A.    Yes. |
| 11:57:30 | 3 | Q.    About how many would you say? |
| 11:57:33 | 4 | A.    I don't recall.  Three, at least. |
| 11:57:37 | 5 | Q.    Do you recall finding drugs and paraphernalia in all |
| 11:57:40 | 6 | of those cars, some of those cars? |
| 11:57:44 | 7 | A.    I -- I couldn't say for sure how many. |
| 11:57:49 | 8 | Q.    More than one? |
| 11:57:54 | 9 | A.    Most likely, but I can't say with all certainty. |
| 11:57:59 | 10 | Q.    How many times would you say you found drugs or drug |
| 11:58:03 | 11 | paraphernalia in the cars during that period you described |
| 11:58:06 | 12 | from 2015 to 2019? |
| 11:58:11 | 13 | A.    Maybe like a dozen times. |
| 11:58:15 | 14 | MR. WISE:  Thank you.  Nothing further, Your |
| 11:58:16 | 15 | Honor. |
| 11:58:16 | 16 | THE COURT:  All right.  Thank you.  All right. |
| 11:58:22 | 17 | Thank you, ma'am.  You're excused.  Thanks for coming in. |
| 11:58:25 | 18 | What's next? |
| 11:58:27 | 19 | MR. WISE:  The United States calls Zoe Kestan. |
| 11:58:58 | 20 | THE COURT:  So members of the jury, fact |
| 11:59:00 | 21 | witnesses don't get to hear what other fact witnesses have |
| 11:59:03 | 22 | to say so you get to hear what their views are without being |
| 11:59:07 | 23 | influenced, so that's why it takes us a couple of minutes to |
| 11:59:10 | 24 | go grab them from someplace else. |
| 11:59:12 | 25 | COURTROOM DEPUTY:  Please raise your right hand. |

Kestan - direct

11:59:16  1    Please state and spell your full name for the record.

11:59:31  2         THE WITNESS:  Zoe Kestan, Z-O-E, K-E-S-T-A-N.

11:59:49  3         ZOE KESTAN, having been duly sworn, was examined

11:59:53  4    and testified as follows:

11:59:56  5                   DIRECT EXAMINATION

11:59:57  6    BY MR. WISE:

12:00:02  7    Q.    Good afternoon, Ms. Kestan.

12:00:04  8    A.    Hi.

12:00:05  9    Q.    Without giving your address, can you tell the members

12:00:08 10    of the jury where you live?

12:00:09 11    A.    Brooklyn, New York.

12:00:11 12    Q.    And what do you do for a living, Ms. Kestan?

12:00:13 13    A.    I'm design director for a home decor company.

12:00:16 14    Q.    How far did you go in school?

12:00:18 15    A.    I got my Bachelors from the Rhode Island School of

12:00:24 16    Design in Textile Design.

12:00:24 17    Q.    What year did you get your Bachelors from the Rhode

12:00:29 18    Island School of Design in Textile Design?

12:00:30 19    A.    2015.

12:00:32 20    Q.    Were you subpoenaed to testify here today,

12:00:38 21    Ms. Kestan?

12:00:38 22    A.    Yes.

12:00:39 23    Q.    And do you understand that's a court order to appear?

12:00:42 24    A.    Yes.

12:00:43 25    Q.    And are you testifying under a court order grant of

Kestan - direct

12:00:49  1    immunity?

12:00:49  2    A.      Yes.

12:00:50  3    Q.      And what do you understand that to mean?

12:00:53  4    A.      If I tell the truth, then nothing I say can be used

12:00:57  5    against me.

12:00:58  6    Q.      And what is your understanding of what happens if you

12:01:01  7    don't tell the truth?

12:01:02  8    A.      Then my immunity is revoked.

12:01:04  9    Q.      Could you be -- could the statements you make be used

12:01:08 10    against you as you put it?

12:01:10 11    A.      Yes.

12:01:10 12    Q.      Do you know the defendant?

12:01:12 13    A.      Yes.

12:01:13 14    Q.      And when did you first meet him?

12:01:16 15    A.      I met him in December of 2017.  I was working

12:01:22 16    part-time at a gentleman's club called Vivid Cabaret.

12:01:27 17    Q.      Where was that?

12:01:28 18    A.      Midtown Manhattan.

12:01:30 19    Q.      Can you describe the circumstances of how you first

12:01:33 20    met in December of 2017?

12:01:35 21    A.      It was late at night and I was about to clock out

12:01:40 22    from working there.  I was then offered to do one more

12:01:45 23    private dance for 30 minutes.  When I got upstairs to the

12:01:49 24    private dance, he was already in the room, and I was there

12:01:54 25    with another dancer.  We introduced ourselves, but I didn't

Kestan - direct

12:02:00 1  get his name and I wouldn't have known who he was at the

12:02:04 2  time anyway.

12:02:05 3  Q.    I'm just going to interrupt you for a second.  Just

12:02:08 4  to be clear, you didn't know who he was?

12:02:10 5  A.    No.

12:02:10 6  Q.    Do you see him in the courtroom here today?

12:02:12 7  A.    Yes.

12:02:12 8  Q.    Can you indicate where he's seated and describe what

12:02:16 9  he's wearing?

12:02:17 10         MR. LOWELL:   We stipulate that Hunter Biden is

12:02:19 11  sitting at the defendant's table.

12:02:22 12  BY MR. HINES:

12:02:23 13  Q.    Do you see him in the courtroom?

12:02:24 14  A.    I do.

12:02:25 15  Q.    And when you -- well you started to describe what

12:02:30 16  happened.  What happened when you came in the room and he

12:02:32 17  was there?

12:02:33 18  A.    The music was off because the club was about to

12:02:39 19  close.  He took out his phone and started playing a song on

12:02:43 20  his phone by Blind Foxes, I think the waitress came in to

12:02:50 21  take our drink orders and I think within ten minutes after

12:02:57 22  we were in the room, we were you know, chatting and we were

12:03:01 23  talking about music.  He went over to the side of the room,

12:03:04 24  there was -- this particular room had a separate balcony,

12:03:08 25  and he opened the sliding door and pulled out a pipe to

Kestan - direct

12:03:14  1   start smoking something.

12:03:17  2   Q.    Did you have an understanding of what he was smoking?

12:03:20  3   A.    It was a type of pipe that I have never seen before

12:03:24  4   -- I had never seen before at the time.  And it was an

12:03:28  5   unusual smell, I assumed it to be crack cocaine.

12:03:33  6   Q.    And was he also drinking?

12:03:35  7   A.    Yes.

12:03:35  8   Q.    What did you observe about his demeanor after you

12:03:38  9   said he went to the part of the room that had the balcony

12:03:42 10   and smoked what you thought to be crack cocaine?

12:03:46 11   A.    I remember thinking to myself that I didn't notice a

12:03:51 12   change in his behavior.  The first ten minutes he was

12:03:55 13   incredibly charming and charismatic and friendly and I the

12:04:01 14   felt really safe around him.  And I remember that after --

12:04:06 15   after he had smoked it that I felt like nothing had changed,

12:04:10 16   he was the same charming person.

12:04:13 17   Q.    And then what happened?

12:04:17 18   A.    Well, the private room was only about 30 minutes.  It

12:04:24 19   was me, him, and another girl, and the 30 minutes went by

12:04:29 20   really fast.  At the end, a host came in and asked if -- if

12:04:33 21   he wanted to extend the time, and he declined, so we ended

12:04:38 22   it there, and I went to the locker room to change and go

12:04:43 23   home.

12:04:43 24   Q.    At the end of the session, did he ask you anything?

12:04:47 25   A.    He asked me in I wanted to go to his hotel room.  I

12:04:51 1    declined, but I gave him my phone number, and I believe he

12:04:55 2    texted me when I was getting ready to go home about

12:05:00 3    20 minutes later, just sending me the address of his hotel

12:05:05 4    in case I wanted to go, and I didn't respond.

12:05:08 5    Q.    You testified this was December of 2017; right?

12:05:12 6    A.    Correct.

12:05:12 7    Q.    Moving forward in time, did you see him again?

12:05:16 8    A.    Yeah.

12:05:17 9    Q.    When was that?

12:05:18 10   A.    About a week or so after that, I remember somehow

12:05:23 11   coming across his photo online and putting two and two

12:05:26 12   together about who he was and realizing that was the guy

12:05:31 13   from this experience.  And then about a week after that, a

12:05:35 14   friend of mine who had apparently known him, I was in

12:05:39 15   Manhattan at the time, I think it was a Monday, it was like

12:05:44 16   2 o'clock and she texted me that she was with him and

12:05:47 17   invited me to the Soho Grand Hotel where he was, and I was

12:05:52 18   close by.

12:05:52 19   Q.    And did you go?

12:05:54 20   A.    I did.

12:05:55 21   Q.    And describe what happened when you got there?

12:05:58 22   A.    I went to the elevator and I went straight up to the

12:06:00 23   room number that she told me.  The two of them were there.

12:06:04 24   I think he recognized me when I got in, and he was

12:06:09 25   incredibly friendly and it was fun, he was playing loud rock

Kestan - direct

12:06:14  1   music and I think there were bottles of alcohol, there were

12:06:18  2   drinks, room service, he was smoking cigarettes, and there

12:06:21  3   was luggage kind of strewn across the room.

12:06:24  4   Q.    At some point now at the Soho Grand, did you see him

12:06:30  5   smoking crack?

12:06:30  6   A.    Yes.  Probably 10 or 15 minutes in, I remember him

12:06:36  7   taking it out and offering me some and I declined, and he --

12:06:41  8   yeah, and he smoked it for like 10 or 15 minutes in.

12:06:48  9   Q.    And then what happened?

12:06:49 10   A.    We hung out there for the rest of the day.  At one

12:06:55 11   point he offered to buy me some weed if I wanted to get

12:07:00 12   some.  We went out for a walk at one point.  And then the

12:07:04 13   three of us went for dinner at a place called Fanelli's

12:07:10 14   Cafe, after dinner she had to go home, and I didn't want to

12:07:13 15   go home, I -- I felt a connection with him and I was really

12:07:19 16   enjoying myself, and I went back to the Soho Grand with him

12:07:24 17   that night and I didn't leave for five days.

12:07:27 18   Q.    So you stayed for another five days then?

12:07:30 19   A.    It was Monday through Friday.

12:07:33 20   Q.    Okay.  And I'm not asking for sort of day by day, but

12:07:37 21   what did you do while you were in the Soho Grand with the

12:07:40 22   defendant for those five days?

12:07:41 23   A.    Spent a lot of time just the two of us.  I think the

12:07:46 24   second day in the evening, he went out for a dinner, a

12:07:50 25   business dinner or something, and I stayed back by myself.

12:07:54 1  I had a project I was working on, I think I had my laptop

12:07:58 2  with me, so I was doing my work in the hotel room.

12:08:03 3          On the third night, we went out to an event that

12:08:08 4  I had been invited to at a place called the Flower Shop in

12:08:12 5  Chinatown, it was the launch party for a friend of mine's

12:08:16 6  clothing brand, we met some of my friends, and we went out

12:08:20 7  there.

12:08:21 8          The day after that, we woke up, our sleep

12:08:24 9  schedules were also, we were staying up late and waking up

12:08:28 10 late the next time -- the next day.

12:08:31 11         The third day we walked around, we went shopping

12:08:34 12 a little bit.  And again, we spent most of our time together

12:08:39 13 in the Soho Grand, and then on Friday, I think we checked

12:08:44 14 out in the afternoon and parted ways.

12:08:46 15 Q.    During that week, or five days, you were at the Soho

12:08:50 16 Grand with him, was he smoking crack during that period of

12:08:54 17 time?

12:08:54 18 A.    Yes.

12:08:54 19 Q.    When he was smoking crack, how frequently was he

12:09:00 20 doing it?

12:09:01 21 A.    I like to think like every 20 minutes or so.  I think

12:09:06 22 that week it was a little bit less than every 20 minutes.  I

12:09:12 23 think we were really focused on each other, and at one point

12:09:17 24 I think he said to me that I was a bit of a distraction and

12:09:20 25 that he felt that week that he was smoking a little bit less

Kestan - direct

12:09:23  1    than he was used to.  And I had had experience with friends

12:09:29  2    and family who had suffered from addiction, and I -- I

12:09:36  3    already felt myself really caring for him, and kind of

12:09:40  4    starting the discussions about addiction.

12:09:43  5    Q.    Now, you said that you went out to dinner, I think

12:09:46  6    you said you went to an event, you went shopping.  Just to

12:09:50  7    be clear, were there times when he wasn't smoking crack when

12:09:53  8    he was with you?

12:09:54  9    A.    When we would go out together in public, you know, if

12:09:58 10    it was a restaurant or an event, you know, if we were busy

12:10:03 11    talking to people and we were out and about, maybe once an

12:10:08 12    hour he would go to the bathroom or step out.  And I knew

12:10:12 13    what he was doing when he did that.  But it was more about

12:10:16 14    every 20 minutes or so when it was just the two of us, you

12:10:20 15    know, alone.

12:10:21 16    Q.    And I think you had testified about that first

12:10:24 17    interaction and what you observed in December, what you

12:10:27 18    observed about his demeanor.  What did you observe about his

12:10:30 19    demeanor, for instance, when you were out with him now with

12:10:33 20    other people when he would smoke crack, what, if anything,

12:10:36 21    did you notice?

12:10:37 22    A.    He was just so, so charming and so nice, and I could

12:10:42 23    -- at the time I felt myself you know, having feelings for

12:10:45 24    him, and I never -- especially that week, I never saw an

12:10:51 25    immediate change in his behavior, which really, you know,

Kestan - direct

12:10:55  1    kind of confused me.  I remember the first day after I woke

12:11:00  2    up there, I, you know, was kind of concerned that his

12:11:06  3    behavior might change at some point, but it didn't, it was,

12:11:09  4    you know, cognizant, coherent, and yeah.

12:11:15  5    Q.    And it sounds like did you see him also interacting

12:11:19  6    with other people during this week when he was at the same

12:11:22  7    time using drugs?

12:11:25  8    A.    Yes.

12:11:26  9    Q.    Moving forward in time, did you see him again -- so

12:11:28 10    that was January I think you said of 2018, correct?

12:11:32 11    A.    Yes.

12:11:32 12    Q.    Moving forward in time, did you see him again?

12:11:34 13    A.    Yes.  The following week after I left the Soho Grand,

12:11:40 14    I had a work trip in California, and Las Vegas, so I was

12:11:47 15    there for a week.  At the end of that trip, we had been

12:11:49 16    talking kind of throughout, I think we were talking on the

12:11:52 17    phone for most of those week, week-and-a-half between, but

12:11:57 18    on the day that I was flying back from LA, he told me he

12:12:02 19    wanted to come up to New York from I think it was D.C., and

12:12:07 20    by the time I landed at JFK, he told me to get an Uber and

12:12:12 21    have the Uber take me to Atlantic City, where he would meet

12:12:17 22    me, as it was a halfway point between New York and D.C.

12:12:21 23    Q.    Did you do that?

12:12:22 24    A.    I did.

12:12:22 25    Q.    When you got there, did you stay the night?

604

Kestan - direct

12:12:25  1    A.       Yes.   In the car on the way to Atlantic City, he sent

12:12:30  2    me images of his credit card and asked me to call hotels and

12:12:35  3    find somewhere for us to stay that night.   I called a few,

12:12:39  4    they didn't have any availability, and then I landed on a

12:12:42  5    hotel called The Borgata, and I booked the room while I was

12:12:47  6    in the car.   And we met there, I think it was like

12:12:51  7    10 o'clock at night.   We met in the lobby.   And we stayed

12:12:56  8    there for one night together.   The next day, it was the day

12:13:00  9    before his birthday, and he was supposed to go to the Super

12:13:04 10    Bowl the day after, so he had to go back down, around here,

12:13:09 11    so in the afternoon the following day, after we checked out

12:13:13 12    we sat in his car for a while and talked, and then we parted

12:13:18 13    ways, and I went back to Brooklyn, and he went back down to

12:13:22 14    either Delaware or Maryland or D.C.

12:13:25 15    Q.       For the night you were with him at The Borgata, was

12:13:30 16    he smoking crack then?

12:13:31 17    A.       Yes.

12:13:31 18    Q.       You testified that he even sent you images of his

12:13:35 19    credit card to pay for the Hotel?

12:13:36 20    A.       To make the booking.

12:13:37 21    Q.       To make the booking.   We're going to move forward in

12:13:41 22    time, did he do that on more than one occasion?

12:13:44 23    A.       Yes.

12:13:44 24    Q.       When he did that, did you ever use the credit card or

12:13:47 25    debit card or whatever it was without his permission?

Kestan - direct

| | | |
|---|---|---|
| 12:13:51 | 1 | A.       No. |
| 12:13:54 | 2 | Q.       So moving forward in time, did you see him again? |
| 12:13:57 | 3 | A.       Yes. |
| 12:13:57 | 4 | Q.       When was that? |
| 12:13:58 | 5 | A.       So the day that we left, it must have been |
| 12:14:03 | 6 | February 3rd, and the next time I saw him it was the |
| 12:14:07 | 7 | beginning of fashion week in New York, which usually starts |
| 12:14:12 | 8 | around the seventh or eighth of February.  I was in the East |
| 12:14:17 | 9 | Village, I had just gone to a show.  I was doing some work |
| 12:14:20 | 10 | at the time, you know, for various events and shows for |
| 12:14:26 | 11 | fashion week.  And I just had gotten out of a show from a |
| 12:14:30 | 12 | brand called Gothic Chain, and he texted me he was on his |
| 12:14:35 | 13 | way back to New York and he would be there in a couple of |
| 12:14:38 | 14 | hours and to meet him at a hotel called The Four Seasons. |
| 12:14:42 | 15 | Q.       Did you do that, did you meet him at a hotel called |
| 12:14:47 | 16 | The Four Seasons? |
| 12:14:47 | 17 | A.       I did. |
| 12:14:48 | 18 | Q.       I'm going to ask you to look at, it should be in that |
| 12:14:50 | 19 | binder in front of you, an exhibit that's marked government |
| 12:14:54 | 20 | Exhibit 38.  There should be a tab that says 38.  Do you see |
| 12:14:58 | 21 | it? |
| 12:14:58 | 22 | A.       Yes. |
| 12:14:58 | 23 | Q.       Take a moment to flip through that. |
| 12:15:10 | 24 | A.       (Witness reviewing exhibit. )  Okay. |
| 12:15:43 | 25 | Q.       Are you familiar with those pictures? |

Kestan - direct

12:15:45  1   A.      Yes, they're from my phone.

12:15:47  2   Q.      They're from your phone?

12:15:48  3   A.      Yes.

12:15:49  4   Q.      Are they pictures that you took or images that were

12:15:52  5   otherwise on your phone?

12:15:53  6   A.      Yes.

12:15:54  7           MR. WISE:  Your Honor, at this point I move into

12:15:56  8   for admission government Exhibit 38.

12:15:59  9           MR. LOWELL:  No further objection.

12:16:00 10           THE COURT:  All right.  Thank you.  It's

12:16:02 11   admitted.

12:16:03 12           (Government Exhibit No. 38 was admitted into

12:16:04 13   evidence.)

12:16:04 14   BY MR. WISE:

12:16:07 15   Q.      If we could have the first.  Do you see that image on

12:16:09 16   the screen, Ms. Kestan?

12:16:11 17   A.      Yes.

12:16:11 18   Q.      Is this one of the pictures you took?

12:16:13 19   A.      Yeah, a photo I had taken of myself in the mirror and

12:16:18 20   that's the reflection of the countertop.

12:16:19 21   Q.      Got it.  Just to be clear, and I think this will

12:16:23 22   apply, are there -- we'll see it in further pictures, are

12:16:28 23   there redactions, like black boxes, in some of these

12:16:32 24   pictures?

12:16:32 25   A.      Uh-huh.

607

Kestan - direct

12:16:32  1    Q.      And they weren't put there by you, right?

12:16:35  2    A.      No.

12:16:36  3    Q.      They were put there from someone from the United

12:16:39  4    States?

12:16:39  5    A.      Yes.

12:16:39  6    Q.      These pictures are not necessarily the whole image,

12:16:42  7    it's specific parts of an image; is that right?

12:16:45  8    A.      Correct.

12:16:45  9    Q.      So you said you took this first picture.  Where did

12:16:48 10    you take this first picture?

12:16:49 11    A.      This was in the room at The Four Seasons from that

12:16:54 12    time that I had just mentioned during early February.

12:16:57 13    Q.      Of 2018?

12:16:58 14    A.      Of 2018.

12:17:00 15    Q.      And also to be clear, you had seen these pictures

12:17:02 16    before, before today; right?

12:17:04 17    A.      Yes.

12:17:05 18    Q.      Now, if I ask you to focus on the upper left-hand

12:17:13 19    corner, what is in the upper left-hand corner of the picture

12:17:16 20    near what looks like a glass of water?

12:17:19 21    A.      The used crack pipe.

12:17:22 22    Q.      How did you come to know that's what that was?

12:17:26 23    A.      There wouldn't be any other item that's just a long

12:17:31 24    straight tube like that, but it also has the coloring and

12:17:34 25    the residue of being an older, used one, so you can see the

Kestan - direct

12:17:42  1    darkness on either end of the pipe and the kind of resin

12:17:46  2    coloring around it.

12:17:48  3    Q.      Did the defendant tell you or explain to you what

12:17:51  4    that was and how he used it?

12:17:53  5    A.      Yes.

12:17:54  6    Q.      What did he tell you?

12:17:56  7    A.      I remember him explaining this to me that week in the

12:18:00  8    Soho Grand.

12:18:01  9    Q.      Was that after this?

12:18:03 10    A.      Before.

12:18:03 11    Q.      Oh, before.  Okay.  Sorry.

12:18:05 12    A.      So when you go to a store to purchase it, it's called

12:18:10 13    a glass rose, because it's just a clear straight tube and it

12:18:14 14    has a paper rose inside of it, and I guess the way that you

12:18:21 15    would smoke it is you would need to put some sort of filter

12:18:27 16    thing inside of it so that the drug wouldn't fall through

12:18:32 17    both ends.  So to do that, you would use this thing called a

12:18:37 18    chore boy, which is like a brillo pad, it's a scouring

12:18:42 19    material, it's like a copper measure, and you would break

12:18:46 20    off a little piece, and you put in about an inch in on one

12:18:50 21    end, so that the small pieces of the drugs would rest on

12:18:55 22    that one inch end, and you can smoke it from the other end.

12:19:01 23    Q.      We're going to move forward in time.  Were there

12:19:07 24    times when you saw him do that, sort of assemble it the way

12:19:11 25    you just described?

Kestan - direct

12:19:12 1    A.      Yes.

12:19:12 2    Q.      And use it to smoke?

12:19:14 3    A.      Yes.  He would also use things like chop sticks and

12:19:18 4    disassembled pens to push out the filter and clear out the

12:19:24 5    pipe to reuse it.

12:19:29 6    Q.      Now, was he smoking crack when you were with him at

12:19:33 7    The Four Seasons?

12:19:34 8    A.      Yes.

12:19:34 9    Q.      During fashion week?

12:19:36 10   A.      Yes.

12:19:37 11   Q.      And in terms of how far -- you said he would break

12:19:44 12   off a piece to put in a tube.  What size were the quantities

12:19:47 13   that you saw him with?

12:19:50 14   A.      I more remember the visual of it a little bit later

12:19:53 15   on.  But in general, he was buying amounts, you know, like

12:20:00 16   this size relative to a ping pong ball, and he would break

12:20:06 17   off tiny little pieces, sometimes it would be one piece that

12:20:10 18   he would put in and sometimes two or three little pieces.

12:20:15 19   And they would fit in that little small tube.

12:20:20 20   Q.      Did you ever see him buy -- you said when he would

12:20:24 21   have it, you described the size of it.  Did you ever see him

12:20:28 22   buy crack?

12:20:30 23   A.      The first time I saw him was in this room, I think it

12:20:33 24   was the second or the third day that I had been there, it

12:20:37 25   was later in the evening and he told me that a drug dealer

Kestan - direct

12:20:41 1    named Frankie would be coming by.  When Frankie did arrive,

12:20:45 2    I guess he texted him, and Hunter asked me to go downstairs

12:20:49 3    to bring Frankie up to the room.

12:20:51 4    Q.    And did you?

12:20:52 5    A.    I did.  When Frankie got there, they sat on the couch

12:20:57 6    and the armchairs in the little living room area of the

12:21:00 7    suite, and I didn't see the exchange happen, but Frankie

12:21:04 8    talked about other drugs that he had, if we were interested

12:21:08 9    as well.

12:21:09 10          MR. LOWELL:  Objection, hearsay as to what

12:21:13 11    Frankie said.

12:21:14 12          THE COURT:  It is hearsay.

12:21:20 13    BY MR. HINES:

12:21:21 14    Q.    Without telling us what Frankie said, describe what

12:21:23 15    happened after Frankie left, did the defendant have more

12:21:27 16    drugs than he had before Frankie got there?

12:21:29 17    A.    He did.  And then later on in the week, Hunter had

12:21:33 18    told me he had taken a Xanax that I believe he bought from

12:21:37 19    Frankie as well.

12:21:38 20    Q.    Did you ever see Frankie again?

12:21:40 21    A.    I did.

12:21:40 22    Q.    When was that?

12:21:41 23    A.    The night that he came to our -- to the hotel room,

12:21:47 24    he invited us to go to a nightclub with him later that

12:21:50 25    night, you know, a couple of hours after Frankie left the

Kestan - direct

12:21:53 1   hotel room, we went out for dinner to a restaurant called

12:21:58 2   Lucien in the East Village, and after that, we decided to go

12:22:02 3   meet Frankie at the nightclub he was at, and I believe I saw

12:22:09 4   Frankie again maybe a month later at a different hotel.

12:22:12 5   Q.      Were there ever times that the defendant asked you to

12:22:15 6   get cash out of the ATM for him to buy drugs?

12:22:19 7   A.      Yes.  The first time he kind of explained how it

12:22:23 8   worked to me was near The Four Seasons, during this trip,

12:22:28 9   there was a Wells Fargo ATM around there, and he explained

12:22:32 10  to me that someone other than him without a physical debit

12:22:39 11  card would be able to withdraw money from the ATM for him,

12:22:43 12  so he would be able to be in his hotel room and open the app

12:22:48 13  and get a five-minute code, and then he texted me the code

12:22:52 14  and asked me to withdraw cash while I was out before I came

12:22:55 15  back to the hotel room.

12:22:57 16  Q.      Did you do that for him on more than one occasion?

12:23:01 17  A.      Yes.

12:23:01 18  Q.      What did he tell you he was going to use the cash

12:23:03 19  for?

12:23:03 20  A.      He used cash for a lot of things.  He took out a lot

12:23:07 21  of cash, I knew that some of it, a good amount of it was for

12:23:13 22  buying drugs, but at one point later in that trip, I think

12:23:17 23  gave me $800 to go to Supreme to buy clothes and pick out

12:23:24 24  clothes for his kids.

12:23:25 25  Q.      Did he tell you that he also gave drug dealers that

Kestan - direct

12:23:28  1    code so they could also take cash out of the ATM?

12:23:32  2    A.      Yes.

12:23:33  3    Q.      Did he do that on more than one occasion?

12:23:35  4    A.      He told me that he did that.  There was one time

12:23:38  5    actually in California I remember him sending a code to a

12:23:41  6    dealer, somewhere, you know, not near us, and the dealer was

12:23:45  7    taking out cash.

12:23:45  8    Q.      And I think you said that that -- he explained to you

12:23:48  9    that code would expire briefly?

12:23:50 10    A.      Yeah, it only worked for five minutes, I think.

12:23:56 11    Q.      Now, staying at Four Seasons for a moment, was there

12:24:02 12    ever a time, I guess starting at The Four Seasons, where he

12:24:06 13    talked to you about trying to stop using drugs?

12:24:10 14    A.      Yes.  That week he had started to talk about

12:24:15 15    something he wanted to try called Kambo, which is a, I think

12:24:21 16    an indigenous experimental, you know, treatment, where you

12:24:27 17    would take the venom of a type of frog and put it on your

12:24:32 18    skin, and it would make you purge, and he hoped that it

12:24:36 19    would help him with his addiction.

12:24:39 20            We were talking about it I think the last day

12:24:43 21    that I was staying at The Four Seasons, and after we left,

12:24:47 22    after we parted ways, I remember sending him a couple of

12:24:51 23    articles and research I could find on it when I was back

12:24:55 24    home in Brooklyn.

12:24:56 25    Q.      Before we leave The Four Seasons, though, if we could

Kestan - direct

12:24:59  1    just have the next photo.

12:25:02  2              Where was this picture taken?

12:25:04  3    A.      In that same room.

12:25:06  4    Q.      Looks like four days later?

12:25:08  5    A.      Yes.

12:25:09  6    Q.      Similar question.  What's up in the upper left-hand

12:25:14  7    corner?

12:25:14  8    A.      Yeah, yep, that's a pipe, and there is some of my

12:25:17  9    makeup.

12:25:18 10    Q.      And looks like there is a bottle of liquor on the

12:25:22 11    night stand, or on the sink stand, too?

12:25:25 12    A.      Yeah.

12:25:26 13    Q.      Did you see him drinking and smoking crack at the

12:25:30 14    same time?

12:25:30 15    A.      Yes.

12:25:31 16    Q.      Were the two sort of often done together?

12:25:34 17    A.      Yes.

12:25:37 18    Q.      And was that true over the course of all the months

12:25:41 19    you spent with him?

12:25:43 20    A.      Yes.

12:25:44 21    Q.      Now, you said at the end of this trip, you said he

12:25:49 22    wanted to try this Kambo I guess drug program, drug rehab

12:25:53 23    program?

12:25:53 24    A.      I think it was just a private situation where

12:25:57 25    somebody who had the Kambo drug could administer it to him.

Kestan - direct

12:26:02  1   When he told me that he did it later on, he said he did it

12:26:06  2   in a house with one person.

12:26:08  3   Q.    So moving forward in time, when was the next time you

12:26:12  4   saw him after The Four Seasons?

12:26:14  5   A.    Early March, I think it was two weeks later, I was

12:26:18  6   having dinner with my parents in Midtown when he told me he

12:26:21  7   was going to be there soon.  He picked me up in Midtown and

12:26:25  8   took me to a new hotel called The 6 Columbus, and that day

12:26:31  9   we were there for about ten days.

12:26:33 10   Q.    All right.  And this -- so this would have been after

12:26:37 11   whatever the Kambo was, after that had occurred right?

12:26:41 12   A.    Yes.  I remember not hearing from him as often those

12:26:45 13   two weeks, and when I did, he told me he was trying this

12:26:49 14   Kambo, and I knew that when I saw him that time that he had

12:26:57 15   done it, so I was excited to see if it had worked.

12:27:00 16   Q.    Had it?

12:27:02 17   A.    When we got in the car, I thought for a second that

12:27:06 18   it had, he didn't smoke, you know, until we got up to the

12:27:11 19   hotel.  And I saw the scars on his arms, but within

12:27:15 20   20 minutes, he was smoking in the hotel room.

12:27:19 21   Q.    What was he smoking?

12:27:20 22   A.    Crack.

12:27:21 23   Q.    And then how frequently, I guess, when he was smoking

12:27:28 24   crack, was he doing it?

12:27:30 25   A.    Every 20 minutes or so, except, you know, sometimes

Kestan - direct

12:27:35 1    he would stay up late and he would sleep a bit longer, and

12:27:40 2    -- but he would want to smoke as soon as he woke up.

12:27:43 3    Q.      And you said you were with him for about ten days?

12:27:48 4    A.      Yes.

12:27:48 5    Q.      At the 6 Columbus.  Without going into day by day or

12:27:54 6    specific details, did you go out of hotel during that ten

12:27:57 7    days?

12:27:57 8    A.      Yeah, we went out for dinner a bunch, to JD Miller,

12:28:01 9    not JD Miller, a different place, another steak house that

12:28:06 10   he loved.  What else did we do?  At one point, it was my

12:28:11 11   friend's birthday and he offered for my friends to come to

12:28:14 12   the hotel room to hang out there for her birthday.  We went

12:28:22 13   -- we walked around near Columbus circle, up and down 57th

12:28:27 14   street.  I don't remember much.  We were mostly in the

12:28:31 15   hotel, a couple times he left, I also brought my laptop so I

12:28:35 16   could do work while I was there by myself.

12:28:38 17   Q.      Similar question like I had asked you before, were

12:28:40 18   there times when he wasn't using as frequently as you

12:28:44 19   described?

12:28:44 20   A.      Yes, when we were out in public or I assume when he

12:28:49 21   was out in public, too.  And when I look back on this time,

12:28:52 22   I feel like the earlier months that we spent together I

12:28:59 23   think he was a little bit more focused on our time together

12:29:03 24   and maybe he was distracted from it, but later on it got

12:29:07 25   more frequent.

Kestan - direct

12:29:08  1    Q.       And when he was out, as you put it, in public, did

12:29:11  2    you observe him interacting with other people in a variety

12:29:14  3    of settings?

12:29:16  4    A.       Yeah, yes, he was super charming, everybody loves

12:29:20  5    him.

12:29:20  6    Q.       And what, if anything, I have asked this before,

12:29:23  7    what, if anything, did you notice about his demeanor, did it

12:29:27  8    change after he was smoking crack while he was around other

12:29:31  9    people?

12:29:31 10    A.       I didn't notice it, I sometimes think that it was

12:29:36 11    because I was catching feelings for him, I didn't notice it

12:29:39 12    at all, I thought to myself that it's crazy that his

12:29:43 13    demeanor doesn't seem to be changing.

12:29:45 14    Q.       Now, moving forward in time from February of 20 --

12:29:49 15    actually, what was the month when you were with him at the 6

12:29:54 16    Columbus?

12:29:54 17    A.       It was March.

12:29:55 18    Q.       Of 2018?

12:29:56 19    A.       2018, it was early March.

12:29:58 20    Q.       Moving forward in time, when was the next time you

12:30:02 21    remember being with him?

12:30:04 22    A.       After the 6 Columbus, it was probably another week or

12:30:08 23    so.  Every time we would see each other, he would come to

12:30:11 24    New York and then say he would have to leave town to go back

12:30:15 25    down somewhere around here.  So the next time I saw him, I

Kestan - direct

12:30:20  1    actually had just gone to LA again for a work trip for two

12:30:24  2    days, and again when I landed from the flight, I met him

12:30:28  3    straight at a different hotel, this time it was at the

12:30:38  4    French Quarter in Soho.

12:30:38  5    Q.      If we could see the next picture.  This is actually

12:30:42  6    -- what is this a picture of?

12:30:44  7    A.      It looks like a photo of a piece of paper that has a

12:30:48  8    photocopy of his driver's license, or passport.  I believe

12:30:53  9    he texted me this photo.  I never personally took a photo of

12:30:59 10    his passport, though I do remember seeing it in person.  He

12:31:05 11    could have sent this to me for two reasons, around the same

12:31:09 12    time as the picture, one was a --

12:31:11 13              MR. LOWELL:  I'm objecting to why could have.

12:31:13 14    It could be what he said, but it's not for her to say he

12:31:17 15    could have.

12:31:18 16              THE COURT:  You can ask what her recollection

12:31:20 17    is.

12:31:21 18    BY MR. WISE:

12:31:21 19    Q.      What were you two discussing doing -- first of all,

12:31:25 20    where was this photo -- when it wound up on your phone where

12:31:31 21    were you?

12:31:32 22    A.      We were at the Mercer and I think --

12:31:34 23    Q.      Hold on a second.  What were you two talking about

12:31:37 24    doing when you were at the Mercer?

12:31:39 25    A.      He was very stressed out and he was talking about

Kestan - direct

12:31:46 1  attempting another, you know, try to get sober.  I had been

12:31:53 2  talking to him about want going to go to LA for a longer

12:31:57 3  period of time.  My lease was ending in April and I had a

12:32:02 4  plan to produce a line of clothes I was working on with

12:32:05 5  factories in California because that's where I knew the

12:32:08 6  factories, and when I brought that up, he said I love

12:32:12 7  California, I want to get away from the East Coast, I want

12:32:16 8  to get away from the stresses in my life, and I think I

12:32:20 9  could get sober if I go out there with you.

12:32:22 10  Q.    When he said get sober, what did you understand him

12:32:25 11  to be referring to?

12:32:26 12  A.    We first looked up rehab centers, I called a couple,

12:32:32 13  but they didn't have availability.  And then we looked at

12:32:36 14  getting an Airbnb so we could also hirer a detox and sober

12:32:41 15  companion to come live at the Airbnb with us.

12:32:44 16  Q.    What kind of rehab programs were these that you

12:32:48 17  looked up, were they for drugs, alcohol, or both?

12:32:51 18  A.    Both.

12:32:56 19  Q.    So how long did you stay at the Mercer, if you

12:32:59 20  remember?

12:33:00 21  A.    I think it was like 2 or 3 days.  We went out for

12:33:04 22  dinner one night, we went to the Apple store because his

12:33:07 23  phone and his computer were broken, and he had to leave in

12:33:11 24  the middle, so I dropped off, and you know, submitted his

12:33:17 25  phone and laptop at the Apple store for him.

Kestan - direct

12:33:20  1   Q.      Did that happen on more than one occasion where he

12:33:24  2   lost a phone or had to replace a phone?

12:33:26  3   A.      Yes.

12:33:26  4   Q.      Approximately how many times would you say that

12:33:29  5   happened during the period you were with him?

12:33:32  6   A.      Maybe 5 or 6.

12:33:36  7   Q.      And when you were at the Mercer for 2 or 3 nights, 2

12:33:41  8   or 3 days, did you see him smoking crack?

12:33:44  9   A.      Yes.

12:33:45 10   Q.      Can we go to the next picture?

12:33:48 11           So this is the next day, March 26th, 2018;

12:33:54 12   right?

12:33:54 13   A.      Yes.

12:33:54 14   Q.      Where was this taken?

12:33:55 15   A.      It's in the bathroom at the Mercer.

12:33:58 16   Q.      And who is the woman in the picture?

12:34:00 17   A.      That's me.

12:34:02 18   Q.      And is that the defendant behind you?

12:34:04 19   A.      Yes.

12:34:04 20   Q.      And could we enlarge what's on that little table?

12:34:12 21   What's in his sunglasses case?

12:34:15 22   A.      That looks like three pipes, looks like two of them

12:34:19 23   are a little bit more used than the one in the middle.

12:34:22 24   Q.      Where did he keep drug paraphernalia?

12:34:25 25   A.      He had a lot of stuff all the time with him, I saw

620

Kestan - direct

12:34:30 1   him keep pipes in various sunglasses cases.  Toiletries

12:34:37 2   bags, leather pouches, at one point he had a tool box, and I

12:34:41 3   remember the top level of the tool box had pipes and

12:34:47 4   paraphernalia, kept them in his car.

12:34:49 5   Q.     Is that also where he kept the drugs themselves, not

12:34:53 6   just the paraphernalia, but the drugs themselves, all those

12:34:56 7   things you described, pouches, sunglasses cases, backpacks?

12:35:01 8   A.     Sometimes, in the hotel it was just usually out on

12:35:04 9   the table, maybe in a jacket pocket.

12:35:11 10  Q.     Now, you testified that when you were at the Mercer,

12:35:14 11  the two of you discussed or made plans to go out to LA so

12:35:18 12  that he could go into some kind of rehab or detox, right?

12:35:22 13  A.     Uh-huh.

12:35:23 14  Q.     I think you also said you talked about renting an

12:35:26 15  Airbnb to do that?

12:35:27 16  A.     Yes.

12:35:27 17  Q.     So what happened?

12:35:28 18  A.     I -- we booked the flights together on my laptop in

12:35:35 19  the Mercer.  He wanted to go right away.  I had to move out

12:35:38 20  of my apartment still, so our original flights were I think

12:35:43 21  four days apart, he was supposed to go there four days

12:35:46 22  before.  He missed the first flight, I booked him another

12:35:50 23  one, and he missed the second one, and he was set to fly out

12:35:54 24  the day before me and he texted me that the Airbnb had

12:35:59 25  gotten canceled, I thought it was because the host of the

Kestan - direct

12:36:05  1    Airbnb had recognized the name because we booked it under

12:36:08  2    his personal Airbnb account, he called me and texted me and

12:36:12  3    said don't worry about it, I'm going to get a room at The

12:36:18  4    Chateau Marmont.

12:36:18  5    Q.      What is the Chateau Marmont?

12:36:20  6    A.      A hotel in LA.

12:36:22  7    Q.      You testified he missed two flights, is that right?

12:36:24  8    A.      Yes.

12:36:24  9    Q.      Did he make the flight eventually?

12:36:26 10    A.      He missed it.  I remember going and doing it on my

12:36:29 11    phone and booking him another one and texting to ask if he

12:36:34 12    made it on the flight, and by the third time, he did.

12:36:38 13    Q.      Okay.  And then did you follow?

12:36:42 14    A.      Yeah, I -- he got there on the day he got there, and

12:36:46 15    I was scheduled to fly out the next day.  We were in

12:36:50 16    contact, and when I landed, he was supposed to come pick me

12:36:55 17    up at LAX, and he was late, so he asked me to get an Uber

12:37:02 18    and we met halfway between where he was at the In And Out,

12:37:07 19    and we switched all my bags into his car there, and then we

12:37:11 20    drove to the Chateau Marmont.

12:37:13 21    Q.      You testified that the plan was for him to go to

12:37:16 22    California for rehab and detox.  When you got to the Chateau

12:37:21 23    Marmont, was he detoxing?

12:37:23 24    A.      No it seems like the plan had gone out the window.

12:37:27 25    Q.      What's going on at the Chateau Marmont?

Kestan - direct

12:37:30  1    A.      I wasn't expecting it but when I got to the room,

12:37:33  2    it's like a mini house, like a bungalow, there were two

12:37:38  3    women there.  I guess he had met them from next door, and

12:37:42  4    there were bottles of alcohol and food and drug

12:37:45  5    paraphernalia around the room.

12:37:46  6            When I got there, he told me that he couldn't

12:37:49  7    get the women to leave.  And we tried to get them to leave

12:37:53  8    by going out for dinner.

12:37:56  9    Q.      And eventually, did you come back that night?

12:37:58 10    A.      Yep.  We came back that night and I was really glad

12:38:03 11    to see him.  I think after an hour or two, he told me he had

12:38:08 12    to leave -- he told me that a dealer would be coming, a

12:38:11 13    dealer that he knew from LA.

12:38:12 14    Q.      What kind of dealer?

12:38:13 15    A.      He told me he was Samoan.

12:38:16 16    Q.      What would be --

12:38:17 17    A.      For his drug of choice, for crack, he told me he had,

12:38:21 18    you know, used this dealer previous times he had been in LA.

12:38:26 19    Q.      I think you testified that he said he had to leave?

12:38:28 20    A.      Yeah.  I think he went to go get cash, but then he

12:38:33 21    was gone for a while.  After an hour, I couldn't get a hold

12:38:37 22    of him, and the dealer showed up, and I was there in the

12:38:40 23    room with a kind of scary drug dealer probably for another

12:38:45 24    hour, neither of us could get ahold of him until he came

12:38:48 25    back in.

Kestan - direct

12:38:48  1    Q.      And eventually did he come back?

12:38:51  2    A.      Yes, and they did the exchange and the dealer left.

12:38:54  3    Q.      And was this -- did you see this dealer on -- this

12:39:01  4    dealer that you described coming the first night to the

12:39:04  5    Chateau on more than one occasion?

12:39:06  6    A.      Yes.

12:39:07  7            After we spent that first night in what they

12:39:11  8    called the bungalows, we moved into a room in the tower for

12:39:16  9    about a week.  And we spent more time together in that room.

12:39:21 10    But after that, we moved into another bungalow where

12:39:25 11    essentially the tower is off to one side and then there is a

12:39:30 12    gated pool and bungalow area when you have a room there, you

12:39:33 13    get a key, and besides the gate that's in the main entrance

12:39:39 14    of the hotel, there is also a gate that goes directly out to

12:39:42 15    the street.

12:39:42 16            By the time we were living in the bungalow, at

12:39:46 17    this point we had booked it for a whole month, the same drug

12:39:50 18    dealer would come often and wait by the side gate and one of

12:39:55 19    us would go let him in so he wouldn't have to come in the

12:39:59 20    lobby area of the hotel.

12:40:00 21    Q.      Do you remember that happening on more than one

12:40:02 22    occasion?

12:40:03 23    A.      Yes.

12:40:03 24    Q.      Just to locate us in time, you testified you had been

12:40:06 25    at the Mercer in March making plans to come to Los Angeles,

Kestan - direct

12:40:10  1    now you're at the Chateau.  What month are you in in 2018

12:40:14  2    when you first start, sounds like about a month stay at the

12:40:18  3    Chateau?

12:40:18  4    A.     Yeah, I think we were there for about five days,

12:40:22  5    maybe four, before he decided to book, you know, with the

12:40:27  6    hotel for a full month long stay, so in total it was

12:40:31  7    probably a month and five days.

12:40:33  8    Q.     So that would be from when to when?

12:40:36  9    A.     I think I got there, I think, on the 4th or 5th, so I

12:40:41 10    feel like it would be April 11th to May 11th.

12:40:45 11    Q.     Okay.  And if we could see the next picture.  Where

12:40:51 12    was this picture taken?

12:40:53 13    A.     That's in the room in the tower.  We just started the

12:40:57 14    residency.  He had gone out and bought me funny T-shirts and

12:41:03 15    he bought that one for himself.

12:41:05 16    Q.     What does his T-shirt say?

12:41:08 17    A.     Says Addicted with a marijuana leaf symbol to make a

12:41:13 18    joke about Adidas.

12:41:16 19    Q.     If we could come out.  This is dated April the 11th?

12:41:19 20    A.     I thought that was funny because he didn't smoke

12:41:22 21    weed.

12:41:28 22    Q.     And if we move forward in time, I think you said you

12:41:31 23    were there for at least a month.  What is the next photo?

12:41:37 24    A.     This is from May the 11th.

12:41:39 25    Q.     Where was this photo taken?

Kestan - direct

12:41:41  1  A.      That was one of the last few nights at the final

12:41:46  2  bungalow that stay, and us, yeah, late at night, I think it

12:41:54  3  was at like 3:00 in the morning, and it was the bungalow, we

12:42:01  4  were taking a bath together.

12:42:02  5  Q.      What's in his, I guess right-hand?

12:42:05  6  A.      That's a pipe, he would put this little grip on it, I

12:42:09  7  think it's for like a pencil either to protect his lips from

12:42:14  8  the heat or from the resin or something.

12:42:18  9  Q.      We can take that down.

12:42:20 10          You testified --

12:42:21 11          MR. LOWELL:  Your Honor, can I talk to counsel,

12:42:23 12  I know this -- there is something about the exhibits I would

12:42:26 13  like to ask him about.

12:42:27 14          THE COURT:  Okay.

12:43:29 15          (Discussion off record between counsel:)

12:43:35 16  BY MR. WISE:

12:43:38 17  Q.      So what I was about to ask you, was you testified

12:43:42 18  that this dealer that came the first night to the Chateau

12:43:45 19  came on other occasions, I think you said through this gate?

12:43:49 20  A.      Yes.

12:43:49 21  Q.      And at some point, did the defendant start using a

12:43:55 22  different dealer while you were at the Chateau with him?

12:43:58 23  A.      Yes.  By the time we moved to this bungalow, the one

12:44:03 24  from the bathtub picture, he started saying that he felt he

12:44:08 25  was getting ripped off by this big Samoan guy, either the

Kestan - direct

12:44:14  1    quality wasn't good or the quantity wasn't the amount he

12:44:18  2    paid for.  He knew it was easier to find powder cocaine, so

12:44:23  3    we were in this bungalow that had a kitchen in it, and he

12:44:27  4    eventually found a powder cocaine dealer and was kind of

12:44:33  5    testing out how to cook it in there.

12:44:35  6    Q.    Did you see him doing that?  Did you see him testing

12:44:39  7    out cooking it, cooking powder cocaine into crack in the

12:44:44  8    kitchen at the bungalow at the Chateau?

12:44:46  9    A.    Yeah, I sat at the kitchen, and he had me look up

12:44:50 10    things on the internet about it while he was trying it.

12:44:52 11    Q.    And was he able to do it?

12:44:54 12    A.    Yes.  The yields of it, I guess is what you would

12:45:00 13    say, probably wasn't as much as he wanted, but he was trying

12:45:05 14    to figure out how to do it.

12:45:07 15    Q.    And then moving forward in time from when I guess he

12:45:11 16    figured it out, did he buy both powder and crack cocaine?

12:45:16 17    A.    Yes.

12:45:17 18    Q.    Now you said the residency, I think that was the word

12:45:27 19    you used, ended at the Chateau Marmont in May of 2018,

12:45:33 20    right, the middle of the month?

12:45:34 21    A.    Yes.

12:45:34 22    Q.    Where did you two go from there?

12:45:37 23    A.    I had just started my meetings with the factories, I

12:45:43 24    had to wait when I first got to California for a box to be

12:45:47 25    shipped.  So towards the end, I was starting to have things

Kestan - direct

12:45:50  1    to do.

12:45:51  2              And by this time, he was disappearing more, and

12:45:56  3    I was starting to feel unstable and unsettled and there were

12:46:00  4    a couple of days where I would wake up there alone and I

12:46:03  5    would get a call from the front desk asking if we were

12:46:07  6    planning to go checkout.

12:46:09  7              So we spoke briefly, but I ended up booking an

12:46:15  8    Airbnb in Hollywood and the day that, you know, we checked

12:46:20  9    out of the Chateau Marmont, we took all of his things and my

12:46:26 10    things to this new Airbnb.

12:46:28 11              THE COURT:  Mr. Wise, is this a good time for us

12:46:30 12    to take our lunch break?

12:46:32 13              MR. WISE:  Sure.

12:46:32 14              THE COURT:  Members of the jury, we're going to

12:46:34 15    take our lunch break.  We'll come back in an hour.

12:46:42 16              COURTROOM DEPUTY:  All rise.

12:46:43 17              (Jury exiting the courtroom at 12:46 p.m.)

12:47:08 18              THE COURT:  All right.  Anything we need to

12:47:13 19    discuss?

12:47:14 20              MR. WISE:  No, Your Honor.  Thank you.

12:47:15 21              THE COURT:  All right.  I'll see you in an hour.

12:47:17 22              (A luncheon recess was taken.)

13:49:05 23              COURTROOM DEPUTY:  All rise.

13:49:07 24              THE COURT:  Bring in the jury.

13:49:11 25              (Jury entering the courtroom at 1:49 p.m.)

Kestan - direct

13:49:27  1              THE COURT:  All right.  Members of the jury,

13:49:37  2     welcome back.  Everyone may be seated.

13:49:40  3              Mr. Wise, you may continue.

13:49:45  4              MR. WISE:  Thank you, Your Honor.

13:49:46  5     BY MR. WISE:

13:49:52  6     Q.     Ms. Kestan, when we broke, you had just testified

13:49:56  7     that in mid May, the month or so that you and the defendant

13:50:01  8     spent at the Chateau Marmont came to an end; right?

13:50:06  9     A.     Yes.

13:50:06 10     Q.     And I think you started to testify that from there,

13:50:11 11     you rented an Airbnb in LA, is that right?

13:50:14 12     A.     Yes.

13:50:14 13     Q.     And did the defendant stay with you at the Airbnb?

13:50:19 14     A.     At first we moved all of our things over there.  But

13:50:25 15     he had plans to go back to the East Coast at some point soon

13:50:29 16     for his daughter's graduation, so it was, you know, for both

13:50:34 17     of us in some sense, but...

13:50:38 18     Q.     What if anything happened that very first night you

13:50:41 19     had the -- I guess had rented the Airbnb whether or not you

13:50:45 20     stayed there?

13:50:46 21     A.     The night that -- or the afternoon that we went over

13:50:49 22     there, we brought all of our things and later that night,

13:50:53 23     Hunter had two men come over to the Airbnb, one of them was

13:50:57 24     a dealer.

13:50:58 25     Q.     What kind of dealer?

Kestan - direct

13:50:59  1    A.      Cocaine dealer.

13:51:02  2    Q.      Okay.

13:51:02  3    A.      The other man I think was a security guy from the

13:51:07  4    strip club.  And they brought over powdered cocaine and they

13:51:15  5    stayed for about an hour.

13:51:16  6            And one of -- one or both of the men suggested

13:51:20  7    that we go to a different hotel called The Roosevelt to

13:51:25  8    throw a party.

13:51:26  9    Q.      Did you and the defendant do that, did you go to The

13:51:29 10    Roosevelt, even though you had the Airbnb?

13:51:31 11    A.      Yes.  We did.  So, a big suite room that the men had

13:51:36 12    talked about wasn't available, so he said he got two

13:51:39 13    separate rooms.  I was tired so I went to the one in the

13:51:44 14    tower of the hotel, but I fell asleep up there, and he and

13:51:49 15    the other men went to the other room, which was down by the

13:51:53 16    pool.  When I woke up, I remember it was mother's day and I

13:51:57 17    called my mom.  And then I went down and found them in the

13:52:01 18    pool room area, and they had been up all night and they were

13:52:06 19    all still there.

13:52:07 20    Q.      Okay.  And what happened after that?

13:52:14 21    A.      We hung out by the pool for a couple of hours and at

13:52:18 22    a certain point, Hunter told me that Hallie was on her way

13:52:22 23    to the hotel, I guess she had flown over to California and

13:52:26 24    he asked me to leave.  So I went back to the Airbnb.

13:52:31 25    Q.      Okay.  And then when was the next time you saw the

Kestan - direct

13:52:35  1   defendant after -- well, was he using drugs for the night at

13:52:40  2   The Roosevelt that you saw?

13:52:42  3   A.     Like I said, I went to the room by myself the first

13:52:46  4   night, but the next morning after I woke up and met up with

13:52:50  5   them, he was using that day.  And a day or so after, I left

13:52:57  6   to go back to the Airbnb.  He told me he was going to try

13:53:00  7   rehab south of LA, I think he said Long Beach, but I'm not

13:53:05  8   sure.

13:53:06  9   Q.     Okay.  So after he told you he was going to try a

13:53:09 10   rehab south of LA, when was the next time you saw him?

13:53:13 11   A.     I think about a week later, I hadn't heard from him

13:53:17 12   after he said that he was going to the rehab, I didn't get

13:53:20 13   any confirmation that he was there.  And I was starting to

13:53:26 14   get, you know, stressed out, a little upset, not knowing

13:53:31 15   what was going on.  And at one point, I opened my laptop

13:53:35 16   which had his bank account log in information still on from

13:53:39 17   when he had used it, and I saw that there was a recent ATM

13:53:43 18   withdrawal that was no where near south of LA.  And I

13:53:49 19   reached out to him questioning whether he did go to the

13:53:54 20   rehab.

13:53:55 21   Q.     What, if anything, did he tell you about whether he

13:53:58 22   went to the rehab?

13:54:00 23   A.     He didn't respond to that question.  He said don't

13:54:05 24   worry about me, or something like that.  And I think a

13:54:09 25   couple of days later he showed up at the Airbnb and told me

Kestan - direct

13:54:14  1  he had been staying at a different hotel called The Jeremy.

13:54:18  2  Q.    Now, you testified that you had opened your laptop

13:54:21  3  and I guess his bank log in information had been saved.  Did

13:54:24  4  you ever -- did you ever do anything in his -- any banking

13:54:28  5  out of his accounts?

13:54:29  6  A.    No.  But there were a number of times where I think

13:54:34  7  at that point he had two laptops, and various things were

13:54:39  8  broken, and in New York and in LA, he used my laptop for

13:54:44  9  things, yeah.

13:54:45 10  Q.    You testified he told you he had been staying at a

13:54:48 11  hotel called The Jeremy, at some point did you go there?

13:54:53 12  A.    The day he showed up at my Airbnb, he told me he had

13:54:57 13  been staying at The Jeremy, and the night before he had met

13:55:01 14  a young woman that was homeless and he had offered her a

13:55:05 15  stay at The Jeremy with him.  I know I could go back to The

13:55:13 16  Jeremy with him from the Airbnb, but later that evening I

13:55:15 17  took an Uber and went to The Jeremy where I found him there

13:55:19 18  with this young woman.

13:55:21 19  Q.    And then what happened?

13:55:23 20  A.    Eventually she left.  I had a dentist appointment the

13:55:27 21  next morning early, close to that hotel, so I thought we

13:55:32 22  would spend the night together in The Jeremy, but I think

13:55:36 23  around 9 o'clock he said he had to leave and he didn't

13:55:38 24  return at all that night.  I left early for my dentist

13:55:43 25  appointment, went back to my Airbnb and around 5:00 p.m. the

Kestan - direct

13:55:48  1   next day he finally responded.  Claiming he had fallen

13:55:53  2   asleep.  And then he said he had to catch a flight back to

13:55:56  3   the East Coast and that he would leave his car at LAX for me

13:56:02  4   to pick up.

13:56:03  5           So the next day I picked up the car, and he had

13:56:08  6   also asked me because he had to leave so rushed, if I would

13:56:13  7   clean up his hotel room at The Jeremy, and officially

13:56:17  8   checkout for him.  So the next morning once he was gone I

13:56:21  9   drove his car over there to clean up the room and checkout.

13:56:25 10   Q.    And if we could have Exhibit 38 back.  I'm showing

13:56:33 11   you a picture dated May 25th of 2018.  Where was this

13:56:38 12   picture taken?

13:56:38 13   A.    This was the room that I -- that he had stayed in at

13:56:44 14   The Jeremy, and I was quite angry that I had to clean it up.

13:56:51 15   So this is the state that I found it in.

13:56:53 16   Q.    You testified you had been there with him for some

13:56:56 17   number of hours, I guess, that first night before he left.

13:56:59 18   Was he using drugs while you were there for how ever long it

13:57:03 19   was with him?

13:57:04 20   A.    I think it was only 1 or 2 hours, but yes.

13:57:06 21   Q.    And then, is there drug paraphernalia on this table?

13:57:10 22   A.    Yes.

13:57:10 23   Q.    And maybe you can describe what it is and where it

13:57:13 24   is?

13:57:13 25   A.    There are two boxes of baking soda, one on either

Kestan - direct

13:57:19  1  side of the table.  I see --

13:57:21  2  Q.      What is baking soda used for?

13:57:23  3  A.      You use that to mix with the powder cocaine to turn

13:57:28  4  it into crack cocaine.

13:57:28  5  Q.      Had you seen him do that?

13:57:30  6  A.      Yes.

13:57:31  7  Q.      What else?

13:57:33  8  A.      Behind the bottles of tequila and vodka and part of a

13:57:39  9  broken pipe behind it, there are also two pipes on the

13:57:43 10  magazines in the middle of the table.  There is a glass bowl

13:57:49 11  off to the right that has the residue of mixing the cocaine

13:57:55 12  and the baking soda, and I think the black spot underneath

13:58:00 13  is from heating up the bottom of the bowl.  There are also

13:58:05 14  spoons, he used both spoons and bigger bowls to do this, and

13:58:10 15  that's why I think there are black marks every where because

13:58:16 16  the heating process would cause stuff to get every where.

13:58:24 17  Q.      And then there is also like a bottle of liquor, you

13:58:31 18  mentioned the tequila bottle, the Smirnoff bottle, and the

13:58:35 19  Jack Daniels bottles that are also in the picture?

13:58:37 20  A.      Yes.  And I see some chop sticks looking things, that

13:58:41 21  would have been used to clean out used pipes.

13:58:45 22  Q.      And then -- so then this is 12:57 on May 25th.  If we

13:58:51 23  could go to the next picture.  Is this just a couple of

13:58:55 24  minutes later?

13:58:56 25  A.      Yeah, that's in the bathroom of that same hotel room.

634

Kestan - direct

13:59:00  1    Q.      What's in that mug and then looks like a mixing cup

13:59:03  2    on the counter there?

13:59:04  3    A.      Yeah.  The smaller dish, the mug just looks like

13:59:10  4    maybe cigarette ash in a cup of water for some reason.  And

13:59:15  5    the other canister thing looks like it's been used to cook

13:59:24  6    the baking soda and the cocaine and the black on the bottom

13:59:37  7    from heating it.

13:59:37  8    Q.      You testified that he told you he had to catch a

13:59:40  9    flight to the East Coast.  Was it your understanding that he

13:59:44 10    did in fact catch a flight back to the East Coast and we're

13:59:48 11    still in May of 2019?

13:59:50 12    A.      Yeah, I picked up his car at the airport, he left his

13:59:54 13    keys on the wheel for me.  And I think he said it would only

13:59:57 14    be a week or two.  And I know that when he did try to come

14:00:02 15    back to the West Coast, he missed a couple of flights, and I

14:00:05 16    think it was three weeks later that he came back.

14:00:08 17    Q.      But you anticipated my next question, which was at

14:00:12 18    some point did he come back?

14:00:14 19    A.      Yes.

14:00:14 20    Q.      And approximately when was that?

14:00:17 21    A.      Middle of June, maybe.

14:00:20 22    Q.      And did you see him when he came back?

14:00:24 23    A.      The night -- or he texted me when he was on the

14:00:27 24    flight and I drove his car to LAX and picked him up.  When I

14:00:33 25    picked him up, he said he wanted to go to the hotel, Sixty,

Kestan - direct

14:00:37  1  the same chain of hotels as the one we did in New York, but

14:00:40  2  in Beverly Hills.

14:00:42  3  Q.      If I could have the next picture in this photograph.

14:00:45  4  This is a photograph from June 18th of 2018.  Where was this

14:00:49  5  taken?

14:00:49  6  A.      That's in the hotel room at the Sixty, Beverly Hills.

14:00:53  7  Q.      What's on the night stand in the upper right-hand of

14:00:58  8  the picture over the defendant's shoulder?

14:01:00  9  A.      Looks like a plastic bag with drugs in it.

14:01:03 10  Q.      What kind of drugs?

14:01:04 11  A.      Cocaine.

14:01:06 12  Q.      And did you see him use -- smoke crack when you were

14:01:11 13  at The Sixty in Beverly Hills, now in June of 2018?

14:01:16 14  A.      Yes.

14:01:19 15  Q.      How long did you stay at The Sixty?

14:01:22 16  A.      Maybe 3 or 4 days.

14:01:25 17  Q.      And then where did you go from there?

14:01:28 18  A.      He had talked about going to a place called Esalen in

14:01:35 19  Big Sur, California, he spoke about it like it was a

14:01:38 20  potential sobriety attempt, but it was a yoga retreat.  At

14:01:44 21  one point, he suggested that we drive up the coast together,

14:01:48 22  but eventually, I don't know what happened, but he went --

14:01:51 23  he said he was going up there.  I think actually before

14:01:55 24  that, when we left The Sixty, he wanted to spend one more

14:01:59 25  night in a different hotel.  We went to a party downtown and

636

Kestan - direct

14:02:03  1    after that, we stayed at a hotel near by called The Nomad.

14:02:09  2    Q.      If I could see the next photograph and exhibit.  This

14:02:12  3    is from June 23rd of 2018.  Where was this taken?

14:02:16  4    A.      That's at the Nomad.

14:02:17  5    Q.      The place you just testified about?

14:02:20  6    A.      Yes.

14:02:20  7    Q.      If you could zoom in on the table.  What's on the

14:02:23  8    table?

14:02:24  9    A.      A chop stick and a broken pen cap for you know, using

14:02:29 10    to clean out the pipes, and a torch lighter, and it looks

14:02:34 11    like a can of butane for the torch lighter.

14:02:37 12    Q.      If I didn't ask you before, what's the torch lighter,

14:02:40 13    I guess it's filled with butane, used for?

14:02:43 14    A.      I mean, it could be used for lighting you know, a

14:02:46 15    pipe or cigarette or whatever, but it has, you know, more

14:02:50 16    strength than a regular lighter, so I think it was his

14:02:55 17    preference for applying the heat for mixing the drugs.

14:02:59 18    Q.      Did you see him do that?

14:03:00 19    A.      Yes.

14:03:02 20    Q.      Moving forward in time if I could see the next photo.

14:03:05 21            So this is June 30th of 2018.  What's this a

14:03:10 22    picture of?

14:03:10 23    A.      His driver's license.

14:03:11 24    Q.      And is this something he sent you or a picture you

14:03:15 25    took of the actual driver's license, if you know?

Kestan - direct

14:03:18  1    A.      I think it -- I'm pretty sure that he sent me the

14:03:21  2    photo of the driver's license.

14:03:23  3    Q.      Do you recall why he sent you a photo of his

14:03:27  4    drivers's license?

14:03:27  5    A.      I believe it would have been for the address on the

14:03:30  6    license for a billing address for something.

14:03:32  7    Q.      Okay.  Now you said that he told you he wanted to go

14:03:41  8    to a place called Esalen, after I guess one more night in

14:03:45  9    LA.  Where did you go from this last hotel?

14:03:47 10    A.      Back to the Airbnb in Hollywood.

14:03:51 11    Q.      How long did you stay there?

14:03:53 12    A.      I believe I only had it for a little over a week

14:03:59 13    left, and it kind of worked out for the timing of his

14:04:02 14    planned trip to Esalen.  He was supposed to come back the

14:04:07 15    day that I was going to move out of the Airbnb, so I went to

14:04:14 16    a hotel to meet him there called The Standard, but he didn't

14:04:18 17    show up until a day later.

14:04:21 18    Q.      Okay.  And did you then stay with him at The

14:04:25 19    Standard?

14:04:25 20    A.      Yes, I spent the first night there by myself and the

14:04:29 21    second night there with him.

14:04:30 22    Q.      Was he using drugs when he came back from Esalen?

14:04:34 23    A.      Yes.

14:04:34 24    Q.      At the standard?

14:04:35 25    A.      Yes.

Kestan - direct

14:04:39  1   Q.      How much longer did you stay in LA?

14:04:44  2   A.      This is in early July.  I believe I left LA sometime

14:04:51  3   between like the 10th or the 13th of August.

14:04:55  4   Q.      Okay.  So you spent about --

14:04:57  5   A.      Another month or so.

14:04:58  6   Q.      Another month in the Airbnb?

14:05:00  7   A.      At this point, I didn't have the Airbnb anymore.  He

14:05:03  8   suggested I book another one in downtown LA.  Actually after

14:05:08  9   The Standard, we went back to The Nomad, and we were there

14:05:11 10   on July 4th.  And once that trip at that -- at The Nomad was

14:05:19 11   over I moved into an Airbnb.  That was also in downtown.

14:05:26 12   And he had to leave for some reason.

14:05:28 13   Q.      And did he leave the Airbnb or did he leave LA, what

14:05:32 14   was your understanding of where he went?

14:05:35 15   A.      I don't remember what he said in terms of where he

14:05:38 16   went.  He always had something to take care of.  We didn't

14:05:42 17   speak for a week or so.  I think we got into an argument

14:05:46 18   actually on the night of July 4th, he had me invite friends

14:05:52 19   of mine and people that we met at the pool to our room of

14:05:56 20   our hotel, and I remember the next day he got angry with me

14:06:00 21   because he thought that I had been speaking badly about him

14:06:03 22   to those people and he left angrily, and he left his

14:06:10 23   computer at the hotel.  After an hour, after he left, he

14:06:14 24   texted me saying I needed to put his computer in an Uber,

14:06:18 25   and send it to The Roosevelt Hotel, where he was now.

639

Kestan - direct

14:06:22  1    Q.      In that month, I guess this second Airbnb, did you

14:06:26  2    see him in July and into August before you left you said?

14:06:30  3    A.      He wasn't returning my texts and phone calls and

14:06:34  4    e-mails for a couple of weeks, and one day, later in July,

14:06:38  5    he called me and said he was in downtown and two blocks away

14:06:42  6    from me, to come meet him.  He was at a cell phone store and

14:06:48  7    I walked in and he said to the guy, my girlfriend is mad at

14:06:51  8    me.  And we went shopping at a bookstore and he spent a

14:06:55  9    night or two at the Airbnb before he said he had to leave to

14:06:58 10    go deal with something, I think it was his cousin.

14:07:02 11    Q.      Back on the East Coast?

14:07:03 12    A.      No, in California.

14:07:04 13    Q.      In California.  Okay.  And the night or two, whatever

14:07:07 14    it was that he spent with you, was he still using drugs at

14:07:11 15    that point?

14:07:11 16    A.      Yes.

14:07:12 17    Q.      And then I think you said you then left LA in early

14:07:18 18    August; is that right?

14:07:19 19    A.      Yeah.  The night or so -- it could have been two

14:07:24 20    nights that he spent with me in the Airbnb, it was the

14:07:27 21    Friday before my birthday, which was on a Monday, and he had

14:07:31 22    said that he would come back to spend my birthday with me.

14:07:34 23    He never -- he never responded to my calls or texts and

14:07:38 24    never showed up.  And it was about this time that my

14:07:45 25    production process that was happening at the factories was

Kestan - direct

14:07:49  1    ready to basically move into production, I had to proof the

14:07:53  2    samples, so I would have a month or two before anything else

14:07:56  3    would happen, and I didn't have much else to do in LA, and I

14:08:01  4    was really upset and emotionally distraught, so I decided to

14:08:05  5    go back to New York early.

14:08:06  6    Q.    Okay.  And that would have been, I think you said, in

14:08:09  7    early August when you went back to New York?

14:08:11  8    A.    It was the week of my birthday, which is the sixth.

14:08:16  9    Q.    Okay.  Moving forward in time, did you again come to

14:08:21 10    talk to him or facetime with him when you were in New York

14:08:25 11    and he was in LA?

14:08:27 12    A.    When I first got back to New York, I told myself that

14:08:31 13    I needed to cut contact with him for a bit because it wasn't

14:08:36 14    healthy for me.  But eventually I really missed him and we

14:08:40 15    started talking over Facetime, on the phone, in early

14:08:46 16    September, and by middle of September, I got the call from

14:08:51 17    my factory that the final samples had been finished and

14:08:55 18    needed approval, and by this time he and I had been

14:09:00 19    Facetiming, he told me he had been staying in a house in

14:09:03 20    Malibu and invited me to come back to California.

14:09:08 21    Q.    Okay.  If we could have the next picture, this is

14:09:11 22    from September the 10th of 2018.  Here is an image of you in

14:09:17 23    the upper corner and an image in the middle.  Is that you in

14:09:21 24    the upper right-hand?

14:09:22 25    A.    Yes.

Kestan - direct

Q.      Where are you?

A.      I'm in New York, yeah.

Q.      And where is -- who was in the middle picture?

A.      He was face timing me from Malibu to show me his new tattoo.

Q.      This is when he's in the house in Malibu when he mentioned that he wanted you to come and stay with him; is that right?

A.      Yes.

Q.      You can take that down.

        Did you eventually go to LA and then from LA stay in the house with him in Malibu?

A.      Yeah, I planned a trip for a week or so, I think it was the 19th -- no, it was like the 16th, 17th of September. I planned to spend the first two days in Downtown LA so I could take my meetings with the factories, and then planned to go to Malibu.  When I landed, he picked me -- or, when the plane landed, he was still driving from Malibu back across Los Angeles, and told me to meet him at a hotel called Freehand.  So I took an Uber from the airport to the Freehand, we met in the lobby, and I think we spent two nights -- a night or two there.

Q.      If I can see the next picture.  This is from September the 18th, 2018.  Where was this picture taken?

A.      That's in The Freehand.

Kestan - direct

14:10:39 1    Q.      Is that what it says on the bath robe, The Freehand?

14:10:42 2    A.      Yes.

14:10:43 3    Q.      And you testified he was there with you for a night

14:10:45 4    or two?

14:10:45 5    A.      Yes.  I believe we got there at around 10 o'clock, we

14:10:50 6    met in the lobby.  We spent the night there.  When we woke

14:10:53 7    up, we went out to the street, and his car had been towed,

14:10:58 8    and he asked me to go to the tow lot to go retrieve his car,

14:11:03 9    and I believe once I did that, I came back to downtown LA,

14:11:08 10   he went back to Malibu in his car.  I spent one more night

14:11:12 11   in the hotel by myself, and I spent another night with

14:11:15 12   friends downtown while they took my meetings over there.

14:11:19 13   Q.      And so staying first at The Freehand, you said he

14:11:22 14   came to stay with you at The Freehand?

14:11:24 15   A.      We met there the night that I landed.

14:11:26 16   Q.      And this was September the 18th of 2018, right?

14:11:31 17   A.      I believe I was in the room by myself when I took

14:11:33 18   that photo, so I think the day that we woke up there and he

14:11:38 19   left later was the 17th.

14:11:40 20   Q.      Okay.  The day or -- and the night he was there with

14:11:44 21   you, did you see him smoking crack at The Freehand?

14:11:47 22   A.      Yes.

14:11:48 23   Q.      All right.  And this again is in September 17th,

14:11:51 24   let's say of 2018; right?

14:11:53 25   A.      Yes.

Kestan - direct

14:11:54  1   Q.      And then from there, did you actually go to the house

14:11:59  2   he had rented in Malibu?

14:12:01  3   A.      Yeah.  After my meetings were finished and I approved

14:12:05  4   the samples, I had a rental car this trip and I drove out to

14:12:11  5   Malibu to this house he was staying in.  And it was the same

14:12:15  6   one from that face time.

14:12:16  7   Q.      From the face time on September the 10th?

14:12:19  8   A.      Uh-huh.

14:12:19  9   Q.      If I can see the next picture.

14:12:21 10           This is from September the 20th.  If you could

14:12:26 11   maybe enlarge the bottom, it's kind of small.  That's

14:12:32 12   September the 20th of 2018?

14:12:33 13   A.      Yes.

14:12:34 14   Q.      Did you actually take this picture yourself?

14:12:36 15   A.      Yes.

14:12:36 16   Q.      And where was this picture taken?

14:12:38 17   A.      In the bedroom of the Malibu house.

14:12:40 18   Q.      Who is it of in silhouette?

14:12:43 19   A.      It's of Hunter.

14:12:45 20   Q.      All right.  Now, when you get there on September

14:12:50 21   the 20th of 2018, you've already testified he was smoking

14:12:54 22   crack at The Freehand.  Was he smoking crack at the Malibu

14:12:57 23   house, when you were there in that week starting on

14:13:02 24   September the 20th?

14:13:02 25   A.      Yes.

Kestan - direct

14:13:02 1  Q.      And how frequently?

14:13:04 2  A.      Every 20 minutes or so.

14:13:07 3  Q.      And did you see drugs and drug paraphernalia in the

14:13:10 4  house in Malibu?

14:13:12 5  A.      Yes.

14:13:12 6  Q.      Where?

14:13:13 7  A.      In the bedroom, in the bathroom of the master

14:13:18 8  bedroom, he spent a lot of time in there.  In the kitchen.

14:13:23 9  It was a big house, so kind of all over.

14:13:27 10  Q.      Was there anyone staying there with him when you were

14:13:30 11  there?

14:13:31 12  A.      When I drove out there from downtown, I picked up a

14:13:35 13  friend of ours that we had met over the summer named Filipa,

14:13:40 14  an artist, she had planned to do a project with him.  She

14:13:46 15  was painting him, he wanted the three of us to brainstorm

14:13:50 16  together there.  So she stayed there I think 1 or 2 nights

14:13:53 17  in one of the other bedrooms.  And I believe she left before

14:13:58 18  I did.  I was there by myself for another night or two.

14:14:02 19  Q.      With him?

14:14:02 20  A.      With him.

14:14:04 21  Q.      Okay.  At any point when you were with him in Malibu

14:14:10 22  in September and he was smoking crack, did he tell you he

14:14:14 23  had recently tried rehab?

14:14:16 24  A.      I don't remember.  I think when I was in New York, he

14:14:21 25  might have referred to the reason that he had been so hard

Kestan - direct

14:14:28  1    to contact and unresponsive was that he was trying to do a

14:14:34  2    rehab or meeting with a -- you know, rehab coach or sober

14:14:39  3    companion.  But when I was there in Malibu, he didn't

14:14:44  4    mention a specific session from time to time.

14:14:48  5    Q.    And he was using drugs again, right?

14:14:50  6    A.    Yes.

14:14:51  7    Q.    And there wasn't a sober companion in the house was

14:14:54  8    there?

14:14:54  9    A.    No.

14:14:54 10    Q.    Just you and Filipa it sounds like for a time?

14:14:59 11    A.    Yeah.

14:14:59 12    Q.    Was he drinking when you were in Malibu with him?

14:15:02 13    A.    Yes.

14:15:02 14    Q.    And when did you leave Malibu, what was the date when

14:15:06 15    you left Malibu?

14:15:07 16    A.     It was the 20 something, either the 22nd or 23rd.  He

14:15:13 17    was acting more stressed out, erratic, he yelled at me a

14:15:21 18    couple of times, I think, because I felt like he wasn't

14:15:24 19    giving me any attention at all.  He was on the phone,

14:15:28 20    stressed out with people, and I told myself I should leave.

14:15:33 21    So I think I left a day earlier than I planned to go back to

14:15:37 22    New York.

14:15:42 23    Q.    Over the period of time that you described from

14:15:46 24    December of 2017 through the end of September of 2018, did

14:15:52 25    you and the defendant talk about his drug use?

Kestan - direct

14:15:55  1    A.      Yes.

14:15:56  2    Q.      And what did you talk about?

14:15:59  3    A.      From the beginning really he spoke about being an

14:16:06  4    addict and various times in his life that he had, you know,

14:16:11  5    gotten through chunks of time with sobriety and he told me

14:16:15  6    all about the teachings of AA.  And as early as I can

14:16:23  7    remember during this whole time he spoke about the fact that

14:16:27  8    no matter how long you are sober, you will always be an

14:16:31  9    addict.

14:16:32 10    Q.      Did he refer to himself as that way?

14:16:35 11    A.      Yes.

14:16:35 12    Q.      Did he ever say he wasn't an addict?

14:16:38 13    A.      No.

14:16:38 14    Q.      Did he ever say he wasn't suffering from addiction?

14:16:43 15    A.      Not in that phrasing.

14:16:46 16    Q.      Now, you said you left around September the 24th of

14:16:55 17    2018; right?

14:16:56 18    A.      Uh-huh.

14:16:57 19    Q.      When was the next time you saw him?

14:17:01 20    A.      The next time I saw him was the 18th or 19th of

14:17:09 21    November.

14:17:09 22    Q.      Where did you see him?

14:17:10 23    A.      In Massachusetts.

14:17:12 24    Q.      And why did you go to see him in Massachusetts?

14:17:16 25    A.      For most of October he was out of contact with me,

Kestan - direct

14:17:21 1   unresponsive to me reaching out.  But I think by late

14:17:26 2   October, early November, he said that he was in Newburyport,

14:17:32 3   Massachusetts, and was very depressed and eventually he

14:17:37 4   asked me to get on a plane to go to Boston.

14:17:40 5   Q.      And did you?

14:17:43 6   A.      I did.

14:17:43 7   Q.      And when you got there, where was he staying?

14:17:46 8   A.      He was staying on an island called Plum Island, next

14:17:52 9   to, or part of a place called Newburyport, Massachusetts, he

14:17:57 10  said he was doing a ketamine infusion treatment.

14:18:01 11  Q.      What did you understand that to mean?

14:18:03 12  A.      It sounded like it was an outpatient type thing,

14:18:06 13  where he would go to a clinic during daytime hours and get

14:18:11 14  the treatment.  And he was staying in a, like a rental house

14:18:15 15  on his own otherwise.

14:18:17 16  Q.      And when you went to visit him, did he in fact leave

14:18:21 17  for whatever these treatments were?

14:18:23 18  A.      Yes.  I got there evening time and he was staying in

14:18:28 19  a rental house.  We stayed up pretty late that night.  And

14:18:33 20  the next morning he went to his treatment session somewhere

14:18:38 21  in town.  He left me his car for the day and told me to

14:18:42 22  drive around and keep myself busy while he was in treatment.

14:18:48 23  Q.      And if we go to the next picture.  Is this the car he

14:18:53 24  left you?

14:18:54 25  A.      Yes.

Kestan - direct

14:18:54  1    Q.      All right.  While you were there with him and he was

14:18:58  2    getting the treatment, was he using drugs?

14:19:01  3    A.      That first night when I got there and the next

14:19:05  4    morning before he left yes.

14:19:06  5    Q.      Before he left for the treatment?

14:19:08  6    A.      Yes.

14:19:08  7    Q.      And then what happened, what happened after you drove

14:19:16  8    around for the day in his car while he was getting

14:19:19  9    treatment?

14:19:19 10    A.      In the evening time he came back.  We went for dinner

14:19:23 11    and drinks and we got tacos.  And eventually he asked me if

14:19:29 12    I could find cocaine for him.  We were close to Providence,

14:19:35 13    which is close to my school, and I texted someone who was

14:19:42 14    still at the school to ask them if they had a number for

14:19:44 15    someone who sold cocaine.

14:19:46 16    Q.      If I could just interrupt you for a second.  You

14:19:49 17    testified that you had graduated in 2015, correct?

14:19:53 18    A.      Correct.

14:19:53 19    Q.      So we're now at 2018, right?

14:19:55 20    A.      Yes.

14:19:56 21    Q.      You're only three years out of college, right?

14:19:59 22    A.      Yes.

14:20:00 23    Q.      In fact, you still knew people in college it sounds

14:20:02 24    like?

14:20:02 25    A.      Yes.

Kestan - direct

14:20:02  1    Q.      You said he asked you to help him get cocaine and you

14:20:06  2    reached out to somebody who you thought could?

14:20:09  3    A.      Yes.

14:20:09  4    Q.      What happened?

14:20:10  5    A.      We drove the two hours to Newburyport to Providence.

14:20:14  6    At this time I had gotten a number, given it to him, and we

14:20:19  7    -- he'd been in contact, I can't remember if it was texting

14:20:23  8    the dealer from my phone or his.  We drove straight to the

14:20:27  9    parking lot of CVS in a place called Wayland Square, I

14:20:31 10    think, in Providence.  Did the deal and then we went to go

14:20:35 11    check into a hotel I knew of in Providence called The Dean

14:20:39 12    that night.  We spent the night at The Dean, and then the

14:20:44 13    next morning I wanted to show him around my school, he had

14:20:49 14    said that his daughter was interested in an art school, so

14:20:52 15    we spent the day looking at the studios, drove out to the

14:20:56 16    museum, and walked around the campus.  It was Thanksgiving

14:21:01 17    break, so nobody was there.

14:21:02 18    Q.      You testified that his daughter was interested in art

14:21:05 19    school, did he have daughters that were around your age?

14:21:08 20    A.      Yes, to my knowledge.

14:21:09 21    Q.      If we could have the last picture.  You testified

14:21:11 22    that you took him to I guess a museum at the school where

14:21:16 23    you had gone?

14:21:16 24    A.      We went to a museum and we went to a place called the

14:21:21 25    Nature Lab at RISD, it's a library of sorts for natural

14:21:25 1    specimens, you can check things out for your project, like a

14:21:28 2    mini natural history museum.

14:21:30 3    Q.      Is that where this picture was taken?

14:21:32 4    A.      Yes.

14:21:32 5    Q.      Was this the last time you saw him, on November

14:21:35 6    the 20th of 2018?

14:21:36 7    A.      Yep.

14:21:36 8    Q.      And if we could go to the next image.  Is this a

14:21:41 9    screen shot of a text that you had on your phone?

14:21:44 10   A.      Yes.

14:21:45 11   Q.      And when about was this from?

14:21:47 12   A.      A couple of weeks later after we spent the day at the

14:21:52 13   museum, a day or so before Thanksgiving, he dropped me off

14:21:58 14   at the Amtrak station so I could take the train back to New

14:22:01 15   York, at the time I didn't know it would be the last time I

14:22:04 16   saw him.  From that point on, for the next couple of months,

14:22:08 17   I would get in contact, hoping to hear about how his

14:22:12 18   sobriety attempts were going and see how he was doing.

14:22:16 19   Q.      And can you read what he wrote to you starting with

14:22:20 20   I'm sitting?

14:22:21 21   A.      "I'm sitting here on a fucking island by myself.

14:22:24 22   Trying to beat the devil out of me.  I'm doing it alone no

14:22:28 23   matter how many people say my being alone is my fault I'm

14:22:32 24   still fucking alone.  And the realization that I've built a

14:22:35 25   life that makes it impossible for others to be with me is a

                          Kestan - cross

14:22:39  1   sickening weight that sinks in with every day I don't

14:22:42  2   completely anesthetize myself.  I can be sober but I'll

14:22:47  3   always be an addict.  And the addict is as much me as the me

14:22:47  4   you love to hate."

14:22:55  5              MR. WISE:  Nothing further, Your Honor.

14:22:56  6              THE COURT:  All right.  Cross-exam.

14:22:59  7              MR. LOWELL:  Yes, Your Honor.

14:23:00  8                   CROSS-EXAMINATION

14:23:09  9              MR. LOWELL:  May I approach the witness with a

14:23:14 10   notebook?

14:23:15 11              THE COURT:  You may.

14:23:20 12   BY MR. LOWELL:

14:23:27 13   Q.     Good afternoon, Ms. Kestan, my name is Abbe Lowell,

14:23:31 14   I'm one of Mr. Hunter's attorneys.

14:23:33 15   A.     Hi.

14:23:33 16   Q.     We never met?

14:23:35 17   A.     No.

14:23:35 18   Q.     Never spoken?

14:23:36 19   A.     No.

14:23:36 20   Q.     To start off with, you said that a last time you saw

14:23:41 21   Hunter in California was the end of September, the 22nd,

14:23:46 22   23rd, in that period of time; is that right?

14:23:48 23   A.     Correct.

14:23:48 24   Q.     And the next time you saw him was in the middle --

14:23:52 25   the end of November?

                                  Kestan - cross

14:23:53   1    A.        Yeah.

14:23:54   2    Q.        So you didn't see him between those two dates; right?

14:23:57   3    A.        Nope.

14:23:58   4    Q.        So you didn't see him in person, and you didn't face

14:24:02   5    time him with any pictures in that period of time?

14:24:05   6    A.        No.

14:24:06   7    Q.        So you don't have any idea of what he was doing from

14:24:09   8    the moment he left California to the moment you saw him

14:24:12   9    again in November?

14:24:13  10    A.        No idea.

14:24:15  11    Q.        In the beginning of your testimony, you were asked

14:24:20  12    whether or not you were here by a grant of immunity?

14:24:24  13    A.        Yes.

14:24:25  14    Q.        And you said if I tell the truth, then my immunity

14:24:33  15    sticks.  But your immunity is not because that you're

14:24:36  16    supposed to worry about lying, right, it's because you told

14:24:40  17    the prosecutors about things that you did that violated laws

14:24:43  18    for which they gave you immunity, right?

14:24:46  19              MR. WISE:  Your Honor, I'm going to object.  If

14:24:48  20    we can go to side-bar.

14:29:54  21              (Side-bar discussion:)

14:29:54  22              MR. WISE:  She does have counsel.  She's had

14:29:54  23    discussions with her counsel.  Counsel requested immunity.

14:29:54  24    I have no idea what her personal views on why she needed

14:29:54  25    immunity were.  That's between her and her counsel and is

Kestan - cross

14:29:54  1    privileged.  He shouldn't be able to ask her that.  She

14:29:54  2    doesn't know that she doesn't have to answer that.  She is a

14:29:54  3    represented person who requested immunity by her counsel and

14:29:54  4    it was granted.  He can't explore what they discussed.

14:29:54  5    Whether she needed it or whether he requested if for

14:29:54  6    exposure, for what, I don't know.

14:29:54  7            MR. LOWELL:  They've given them a -- them being

14:29:54  8    the jury, she has immunity because if she tells the truth

14:29:54  9    that's something to do with the immunity.  Her immunity is

14:29:54 10    because she told them about things which either her or her

14:29:54 11    lawyer, I'm not invading that, but she understood that she

14:29:54 12    was going to tell the truth about things that she did that

14:29:54 13    could violate the law.  I mean, I can't imagine you're

14:29:54 14    allowed to have someone with immunity and say I'm not

14:29:54 15    telling you what the immunity is.

14:29:54 16            MR. WISE:  If you have a lawyer and you're

14:29:54 17    conferring with your lawyer about it, yeah, that's exactly

14:29:55 18    right.

14:29:55 19            THE COURT:  So can he ask -- you have a grant of

14:29:55 20    immunity because either you or your attorney thought you

14:29:55 21    needed it or something like that.

14:29:55 22            MR. LOWELL:  Whether she should have it, I'm not

14:29:55 23    saying needed it.

14:29:55 24            MR. WISE:  She can't testify what her attorney

14:29:55 25    thought, all she can say is I'm going to ask the prosecutors

14:29:55  1    for immunity.  I have no idea what they discussed.  I can't

14:29:55  2    know, that's privilege.  The same goes for him.

14:29:55  3             MR. LOWELL:  But they granted her immunity for

14:29:55  4    her testimony, so whatever the reason was, she has to know

14:29:55  5    whatever she says can't be used against it.

14:29:55  6             MR. WISE:  She's already said that.

14:29:55  7             THE COURT:  So can you ask -- so, I mean, you

14:29:55  8    can't ask her what did you do that broke the law.

14:29:55  9             MR. LOWELL:  I understand that.

14:29:55 10             THE COURT:  And why did you think you needed

14:29:55 11    immunity.  What you can say is you understand to the extent

14:29:55 12    that you disclose anything that you broke the law, you're

14:29:55 13    not going to be prosecutor.

14:29:55 14             MR. LOWELL:  I can say that.

14:29:55 15             MR. WISE:  Just that your statements can't be

14:29:55 16    used against it, it's not transactional, it's just

14:29:55 17    testimony.

14:29:55 18             THE COURT:  Can you say it that way?

14:29:55 19             MR. LOWELL:  Yes, I can.  Say it one more time

14:29:55 20    for me so I get it right.  Maybe, you can tell me exactly

14:29:55 21    how the Judge said it.

14:29:55 22             (Reporter read back from the record.)

14:29:55 23             THE COURT:  But we have to say any statements so

14:29:55 24    you can say you have immunity because you understand of any

14:29:55 25    statements that you made.

Kestan - cross

14:29:55  1                    MR. WISE:  Can't be used against you.

14:29:55  2                    THE COURT:  Can't be.

14:29:55  3                       (End of side-bar.)

14:29:55  4    BY MR. LOWELL:

14:29:55  5    Q.       Ms. Kestan, before we just had that bench conference,

14:29:55  6    I asked you a question about immunity.  As you understand

14:29:55  7    it, the immunity that you talked or spoken with, met with

14:29:55  8    the prosecutors, and nothing you said to them about what you

14:29:55  9    did can be used against you?

14:29:55 10    A.       That's my understanding.

14:29:55 11    Q.       Speaking of that, over the time of the last few

14:29:55 12    years, have you met with prosecutors?

14:29:55 13    A.       I met with them starting a couple of weeks ago over

14:29:55 14    zoom and I gave a grand jury testimony.

14:29:55 15    Q.       Prior to the grand jury testimony, you also met with

14:29:55 16    investigators of the department of treasury, isn't that

14:29:55 17    right?

14:29:55 18    A.       I don't know if they're from the department of

14:29:55 19    treasury.

14:29:55 20    Q.       Got it?

14:29:55 21    A.       Two people showed up at my apartment and subpoenaed

14:29:55 22    me for a grand jury.

14:29:55 23    Q.       Okay.  Didn't you have an interview with

14:29:55 24    investigators in January of 2022?

14:29:55 25    A.       That must have been the first, you know, session of,

Kestan - cross

14:29:56  1   you know, going through my testimony before the grand jury,

14:29:56  2   yeah.

14:29:56  3   Q.     And then you also had a meeting with investigators in

14:29:56  4   July of 2022?

14:29:56  5   A.     Yes, they said they had a few more questions for me,

14:29:56  6   it was over zoom.

14:29:56  7   Q.     But in between those two what you said to the

14:29:57  8   investigators in January and then the meeting that you had

14:29:58  9   in July, it's in between that you went to the grand jury?

14:30:02 10   A.     Correct.

14:30:03 11   Q.     So after you testified, that's, and the grand jury,

14:30:06 12   that's under oath, right?

14:30:07 13   A.     Yes.

14:30:07 14   Q.     After you testified in the grand jury, which I

14:30:10 15   believe is in February, right?

14:30:12 16   A.     Uh-huh.

14:30:13 17   Q.     Then a couple of months later they wanted to talk to

14:30:16 18   you again?

14:30:16 19   A.     Yeah, they said they had a couple more questions.

14:30:20 20   Q.     Okay.  So first time in January, right?

14:30:22 21   A.     Yes.

14:30:23 22   Q.     And then you went to the grand jury; right?

14:30:26 23   A.     Yes.

14:30:26 24   Q.     And right before you went into the grand jury, where

14:30:29 25   was that grand jury, here in Delaware?

Kestan - cross

14:30:31  1    A.        I think it was in this building.

14:30:33  2    Q.        Did you meet with the prosecutors right before going

14:30:37  3    in?

14:30:37  4    A.        They put me in a room where I waited for a couple of

14:30:41  5    hours while another witness was testifying, we didn't talk

14:30:46  6    about anything.  They brought me in the room.

14:30:50  7    Q.        And so you waited, you went to the grand jury after

14:30:53  8    you met with them, and then you said a few months later you

14:30:57  9    met again because they had a few more questions, right?

14:30:59 10    A.        Yeah, they reached out to me.

14:31:01 11    Q.        And then you said a few weeks ago, let's take that.

14:31:04 12    How many times in the last, I don't know, two months have

14:31:08 13    you met with or spoken with by phone or any other device any

14:31:14 14    of the prosecutors or investigators?

14:31:16 15    A.        Three.

14:31:16 16    Q.        Three?

14:31:17 17    A.        Yes.

14:31:18 18    Q.        When was the last one?

14:31:20 19    A.        On Monday night.

14:31:21 20    Q.        Today being Wednesday?

14:31:23 21    A.        Correct.

14:31:24 22    Q.        How long did you spend with them on Monday night?

14:31:27 23    A.        Two hours, maybe 2 hours 15 minutes.

14:31:29 24    Q.        And then the time before that was how far back after

14:31:33 25    that Monday night?

Kestan - cross

14:31:34  1    A.      It was last Thursday.

14:31:37  2    Q.      And how many hours did you spend with them that day?

14:31:40  3    A.      An hour.

14:31:41  4    Q.      And you said there was a third, when was that?

14:31:44  5    A.      The first one was the Thursday or Friday before that,

14:31:49  6    and that one was about three hours.

14:31:53  7    Q.      So three hours plus another hour plus another two

14:31:57  8    hours, that's about six hours in the last few weeks?

14:32:03  9    A.      Yes.

14:32:03 10    Q.      You talked about the time you met Hunter at the end

14:32:07 11    of 2017?

14:32:11 12    A.      Yes.

14:32:11 13    Q.      You knew he was already divorced for some time before

14:32:14 14    you and he started dating?

14:32:16 15    A.      I only learned that that first week at the Soho

14:32:20 16    Grand, yes.

14:32:20 17    Q.      By the time you and he became dating?

14:32:23 18    A.      Yeah.

14:32:24 19    Q.      You knew he was a divorced person?

14:32:26 20    A.      Yes.

14:32:27 21    Q.      You mentioned in your testimony various things about

14:32:33 22    his use of funds and cash, debit cards, et cetera; yes?

14:32:40 23    A.      Yes.

14:32:40 24    Q.      I think you said he used cash a lot.

14:32:43 25    A.      Yes.

Kestan - cross

14:32:43  1   Q.      Not just for drugs?

14:32:45  2   A.      No.

14:32:45  3   Q.      In fact, he would give you cash?

14:32:48  4   A.      Yes.

14:32:48  5   Q.      Sometimes a good amount of cash?

14:32:51  6   A.      Sometimes.

14:32:52  7   Q.      Hundreds?

14:32:54  8   A.      Yeah, if -- if, you know, he said that he wanted to

14:32:59  9   buy me something that was worth $500 and I paid for it on

14:33:03 10   my, you know, my debit card or credit card, then he would

14:33:09 11   send me 7 or 800 back.

14:33:11 12   Q.      And that happened frequently?

14:33:13 13   A.      Yes.

14:33:13 14   Q.      You mentioned that you would buy something and he

14:33:17 15   would pay for it and then some?

14:33:18 16   A.      Yeah.

14:33:19 17   Q.      Sometimes he would buy things for you directly?

14:33:21 18   A.      Yeah.

14:33:21 19   Q.      And sometimes he would authorize you, you said you

14:33:26 20   had a code or you had his credit card, he would authorize

14:33:29 21   you to spend money on your accounts yourself?

14:33:32 22   A.      Yes.

14:33:32 23   Q.      And that was quite a lot?

14:33:33 24   A.      Yes, he said sometimes to me that my money is your

14:33:37 25   money.

Kestan - cross

14:33:37  1    Q.    And you spent it?

14:33:39  2    A.    Sometimes.

14:33:40  3    Q.    You mentioned a house in Malibu?

14:33:42  4    A.    Yes.

14:33:43  5    Q.    Do you know how that was paid for?

14:33:46  6    A.    I don't.  He had already rented it.

14:33:48  7    Q.    But you mentioned Airbnb's that you stayed in?

14:33:51  8    A.    Yes.

14:33:52  9    Q.    Including times that he wasn't with you?

14:33:55 10    A.    Yes.

14:33:56 11    Q.    And he paid for those as well?

14:33:59 12    A.    Yeah.

14:34:00 13    Q.    Even when he wasn't there?

14:34:02 14    A.    Yes.  I kept a lot of his things there as well.

14:34:06 15    Q.    In terms of your time with him, you talked about when

14:34:09 16    he was using crack in 2017 and into the first half of 2018,

14:34:16 17    you said he would use it and then sometimes go out when you

14:34:19 18    would go to a restaurant.  Yes?

14:34:21 19    A.    Uh-huh.

14:34:21 20    Q.    And you said that he would engage with people like

14:34:24 21    your friends that he would invite or yours?

14:34:27 22    A.    Yes.

14:34:27 23    Q.    You said that he would sometimes of course deal with

14:34:30 24    people that you understood were people he was getting drugs

14:34:33 25    from?

Kestan - cross

14:34:33  1    A.      Yes.  But also friends of his, too.

14:34:36  2    Q.      Okay.  In that period of time where you say you were

14:34:39  3    with him in New York or in other places and he was using,

14:34:43  4    did you ever see him with his daughters?

14:34:46  5    A.      No.

14:34:46  6    Q.      Did you ever see him with his mother or his father?

14:34:49  7    A.      No.

14:34:49  8    Q.      Did you ever see him using when he was in their

14:34:53  9    presence, obviously not?

14:34:55 10    A.      No.

14:34:55 11    Q.      You identified in the morning, and in the afternoon

14:35:00 12    after the lunch break a number of photographs that you took?

14:35:03 13    A.      Yes.

14:35:04 14    Q.      And those are from your phone; right?

14:35:07 15    A.      Yes.

14:35:08 16    Q.      As I was looking through them again before I got up

14:35:11 17    to the podium, I was looking at them, and in virtually every

14:35:15 18    one in which you identified, whatever you said was a pipe or

14:35:21 19    ashes, there is also either -- there is a liquor bottle?

14:35:24 20    A.      Yes.

14:35:24 21    Q.      Sometimes more than one?

14:35:26 22    A.      Yes.

14:35:26 23    Q.      Sometimes four in the same picture?

14:35:28 24    A.      Definitely.

14:35:30 25    Q.      That was something he did?

Kestan - cross

14:35:31  1    A.       Yes.

14:35:31  2    Q.       And in the exhibit that you went over in terms of

14:35:37  3    the, I think it's government 38, there are some pictures in

14:35:42  4    September when you were back out in Los Angeles, right?

14:35:46  5    A.       Which photos are you referring to?

14:35:48  6    Q.       If you look in -- you still have the government's

14:35:52  7    book in front of you.  The ones that are in September of

14:35:57  8    '18, do you see those?

14:35:59  9    A.       Yes.

14:36:00 10    Q.       Prior to that when you're taking pictures, you can

14:36:03 11    see the pipe, the ashes, you can see the bowl, you can see

14:36:07 12    that, right?

14:36:07 13    A.       Yes.

14:36:08 14    Q.       And those are pictures you took?

14:36:09 15    A.       Yes.

14:36:09 16    Q.       Look at the pictures you took in September.  You

14:36:13 17    don't see that there then, do you?

14:36:14 18    A.       No.  No.

14:36:32 19    Q.       In the period of time in September when you did come

14:36:35 20    to visit him again, you said it was after August where you

14:36:39 21    had not seen him, you had left and come back, is that right?

14:36:42 22    A.       Correct.

14:36:43 23    Q.       And I think you said that when you were back in New

14:36:47 24    York, you came to learn in your exchanges that he had or was

14:36:53 25    intending to go into some other form of recovery,

Kestan - cross

14:36:57  1    rehabilitation?

14:36:58  2    A.      That was always an -- part of the conversation.

14:37:02  3    Q.      But how about that one?  I think you said it --

14:37:05  4    A.      Yeah, yeah.

14:37:06  5    Q.      It was in New York?

14:37:07  6    A.      Part of the reason why I would leave was because I

14:37:11  7    couldn't handle, you know, him in person not trying and I

14:37:15  8    thought that if I left, he finally would.

14:37:18  9    Q.      So one of those times you're in New York, he's in Los

14:37:22 10    Angeles, that's in the month of August of 2018?

14:37:24 11    A.      Uh-huh.

14:37:25 12    Q.      Yes?

14:37:25 13    A.      Yes.

14:37:26 14    Q.      And in that period of time, did you hear him mention

14:37:30 15    the word The View?  Did he hear that name?

14:37:36 16    A.      The View?

14:37:37 17    Q.      Yes.

14:37:38 18    A.      No.

14:37:39 19    Q.      You did go back out and then you saw him -- when you

14:37:43 20    were out there, he was at some point living in a house in

14:37:47 21    Malibu?

14:37:48 22    A.      Yes.  He had driven from the house in Malibu to

14:37:52 23    downtown the night I arrived, the day after he went back,

14:37:56 24    and a day or so after that I went to go meet him there.

14:38:00 25    Q.      And when you did that in that period of time, are you

Kestan - cross

14:38:03 1    saying that you did not know or did not see any people that
14:38:08 2    were coming visiting him or living with him after he
14:38:14 3    attended, if you understood he did, some rehabilitation
14:38:17 4    program, you never saw them?
14:38:18 5    A.      There were no, you know, rehab people around us then.
14:38:21 6    Q.      In the two days?
14:38:23 7    A.      In the two days.  The last day he left the house and
14:38:27 8    I thought that he was avoiding me, and hadn't responded to
14:38:32 9    my calls for hours and he had called me saying calm down,
14:38:37 10   I'm meeting with rehab people.  At the time, I didn't
14:38:42 11   believe it.  But it could be true.
14:38:44 12   Q.      But you didn't see them at the time?
14:38:46 13   A.      I didn't, no.
14:38:47 14   Q.      And when that exchange happened, you were with him
14:38:50 15   for two days in that period and then you were gone?
14:38:53 16   A.      Yes.
14:38:53 17   Q.      And never saw him again until November?
14:38:56 18   A.      Correct.
14:38:57 19   Q.      You said that you saw him in that period of time in
14:39:01 20   the Malibu house using drugs?
14:39:05 21   A.      Yes.
14:39:06 22   Q.      Are you sure about that?
14:39:07 23   A.      I remember him using drugs in the bathroom and the
14:39:12 24   bedroom and the outdoor area of that Malibu house, yes.
14:39:15 25   Q.      In September?

14:39:16  1   A.      In September.

14:39:17  2   Q.      We'll come back to that.

14:39:18  3           In that period of time that you said that you

14:39:21  4   met with the process -- investigators in January and then

14:39:24  5   you met with them in July and went to the grand jury, do you

14:39:28  6   remember being asked any questions at all in the grand jury

14:39:31  7   about his drug use in September?

14:39:33  8   A.      I don't remember.

14:39:34  9   Q.      Do you remember ever describing Hunter in that period

14:39:38 10   of time as just being scattered?

14:39:40 11   A.      Yes.

14:39:43 12   Q.      Scattered doesn't necessarily or doesn't say I know

14:39:47 13   he's scattered because he's using drugs; right?

14:39:50 14   A.      No.

14:39:50 15   Q.      But that's the phrase you used, right?

14:39:53 16   A.      Yeah, I used that because his demeanor towards me was

14:39:57 17   unfriendly, and seemed stressed out over either family or

14:40:02 18   business things.

14:40:03 19   Q.      Do you know how people act when they're getting off

14:40:06 20   of an alcohol addiction or drug addiction?

14:40:10 21   A.      I would assume that you are sick with flu like

14:40:14 22   symptoms.

14:40:14 23   Q.      How about your demeanor, can there be somebody who

14:40:18 24   gets angry, somebody who is testy, somebody who is not the

14:40:22 25   same as they were when they were using?

Kestan - cross

| | | |
|---|---|---|
| 14:40:24 | 1 | A.      Yes. |

14:40:24  1   A.      Yes.

14:40:25  2   Q.      The next time you saw Hunter was in November, right?

14:40:27  3   A.      Correct.

14:40:28  4   Q.      And he asked you to come up because he was in some

14:40:30  5   sort of treatment and he wanted to see you?

14:40:32  6   A.      Yeah, he said he was lonely.

14:40:35  7   Q.      And you knew and he told you as you testified that he

14:40:38  8   was up there having treatment?

14:40:39  9   A.      Yes.

14:40:40 10   Q.      You said that earlier before the lunch hour that you

14:40:46 11   and he had developed a relationship and that you had

14:40:49 12   feelings for him, you used that word?

14:40:51 13   A.      Yeah.

14:40:51 14   Q.      When you were in his presence, whether it was in

14:40:54 15   California, or New York, you held him get drugs?

14:40:59 16   A.      I did.

14:41:01 17   Q.      So now he's in Massachusetts in November and you go

14:41:06 18   up and visit him, and he asks you, you're in Massachusetts,

14:41:13 19   in Newburyport or Plum Island?

14:41:15 20   A.      Yep.

14:41:16 21   Q.      And he asked you something about can you help him get

14:41:19 22   drugs; right?

14:41:20 23   A.      Yes.

14:41:20 24   Q.      And you said you could?

14:41:21 25   A.      Yeah.

667

Kestan - cross

14:41:22  1    Q.    And you drove him to Providence?

14:41:25  2    A.    He drove.

14:41:27  3    Q.    I'm sorry, you drove together to Providence?

14:41:29  4    A.    Yeah.

14:41:29  5    Q.    Did he know anybody in Providence?

14:41:31  6    A.    No.

14:41:32  7    Q.    You did?

14:41:32  8    A.    I did.

14:41:32  9    Q.    You're the one who made the connection?

14:41:34 10    A.    I did.

14:41:35 11    Q.    You're the one who introduced him to somebody?

14:41:38 12    A.    I guess so, yeah.

14:41:39 13    Q.    And that's where he then picked up whatever drugs you

14:41:43 14    said were in November, is that right?

14:41:46 15    A.    Yes.  Although he had drugs when I first arrived in

14:41:51 16    Newburyport, then he ran out.

14:41:52 17    Q.    But that's in November?

14:41:54 18    A.    Yes.

14:41:54 19    Q.    And then when he ran out?

14:41:55 20    A.    Then he asked me about Providence.

14:41:57 21    Q.    And then you did what you did to get him more drugs?

14:42:00 22    A.    Yep.

14:42:02 23    Q.    And so from the time of September to the time of the

14:42:06 24    end of November, did you know that he went back from Los

14:42:11 25    Angeles to Delaware on October the 5th?

Kestan - cross

14:42:13  1    A.      I have no idea about that.

14:42:14  2    Q.      Do you have any idea what his condition was then?

14:42:17  3    A.      Nope.

14:42:17  4    Q.      Any idea whether he was reviewing or calling himself

14:42:22  5    in any particular way at that period of time?

14:42:25  6    A.      Nope.

14:42:25  7    Q.      Any idea what condition or what he was doing on

14:42:29  8    October the 12th of 2018?

14:42:31  9    A.      No.

14:42:32 10    Q.      Any idea what was happening to him on October 23rd of

14:42:35 11    that year?

14:42:36 12    A.      No.

14:42:36 13    Q.      You said something earlier about, I think you

14:42:42 14    mentioned Alcoholics Anonymous?

14:42:44 15    A.      Yes.

14:42:45 16    Q.      Are you familiar with that vaguely?

14:42:48 17    A.      Yes.

14:42:48 18    Q.      Do you know in Alcoholics Anonymous, the first thing

14:42:51 19    you say is hi, I'm Hunter Biden, I'm an addict?

14:42:58 20    A.      Yep.

14:42:59 21    Q.      That last text you read?

14:43:00 22    A.      Uh-huh.

14:43:01 23    Q.      The one that he's looking backwards and saying I'm an

14:43:04 24    addict?

14:43:05 25    A.      Yes, ma'am.

Kestan - redirect

14:43:05  1   Q.      That's what people who are addicts always say about

14:43:09  2   themselves isn't it?

14:43:09  3   A.      Yep, and I commended him for his honesty and kind of

14:43:15  4   admitting that about himself throughout the whole

14:43:18  5   relationship.

14:43:19  6                   MR. LOWELL:  Thank you, Ms. Kestan.

14:43:23  7                   THE COURT:  Thank you.  Redirect.

14:43:25  8                   MR. WISE:  Thank you.

14:43:28  9                        REDIRECT EXAMINATION

14:43:28 10   BY MR. WISE:

14:43:28 11   Q.      I just want to follow-up on that last comment.  You

14:43:31 12   testified that throughout your relationship with him, he

14:43:33 13   referred to himself as an addict; right?

14:43:35 14   A.      Yes.

14:43:36 15   Q.      I think you said you commended him for his honestly

14:43:40 16   about that; right?

14:43:41 17   A.      Yes.

14:43:41 18   Q.      Are the behaviors you saw consistent with your

14:43:44 19   understanding of what an addict would look like?

14:43:46 20   A.      Yes.

14:43:46 21   Q.      Mr. Lowell asked you about whether you helped him get

14:43:50 22   drugs?

14:43:50 23   A.      Yes.

14:43:50 24   Q.      And you said you did?

14:43:51 25   A.      I did.

14:43:52  1    Q.        How old were you when you were in this relationship

14:43:55  2    with him?

14:43:56  3    A.        My birthday, the day that he didn't turn up and I

14:44:01  4    decided to go back to New York, I turned twenty-five.  I was

14:44:06  5    twenty-four.

14:44:06  6    Q.        You were twenty-four.  How old was he?

14:44:08  7    A.        Twice my age, so forty-eight.

14:44:11  8              MR. WISE:  Nothing further.

14:44:12  9              THE COURT:  All right.  Thank you.  All right.

14:44:15 10    Thank you, ma'am, you may step down.

14:44:17 11              What's next?

14:44:21 12              MR. HINES:  Our next witness is Gordon

14:44:31 13    Cleveland.

14:44:59 14              May I approach for a minute, Your Honor?

14:45:01 15              THE COURT:  Sure.

14:46:32 16              (Side-bar discussion:)

14:46:32 17              MR. HINES:  I don't know that this needs to be

14:46:32 18    on the record, but I want to let the Court know that

14:46:32 19    Mr. Cleveland is in the bathroom.  So he was waiting in the

14:46:32 20    room.

14:46:32 21              THE COURT:  Do you want to take our afternoon

14:46:32 22    break?

14:46:32 23              MR. LOWELL:  Could we do that?

14:46:32 24              (End of side-bar.)

14:46:32 25              THE COURT:  We're going to take our afternoon

Cleveland - direct

14:46:32  1   break now, just fifteen minutes, and then come back and

14:46:32  2   finish up for the end of the day.

14:46:32  3            COURTROOM DEPUTY:  All rise.

14:46:32  4            (Jury exiting the courtroom at 2:45 p.m.)

14:46:32  5            THE COURT:  All right.  Fifteen minutes.

14:46:32  6            (A brief recess was taken.)

15:08:43  7            COURTROOM DEPUTY:  All rise.

15:09:38  8            (Jury entering the courtroom at 3:09 p.m.)

15:09:50  9            THE COURT:  All right.  Welcome back, everyone.

15:10:10  10  Everyone else, please be seated.  Mr. Cleveland, you can

15:10:15  11  remained standing for just one more minute.

15:10:17  12            COURTROOM DEPUTY:  Please raise your right hand.

15:10:20  13  Please state and spell your full name for the record.

15:10:23  14  Gordon T. Cleveland, G-O-R-D-O-N, middle name is Thomas,

15:10:28  15  T-H-O-M-A-S, last name is Cleveland, C-L-E-V-E-L-A-N-D.

15:10:34  16            GORDON CLEVELAND, having been fully sworn was

15:10:39  17  examined and testified as follows:

15:10:42  18                    DIRECT EXAMINATION

15:10:43  19  BY MR. HINES:

15:10:44  20  Q.    Good afternoon, Mr. Cleveland.

15:10:45  21  A.    Good afternoon.

15:10:45  22  Q.    Sir, are you a residence of the State of Delaware?

15:10:48  23  A.    Yes.

15:10:49  24  Q.    Without giving your exact address, can you describe

15:10:52  25  the general area you live in?

Cleveland - direct

15:10:54 1   A.      Right now I reside closer to the PA line, somewhere

15:11:01 2   in the Claymont area.

15:11:05 3   Q.      How long have you been in this region, living in the

15:11:08 4   region?

15:11:08 5   A.      My whole life.

15:11:09 6   Q.      Delaware up bringing?

15:11:10 7   A.      Yes.

15:11:11 8   Q.      What do you do for a living?

15:11:12 9   A.      I work for the city of Wilmington, I drive a trash

15:11:17 10  truck.

15:11:18 11  Q.      How long have you been driving a trash truck for the

15:11:21 12  city of Wilmington?

15:11:21 13  A.      The last 11 years.

15:11:23 14  Q.      Do you currently have any secondary employment?

15:11:26 15  A.      No.

15:11:26 16  Q.      At periods of time over the last 11 years, have you

15:11:30 17  had secondary employment?

15:11:31 18  A.      Yes.

15:11:31 19  Q.      Where are have you been employed most recently?

15:11:34 20  A.      StarQuest Shooters & Survival Supply.

15:11:37 21  Q.      I'll ask you some questions about StarQuest in a

15:11:40 22  moment, but currently why don't you have secondary

15:11:43 23  employment?

15:11:43 24  A.      More so family got me out of the business and my

15:11:47 25  health.

Cleveland - direct

15:11:47  1    Q.      Work --

15:11:48  2    A.      Working two jobs and running myself a little bit

15:11:51  3    tired and came down with diabetes.

15:11:54  4    Q.      When did you work for StarQuest, what years?

15:11:57  5    A.      I want to say late 2015, I believe I got there, going

15:12:03  6    all the way until 21.

15:12:06  7    Q.      What is StarQuest?

15:12:07  8    A.      StarQuest is a gun shop, but they also sell survival

15:12:12  9    supplies, so like emergency blankets, food, different other

15:12:16 10    things, other than just firearms and ammunition.

15:12:18 11    Q.      And why did you end up deciding to work there?

15:12:22 12    A.      I was working at another place before I got there,

15:12:26 13    and stopped in, purchased something, and in my view it was

15:12:33 14    in line with where I was working at the time, because all I

15:12:36 15    really want to do was be a sales man, and I got offered to

15:12:40 16    work there at StarQuest.

15:12:41 17    Q.      Before you is a binder with some exhibits, the first

15:12:44 18    page of that binder is Exhibit 41.  Do you see an aerial

15:12:50 19    photo in front of you depicting StarQuest?

15:12:53 20    A.      Yes.

15:12:53 21             MR. HINES:  Move for the admission of 41.

15:13:06 22             MR. LOWELL:  No objection.

15:13:07 23             THE COURT:  All right.  Thank you.  It's

15:13:08 24    admitted.

15:13:09 25             (Exhibit No. 41 was admitted into evidence.)

Cleveland - direct

**BY MR. HINES:**

Q.      Now, is that StarQuest Shooters and Survival Supply
in sort of the top right quadrant?

A.      Yes.

Q.      What street address or intersection is StarQuest
located at?

A.      I believe it's 3701, so right across from the Five
Below that's in the shopping center.

Q.      And it's off Concord Pike and Prospect Avenue?

A.      Yes, right off of Concord Pike.

Q.      Can you describe for the jury sort of the general
layout of the store?

A.      The general layout is you got -- when you first come
in, you got some racks to your right, you got some racks to
your left, you have an island where it's some firearms that
are in cases there, knives in some of the other cases, and
it wraps around.  And then you have your main cases where
all around the walls in the store, various firearms in those
cases.

Q.      And you said you were a salesman, what kind of duties
and responsibilities did you have in the store as a
salesman?

A.      Just selling, that's it.

Q.      Selling, just limited to guns, or were you
responsible for selling --

Cleveland - direct

15:14:16  1    A.    Everything, everything.   I mean, I mainly stuck with

15:14:21  2    guns and ammunition, but it was other things to sell, like I

15:14:25  3    said, emergency food and heated blankets, not the heated

15:14:30  4    blankets, the emergency blankets and different things like

15:14:33  5    that.

15:14:34  6    Q.    I would like to direct your attention to

15:14:36  7    October 12th, 2018.   Were you working on that day?

15:14:39  8    A.    Yes.

15:14:39  9    Q.    Did you sell any firearms that day?

15:14:42 10    A.    Yes.

15:14:42 11    Q.    Who did you sell a firearm to?

15:14:44 12    A.    I sold a firearm to, do you want me to say a name or

15:14:50 13    defendant?

15:14:51 14    Q.    You can say however you understand it?

15:14:53 15    A.    Hunter Biden, I sold a firearm to Hunter Biden.

15:14:56 16    Q.    Now, we're going to go step by step through that day

15:15:00 17    on October 12, 2018, and I would like you to start out by

15:15:04 18    describing what your first observation was of Hunter Biden

15:15:06 19    that day?

15:15:07 20    A.    Usually what I do with my downtime, we got -- I left

15:15:11 21    that out, we got a statute of the Duke by one of the

15:15:15 22    windows, usually I'll stand there, just standing there just

15:15:18 23    waiting for people to come in.   I observed him pull up in a

15:15:23 24    black Cadillac CTS.

15:15:25 25    Q.    How do you remember?

Cleveland - direct

15:15:27  1   A.       I believe a CTS-V.

15:15:29  2   Q.       How do you know --  do you remember the description

15:15:31  3   of the car?

15:15:31  4   A.       I like guns and I like cars.  Two things I'm really

15:15:35  5   into.

15:15:37  6   Q.       So you saw him pull in a nice black Cadillac?

15:15:41  7   A.       Yes.

15:15:41  8   Q.       And then what happened next?

15:15:43  9   A.       He came in.  I greeted him.

15:15:46 10   Q.       Now at the time you greeted him, did you know who he

15:15:49 11   was at that moment?

15:15:50 12   A.       No.

15:15:50 13   Q.       Did you later come to learn he was Hunter Biden?

15:15:53 14   A.       Yes.

15:15:53 15   Q.       We'll get to that in a moment.

15:15:55 16            So you greeted him and what was your initial

15:15:59 17   conversation with Mr. Biden?

15:16:00 18   A.       What brought you in today?  He said looking for a

15:16:03 19   firearm.

15:16:04 20   Q.       So let me just interrupt you there.  He told you at

15:16:07 21   the outset that he was looking for a firearm?

15:16:09 22   A.       Yes.

15:16:10 23   Q.       All right.  What did you say in response to that when

15:16:12 24   he said he was looking for a firearm?

15:16:13 25   A.       Do you have anything specific in mind, would it be

Cleveland - direct

15:16:17  1   something semiautomatic or revolver, he implied a revolver.

15:16:22  2   Q.    He said revolver, he wanted a revolver?

15:16:25  3   A.    Yes.

15:16:26  4   Q.    So at that point when Mr. Biden told you he wanted a

15:16:29  5   firearm and he specifically told you he wanted a revolver,

15:16:32  6   what did you do next?

15:16:33  7   A.    I took him to the case -- well I started off with one

15:16:36  8   of the cases that had a little bit more of the revolvers in

15:16:39  9   there.  Am I allowed to say the manufacturers name.

15:16:44 10   Q.    Yes?

15:16:44 11   A.    It was a case that had some Ruger's in there.  He

15:16:47 12   didn't like -- I guess he didn't like the Ruger's, so I made

15:16:52 13   my way over to where the Colt case was, and he chose a Colt

15:16:58 14   Cobra.

15:16:58 15   Q.    In advance of your testimony today, did you have an

15:17:02 16   opportunity to exam an exhibit in this case that is a

15:17:05 17   revolver?

15:17:06 18   A.    Yes.

15:17:07 19   Q.    All right.  When you took him to the case that had

15:17:10 20   the Colt Cobra in there, what was the next discussion you

15:17:15 21   had with Mr. Biden?

15:17:16 22   A.    Just talking about how you know, the Colt -- well,

15:17:19 23   the Colt line has very good firearms, they're dependable,

15:17:25 24   some of the other things on the market might not be so

15:17:29 25   great.

Cleveland - direct

15:17:29  1    Q.       Why are Colt Cobra's known to be dependable?

15:17:33  2    A.       Dependable, just, with firearms you got some people,

15:17:37  3    I guess their main thing is get them a little bit more

15:17:43  4    affordable, so the quality of the firearm is not as great.

15:17:47  5    Like me personally, I purchased a Ruger and fired it at the

15:17:51  6    range, the front sight came off.  Little different things

15:17:54  7    like that.  And with a Colt, you know, they just have more

15:17:57  8    of a following because they do custom engraving, which they

15:18:02  9    just brought back recently, they do a lot of high end things

15:18:06 10    for their firearms.

15:18:07 11    Q.       What happened next as you were showing Mr. Biden the

15:18:10 12    inventory of revolvers?

15:18:13 13    A.       He chose the Colt Cobra.

15:18:15 14    Q.       What model did he pick?

15:18:17 15    A.       He chose a Talo Edition Colt Cobra with custom wood

15:18:24 16    grips, with their insignia in the grips.

15:18:27 17    Q.       Does it have distinctive features?

15:18:29 18    A.       Yes.

15:18:29 19    Q.       Did you examine this revolver that Mr. Biden had

15:18:33 20    picked out in advance of your testimony today?

15:18:35 21    A.       Yes.

15:18:35 22    Q.       Is it this revolver that I have here in my arm?

15:18:38 23    A.       Yes, sir.

15:18:39 24             MR. HINES:  Your Honor, I'll represent to the

15:18:41 25    Court that United States Marshals Service has made this gun

Cleveland - direct

15:18:44  1   safe with a red tag, and I would like for the record,

15:18:47  2   permission to approach the witness and display it so he can

15:18:52  3   identify the serial number on this revolver.

15:18:58  4           THE COURT:  Okay.  That's fine.

15:19:04  5   BY MR. HINES:

15:19:04  6   Q.      Sir, are you able to see the serial number on the

15:19:07  7   revolver?

15:19:07  8   A.      Yes.

15:19:08  9   Q.      What is the serial number on this revolver?

15:19:10  10  A.      RA551363.

15:19:14  11  Q.      And is this the revolver that Mr. Biden ultimately

15:19:18  12  wanted to purchase that day?

15:19:20  13  A.      Yes, sir.

15:19:21  14          MR. HINES:  Your Honor, I request permission to

15:19:22  15  move government Exhibit 1 into evidence.

15:19:24  16          MR. LOWELL:  No objection.

15:19:25  17          THE COURT:  Thank you.  It's admitted.

15:19:26  18          (Exhibit No. 1 was admitted into evidence.)

15:19:27  19          MR. HINES:  Can I also request permission to

15:19:29  20  move into evidence the photo of that revolver as 1A.

15:19:32  21          MR. LOWELL:  Also no objection.

15:19:34  22          THE COURT:  Thank you.  That's also admitted.

15:19:37  23          (Exhibit No. 1A was admitted into evidence.)

15:19:38  24  BY MR. HINES:

15:19:48  25  Q.      Now after Mr. Biden selected this Colt Cobra .38

Cleveland - direct

15:19:55  1  Special in the store, what was the next discussion that you

15:19:57  2  had with him?

15:19:58  3  A.      That he was going to have to fill out a 4473 to

15:20:02  4  purchase the firearm.

15:20:03  5  Q.      What is a 4473?

15:20:05  6  A.      4473 is a federal form where you will fill in your

15:20:11  7  information and answer a series of questions to obtain the

15:20:15  8  firearm once the background check is ran.

15:20:17  9  Q.      Is this a form that is used for every gun purchase in

15:20:20 10  the store?

15:20:21 11  A.      Every gun purchase and everybody that comes to buy a

15:20:25 12  gun has to do a 4473.

15:20:27 13  Q.      Is it an important form for you?

15:20:29 14  A.      Yes, it is.

15:20:29 15  Q.      Why is it important for you as a salesman?

15:20:32 16  A.      It's important because after you fill in your

15:20:35 17  personal information, there is a series of questions that

15:20:37 18  can ultimately void the sale before it even gets all the way

15:20:42 19  started with running the background, depending on what the

15:20:45 20  answers are on that form.

15:20:47 21  Q.      So you told Mr. Biden that he was going to have to

15:20:49 22  fill out the blank Form 4473?

15:20:52 23  A.      Yes.

15:20:52 24  Q.      What happened after you told him that, what was the

15:20:55 25  next thing?

Cleveland - direct

15:20:55  1    A.      I got the 4473 for him, and I received his passport

15:21:01  2    from him.

15:21:01  3    Q.      You gave him the blank form and received his

15:21:06  4    passport?

15:21:06  5    A.      Yes.

15:21:06  6    Q.      What did you do once you received the passport?

15:21:09  7    A.      Once I received the passport, I proceeded to tell

15:21:12  8    him, you need to fill in your personal information and

15:21:15  9    answer all the questions and take your time answering them.

15:21:19 10    Q.      Now, at that point on the floor is you and Mr. Biden?

15:21:23 11    A.      Yes.

15:21:24 12    Q.      Is there anyone else on the floor in the store at

15:21:28 13    that time?

15:21:28 14    A.      A couple of other salesmen, but they were doing their

15:21:30 15    own thing, talking among each other.   Sorry.

15:21:33 16    Q.      I'm sorry.   Did you leave the blank form with

15:21:36 17    Mr. Biden?

15:21:37 18    A.      I had -- yes, left it with him and I went to go make

15:21:43 19    a copy of his passport.

15:21:44 20    Q.      You walked where to make the copy?

15:21:46 21    A.      So as I said, where the cases are in this store, you

15:21:50 22    have a door that leads into the back so that you go right to

15:21:53 23    the copier and make a copy.

15:21:54 24    Q.      How long does it take you to make a copy of a

15:21:57 25    document?

Cleveland - direct

15:21:57  1  A.      Like a second or two.  Only because it's not like a

15:22:03  2  green card or a state issued ID, you don't have to scan in

15:22:07  3  the front and scan in the back, you just scan the passport.

15:22:11  4  Q.      You put the passport on the scanner, it does a scan,

15:22:14  5  prints out a piece of paper?

15:22:16  6  A.      Yes.

15:22:16  7  Q.      And then you walk where?

15:22:18  8  A.      I walked back out to the sales floor.

15:22:20  9  Q.      At that point when you walked back out to the sales

15:22:23 10  floor, where was Mr. Biden?

15:22:24 11  A.      He was at the case, the case where the island is set

15:22:28 12  up at one of the -- I believe it was the front case where it

15:22:32 13  was set up at.

15:22:33 14  Q.      Was he still sort of alone near the front case with

15:22:37 15  the Form 4473?

15:22:39 16  A.      Yes.

15:22:39 17  Q.      At that point when you walked out with the copy of

15:22:42 18  his passport, and his passport, did you return the original

15:22:45 19  passport to him or did you hold on to it?

15:22:48 20  A.      I had it sitting there and we were getting ready to

15:22:51 21  start filling -- well, he was getting ready to start filling

15:22:54 22  everything out, I need to fill in certain things, as he's

15:22:58 23  filling things out, I got to fill things in, too.

15:23:01 24  Q.      Let's get to each of those things.

15:23:03 25  A.      Okay.

Cleveland - direct

15:23:04  1   Q.      So when you go back out there, is the form, the blank
15:23:08  2   Form 4473, has he started filling it out yet?
15:23:11  3   A.      No, he started filling it out as I was filling things
15:23:14  4   out on my end that I needed to log with the firearm.
15:23:16  5   Q.      Where were you in proximity to him as he started
15:23:20  6   filling that out?
15:23:20  7   A.      He would have been on this end of the case, I would
15:23:24  8   have been right in front of him on the other side of the
15:23:26  9   case.
15:23:27 10   Q.      If you had to describe it in feet, roughly how many
15:23:30 11   feet apart were you and Mr. Biden as he's filling out the
15:23:33 12   form?
15:23:34 13   A.      Maybe about like two.
15:23:35 14   Q.      Two feet?
15:23:36 15   A.      Yeah.
15:23:37 16   Q.      Now, in advance of your testimony today, did you
15:23:45 17   review the actual form that Mr. Biden had filled out?
15:23:49 18   A.      Yes.
15:23:49 19   Q.      And I'm showing you what's been admitted as
15:23:53 20   government's Exhibit 10(a).  Is this the form that Mr. Biden
15:24:01 21   filled out in your presence on October 12th, 2018?
15:24:05 22   A.      Yes.
15:24:06 23   Q.      We're going to go through this together
15:24:08 24   Mr. Cleveland, starting at the top.
15:24:10 25               Ms. Vo, if you could zoom in on the warning

Cleveland - direct

15:24:14 1  sign.  Does the first sentence read, "warning, you may not

15:24:19 2  receive a firearm if prohibited by federal or state law.

15:24:22 3  The information you provide will be used to determine

15:24:25 4  whether you are prohibited from receiving a firearm."  Are

15:24:27 5  those the first two sentences?

15:24:29 6  A.    Yes.

15:24:29 7  Q.    With Mr. Biden, as he has this blank form, what

15:24:32 8  discussion do you have, if any, regarding what he's supposed

15:24:35 9  to do with this form?

15:24:36 10  A.    Supposed to fill in his personal information and then

15:24:39 11  answer all the questions truthfully and take your time

15:24:42 12  reading the questions, I cannot help you fill the form out

15:24:45 13  as far as answering the questions.

15:24:46 14  Q.    Let's go through each of those things you just said.

15:24:49 15  You said he's supposed to fill out the form truthfully?

15:24:52 16  A.    Yes.

15:24:52 17  Q.    You used those words truthfully?

15:24:55 18  A.    Yes.

15:24:55 19  Q.    Do you do that as a matter of practice?

15:24:57 20  A.    Always.

15:24:58 21  Q.    Why do you do that?

15:24:59 22  A.    Because of the questions that are on the form.

15:25:01 23  Q.    And you said to take your time to Mr. Biden?

15:25:04 24  A.    Yes.

15:25:04 25  Q.    Do you do that as a matter of practice with all your

Cleveland - direct

15:25:08 1    customers?

15:25:08 2    A.      Yes, because you will have some people that try to

15:25:11 3    rush through the form, they answer the questions wrong and

15:25:13 4    it voids the sale.

15:25:14 5    Q.      So you want the person to take their time so they

15:25:17 6    make sure they answer their questions accurately?

15:25:20 7    A.      Yes.

15:25:23 8    Q.      And the next thing you said to Mr. Biden was what?

15:25:27 9    A.      After I said that with answering the questions and

15:25:35 10   everything, I told him that I would need to go ahead and

15:25:38 11   just double-check about the passport.

15:25:40 12   Q.      Okay.  We'll wait for the passport for a moment.  Did

15:25:44 13   you watch Mr. Biden begin to answer the Form 4473?

15:25:48 14   A.      Yes.

15:25:48 15   Q.      Let's zoom in on the top portion Section A, please,

15:25:53 16   Ms. Vo.

15:25:54 17           At the top of Section A, does it say must be

15:25:58 18   completed personally by transferee/buyer?

15:26:01 19   A.      Yes.

15:26:02 20   Q.      Who is the buyer in this case?

15:26:03 21   A.      That would be Hunter Biden.

15:26:04 22   Q.      Now in Section A, is there anyone that's allowed to

15:26:08 23   fill that out other than the buyer?

15:26:10 24   A.      No.  Not at all.  It's all your personal information

15:26:16 25   as the transferee/buyer.

Cleveland - direct

15:26:18 1   Q.      Turning to the first item, does it say last name

15:26:25 2   Biden, first name Robert, middle name Hunter?

15:26:28 3   A.      Yes.

15:26:28 4   Q.      Did you watch Mr. Biden fill out question one?

15:26:32 5   A.      Yes.

15:26:32 6   Q.      And then did Mr. Biden fill out a number and a street

15:26:36 7   address that's under the redaction box?

15:26:38 8   A.      He sure did.

15:26:39 9   Q.      Did you watch him do that?

15:26:41 10  A.      Yes.

15:26:41 11  Q.      Did he list his city, county, state, and zip code?

15:26:45 12  A.      Yes.

15:26:46 13  Q.      Did he also list his place of birth as Wilmington,

15:26:50 14  Delaware?

15:26:52 15  A.      Yes.

15:26:52 16  Q.      And then did he fill out his height, weight, sex, and

15:26:56 17  birth date?

15:26:57 18  A.      Yes.

15:26:57 19  Q.      Did you watch him fill out this portion of the form?

15:27:00 20  A.      Yes.

15:27:00 21  Q.      Did he move on to writing in his unique Social

15:27:05 22  Security number?

15:27:05 23  A.      He didn't -- oh, he needed to do the Social Security,

15:27:08 24  yes, I watched him do that, but he didn't need to do the

15:27:12 25  unique pin.  You only get the unique pin if you're delayed

Cleveland - direct

15:27:16  1    and you want to make the process a little bit faster as far

15:27:18  2    as the background being arranged.

15:27:21  3    Q.    Did you have that conversation with Mr. Biden as he's

15:27:24  4    filling it out?

15:27:25  5    A.    Yeah, I told him don't worry about the unique pin.

15:27:28  6    Q.    So then after that question 10(a), did Mr. Biden

15:27:32  7    check the box there that says not Hispanic or Latino?

15:27:37  8    A.    Yes.

15:27:37  9    Q.    And you saw him do that?

15:27:39 10    A.    Yes.

15:27:39 11    Q.    Turning to 10B Race, did Mr. Biden list his race as

15:27:45 12    white?

15:27:45 13    A.    Yes.

15:27:45 14    Q.    And you saw him check that box?

15:27:47 15    A.    Yes.

15:27:47 16    Q.    Now the next section, did you stay with Mr. Biden as

15:27:51 17    he began to fill out the answers to question 11?

15:27:54 18    A.    Yes.

15:27:55 19    Q.    Ms. Vo, if we could zoom in on the question 11.

15:28:03 20         At the top of the form, the top of question 11,

15:28:08 21    does it say answer the following questions by checking or

15:28:11 22    marking yes or no in the boxes to the right of the

15:28:15 23    questions, and then it lists yes or no?

15:28:17 24    A.    Yes.

15:28:17 25    Q.    Did you have any discussions with Mr. Biden at this

Cleveland - direct

15:28:20 1  point as he got to this portion of the form?

15:28:22 2  A.    No, because I had already explained, you know, before

15:28:26 3  he got to that part so I didn't have any discussion about

15:28:30 4  that.

15:28:30 5  Q.    Up until this point, was Mr. Biden writing his

15:28:35 6  personal information, was he writing it rapidly, normally?

15:28:39 7  A.    He was just filling it out like you would do with any

15:28:42 8  form, taking your time and getting it filled out.

15:28:46 9  Q.    So you get to question 11.  The first question

15:28:50 10 actually asks are you the actual transferee/buyer of the

15:28:54 11 firearm listed on the form?  And it gives a warning.  How

15:28:59 12 did Mr. Biden answer that question?

15:29:01 13 A.    He answered yes.

15:29:03 14 Q.    Had he answered no at this point, what would have

15:29:06 15 happened to the sale?

15:29:07 16 A.    I would have said I am not able to finish this sale

15:29:10 17 with you, that voids the sale.

15:29:11 18 Q.    Why is that?

15:29:14 19 A.    Because basically if you're not the actual

15:29:16 20 transferee/buyer, then you're purchasing it for someone

15:29:20 21 else, I don't know if anyone has heard the term "straw

15:29:23 22 purchase", that's what that would be, someone that goes in

15:29:26 23 that's able to buy the gun, that don't have any felonies and

15:29:31 24 they buy a gun for someone that can't have a gun.

15:29:34 25 Q.    If someone were to be filling this out and take a

15:29:38 1  pencil and go down the no section real quick, that would

15:29:41 2  void the sale right?

15:29:42 3  A.      Yes, that would -- no, taking a pencil and going all

15:29:46 4  the way down from the start of that first yes, yes, that

15:29:49 5  would void the sale.

15:29:50 6  Q.      If someone answered 11A no, and swiped it real quick

15:29:54 7  not paying attention to it, someone answers 11A no, that

15:29:57 8  they are not the actual transferee/buyer, would that void

15:30:01 9  the sale?

15:30:02 10  A.      Yes.

15:30:02 11  Q.      Now turning to 11B, 11C, 11D, were those a series of

15:30:09 12  questions that Mr. Biden answered?

15:30:11 13  A.      Yes.

15:30:11 14  Q.      Did you witness him answer those questions?

15:30:13 15  A.      Yes.

15:30:13 16  Q.      And did he answer each of those no, striking the box

15:30:16 17  with an X?

15:30:17 18  A.      Yes.

15:30:18 19  Q.      Getting to 11E, if we could zoom in on that, Ms. Vo.

15:30:32 20  Does 11E asks "are you an unlawful user of, or addicted to

15:30:36 21  marijuana or any depressants, stimulants, narcotic drugs, or

15:30:42 22  any other controlled substance?"  Is that what the question

15:30:45 23  ask?

15:30:45 24  A.      Yes.

15:30:45 25  Q.      Did you watch Mr. Biden answer that question?

Cleveland - direct

15:30:48  1    A.      Yes.

15:30:48  2    Q.      What did he write?

15:30:50  3    A.      He wrote no.

15:30:52  4    Q.      You saw him strike that box with an X?

15:30:55  5    A.      Yes.

15:30:56  6    Q.      Did he ask you any questions about what that meant?

15:30:58  7    A.      No.

15:30:58  8    Q.      Did he say I don't understand what a controlled

15:31:01  9    substance is?

15:31:01 10    A.      No.

15:31:01 11    Q.      Did he say I don't know what it means to be a user?

15:31:05 12    A.      No.

15:31:05 13    Q.      Did he say I don't know what it means to be addicted

15:31:08 14    to?

15:31:08 15    A.      No.

15:31:08 16    Q.      He didn't seem to express any confusion by that

15:31:12 17    question?

15:31:12 18    A.      No.

15:31:13 19    Q.      Now, turning to the remaining questions, we zoom back

15:31:19 20    out and just show 11 and the full snapshot, please, Ms. Vo,

15:31:24 21    did Mr. Biden continue answering the following questions no

15:31:28 22    from 11F to 11I?

15:31:31 23    A.      Yes.

15:31:40 24    Q.      Now, getting to question 12, did you watch -- by the

15:31:44 25    way, just for the record, did you watch Mr. Biden fill out

Cleveland - direct

15:31:48  1   all of 11, A through I?

15:31:50  2   A.     Yes.

15:31:51  3   Q.     Now getting to question 12, 12(a), did Mr. Biden fill

15:31:58  4   out this section in your presence?

15:32:00  5   A.     Yes.

15:32:00  6   Q.     Did he answer that his country of citizenship is the

15:32:05  7   USA?

15:32:06  8   A.     Yes.

15:32:06  9   Q.     And then he answered 12B and 12C, no, and 12D-1 no,

15:32:12 10   correct?

15:32:12 11   A.     Yes.

15:32:12 12   Q.     Getting to 12D-2, he actually put an X in a different

15:32:18 13   box, not in a yes or no column, but this is the not

15:32:22 14   applicable box, correct?

15:32:23 15   A.     Yes.

15:32:24 16   Q.     That question yes, do you fall within any of

15:32:28 17   exceptions stated in the instructions and he struck not

15:32:31 18   applicable, correct?

15:32:31 19   A.     Yes.

15:32:32 20   Q.     And not applicable is a satisfactory answer on this,

15:32:35 21   that you can still proceed with the gun sale, correct?

15:32:38 22   A.     Yes.

15:32:43 23   Q.     Now, at this point, what happens next after you

15:32:47 24   witnessed Mr. Biden filling out the entire page 1?

15:32:50 25   A.     So, that's when I went to go get clarity on the

Cleveland - direct

15:32:55  1    passport.

15:32:56  2    Q.      When you say get clarity, why did you get clarity on

15:33:00  3    the passport?

15:33:01  4    A.      I figured it was all right, I just needed to

15:33:03  5    double-check because it was my first time using a passport,

15:33:06  6    and I know like as far as with the ID's, it's a form of ID,

15:33:12  7    you're able to use that for a lot of different things.

15:33:14  8    Q.      Do most customers present like driver's licenses or

15:33:18  9    other forms of ID?

15:33:20 10    A.      So you usually get driver license, state ID, the

15:33:24 11    green cards, and in this event the passport.

15:33:30 12    Q.      All right.

15:33:30 13    A.      Which you can do with the passport.  I guess some

15:33:34 14    people just don't use it like that because of having a state

15:33:38 15    ID or a driver's license.

15:33:40 16    Q.      So at this point, do you leave the Form 4473 with

15:33:44 17    Mr. Biden when you go back and ask the question about the

15:33:47 18    passport?

15:33:47 19    A.      Yes.

15:33:48 20    Q.      Who -- when you leave, who is with Mr. Biden at the

15:33:51 21    counter that you were just at?

15:33:53 22    A.      It's a couple of different salesmen that are out on

15:33:56 23    the floor right there.  We usually don't leave one salesman

15:34:01 24    on the floor, it always has to be two salesmen on the floor

15:34:05 25    just so they're not overpowered by anybody, and you know,

Cleveland - direct

15:34:08  1    they have a fair chance on the floor as far as someone

15:34:11  2    coming in to try to take a firearm or coming in doing

15:34:14  3    something, you know, terrible.

15:34:16  4    Q.    Did you actually leave the floor at that point

15:34:19  5    momentarily?

15:34:19  6    A.    Yes.

15:34:20  7    Q.    When you left, who did you see as you left?

15:34:23  8    A.    I seen Ron Palimere and I seen Jason Turner.

15:34:27  9    Q.    Where were they?

15:34:28 10    A.    They were in the back.

15:34:30 11    Q.    So not on the floor?

15:34:32 12    A.    No.

15:34:32 13    Q.    When you went to the back and saw Ron Palimere.  Let

15:34:35 14    me ask you this, is Ron Palimere the owner of StarQuest?

15:34:38 15    A.    Yes, he is.

15:34:39 16    Q.    And you said you saw someone named Jason Turner, is

15:34:42 17    he another employee?

15:34:44 18    A.    Yes.

15:34:44 19    Q.    Did you have a discussion with them?

15:34:46 20    A.    Yes.  I said I think the passport is okay, just

15:34:49 21    double-checking.

15:34:50 22    Q.    Let me stop you there.  So you had a discussion with

15:34:53 23    them because you had a question about passport, correct?

15:34:56 24    A.    Yes.

15:34:56 25    Q.    Now, at that point did you go ---end up going back to

15:35:01  1   the sales floor after your question had been answered?

15:35:04  2   A.     Yeah.

15:35:04  3   Q.     To your satisfaction?

15:35:05  4   A.     Yep, I went right back to the sales floor.

15:35:08  5   Q.     And what did you believe you could do at that point

15:35:10  6   in the transaction?

15:35:11  7   A.     You could take the passport, I was told.

15:35:14  8   Q.     So you go back to Mr. Biden out on the sales floor;

15:35:18  9   right?

15:35:18 10   A.     Yes.

15:35:18 11   Q.     And at that point, did anybody come with you out on

15:35:22 12   to the sales floor?

15:35:23 13   A.     Jason.

15:35:24 14   Q.     Jason Turner?

15:35:25 15   A.     Yes.

15:35:25 16   Q.     Was Mr. Biden still at the counter?

15:35:27 17   A.     Yes.

15:35:28 18   Q.     With the Form 4473?

15:35:30 19   A.     Yes.

15:35:30 20   Q.     And what did you -- what interaction, if any, did you

15:35:35 21   have with Mr. Biden at that point?

15:35:36 22   A.     Interaction I had with him, I just needed him to go

15:35:39 23   ahead and certify the form, Jason pointed that out to me, he

15:35:45 24   opened the form, he signed the form, and then he dated it,

15:35:48 25   and then from there, Jason said also --

Cleveland - direct

15:35:50  1   Q.      Let me stop you there.  Let's look at that on the

15:35:54  2   form.  If we could go to page 2, is there a certification at

15:36:00  3   the top there?

15:36:00  4   A.      Yes.

15:36:01  5   Q.      Does it say I certify that my answers in Section A

15:36:05  6   are true, correct, and complete?

15:36:07  7   A.      Yes.

15:36:08  8   Q.      And the third sentence, does it say, the second

15:36:11  9   sentence does it say I have read and understand the notices,

15:36:15 10   instructions, and definitions on the ATF Form 4473.

15:36:18 11   A.      Yes.

15:36:19 12   Q.      Does the third sentence say I understand that

15:36:21 13   answering yes to question 11A, I'm just going to say dot dot

15:36:25 14   dot, it goes through each of the questions through 11;

15:36:28 15   correct?

15:36:28 16   A.      Yes.

15:36:28 17   Q.      Getting to 11B through I, it says on the third line,

15:36:35 18   I understand that a person who answers yes to any of the

15:36:38 19   questions 11B through 11I and/or 12B through 12C is

15:36:42 20   prohibited from purchasing or receiving a firearm.  Is that

15:36:46 21   what it says there?

15:36:46 22   A.      Yes.

15:36:49 23   Q.      And then two sentences later, does it then say, I

15:36:53 24   also understand that making any false oral or written

15:36:57 25   statement or exhibiting any false or misrepresented

Cleveland - direct

15:37:00 1  identification with respect to this transaction, is a crime

15:37:03 2  punishable as a felony under federal law and may also

15:37:07 3  violate state and/or local law.  Is that what it says?

15:37:10 4  A.    Yes.

15:37:10 5  Q.    Did Mr. Biden ask you any questions about this

15:37:13 6  certification?

15:37:15 7  A.    No.

15:37:15 8  Q.    Did he express any confusion to you about this

15:37:18 9  certification?

15:37:19 10  A.    No.

15:37:21 11  Q.    Did you witness him sign his signature right there?

15:37:24 12  A.    Yes.

15:37:25 13  Q.    And is that -- do you see Mr. Biden in the courtroom?

15:37:28 14  A.    Yes.

15:37:28 15  Q.    Where is Mr. Biden seated?

15:37:30 16  A.    He's to your left and next to his lawyer sitting in

15:37:33 17  the middle.

15:37:34 18        MR. HINES:  Let the record reflect he's

15:37:36 19  identified the defendant.

15:37:37 20  BY MR. HINES:

15:37:38 21  Q.    Do you see a certification date listed there?

15:37:40 22  A.    Yes.

15:37:41 23  Q.    Who wrote that date in the certification section?

15:37:43 24  A.    He did.

15:37:45 25  Q.    So at that point, Section A, the section that says

Cleveland - direct

15:37:49  1   must be completed by the buyer, been entirely completed by

15:37:55  2   Mr. Biden?

15:37:56  3   A.      Yes.

15:37:56  4   Q.      Has any other person filled out anything in that

15:37:59  5   section?

15:37:59  6   A.      No.

15:38:00  7   Q.      What happens next after you see Mr. Biden sign the

15:38:04  8   form and date it?

15:38:06  9   A.      What happened next is Jason said also we would need

15:38:09 10   for the passport, another form of like identification

15:38:16 11   stating his address, it could be a bill, or it could be a

15:38:20 12   vehicle registration.

15:38:21 13   Q.      What's the next thing you observe?

15:38:24 14   A.      I observe Mr. Biden leave out and then come back in.

15:38:29 15   Q.      Did you have a Form 4473 with you at that point?

15:38:32 16   A.      Yes, yes, it was up front.

15:38:34 17   Q.      Where did Mr. Biden go when he came back into the

15:38:38 18   store?

15:38:38 19   A.      He came back to the front case.

15:38:41 20   Q.      What happened next?

15:38:42 21   A.      Jason looked over everything and then went ahead and

15:38:47 22   took it back to Ron for a background check.

15:38:50 23   Q.      Now the form Section B continues forward, it says

15:38:55 24   must be completed by the transferor or seller.  From this

15:38:59 25   point forward in the form, does the buyer have anything to

Cleveland - direct

15:39:01  1    fill out?

15:39:02  2    A.        No, this is all the person who runs the background.

15:39:05  3    So that's why I don't fill anything out, because I don't do

15:39:10  4    background -- well I wasn't doing background checks, I would

15:39:13  5    only sell.

15:39:14  6    Q.        If you look at 19G, who is the employee that

15:39:17  7    completed the background check that day?

15:39:19  8    A.        Jason Turner.

15:39:21  9    Q.        And under -- so from 16 down, who filled out that

15:39:28 10    section?

15:39:28 11    A.        Jason.

15:39:32 12    Q.        And you see two different color pens there, correct?

15:39:35 13    A.        Yes.

15:39:36 14    Q.        Why are there two different color pens there?

15:39:39 15    A.        Two different color pens is because Jason does red

15:39:43 16    with dates and the NICS number, so the NICS number is going

15:39:47 17    to be the number that is given once you do the background

15:39:51 18    check for proceed, delay, or deny.

15:39:54 19    Q.        Is that practice at StarQuest?

15:39:55 20    A.        Yes, that's what Jason tried to get me on board with,

15:40:01 21    but it is a practice.  I didn't, never got into doing

15:40:05 22    background.

15:40:05 23    Q.        You see the zeros are sort of struck with a line

15:40:09 24    through them?

15:40:10 25    A.        Yes.

699

Cleveland - direct

15:40:10 1  Q.      The zeros at the top in question 18, and the zeros in

15:40:17 2  the middle in question 19, those were done by Jason Turner

15:40:22 3  in the same manner, correct?

15:40:24 4  A.      Yes.

15:40:24 5  Q.      Turning to the next page, page 3, do you see section

15:40:30 6  D must be completed by transferor/seller even if the firearm

15:40:35 7  is not transferred, do you see that section there?

15:40:38 8  A.      Yes.

15:40:38 9  Q.      What is listed under question 1, or line 1, I should

15:40:41 10 say?

15:40:42 11 A.      Colt MFGCO, Cobra, serial number for the revolver,

15:40:49 12 the type of firearm, it is revolver and then caliber, .38

15:40:54 13 Special.

15:40:54 14 Q.      Who wrote that in?

15:40:55 15 A.      Jason.

15:40:56 16 Q.      And the next section says number 29, total number of

15:40:59 17 firearms transferred and the answer is one?

15:41:05 18 A.      Yes.

15:41:05 19 Q.      Who wrote that in there?

15:41:06 20 A.      Jason.

15:41:07 21 Q.      Now the serial number written there, RA551363, could

15:41:14 22 you please display Exhibit 1 A side-by-side.  And if you

15:41:25 23 zoom in on one A to the serial number under the wheel,

15:41:33 24 please, Ms. Vo.  Is that the same serial number?

15:41:40 25 A.      Yes it is.

Cleveland - direct

15:41:42  1   Q.      On this exhibit that is on the form?

15:41:44  2   A.      Yes, it is.

15:41:45  3   Q.      Zooming out a second, Ms. Vo.

15:41:49  4           Returning to the form, you can -- actually,

15:41:56  5   that's fine.

15:41:57  6           Going down to Section 33, paragraph 33, what is

15:42:04  7   stamped there?

15:42:05  8   A.      That is the location StarQuest Shooters and Survival

15:42:12  9   Supply, and then that is the, I believe, are FFL number.

15:42:18 10   Q.      When is the stamp applied?

15:42:20 11   A.      The stamp is applied after the sale.

15:42:24 12   Q.      Do you know who applied that stamp?

15:42:27 13   A.      That would be someone in the filing part of that.  I

15:42:31 14   didn't really get to meet the people that did the filing.

15:42:34 15   Q.      Now, going to the next line, paragraph 34, who wrote

15:42:43 16   Gordon Cleveland?

15:42:44 17   A.      I did.

15:42:45 18   Q.      And that's you, obviously?

15:42:46 19   A.      Yes.

15:42:46 20   Q.      Whose signature is that in line 35?

15:42:49 21   A.      That's mine.

15:42:50 22   Q.      And who wrote the seller's title?

15:42:53 23   A.      I did.

15:42:54 24   Q.      Your title was?

15:42:55 25   A.      Sales.

15:42:56  1    Q.      And then paragraph 37 has a different ink?

15:43:02  2    A.      Yes.

15:43:02  3    Q.      Who wrote the date in there?

15:43:04  4    A.      Jason did.

15:43:05  5    Q.      And why is -- what is the practice and why is it done

15:43:08  6    that way, where it's written in a different ink?

15:43:11  7    A.      It's done that way because Jason said it was better

15:43:14  8    and easier for the agents when they come in and do an audit

15:43:18  9    that they can see it in bright red.  And he filled it in

15:43:23 10    instead of you because he wanted to make sure it was done in

15:43:26 11    red, because I would do it sometimes in black or blue.

15:43:30 12    Q.      So at this point once the form is completed with

15:43:33 13    Mr. Biden, what happens sort of next before the sale is

15:43:38 14    completed?

15:43:39 15    A.      The next thing that happened was I talked to him

15:43:44 16    about various things for the firearm, the few different

15:43:49 17    things like a speed loaders, ammunition, just stuff that you

15:43:54 18    need for the firearm.

15:43:56 19    Q.      What kinds of things did Mr. Biden and you discuss?

15:43:59 20    A.      We discussed about practice ammo, so ammo that is

15:44:05 21    full metal jacket that you would only use at the range.  And

15:44:09 22    we talked about who hollow points for self defense.

15:44:11 23    Q.      So did you describe to him the differences in those

15:44:14 24    two ammunitions?

15:44:15 25    A.      Yes.

Cleveland - direct

15:44:16  1    Q.      What are the differences between those two

15:44:18  2    ammunitions?

15:44:19  3    A.      Differences is full metal jacket, you do not want to

15:44:23  4    use if you're planning to use the gun for self defense,

15:44:27  5    because with firearms, the bullet that you use, if it over

15:44:30  6    penetrates your target, and it hits someone or damages

15:44:34  7    someone's property, you're held accountable for that, so

15:44:37  8    usually what you want to do is you want to use what we call

15:44:40  9    hollow points, because upon impact it opens up and makes a

15:44:43 10    wound channel, or whatever it hits, it will open up and it

15:44:48 11    won't over penetrate, it will stay in what it hits.

15:44:51 12    Q.      So a hollow point expands upon impact and takes out a

15:44:56 13    larger portion of the target, is that fair?

15:44:58 14    A.      Yes.

15:44:59 15    Q.      Which of those two options did Mr. Biden indicate he

15:45:02 16    wanted?

15:45:02 17    A.      He went with the hollow points.

15:45:05 18    Q.      So not the ammunition that you asked him, that you

15:45:07 19    wanted for a range?

15:45:08 20    A.      Yes.

15:45:09 21    Q.      I'm showing you what's been marked as government's

15:45:15 22    Exhibit 2 and 2A is before you.

15:45:21 23             MR. HINES:  May I approach, Your Honor?

15:45:22 24             THE COURT:  You may.

15:45:27 25    BY MR. HINES:

Cleveland - direct

15:45:27  1    Q.      Do you recognize government's Exhibit 2 and 2A, sir?

15:45:30  2    A.      Yes.

15:45:30  3    Q.      What is 2 and 2A?

15:45:33  4    A.      2 and 2A is American Gunner - Hornady, it's one of

15:45:38  5    their lines of hollow points that they sell.

15:45:41  6            MR. HINES:  May I publish?

15:45:42  7            THE COURT:  You may.

15:45:47  8    BY MR. HINES:

15:45:49  9    Q.      Now Mr. Cleveland, how many cartridges of ammunition

15:45:52 10    were in Exhibit 2 that Mr. Biden purchased?

15:45:55 11    A.      I believe it was 25 or 30, I'm not a hundred percent

15:46:01 12    sure, those are usually the numbers that you get with them.

15:46:05 13    Q.      It doesn't say 25 cartridges on two A?

15:46:08 14    A.      Yes.

15:46:09 15    Q.      Now you also mentioned a speed loader.  Mr. Biden

15:46:13 16    expressed an interest in a speed loader?

15:46:15 17    A.      Yes.

15:46:16 18    Q.      What is a speed loader?

15:46:17 19    A.      A speed loader is used to be able to reload a

15:46:22 20    revolver a little bit faster because when you don't have a

15:46:25 21    semiautomatic it's totally different, you have to use the

15:46:28 22    pusher to push out the shells after you shoot them.  With a

15:46:31 23    speed loader, you load the ammunition in it, you click it,

15:46:35 24    you turn it, you click it, you lock them in place, what you

15:46:40 25    do is line everything up with the cylinder on the revolver

Cleveland - direct

15:46:42  1   and you turn it and the bullets drop right in.  It's ideal

15:46:47  2   if you're in a situation where you have to brandish your

15:46:50  3   firearm and use it, it cuts down on the time of you possibly

15:46:53  4   having something happen to you, it will put you back in the

15:46:57  5   fight.

15:46:58  6            MR. HINES:  And approaching with Exhibit 3.

15:47:03  7   Q.    What is Exhibit 3 and 3A?

15:47:05  8   A.    It is an HKS speed loader.

15:47:08  9   Q.    And is this the speed loader you sold Mr. Biden?

15:47:12 10   A.    Yes.

15:47:13 11   Q.    And is this the one he expressed an interest in?

15:47:17 12   A.    Yes.

15:47:17 13            MR. HINES:  May I publish?

15:47:19 14            THE COURT:  You may.

15:47:21 15   BY MR. HINES:

15:47:26 16   Q.    So at this point you're speaking with Mr. Biden about

15:47:29 17   other sort of accessories, ammunition, things of that

15:47:33 18   nature.  Has the NICS check allowed you to proceed with the

15:47:40 19   sale at this point?

15:47:41 20   A.    Yes.

15:47:41 21   Q.    So what happens next?

15:47:42 22   A.    What happened next is you just go ahead and have the

15:47:46 23   customer pay, you ring everything up, and you have him pay.

15:47:49 24   Q.    Did you ring out the sale?

15:47:51 25   A.    Yes.

Cleveland - direct

15:47:52  1   Q.      I'm showing you Exhibit 13(a).  Is this the receipt,

15:48:04  2   a reprint of the receipt that rang out the sale for

15:48:07  3   Mr. Biden that day?

15:48:08  4   A.      Yes, it is.

15:48:09  5   Q.      What is the first item listed there for $749.95?

15:48:16  6   A.      That's the Talo Edition Colt Cobra.

15:48:20  7   Q.      So Exhibit 1?

15:48:21  8   A.      Yes.

15:48:21  9   Q.      What is the second item listed there?

15:48:24 10   A.      HKS speed loader.

15:48:27 11   Q.      So Exhibit 3?

15:48:30 12   A.      That is going to be for the Gamo air pistol.

15:48:37 13   Q.      Line 3 is the air pistol in the receipt you said?

15:48:40 14   A.      Yes.

15:48:41 15   Q.      What is line 4?

15:48:44 16   A.      Line 4 is Hornady American Gunner ammunition.

15:48:48 17   Q.      How about line 5?

15:48:50 18   A.      NEBO true utility Fishface, I believe that is one of

15:48:55 19   their versions of the flashlight and the other one is a NEBO

15:48:59 20   fire light and I think fire starter kit.

15:49:02 21   Q.      Was there anything unique about this particular semi

15:49:05 22   auto air rifle that Mr. Biden purchased for $89.95?

15:49:10 23   A.      Yes.

15:49:11 24   Q.      What was unique about it?

15:49:13 25   A.      What was unique about that was it didn't have an

Cleveland - direct

15:49:16  1  orange tip to indicate it was an air pistol.

15:49:19  2  Q.      What's the orange tip mean?

15:49:21  3  A.      It's for safety, got forbid you have kids that have

15:49:25  4  an air pistol and they're playing with it, someone from law

15:49:29  5  enforcement could mistake it as a real gun.

15:49:32  6  Q.      Without the orange tip does it look like a real gun?

15:49:35  7  A.      Exactly like a real gun.

15:49:37  8  Q.      How did Mr. Biden pay that day?

15:49:38  9  A.      He paid in cash.

15:49:40 10  Q.      Did he tender $900 in cash?

15:49:42 11  A.      Yes.

15:49:42 12  Q.      Did you return $13.19 in change?

15:49:46 13  A.      Yeah, he told me to keep the change, which I didn't,

15:49:49 14  that was like a first for me in sales, I said to the owner,

15:49:54 15  you know, being honest about it, he wanted me to keep the

15:49:58 16  change and he said just keep it, and I actually put it in an

15:50:03 17  envelope and left it up at the register.

15:50:06 18  Q.      As a matter of practice you're not allowed to keep

15:50:09 19  sort of tips?

15:50:09 20  A.      I don't, I don't keep tips, that's just not what you

15:50:13 21  do on sales.

15:50:13 22  Q.      Did Mr. Biden leave that day with all of these items

15:50:16 23  on the receipt?

15:50:17 24  A.      Yes.

15:50:18 25  Q.      And you watched him walk out to the Cadillac?

Cleveland - cross

15:50:21  1    A.      Yes.

15:50:22  2    Q.      Have you had any other interaction with Mr. Biden

15:50:25  3    since that day?

15:50:25  4    A.      No.

15:50:26  5              MR. HINES:  No further questions, Your Honor.

15:50:28  6              THE COURT:  Okay.  Thank you.

15:50:29  7              Cross-exam.

15:50:33  8                    CROSS-EXAMINATION

15:50:34  9    BY MR. LOWELL:

15:50:55 10    Q.      Good afternoon, Mr. Cleveland.

15:50:56 11    A.      Good afternoon.

15:50:57 12    Q.      I'm the lawyer that's sitting next to Mr. Biden.

15:51:01 13    A.      Yes, sir.

15:51:02 14    Q.      We've never met?

15:51:03 15    A.      No.

15:51:04 16    Q.      Never spoken?

15:51:05 17    A.      No.

15:51:06 18    Q.      You have met with prosecutors and investigators?

15:51:09 19    A.      Yes.

15:51:09 20    Q.      How many times?

15:51:10 21    A.      Twice.

15:51:11 22    Q.      When was the last time?

15:51:14 23    A.      I believe last week.

15:51:18 24    Q.      Okay.  And where was that, here?

15:51:20 25    A.      No.

Cleveland - cross

15:51:21  1    Q.       Where was that?

15:51:22  2    A.       That was at the ███████████.

15:51:25  3    Q.       Okay.  And before that?

15:51:27  4    A.       Same place.

15:51:30  5    Q.       Okay.  How many occasions did you have to be

15:51:33  6    interviewed by either investigators or prosecutors in this

15:51:36  7    matter?

15:51:37  8    A.       Twice.

15:51:37  9    Q.       And in addition, did you ever appear in front of a

15:51:41 10    grand jury?

15:51:42 11    A.       Yes.

15:51:42 12    Q.       And before you walked into the grand jury, did you

15:51:45 13    have any conversations with other prosecutors or

15:51:48 14    investigators?

15:51:49 15    A.       No, I actually went in to that, they just let me know

15:51:54 16    that I was being summons to go.

15:51:56 17    Q.       You indicated that you had worked at StarQuest from

15:51:59 18    2015 to 2021?

15:52:01 19    A.       Yes.

15:52:01 20    Q.       Why did you leave in 2021, is that when you were --

15:52:05 21    I'm sorry, is that -- why did you leave in 2021?

15:52:08 22    A.       Family, having my third child and my health, my

15:52:13 23    health in the middle of me working at StarQuest became -- I

15:52:16 24    came down diabetic and actually had to stay away for a

15:52:20 25    little while because I didn't know what the signs were

Cleveland - cross

15:52:23  1  coming down, and my eyesight was compromised a little bit.

15:52:26  2  Q.      Are you doing better now?

15:52:28  3  A.      Yeah.  Yeah.  It was just, my sugar was so high that

15:52:33  4  you know, I had to get flushed out to be fine.

15:52:35  5  Q.      You indicated to -- when you were asked a question

15:52:40  6  where StarQuest was located?

15:52:47  7               MR. LOWELL:  Without objection, Your Honor, we

15:52:49  8  move into evidence exhibit, defense exhibit number 11.

15:52:53  9               THE COURT:  Okay.  It's admitted.  Thank you.

15:52:55 10               (DTX Exhibit No. 11 was admitted into evidence.)

15:52:56 11  BY MR. LOWELL:

15:52:57 12  Q.      And it's on your -- you can also see it on your

15:53:00 13  screen?

15:53:00 14  A.      Yes.

15:53:01 15  Q.      Mr. Hines showed you this -- a Google picture with

15:53:09 16  Concord and being in front, do you see that?

15:53:11 17  A.      Yes.

15:53:11 18  Q.      And then I'm showing you a different one.  That's the

15:53:14 19  same location, isn't it?

15:53:17 20  A.      Yes.

15:53:17 21  Q.      That's the same store in the same location?

15:53:19 22  A.      Yes, it is.

15:53:20 23  Q.      And do you see where the store is located?

15:53:22 24  A.      Yes.

15:53:23 25  Q.      And do you see below that in the picture another

Cleveland - cross

15:53:26  1    building that's labeled AT&T store?

15:53:29  2    A.      Yes.

15:53:29  3    Q.      Is that in the same area?

15:53:32  4    A.      Yes, it's right across from it.

15:53:34  5    Q.      In the same, I don't know if you call it the same

15:53:36  6    parking lot, about the same side?

15:53:38  7    A.      Yes, it is.

15:53:39  8    Q.      And let me ask you, where does the front of StarQuest

15:53:45  9    Shooters and Survival face?

15:53:47 10    A.      It faces the highway.

15:53:52 11            MR. LOWELL:  Without objection, can I please,

15:53:55 12    this is Exhibit 21.

15:53:57 13            MR. HINES:  No objection.

15:53:58 14            THE COURT:  Thank you.  It's admitted.

15:54:00 15            (DTX Exhibit No. 21 was admitted into evidence.)

15:54:01 16    BY MR. LOWELL:

15:54:01 17    Q.      Is that an accurate depiction of the StarQuest

15:54:04 18    Shooters and Survival?

15:54:05 19    A.      Yes, it is.

15:54:06 20    Q.      And that road, is that the road we just identified as

15:54:10 21    being Concord?

15:54:11 22    A.      Yes.

15:54:11 23    Q.      So you testified that on that day, you were on the

15:54:18 24    sales floor?

15:54:19 25    A.      Yes.

15:54:20  1    Q.      And you looked out the window?

15:54:22  2    A.      Yes.

15:54:22  3    Q.      And you say you saw Mr. Biden drive up in a black

15:54:27  4    Cadillac?

15:54:27  5    A.      Yes.

15:54:28  6    Q.      Were you looking out the front of the store when that

15:54:32  7    happened through those windows?

15:54:34  8    A.      No, if you see where that yellow pole is, looking out

15:54:37  9    the side, there is a side window right there, you got that

15:54:40 10    front window and there is a side window right on that wall.

15:54:44 11    Q.      Looking that way if you will pointing to --

15:54:46 12    A.      Yes.

15:54:46 13    Q.      Where were you in the store?

15:54:48 14    A.      I was right by the window, where that window is that

15:54:50 15    I'm telling you about, the side window, is the statute of

15:54:55 16    the Duke.

15:54:55 17    Q.      The first time, maybe the only time, the first time

15:54:58 18    you saw Mr. Biden, are you sure he drove up as opposed to

15:55:02 19    walking across the parking lot?

15:55:03 20    A.      Hundred percent sure he drove up.

15:55:06 21    Q.      Did you ever see him walk?

15:55:07 22    A.      No.

15:55:07 23    Q.      What time of day is it that this all occurred that

15:55:11 24    you were there?

15:55:11 25    A.      It was in the afternoon because I was --

Cleveland - cross

15:55:14  1    Q.       Closer to 12, closer to one, closer to four?

15:55:18  2    A.       I would say somewhere around the ballpark of probably

15:55:21  3    like 5, 6.

15:55:22  4    Q.       So the end of the day?

15:55:23  5    A.       Yeah.

15:55:23  6    Q.       Did you see when you saw him drive up in a black

15:55:27  7    Cadillac, you notice cars, right?

15:55:29  8    A.       Yes.

15:55:29  9    Q.       And you noticed the black Cadillac, did you notice

15:55:33 10    from where it was coming?

15:55:34 11    A.       Where it was coming, it was pulling to the back side

15:55:36 12    of the building, coming in to and pulling into where I was

15:55:42 13    looking out of the window.

15:55:43 14    Q.       Can we go back to the last picture, Exhibit 11.  So

15:55:46 15    looking at this, was it come in the direction of what says

15:55:53 16    Giant Brandywine Pike or coming from the direction of the

15:55:54 17    AT&T store?

15:55:55 18    A.       Coming from where Prospect Avenue is, pulling in that

15:55:59 19    way.

15:55:59 20    Q.       So from the same direction as the AT&T store?

15:56:02 21    A.       Yes.  Yes.

15:56:03 22    Q.       Okay.  So the StarQuest store you said faces Concord,

15:56:11 23    right?

15:56:11 24    A.       Yes.

15:56:11 25    Q.       And you said you were standing at the corner where

Cleveland - cross

15:56:14  1    the statute is where the yellow pole was, right?

15:56:18  2    A.      Yes.

15:56:18  3    Q.      That's on that side of the building, isn't it?

15:56:21  4    A.      Yes.

15:56:22  5    Q.      You just said that the car was coming from the

15:56:24  6    direction of the AT&T store?

15:56:26  7    A.      Yes.

15:56:27  8    Q.      Could you see through the wall?

15:56:28  9    A.      No, I didn't see through the wall, I seen the car

15:56:31 10    coming around, so basically coming up where the other cars

15:56:34 11    are on the right and pulling around into where I was

15:56:37 12    watching from the window.

15:56:38 13    Q.      So what you're saying is that it came from the

15:56:41 14    direction of the AT&T store, went past Prospect, came around

15:56:45 15    and then parked; is that what you're saying?

15:56:48 16    A.      No, I'm saying that the car entered from where

15:56:53 17    Prospect Avenue is and came around to where I was at.

15:56:55 18    Q.      Which would be on the top side of the building --

15:56:59 19    A.      Yes.

15:56:59 20    Q.      And at what point did you notice the car?

15:57:02 21    A.      I noticed the car as soon as it pulled in the third

15:57:06 22    parking spot.

15:57:07 23    Q.      How did you know which direction it was coming from?

15:57:09 24    A.      Because you can only go two ways coming in, you're

15:57:13 25    either coming in off of Concord Pike as far as down where

Cleveland - cross

15:57:16  1  now it's the bicycle store, or you could come in off of

15:57:20  2  Concord Pike on to Prospect.

15:57:23  3  Q.     Okay.  So as I'm now understanding, you think he came

15:57:28  4  up from the same direction as the AT&T store, it came at the

15:57:32  5  back, and came around and parked in what you call the third

15:57:36  6  spot?

15:57:36  7  A.     Yes.

15:57:39  8  Q.     You were on the floor at that time?

15:57:41  9  A.     Yes.

15:57:41 10  Q.     And you saw a person, a man come into the front door?

15:57:44 11  A.     Yes.

15:57:45 12  Q.     Not the side or back door, the front door?

15:57:47 13  A.     No, not the back, the side, the front door.

15:57:50 14  Q.     And at first you said you didn't know who he was?

15:57:53 15  A.     No.

15:57:53 16  Q.     When he came in, did he come right up to you and say

15:57:57 17  hi, I want to buy a gun?

15:58:00 18  A.     No, I greeted him.

15:58:01 19  Q.     You went to him?

15:58:03 20  A.     Yes.

15:58:03 21  Q.     When you greeted him, had he been in the store for a

15:58:07 22  minute or two minutes or how long?

15:58:09 23  A.     About a minute.  I mean, practice is you want to

15:58:14 24  greet people and we were scrutinized about just letting

15:58:18 25  people come in and look and not greet them and some people

Cleveland - cross

15:58:21  1    were upset that they weren't greeted, I mean it's just not

15:58:25  2    the proper thing to do in firearms sales, you got to greet

15:58:29  3    people.

15:58:30  4    Q.      So you described how the inside of the store is laid

15:58:33  5    out?

15:58:33  6                    MR. LOWELL:  I would like to move into admission

15:58:37  7    Defense Exhibit 23, the inside of the store.

15:58:38  8                    MR. HINES:  No objection.

15:58:39  9                    THE COURT:  If you want, you can ask me and then

15:58:41 10    he can say.

15:58:42 11                    MR. LOWELL:  I'm sorry, Your Honor.

15:58:44 12                    THE COURT:  It's admitted.

15:58:46 13                    MR. LOWELL:  Thank you.

15:58:46 14                    THE COURT:  Because otherwise, I didn't really

15:58:50 15    hear what number you said.

15:58:50 16                    MR. LOWELL:  I would like to move into evidence

15:58:53 17    Defense Exhibit 23.

15:58:53 18                    THE COURT:  All right.  Thank you.  It's

15:58:55 19    admitted.

15:58:56 20                    (DTX Exhibit No. 23 was admitted into evidence.)

15:58:56 21    BY MR. LOWELL:

15:58:57 22    Q.      Is this a fair and accurate depiction of the showroom

15:59:00 23    that you were describing?

15:59:01 24    A.      Yes, it is.

15:59:02 25    Q.      And when you acclimate us, when I'm looking at this

Cleveland - cross

15:59:06  1    picture and you're looking at the front counter, which

15:59:09  2    direction is that looking in as to the front of the store?

15:59:12  3    A.        You said looking at the counter?

15:59:14  4    Q.        Yes, I'm sorry, this is a little hard.  You see this

15:59:17  5    area here?

15:59:17  6    A.        Yes.

15:59:17  7    Q.        If I'm looking that way, where am I looking?

15:59:20  8    A.        You're looking out towards where the statute is of

15:59:23  9    the drive up in a black Cadillac is in that window.

15:59:25 10    Q.        Would you say this side is the side where the front

15:59:27 11    is?

15:59:27 12    A.        Yes.

15:59:28 13    Q.        So that faces Concord?

15:59:30 14    A.        Yes, it does.

15:59:32 15    Q.        All right.  Now when you come in there, a person

15:59:36 16    comes in there, do you see on the corner of the counter a

15:59:39 17    display?

15:59:40 18    A.        Yes.

15:59:40 19    Q.        What is in that display?

15:59:42 20    A.        That is knives.

15:59:45 21    Q.        Is that where NEBO utility tools are?

15:59:49 22    A.        NEBO was scattered a couple different places, we had

15:59:53 23    it -- it was like right up around there and then we had some

15:59:57 24    on the shelf too.

15:59:58 25    Q.        So you could see the NEBO products either in that

Cleveland - cross

16:00:01 1    display or in that vicinity?

16:00:03 2    A.    Yes, yes, you could.

16:00:10 3    Q.    You talked about this NEBO fish face?

16:00:13 4    A.    Yeah.

16:00:19 5    Q.    Can you please turn in your book please to exhibit DX

16:00:24 6    24, do you see that in the book I gave you?

16:00:26 7    A.    Yep.  I sure do.

16:00:29 8    Q.    Tell me when you're there.  Do you see that?

16:00:36 9    A.    Yes.

16:00:37 10   Q.    Do you recognize what that is?

16:00:39 11   A.    That is one of the NEBO tools.

16:00:42 12   Q.    Can you look at that carefully, that is one of the

16:00:45 13   NEBO tools?

16:00:46 14   A.    Yes.

16:00:46 15   Q.    Did you see the sales slip that you were shown a

16:00:49 16   moment ago by Mr. Hines?

16:00:51 17   A.    Yes.

16:00:51 18   Q.    And it indicated a type of NEBO purchase, right?

16:00:54 19   A.    Yes.

16:00:55 20   Q.    Does that fairly and accurately depict that NEBO?

16:00:58 21   A.    Yes.

16:00:58 22          MR. LOWELL:  Your Honor, we would move into

16:01:00 23   evidence Defense Exhibit 24.

16:01:03 24          MR. HINES:  No objection.

16:01:04 25          THE COURT:  All right.  Thank you.  It's

16:01:05  1    admitted.

16:01:06  2                (DTX Exhibit No. 24 was admitted into evidence.)

16:01:08  3    BY MR. LOWELL:

16:01:09  4    Q.    So this is kind of a utility tool, it has various

16:01:12  5    aspects to it, and that's what was reflected on the receipt?

16:01:15  6    A.    Yes.

16:01:21  7    Q.    You indicated that there was a sale of a Pellet or a

16:01:25  8    BB gun that day, too, right?

16:01:27  9    A.    Yes.

16:01:28 10    Q.    And you indicated what kind that was?

16:01:30 11    A.    It was a Gamo.

16:01:34 12    Q.    Meaning -- does the Gamo, you said I think on the

16:01:39 13    sales slip PTA?

16:01:41 14    A.    A PT 80.

16:01:43 15    Q.    Who is the manufacturer?

16:01:44 16    A.    Gamo is.

16:01:46 17    Q.    Would you go back to Exhibit 23.

16:01:50 18          So in the store they also display those, pellet

16:01:54 19    guns, BB guns, things like that?

16:01:56 20    A.    Yes, they would be -- they're in that same area.

16:01:59 21          Do you see where that case is that's facing

16:02:01 22    towards the window?

16:02:02 23    Q.    I do, yes.

16:02:03 24    A.    It's another display that holds the pellet guns.

16:02:07 25    Q.    So if I go up to this, it's on this side?

Cleveland - cross

16:02:10  1    A.      Yes.

16:02:11  2    Q.      And that's where that's displayed?

16:02:13  3    A.      Yes.

16:02:13  4    Q.      Would you please look at Defense Exhibit 23.  No, I'm

16:02:20  5    sorry, 25?

16:02:21  6    A.      25.

16:02:21  7    Q.      It's right after the one I gave you.

16:02:24  8    A.      All right.

16:02:29  9    Q.      Does that picture fairly and accurately depict the BB

16:02:33 10    gun that was put on the sales slip?

16:02:35 11    A.      Yes, it does.

16:02:36 12            MR. LOWELL:  Your Honor, we move that exhibit,

16:02:37 13    25 into evidence.

16:02:38 14            MR. HINES:  No objection.

16:02:39 15            THE COURT:  Thank you.  It's admitted.

16:02:40 16            (DTX Exhibit No. 25 was admitted into evidence.)

16:02:41 17    BY MR. LOWELL:

16:02:41 18    Q.      So before you indicated that -- you indicated that

16:02:45 19    there was a gun, a BB pellet gun sold.  Can you describe

16:02:50 20    this one and that's the one that looks like the one you

16:02:53 21    sold?

16:02:53 22    A.      Yes, it is.

16:02:54 23    Q.      You said something about there not being a red tip?

16:02:57 24    A.      An orange tip.

16:02:59 25    Q.      I'm sorry, an orange tip?

Cleveland - cross

16:03:00  1    A.        Yes.

16:03:00  2    Q.        That issue of whether it had an orange tip or not,

16:03:04  3    that's not something -- allow me to look at what you said,

16:03:08  4    that's not something you discussed that day with him?

16:03:10  5    A.        What --

16:03:11  6    Q.        Whether it had or didn't have an orange tip?

16:03:13  7    A.        No, not at all.

16:03:14  8    Q.        It didn't come up?

16:03:15  9    A.        No.

16:03:16 10    Q.        So the next thing, at some point you are talking to

16:03:20 11    him, and I think you said he said he was looking for a

16:03:23 12    handgun?

16:03:24 13    A.        Yes.

16:03:24 14    Q.        Tell me about -- you can take that down.

16:03:29 15              Tell me about the NEBO tool, when did that come

16:03:33 16    up in the conversation?

16:03:34 17    A.        That came after the gun.

16:03:36 18    Q.        Not before?

16:03:36 19    A.        No.  Not at all.

16:03:39 20    Q.        So you sell him a gun and then other accoutrements

16:03:45 21    for the gun, and then other things happen?

16:03:48 22    A.        He picked those other items as far as the NEBO stuff,

16:03:51 23    I didn't talk him into the NEBO stuff, as far as like

16:03:55 24    promoting the NEBO stuff.

16:03:57 25    Q.        I'm sorry, I wasn't asking you --

16:03:59  1    A.      I said I wasn't promoting the NEBO items.

16:04:03  2    Q.      You said of course you didn't know who it was at the

16:04:05  3    time.

16:04:06  4            When you started having a conversation with him,

16:04:09  5    I want to ask you some questions about topics.

16:04:16  6    A.      Uh-huh.

16:04:22  7    Q.      In the conversations you had with Mr. Biden before

16:04:24  8    any purchase and you were talking to him, do you remember

16:04:26  9    the topic of him ever being in the store coming up again

16:04:30 10    before?

16:04:31 11    A.      You said being --

16:04:32 12    Q.      Did the topic of his ever having been in that store

16:04:36 13    come up between you?

16:04:37 14    A.      No, not at all.

16:04:38 15    Q.      Did any topic come up when he was talking to you

16:04:42 16    about his familiarity with guns, the topic ever being skeet

16:04:47 17    shooting with his brother?

16:04:49 18    A.      No.

16:04:49 19    Q.      You don't remember that?

16:04:50 20    A.      I don't remember that at all.

16:04:51 21    Q.      When the topic of what happened with the BB gun, did

16:04:56 22    you have any memory of why it was any BB gun was being

16:05:02 23    discussed?

16:05:02 24    A.      No.

16:05:02 25    Q.      Did you remember him telling you anything about skeet

Cleveland - cross

16:05:05  1    shooting?

16:05:05  2    A.      No.

16:05:06  3    Q.      When you and he were talking, you have behind the

16:05:11  4    store as we saw it a display of guns?

16:05:14  5    A.      Yes.

16:05:15  6    Q.      Did he know which was which?

16:05:17  7    A.      No.  That's why I --

16:05:20  8    Q.      You had to explain to him?

16:05:21  9    A.      I explained to him, yes.

16:05:23 10    Q.      So when he came in, he didn't say I want a Colt, he

16:05:27 11    didn't say I want a whatever, you're saying he was

16:05:31 12    interested in a handgun?

16:05:32 13    A.      Yes.

16:05:32 14    Q.      But to be clear, you're the one who explained the

16:05:36 15    various kinds of handguns?

16:05:38 16    A.      Yes, I did.

16:05:41 17    Q.      And in that conversation, you said something about

16:05:45 18    the Colt being reliable, or standard, or effective, you

16:05:51 19    explained that to him?

16:05:53 20    A.      Yes, I did.

16:05:54 21    Q.      He didn't know about this Colt Cobra before you

16:05:58 22    explained it, is that right?

16:05:59 23    A.      No.

16:06:00 24    Q.      At the time when you were explaining the differences,

16:06:03 25    I think you said something about quality and price, did you

Cleveland - cross

16:06:06  1    explain to him the differences between each of the guns that

16:06:08  2    you had on the display?

16:06:09  3    A.      Yes.   I did.

16:06:12  4    Q.      Are you familiar with the phrase "whale hunter"?

16:06:17  5    A.      Yes.

16:06:17  6    Q.      I see you're laughing?

16:06:19  7    A.      Yes, I got to laugh about it.

16:06:22  8    Q.      What's a whale hunter?

16:06:24  9    A.      That's what they call me because I sold high end guns

16:06:27 10    to customers.

16:06:28 11    Q.      That was your intention to sell high end guns?

16:06:31 12    A.      I mean, I'm a salesman, so at the end of the day I'm

16:06:35 13    going to sell everything, but I mean, if I'm going to buy it

16:06:38 14    personally, and have it in my collection, or something that

16:06:41 15    is very nice, I wouldn't sell you something that is terrible

16:06:46 16    and let you waste your money.

16:06:47 17    Q.      I understand, but it's your intention, you're a

16:06:50 18    salesperson to make the highest price sale you can make?

16:06:53 19    A.      Yes.

16:06:53 20    Q.      And any other item you can sell at that time and you

16:06:57 21    can tell or convince a buyer to buy it?

16:07:00 22    A.      No, I really was not one to promote a lot of the

16:07:02 23    other stuff.   I always felt if you buy a gun, you might as

16:07:07 24    well buy the ammunition because what are you going to do,

16:07:10 25    throw it at somebody, that was a big thing with me and

Cleveland - cross

16:07:13 1    Palimere, I did not do up sales, that wasn't my thing.  I

16:07:17 2    strictly struck to firearms and ammunition, that's what I

16:07:21 3    was good at.

16:07:21 4    Q.    So somebody comes in, and then buys a handgun, you

16:07:27 5    said that being a whale hunter means you're trying to -- did

16:07:31 6    you say, would it be fair to say you sway them into higher

16:07:34 7    end firearms?

16:07:36 8    A.    So my colleagues labeled me as the whale hunter,

16:07:40 9    because I was the guy on any given day I could sell two

16:07:45 10   Desert Eagles, I could sell a Barrett .50 cal, that's just

16:07:48 11   what I did.

16:07:49 12   Q.    You were the one to be able to have people buy a more

16:07:53 13   expensive weapon?

16:07:54 14   A.    Just buy a weapon, that's what you do as a sales

16:07:57 15   person, you get people to buy, just like when you go to buy

16:08:01 16   a car, the car salesman is going to have you buy something,

16:08:05 17   it's just the law of sales.

16:08:06 18   Q.    But it's your intention to have customers buy, not

16:08:09 19   saying anything wrong with this, a "higher end firearm, a

16:08:13 20   bit more expensive" if you could?

16:08:14 21   A.    I would have them buy something that was of quality

16:08:18 22   of what I would buy, I wouldn't sell junk, that's what I'm

16:08:21 23   saying.

16:08:22 24   Q.    I'm asking a very specific phrase though, would you

16:08:24 25   tell them or would you say that it was your intention to

Cleveland - cross

16:08:27 1  have them buy higher end firearms, a bit more expensive,

16:08:32 2  would that be a fair characterization?

16:08:34 3  A.    No.

16:08:34 4  Q.    Do you remember testifying on at a grand jury on

16:08:37 5  April the 19th, 2022?

16:08:39 6  A.    Yes.

16:08:39 7  Q.    Would you look in your book, please for tab -- may I

16:08:45 8  approach, judge?

16:08:46 9        THE COURT:  Yes.

16:09:02 10       THE WITNESS:  Do you want me to close this?

16:09:04 11 Q.    You may.

16:09:07 12       Page 11, line 13.  I'm sorry, I'm told --

16:09:20 13 A.    Is it in here?

16:09:22 14 Q.    I think.  Let me find it.  It's in there, sorry,

16:09:25 15 pardon me, it's the very first tab.

16:09:29 16       Will you look on page 11, line 13.  You said you

16:09:45 17 remembered being in the grand jury, right?

16:09:47 18 A.    Yes.

16:09:47 19 Q.    You were put under oath?

16:09:49 20 A.    Yes.

16:09:49 21 Q.    Were you asked and then answered as I asked you, I

16:09:52 22 try to sway them to higher end firearms, a bit more

16:09:56 23 expensive, wasn't that your testimony?

16:09:58 24 A.    Yes.

16:09:59 25 Q.    You can shut that.

16:10:03 1            In that same regard being the whale hunter, do

16:10:07 2  you also seek people if they have a choice to buy a more

16:10:11 3  expensive brand of bullet?

16:10:13 4  A.     I mean, hollow points ammunition is kind of close

16:10:18 5  now, but there was a price difference in them, yes.

16:10:20 6  Q.     Hollow tip, as you described it, cost more than the

16:10:24 7  other kind?

16:10:25 8  A.     Yes.

16:10:26 9  Q.     That's the one he bought that day?

16:10:28 10  A.     Yes.

16:10:29 11  Q.     Now, when he came in, did he appear to you to be

16:10:32 12  somebody who would even know the difference between a hollow

16:10:36 13  tip bullet and a "full metal jacket"?

16:10:39 14  A.     No, that's why I explained it to him.

16:10:41 15  Q.     So you're the one who explained it?

16:10:43 16  A.     Yes.

16:10:43 17  Q.     And you're the one who directed him to the hollow tip

16:10:47 18  after you explained it?

16:10:48 19  A.     No, he picked that, I didn't.

16:10:49 20  Q.     But you explained both?

16:10:51 21  A.     I explained it, everything that he bought, he

16:10:55 22  ultimately decided on.

16:10:55 23  Q.     Right.  But you brought that to his attention?

16:10:58 24  A.     Yes.

16:10:58 25  Q.     Then you mentioned the speed loader.  When he came

Cleveland - cross

16:11:01 1    into the store, did he look like somebody who would know

16:11:04 2    what a speed loader was?

16:11:05 3    A.      No.

16:11:06 4    Q.      Did you explain that to him?

16:11:08 5    A.      Yes.

16:11:08 6    Q.      All that explanation about it makes it easier to

16:11:11 7    load, et cetera, that was your understanding, right?

16:11:13 8    A.      Yes.

16:11:16 9    Q.      Was having him buy a speed loader part of being a

16:11:21 10   whale hunter?

16:11:22 11   A.      No.  So to elaborate, can I elaborate on that?

16:11:29 12   Q.      Please do.

16:11:29 13   A.      With that, I mean, I'm making -- I was making the

16:11:32 14   same pay regardless if anyone bought anything or not.

16:11:36 15   Q.      Okay.  Let's talk about that.  I get that and you

16:11:39 16   didn't take a tip, I get that.  But you get paid a salary

16:11:44 17   and you want obviously to be a successful salesperson,

16:11:48 18   right?

16:11:48 19   A.      It was more of me being in sales because I liked

16:11:52 20   firearms, it was just to basically -- that little bit of

16:11:56 21   income was good because what I was usually doing was taking

16:12:00 22   my full-time job checks and buying multiple firearms in a

16:12:04 23   month.  So just to have a little extra cash was decent.

16:12:08 24   Q.      I don't -- I understand and I'm sorry that you had to

16:12:12 25   work two jobs.  What I'm asking is it was your intention to

Cleveland - cross

16:12:16  1   have your customers purchase as much as they would buy?

16:12:18  2   A.    It's up to them what they want to buy, all I do is

16:12:21  3   just go ahead and tell them the differences about what I

16:12:25  4   prefer as far as being better quality than some other

16:12:29  5   people.

16:12:29  6   Q.    I'm sorry, just a moment ago didn't you look at the

16:12:32  7   grand jury and say I try to sway them to higher end

16:12:35  8   firearms, a bit more expensive?

16:12:37  9   A.    Yeah, because of some firearms being not so great and

16:12:40 10   I wouldn't want somebody to come back and complain "well

16:12:44 11   this firearm needs to go back to the manufacturer and be

16:12:47 12   fixed because it jammed after three rounds at the range."

16:12:51 13   Q.    Okay.  I understand.

16:12:53 14   A.    So that --

16:12:54 15   Q.    So now the sequence of events is that he comes in,

16:12:59 16   his immediate conversation with you is about a handgun, and

16:13:02 17   it's after which that you and he discuss that NEBO utility

16:13:08 18   tool?

16:13:08 19   A.    I didn't discuss the NEBO utility tool, he picked

16:13:12 20   that.

16:13:12 21   Q.    Where were you when he did that and what did you say

16:13:15 22   to him about that?

16:13:16 23   A.    I didn't say anything because that was what he

16:13:19 24   picked.  He picked it.  He picked it while he was up there.

16:13:21 25   Q.    Was there any other salesperson working with him that

Cleveland - cross

16:13:25  1  day?

16:13:25  2  A.      No.   I mean, Jason is in sales, but he runs the

16:13:28  3  background, he came out.   But no, there wasn't anybody else,

16:13:31  4  it was just me.

16:13:32  5  Q.      So in the sequence, he bought the gun?

16:13:35  6  A.      He's getting ready to checkout for the gun, he hasn't

16:13:40  7  finished paying when he's getting all the other items that

16:13:43  8  he's getting.

16:13:44  9  Q.      After the gun is explained to him, the speed loader

16:13:46  10  explained to him, the bullets are explained to him, and he

16:13:49  11  has all that, is that on the counter?

16:13:52  12  A.      Yes.

16:13:52  13  Q.      And that's when you deal with the form?

16:13:54  14  A.      The form -- the form was -- no, so you got the

16:13:58  15  sequence messed up.   The guns and all that stuff was -- I

16:14:02  16  mean the gun, the ammo, and the speed loader was on the

16:14:06  17  counter, but that was after the fact that the background

16:14:09  18  check was already ran.

16:14:10  19  Q.      So before the background check was already done,

16:14:14  20  where was the handgun?

16:14:14  21  A.      The handgun was already on the counter.

16:14:17  22  Q.      Where are the bullets?

16:14:19  23  A.      The bullets are on the shelf because we haven't even

16:14:21  24  discussed them before the background check.

16:14:23  25  Q.      Where was the speed loader?

Cleveland - cross

16:14:24  1    A.       The speed loader is on shelf.

16:14:26  2    Q.       So to put in the right sequence, at some point all of

16:14:29  3    those things get on the counter?

16:14:30  4    A.       We end up going through it and he ultimately picks

16:14:34  5    the stuff and it gets on the counter.

16:14:36  6    Q.       Now he, according to you, intended to and did have

16:14:39  7    the gun, the bullets, and the speed loader all there ready

16:14:43  8    to go?

16:14:43  9    A.       Yes.

16:14:43 10    Q.       And you had been working with him during this period

16:14:46 11    of time?

16:14:46 12    A.       Yes.

16:14:46 13    Q.       It's your testimony that then he goes by the way,

16:14:51 14    over there, I see that NEBO display, I will take one of

16:14:54 15    those, he wondered over there?

16:14:55 16    A.       He went and got it.

16:14:58 17    Q.       I'm asking how that went about?

16:15:00 18    A.       He picked the NEBO.  I'm at the counter.  He picked

16:15:03 19    the NEBO, he decided about the NEBO, I didn't discuss it.

16:15:07 20    Q.       Let's talk about the sequence.

16:15:07 21    A.       Okay.

16:15:09 22    Q.       You're at the counter, but the gun, the bullets, and

16:15:12 23    speed loader are there?

16:15:13 24    A.       Yes.

16:15:13 25    Q.       And he's about to pay?

Cleveland - cross

16:15:15  1    A.      Yes.

16:15:15  2    Q.      And it's your testimony that at that moment he turns

16:15:18  3    and sees the utility display and says "I'll take one of

16:15:22  4    those"?

16:15:23  5    A.      I mean yeah, I'll take one of those.

16:15:24  6    Q.      He didn't reach in him self, he had to have somebody

16:15:27  7    do it?

16:15:27  8    A.      Yes.

16:15:27  9    Q.      That would be you?

16:15:28 10    A.      Yes.

16:15:29 11    Q.      And that's when you say it happened?  Which happened

16:15:32 12    first, the NEBO utility, or the next item on the sales slip?

16:15:36 13    A.      I think it was the NEBO.

16:15:38 14    Q.      So he does that, so now you have the gun, the

16:15:40 15    bullets, and the revolver, and now has the NEBO utility tool

16:15:45 16    been put on the counter?

16:15:46 17    A.      Yes.

16:15:47 18    Q.      And then he goes to another display and says I also

16:15:51 19    want a BB gun?

16:15:53 20    A.      He picked the BB gun out, I don't think he said

16:15:57 21    anything to me about the BB gun, he just picked the BB gun.

16:16:02 22    Q.      So again to sequence, you think the NEBO came first?

16:16:04 23    A.      Yes.

16:16:05 24    Q.      And then tell me how that happened, so now you're at

16:16:08 25    is the counter, he's checking out, you have the gun, the

Cleveland - cross

16:16:11 1  bullet, the speed loader, and now you pick the utility tool,

16:16:14 2  how did the BB gun, he walks around and says I want one of

16:16:18 3  those too?

16:16:19 4  A.    That's what I'm saying, he walked around and got the

16:16:22 5  BB gun, the BB gun is not secured like the real firearms

16:16:26 6  are, so you can walk up and pull it right off of the shelf.

16:16:29 7  Q.    What shelf?

16:16:30 8  A.    The display that it was on.

16:16:32 9  Q.    Can we go back to the interior of the store photo,

16:16:35 10 please, Exhibit 23.

16:16:39 11        So, I thought you said, you see in the side that

16:16:43 12 was facing the counter?

16:16:44 13 A.    Yes.

16:16:45 14        MR. HINES:  Counsel, can I ask you a question?

16:16:51 15        (Discussion off the record.)

16:16:53 16 Q.    I thought I asked you and if I didn't, please let me

16:16:56 17 do it again.  Does this fairly and accurately depict the

16:16:59 18 floor of the StarQuest Shooters the day that you sold him

16:17:03 19 the gun?

16:17:04 20 A.    Yes.

16:17:05 21 Q.    And the point that I was at was asking you about the

16:17:09 22 BB gun, is it up there, is it in here, where is it?

16:17:14 23 A.    No, so take your pen, go to where the black area is

16:17:17 24 right there, to your left, to your left, to your left, to

16:17:20 25 your left, go over to your left some more, oh you're out of

Cleveland - cross

16:17:23  1    frame of the picture because that's where the case was.

16:17:26  2    Q.      It's in a case in the back?

16:17:27  3    A.      It's not in a case, the display case, it's not in a

16:17:30  4    case in the back.

16:17:31  5    Q.      It's in a case that would be next to what looks likes

16:17:35  6    hand guns over there?

16:17:36  7    A.      It's basically like you go in to a supermarket and

16:17:39  8    you get something right off of the hanger on the shelf,

16:17:41  9    that's what type of display case it was, it wasn't secured

16:17:45 10    or locked up or anything like the real firearms.

16:17:47 11    Q.      It had a glass in front of it?

16:17:50 12    A.      No, BB guns don't have glasses in front.

16:17:54 13    Q.      So it's on a shelf?

16:17:54 14    A.      Yes, BB guns don't have glass in front of them.

16:17:55 15    Q.      So where are you when he enters with the gun, the

16:17:59 16    speed loader, over here?

16:18:00 17    A.      Yes.

16:18:01 18    Q.      And then he walks over and gets somebody to give him

16:18:03 19    the NEBO tool?

16:18:05 20    A.      Yes.

16:18:05 21    Q.      And then your testimony is after that, he wanders

16:18:11 22    over to another display case on the back wall, and where are

16:18:16 23    you?

16:18:18 24    A.      I am still up at the front.

16:18:23 25    Q.      Did he tell you why he was going over there?

Cleveland - cross

16:18:25  1    A.    No.

16:18:26  2    Q.    Did you see him go and pick out a gun, a BB gun?

16:18:30  3    A.    I seen him pick out the BB gun.

16:18:32  4    Q.    And that's back there?

16:18:34  5    A.    Yes.

16:18:40  6    Q.    When in the sequence that I brought you to -- so when

16:19:00  7    in sequence of these events do you hand him the 4473 form?

16:19:07  8    A.    He gets handed the 4473 after he picks what firearm

16:19:12  9    he wants to go with.

16:19:14 10    Q.    After you explain it?

16:19:15 11    A.    Yes.

16:19:15 12    Q.    Before the bullets and the speed loader?

16:19:17 13    A.    Yes.

16:19:18 14    Q.    So you're at the front, you described, you would be

16:19:23 15    on the inside, he would be on the outside?

16:19:24 16    A.    Yes.

16:19:25 17    Q.    Is that where the form was given to him?

16:19:27 18    A.    Yes.

16:19:27 19    Q.    And it's given to him in blank, right?

16:19:31 20    A.    Yes.

16:19:32 21    Q.    And did he have a pen?

16:19:35 22    A.    I had to get him a pen.

16:19:36 23    Q.    What color pen?

16:19:37 24    A.    Black.

16:19:39 25    Q.    So you gave him a pen.  And at what point did you

Cleveland - cross

16:19:44  1    take the identification form, the type of identification?

16:19:47  2    A.     Right after I sat the form up there, I went to go and

16:19:51  3    do the identification, and make the copy.

16:19:53  4    Q.     So no, I'm sorry, I can ask that better.  When did he

16:19:59  5    hand you the form of identification in the sequence?

16:20:01  6    A.     He handed me the form of identification when I asked

16:20:04  7    for it while I was getting the 4473.  So it was like an

16:20:08  8    exchange of getting the identification and the 4473.

16:20:11  9    Q.     Where was the 4473 form?

16:20:13 10    A.     They were -- so you see that register right there up

16:20:17 11    front, they were right underneath of there.

16:20:19 12    Q.     So you went to get a form?

16:20:21 13    A.     Yes.

16:20:21 14    Q.     Did you have his passport at that point?

16:20:23 15    A.     Yes.

16:20:24 16    Q.     So he gave you the passport before you got the form?

16:20:27 17    A.     Yeah.

16:20:27 18    Q.     So you went to get the form, right?

16:20:30 19    A.     Yes.

16:20:30 20    Q.     Okay and you brought it back?

16:20:33 21    A.     I just -- no, I'm in the island so I sat it right up

16:20:38 22    on the front.

16:20:38 23    Q.     But you're holding his passport?

16:20:41 24    A.     Yes.

16:20:41 25    Q.     But he has the blank form, you have the passport.  At

Cleveland - cross

16:20:44  1    what point do you then as you said go and take the passport

16:20:50  2    elsewhere?

16:20:50  3    A.      I go and do the passport after he's filling out all

16:20:54  4    this stuff.

16:20:55  5    Q.      So he starts filling it out and you're still holding

16:20:59  6    his passport?

16:21:00  7    A.      Yes.

16:21:00  8    Q.      You haven't gone and made a copy yet?

16:21:03  9    A.      No.

16:21:03  10   Q.      Are you sure?

16:21:04  11   A.      Yes.

16:21:05  12   Q.      So he fills out the form and then you deal with the

16:21:07  13   passport.

16:21:09  14           Can you put up, please, government

16:21:17  15   Exhibit 10(a).  And you identified this as the form?

16:21:19  16   A.      Yes.

16:21:20  17   Q.      And as you identified it, there are parts to the form

16:21:25  18   that are filled out by the buyer?

16:21:26  19   A.      Yes.

16:21:27  20   Q.      And by the seller?

16:21:28  21   A.      Yes.

16:21:28  22   Q.      And some of the seller is you and some of it could be

16:21:32  23   Mr. Turner?

16:21:33  24   A.      Yes.

16:21:38  25   Q.      When you gave him the form, Mr. Hines had you read

Cleveland - cross

16:21:44 1   what it said on top, but you didn't read that out loud about

16:21:48 2   the warning, that didn't happen, that's not what you do?

16:21:51 3   A.      No, that's not for me to read, that's for the

16:21:54 4   purchaser to read.

16:21:54 5   Q.      And you said that you said to him, "take your time

16:21:59 6   answering the questions."  And "I can't help you."

16:22:05 7   A.      Yes.

16:22:05 8   Q.      Both of those things you said to him?

16:22:07 9   A.      Yes.

16:22:08 10  Q.      Then you said, I then started filling out the form?

16:22:12 11  A.      Yes.

16:22:13 12  Q.      Did he fill out the top part of the form with his

16:22:17 13  name and his address and his weight, et cetera, and then

16:22:23 14  that with his passport were taken to the back room so that

16:22:29 15  somebody could say to you if it was okay?

16:22:31 16  A.      You said did I take the form with the passport?

16:22:34 17  Q.      Yeah, did you?

16:22:35 18  A.      No.

16:22:35 19  Q.      Just the passport?

16:22:36 20  A.      Just the passport.

16:22:37 21  Q.      You're sure about that?

16:22:38 22  A.      Hundred percent sure.

16:22:40 23  Q.      In the back room when you did that, who was there?

16:22:43 24  A.      It was Ronald Palimere and Jason Turner.

16:22:46 25  Q.      They're both in the back room?

Cleveland - cross

16:22:49  1    A.      Yes.

16:22:49  2    Q.      They would have seen what you brought?

16:22:52  3    A.      Yes.

16:22:54  4    Q.      And up on this, it says on the top, read the notices

16:23:04  5    instructions, and definitions on the form.  Do you see that?

16:23:06  6    A.      Yes.

16:23:07  7    Q.      That applies to everybody on the form, right?  You --

16:23:12  8    I'm sorry, Mr. Biden and everybody else who has to fill it

16:23:15  9    out?

16:23:15 10    A.      Yes.

16:23:16 11    Q.      And it says on page 1, same thing, it says, do you

16:23:21 12    see where it says prepare an original only?

16:23:24 13    A.      Yes.

16:23:25 14    Q.      And the top part A says transfer or seller's

16:23:30 15    transaction?

16:23:33 16    A.      Yes.

16:23:34 17    Q.      Okay.  And then Section A is filled out by the buyer,

16:23:37 18    in this case Hunter?

16:23:39 19    A.      Yes.

16:23:39 20    Q.      And you talked about what he filled out, a name, et

16:23:43 21    cetera, I don't want to go over that again.  The address he

16:23:46 22    gave, did you know whether that was his address or the

16:23:50 23    address of his parents or the address of anybody else?

16:23:52 24    A.      No, I didn't know what address that was.

16:23:55 25    Q.      Okay.  Then Section B, a little bit further down,

Cleveland - cross

16:23:59  1   that's -- Section B is the next page, I think.  And that

16:24:06  2   part is filled out by the seller?

16:24:09  3   A.      Yes.

16:24:09  4   Q.      And all of that U.S. passport and the numbers in

16:24:13  5   black and in red, you said that was by Mr. Turner?

16:24:17  6   A.      Yes.

16:24:17  7   Q.      And then questions 19, 20, and 21, are also ones that

16:24:26  8   are filled out by in this case the seller; right?

16:24:29  9   A.      Yes.

16:24:29 10   Q.      And that's in red?

16:24:31 11   A.      Yes.

16:24:31 12   Q.      Does Mr. Turner always do it in red?

16:24:34 13   A.      Yes.

16:24:35 14   Q.      And that's when you -- he does what's called a

16:24:40 15   background check?

16:24:40 16   A.      Yes.

16:24:41 17   Q.      And then it comes back --

16:24:42 18   A.      Well that wouldn't be filled in until he did the

16:24:45 19   background because he can't put that NICS number in there

16:24:49 20   without doing the background.

16:24:50 21   Q.      He does the check based on -- what did he have in his

16:24:53 22   possession, Mr. Turner, when he ran the background check?

16:24:57 23   A.      He had the form.

16:24:57 24   Q.      And in what condition did he have the form?

16:25:00 25   A.      The form completed.

Cleveland - cross

16:25:01 1    Q.      Completed.

16:25:02 2    A.      Yes.

16:25:03 3    Q.      It would have all the boxes checked and Mr. Biden's

16:25:06 4    signature on it?

16:25:07 5    A.      Yes.

16:25:07 6    Q.      And then he runs it and that's when he does his entry

16:25:11 7    of the date and NICS number and the proceed?

16:25:16 8    A.      Yes.

16:25:16 9    Q.      If you go down to section D.  That handwriting Colt,

16:25:22 10   that's also you said Mr. Turner's?

16:25:24 11   A.      Yes, sir.

16:25:25 12   Q.      And then on the back page -- I'm sorry, before you

16:25:29 13   get there, Mr. Radic, apologize.  On line 33, the stamp,

16:25:34 14   StarQuest Shooters on the left side?

16:25:36 15   A.      Yes.

16:25:36 16   Q.      Is that on the form to start with?

16:25:38 17   A.      No.

16:25:39 18   Q.      Or does it have to be put --

16:25:41 19   A.      No, that goes, like I said, that happens I believe

16:25:44 20   with the filing, that gets filled in to be filed.  The

16:25:47 21   stamping of the store and the FFL number.

16:25:50 22   Q.      And then further down, the next page, that's where

16:25:54 23   you identified your name and your signature that you wrote?

16:25:57 24   A.      Yes.

16:25:57 25   Q.      And then Mr. Turner puts in the red ink?

Cleveland - cross

16:26:01  1    A.       Red ink, yes.

16:26:03  2    Q.       There form then says notices, instructions and

16:26:05  3    definitions right under that, do you see that?

16:26:07  4    A.       Yes it does.

16:26:08  5    Q.       It says the purpose of the form.  It says the

16:26:11  6    information and certification are designed so that a person

16:26:15  7    licensed may determine if he or she may lawfully sell,

16:26:20  8    Mr. Hines pointed to this to make sure you can properly sell

16:26:23  9    or somebody can properly buy a gun right?

16:26:26 10    A.       Yes.

16:26:26 11    Q.       It says it need to be filled out by the licensed

16:26:29 12    business premises, that would be StarQuest, right?

16:26:32 13    A.       Yes.

16:26:32 14    Q.       And it says you, that is the seller, "the transferor

16:26:38 15    or seller of a firearm must determine the lawfulness of a

16:26:42 16    transaction, right?

16:26:43 17    A.       Yes.

16:26:45 18    Q.       And it says that the seller, in this case, StarQuest

16:26:49 19    needs to maintain proper records, correct?

16:26:51 20    A.       Yes.

16:26:51 21    Q.       And then it says after the seller has completed the

16:26:54 22    firearms transaction, he, she, must make the completed

16:26:58 23    original form which includes the notices, general

16:27:01 24    instructions and definitions and any supporting

16:27:03 25    documentation part of their permanent records and keep it

16:27:06  1   for twenty years?

16:27:07  2   A.      Yes.

16:27:07  3   Q.      That's on the form itself?

16:27:09  4   A.      Yes.

16:27:10  5   Q.      So in the normal course of things, the form is filled

16:27:13  6   out and then it is kept on the premises of the store?

16:27:17  7   A.      Uh-huh.

16:27:17  8   Q.      I'm sorry, you have to say yes or no?

16:27:21  9   A.      I'm sorry, yes.

16:27:21 10   Q.      It's not supposed to be at that point sent anywhere?

16:27:25 11   A.      No, not at all.

16:27:27 12   Q.      And --

16:27:28 13   A.      Sorry, I think they make an exception to that you can

16:27:31 14   have like a storage unit and store it, too.

16:27:34 15   Q.      But you don't have to mail it or fax it or send it to

16:27:38 16   anybody?

16:27:39 17   A.      No, not at all.

16:27:40 18   Q.      On page 3, if you'll go up above, I'm sorry, on

16:27:45 19   page 3, go back down a little bit.  On the right side of the

16:27:54 20   column, the second paragraph, it reads, if the

16:27:59 21   transfer/seller, that would be StarQuest, right?

16:28:01 22   A.      Yes.

16:28:01 23   Q.      Or the buyer discovers that a form is incomplete or

16:28:05 24   improperly completed after the firearm has been transferred

16:28:08 25   --

16:28:08  1                    MR. HINES:  I object, Your Honor.

16:28:10  2                    THE COURT:  All right.  Let's have a side-bar.

16:30:47  3                    (Side-bar discussion:)

16:30:47  4                    MR. HINES:  So the objection is not only it is

16:30:47  5          outside the scope of direct, it is irrelevant what StarQuest

16:30:47  6          did years later, with the form, and he's driving towards

16:30:47  7          that, it has no relevancy to whether or not Mr. Biden filled

16:30:47  8          out the form.

16:30:47  9                    THE COURT:  Should I let the jury go for

16:30:47 10          tonight?

16:30:47 11                    MR. LOWELL:  No, it's a good time to let them

16:30:48 12          go.  Can I respond?

16:30:48 13                    THE COURT:  How much more do you have?

16:30:48 14                    MR. LOWELL:  For him, quite a lot.

16:30:48 15                    THE COURT:  Okay.  All right.

16:30:48 16                    MR. LOWELL:  Well, I'm sorry, that's stupid, I

16:30:48 17          apologize.

16:30:48 18                    MR. HINES:  He drives a trash truck, he's away

16:30:48 19          from work.

16:30:48 20                    MR. LOWELL:  It won't be over by 4:30 or even

16:30:48 21          4:45, and I'm -- well, do you want to talk about this in

16:30:48 22          open court before, or how do you want to do this?

16:30:48 23                    THE COURT:  I mean, if's he not going to finish,

16:30:48 24          are you going to finish by 5:00.

16:30:48 25                    MR. LOWELL:  Maybe, I don't know how long it

16:30:48  1    will take.  I don't want --

16:30:48  2                THE COURT:  I'm just sensitive to the fact that

16:30:48  3    he's missing his work.

16:30:48  4                MR. LOWELL:  Can I see how far -- let me respond

16:30:48  5    to his objection.

16:30:48  6                THE COURT:  Yes.

16:30:48  7                MR. LOWELL:  I am not asking something you did

16:30:48  8    years later, not doing that.  I am indicating because he

16:30:48  9    opened the door when he said something about somebody

16:30:48 10    getting a second car registration or second form of

16:30:48 11    identification, he said that, I didn't, and so consequently,

16:30:48 12    I need to ask him what that was.

16:30:48 13                THE COURT:  No.  You're not putting that in.  I

16:30:48 14    ruled on that.  I don't think that he opened the door.  You

16:30:48 15    didn't object or I guess, if you want me to strike what he

16:30:48 16    said on that, I will consider it, but we're not opening the

16:30:48 17    door on that.

16:30:48 18                MR. LOWELL:  So I cannot ask him, then, was a

16:30:48 19    second form of identification given to him that moment.

16:30:48 20                THE COURT:  At that moment.  Why can't they ask

16:30:48 21    at that moment.

16:30:48 22                MR. HINES:  He has no basis, he doesn't know.

16:30:48 23                MR. LOWELL:  To him.

16:30:48 24                THE COURT:  You can say at that moment.

16:30:48 25                MR. LOWELL:  Okay.

16:30:48  1              THE COURT:  But if he misunderstands your

16:30:48  2    question and starts talking about something later, we're

16:30:48  3    going to cut him off.

16:30:48  4              MR. LOWELL:   Okay.

16:30:53  5              THE COURT:  Members of the jury, we're going to

16:30:55  6    hopefully --

16:34:06  7              (Sidebar discussion:)

16:34:06  8              MR. LOWELL:  I want to be very fair to

16:34:06  9    Mr. Cleveland, but to be fair to the jury, I don't think I

16:34:06 10    would finish by 5 o'clock.  And I want to say that so that I

16:34:06 11    don't mislead and have them wait around.  I'm sorry about

16:34:06 12    him, I didn't know the time, how long anything would take

16:34:06 13    today.  But I'm looking at my outline for the things that

16:34:06 14    you're lug me to ask and I won't be done in that period of

16:34:06 15    time.

16:34:06 16              MR. HINES:  I don't know what else is relevant

16:34:06 17    of this witness.  We just did a tour of StarQuest.

16:34:06 18              MR. LOWELL:  Why is that not relevant to find

16:34:06 19    out where he was?

16:34:06 20              MR. HINES:  Well, you have taken more than

16:34:06 21    thirty minutes --

16:34:06 22              THE COURT:  I'm not going to cut him off from

16:34:06 23    asking fair questions of the witness.  So hopefully

16:34:06 24    Mr. Cleveland won't have to miss too much work tomorrow.

16:34:06 25              MR. LOWELL:  I'm promise I'll cut it down based

16:34:06  1    on what you said.  I'm being honest with you and you and

16:34:06  2    you, it won't be over and I know the jury will be here

16:34:06  3    longer.  I'm sorry, can I also say I'm trying, but at the

16:34:06  4    same time, you shouldn't criticize me for how long -- you're

16:34:06  5    taking time on things you could have done shorter as well.

16:34:06  6              THE COURT:  If he's not going to finish, then

16:34:06  7    why I am going to keep everybody here for a half hour?

16:34:06  8              MR. WISE:  I think he's going to run out.  It's

16:34:06  9    hard to imagine --

16:34:06 10              THE COURT:  Keep going.  I have a lot of faith

16:34:06 11    in Mr. Lowell that he's not going to run out of things.  I

16:34:06 12    do.

16:34:06 13              MR. WISE:  I have less faith.

16:34:06 14              MR. LOWELL:  So I am suggesting, you tell me, I

16:34:06 15    don't know, this could go for another hour, I'm not saying

16:34:06 16    it will, but I don't want to invoke the wrath of the jury

16:34:06 17    who has been told at the end of the day it's 4:30.  I think

16:34:06 18    this fairest thing to do is for me to stop.  I will go back

16:34:06 19    to my outline and make it as short as possible -- I can't do

16:34:06 20    that now -- to save time.

16:34:06 21              THE COURT:  I'm going to let him do it.  And

16:34:06 22    we're going to hope that you can do it in a -- make it more

16:34:06 23    efficient if you're representing that that's what you're

16:34:06 24    going to try to do tonight so that we can avoid this man

16:34:06 25    missing more work than is necessary.

16:34:06  1          MR. LOWELL:  Okay.  I will do that.

16:34:06  2                (End of side-bar.)

16:34:06  3          THE COURT:  All right.  So Mr. Cleveland, we're

16:34:06  4   going to take a break for the night and I'm going to ask you

16:34:06  5   to come back in the morning.  We're going to try to get you

16:34:06  6   out of here in the morning as early as we can.  But we're

16:34:06  7   now going to take a break for the evening.  We'll come back

16:34:07  8   at 9:00 a.m. tomorrow.  And I'll just remind you not to talk

16:34:07  9   to anybody, not to listen to anybody, not to engage in

16:34:07 10   anything that would possibly have any effect on this case.

16:34:07 11          Thank you.  Have a good night.

16:34:11 12                (Jury exiting the courtroom at 4:34 p.m.)

16:34:22 13          THE COURT:  All right.  Everyone, anything else

16:34:25 14   we need to talk about?

16:34:26 15          MR. HINES:  Yes, Your Honor.  And should the

16:34:28 16   witness be excused?

16:34:29 17          THE COURT:  Yes, so you can be excused.

16:34:32 18          Thank you very much and we pick up tomorrow

16:34:34 19   morning at 9:00 a.m.

16:34:35 20          THE WITNESS:  Do you want me to leave this right

16:34:37 21   here?

16:34:37 22          THE COURT:  And everybody else can be seated.

16:34:39 23          MR. HINES:  I just want to preview for the court

16:34:41 24   that we have six witnesses remaining after Mr. Cleveland,

16:34:45 25   all of them are shorter witnesses, so it's possible that we

16:34:50 1   will be resting our case-in-chief tomorrow.  So just like we

16:34:54 2   have been telling the defense our witnesses we would ask

16:34:57 3   that they tell us tonight who they intend to call tomorrow

16:35:00 4   at the completion ever our case.

16:35:02 5             THE COURT:  Thoughts.

16:35:03 6             MR. LOWELL:  Yes.  Understanding what they just

16:35:06 7   said, so if they -- I think we go all day tomorrow, I'll

16:35:09 8   tell them tonight who will be your first witness likely on

16:35:13 9   Friday morning.

16:35:14 10            THE COURT:  Okay.  Does that work?

16:35:15 11            MR. HINES:  Yes.  Thank you.

16:35:17 12            THE COURT:  Anything else?

16:35:18 13            MR. LOWELL:  Only that I will among other things

16:35:20 14   look at the transcript about what he said about that second

16:35:24 15   registration or the second identification, I will look at

16:35:26 16   the exact words so --

16:35:28 17            THE COURT:  You can raise it again in the

16:35:30 18   morning if you like.

16:35:31 19            MR. LOWELL:  Thank you.

16:35:32 20            MR. HINES:  Thank you.

16:35:36 21            THE COURT:  All right.  Everyone have a good

16:35:37 22   night.

16:35:37 23            COURTROOM DEPUTY:  All rise.  Court is

16:35:39 24   adjourned.

25                  (Court adjourned at 4:35 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court