08:08:46

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    UNITED STATES OF AMERICA, ) VOLUME 4
                               )
5                              ) CRIMINAL ACTION
     v.                        ) NO. 23cr61(MN)
6                              )
     ROBERT HUNTER BIDEN,      )
7                              )
             Defendant.        )
8

9

                    Thursday, June 6, 2024
10                  9:00 a.m.
                    Jury Trial
11

12                  Courtroom 4A
                    844 King Street
13                  Wilmington, Delaware

14

15
     BEFORE:  THE HONORABLE MARYELLEN NOREIKA
16           United States District Court Judge

17

18

19   APPEARANCES:

20
                    SPECIAL COUNSEL'S OFFICE
21                  BY:  DEREK E. HINES, ESQ.
                    BY:  LEO WISE, ESQ.
22

23                       Counsel for the
                         United States of America
24

25

1

APPEARANCES CONTINUED:

2

3

        DALTON & ASSOCIATES, P.A.

4          BY:  BARTHOLOMEW J. DALTON, ESQ.
        BY:  CONNOR DALTON, ESQ.

5
        -and-

6
        WINSTON & STRAWN LLP

7          BY:  ABBE DAVID LOWELL, ESQ.
        BY:  DAVID KOLANSKY, ESQ.

8          BY:  ISABELLA OISHI, ESQ.

9

                Counsel for the Defendant

10

11

12               - - - - - - - - - - -

13

08:51:47 14

08:51:47 15          COURT CLERK:  All rise.

08:55:05 16          THE COURT:  All right.  Good morning, everyone.

08:55:08 17  Please be seated.

08:55:11 18          You had some issues?

08:55:13 19          MR. LOWELL:  Good morning, Your Honor.

08:55:14 20          THE COURT:  Mr. Lowell, good morning.

08:55:16 21          MR. LOWELL:  First, at the end of the day

08:55:18 22  yesterday -- first I should say that I did as I said I would

08:55:22 23  do and I've thinned this and turned it into a shorter event

08:55:26 24  so hopefully I used the time wisely.

08:55:29 25          Secondly, when we left the day I was raising the

08:55:31  1    issue that we started, on page 697 of the transcript.

08:55:54  2                THE COURT:  Yes.

08:55:54  3                MR. LOWELL:  Lines 7 through 14.  He was asked

08:56:00  4    "What happened next after you see Mr. Biden sign the form

08:56:03  5    and date it?

08:56:04  6                "What happened next is Jason said, also we would

08:56:06  7    need for the passport, another form of like identification

08:56:12  8    stating his address, it could be a bill or it could be

08:56:16  9    vehicle registration.

08:56:17 10                "What's the next thing you observed?

08:56:19 11                "I observed Mr. Biden leave out and then come

08:56:22 12    back in."

08:56:22 13                So on that, the questioning would be what was

08:56:24 14    the issue.  He was never asked yet what was the issue that

08:56:27 15    you went to talk to Mr. Turner about that caused you to be

08:56:31 16    asking that question.  And then he doesn't state what

08:56:34 17    happens next.  So it leaves open whether he says that there

08:56:37 18    was another form of identification because he says he went

08:56:40 19    out and he came back in, so I would ask him whether that

08:56:44 20    happened.

08:56:44 21                THE COURT:  If he says no, what's next?

08:56:47 22                MR. LOWELL:  If he says no, nothing.

08:56:53 23                THE COURT:  So you say.

08:56:54 24                MR. LOWELL:  If he says no other form of

08:56:56 25    identification was presented when Mr. Biden came back in,

08:56:58  1    no, if he says yes, then I have to ask him what it was and

08:57:01  2    then we'll see where that goes because he attaches to the

08:57:06  3    4473 form only the passport, he doesn't attach any other

08:57:09  4    form.

08:57:09  5            THE COURT:  All right.  So what is your

08:57:11  6    position?

08:57:11  7            MR. HINES:  Yeah, so on the second question, did

08:57:13  8    he see what the secondary form of identification was, if

08:57:18  9    anything, he can ask that.  I anticipate Mr. Cleveland will

08:57:22 10    say I didn't see.  But as far as like his first question,

08:57:26 11    what is the issue, what is the issue, the Court has already

08:57:29 12    ruled on that.  The gun store is not on trial for whether or

08:57:32 13    not they collected a supplemental form so that would be an

08:57:35 14    inappropriate question and not relevant in this case.

08:57:38 15            MR. LOWELL:  Not what the issue was, I could ask

08:57:40 16    that better, what did you say to Mr. Palimere and/or

08:57:43 17    Mr. Turner.

08:57:44 18            MR. HINES:  So the portion that he just cited

08:57:48 19    there, Mr. Cleveland on the stand is not saying anything,

08:57:51 20    it's Mr. Turner who says he's got to go get another form of

08:57:55 21    identification.  Mr. Cleveland has nothing to do with that

08:57:57 22    process according to what he's testified to and what

08:58:01 23    Mr. Lowell has cited to in the transcript.

08:58:03 24            MR. LOWELL:  But he's saying what happened next

08:58:08 25    is Jason said, so I want to ask him what did he say to

08:58:11   1    Jason.

08:58:15   2                    MR. HINES:  That Jason said.

08:58:17   3                    MR. LOWELL:  Yeah, what happened next, is Jason.

08:58:20   4                    MR. HINES:  Jason Turner says.

08:58:21   5                    MR. LOWELL:  But you're cutting out --

08:58:23   6                    THE COURT:  Hold on.  I'm trying to get this in

08:58:25   7    context.  Did he see him sign it?  Yes.  And then we made

08:58:31   8    sure that it was the same person.  And we said there is a

08:58:36   9    date.  Who wrote the date?  Mr. Biden did.  Then Section A

08:58:42  10    is completed.  Was -- did you see Section A completely

08:58:47  11    completed by Mr. Biden.  Yes.  Has anyone else filled out

08:58:51  12    anything in that section.  No.  What happens next?  After

08:58:54  13    you saw Mr. Biden sign the form and date it?  What happened

08:58:59  14    next is Jason said.  So you want to say how did Jason get

08:59:06  15    involved?

08:59:07  16                    MR. LOWELL:  Yes.

08:59:11  17                    MR. HINES:  Okay.

08:59:11  18                    THE COURT:  You can say you said that after you

08:59:14  19    saw Mr. Biden sign the form and date it, you said that the

08:59:18  20    thing that happened next was Jason said we would need with

08:59:23  21    the passport another form of identification.  How did Jason

08:59:27  22    get involved?  And then did you see another form of

08:59:32  23    identification?

08:59:34  24                    MR. LOWELL:  And not be able to say to him what

08:59:37  25    did you say to Jason, if anything?  I mean, that's the

08:59:41 1  natural in between question.

08:59:42 2          THE COURT:  I mean, how did Jason get involved,

08:59:45 3  I guess if he says Jason was standing there, did you say

08:59:49 4  anything, no, and if he says I went into the back and talked

08:59:52 5  to Jason, I guess you can say what did you say to Jason.

08:59:56 6          MR. LOWELL:  Okay.  That was one issue.

08:59:57 7          THE COURT:  Okay.

08:59:58 8          MR. LOWELL:  The second issue is the government

09:00:00 9  said that they had six witnesses, they think they'll finish

09:00:04 10 at the end of the day or before, last night we told him who

09:00:08 11 our witnesses will be, we summoned them, they have to come,

09:00:13 12 and their lawyers have to come.  They're all coming this

09:00:15 13 afternoon, if they end up at 3 o'clock or 3:30, I don't have

09:00:20 14 them yet, they'll be here first thing in the morning, if

09:00:25 15 that happens, I ask that we break them here, we summoned

09:00:30 16 them yesterday, they're getting here as soon as they can.

09:00:33 17         THE COURT:  Let's see where we are, do you have

09:00:35 18 any problem with that, you may have a problem with

09:00:37 19 witnesses, and maybe that will give us time to deal with it

09:00:40 20 if you did.

09:00:41 21         MR. HINES:  I understand one of the witnesses

09:00:42 22 were represented, I don't know, you referenced multiple

09:00:46 23 lawyers, there will be witnesses available based on my

09:00:49 24 understanding as early as early afternoon.

09:00:52 25         MR. LOWELL:  No, I don't know that anybody is

09:00:54 1    available, they're coming this afternoon or this evening,

09:00:57 2    they're coming from different places so they're getting here

09:01:00 3    when they get here, and we did that last night based on the

09:01:05 4    government's schedule.

09:01:05 5        THE COURT:  Keep me informed.

09:01:07 6        MR. LOWELL:  On scheduling, when the government

09:01:09 7    rests, Your Honor, we have a written Rule 29 motion on three

09:01:12 8    topics.  One would be the topic that you reserved on the

09:01:15 9    issue of unconstitutional based on vagueness.  The second

09:01:20 10   will be an issue we found in 922(g), which has been amended,

09:01:26 11   so we have to address the issue that it doesn't exist at the

09:01:29 12   time of the -- of our trial.  I don't want to say more about

09:01:34 13   it because I'll say it wrong, but that's the second.  And

09:01:37 14   the third would be the issue sort of dovetails with the

09:01:40 15   first on the sufficiency of the evidence on the key issue.

09:01:44 16   But all of them are in the works and all of them have been

09:01:47 17   filed at the end of the day as soon as the government rests.

09:01:49 18   And obviously you'll want to see it and the government will

09:01:53 19   want a chance to respond, that's another good reason if we

09:01:56 20   break we would be able to do that and see what happens from

09:01:59 21   there.

09:01:59 22       THE COURT:  If you think I can read your motion,

09:02:02 23   the government will have a chance to read your motion,

09:02:05 24   respond to your motion, and I will have a chance to

09:02:08 25   carefully review that and rule by tomorrow morning, you have

09:02:12  1    an elevated view of my abilities.

09:02:15  2              So I appreciate that, but it's not going to

09:02:20  3    happen.  But I will take a look at it when it's filed.

09:02:22  4              MR. LOWELL:  What I really wanted to do is let

09:02:26  5    everybody know that, so I don't know how that effects the

09:02:30  6    scheduling, usually you argue that before you present the

09:02:33  7    case so I wanted to let you know that was in the works.

09:02:35  8              MR. HINES:  Your Honor --

09:02:36  9              THE COURT:  And I understand what you're saying,

09:02:38 10    but it's also so -- I'm not going to waste the jurors time

09:02:43 11    with making them sit around and wait for a day or two while

09:02:46 12    I figure that out.  So it may be that I just need to

09:02:50 13    reserve.

09:02:51 14              MR. LOWELL:  Right.  And that's fine.  I just

09:02:53 15    needed to give everybody notice that that was the case and I

09:02:56 16    expected that that could be one possibility.

09:02:59 17              THE COURT:  Okay.  All right.  Anything else?

09:03:02 18              MR. WISE:  Your Honor, we have an objection to

09:03:03 19    an exhibit that we got late last night that the defense

09:03:07 20    intends to use with our second witness today, Ms. Hallie

09:03:11 21    Biden.  It's Defense Exhibit 16A, I don't know if the Court

09:03:16 22    has been provided with that.

09:03:17 23              THE COURT:  Let me check.

09:03:24 24              Yes, I do have that.

09:03:26 25              MR. WISE:  The first issue is globally, we got

09:03:30  1    this at 11:07 last night that actually provided the sources

09:03:33  2    for these messages.  We have been asking for it since Monday

09:03:37  3    when they sent it to us.  We of course provided our summary

09:03:42  4    chart months ago.  The whole point of the rule, 1006 to

09:03:45  5    allow each side to check the accuracy of the statements that

09:03:48  6    are in the summary chart.  So we think the whole thing

09:03:52  7    should be kept out because we haven't had the time and they

09:03:55  8    haven't followed the rules to give us the time.  And it's

09:03:58  9    eight-pages long.  And what we did on our summary chart is

09:04:03 10    we told them page numbers in an extraction report which

09:04:08 11    makes it something you can actually find.  Here they have

09:04:10 12    given us what appears to be the same, you know, it looks

09:04:15 13    like every source is the same file path.  Which doesn't

09:04:21 14    actually tell us really thinking.  And candidly I was in a

09:04:26 15    hotel room at 11:07 last night, so wherever this was, I

09:04:29 16    wasn't in a position to go hunting for it, even assuming I

09:04:33 17    could.

09:04:34 18             The other issue it's full of inadmissible

09:04:37 19    hearsay.  Our first objection is it's late, they didn't

09:04:40 20    follow 1006, it shouldn't come in, the second is nearly

09:04:44 21    everything they wanted to do other than a couple of message

09:04:47 22    strings that are on our chart, which come in because under

09:04:51 23    801(d)(2) their opposing party statements offered against

09:04:54 24    that party --

09:04:56 25             THE COURT:  It's different if the defendant

09:04:58  1  wants to put the statements in, it's one thing if you do,

09:05:00  2  because they're admissions, but he can't put them in.

09:05:04  3           MR. HINES:  Exactly, and some of them are quite

09:05:06  4  frankly quite salacious, we can talk about them in open

09:05:10  5  court or come to side-bar so I can point those out.  I think

09:05:15  6  row number 21, for instance.

09:05:32  7           MR. WISE:  As I said, most of them, I counted

09:05:34  8  four on page 1, lines 2, 3, 4 and 5, there are strings that

09:05:40  9  contain admissions that are -- we were offering so we

09:05:44 10  obviously don't have an objection to that, and then 11, 12,

09:05:48 11  13, and 14 are also part of strings that have admissions.

09:05:52 12  And then 20 --

09:05:53 13           THE COURT:  I'm sorry, tell me again, there are

09:05:55 14  so many numbers on here.  Okay.  So first you have the

09:06:00 15  hearsay and your hearsay is the rows where it's something

09:06:06 16  that was said by the defendant, not the issue where it was

09:06:09 17  said by Ms. Biden because those aren't hearsay if she's on

09:06:15 18  the stand and they're asking her questions, right?

09:06:18 19           MR. HINES:  So it's still hearsay even if she's

09:06:22 20  on the stand because it's an out of court statement that she

09:06:25 21  made for the truth of the matter asserted, they got hearsay

09:06:29 22  problems with her and they got hearsay problems with him.

09:06:32 23  So number one, for instance, is a hearsay statement of

09:06:35 24  Ms. Biden, first row, that there is no exception for.

09:06:41 25           Same thing with it picks up, as I said, Row 2,

09:06:46  1    3, and 4 on their chart --

09:06:48  2            THE COURT:  So you're saying, they could use

09:06:51  3    this for impeachment if they asked her, for example, if they

09:06:55  4    were having problems in their relationship at that point and

09:06:57  5    she said no.

09:06:58  6            MR. HINES:  Potentially, depending on how they

09:07:02  7    set it up.

09:07:03  8            THE COURT:  Do you have a response?

09:07:04  9            MR. LOWELL:  Yes, of course.  So as to the first

09:07:07  10   one, Mr. Wise would indicate that the first time he saw

09:07:10  11   these texts was whenever he just said.  Actually, over the

09:07:14  12   last few days we have back and forth, they keep asking us

09:07:17  13   for source material and we keep trying to provide it.

09:07:20  14           THE COURT:  What are these sources that they all

09:07:22  15   have exactly the same number?

09:07:24  16           MR. LOWELL:  I would like my colleague to

09:07:26  17   address the source if I could have that happen.

09:07:29  18           MR. WISE:  I didn't say we saw the text for the

09:07:32  19   first time last night, I said we saw the source.

09:07:34  20           THE COURT:  I understand, you were trying to

09:07:36  21   check the accuracy and authenticity.

09:07:38  22           MR. LOWELL:  Again, one of the things I asked

09:07:41  23   Agent Jensen was whether or not that material, the Cloud

09:07:44  24   material, and the laptop was in the condition that they got

09:07:47  25   it and whether they provided it to us in discovery and

09:07:49  1    whether it was the same material and she said it was.  That

09:07:52  2    is the source, they have it and they sent it to us, we sent

09:07:55  3    it back to them, but I'll have Mr. Kolansky address the

09:07:58  4    source for it.

09:08:00  5              MR. WISE:  I don't think they sent it back to

09:08:02  6    us.  But again, if you look at our chart, we literally have

09:08:05  7    page 1001, I'm looking at a message 86, page 1412, so that

09:08:11  8    they could go back exactly to where this message comes from

09:08:15  9    and it was provided months ago.

09:08:17 10              MR. KOLANSKY:  Your Honor, these messages that

09:08:19 11    start on October the 11th, they're extracted from the hard

09:08:23 12    drive that we received in discovery from the government.  It

09:08:26 13    was a single hard drive with essentially, if you think about

09:08:29 14    it --

09:08:30 15              THE COURT:  So was there a way for you to say

09:08:33 16    it's on page whatever of the hard drive?

09:08:37 17              MR. KOLANSKY:  There is not, Your Honor.

09:08:38 18              THE COURT:  How did they do it?

09:08:40 19              MR. KOLANSKY:  I don't know how they do it, I

09:08:42 20    don't know what software they used.

09:08:44 21              THE COURT:  How did you give them a specific

09:08:46 22    place to go and he's saying you can't.

09:08:48 23              MR. WISE:  We gave it to them both ways, they

09:08:51 24    asked for the raw data and then we also gave them these

09:08:55 25    extraction reports that reflect all of the messages that we

09:08:59  1    are using with page numbers and all of the messages they're

09:09:01  2    using, they're just somewhere in these 18,000 pages and they

09:09:06  3    won't tell us where.

09:09:07  4              THE COURT:  You're assuming they're somewhere in

09:09:09  5    these 18,000 pages, you don't know?

09:09:11  6              MR. HINES:  They keep saying they're from the

09:09:14  7    same data, so that means they should be on the extraction

09:09:17  8    reports and the extraction reports are pages that are--

09:09:21  9              THE COURT:  Can you get them that information?

09:09:24 10              MR. KOLANSKY:  We can get them the information

09:09:26 11    based on an extraction report that we created using an

09:09:29 12    extraction software we have.  It's not going to match --

09:09:32 13              THE COURT:  Did they give you an extraction --

09:09:36 14              MR. WISE:  We gave them an extraction report,

09:09:39 15    they did not give us whatever he's referring to that has

09:09:42 16    page numbers that we can look at.

09:09:43 17              THE COURT:  So you gave them an extraction

09:09:45 18    report, the same extraction report you used to come up with

09:09:48 19    page numbers?

09:09:49 20              MR. WISE:  Exactly.

09:09:50 21              THE COURT:  Can you use that extraction report

09:09:53 22    and give them page numbers?

09:09:54 23              MR. KOLANSKY:  When I searched these messages

09:09:56 24    last night, Your Honor, for each of the 42 rows, I did not

09:10:00 25    find these messages in the extraction report that they're

09:10:04 1    referring to.

09:10:05 2            MR. WISE:  So they have discovery, an extraction

09:10:06 3    report that they're relying on that they haven't give us

09:10:09 4    which is the underlying material that supports under 1006

09:10:13 5    the summary report and they should have given it to us.

09:10:15 6            MR. KOLANSKY:  Your Honor, we're happy to

09:10:17 7    provide the extraction report that we generated.

09:10:20 8            THE COURT:  Why are you doing that today when

09:10:22 9    you expect to use the exhibit today?

09:10:25 10            MR. KOLANSKY:  It's an extraction report that we

09:10:27 11    used in order to thread the messages so that they're

09:10:29 12    readable.

09:10:31 13            THE COURT:  Yes, but -- what I'm confused about

09:10:34 14    is you're not giving them the information in the same way

09:10:36 15    that they gave it to you.  You're saying -- he's saying

09:10:40 16    look, tell us where it is, we gave you an extraction report

09:10:43 17    and you're telling me but it's not in, it's something new

09:10:47 18    that wasn't in the government's extraction report and you

09:10:49 19    can't tell us where it is?

09:10:53 20            MR. KOLANSKY:  Let me try to rephrase it, maybe

09:10:55 21    I'm mischaracterizing it.  When we --

09:10:58 22            THE COURT:  Was it in the -- so the government

09:11:00 23    gave you an extraction report, you're telling me these

09:11:04 24    messages you want to use were not in there.

09:11:06 25            MR. KOLANSKY:  Correct.  They were in something

09:11:08  1    else.

09:11:08  2                MR. LOWELL:  They were in a separate sub-data,

09:11:08  3    the extraction reports were from the iCloud, these messages

09:11:14  4    were derived not from the source file, but from Macintosh

09:11:16  5    HD, Macintosh hard drive, so there is two worlds of

09:11:20  6    discovery, iCloud, and those were the extraction reports,

09:11:23  7    and then material from the hard drive, which we extracted

09:11:28  8    ourselves based on the forensic images they provided.

09:11:32  9                THE COURT:  Did you give them an extraction from

09:11:33 10    the hard drive?

09:11:34 11                MR. WISE:  Yes, from the laptop.  There is an

09:11:37 12    extraction-- that's why if you remember when Agent Jensen

09:11:40 13    was testifying, the format changed --

09:11:42 14                THE COURT:  So these are messages that you're

09:11:44 15    using from the laptop, not from the -- not from the iCloud.

09:11:50 16                MR. KOLANSKY:  They're from the hard drive that

09:11:53 17    we received from the government.

09:11:54 18                THE COURT:  The hard drive image is from the

09:11:57 19    laptop.  You guys are talking, I got laptops and hard

09:12:00 20    drives, and I don't even know what else I got, iClouds, oh

09:12:04 21    my.

09:12:05 22                MR. KOLANSKY:  Yes, that's right.

09:12:06 23                THE COURT:  So the hard drive, though, is the

09:12:09 24    hard drive that correlates with the laptop.

09:12:13 25                MR. KOLANSKY:  Yes, Your Honor.

09:12:13  1          THE COURT:  So these are messages you want to

09:12:16  2   rely on from the laptop that are not in the iCloud?

09:12:20  3          MR. KOLANSKY:  That's correct, Your Honor.

09:12:21  4          THE COURT:  Okay.  And you're saying, Mr. Wise,

09:12:23  5   that you gave them extraction files from the hard

09:12:29  6   drive/laptop.

09:12:30  7          MR. WISE:  Exactly.

09:12:31  8          THE COURT:  And why didn't you give them from

09:12:33  9   that extraction file, the page numbers?

09:12:37 10          MR. KOLANSKY:  I have not seen that extraction

09:12:39 11   report, Your Honor.

09:12:40 12          MR. WISE:  We provided it in discovery.  It was

09:12:42 13   -- that's how we made the chart, I mean, which they've had

09:12:45 14   for months.  So if they looked at that chart and said wait a

09:12:49 15   minute this says laptop, we don't have an extraction report

09:12:52 16   from the laptop, where are you getting this from, we would

09:12:55 17   have expected to hear that months ago.  There is clearly an

09:12:58 18   extraction report, that's what the 1006 reflects and we

09:13:02 19   reattached it when we provided our expert discovery.

09:13:05 20          MR. LOWELL:  One point on that, by the way, if

09:13:08 21   we're talking about authenticity, which I think is half the

09:13:13 22   issue, we talked to the government and have the stipulation

09:13:16 23   about it being authentic.  These messages that we tried to

09:13:20 24   put together in this fashion, we could take more time and

09:13:24 25   then what we could do is printout every one individually and

09:13:27  1    ask the witness did you send it.  That will issue into the

09:13:32  2    question they raised about asking a witness on the stand did

09:13:34  3    she do something and send something.  That is not hearsay as

09:13:38  4    to the witness, she is in court to be examined.  I can ask

09:13:41  5    her, usually, did you on that moment send Mr. Biden a text.

09:13:46  6    What did the text say.  If she says she knows, fine, if she

09:13:51  7    says she doesn't, I can refresh her recollection.

09:13:53  8                  THE COURT:  With the text?

09:13:54  9                  MR. LOWELL:  With the text itself.  If she then

09:13:56 10    states that it is not something that refreshes her

09:13:59 11    recollection, then it is a prior recorded, you know, it fits

09:14:03 12    into the issue of something that was already in existence.

09:14:06 13    But the idea that you can't ask a witness on the stand

09:14:09 14    whether that witness said something or wrote something and

09:14:12 15    that's the hearsay, it is not hearsay at that moment.  It is

09:14:16 16    something that was existing before, but you can ask, when

09:14:20 17    and if Mr. Biden took the stand and he was testifying, he

09:14:24 18    would be able to be asked about did you receive a text from

09:14:28 19    Mrs. Biden and how did you respond and why.  So you can't

09:14:31 20    have half the story the way they have not had half the story

09:14:35 21    when they are going back and forth.

09:14:38 22                  THE COURT:  Well, no, but you can't put in

09:14:40 23    evidence that is hearsay.  You can't put in statements from

09:14:43 24    the defendant when she's on the stand.

09:14:47 25                  MR. LOWELL:  Not for the truth necessarily.  In

09:14:49  1    other words -- well, first of all --

09:14:52  2                THE COURT:  Well, I mean --

09:14:53  3                MR. LOWELL:  I don't need to seek its admission

09:14:56  4    because if she says this is what I want you to do, it's what

09:14:59  5    I want you to do necessarily, but it certainly reflects the

09:15:02  6    state of mind that they were both in at the period of time

09:15:05  7    that they were conversing, so it's that exception as well.

09:15:08  8    But if you're saying that if a witness is on the stand and

09:15:11  9    you can't ask the witness did you call Mr. Biden, what did

09:15:15 10    you say to Mr. Biden.

09:15:16 11                THE COURT:  That's very different than what did

09:15:18 12    he say to you.

09:15:19 13                MR. LOWELL:  I get that, I understand that.

09:15:20 14                THE COURT:  But you have that in this --

09:15:23 15                MR. LOWELL:  You often -- I'm sorry, often in

09:15:26 16    context, both sides will come in to put it in context, I

09:15:30 17    understand and I don't need to ask her what Mr. Biden wrote

09:15:33 18    back, I can ask her, though, I think, what did you say to

09:15:36 19    him, what did you write.  In terms of the salacious material

09:15:40 20    we provided it to them in that form but certainly there are

09:15:44 21    redactions we wanted to make, I wanted them to see the full

09:15:47 22    thing in terms of, for example, the one they said.  I

09:15:50 23    understand that Ms. Biden, from me can't be asked what did

09:15:55 24    Hunter say.  I can, though, I think, say what did you say to

09:15:59 25    him.  And especially because some of these are contextually

09:16:02  1    in state of mind.  I mean, if she wrote him and said today

09:16:06  2    it's raining, when it's not raining, I'm not putting it in

09:16:10  3    for the truth that it was raining but it does have bearing

09:16:13  4    on what she was saying to him and what his reaction would

09:16:15  5    be.

09:16:16  6            So there is -- I have never been in a situation

09:16:19  7    where you can't ask a witness did you call, you said I could

09:16:22  8    do that.  Did you say something.  You can say that.  There

09:16:25  9    is no difference in a text, did you write him, what did you

09:16:28 10    say?  And then that's where that ends in terms of not what

09:16:33 11    Mr. Biden said back.

09:16:34 12            MR. WISE:  So there is a couple of issues with

09:16:36 13    Mr. Lowell has argued.  First of all, the issue with the

09:16:39 14    summary chart is --

09:16:40 15            THE COURT:  Wait, I was actually going to ask

09:16:42 16    you that.  Let's say I say no to the summary chart because

09:16:46 17    they didn't provide you with the information that they

09:16:48 18    should have provided you in a timely way.  Mr. Lowell says,

09:16:51 19    well, okay, then I can just pull out -- you know that they

09:16:56 20    have the messages, can they just pull out a message and ask

09:17:00 21    her about it?  Not from your other objections about doing

09:17:06 22    that, but is that appropriate?

09:17:08 23            MR. WISE:  So no, it's still a text message she

09:17:11 24    wrote, is an out of court statement.

09:17:13 25            THE COURT:  No.  No.  I'm sorry, I'll let you

09:17:15  1    make that argument about the hearsay.  My point is does that

09:17:18  2    get us through the objection that they didn't give you the

09:17:23  3    information that you should have had in a timely way.

09:17:26  4            MR. WISE:  There is sort of two things with

09:17:29  5    that.  We didn't get everything that's on that laptop.  It

09:17:34  6    went through a filter review.  So we may or may not have.

09:17:38  7    They have the whole set.  So first thing --

09:17:40  8            THE COURT:  Filter review from whom?

09:17:43  9            MR. WISE:  A separate team that we have no

09:17:45  10   access, we're walled off for, it's in the search warrant,

09:17:50  11   that is the protocol that would be followed.  The first

09:17:53  12   thing is whatever they would want to show her, they should

09:17:57  13   give us, we should see it so we know, and we're not going to

09:18:00  14   be able to sitting here sort of find it on the fly.

09:18:03  15           If the question is authenticity, sure a witness

09:18:08  16   can testify that, you know, this is a text I sent or an

09:18:11  17   e-mail I sent and that gets them through the authenticity

09:18:15  18   gate, but it doesn't necessarily get them through the

09:18:18  19   admissibility gate and the admissibility gate is often

09:18:22  20   things like is it a business record, that's how it comes in,

09:18:24  21   is it some other exception --

09:18:26  22           THE COURT:  Well he's saying it goes to state of

09:18:28  23   mind.

09:18:29  24           MR. WISE:  A lot of them don't.  A lot of them

09:18:31  25   are, you know, I mean, I'll just start at the back.  "Are

09:18:37  1    you here.  I'll see you inside, I'm in the parking lot but I

09:18:41  2    feel comfortable about going in right now, I will wait here

09:18:45  3    for you.  Come in, F you, I came because it was important

09:18:49  4    for me to show dad that I could show up."

09:18:51  5            MR. LOWELL:  I'm sorry to interrupt, that's a

09:18:53  6    Hunter one.

09:18:54  7            MR. WISE:  It's the same issue with all of

09:18:56  8    these, these are out of court statements being offered for

09:18:59  9    the truth of the matter asserted that they're saying these

09:19:01 10    things, that these things reflect where they are or what

09:19:04 11    they're doing.  It's not to say, oh we want to impeach that

09:19:07 12    she said it's raining and we know it's not raining, they

09:19:09 13    want to push through, the defendant can take the stand and

09:19:13 14    say I was here or I did this or I said this, but they can't

09:19:16 15    use as proxies out of court statements he made.

09:19:19 16            MR. LOWELL:  We agree about that.

09:19:22 17            THE COURT:  We are in agreement, they cannot use

09:19:24 18    on his statements.  Okay.  Those are hearsay.

09:19:27 19            MR. LOWELL:  Right.

09:19:27 20            THE COURT:  If they want to get those in, they

09:19:29 21    have to do it a different way.

09:19:33 22            With respect to this witness, are you saying

09:19:40 23    that they would have to say -- I mean, these statements as I

09:19:46 24    read them suggest that there were issues in the relationship

09:19:52 25    at that time.

09:19:53  1          MR. WISE:  Yes, I agree.

09:19:55  2          THE COURT:  And if you're saying that they

09:20:03  3  should really be using those for impeachment, if she says,

09:20:07  4  gosh, we were happier than we have ever been, everything was

09:20:11  5  great, then you could impeach and say they weren't really.

09:20:15  6          MR. WISE:  Exactly.

09:20:16  7          THE COURT:  But if she says no, things were

09:20:18  8  really bad, then that's fine.

09:20:20  9          MR. WISE:  Exactly.

09:20:21 10          THE COURT:  If Mr. Lowell said was one of the

09:20:25 11  issues you were worried about infidelity in the relationship

09:20:29 12  and she says no, he can use those to say you did have

09:20:36 13  concerns.

09:20:36 14          MR. WISE:  Right, because then there is a prior

09:20:39 15  inconsistent statement, that gets them through the

09:20:41 16  admissibility gate.  But if she says yeah, we were fighting,

09:20:45 17  which is what they seem to be getting at that, they were

09:20:48 18  fighting, they were accusing each other of things, I don't

09:20:52 19  know how deeply we need to get into that, there is a 403

09:20:55 20  issue at some point, but if she said as Your Honor said

09:20:58 21  everything was great, then potentially, that allows for one

09:21:01 22  of these statements to come in as a prior inconsistent

09:21:03 23  statement because the rules provide for that.

09:21:05 24          THE COURT:  What if she says as Mr. Lowell says,

09:21:08 25  back around the time in October of 2018, were you guys in a

09:21:13  1    good place, and she says I don't remember.  And he says well

09:21:18  2    let me show you some things to refresh your recollection.

09:21:21  3    That's okay?

09:21:22  4              MR. WISE:  Right.  Provided one, it doesn't go

09:21:24  5    up on the screen, she looks at it herself, and the key

09:21:28  6    question is does this refresh your recollection, and if she

09:21:30  7    says yes, then he can go back to asking her okay, what was

09:21:34  8    the state of your relationship or whatever, if she says no,

09:21:36  9    the statement itself doesn't come in because it's not like a

09:21:40 10    grand jury transcript where it's under oath, it's

09:21:44 11    inadmissible, the statement itself is inadmissible other

09:21:47 12    than if its a prior inconsistent statement or if it

09:21:50 13    refreshes recollection.

09:21:51 14              THE COURT:  What about if you're putting it in

09:21:54 15    not for the truth but for her state of mind that she was

09:22:00 16    upset.

09:22:02 17              MR. WISE:  So her state of mind isn't relevant

09:22:05 18    right, it's the defendant's state of mind.  The elements are

09:22:09 19    what was he knowing, not what was in her state of mind.  So

09:22:12 20    the hearsay exception for state of mind evidence still has

09:22:15 21    to get through the relevancy test which is, is it a fact or

09:22:19 22    consequence that -- will this be a fact or consequence more

09:22:24 23    or less probable.  What she's thinking isn't, it's simply

09:22:28 24    not relevant whether she believes what he's saying or not.

09:22:31 25    You know, what their -- is she paranoid, is she saying

09:22:37  1    things because she doesn't mean them because she wants to

09:22:39  2    get back at him, whatever, none of that matters.  They can

09:22:43  3    explore a little bit in terms of bias and motive, about the

09:22:46  4    rule for state of mind for, the hearsay exception for

09:22:51  5    statements doesn't relate to a witness where the witness's

09:22:55  6    state of mind is not an element of defense.

09:22:58  7              MR. LOWELL:  I can respond in a moment.

09:23:01  8              THE COURT:  Please.

09:23:01  9              MR. LOWELL:  Okay.  I heard Mr. Wise, in my mind

09:23:05 10    he's jumbled two things.  State of mind is relevant to any

09:23:09 11    witness if that person is testifying.  It is relevant for

09:23:13 12    any number of reasons that Your Honor has asked one about,

09:23:18 13    Mr. Wise is trying to cabin this either into a refresh

09:23:23 14    recollection, or saying it's hearsay for it's the truth of

09:23:26 15    the matter.

09:23:26 16              But if Ms. Biden is writing Mr. Biden, Ms. Biden

09:23:32 17    is writing Mr. Biden and saying where are you, where are

09:23:35 18    you, where are you, that does reflect what's happening at

09:23:38 19    that moment, especially because I understand her testimony

09:23:41 20    is going to be that he was with her on a particular time

09:23:46 21    when her writing to him and saying where are you, where are

09:23:49 22    you, will reflect that that's not possible.  Or she's either

09:23:54 23    not being accurate on the stand or she's not being accurate

09:23:57 24    where she's saying --

09:23:58 25              THE COURT:  Then you can use that to impeach or

09:24:01  1    to refresh her recollection.

09:24:03  2            MR. LOWELL:  That's what I'm saying, there are

09:24:04  3    various parts of what --

09:24:06  4            THE COURT:  So I think it's a difference between

09:24:09  5    -- I'm sorry, I cut you off, I asked you not to cut me off,

09:24:13  6    so I apologize.  But I think it's a difference between

09:24:15  7    whether you use it affirmatively or whether she testifies to

09:24:18  8    something inconsistently and you then use it to impeach or

09:24:22  9    she doesn't remember what she's doing and you use it to

09:24:25 10    refresh her recollection.

09:24:26 11            MR. LOWELL:  I think that's right.  I think each

09:24:28 12    one can be for a reason and the reason could be either a

09:24:32 13    state of mind that would be relevant as to the nature of

09:24:35 14    their relationship at a moment, it would be for the

09:24:38 15    possibility of again refreshing and if she says she did say

09:24:42 16    this and she did write him six times and say where are you,

09:24:46 17    where are you, then I think that's established.  If she says

09:24:49 18    something that's inconsistent with what a text says, then

09:24:53 19    its impeachment and I think that's right.  And the reason

09:24:56 20    that we've struggled to try to get them in a very set of

09:24:59 21    data where you can find things from the reason that Mr. Wise

09:25:02 22    said, for example, that it went through a filter team, now

09:25:05 23    I'm understanding that, but I don't know why that would

09:25:09 24    eliminate these kind of texts just to save time.  We can

09:25:13 25    print each one of these separately and use them separately,

09:25:16  1   and that will be a back and forth up to the witness stand or

09:25:22  2   not, and so we thought we would try it this way.

09:25:25  3            THE COURT:  So I'm going to sustain the

09:25:27  4   objection as to the summary chart, I think that the summary

09:25:30  5   chart does include hearsay certainly as to the statements

09:25:33  6   that Mr. Biden made to Ms. Biden.  So the summary chart is

09:25:39  7   out.

09:25:40  8            As to the texts from Ms. Biden to Mr. Biden, I

09:25:48  9   think we'll have to play that one at a time.  I do think

09:25:51 10   that they are hearsay, and the question is whether they can

09:25:55 11   be used in some way to refresh her recollection, to impeach

09:26:01 12   her if she says something inconsistently.  And as to her

09:26:07 13   state of mind, I don't think her state of mind is

09:26:10 14   necessarily relevant to the issue in this case whereas her

09:26:14 15   state of mind I guess to the extent it goes to bias or

09:26:17 16   something like that, may come into play, so we're going to

09:26:21 17   have to take those issues one at a time.

09:26:24 18            MR. LOWELL:  Understand.  I will still have the

09:26:27 19   summary chart up there, for the purposes of when it gets to

09:26:31 20   refreshing, that would just be clear, or impeachment, that

09:26:35 21   would be easier for them, but we will print out the

09:26:37 22   individuals ones as well.

09:26:38 23            MR. WISE:  I seen stuff in the summary chart

09:26:41 24   where there are messages and I can recognize them where

09:26:43 25   they're not accurate.  That's the problem, if you put

```
09:26:46  1    something in front of her, she's not going to remember
09:26:51  2    precise wording.
09:26:51  3              THE COURT:  All right.  So you have to show her
09:26:53  4    the message and provide those messages to you.
09:26:56  5              MR. WISE:  And then we need something, whatever
09:26:59  6    they're going to show her, we need to see it too.
09:27:02  7              THE COURT:  You need to see it from their
09:27:03  8    extraction file.
09:27:07  9              MR. LOWELL:  So in the meantime when we're
09:27:08 10    starting this morning --
09:27:09 11              THE COURT:  My guess is that you're not the one
09:27:13 12    who is creating an extraction file?
09:27:14 13              MR. LOWELL:  You probably got that right.
09:27:16 14              THE COURT:  You do that in your spare time.
09:27:18 15              MR. LOWELL:  Yes.  So we will try to get that
09:27:20 16    done quickly and figure that out.  Again, not that I feel
09:27:23 17    like I need to apologize, but we have been going back and
09:27:28 18    forth.  The data is incredibly dense and we have gotten it
09:27:31 19    from the government in various ways.  And now I'm hearing
09:27:36 20    that they're saying in their extraction report or what they
09:27:39 21    did, there may be things missing, well we have them from
09:27:42 22    them, so I don't know how things we put here could be
09:27:45 23    missing because we didn't invent this, we got it from them.
09:27:50 24              THE COURT:  So anything -- maybe I should
09:27:51 25    address this to your colleague.  So anything that you have
```

09:27:55 1  gotten or put on this chart is something you got from the

09:27:58 2  government, not from any other source?

09:28:00 3          MR. KOLANSKY:  That's correct, Your Honor, and I

09:28:02 4  proffer that and it comes directly from the government and

09:28:05 5  that is why I endeavored to be as precise as possible to the

09:28:09 6  original source file path they can stick it on the hard

09:28:13 7  drive and get exactly to the folder where that message is

09:28:16 8  derived from on the hard drive we received.

09:28:19 9          MR. LOWELL:  Like last night I think, or

09:28:22 10 yesterday afternoon, whenever we were able to go back, we

09:28:25 11 provided them with the media that they can go and do exactly

09:28:28 12 what Mr. Kolansky just said and check it.  Now if they chose

09:28:32 13 not to, I'm sorry but we gave it to them because that's the

09:28:35 14 best you can do with the data they gave us.

09:28:37 15         THE COURT:  All right.

09:28:38 16         MR. WISE:  No, no, we didn't get any media, I

09:28:41 17 got, 11:07, I saw something on my phone that has this path

09:28:46 18 name that I don't know what it is.

09:28:48 19         MR. LOWELL:  I'm sorry, we gave them the file

09:28:51 20 path one by one of something they gave us.

09:28:54 21         MR. WISE:  Yeah.

09:28:55 22         THE COURT:  The file path one by one, but the

09:28:58 23 file path is identical.

09:29:00 24         MR. HINES:  It's filtered, we can't see that but

09:29:05 25 we can't -- and they know that from the search warrant, it's

09:29:08  1    in the search warrant.

09:29:09  2                THE COURT:  So you're limited in what you can do

09:29:14  3    because you're trying to protect rights using only the

09:29:17  4    information allowed from the search warrant.

09:29:19  5                MR. WISE:  Exactly.

09:29:20  6                MR. LOWELL:  What I'm learning for the first

09:29:22  7    time, understand this, they have provided us in discovery

09:29:27  8    things that they're saying that the investigative team does

09:29:30  9    not have.  So I didn't realize that, I thought it was a one

09:29:33 10    to one match, you would have assumed that otherwise I don't

09:29:37 11    know why they would have sent it to me, it's not

09:29:40 12    attorney/client materials we're talking about, it's

09:29:42 13    conversations between Mr. and Ms. Biden, so I don't

09:29:45 14    understand that.

09:29:46 15                MR. WISE:  It's Rule 16, it's his statement, we

09:29:49 16    have to turn it over, if it's privileged, we don't get to

09:29:52 17    see it if it goes through a filter, this is not anything

09:29:57 18    new, the search warrant says it went through a filter.

09:29:59 19                THE COURT:  He's saying this is conversation

09:30:01 20    between Mr. Biden and Ms. Biden, there is no arguable

09:30:04 21    privilege here.

09:30:05 22                MR. WISE:  Again, we don't know what we don't

09:30:08 23    know, when they say we got it, we don't have it.

09:30:11 24                THE COURT:  So there is a question as to the

09:30:14 25    authenticity accuracy of these statements, if you can

09:30:17  1    provide the extraction file whatever, so they can find that

09:30:21  2    and confirm that, then we can deal with that objection and

09:30:25  3    get through, you can use -- deal with them on a one by one

09:30:30  4    basis.  All right.  Anything else?

09:30:31  5              MR. LOWELL:  And one last piece on that so I'm

09:30:34  6    understanding, please.

09:30:35  7              So if there is a filter team, there is no basis

09:30:39  8    for them to filter out to the government a conversation

09:30:42  9    between Hallie Biden and Hunter Biden.  So how that would

09:30:46 10    not get back into their possession when it got into ours is

09:30:50 11    still something I don't understand.

09:30:52 12              THE COURT:  So it may be, and I think Mr. Wise

09:30:55 13    would say, he very well may have it, but he has no idea if

09:30:59 14    he has it based on what you gave him.  So I'm saying give

09:31:03 15    him something so that he can look at it and say oh, yeah, I

09:31:07 16    have it.  He's just saying look, I think he's trying to make

09:31:10 17    the record, I don't have everything.  Some of the stuff

09:31:13 18    that's in here, I don't remember seeing.  So I don't know if

09:31:16 19    it's right or wrong.  And so we're saying, okay, give him

09:31:21 20    the stuff to show so that he can decide if he has an

09:31:25 21    objection.

09:31:25 22              MR. LOWELL:  One other thing so that we can do

09:31:27 23    that.  On those texts which you phrased as salacious, I

09:31:32 24    wanted to make sure you saw everything, but those phrases we

09:31:35 25    can redact out and I'll show them how we do that.

09:31:40  1        MR. WISE:  We don't have a redacted set.

09:31:43  2        THE COURT:  I don't know what the point of

09:31:44  3  having that text is if you take that out because there is

09:31:47  4  nothing there other than --

09:31:49  5        MR. LOWELL:  Well, no, I'm sorry, I didn't mean

09:31:51  6  to interrupt you.

09:31:52  7        THE COURT:  21, so what do you take one word out

09:31:56  8  and then it doesn't really mean anything.

09:32:00  9        MR. LOWELL:  For that one, for example, will you

09:32:02  10  come home, then you redact so we can, blah, blah, blah

09:32:07  11  before I go.  That matters, it matters because of the date.

09:32:11  12  It matters because it indicates that he is not there.  It

09:32:17  13  matters because of that.  The relevance is her testimony of

09:32:21  14  what happened that morning and where she was and where he

09:32:23  15  was.  She's asking him to come home.  The natural inference,

09:32:29  16  not even inference, is he's not there.

09:32:32  17        MR. WISE:  But it's not that he was never there.

09:32:35  18        THE COURT:  No, no, I get it.  But that's fair

09:32:38  19  for the jury to decide.  Right?  If she says he was, he says

09:32:43  20  he wasn't, that's for the jury to decide.

09:32:46  21        MR. WISE:  Sure, and if she says he wasn't, he

09:32:49  22  left, this isn't inconsistent with that.

09:32:51  23        THE COURT:  I understand.  That's why I say

09:32:53  24  we'll take it one step at a time because I don't know what

09:32:56  25  the witness is going to say.

09:32:58  1                        Okay.  Any other exhibits, anything else we need

09:33:01  2   to talk about before we let the jury come in?

09:33:05  3                        MR. WISE:  Not from the United States.

09:33:06  4                        MR. LOWELL:  No, we'll get working on that.

09:33:10  5                        THE COURT:  All right.  Thank you.  Let's bring

09:33:11  6   in the jury.

09:34:14  7                        (Jury entering the courtroom at 9:35 a.m.)

09:36:06  8                        THE COURT:  All right.  Everyone, be seated.

09:36:35  9   Members of the jury, welcome back.  It's time for me to ask

09:36:39 10   my question.  Have you heard anything about this trial?

09:36:42 11                        THE JURY:  No.

09:36:43 12                        THE COURT:  Anyone try to talk to you about

09:36:44 13   anything in this trial?

09:36:46 14                        THE JURY:  No.

09:36:47 15                        THE COURT:  All right.  And you haven't done any

09:36:49 16   research or watched any TV, social media, heard any radio,

09:36:55 17   read any internet, anything kind of like that; right?

09:37:01 18                        THE JURY:  No.

09:37:01 19                        THE COURT:  All right.  Okay.  All right.  Let's

09:37:04 20   continue.  Let's bring in Mr. Cleveland.  Welcome back.

09:37:08 21                        THE WITNESS:  Good morning.

09:37:08 22                        THE COURT:  And sir, I'm just going to remind

09:37:10 23   you, you're still under oath.  Okay.

09:37:14 24                        THE WITNESS:  Yes.

09:37:17 25                        MR. LOWELL:  Ready, Your Honor?

09:37:25 1        THE COURT:  I am.

09:37:26 2            CROSS-EXAMINATION

09:37:26 3  BY MR. LOWELL

09:37:27 4  Q.    Good morning, Mr. Cleveland, good morning, ladies and

09:37:29 5  gentlemen.  Mr. Cleveland, sorry I didn't get to finish last

09:37:33 6  evening.

09:37:33 7            Yesterday we were talking about a government

09:37:36 8  exhibit, which is government Exhibit A, which is the

09:37:43 9  Form 4473.  And you were asked questions about the questions

09:37:46 10  on the first page.  Do you remember doing that yesterday?

09:37:49 11  A.    Yes.

09:37:50 12  Q.    And you identified one that is letter E.  Do you

09:37:54 13  remember that?

09:37:55 14  A.    Yes.

09:37:56 15  Q.    I would like you to read through the other questions

09:37:58 16  that you said you saw Mr. Biden check the box for, okay?

09:38:02 17  A.    Okay.  So you want me to start with E?

09:38:04 18  Q.    No, I'll do it as short as I can to save you and the

09:38:09 19  jury time.

09:38:09 20  A.    Okay.

09:38:10 21  Q.    A, for example, asks the question, are you the actual

09:38:13 22  transferee; correct?

09:38:15 23  A.    Yes.

09:38:15 24  Q.    And that question uses the word "are"?

09:38:20 25  A.    Yes.

Cleveland - cross

09:38:23  1    Q.      Then B says, are you under indictment or

09:38:28  2    investigation, do you see that, for a felony?

09:38:30  3    A.      Yes.

09:38:30  4    Q.      It uses the word "are", correct?

09:38:34  5    A.      Yes.

09:38:34  6    Q.      It doesn't ask have you ever been indicted, does it?

09:38:38  7    A.      No.

09:38:38  8    Q.      Then C says, have you been convicted, do you see

09:38:42  9    that?

09:38:43 10    A.      Yes.

09:38:43 11    Q.      So that one has a "have you ever" or "have you been",

09:38:46 12    right?

09:38:49 13    A.      Yes.

09:38:49 14    Q.      D says are you a fugitive, it's another "are", do you

09:38:54 15    see that?

09:38:54 16    A.      Yes.

09:38:54 17    Q.      It doesn't ask have you ever been a fugitive,

09:38:58 18    correct?

09:38:59 19    A.      Yes.

09:38:59 20    Q.      E says, as you indicated, "are you", an unlawful user

09:39:04 21    of, or, it has the word "or" in it, right?

09:39:08 22    A.      Yes.

09:39:08 23    Q.      And then it says addicted.  That's one that is an

09:39:12 24    are, A-R-E; right?

09:39:15 25    A.      Yes, sir.

Cleveland - cross

09:39:15 1  Q.      F then says have you ever been adjudicated as a

09:39:20 2  mental defective, do you see that?

09:39:22 3  A.      Yes.

09:39:22 4  Q.      And that's a "have you", looking at the words have

09:39:26 5  you ever, do you see that?

09:39:27 6  A.      It is.

09:39:27 7  Q.      G says have you been discharged, and you see that

09:39:33 8  one?

09:39:33 9  A.      Yes.

09:39:33 10  Q.      That is also one that says "have you"; is that right?

09:39:36 11  A.      Yes.

09:39:37 12  Q.      And then H says are you subject to a court order

09:39:42 13  restraining you, do you see that?

09:39:44 14  A.      Yes.

09:39:44 15  Q.      That's an "are"?

09:39:45 16  A.      Yes.

09:39:46 17  Q.      It doesn't say "have you ever"?

09:39:48 18  A.      No.

09:39:49 19  Q.      In your experience selling weapons, would it give you

09:39:55 20  pause if somebody said "I used to have a restraining order

09:39:59 21  against me for my partner, my spouse, but I would like to

09:40:03 22  get a gun"?

09:40:04 23  A.      Yes, it would have me stop the sale.

09:40:06 24  Q.      But that's not what it asks, is it?

09:40:09 25  A.      No.

Cleveland - cross

09:40:09   1   Q.      I says, have you ever been convicted, right?

09:40:12   2   A.      Yes.

09:40:13   3   Q.      That's a "have you"?

09:40:14   4   A.      Yes, it is.

09:40:15   5   Q.      12B says, have you ever renounced, right?

09:40:19   6   A.      Yes.

09:40:20   7   Q.      It doesn't say are you presently renouncing, do you

09:40:23   8   plan to renounce, it says "have you"?

09:40:24   9   A.      Yes.

09:40:25  10   Q.      12C says, are you an illegal -- sorry, are you an

09:40:32  11   alien illegally or unlawfully in the United States, right?

09:40:36  12   A.      Yes.

09:40:37  13   Q.      That's an "are", A-R-E, right?

09:40:39  14   A.      Yes.

09:40:40  15   Q.      It doesn't say have you ever been admitted illegally

09:40:43  16   or unlawfully, it doesn't look backwards, does it?

09:40:46  17   A.      No.

09:40:46  18   Q.      But to be clear, E is one of those ones that say

09:40:51  19   "are", A-R-E?

09:40:53  20   A.      Yes.

09:40:56  21   Q.      Okay.  Then if you take that piece down.

09:41:00  22          Your testimony you said that you observed

09:41:03  23   Mr. Biden looking at the form, you told him to take his

09:41:06  24   time?

09:41:06  25   A.      Yes.

Cleveland - cross

09:41:06 1    Q.    You remember that, right?

09:41:08 2    A.    Yes.

09:41:09 3    Q.    Okay.  So the form has multiple pages on it, right?

09:41:13 4    A.    Yes.

09:41:14 5    Q.    And you saw him looking at each page?

09:41:16 6    A.    Well, he only had to go ahead and look at the first

09:41:19 7    -- the front of it and the back when he went to go to the

09:41:22 8    certified, so yes.

09:41:24 9    Q.    How about the instructions which explain what we just

09:41:26 10   went through, A, B, C, D, E, that's in the form, isn't it?

09:41:31 11   A.    Yes.

09:41:31 12   Q.    That's something that would be in the same form that

09:41:33 13   you handed him?

09:41:34 14   A.    Yes.

09:41:34 15   Q.    So it's a whole package?

09:41:37 16   A.    Yes.

09:41:37 17   Q.    And that's where directions, instructions, and

09:41:39 18   definitions apply for somebody who is filling out the form?

09:41:44 19   A.    Yes, sir.

09:41:44 20   Q.    If you'll turn to the page, put back 10A, Mr. Radic,

09:41:49 21   if you will turn the page.  Turn the page again.  Okay.  So

09:41:55 22   that's where your signature is and then it begins, the

09:42:00 23   series of instructions and definitions, right?

09:42:03 24   A.    Yes.

09:42:03 25   Q.    So if you look -- if you'll turn the page, Mr. Radic.

Cleveland - cross

09:42:07  1              If you look at the -- the questions on that page

09:42:12  2    conform to the boxes, don't they?

09:42:14  3    A.      Yes.

09:42:14  4    Q.      So if you'll see, there is one for 9, there is one

09:42:19  5    for 10A, et cetera, and then there is the 11 questions

09:42:22  6    starting at the bottom of the lower page, do you see that?

09:42:24  7    A.      Yes, sir.

09:42:25  8              MR. HINES:  Objection.  Actually it starts at

09:42:27  9    the top of the page.

09:42:28 10    BY MR. LOWELL:

09:42:28 11    Q.      I'm sorry, go to the left, the bottom of the

09:42:31 12    left-hand column, letter A, "actual transferee", do you see

09:42:35 13    that.  You don't have to blow it up yet Mr. Radic.  That's

09:42:39 14    where there is a corresponding instruction for the parts of

09:42:42 15    the box you said that Mr. Biden signed?

09:42:44 16    A.      Yes.

09:42:44 17    Q.      And there is one more 11A, 11B, 11D, 11F, on the next

09:42:54 18    page, Mr. Radic?

09:42:56 19              MR. HINES:  Objection.  Sorry just to be clear,

09:43:00 20    11B-12.

09:43:04 21    BY MR. LOWELL:

09:43:04 22    Q.      Let me start again.  You see there is an instruction

09:43:08 23    for 11A to bottom?

09:43:09 24    A.      Yes.

09:43:09 25    Q.      Then there is one for 11B-12.  Do you see that?

Cleveland - cross

09:43:14 1   A.      Yes.

09:43:14 2   Q.      And then there is a lot of words right between that

09:43:17 3   one and the next one?

09:43:18 4   A.      Yes.

09:43:18 5   Q.      And then it says 11D, right?

09:43:20 6   A.      Yes.

09:43:21 7   Q.      All right.  11A was actual transferor definition of

09:43:25 8   that, right?

09:43:26 9   A.      Yes.

09:43:26 10  Q.      And 11B-12 is addressing the issue of what's

09:43:33 11  prohibited in terms of transportation, shipment as it is

09:43:37 12  explained there, right?

09:43:38 13  A.      Yes.

09:43:38 14  Q.      And then 11D is phrased fugitive from justice?

09:43:43 15  A.      Yes.

09:43:44 16  Q.      And it explains that provision, correct?

09:43:48 17  A.      Yes.

09:43:48 18  Q.      11F says adjudicated as a mental defective, and do

09:43:54 19  you see that?

09:43:55 20  A.      Yes.

09:43:55 21  Q.      And then it goes further, it says committed to, and

09:43:57 22  then there is an exception.  Can you turn to the next page,

09:44:01 23  Mr. Radic.  And then it goes more words to 11H, which says

09:44:06 24  "qualifying restraining order".

09:44:09 25  A.      Yes.

09:44:09  1   Q.      And it's talking again, that's the one that says "are

09:44:14  2   you", not have you?

09:44:15  3   A.      Yes.

09:44:15  4   Q.      And then 11I explains what a misdemeanor crime for

09:44:21  5   domestic violence is?

09:44:23  6   A.      Yes.

09:44:23  7   Q.      And 12D explains that question of immigration status

09:44:27  8   in the present tense?

09:44:28  9   A.      Yes.

09:44:29 10   Q.      And it doesn't go and ask have you ever, does it?

09:44:32 11   A.      No.

09:44:35 12   Q.      And then 13 explains further about the U.S. issued

09:44:41 13   alien number, correct?

09:44:41 14   A.      Yes.

09:44:42 15   Q.      If you go back a page, Mr. Radic.  Do you see on the

09:44:45 16   page before where I said there is a definition for question

09:44:49 17   11D called fugitive from justice?

09:44:52 18   A.      Yes.

09:44:53 19   Q.      And then it goes to 11F, right?

09:44:55 20   A.      Yes.

09:44:55 21   Q.      There is no provision in this which defines or

09:44:59 22   instructs as to 11E, is there?

09:45:00 23              MR. HINES:  Objection.  May we approach?

09:46:25 24              (Side-bar discussion.)

09:46:25 25              MR. HINES:  So really two issues, one there is

09:46:25 1    no foundation for these questions because there is a

09:46:25 2    question that addresses 11E, it's in the section that says

09:46:25 3    question B through 12 and what Mr. Lowell just did is he

09:46:25 4    skipped the part he is an unlawful user of or addicted to

09:46:25 5    marijuana or any depressant or narcotic drug, he's

09:46:25 6    suggesting there is nothing in these instructions related to

09:46:25 7    that, the second issue it's irrelevant because it doesn't

09:46:25 8    matter what Mr. Cleveland's interpretation are regarding

09:46:25 9    what we're going through with the instruction, it's an

09:46:25 10   irrelevant basis.

09:46:25 11                MR. LOWELL:  As to the first, I don't mind going

09:46:25 12   backwards, all it does is repeat the question, it doesn't

09:46:25 13   define it.  As to the second, I'm not asking the question

09:46:25 14   that he just asked, I am pointing out that they can readily

09:46:25 15   see which is, there is nothing on 11E, that's all end of the

09:46:25 16   story.

09:46:25 17                THE COURT:  That's all your going to ask?

09:46:25 18                MR. LOWELL:  Yes.

09:46:25 19                THE COURT:  You can point out whatever you want

09:46:25 20   to point out.

09:46:25 21                MR. HINES:  Okay.

09:46:26 22   BY MR. LOWELL:

09:46:27 23   Q.    Mr. Radic, would you go back to the second column

09:46:30 24   which says questions 11B-12.  11B-12 references a statute

09:46:37 25   and it says what it prohibits, it prohibits receipt or

Cleveland - cross

09:46:41 1  possession in or affecting interstate commerce of a firearm

09:46:46 2  by one who has been convicted of a felony in a federal state

09:46:51 3  or local court, right?

09:46:52 4  A.     Yes.

09:46:52 5  Q.     And that corresponds to one of the questions, yes?

09:46:55 6  A.     Yes.

09:46:57 7  Q.     And that's a has been.  Than or any other crime

09:47:01 8  punishable by imprisonment, and then it explains it does not

09:47:04 9  include state misdemeanors, right?

09:47:06 10 A.     Yes.

09:47:07 11 Q.     Is a fugitive from justice?

09:47:09 12 A.     Yes.

09:47:10 13 Q.     It's not have you ever been.  Is an unlawful user of

09:47:13 14 or addicted to marijuana or any depressant, stimulant,

09:47:14 15 narcotic drug or any other controlled substance, do you see

09:47:17 16 that one?

09:47:17 17 A.     Yes.

09:47:17 18 Q.     That matches E right?

09:47:20 19 A.     Yes.

09:47:20 20 Q.     In that paragraph, it doesn't say more than what the

09:47:23 21 11E space on the front of the form says, the exact same

09:47:26 22 words?

09:47:27 23 A.     Yes.

09:47:27 24 Q.     It doesn't have a definition?

09:47:28 25 A.     No.

Cleveland - cross

09:47:29  1    Q.      Then it says has been adjudicated as a mental

09:47:32  2    defective, that's something that you and I went over on the

09:47:35  3    front of the form, right?

09:47:36  4    A.      Yes.

09:47:36  5    Q.      And has been, that's another has been, discharged

09:47:39  6    from the armed forces, do you see that?

09:47:41  7    A.      Yes.

09:47:42  8    Q.      And then there is that "is", is subject to certain

09:47:45  9    restraining orders, right?

09:47:46 10    A.      Yes.

09:47:46 11    Q.      That's an is, I'm sorry, that's an is, not a has

09:47:52 12    been?

09:47:52 13    A.      Yes.

09:47:52 14    Q.      And then second line down, has renounced?

09:47:55 15    A.      Yes.

09:47:56 16    Q.      Do you see that one?

09:47:57 17    A.      Yes.

09:47:57 18    Q.      That just matches the words in the front of the form,

09:48:00 19    there are no specific definitions in those?

09:48:02 20    A.      No.

09:48:02 21    Q.      And then if you'll zoom out, Mr. Radic.  And then all

09:48:05 22    I was asking you is that now we've looked at each of the

09:48:08 23    words in 11B-12, you go down the page, 11D says, "fugitive

09:48:14 24    from justice", that's where we're at, correct?

09:48:17 25    A.      Yes, sir.

Cleveland - cross

09:48:18  1    Q.      And then it skips to 11F?

09:48:20  2    A.      Yep.

09:48:20  3    Q.      So all I'm asking you, in this form in that place, is

09:48:25  4    there an 11E definition?  There is not, is there?

09:48:28  5    A.      No.

09:48:31  6    Q.      You can take that down, Mr. Radic.

09:48:33  7             Then in terms of the sequence of events, you

09:48:37  8    talked about the form being presented going into the back

09:48:42  9    room.  And yesterday you were asked this question in terms

09:48:51 10    of when Mr. Biden signed the form.  You were asked "what

09:48:57 11    happened next after you seen Mr. Biden sign the form and

09:48:59 12    date it?"  And then you answered "what happens next is

09:49:04 13    Jason", is that referring to Jason Turner, right?

09:49:07 14    A.      Yes, sir.

09:49:07 15    Q.      "Said also we would need for the passport, another

09:49:10 16    form of like identification stating his address, it could be

09:49:16 17    a bill, or it could be vehicle registration", then question,

09:49:22 18    "what's the next thing you observed?"  And the answer, "I

09:49:25 19    observed Mr. Biden leave out and then come back in."

09:49:28 20             That's what you said yesterday?

09:49:30 21    A.      Yes.

09:49:31 22    Q.      What was it that you brought to Mr. Jason Turner's

09:49:36 23    attention?

09:49:37 24    A.      What did I bring -- you said what did I bring to

09:49:41 25    Jason Turner?

Cleveland - cross

09:49:42  1  Q.      You said Jason Turner did something, what did you say
09:49:46  2  to him?
09:49:46  3  A.      I didn't say anything, I think Jason, I think he
09:49:49  4  realized that it needed to be --
09:49:52  5              MR. HINES:  Objection.
09:49:52  6              THE COURT:  Yes.  So you don't have to speculate
09:49:54  7  on what Mr. Turner thought, if you don't know.
09:49:57  8              THE WITNESS:  Yeah, I'm not a hundred percent
09:49:59  9  sure about that.
09:50:00 10  BY MR. LOWELL:
09:50:00 11  Q.      Hundred percent.  You presented Mr. Jason -- sorry,
09:50:03 12  you presented Mr. Turner with what?
09:50:05 13  A.      I presented Mr. Turner with the form so that he could
09:50:09 14  go ahead and run the background check.
09:50:12 15  Q.      Okay.  And did you also provide him the
09:50:14 16  identification that existed at the time?
09:50:16 17  A.      Yes.
09:50:17 18  Q.      Okay.  And then what did -- what did you say to him
09:50:20 19  when you did that, did you say anything?
09:50:22 20  A.      I said it's ready to go.
09:50:24 21  Q.      Okay.
09:50:25 22  A.      Ready to run the background.
09:50:27 23  Q.      Did you say anything to him about that you were
09:50:29 24  giving him a passport versus any other form?
09:50:32 25  A.      No, he already had seen it.

Cleveland - cross

09:50:35 1    Q.      Okay.  Tell me that.  What did he see what?

09:50:38 2    A.      He already knew about the passport.

09:50:40 3               MR. HINES:  Objection.  Asked and answered

09:50:42 4    yesterday.

09:50:43 5               THE COURT:  Yes.

09:50:44 6               MR. LOWELL:  I'm sorry, I know we asked it, you

09:50:48 7    asked it.

09:50:48 8    BY MR. LOWELL:

09:50:49 9    Q.      I'm sorry, can I unwind that a second please.  He had

09:50:52 10   already seen what?

09:50:53 11   A.      The passport.

09:50:54 12   Q.      When did he see that?

09:50:55 13   A.      He seen that when I went to go ask about was it fine

09:50:59 14   to use.

09:51:00 15   Q.      So you did say something to him?

09:51:02 16   A.      Yes.

09:51:04 17   Q.      And you said is it okay to use the passport?

09:51:06 18   A.      Yes.

09:51:06 19   Q.      Is that all you said?

09:51:07 20   A.      Yeah, that was it.

09:51:08 21   Q.      Why did you ask him that?

09:51:10 22   A.      Because as I stated yesterday, I have --

09:51:13 23               MR. HINES:  Objection.

09:51:22 24               THE COURT:  I'm not -- I mean, come over here.

09:55:02 25               (Side-bar discussion.)

Cleveland - cross

09:55:02  1          THE COURT:  What's the objection?

09:55:02  2          MR. HINES:  The issue is, maybe I jumped the gun

09:55:02  3  with the objection, I'll say that, but where are we going

09:55:02  4  with this and what's next, if he's just asking why did you

09:55:02  5  ask the question, but then if it is, was the reason you

09:55:02  6  asked that question was because you needed a secondary form

09:55:02  7  of identification, what is the state of mind at this point,

09:55:02  8  they're sort of packaged together, that's all irrelevant,

09:55:02  9  it's not a fact or consequence.

09:55:02 10          THE COURT:  You're going to say why did you do

09:55:02 11  it and he said because I don't know if that was enough and

09:55:02 12  then what?

09:55:02 13          MR. LOWELL:  That's the end of that question I

09:55:02 14  think.

09:55:02 15          THE COURT:  I know that's the end of that

09:55:02 16  question but what comes next in your questions.

09:55:02 17          MR. LOWELL:  Yesterday he testified that it

09:55:02 18  could be a bill, like a utility bill, he used the word bill,

09:55:02 19  it can't be a bill, he said it in testimony.

09:55:02 20          THE COURT:  Okay.

09:55:02 21          MR. LOWELL:  It can't be a bill, Your Honor.

09:55:02 22          THE COURT:  No.  No.  I mean, that's not really

09:55:02 23  relevant to whether or not this guy checked the box.  So you

09:55:02 24  can say did you ever get that, did you ever get it, you can

09:55:02 25  ask that.  But you can't ask -- and you know it was illegal

Cleveland - cross

09:55:02  1    that you used the a bill.

09:55:02  2              MR. LOWELL:  I wasn't going to say that.

09:55:02  3              THE COURT:  It wasn't allowed that you used just

09:55:02  4    a passport.

09:55:02  5              MR. LOWELL:  Okay.  The form is in evidence,

09:55:02  6    Your Honor, though, so when it comes to the definition of

09:55:02  7    what is the residence, I mean it's in evidence, I won't ask

09:55:02  8    him about it.

09:55:02  9              THE COURT:  I understand.  Look, I just put

09:55:02 10    someone in prison for a long time because he used the wrong

09:55:02 11    address and you said in your opening that he put the wrong

09:55:02 12    address on even though he doesn't live there.  So you can

09:55:02 13    you know talk about that and the address and he can put

09:55:03 14    what's there, but I'm not sure it's helpful.

09:55:03 15              MR. LOWELL:  On that point Your Honor, since you

09:55:03 16    raised it, that's where he was living when he was in

09:55:03 17    Delaware.

09:55:03 18              THE COURT:  Okay.  I'm just going by-- it

09:55:03 19    surprised me when you said it in your opening, I said holy

09:55:03 20    cow.

09:55:03 21              MR. LOWELL:  It wasn't his permanent address,

09:55:03 22    but the relevance so that the record is as you and I are

09:55:03 23    doing it, if somebody said he went and got a car

09:55:03 24    registration at that address in the black Cadillac, it's his

09:55:03 25    father's car.

09:55:03 1          THE COURT:  He already said it wasn't his car.

09:55:03 2  I think -- or maybe you said it.

09:55:03 3          MR. LOWELL:  I said in opening.

09:55:03 4          THE COURT:  You said it wasn't his car.  He knew

09:55:03 5  it wasn't his car.

09:55:03 6          MR. LOWELL:  If they're going to profess that

09:55:03 7  the man came back with a car registration as maybe he or

09:55:03 8  somebody else.

09:55:03 9          MR. WISE:  He didn't say that, he didn't say

09:55:03 10  that, he never said he came back with a registration.

09:55:03 11          MR. LOWELL:  I'm sorry, because somebody said

09:55:03 12  something wrong once one way in an interview.

09:55:03 13          MR. WISE:  He didn't say it on direct.

09:55:03 14          THE COURT:  You can ask him did he ever see a

09:55:03 15  car, a registration.

09:55:03 16          MR. LOWELL:  Yes.

09:55:03 17          THE COURT:  That's it.

09:55:03 18          MR. LOWELL:  Right, and then Mr. Turner will be

09:55:03 19  asked the same question.

09:55:03 20          MR. HINES:  But our case-in-chief is ending, we

09:55:03 21  have proved it you can't dull Turner.

09:55:03 22          THE COURT:  Just to impeach him.

09:55:03 23          MR. LOWELL:  Not to impeach Mr. Cleveland.

09:55:03 24          THE COURT:  Or you can't call him just to

09:55:03 25  impeach Mr. Turner, either ask him to say something if you

Cleveland - cross

09:55:03  1    think he's going to lie on the stand.  You can't put him up

09:55:03  2    there to lie because.  You're not allowed the put someone up

09:55:03  3    there to lie and if they do, you can't put them up there

09:55:03  4    just to cross-examine him.

09:55:03  5             If you're going to call Mr. Turner and you

09:55:03  6    object, we can get a proffer.  We don't need to find that

09:55:03  7    right now.  That seems pointless.

09:55:08  8             (End of side-bar.)

09:55:08  9    BY MR. LOWELL:

09:55:11 10    Q.    I'm trying to remember my last question, which was

09:55:13 11    did I ask you yet what did you say to Mr. Turner?

09:55:16 12    A.    Yes.

09:55:17 13    Q.    What did you say?

09:55:17 14    A.    I said that the background check was ready.

09:55:20 15    Q.    Before that you were, were you presenting the first

09:55:22 16    time with the passport what did you say?

09:55:24 17    A.    I asked him was the passport fine to use.

09:55:26 18    Q.    And then coming back he then did something you said

09:55:30 19    yesterday, you don't have to tell me what he said, but he

09:55:32 20    did something?

09:55:33 21    A.    Yes.

09:55:33 22    Q.    But yesterday you did say you got the okay?

09:55:36 23    A.    Yeah.

09:55:36 24    Q.    And who else was in the room when that happened?

09:55:39 25    A.    Jason and Ronald Palimere.

Cleveland - cross

09:55:41  1    Q.        And was Mr. Palimere and Mr. Turner together when

09:55:45  2    this exchange was going on?

09:55:47  3    A.        Yes.

09:55:48  4    Q.        They both heard your -- sorry, Mr. Palimere was close

09:55:51  5    enough to Mr. Turner to hear what you were saying and what

09:55:54  6    Mr. Turner was saying?

09:55:56  7    A.        Yes.

09:56:00  8    Q.        When you were in the room with Mr. Palimere, did you

09:56:03  9    get an impression in your exchange of what Mr. Palimere was

09:56:07 10    seeking to get the sale done quickly?

09:56:11 11    A.        He wanted the sale done quickly because he didn't

09:56:14 12    want him --

09:56:15 13                   MR. HINES:  Objection.

09:56:16 14                   THE COURT:  Yeah.  Hearsay is when you're

09:56:20 15    talking about what someone else said out of court.  So we

09:56:23 16    don't let in hearsay, and I sustain the objection.

09:56:27 17                   MR. LOWELL:  All he was asking, and I didn't ask

09:56:29 18    you for what he said, I said did you get the impression that

09:56:32 19    he wanted the sale to go quickly.

09:56:34 20                   THE WITNESS:  Yes.

09:56:34 21    BY MR. LOWELL:

09:56:34 22    Q.        Now, after you said yesterday that Jason said that we

09:56:40 23    should need for the passport another form of identification

09:56:43 24    stating his address, it could be a bill, or it could be a

09:56:46 25    vehicle registration, then you said what's next, I observed

Cleveland - cross

09:56:50  1    Mr. Biden leave out and then come back in?

09:56:52  2    A.      Yes.

09:56:53  3    Q.      Right, did he come back in with anything?

09:56:56  4    A.      I believe so.

09:56:58  5    Q.      When you say you believe so, what's that belief based

09:57:02  6    on?

09:57:02  7    A.      I believe so because Jason was the one that was

09:57:05  8    handling the rest of that, taking over to run the background

09:57:08  9    check.

09:57:08 10    Q.      So is it your testimony that you don't know and are

09:57:14 11    assuming that Mr. Turner did or got something or you saw

09:57:17 12    that, or what did you see Mr. Biden do and come back with,

09:57:21 13    if anything?

09:57:22 14    A.      He just came back in, that's all I can say, he came

09:57:25 15    back in.

09:57:25 16    Q.      Did you see him have a piece of paper in his hand?

09:57:28 17    A.      No.

09:57:29 18    Q.      Did you see him talk to Mr. Turner at that point?

09:57:32 19    A.      Yes.

09:57:33 20    Q.      So he comes back in and has a conversation with

09:57:37 21    Mr. Turner?

09:57:38 22    A.      Yes.

09:57:38 23    Q.      Did you see Mr. Biden give Mr. Turner anything?

09:57:41 24    A.      No.

09:57:41 25    Q.      And then what happened next in terms of the sequence,

Cleveland - cross

09:57:46  1  did Mr. Turner go back into the back room?

09:57:48  2  A.    Yes, to run a background.

09:57:50  3  Q.    So that's when he ran the background?

09:57:52  4  A.    Yes, we don't do it on the sales floor.

09:57:55  5  Q.    Okay.  Going back to the form, go to the first -- to

09:58:07  6  the second page, Mr. Radic.

09:58:10  7        In the form, you said that it was Mr. Turner who

09:58:15  8  filled out line 18(a)?

09:58:17  9  A.    Yes.

09:58:17 10  Q.    And that's where the passport is referred to?

09:58:20 11  A.    Yes.

09:58:20 12  Q.    And then 18(b) says supplement, do you see that?

09:58:24 13  A.    Yes.

09:58:24 14  Q.    Is there anything on the form about a supplement that

09:58:27 15  day?

09:58:28 16  A.    No.

09:58:37 17  Q.    Yesterday you said that you're the one who copied the

09:58:40 18  form and attached the form of identification to it?

09:58:45 19  A.    Yes.

09:58:47 20  Q.    Okay.  Can we get back to government Exhibit 10A

09:58:52 21  again?  So if we flip to the next page.  And the next page.

09:58:58 22  And the next page.  Sorry, keep going, please.  And the next

09:59:03 23  page.  Next page.  Okay.

09:59:06 24        So it is the practice to take what it is a

09:59:10 25  person presents as their I.D., and then put it on the form?

Cleveland - cross

09:59:14  1    A.      Yes.

09:59:14  2    Q.      And there was a passport, you talked about the

09:59:16  3    passport.  Whose handwriting is on the left?

09:59:19  4    A.      Mine.

09:59:20  5    Q.      So you did that and attached that; is that right?

09:59:25  6    A.      Yes.

09:59:26  7    Q.      And I notice that was in red?

09:59:29  8    A.      Yes.

09:59:29  9    Q.      Yesterday I think your -- and we saw your handwriting

09:59:34 10    was in blue?

09:59:35 11    A.      Yes.

09:59:35 12    Q.      Except for that date next to your signature which was

09:59:38 13    in red?

09:59:38 14    A.      Yes.

09:59:39 15    Q.      How did this become red?

09:59:40 16    A.      Because with this form I don't have to fill out any

09:59:43 17    specific color, I can use whatever pen that I grab out of

09:59:47 18    the pen holder.

09:59:48 19    Q.      I got it.  I'm just trying to figure out like when

09:59:50 20    the blue came to red on this.  So you had both or did you

09:59:54 21    take Jason's pen?

09:59:55 22    A.      No, multiple different color pens in the pen holder.

10:00:01 23    Q.      Okay.  So you can -- that handwriting is yours?

10:00:04 24    A.      Yes.

10:00:05 25    Q.      And that's what you attached?

Cleveland - cross

| | | |
|---|---|---|
| 10:00:06 | 1 | A.      Yes. |

A.      **Yes.**

Q.      **There is nothing after this passport, you didn't attach any other form of I.D. that day?**

A.      **No.**

Q.      **In terms of your interchange with Mr. Biden that day -- now you can take it down.**

**Did you go through the checklist with him and ask him if he was a fugitive or ask him whether or not he was under a restraining order, or ask if he had ever been an improper person in the country, did you go through and ask him any of those orally?**

A.      **No, he's supposed to read that and answer those questions himself.**

Q.      **Did you ask him any questions about whether or not he ever drank or was presently drinking alcohol?**

A.      **No.**

Q.      **But I understand that that would be of concern to you?**

A.      **Yes.**

Q.      **Even though it's not asked for on the form?**

A.      **Yes.**

Q.      **So are you -- am I right that there is no other form that he was given that day that asked him about his use of alcohol?**

A.      **No.**

Cleveland - cross

10:01:03  1    Q.      And you don't want to sell a gun, I imagine, to

10:01:06  2    somebody who you know to be either high or drunk or using a

10:01:12  3    drug or using alcohol, right?

10:01:14  4    A.      No.

10:01:15  5    Q.      Is it your practice to try to understand or glean or

10:01:20  6    observe a person?

10:01:20  7    A.      Yes.

10:01:22  8    Q.      And as I understand it, your practice would be that

10:01:26  9    you would try to see whether somebody is glassy eyed, right?

10:01:30 10    A.      Yes.

10:01:30 11    Q.      Or smells of alcohol?

10:01:32 12    A.      Yes.

10:01:32 13    Q.      Or smells of marijuana such that it gives a smell?

10:01:36 14    A.      Yes.

10:01:36 15    Q.      Or any other indication of a person?

10:01:39 16    A.      Yeah.

10:01:39 17    Q.      Not being in their normal sober condition?

10:01:42 18    A.      Yes.

10:01:43 19    Q.      And that day Mr. Biden didn't exhibit any of those

10:01:48 20    things that you try to observe?

10:01:50 21    A.      Not at all.

10:01:53 22    Q.      Then you indicated that Mr. Turner was the one to run

10:01:58 23    the background check, I'm not going to belabor that.  I do

10:02:02 24    want to figure out just as best as I can the sequence.

10:02:05 25    Okay?

Cleveland - cross

10:02:05  1    A.      Okay.

10:02:06  2    Q.      I promise I won't take a long time.  If you'll put up

10:02:09  3    government Exhibit 12.  So I'm referring to government

10:02:26  4    Exhibit 12A, which is in evidence.  Do you recognize what

10:02:30  5    this is?

10:02:31  6    A.      Yes.

10:02:31  7    Q.      What is it?

10:02:32  8    A.      That is the paperwork for when you run a NICS

10:02:37  9    background check.

10:02:38 10    Q.      This would have been something Mr. Turner was

10:02:40 11    responsible for?

10:02:41 12    A.      Yes.

10:02:41 13    Q.      And Mr. Turner runs the check, and it indicates when

10:02:46 14    it was done on the top; right?

10:02:49 15    A.      Yes.

10:02:50 16    Q.      And that says on the 12th of October and the time is

10:02:54 17    6:36 p.m., do you see that?

10:02:56 18    A.      Yes.

10:02:56 19    Q.      And then it also indicates when the response came,

10:03:00 20    doesn't it?

10:03:01 21    A.      Yes.

10:03:01 22    Q.      And that would be three lines from the bottom of

10:03:05 23    6:37 p.m., right?

10:03:06 24    A.      Yes.

10:03:07 25    Q.      So it took a minute for this to happen, right?

Cleveland - cross

| | | |
|---|---|---|
| 10:03:10 | 1 | A.    Yes. |
| 10:03:10 | 2 | Q.    And would you put up government Exhibit 13A, which is |
| 10:03:20 | 3 | the sales receipt. |
| 10:03:22 | 4 | And the sales receipt has a time on the top, |
| 10:03:28 | 5 | doesn't it? |
| 10:03:29 | 6 | A.    Yes. |
| 10:03:29 | 7 | Q.    What's that time? |
| 10:03:31 | 8 | A.    6:53. |
| 10:03:33 | 9 | Q.    So the first time stamp of the check is 6:36, right? |
| 10:03:40 | 10 | A.    Yes. |
| 10:03:40 | 11 | Q.    Or 37 when it comes back? |
| 10:03:42 | 12 | A.    Yes. |
| 10:03:42 | 13 | Q.    And then this is all paid for on a cash -- on a cash |
| 10:03:48 | 14 | basis, a receipt that is 6:53? |
| 10:03:51 | 15 | A.    Yes. |
| 10:03:51 | 16 | Q.    So I'm just trying to make sure I have this right. |
| 10:03:54 | 17 | In the sequence of events, the following things happened |
| 10:03:58 | 18 | after you got the go ahead from Mr. Turner.  You came back, |
| 10:04:05 | 19 | only the gun was there, and then the other events occurred? |
| 10:04:08 | 20 | A.    Yes. |
| 10:04:08 | 21 | Q.    That's when you spoke to Mr. Biden about bullets? |
| 10:04:12 | 22 | A.    Yes. |
| 10:04:12 | 23 | Q.    That's when you spoke the to him about speed loader? |
| 10:04:16 | 24 | A.    Yes. |
| 10:04:17 | 25 | Q.    That's when he, according to you, went and looked and |

Cleveland - cross

10:04:22  1    got the NEBO thing?

10:04:24  2    A.      Yes.

10:04:24  3    Q.      And then went over to the case where a BB gun was?

10:04:29  4    A.      Yes.

10:04:30  5    Q.      And then came back?

10:04:31  6    A.      Yes.

10:04:31  7    Q.      And then discussed with you all those purchases, put

10:04:36  8    it on the table, you had to ring it up?

10:04:38  9    A.      Yes.

10:04:38 10    Q.      And you said yesterday that, his looking at the BB

10:04:44 11    gun, his seeking the NEBO utility knife and the flash light

10:04:49 12    all happened after the gun was picked out, not before?

10:04:52 13    A.      Yes.

10:04:52 14    Q.      And therefore in your sequence, all the events I just

10:04:56 15    said, going in the back room, getting it, coming back,

10:05:00 16    saying it was okay, all the things I just said happened in

10:05:04 17    those 16 minutes?

10:05:05 18            MR. HINES:   Objection.   The form, he did it

10:05:11 19    before the background check.

10:05:12 20    BY MR. LOWELL:

10:05:13 21    Q.      I'm sorry, all the events that I just went through

10:05:15 22    with you, all the ones that I detailed about whatever you

10:05:18 23    did after you got the okay, and you're saying it all happens

10:05:22 24    in terms of the utility knife, the flashlight, you said it

10:05:25 25    was after?

Cleveland - cross

| | | |
|---|---|---|
| 10:05:26 | 1 | A.      Yes. |
| 10:05:26 | 2 | Q.      That happened in those 16 minutes? |
| 10:05:29 | 3 | A.      Yes. |
| 10:05:31 | 4 | Q.      So you ended up with that cash receipt and the sale |
| 10:05:34 | 5 | at that hour.  And Mr. Biden purchased all of those events. |
| 10:05:41 | 6 | But the gun itself didn't go out of the store with the way |
| 10:05:47 | 7 | it was presented to the jury as just a handgun that he puts |
| 10:05:51 | 8 | in a bag and goes out, right? |
| 10:05:53 | 9 | A.      No.  It's leaving out in the case that it comes in |
| 10:05:57 | 10 | from the manufacturer. |
| 10:05:57 | 11 | Q.      Which has a lock on it? |
| 10:06:00 | 12 | A.      No.  It doesn't have a lock. |
| 10:06:01 | 13 | Q.      At the time it didn't? |
| 10:06:03 | 14 | A.      No, when the guns go out, this they don't have a |
| 10:06:07 | 15 | lock, they have a lock inside to render them useless, you |
| 10:06:11 | 16 | usually put it through the barrel and put the slide back or |
| 10:06:14 | 17 | you open the cylinder on a revolver and you put the lock |
| 10:06:17 | 18 | through and lock it with a key. |
| 10:06:19 | 19 | MR. LOWELL:  May I approach, Your Honor? |
| 10:06:21 | 20 | THE COURT:  All right. |
| 10:06:22 | 21 | BY MR. LOWELL: |
| 10:06:23 | 22 | Q.      Let me show you what's been marked as government |
| 10:06:25 | 23 | Exhibit 5A.  Do you recognize that? |
| 10:06:28 | 24 | A.      Yes. |
| 10:06:29 | 25 | Q.      What does it depict? |

Cleveland - cross

| | | |
|---|---|---|
| 10:06:32 | 1 | A.       I didn't hear you. |
| 10:06:33 | 2 | Q.       What does it depict, what does it show? |
| 10:06:35 | 3 | A.       It depicts the Colt case for the revolver and it has |
| 10:06:39 | 4 | a lock on it, which that lock would have been put on after |
| 10:06:42 | 5 | the fact, leaving the store. |
| 10:06:44 | 6 | Q.       And you see that the lock that you were just talking |
| 10:06:47 | 7 | about has the name Colt on it? |
| 10:06:49 | 8 | A.       Yes. |
| 10:06:49 | 9 | Q.       It comes with the box? |
| 10:06:52 | 10 | A.       Yes. |
| 10:06:52 | 11 | Q.       Inside? |
| 10:06:53 | 12 | A.       Yes. |
| 10:06:53 | 13 | Q.       And then it gets put on the outside? |
| 10:06:55 | 14 | A.       Yes. |
| 10:06:56 | 15 | Q.       Is this an accurate depiction of the box that was |
| 10:07:00 | 16 | given to Mr. Biden or that he asked about?  He asked about |
| 10:07:03 | 17 | the box, didn't he? |
| 10:07:05 | 18 | A.       No, he didn't have to ask about the box, when you |
| 10:07:08 | 19 | present the firearm -- so, once the person picks out what |
| 10:07:11 | 20 | they want, I retrieve the box for it so the box is already |
| 10:07:16 | 21 | there with the firearm sitting in it. |
| 10:07:18 | 22 | Q.       He didn't leave with the firearm outside of the box? |
| 10:07:20 | 23 | A.       No. |
| 10:07:21 | 24 | Q.       He left with it in this? |
| 10:07:22 | 25 | A.       Yes. |

10:07:23  1          MR. LOWELL:  Your Honor we move into evidence

10:07:25  2   government Exhibit 5 and 5A.

10:07:27  3          MR. HINES:  No objection.

10:07:28  4          THE COURT:  Thank you.  Admitted.

10:07:30  5          MR. LOWELL:  May I bring this to the attention

10:07:32  6   of the witness and the jury?

10:07:34  7          THE COURT:  You may.

10:07:35  8          MR. LOWELL:  Thank you.

10:07:35  9          (Government Exhibits No. 5 and 5A were admitted

10:07:40 10   into evidence.)

10:07:40 11   BY MR. LOWELL:

10:07:41 12   Q.    Mr. Cleveland, I'm looking at what is admitted as

10:07:43 13   Exhibit 5.  Is this what you were talking about a moment

10:07:46 14   ago?

10:07:47 15   A.    Yes.

10:07:47 16   Q.    This is the lock on it that says Colt, just as in the

10:07:50 17   photo?

10:07:51 18   A.    Yes.

10:08:13 19   Q.    After Mr. Biden left the store with the material he

10:08:17 20   had purchased and the gun was in the lock box, correct?

10:08:20 21   A.    Yes.

10:08:21 22   Q.    Put in a lock box.  Do you know what happened next,

10:08:24 23   where he went, what he did with it?

10:08:26 24   A.    No.

10:08:26 25   Q.    Did it ever come to your attention where he went

Cleveland - redirect

10:08:29  1   after that?

10:08:29  2   A.      No.

10:08:30  3   Q.      Or what happened to the gun?

10:08:31  4   A.      No.

10:08:33  5   Q.      I'm sorry, that I had you stay over.  I have no other

10:08:37  6   questions?

10:08:37  7             THE COURT:  Redirect.

10:08:41  8             MR. HINES:  Yes, Your Honor.

10:08:42  9                     REDIRECT EXAMINATION

10:08:43 10   BY MR. HINES:

10:08:43 11   Q.      Picking up where we left off, Government's Exhibit 5,

10:08:46 12   Mr. Cleveland, you see how today in court it has a lock on

10:08:50 13   top?

10:08:50 14   A.      Yes.

10:08:50 15   Q.      Was this lock on the box when you presented this to

10:08:54 16   Mr. Biden?

10:08:55 17   A.      No.

10:08:55 18   Q.      It was inside the box?

10:08:56 19   A.      Yes.

10:08:57 20   Q.      And when he left the store, was the lock on it?

10:09:00 21   A.      No.

10:09:00 22   Q.      Do you know whether law enforcement or someone else

10:09:03 23   put the lock on this box or Mr. Biden, do you have any idea?

10:09:07 24   A.      No.

10:09:08 25   Q.      Do you know whether Mr. Biden actually put his

Cleveland - redirect

| | | |
|---|---|---|
| 10:09:10 | 1 | revolver in this lock box when he had it in his possession? |
| 10:09:16 | 2 | A.      No. |
| 10:09:19 | 3 | Q.      Now, if we could have Exhibit 13A on the screen, |
| 10:09:24 | 4 | please.  Mr. Lowell asked you a series of questions about |
| 10:09:29 | 5 | the events that occurred prior to 6:53, when this receipt |
| 10:09:33 | 6 | was generated.  Do you recall those questions he was just |
| 10:09:36 | 7 | asking you? |
| 10:09:36 | 8 | A.      Yes. |
| 10:09:37 | 9 | Q.      And the background check was completed 16 minutes |
| 10:09:40 | 10 | earlier? |
| 10:09:41 | 11 | A.      Yes. |
| 10:09:41 | 12 | Q.      Was Mr. Biden out on the floor while the background |
| 10:09:45 | 13 | check was occurring? |
| 10:09:47 | 14 | A.      Yes. |
| 10:09:47 | 15 | Q.      And so he would have been on the floor for longer |
| 10:09:52 | 16 | than 16 minutes looking at items? |
| 10:09:55 | 17 | A.      Yes. |
| 10:09:55 | 18 | Q.      Now, if you look at the number of items after the |
| 10:09:59 | 19 | revolver, just 1, 2, 3, 4, 5 items on that receipt in |
| 10:10:03 | 20 | addition to the revolver, correct? |
| 10:10:05 | 21 | A.      Yes. |
| 10:10:08 | 22 | Q.      And then yesterday Mr. Lowell asked you some |
| 10:10:12 | 23 | questions, and actually again today, about Government's |
| 10:10:17 | 24 | Exhibit 10A, and your signature on that on page 3.  And |
| 10:10:28 | 25 | above your signature at the end of the certification it |

Cleveland - redirect

10:10:30  1    says, "it is my belief that it is not unlawful for me to

10:10:34  2    sell, deliver, transport, or otherwise dispose of the

10:10:37  3    firearms listed on the form to the person identified in

10:10:40  4    section A."  Is that what it says there at the bottom of the

10:10:42  5    certification?

10:10:43  6    A.      Yes.

10:10:43  7    Q.      Does that mean that you're responsible, too, and that

10:10:47  8    you're not able to sell someone a firearm if you knew that

10:10:50  9    they were an unlawful user or an addict?

10:10:53 10    A.      Yes.

10:10:53 11    Q.      Is that why that question 11E matters?

10:10:56 12    A.      Yes.

10:10:56 13    Q.      Mr. Lowell asked you about that question, why does it

10:11:00 14    matter?

10:11:01 15    A.      It matters because on the form, you're not supposed

10:11:06 16    to be purchasing firearms using drugs, even with a medical

10:11:09 17    marijuana card, it's just the rules.

10:11:12 18    Q.      Do you care?

10:11:13 19    A.      Yes.

10:11:13 20    Q.      Why do you care?

10:11:15 21    A.      I mean, you have somebody under the influence,

10:11:18 22    anything could happen.

10:11:20 23              MR. HINES:  No further questions, Your Honor.

10:11:21 24              THE COURT:  Thank you.  All right.  Thank you so

10:11:24 25    much for coming back, Mr. Cleveland.  You're excused.

Hallie Biden - direct

| 10:11:27 | 1 | THE WITNESS:  All right. |

10:11:27  1                 THE WITNESS:  All right.

10:11:28  2                 THE COURT:  What's next?

10:11:29  3                 MR. WISE:  Your Honor, the United States calls

10:11:31  4    Hallie Biden.

10:11:48  5                 COURTROOM DEPUTY:  Please raise your right hand.

10:12:10  6    Please state and spell your full name for the record.

10:12:17  7                 THE WITNESS:  Hallie Biden, H-A-L-L-I-E,

10:12:34  8    B-I-D-E-N.

10:12:36  9                 HALLIE BIDEN, having been duly sworn was

10:12:42 10    examined and testified as follows:

10:12:51 11                 THE COURT:  All right.  Go ahead, Mr. Wise.

10:12:53 12                 MR. WISE:  Thank you, Your Honor.

10:12:53 13                         DIRECT EXAMINATION

10:12:53 14    BY MR. WISE:

10:12:54 15    Q.      Good morning, Ms. Biden.

10:12:55 16    A.      Good morning.

10:12:56 17    Q.      Do you know the about defendant?

10:12:58 18    A.      Yes.

10:12:59 19    Q.      And how do you know him?

10:13:00 20    A.      He's my brother-in-law.

10:13:05 21    Q.      How long have you known him?

10:13:06 22    A.      Since I was young, actually, probably middle school.

10:13:09 23    Q.      You testified he is your brother-in-law.  Were you

10:13:13 24    married to his brother?

10:13:14 25    A.      Yes.

Hallie Biden - direct

10:13:14  1    Q.      Did your husband die in 2015?

10:13:17  2    A.      Yes.  He did.

10:13:18  3    Q.      At some point after the death of your husband, did

10:13:21  4    you and the defendant begin a romantic relationship?

10:13:24  5    A.      Yes.

10:13:24  6    Q.      And approximately when was that?

10:13:26  7    A.      Late 2015 or 2016, it was gradual.

10:13:32  8    Q.      At some point after that, did you learn that the

10:13:35  9    defendant was using drugs?

10:13:36 10    A.      Yes, I did.

10:13:38 11    Q.      And approximately when did you learn that?

10:13:41 12    A.      During the time that I was in a romantic relationship

10:13:45 13    with him, but I'm not sure exactly.

10:13:48 14    Q.      And what kind of drugs was it that you learned he was

10:13:51 15    using?

10:13:52 16    A.      Crack cocaine.

10:13:54 17    Q.      And how did you first learn that?

10:13:56 18    A.      I found it and I Googled it because I didn't know

10:14:03 19    what it was.

10:14:04 20    Q.      Once you found it and you Googled it, did you talk to

10:14:09 21    the defendant about it?

10:14:11 22    A.      Yes, I did.

10:14:14 23    Q.      And what did he tell you, I'm not looking for a

10:14:17 24    quote, but what did he tell you?

10:14:19 25    A.      He told me what it was.

Hallie Biden - direct

| 10:14:20 | 1 | Q. | And what did he say it was? |

10:14:20  1    Q.    And what did he say it was?

10:14:22  2    A.    Crack cocaine.

10:14:25  3    Q.    Had you ever seen that before?

10:14:26  4    A.    I had not.

10:14:35  5    Q.    Did he deny it was his?

10:14:37  6    A.    No.

10:14:40  7    Q.    And where were you when you first found it?

10:14:44  8    A.    I think it was -- I'm not sure exactly but I believe

10:14:47  9    it was my house.

10:14:48  10   Q.    And where was your house at the time?

10:14:50  11   A.    In Wilmington, Delaware.

10:14:53  12   Q.    And would the defendant stay at your house in

10:14:59  13   Wilmington, Delaware, from time to time?

10:15:01  14   A.    Yes.

10:15:01  15   Q.    After you first found it, did there come a time when

10:15:04  16   you actually saw him smoking crack?

10:15:06  17   A.    Yes.

10:15:07  18   Q.    And where was that?

10:15:08  19   A.    I don't remember where -- it might have been in the

10:15:15  20   house or on the patio, I'm not sure exactly when I saw that.

10:15:20  21   Q.    How frequently did you see him doing that once you

10:15:24  22   started seeing him do that?

10:15:26  23   A.    Occasionally.

10:15:29  24   Q.    In between the times you saw him using it, were you

10:15:33  25   also seeing him?

Hallie Biden - direct

10:15:36  1    A.       In between the times -- I'm confused.

10:15:38  2    Q.       In between the times he was smoking crack, were you

10:15:42  3    also with him or seeing him?

10:15:44  4    A.       Yes.

10:15:44  5    Q.       And at those times was he interacting with other

10:15:50  6    people?

10:15:50  7    A.       Yes.

10:15:50  8    Q.       Including members of your family?

10:15:52  9    A.       Yes.

10:15:52 10    Q.       And other acquaintances and family friends?

10:15:56 11    A.       Yes.

10:15:56 12    Q.       Was he also working?

10:15:58 13    A.       Yes.

10:15:59 14    Q.       All right.  And did you see him smoking crack

10:16:07 15    anywhere other than in Wilmington somewhere in or around

10:16:11 16    your home?

10:16:13 17    A.       In D.C., he had an apartment in D.C.

10:16:16 18    Q.       Did you sometimes go there with him?

10:16:20 19    A.       Yes.

10:16:21 20    Q.       Where did he get the drugs from?

10:16:26 21    A.       Various dealers.

10:16:27 22    Q.       Did you sometimes see that?

10:16:29 23    A.       Yes.

10:16:29 24    Q.       Do you remember where you were when you saw that?

10:16:32 25    A.       In D.C.

Hallie Biden - direct

10:16:36 1    Q.    And were you ever with him when he bought drugs from

10:16:39 2    the various dealers?

10:16:41 3    A.    I was.

10:16:44 4    Q.    When he used drugs, did you notice a change or did

10:16:47 5    you observe a change in his demeanor or his behavior?

10:16:51 6    A.    Yes.

10:16:52 7    Q.    And describe what that was?

10:16:55 8    A.    It varied, so it wasn't always consistent, but he

10:17:04 9    would be agitated and high strung.  But then other times,

10:17:12 10    you know, functioning as well.

10:17:15 11    Q.    Okay.  And were there times when you were with him

10:17:18 12    out or interacting with other people where you knew he had

10:17:22 13    used drugs close in time to that?

10:17:26 14    A.    Yes.

10:17:26 15    Q.    And did he appear to be under the influence in those

10:17:29 16    settings or was he showing those signs you saw?

10:17:33 17    A.    Sometimes yes, and sometimes no.

10:17:37 18    Q.    Now in 2017 and 2018, did you and the defendant rent

10:17:46 19    a house together in Annapolis, Maryland?

10:17:51 20    A.    Yes, we did.

10:17:52 21    Q.    And approximately from when to when?

10:17:55 22    A.    The school year basically.

10:17:57 23    Q.    So sort of late, I guess fall '17 through?

10:18:00 24    A.    Right.

10:18:01 25    Q.    Through fall of '18?

Hallie Biden - direct

10:18:03 1  A.      Correct.  We ended -- or I ended it early in July.

10:18:09 2  Q.      And did the defendant stay at the house with you in

10:18:13 3  Annapolis in '17 and into '18?

10:18:16 4  A.      Yes.

10:18:18 5  Q.      And you testified that you saw him using drugs in the

10:18:23 6  house in Wilmington.  The same question for the house in

10:18:26 7  Annapolis, did you see him using drugs there in '17 and '18?

10:18:31 8  A.      Yes.

10:18:32 9  Q.      And where in the house in Annapolis, if you recall?

10:18:35 10  A.      It varied.

10:18:39 11  Q.      Do you know where he kept the drugs?

10:18:42 12  A.      Backpack or a car.

10:18:49 13  Q.      And what kind of quantities did you see him with?

10:18:53 14  A.      That varied as well.

10:18:55 15  Q.      And so if you had to put it on a spectrum, what was

10:19:01 16  sort of the smallest to the largest I guess, because it

10:19:04 17  varied?

10:19:05 18  A.      I don't really know how the quantities, whether it

10:19:09 19  goes by weight or size, I don't know what you mean.

10:19:12 20  Q.      So is the smallest smaller than a marble?

10:19:17 21  A.      Sure, yeah.

10:19:18 22  Q.      And would the biggest be, the size of a ping pong

10:19:23 23  ball, bigger than that, smaller than that?

10:19:27 24  A.      Maybe a ping pong ball, maybe a little bigger

10:19:31 25  sometimes.

Hallie Biden - direct

10:19:31 1   Q.      Were there times when you saw him with multiple ping

10:19:36 2   pong ball size rocks at a time?

10:19:39 3   A.      Occasionally, maybe.

10:19:40 4   Q.      Did you discuss his drug use with him at the house in

10:19:44 5   Annapolis in '17 and '18?

10:19:46 6   A.      I did.

10:19:47 7   Q.      What did you discuss, I'm not looking for exact

10:19:49 8   quotes, but what did you discuss?

10:19:52 9   A.      That this can't go on, we can't do this, a lot of,

10:19:58 10  you know, back and forth with that.

10:20:03 11  Q.      And what did he say about his drug use?

10:20:07 12  A.      It kind of would go back and forth, sometimes, you

10:20:12 13  know, leave me alone, I'm fine, I don't have a problem, and

10:20:16 14  other times, yes, I do, and I, you know, I'll figure it out

10:20:22 15  my way.

10:20:23 16  Q.      Did he talk about it in terms of an addiction or

10:20:28 17  words to that effect or like that?

10:20:30 18  A.      Sometimes, yes.

10:20:36 19  Q.      During the time you were aware of him using drugs,

10:20:39 20  was he also drinking?

10:20:40 21  A.      Yes.

10:20:40 22  Q.      And did the two go hand in hand?

10:20:47 23  A.      Not always hand in hand, but they were both issues.

10:20:52 24  Q.      Was he frequently using both substances at the same

10:21:00 25  time?

Hallie Biden - direct

10:21:00  1    A.    Yes.

10:21:07  2    Q.    So the same question for the house in Annapolis, how

10:21:11  3    frequently was he using when he was with you at the house in

10:21:15  4    Annapolis?

10:21:16  5    A.    It became more and more frequently.

10:21:19  6    Q.    And so, what did that -- what did that look like?

10:21:25  7    A.    Well, he didn't -- he probably stayed there maybe

10:21:31  8    less than 50 percent of the time.  So --

10:21:36  9    Q.    So when he was there, how frequently was it?

10:21:38 10    A.    When he was there, I think it was frequent.  Daily,

10:21:44 11    if that's how you're asking, yes.

10:21:47 12    Q.    Okay.  And when he was using I guess daily, how long

10:21:51 13    would it go between I guess uses, if that's the right word?

10:21:56 14    A.    Generally you know, I don't know, eight hours.

10:22:02 15    Q.    So there were stretches of time in between when he

10:22:05 16    was using, when you observed when he wasn't using?

10:22:08 17    A.    Yes.

10:22:10 18          THE COURT:  Can you just speak clear, you were

10:22:13 19    talking about using alcohol.

10:22:14 20          MR. WISE:  I'm sorry, I'll be clear.

10:22:16 21    BY MR. LOWELL:

10:22:16 22    Q.    I'm focused on using, smoking crack at that time?

10:22:20 23    A.    Okay.

10:22:20 24    Q.    What were-- what were the intervals, if that's the

10:22:25 25    right word, in between when you saw him using crack?

Hallie Biden - direct

10:22:29   1   A.      You mean what were the breaks?

10:22:31   2   Q.      What were the breaks.

10:22:33   3   A.      Sleeping or when there was some obligation.

10:22:38   4   Q.      Okay.  So similar question as I asked from the

10:22:41   5   Wilmington house, when you were with him in Annapolis, in

10:22:45   6   these breaks when he wasn't using, was he interacting with

10:22:49   7   other people?

10:22:51   8   A.      Not when I -- he was really only there at the house

10:22:59   9   when he was there.  So I didn't --

10:23:01  10   Q.      Was there ever anyone at the house besides the two of

10:23:05  11   you?

10:23:06  12   A.      Not often.

10:23:09  13   Q.      But were there occasions where there were?

10:23:12  14   A.      Yes.

10:23:12  15   Q.      Like other family members?

10:23:14  16   A.      Yes.

10:23:15  17   Q.      And your children?

10:23:17  18   A.      Yes.

10:23:17  19   Q.      And were his children sometimes there as well?

10:23:21  20   A.      No.

10:23:22  21   Q.      Friends or acquaintances?

10:23:24  22   A.      Occasionally.

10:23:26  23   Q.      And when other people were at the house, was he able

10:23:32  24   to use the word you used, "function" with them?

10:23:35  25   A.      Yes.

Hallie Biden - direct

10:23:35  1    Q.      And were there times when you knew he had used drugs

10:23:40  2    but the signs you described weren't apparent, I guess, when

10:23:45  3    he was interacting with other people?

10:23:48  4    A.      Yes.

10:23:48  5    Q.      And you said also for, I think you said events or

10:23:52  6    something, did you understand he was going out to do other

10:23:55  7    things as well?

10:23:56  8    A.      Right.  Yes.

10:23:58  9    Q.      Did he ever try and hide his drug use from you in

10:24:03 10    this period in '17 and '18?

10:24:07 11    A.      I don't recall.

10:24:12 12    Q.      Did he ever try and hide it, to your knowledge, from

10:24:15 13    other people like members of your family?

10:24:18 14    A.      Yes.

10:24:18 15    Q.      At some point did he start going to California?

10:24:24 16    A.      I didn't know where he was going.

10:24:27 17    Q.      Okay.  At some point did you go to California to

10:24:30 18    visit him?

10:24:31 19    A.      I did.

10:24:31 20    Q.      And approximately when was that?

10:24:33 21    A.      I believe it was around June of 2018.

10:24:38 22    Q.      Okay.  And what was the first place you remember

10:24:42 23    staying when you went to California to visit him?

10:24:45 24    A.      The Roosevelt Hotel.

10:24:50 25    Q.      And when you went to visit him in the Roosevelt

Hallie Biden - direct

10:24:53   1    Hotel, was he using drugs?  Was he smoking crack then?

10:24:57   2    A.      Yes.

10:24:58   3    Q.      And how frequently was it then?

10:25:11   4    A.      Frequently.

10:25:12   5    Q.      How long did you stay at that time?

10:25:16   6    A.      A couple of days, I believe, I'm not sure exactly.

10:25:22   7    Q.      At that point were you also using drugs?

10:25:26   8    A.      Yes.

10:25:27   9    Q.      And who had introduced you to it?

10:25:32  10    A.      Hunter did.

10:25:34  11    Q.      And was it also crack?

10:25:36  12    A.      Yes.  It was a terrible experience that I went

10:25:42  13    through, and I'm embarrassed and I'm ashamed, and I regret

10:25:47  14    that period of my life.

10:25:54  15    Q.      And at some point did you stop, were you able to

10:25:57  16    stop?

10:25:58  17    A.      Yes.

10:25:58  18    Q.      And when was that?

10:25:59  19    A.      August of 2018.

10:26:02  20    Q.      During the time you were with him in June, did you go

10:26:09  21    out, did you do other things with him while you were in Los

10:26:14  22    Angeles?

10:26:14  23    A.      It was -- no, not really because it was a bit

10:26:19  24    volatile, you know, like arguing.

10:26:24  25    Q.      You testified at the beginning that you were in a

Hallie Biden - direct

10:26:28  1    romantic relationship.  By the, I guess by the summer, what

10:26:31  2    was the state of the relationship?

10:26:33  3    A.      Off and on, and so we wouldn't talk often and then we

10:26:44  4    would and be together and then not again.

10:26:48  5    Q.      You testified you left after a couple of days?

10:26:52  6    A.      Yeah.

10:26:53  7    Q.      And then did you ever go back to LA when he was

10:26:57  8    there?

10:26:58  9    A.      In August I did.

10:27:00 10    Q.      Where did you stay when you went in August?

10:27:02 11    A.      I was staying with a friend.

10:27:04 12    Q.      And how long did you see the defendant for when you

10:27:07 13    went back in August?

10:27:09 14    A.      Just a few hours.

10:27:11 15    Q.      Where was he at that time?

10:27:13 16    A.      He was at a treatment center.

10:27:15 17    Q.      And you said you just stayed for a few hours?

10:27:17 18    A.      Yeah, I was visiting him at the treatment center.

10:27:21 19    Q.      Okay.  All right.  After you saw him for a few hours

10:27:34 20    in August, moving forward in time, did you see him again in

10:27:38 21    October of 2018?

10:27:41 22    A.      I did.

10:27:42 23    Q.      And did he come to stay with you either late at night

10:27:48 24    on October 22nd or early in the morning on October 23rd?

10:27:51 25    A.      Yes.

Hallie Biden - direct

10:27:52  1    Q.    Do you remember which it was, whether it was late the

10:27:54  2    night before or early the following morning?

10:27:57  3    A.    I believe it was in the morning, but I don't recall

10:28:01  4    -- it was kind of a typical pattern, so I don't recall

10:28:04  5    exactly when he got there.

10:28:06  6    Q.    And what was the typical pattern?

10:28:09  7    A.    Where I didn't know where he was and I had been

10:28:12  8    trying to reach him for, it could be weeks.  And then

10:28:16  9    talking and then him coming and spending the night.

10:28:22 10    Q.    So you were awake when he got there, whether it was

10:28:27 11    the night before or the morning of?

10:28:29 12    A.    Yes.  Likely morning.

10:28:32 13    Q.    Likely morning.  What did you observe about him early

10:28:35 14    in the morning on the 23rd?

10:28:38 15    A.    He was tired, exhausted, looked like he hadn't slept.

10:28:46 16    Q.    Did you observe anything else about him?

10:28:52 17    A.    I don't know.

10:28:53 18    Q.    Did it look like he had been using drugs?

10:28:56 19    A.    Could have been.

10:28:57 20    Q.    Is that something you observed?

10:29:00 21    A.    Yes.

10:29:01 22    Q.    And what did he do after he got there?

10:29:07 23    A.    He went to bed.

10:29:10 24    Q.    And what did you do after he went to bed?

10:29:13 25    A.    I went to clean out his car and his stuff hoping that

Hallie Biden - direct

10:29:20  1   you know, after a certain amount of hours when he woke back

10:29:25  2   up we could, you know, help him start a new and deal with

10:29:30  3   stuff.

10:29:30  4   Q.    When you say help him start a new and deal with

10:29:34  5   stuff, what do you mean?

10:29:35  6   A.    Get sober if he wasn't.

10:29:38  7   Q.    And when you say sober, do you mean drugs or alcohol

10:29:42  8   or both?

10:29:43  9   A.    Both.

10:29:44 10   Q.    Based on what --

10:29:45 11   A.    All.

10:29:46 12   Q.    Based on what you had observed?

10:29:48 13   A.    Yeah.

10:29:48 14   Q.    And when you said you cleaned out his car; is that

10:29:52 15   right?

10:29:52 16   A.    Yes.  Or truck.

10:29:54 17   Q.    Or truck.  Right.

10:29:55 18         Did he drive a truck to your house early that

10:29:59 19   morning?

10:30:00 20   A.    Yes.

10:30:00 21   Q.    And where was the truck parked?

10:30:03 22   A.    On the lawn on the side of the house.

10:30:09 23   Q.    Is there a lot somewhere near your house?

10:30:13 24   A.    I don't -- a lot?  A parking lot?

10:30:18 25   Q.    Something that would be referred to as a lot?

Hallie Biden - direct

10:30:21  1    A.      I don't -- not, there is a couple of properties in my

10:30:25  2    area.

10:30:25  3    Q.      You said he parked on the lawn at your house?

10:30:27  4    A.      Right.

10:30:27  5    Q.      And while he was asleep, you went in the car?

10:30:30  6    A.      To clean it out.

10:30:31  7    Q.      What were you looking for?

10:30:33  8    A.      I was looking to clean it out, I wasn't necessarily

10:30:36  9    looking for anything.  So...

10:30:42 10    Q.      Was that the first time you had gone through a car he

10:30:45 11    had been driving?

10:30:46 12    A.      No, that was kind of a pattern as well.

10:30:48 13    Q.      What was the purpose of cleaning out the car, what

10:30:52 14    was looked for?

10:30:53 15    A.      To clean out if there was any drugs or alcohol in the

10:30:56 16    car.

10:30:56 17    Q.      And you said this was a pattern.  Had you done this

10:31:00 18    on more than one occasion?

10:31:01 19    A.      Yes.

10:31:02 20    Q.      And why did you do that?

10:31:04 21    A.      In an effort to help him get or stay sober.

10:31:10 22    Q.      And that was including early in the morning on the

10:31:13 23    23rd?

10:31:13 24    A.      Yes.

10:31:13 25    Q.      Were there times also when your children cleaned out

Hallie Biden - direct

10:31:16 1   his car looking for drugs?

10:31:18 2   A.      Yes.

10:31:19 3   Q.      Or other things?

10:31:21 4   A.      Yes.

10:31:21 5   Q.      When you searched his car, what did you find?  Or

10:31:37 6   when you cleaned out his car, to use your words, when you

10:31:41 7   went through the car?

10:31:42 8   A.      Aside from trash and clothes.

10:31:45 9   Q.      Full of trash and clothes?

10:31:47 10  A.      Yeah.  I did find some remnants of crack cocaine and

10:31:52 11  some paraphernalia.

10:31:56 12  Q.      And just to be clear, this is the morning of the

10:31:59 13  23rd?

10:32:00 14  A.      Yes.  Oh, and the gun, obviously.

10:32:06 15  Q.      Understood.  I'll ask you about that.  I'm going to

10:32:11 16  ask you about each of the things you mentioned, the remnants

10:32:14 17  of crack cocaine and paraphernalia and the gun, before I do

10:32:19 18  that, about at some point did you have to take your kids to

10:32:23 19  school that morning?

10:32:24 20  A.      I don't remember if it was a school day, of course I

10:32:27 21  would have, I always took my kids to school.

10:32:30 22  Q.      Now you testified that you found remnants of crack

10:32:33 23  cocaine, paraphernalia, and a gun, correct?

10:32:35 24  A.      Yes.

10:32:36 25  Q.      What does remnants of crack cocaine mean, what does

Hallie Biden - direct

10:32:38 1    that look like?

10:32:39 2    A.    A dusting of powder, I guess.

10:32:43 3    Q.    And how did that come about, how did the remnants get

10:32:47 4    left behind?

10:32:48 5    A.    As you're using it, it breaks into pieces and a lot

10:32:51 6    of it gets lost and dropped.

10:32:54 7    Q.    And then you said you found paraphernalia?

10:32:58 8    A.    Yeah.  I don't remember exactly what that was, you

10:33:03 9    know, like because I had seen that and cleaned that out

10:33:09 10    previously, so I don't recall exactly what.

10:33:11 11    Q.    Generally speaking, what kind of paraphernalia would

10:33:14 12    you find when you did go through the car?

10:33:16 13    A.    It would be crack pipes or broken pipes.

10:33:21 14    Q.    And then you testified you found a gun, right?

10:33:25 15    A.    Yes.

10:33:25 16    Q.    Is that the first time you ever found a gun?

10:33:29 17    A.    Yes.

10:33:29 18    Q.    Had you ever seen a gun up close like that before?

10:33:33 19    A.    No.

10:33:33 20    Q.    Where did you find the gun in the truck?

10:33:36 21    A.    In the console, the arm console, it was like a box.

10:33:43 22    Q.    Was the box part of the truck like in the --

10:33:46 23    A.    Yes.

10:33:47 24    Q.    Was that box locked?

10:33:48 25    A.    It had a lock, but the lock had been broken.  So it

Hallie Biden - direct

| 10:33:53 | 1 | was like two inches ajar, you couldn't like click it. |

10:33:53  1   was like two inches ajar, you couldn't like click it.

10:33:59  2   Q.    I see.  And how had you gotten in the car?  Was the

10:34:06  3   car locked?

10:34:08  4   A.    I think it was open.

10:34:10  5   Q.    Did you have keys to the truck in any event?

10:34:13  6   A.    I don't know, I don't have my own keys.

10:34:17  7   Q.    I'm sorry, I didn't hear you?

10:34:19  8   A.    I don't have my own keys, I don't have a set of keys,

10:34:23  9   I don't remember if it was open or the keys were in the car

10:34:25 10   or the keys were sitting out when he went to sleep.

10:34:28 11   Q.    But the console you said was unlocked and actually

10:34:33 12   the lock was broken and it was actually up a couple of

10:34:36 13   inches, you said?

10:34:38 14   A.    Yes.

10:34:40 15            MR. WISE:  Can I have government Exhibit 1?

10:34:46 16   Your Honor, this is the same, in the same condition we

10:34:49 17   showed yesterday.  Can I approach the witness with it?

10:34:53 18            THE COURT:  Yes.

10:34:55 19   BY MR. WISE:

10:34:57 20   Q.    Ms. Biden, do you see government Exhibit 1?

10:34:59 21   A.    Yes.

10:35:00 22   Q.    Is that the gun you found?

10:35:01 23   A.    I mean, I can't know if that's the one, but it looks

10:35:05 24   like it.

10:35:05 25   Q.    Have you ever seen another pistol?

Hallie Biden - direct

10:35:08 1    A.    No.

10:35:09 2    Q.    Does this look like the pistol you found?

10:35:12 3    A.    Yes.

10:35:19 4    Q.    And just so it's clear, I think the jurors saw this,

10:35:26 5    but can I have government Exhibit 1A on the screen.  So this

10:35:30 6    is the pistol, this looks like the pistol you found?

10:35:35 7    A.    Yes.

10:35:35 8    Q.    Did you find any ammunition with the gun, any

10:35:38 9    bullets?

10:35:39 10   A.    Yes.

10:35:41 11   Q.    You can take that down.

10:35:43 12          When you found the gun and the bullets, what did

10:35:46 13   you do?

10:35:47 14   A.    I panicked and I wanted to get rid of them.

10:35:54 15   Q.    Why did you panic?

10:35:57 16   A.    Because I didn't want him to hurt himself or I didn't

10:36:03 17   want my kids to find it and hurt themselves, and I just

10:36:09 18   panicked and wanted to get rid of it.

10:36:12 19   Q.    What did you do then?

10:36:14 20   A.    I was looking around for like what to do, I wasn't

10:36:18 21   sure.  I considered hiding it somewhere but then I was

10:36:23 22   afraid one of my children would find it.  So then I wanted

10:36:27 23   -- I thought about throwing it away.  So I remember going

10:36:33 24   back into the house and finding like something to put it in.

10:36:37 25   Q.    What was it that you found?

Hallie Biden - direct

10:36:38  1    A.      Like a -- like just like a little gift shopping bag.

10:36:43  2    Q.      What color was it, do you remember?

10:36:46  3    A.      I don't remember, dark.

10:36:48  4    Q.      Okay.

10:36:48  5    A.      And then I went back out, like I didn't even -- like

10:36:53  6    I'm not -- I was afraid to touch it, I didn't know if it was

10:36:56  7    loaded, so I was trying to kind of put it in the bag and

10:37:01  8    then I realized that it was so visible, so then I was

10:37:04  9    looking around for something to put it in, which was the

10:37:08 10    pouch, and then I --

10:37:10 11    Q.      So you were looking around the car for something?

10:37:12 12    A.      I was looking around the car while sitting there like

10:37:15 13    what could I wrap this, what could I put this in and then

10:37:18 14    put it back in the bag so I could take it and get it off my

10:37:23 15    property and throw it away.

10:37:24 16    Q.      I think you said you found a pouch in the car?

10:37:27 17    A.      I did.

10:37:29 18    Q.      I'm going to show you what's been marked -- I'm going

10:37:32 19    to show you what's been marked as government Exhibit 4.

10:37:40 20    A.      Yes.

10:37:40 21    Q.      Is that the pouch?

10:37:41 22    A.      Yes.

10:37:42 23            MR. WISE:  Your Honor, I move in admission

10:37:44 24    government Exhibit 4.

10:37:45 25            MR. LOWELL:  No objection.

Hallie Biden - direct

10:37:46  1          THE COURT:  Thank you.  It's admitted.

10:37:48  2          (Exhibit No. 4 was admitted into evidence.)

10:37:49  3          MR. WISE:  I would like to have government

10:37:52  4   Exhibit 4A.  I also move this in admission.  The next one.

10:38:00  5   Next one.

10:38:02  6   BY MR. WISE:

10:38:02  7   Q.      Is this the pouch that I just showed you?

10:38:04  8   A.      Yes.

10:38:05  9   Q.      Opened up?

10:38:07 10          THE COURT:  So you offered the 4(a) into

10:38:09 11   evidence?

10:38:11 12          MR. WISE:  Yes, I'm sorry.

10:38:11 13          THE COURT:  Was there an objection?

10:38:12 14          MR. LOWELL:  No objection, Your Honor.

10:38:13 15          THE COURT:  Thank you.  I just want to make sure

10:38:15 16   we have it clear so we can post the right things so it's

10:38:18 17   admitted.

10:38:19 18          MR. WISE:  Thank you, Your Honor.  My apologies.

10:38:22 19          (Exhibit No. 4A was admitted into evidence.)

10:38:22 20   BY MR. WISE:

10:38:23 21   Q.      Had you seen the defendant with pouches before?

10:38:26 22   A.      Yes, but not for a while.

10:38:29 23   Q.      And what did he keep in the pouches?

10:38:31 24   A.      Sometimes business cards, sometimes drugs, sometimes,

10:38:38 25   you know, any little things.

Hallie Biden - direct

10:38:43 1   Q.      So you said you found the pouch in the car and you

10:38:45 2   put the gun inside?

10:38:46 3   A.      I did.

10:38:47 4   Q.      Did you put anything else in it, if you remember?

10:38:49 5   A.      The bullets.

10:38:50 6   Q.      And then what did you do with the pouch that now had

10:38:53 7   the gun and the bullets in it?

10:38:55 8   A.      I put it into the little shopping bag that kind of

10:38:58 9   had a handle so that I could not touch it when I was

10:39:03 10  walking.

10:39:04 11  Q.      Okay.  And then after you did that, what did you do

10:39:13 12  next?

10:39:13 13  A.      I took it to the grocery store up the road and I

10:39:23 14  threw it away.

10:39:24 15  Q.      And you took it to the grocery store up the road and

10:39:27 16  threw it away?

10:39:28 17  A.      Threw it in the outside trash can.

10:39:30 18  Q.      And which grocery store was that?

10:39:33 19  A.      Janssen's Market.

10:39:39 20          MR. WISE:  Your Honor, we have a video, the

10:39:42 21  video from Janssen's Market.  If there is no objection, I

10:39:46 22  would enter that into evidence and play it.

10:39:48 23          MR. LOWELL:  There is no objection.

10:39:49 24          THE COURT:  It's admitted.

10:39:52 25          MR. WISE:  This is 39A, Ms. Vo.

Hallie Biden - direct

10:39:54  1               (Exhibit No. 39A was admitted into evidence.)

10:39:54  2   BY MR. WISE:

10:39:55  3   Q.      Do you see that on the screen, Ms. Biden?

10:39:57  4   A.      Yes.

10:39:58  5   Q.      What's that, just generally speaking the set up where

10:40:02  6   we are?

10:40:02  7   A.      The parking lot at Janssen's.

10:40:04  8   Q.      The parking lot at Janssen's.  Can we play the video?

10:40:13  9               (Video played.)

10:40:25 10               Is that your car?

10:40:26 11   A.      Yes.  I mean, I believe so.

10:40:58 12   Q.      Is that you, Mrs. Biden?

10:41:03 13   A.      Yes.

10:41:04 14   Q.      What you got out of the back, or getting out, we'll

10:41:08 15   see in a second.  Is that the bag?

10:41:11 16   A.      Yes.

10:41:22 17   Q.      And is that you putting it in the trash can?

10:41:25 18   A.      Yes.

10:41:25 19   Q.      And then what did you do after that, did you go

10:41:29 20   inside the store?

10:41:30 21   A.      I forget.  Probably, but I mean, I was so flustered

10:41:35 22   from the whole thing, so, I mean, if I see myself going in,

10:41:41 23   then yes.  It was a stupid idea now, but I was panicking, so

10:41:50 24   I threw it in the trash.

10:41:51 25               MR. WISE:  I would move in evidence 39B, which

Hallie Biden - direct

10:41:54  1  is a clip from inside the store, unless there is an

10:41:57  2  objection.

10:41:57  3            MR. LOWELL:  There is no objection.

10:41:58  4            THE COURT:  Thank you.  It's admitted.

10:42:01  5            MR. WISE:  If we could have 39B.

10:42:03  6        (Exhibit No. 39B was admitted into evidence.)

10:42:04  7  BY MR. WISE:

10:42:04  8  Q.    Is that the inside of the store?

10:42:06  9  A.    Yes.

10:42:07 10  Q.    If you could play it.

10:42:10 11            (Video played.)

10:42:13 12            Is that you coming in?

10:42:15 13  A.    Yes.

10:43:17 14  Q.    After this, did you go back to your car and leave the

10:43:20 15  store?

10:43:21 16  A.    I don't -- I mean, I -- did I shop, I don't recall.

10:43:27 17  Q.    I'm asking, at some point did you leave the store?

10:43:30 18  A.    Yes.

10:43:30 19  Q.    Did you go back home?

10:43:31 20  A.    I did.

10:43:31 21  Q.    When you went home, did you discover that the

10:43:35 22  defendant had left?

10:43:36 23  A.    I can't remember the order of that.  I can't remember

10:43:40 24  if I saw him back at home or if he called me at that point.

10:43:45 25  Q.    So at some point, though, did he leave your home

Hallie Biden - direct

10:43:48  1    either when you were there or when you weren't there?

10:43:51  2    A.      I -- I don't know.

10:43:56  3    Q.      When you got home, was he still there?

10:44:02  4    A.      I -- that's where I'm not sure if I talked to him on

10:44:06  5    the phone or he was back at my house and he had already

10:44:10  6    left.

10:44:10  7    Q.      So, and we're going to look at some messages.   At

10:44:14  8    some point you did communicate with him, I guess later?

10:44:18  9    A.      Correct.

10:44:18 10    Q.      But do you have a memory of when you got back to the

10:44:21 11    house, you discovered he had left or was he still there?

10:44:25 12    A.      That's what I'm not sure.

10:44:29 13    Q.      Do you recall telling when you were interviewed by

10:44:31 14    the police and we'll talk about this later, that at some

10:44:35 15    point he had left your residence that morning?

10:44:37 16    A.      I don't recall the -- him leaving or not leaving.  I

10:44:43 17    remember him telling me to go back and file the police

10:44:47 18    report, so that -- what I'm saying, I can't remember if that

10:44:50 19    was on the phone or if that was in person.

10:44:52 20    Q.      Okay.  But you're clear that he was at your house

10:44:57 21    that morning?

10:44:58 22    A.      Yes.

10:45:00 23    Q.      Now you said either in person or over the phone --

10:45:05 24    well, I guess at some point, did he learn what you had --

10:45:09 25    that you had thrown the gun away?

10:45:11 1    A.      Correct.  Yes.

10:45:12 2    Q.      And either in person or over the phone, what did he

10:45:17 3    tell you to do?

10:45:18 4    A.      To go back to the store and -- first go look for it,

10:45:23 5    and then when I went back to look for it and didn't find it,

10:45:26 6    he told me to file a police report for it because it was

10:45:30 7    registered in his name.

10:45:32 8    Q.      Okay.  And did you do that, did you go back to the

10:45:35 9    store to try to get it?

10:45:36 10   A.      I did, yes.

10:45:38 11            MR. WISE:  Your Honor, I would offer government

10:45:40 12   Exhibit 39D, which is a recording back at the store of

10:45:44 13   Ms. Biden coming back, unless there is an objection.

10:45:47 14            MR. LOWELL:  One second, judge.  What's the

10:45:50 15   number?

10:45:52 16            MR. WISE:  39D.

10:45:55 17            MR. LOWELL:  No objection.

10:45:56 18            THE COURT:  Thank you.  It's admitted.

10:45:58 19            ( Exhibit No. 39D was admitted into evidence.)

10:46:06 20            MR. WISE:  You can play the clip.

10:46:24 21            (Video played. )

10:46:29 22   BY MR. WISE:

10:46:30 23   Q.      Is that you coming back, Ms. Biden?

10:46:32 24   A.      Yes.

10:46:38 25   Q.      Is that you in the shop?

10:46:42  1   A.      Yes, outside of the shop.

10:46:43  2   Q.      And are you looking for it?

10:46:45  3   A.      Yes.

10:47:32  4   Q.      Were you able to find it?

10:47:34  5   A.      No.

10:47:34  6   Q.      And you had nothing in your hand when you got back in

10:47:37  7   the car, right?

10:47:38  8   A.      Right.

10:47:42  9   Q.      What did you do after you couldn't find it?

10:47:49 10   A.      I think I went in and talked to them at Janssen's and

10:47:55 11   asked if they had any -- you know did they take the trash

10:47:58 12   out or was there a security camera, tried to kind of figure

10:48:02 13   that out.

10:48:04 14   Q.      Okay.

10:48:05 15   A.      And then eventually I filed a police report while I

10:48:09 16   was at Janssen's with the manager that worked there.

10:48:15 17   Q.      I think you testified that you communicated with the

10:48:19 18   defendant --

10:48:19 19   A.      Throughout that.

10:48:20 20   Q.      Throughout that.

10:48:23 21           In that time period, how did you communicate --

10:48:25 22   in October of 2018 and then moving forward in time, how did

10:48:29 23   you communicate with the defendant?

10:48:31 24   A.      Cell phone.

10:48:31 25   Q.      Including messages on the cell phone?

10:48:35  1    A.      Texting, correct.

10:48:37  2    Q.      Texting.

10:48:37  3            MR. WISE:  I'm going to ask if we could have

10:48:42  4    government Exhibit 18.

10:48:46  5    BY MR. WISE:

10:48:47  6    Q.      And this should be in front of you, Ms. Biden, that

10:48:53  7    binder.  This is already in evidence, and on the monitor, so

10:48:58  8    whatever is more convenient or comfortable for you, you can

10:49:01  9    look at it on the monitor or on the book, I'm going to be

10:49:05 10    enlarging some things so if you can't see it clearly, I can

10:49:10 11    do that.

10:49:11 12    A.      Okay.

10:49:11 13    Q.      If we could go to page 29.  Just to orient us, if we

10:49:20 14    look across the top, you'll see it's got row, date, time,

10:49:25 15    from, to, and message.  Do you see that?

10:49:30 16    A.      Yes.

10:49:30 17    Q.      And I'm not -- the next three columns I'm not going

10:49:34 18    to be asking you about.

10:49:36 19            And at that time, were you using a cell phone

10:49:40 20    that's at that number that ends in 3774?

10:49:44 21    A.      Yes.

10:49:44 22    Q.      Now, the first message is from October the 13th of

10:49:55 23    2018, so before the events that we just saw, right?

10:49:58 24    A.      Yes.

10:49:58 25    Q.      And the next message, or the message is, "I'm using

Hallie Biden - direct

10:50:03 1    this until my other phone arrives by mail."  Do you see

10:50:06 2    that?

10:50:06 3    A.      Yes.

10:50:07 4    Q.      And that's with the number ending 2473?

10:50:11 5    A.      Yes.

10:50:11 6    Q.      At this time when you were communicating with the

10:50:14 7    defendant, was he using a phone number that had actually

10:50:17 8    been associated with his former spouse?

10:50:19 9    A.      That number, yes.

10:50:20 10   Q.      That number.  And if we go to the next page, at the

10:50:27 11   top, did you say "that freaked me out"?

10:50:29 12   A.      Yes.

10:50:29 13   Q.      And then he said "this is Kathleen, and I'm going to

10:50:34 14   beat you up.  If you come out of that."  And you say,

10:50:37 15   "hello."  So there is a gap.  So just to be clear, this

10:50:42 16   number, you knew you were talking to the defendant even

10:50:45 17   though it had been a number you had previously known his

10:50:48 18   wife to use, ex-wife to use?

10:50:50 19   A.      Correct.

10:50:51 20   Q.      And then later in that same day, it looks like you

10:50:56 21   text him "hello" then "hi, are you on your way home?  Call

10:51:01 22   me please."  Right?

10:51:03 23   A.      Yes.

10:51:04 24   Q.      If we go to the next page, he responds "five."

10:51:10 25   Five."  You can leave them.  I think we can see it okay.

Hallie Biden - direct

10:51:15  1   You say "you okay?  Where are you?  Truthfully."  This is

10:51:20  2   all around 8:14, 8:15 on the 13th, right?

10:51:24  3   A.      Yes.

10:51:25  4   Q.      If we go to the next page.  He says "buy.  I

10:51:32  5   guessing."  So buying with an I guess in the middle, do you

10:51:36  6   see that?

10:51:36  7   A.      Yes.

10:51:37  8   Q.      And then he tells you "hold", we're now at 8:18 on

10:51:41  9   that day, on the 13th.  Did you know what he was buying?

10:51:45 10   A.      I mean, I -- I would guess, but I mean I didn't know

10:51:50 11   for sure.

10:51:51 12   Q.      Okay.  And if we go to the next page.  You asked him

10:51:56 13   "where are you?"  Or he asked you, "where are you?"  He's

10:52:00 14   green, right, you're blue.  And then you say "where?  I'm

10:52:05 15   home."  And then you say to him "in DE or D.C.," right?

10:52:12 16   A.      Yes,

10:52:14 17   Q.      And he responds "New Castle.", right.

10:52:19 18           Go to the next page.  And then you tell him,

10:52:22 19   "Please be safe.  I just want you safe."

10:52:28 20           Now that's at 8:23, 8:24.  Now after 9 o'clock,

10:52:33 21   he asked, "Do you want to go to the latio?"  And then says

10:52:33 22   "Patio."

10:52:37 23           What is that?  Do you know what that is?

10:52:40 24   A.      I don't know if that was --

10:52:43 25   Q.      Is it like a bar or restaurant or something?

Hallie Biden - direct

10:52:46  1    A.      Not that I know of.

10:52:47  2    Q.      If we go to the next page.  And then he says "yes or

10:52:51  3    no?"  You asked, "sure, what time?"  Sort of later it looks

10:52:57  4    like.  And then he says "trying to find out how long they

10:53:01  5    will be there."  And then you say, "what do you think?"

10:53:04  6    Again, this is all still on the 13th.

10:53:06  7                If we go to the next page.  You say, "do you

10:53:11  8    want to go?  I'll do whatever you want.  Love you."  And

10:53:14  9    then there is a question mark now a little before 10:00,

10:53:18 10    right?

10:53:18 11    A.      Uh-huh.

10:53:19 12    Q.      And then he responds, "I'll be home in an hour."

10:53:22 13    Right?  Do you see that?

10:53:23 14    A.      Yes.

10:53:24 15    Q.      And then a few minutes later, "you okay?  We staying

10:53:30 16    home?"  That's what you said, right?

10:53:32 17    A.      Yes.

10:53:32 18    Q.      We go to the next page.  Now at 10:25, you ask "why

10:53:38 19    won't you answer my calls?  Where are you?  Are you with

10:53:41 20    someone?"  And then if we could, the next, in the next one

10:53:44 21    is kind of small, if you could enlarge the next three.  Does

10:53:50 22    he respond "yes."  It's in response to your question are you

10:53:55 23    with someone.  "Yes, Bernard hangs at 7/11 on Greenhill and

10:54:02 24    Lancaster, I'm now off Maryland Avenue behind Blue Rocks

10:54:07 25    Stadium, waiting for a dealer named Mookie", do you see

Hallie Biden - direct

10:54:10  1    that?

10:54:10  2    A.      Yes.

10:54:10  3    Q.      When he said dealer, what did you understand him to

10:54:14  4    mean?

10:54:14  5    A.      That he was buying crack cocaine.

10:54:17  6    Q.      And then he said "his brother L is getting in car

10:54:21  7    now, I'm -- he has my money and I'm getting pissed."  Do you

10:54:30  8    see that?

10:54:30  9    A.      Yes.

10:54:33 10    Q.      And that was at about 10:30 on the 13th, right?

10:54:40 11    A.      Yes.

10:54:41 12    Q.      Now if we move -- we can come out of that and go to

10:54:45 13    the next page.  We move forward in time to the next day,

10:54:48 14    10:14 in the evening, do you see that at the top?

10:54:52 15    A.      Yes.

10:54:52 16    Q.      And did you text him "I called you 500 times in the

10:54:56 17    past 24 hours and you no answer.  Practice what you preach."

10:55:01 18    Do you see those messages?

10:55:02 19    A.      Yes.

10:55:02 20    Q.      And then if you can enlarge the one on the bottom,

10:55:06 21    his response at 5:37, is his response "I was sleeping on a

10:55:11 22    car smoking crack on 4th Street and Rodney."  Is that his

10:55:15 23    response?

10:55:15 24    A.      Yes.

10:55:20 25    Q.      And then if we go to the next page, he asked "where

10:55:26   1   were you?"  And then he says "there's my truth."  And then

10:55:31   2   repeats "where were you?"  Do you see that?

10:55:36   3   A.     Yes.

10:55:36   4   Q.     If we go to the next day, 10:15, at the bottom if you

10:55:42   5   could enlarge that, please?

10:55:44   6          You text, "I just want to help you get sober,

10:55:48   7   nothing that I do or you do is working.  I'm sorry."  Do you

10:55:52   8   see that?

10:55:52   9   A.     Yes.

10:55:52  10   Q.     And then if we go to the next page.  You text, "I'm

10:55:59  11   afraid you are going to die."  Do you see that?

10:56:02  12   A.     Yes.

10:56:03  13   Q.     Was that a fear you had at this time?

10:56:07  14   A.     Yes.

10:56:09  15   Q.     Were you afraid of him overdosing?

10:56:16  16   A.     Maybe, or you know, suicide, you know, I didn't know.

10:56:22  17   Q.     And then he responds on the 15th, a little bit later,

10:56:27  18   "what one thing have you done to help me get sober, Hallie?"

10:56:34  19          Had you tried to help him get sober?

10:56:37  20   A.     Yeah.

10:56:37  21   Q.     And when you tried to get -- help him get sober, was

10:56:42  22   it both to get off of crack and to stop drinking?

10:56:46  23   A.     Yes.

10:56:47  24   Q.     And then he says, "I'm almost there."  And then he

10:56:51  25   says "I'm here can't get in."  And then if we go to the next

Hallie Biden - direct

10:56:56  1     page.  I think that's it.

10:57:00  2              Now, if we move to the next page, 42.  So that

10:57:03  3     was 10:15, if we go to the next page, 42.  And if you could

10:57:08  4     enlarge.  This is now 10:23, this is the, just to remind us,

10:57:14  5     this is the morning where you found the gun in the unlocked

10:57:17  6     console, right?

10:57:18  7     A.     Okay, yes.

10:57:19  8     Q.     After he had come to your home, right?

10:57:21  9     A.     Yes.

10:57:22  10    Q.     And you said you don't remember if you talked to him

10:57:28  11    or if he -- or I guess if he texted you, right?

10:57:34  12    A.     Right.

10:57:35  13    Q.     So I guess -- if you remember, did he find that the

10:57:46  14    gun was missing and ask you about it or do you remember

10:57:50  15    telling him?

10:57:50  16    A.     I did not tell him.

10:57:52  17    Q.     You didn't tell him?

10:57:53  18    A.     No.  I wasn't-- I wasn't planning, I was just going

10:57:58  19    to pretend like it wasn't me.

10:58:00  20    Q.     Okay.  So you didn't tell him what you had done with

10:58:02  21    the gun?

10:58:03  22    A.     No.

10:58:03  23    Q.     He discovered it?

10:58:05  24    A.     Correct.

10:58:05  25    Q.     And you don't remember if the initial discussion was

Hallie Biden - direct

10:58:07  1    -- when he discovered it if he was still there or if it was

10:58:11  2    over the phone or something?

10:58:12  3    A.      Correct.

10:58:12  4            MR. LOWELL:  It's been asked and answered.

10:58:15  5            MR. WISE:  I don't think I have, Your Honor.

10:58:19  6            THE COURT:  Don't ask it again.

10:58:21  7            MR. WISE:  Thank you, Your Honor.

10:58:23  8    BY MR. WISE:

10:58:24  9    Q.      And so he texts you, and this is at 11:45 on the

10:58:28 10    morning of 10/23, "did you take that from me, Hallie?"  What

10:58:34 11    did you understand him to be referring to when he said "did

10:58:37 12    you take that from me?"

10:58:39 13    A.      The gun.

10:58:40 14    Q.      "Are you insane.  Tell me now.  This is no game.  And

10:58:44 15    you're being totally irresponsible and unhinged."  And then

10:58:48 16    it looks like a few seconds later, tell me now, Hallie.  And

10:58:53 17    then I guess a few minutes after that, he says, "you really

10:58:59 18    need to help me think right now, Hallie, this is very, very

10:59:03 19    serious."

10:59:06 20            Right?

10:59:07 21    A.      Yes.

10:59:08 22    Q.      And then if we move to the next page, page 43, the

10:59:16 23    last message was at 11:58, now at 12:17, you say "call me."

10:59:23 24    Right?

10:59:23 25    A.      Right.

Hallie Biden - direct

10:59:24 1  Q.    So I guess by this point you weren't with him, that's

10:59:33 2  clear, right, because you asked him to call you.  And then

10:59:39 3  at 1:06, do you remember talking to him after this text?

10:59:45 4  A.    Yes.

10:59:46 5  Q.    Okay.  What do you remember about that?

10:59:48 6  A.    That he was angry with me.

10:59:51 7  Q.    Okay.  And then you respond, "I can't believe this,

10:59:55 8  you can blame me all you want.  I know it was stupid, but

10:59:59 9  your part is dangerous and negligent.  And because of this

11:00:04 10  and my stupidity for being worried about you, I'm dealing

11:00:07 11  with insanity and possibly I'm the one going to get in

11:00:11 12  trouble.  Check yourself into a local rehab Hunter, this has

11:00:15 13  all got to stop.  Don't run away again.  Please don't

11:00:19 14  leave."

11:00:24 15        And then about 20 minutes later.  You text

11:00:27 16  "police coming to talk to me now, I'll take full blame.  I

11:00:31 17  don't want to live like this anymore.  This too much for me

11:00:34 18  to handle."  Are these messages being sent when you're still

11:00:38 19  at Janssen's?

11:00:40 20  A.    I believe so, probably when we're waiting for the

11:00:43 21  police to arrive.

11:00:44 22  Q.    Okay.  And then the next message is several hours

11:00:51 23  later.  If you can bring that out a little bit just to see

11:00:56 24  the time.  It's 6:47, and he text you back, "the fucking FBI

11:01:01 25  Hallie, it's hard to believe anyone is that stupid.  So

Hallie Biden - direct

11:01:04 1   what's my fault here Hallie that you speak of.  Owning a gun

11:01:08 2   that's in a locked car hidden on another property?  You say

11:01:12 3   I invade your privacy.  What more can I do than come back to

11:01:15 4   you to try again and you do this???  Who in their right mind

11:01:20 5   would trust you to help me get sober?  Was it a locked car

11:01:28 6   on another property?"

11:01:31 7   A.      "It was on my property, it was on the back side

11:01:36 8   yard."

11:01:38 9   Q.      If we go to the next page, still on the 23rd, a

11:01:44 10  minute later, he says "do you want me dead."  And then you

11:01:48 11  respond, "I'm sorry."  If we could bring out her messages

11:01:52 12  because the text gets small at the bottom.  "I'm sorry.  I

11:01:55 13  just want you safe.  That was not safe.  And it was open,

11:01:59 14  unlocked and windows down, and the kids search your car."

11:02:02 15          Do you see that?

11:02:03 16  A.      Yes.

11:02:04 17  Q.      Do you remember the windows being down?

11:02:06 18  A.      I mean, if I wrote that, then they were.

11:02:11 19  Q.      And then you write "you have lost your mind, Hunter,

11:02:14 20  I'm sorry I handled it poorly today, but you are in a huge

11:02:17 21  denial about yourself and about that reality that I just

11:02:20 22  want you safe.  You run away like a child and blame me for

11:02:24 23  your shit, it's to be expected that you go, you prove

11:02:27 24  repeatedly that you can't stay and really do work on

11:02:30 25  yourself, it's easier for you to avoid looking within and

11:02:34  1    cowardly to constantly point the blame on me."  All right.

11:02:39  2    You can take that down.

11:02:40  3              Moving forward in time if we go to the next

11:02:43  4    page, that was 10:23, page 45.  The next message I wanted to

11:02:47  5    ask you about is on November the 3rd, so now we're less than

11:02:52  6    a week later, a little more than a week later.  If you could

11:02:56  7    enlarge those three messages.  The one at the top is from

11:03:00  8    him, right?

11:03:02  9    A.     Yes.

11:03:03  10   Q.     And it he says to you, "I'm a liar and a thief and a

11:03:07  11   blamer and a user, and I'm delusional and an addict unlike

11:03:12  12   beyond and above all other addicts that you know, and I've

11:03:15  13   ruined every relationship that I have ever cherished."  Is

11:03:18  14   that what he wrote?

11:03:20  15   A.     Yes.

11:03:20  16   Q.     And then you respond, "let's do this right, come home

11:03:23  17   and talk with the kids, let's tell your family and your kids

11:03:26  18   the plan and let's stick to it.  Everyone adores you and

11:03:29  19   wants to feel like you are safe and working on sobriety.  We

11:03:33  20   can do this."  When you talk on working on sobriety, are you

11:03:38  21   referring to drugs and alcohol?

11:03:40  22   A.     Well, if you're sober, it's all of the above.

11:03:43  23   Q.     "We can do this.  Then I'll do therapy with you while

11:03:47  24   you are there.  We can talk about everything you want once

11:03:50  25   you are there."  And then the next message, "you are blaming

Hallie Biden - direct

11:03:54  1    me again and for what?  Do you know how much and what you

11:03:57  2    and your addiction has done to us all?  When you humbly

11:04:02  3    realize how much damage you caused, then I'll know you are

11:04:05  4    ready to get sober.  Blaming me, this is an excuse to avoid

11:04:10  5    sobriety, if you want us, our love, our support, my help,

11:04:16  6    than shut up and come home and we can get you there."  If we

11:04:20  7    go to the next page, did he respond within the same minute,

11:04:25  8    "no blame regarding sobriety."  Is that what he said?

11:04:28  9    A.     Yes.  That's what it looks like.

11:04:31 10    Q.     And then you write, "you are the one not sober and

11:04:34 11    brutally effecting all of us."  And then did he write, "I'm

11:04:38 12    a drunk, an addict."  And then if we go to the next page.

11:04:44 13    Did he say, "don't you want your crack back, Hallie?"  And

11:04:49 14    did you respond "I can't take it anymore."  And then did you

11:04:54 15    say "you want me to relapse?"  Do you see that?

11:05:01 16    A.     Yes.

11:05:01 17    Q.     And then he said "for a long time."  Right.  Is that

11:05:05 18    what he said back?

11:05:06 19    A.     That's what it looks like, yes.

11:05:10 20    Q.     And then if we go to the next page, page 48, did you

11:05:14 21    respond, "focus on yourself and getting sober, not on me."?

11:05:19 22    A.     Yes.

11:05:21 23    Q.     Now, that was early November.  I have one more --

11:05:32 24    well, before I do that, I have one message I want to ask you

11:05:39 25    about that's not in that chart.  It should be in your

Hallie Biden - direct

11:05:45  1   binder.  This is 18G.  Do you see 18G on the side, in the

11:06:19  2   binder?

11:06:20  3   A.      You want me to look?

11:06:21  4   Q.      If you could, otherwise I could hand you a copy.

11:06:29  5   A.      Yes.

11:06:30  6   Q.      All right.  And is this another series of text

11:06:33  7   messages between you and the defendant from October, so a

11:06:37  8   little bit before, October the 31st, a little bit before the

11:06:41  9   last message we just looked at?

11:06:44 10   A.      Yes.

11:06:47 11               MR. WISE:  And I would offer 18G into evidence.

11:06:49 12               MR. LOWELL:  We need to approach.

11:11:38 13               (Side-bar discussion:)

11:11:38 14               MR. LOWELL:  I'm being, trying to be generous,

11:11:38 15   that's not reciprocal.  The e-mail account, EDH that's up

11:11:38 16   here is not one that has been previously identified and it

11:11:38 17   is not part of what I believe was put in in the exhibit in

11:11:38 18   which the underlying data was presented.  So I don't know

11:11:38 19   what this account is and it hasn't been provided.

11:11:38 20               MR. WISE:  It has been provided in discovery.

11:11:38 21               MR. LOWELL:  It may every --

11:11:38 22               MR. WISE:  This is part of the exhibits that we

11:11:38 23   disclosed some time ago and they didn't raise any questions

11:11:38 24   about it or ask us to show where it is, but this was

11:11:38 25   provided in discovery.  And it has the page number from the

Hallie Biden - direct

11:11:38  1    discovery at the bottom.

11:11:38  2         MR. LOWELL:  But the agent didn't authenticate

11:11:38  3    this account, what she wrote, what she talked about.

11:11:38  4         MR. WISE:  She can.  She just said this is a

11:11:38  5    text exchanged she had with him, she's already authenticated

11:11:38  6    it.

11:11:38  7         MR. LOWELL:  Okay.  So she'll be able to

11:11:39  8    identify this account and say this is something that she

11:11:39  9    received from him in this account?

11:11:39 10         MR. WISE:  So this iCloud account was already on

11:11:39 11    the summary chart but she just said this was a text exchange

11:11:39 12    she had with him.  This is what I'm going to ask her about,

11:11:39 13    she text him I just went into the library and sitting next

11:11:39 14    to Hunter, that's her son, is your brown leather pouch with

11:11:39 15    a stem in it laying on the chair next to him.  That's the

11:11:39 16    one I'm going to ask her about.

11:11:39 17         MR. LOWELL:  How does she know this is Hunter

11:11:39 18    operating this account?

11:11:39 19         MR. WISE:  Well, first of all, the account is

11:11:39 20    already in evidence, it is on the summary chart but she just

11:11:39 21    testified the texts she had with him including this account

11:11:39 22    and this is another one.

11:11:39 23         THE COURT:  Just so I understand, is this the

11:11:39 24    same brown pouch?

11:11:39 25         MR. WISE:  A different one, he had more than

11:11:39  1    one.  Ms. Kestan testified to that as well.

11:11:39  2            MR. LOWELL:  All I can say is that the iCloud

11:11:39  3    extraction that the agent offered is not this one.  It's not

11:11:39  4    this one.  So -- look, what I'm trying to do is, this is not

11:11:39  5    quite a goose and gander, but if they are going to say I'm

11:11:39  6    supposed to be looking at data to find this text to prove

11:11:39  7    that it's okay, not being able to do this, or she can say it

11:11:39  8    I can ask her the same question did you send a text, and she

11:11:39  9    can authenticate it and did it, that's fine, but they can't

11:11:39 10    say I need to find where it is ahead of time when they

11:11:39 11    haven't shown me.

11:11:39 12            MR. WISE:  This has already been authenticated

11:11:39 13    this is part of the authentication motion in limine we filed

11:11:39 14    with this account, it's already been authenticated, the

11:11:39 15    problem with summary chart we couldn't tell what was on the

11:11:39 16    chart was accurate, this isn't a typed up summary, this is

11:11:39 17    the raw messages.

11:11:39 18            THE COURT:  This is what I actually asked you to

11:11:39 19    use instead of the summary chart, is the raw messages.

11:11:39 20            MR. LOWELL:  Right.

11:11:39 21            THE COURT:  And you're saying this document with

11:11:39 22    the raw messages written like this was produced in

11:11:39 23    discovery?

11:11:39 24            MR. WISE:  Yes.

11:11:39 25            THE COURT:  Under this production number 1605?

Hallie Biden - direct

11:11:39 1          MR. WISE:  Yes.

11:11:39 2          MR. LOWELL:  Authentication was not the issue

11:11:39 3    before, they agreed that what we were seeking was authentic,

11:11:39 4    they said they couldn't fined it and, therefore, they

11:11:39 5    couldn't check its accuracy.

11:11:39 6          THE COURT:  In the summary document?

11:11:39 7          MR. LOWELL:  Right.

11:11:39 8          MR. WISE:  Because we had to compare the raw to

11:11:39 9    the summary document, we couldn't find the raw, this is the

11:11:39 10   raw, it's authenticating because the 902.11 search that was

11:11:39 11   parts of that motion in limine for this account, this

11:11:39 12   account was covered by that.

11:11:39 13         MR. LOWELL:  I understand that both of us have

11:11:39 14   gotten stipulations of the authenticity of the material but

11:11:40 15   that wasn't your objection before, your objection before is

11:11:40 16   notwithstanding that it's authentic, you couldn't find it in

11:11:40 17   the extraction report.  The account did not identify this

11:11:40 18   one as being in the extraction report so I want it on the

11:11:40 19   record that that did not happen.  If you're asking her if

11:11:40 20   she can looking at this text and indicate that it's

11:11:40 21   something that she remembers and that it's something she

11:11:40 22   said --

11:11:40 23         THE COURT:  How about if I let them take their

11:11:40 24   morning break.  Okay.

11:11:40 25         Ladies and gentlemen how about you take your

Hallie Biden - direct

11:11:40  1    morning break, fifteen minutes and then we'll come back.

11:11:43  2                    (Jury exiting the courtroom at 11:11 a.m.)

11:11:59  3              THE COURT:  Okay.  Everyone can be seated.

11:12:05  4              So --

11:12:07  5              MR. LOWELL:  Your Honor.

11:12:09  6              THE COURT:  I'm sorry, yes, actually, you should

11:12:12  7    go out in the hall since we're going to talk about this.

11:12:16  8    Your breaks are usually about 10 or 15 minutes.

11:12:20  9              THE WITNESS:  Okay.

11:12:21 10              THE COURT:  Thank you.  Hold on.  Let me just

11:12:47 11    look at the testimony that came up beforehand.  By the way,

11:12:50 12    Mr. Wise, I can do it or you can do it, but ask the witness

11:12:53 13    to lean into the microphone, some of the jurors are having a

11:12:57 14    hard time hearing her.

11:12:59 15              MR. WISE:  Sure.

11:12:59 16              THE COURT:  Okay.  Let me just look at this

11:13:01 17    question.  So she said this is a series of text messages

11:13:12 18    between her and the defendant from October.  A little bit

11:13:17 19    before October, 31st, a little bit before the November

11:13:20 20    messages that had just been on the screen.

11:13:24 21              MR. WISE:  Right, our paralegal handed me the

11:13:28 22    extraction report that was produced in discovery where this

11:13:32 23    message appears on page --

11:13:36 24              THE COURT:  1605.

11:13:38 25              MR. WISE:  1605, this report is what was

Hallie Biden - direct

11:13:41  1    produced to the defense and it's self authenticating.

11:13:46  2                THE COURT:  You're complaint about them was he

11:13:47  3    didn't have the equivalent?

11:13:49  4                MR. HINES:  We had a chart that purported to be

11:13:52  5    typed up messages and we couldn't compare to see if they

11:13:56  6    were accurate, and for instance I looked at one that I did

11:13:59  7    recognize and it wasn't accurate.  It's not that they

11:14:02  8    deliberately mistyped it, but that's the whole point why we

11:14:06  9    give them to each other.  That's frankly why in our summary

11:14:09 10    chart we used the raw pictures to kind of cut down on,

11:14:12 11    somebody leaves out a word or leaves out a not or whatever,

11:14:16 12    that was my issue with the summary chart.

11:14:18 13                I just need to be able to know that something

11:14:21 14    they're putting in evidence in place of the underlying

11:14:24 15    evidence is accurate.  That's the fairness we're looking

11:14:29 16    for.

11:14:29 17                But this is a series of exchanges that already

11:14:32 18    has been authenticated between her and the defendant.  And

11:14:38 19    they had this -- they've had the report, they have had the

11:14:40 20    exhibit, they raised no objection, I'm going to ask about

11:14:43 21    the one I pointed to at side-bar and that's my question.

11:14:49 22                THE COURT:  Mr. Lowell?

11:14:50 23                MR. LOWELL:  Before the issue was not phrased as

11:14:54 24    authentication.  The government doesn't contest that our

11:14:58 25    texts, Mr. Wise said there is one that he recognized had a

Hallie Biden - direct

11:15:03  1  mistake in it, I don't know if it did or not, we have the

11:15:05  2  original text.

11:15:06  3          THE COURT:  We can deal with mistakes.

11:15:08  4          MR. LOWELL:  It's not an issue, before it wasn't

11:15:10  5  an issue of authentication, it was an issue of whether or

11:15:13  6  not I had provided, we had provided in a way that they can

11:15:16  7  verify.  And they indicated they hadn't.  This is provided

11:15:21  8  in discovery is what Mr. Wise just said, it's the same way

11:15:25  9  that we got what we got and they sent it to us.  So now it's

11:15:29 10  okay if it's just provided in discovery, it's up to us to go

11:15:33 11  find it.  When we were given what they gave us and they're

11:15:35 12  saying they can't find it, that's not okay.

11:15:38 13          What I'm suggesting is, that they are now saying

11:15:41 14  something that should allow us to do what we did but we're

11:15:45 15  doing it your way when we get there, individual texts one by

11:15:48 16  one.  I'm pointing out that the argument they're making

11:15:52 17  contradiction about what they said that we did.  I'm

11:15:56 18  pointing out that the account said we are there too

11:15:58 19  authenticate their account and this is how we got it.  In

11:16:01 20  her extraction testimony this wasn't there.

11:16:03 21          I can work out with Mr. Wise.  At the end of the

11:16:06 22  day, this text is not the end of the day and if she can

11:16:10 23  identify it and say she received it, that's fine I'll work

11:16:13 24  it out with him, but I'm just pointing out that they are

11:16:16 25  making an argument to support what they want to do that's

Hallie Biden - direct

11:16:20 1   different from what they're trying to object to what we are

11:16:23 2   asking to do, that's what I'll work out with him.

11:16:25 3           MR. WISE:  That's just not true.  We gave them

11:16:28 4   the report, it has page numbers on it, that's all we asked

11:16:31 5   for from them and they would not do it.

11:16:34 6           MR. LOWELL:  It's not that we would not do it,

11:16:35 7   Your Honor, we are doing our best, understanding if we told

11:16:38 8   him -- I don't want to belabor that point again.  We

11:16:42 9   discussed that.  I apologize.

11:16:44 10          I will explain to Mr. Wise at the break what we

11:16:48 11  can do about this one, and we do have now what we said we

11:16:51 12  can, I might need to check at the break, it might be fifteen

11:16:55 13  in order to get the individual text to ask her about.  Okay.

11:16:58 14          THE COURT:  Okay.  Just to be clear on the

11:16:59 15  summary chart, part of the problem was that you had the

11:17:02 16  clearly hearsay other texts on there.

11:17:05 17          MR. LOWELL:  And we understood that and I am

11:17:07 18  correcting that as well.

11:17:08 19          THE COURT:  Okay.  All right.  We'll take

11:17:12 20  fifteen minutes and come back around 11:30.

11:17:15 21          MR. WISE:  Thank you, Your Honor.

11:18:26 22          COURTROOM DEPUTY:  All rise.

11:18:29 23          (A brief recess was taken.)

11:35:58 24          COURTROOM DEPUTY:  All rise.

11:37:52 25          (Jury entering the courtroom at 11:37 a.m.)

Hallie Biden - direct

11:38:15 1          THE COURT:  All right, everyone.  Welcome back.

11:38:21 2   Everyone, please be seated.

11:38:26 3          Mr. Wise.

11:38:35 4          MR. WISE:  Thank you, Your Honor.

11:38:36 5   BY MR. WISE:

11:38:37 6   Q.     When we broke, Ms. Biden, I had asked you if the text

11:38:42 7   exchange in government Exhibit 18G was one you had with the

11:38:45 8   defendant.  Do you remember me asking you that?

11:38:49 9   A.     This right here?

11:38:51 10  Q.     Yes.

11:38:51 11  A.     Yes.

11:38:52 12  Q.     I think you testified that it was?

11:38:53 13  A.     Yes.

11:38:55 14          MR. WISE:  I move for the admission now of 18G

11:38:57 15  in evidence.

11:38:59 16          MR. LOWELL:  With no objection.

11:39:02 17          THE COURT:  Thank you.  It's admitted.

11:39:05 18          ( Exhibit No. 18G was admitted into evidence.)

11:39:06 19  BY MR. WISE:

11:39:08 20  Q.     Ms. Vo, if you could enlarge the third bubble up from

11:39:13 21  the bottom, and in this message to the defendant, this is

11:39:19 22  from October 31st, you text, or write "I just went into

11:39:24 23  library and sitting next to Hunter was your brown leather

11:39:28 24  pouch with a stem in it laying in the chair next to him."

11:39:33 25  A.     Yes.

Hallie Biden - direct

11:39:33  1    Q.     Did you have a room in your house at the time that

11:39:35  2    was referred to as the library?

11:39:37  3    A.     Yes.

11:39:37  4    Q.     Is that Hunter, is that the defendant or is that

11:39:39  5    someone else?

11:39:40  6    A.     That's my son.

11:39:41  7    Q.     And you write, "was your brown leather pouch with a

11:39:46  8    stem in it."  What does a stem refer to?

11:39:48  9    A.     A crack pipe.

11:39:50 10    Q.     So you obviously testified that the government

11:39:54 11    Exhibit 4, was the brown leather pouch that you had found in

11:39:57 12    the defendant's truck on the 23rd that you put the gun in,

11:40:02 13    right?

11:40:02 14    A.     Yes.

11:40:04 15    Q.     Now at the end of October, is this another brown

11:40:07 16    leather pouch that you had found in your home?

11:40:09 17    A.     Yes.

11:40:09 18    Q.     And that you're asking the defendant about?

11:40:13 19    A.     Yes.

11:40:13 20    Q.     That apparently had drug paraphernalia in it,

11:40:16 21    correct?

11:40:18 22    A.     Correct.

11:40:20 23    Q.     Do you remember him having multiple leather pouches

11:40:25 24    over a period of time?

11:40:27 25    A.     Yes.

11:40:27 1    Q.    And then if we could go back to 18, I think there was

11:40:33 2    one last message I was going to ask you about, and that's at

11:40:41 3    page, Ms. Vo, 61.  And this is from January of 28, 2019.  If

11:40:56 4    you could enlarge that message, Ms. Vo, at the bottom, it's

11:41:00 5    partially redacted.  This is a message from the defendant to

11:41:02 6    you and it reads "that's a line brighter than throwing my

11:41:07 7    gun in a full trash can in a busy grocery store and then

11:41:10 8    some kid blows his sisters head off and you go to prison for

11:41:15 9    the rest of your life."  Do you see that?

11:41:17 10   A.    I do.

11:41:17 11   Q.    Is that a reference to what happened on October 23rd,

11:41:21 12   that is the throwing gun in a trash can?

11:41:24 13   A.    Yes.

11:41:34 14             MR. WISE:  Your Honor, I have nothing further.

11:41:35 15             THE COURT:  All right.  Thank you.

11:41:38 16             Cross-exam.

11:41:40 17             MR. LOWELL:  Thank you, Your Honor.

11:41:58 18             Your Honor, may I approach?

11:42:01 19             THE COURT:  You may.

11:42:02 20                  CROSS-EXAMINATION

11:42:03 21   BY MR. LOWELL:

11:42:13 22   Q.    Still good morning.

11:42:13 23             Good morning, Ms. Biden.

11:42:15 24   A.    Good morning.

11:42:16 25   Q.    I'm Abbe Lowell, one of Hunter's lawyers.  We never

11:42:20 1  met.

11:42:20 2  A.     We never met.

11:42:22 3  Q.     We have never talked to each other.  I'm sorry that

11:42:27 4  you need to be here.

11:42:29 5          I want to go backwards a bit.  And you were

11:42:33 6  explaining to the jury, various times in the life of you and

11:42:39 7  Hunter in which drugs were involved.  And you talked about

11:42:43 8  his use going backwards from the time that I think you and

11:42:48 9  he started dating, I'm using the word dating, becoming

11:42:53 10 involved at the end of '15, right?

11:42:55 11 A.     Yes.

11:42:55 12 Q.     And then you described his various uses and that was

11:43:00 13 in 2016 as well?

11:43:03 14 A.     Yes.

11:43:04 15 Q.     And then that carried into 2017?

11:43:07 16 A.     Yes.

11:43:08 17 Q.     But there were times when neither he nor you were

11:43:13 18 using drugs, right?  There were various times?

11:43:17 19 A.     Yes.

11:43:17 20 Q.     And those could last for some period, correct?

11:43:20 21 A.     Yes.

11:43:20 22 Q.     And then in the beginning of 2018, I think you said

11:43:26 23 there came a point where you visited him in LA, but in the

11:43:30 24 first part of 2018, he wasn't living with you?

11:43:35 25 A.     Like January, February --

Hallie Biden - cross

11:43:38  1    Q.      No, I'm sorry, living or visiting, sometimes staying

11:43:41  2    with you in January?

11:43:43  3    A.      In the month of January.

11:43:44  4    Q.      Of 18?

11:43:45  5    A.      I don't recall.

11:43:46  6    Q.      But you do know later in 2018, in the spring, he then

11:43:50  7    moved to -- took a trip to Los Angeles or California?

11:43:54  8    A.      Yes.

11:43:55  9    Q.      And at some point you visited him there?

11:43:58 10    A.      Yes.

11:44:02 11    Q.      I'll come back to 2018.    In the period of time I

11:44:07 12    think that you had testified prior to our break, I think you

11:44:11 13    said there were instances, or many instances where he would

11:44:15 14    not be truthful with himself about what he was using and how

11:44:19 15    bad his problem was?

11:44:21 16    A.      Yes.

11:44:21 17    Q.      And that would be both as to alcohol and when he

11:44:26 18    started to use cocaine, crack cocaine?

11:44:28 19    A.      Yes.

11:44:28 20    Q.      And he would deny that, right?

11:44:30 21    A.      Yes.

11:44:30 22    Q.      Deny it to you?

11:44:32 23    A.      Sometimes, yes.

11:44:33 24    Q.      And deny it to himself?

11:44:35 25    A.      Yes.

11:44:36  1              MR. WISE:  Your Honor, I object, she can't say

11:44:40  2    what he's doing to himself.  I would object.

11:44:43  3    BY MR. LOWELL:

11:44:43  4    Q.      When he would speak out loud and say he would deny

11:44:47  5    it, he's the one who is speaking, correct?

11:44:50  6    A.      Yes.

11:44:52  7              THE COURT:  So we'll strike her speculation as

11:44:56  8    to what he was -- believed in his own mind.

11:45:02  9    BY MR. LOWELL:

11:45:02 10    Q.      And I think in the events that you said in terms of

11:45:05 11    your back and forth with him, there came a point that you

11:45:09 12    also started using drugs?

11:45:11 13    A.      Yes.

11:45:12 14    Q.      And in that period of time, there were times where

11:45:16 15    both he and you were working together towards sobriety and

11:45:23 16    recovery and rehabilitation; correct?

11:45:25 17    A.      Correct.

11:45:25 18    Q.      And in fact, sometimes you did that together?

11:45:28 19    A.      Yes.

11:45:28 20    Q.      And in those occasions, he was also urging you to try

11:45:33 21    to become sober?

11:45:36 22    A.      Yes.

11:45:36 23    Q.      And you to him?

11:45:38 24    A.      Yes.

11:45:39 25    Q.      And on those occasions in which you were doing this,

Hallie Biden - cross

11:45:42 1   either alone or apart, he was paying for all that, wasn't

11:45:47 2   he?

11:45:47 3   A.       For his or mine?

11:45:49 4   Q.       Sometimes yours and always his.

11:45:53 5   A.       Uh --

11:45:54 6   Q.       He paid for periods of time where you, for example --

11:45:57 7   A.       Maybe -- maybe some things he paid for of mine, yeah.

11:46:02 8   Q.       Sitting here today, I notice this morning that

11:46:05 9   sometimes you said maybe, sometimes you said you guess.  I

11:46:08 10  have to assume that the events of October 2018, were fairly

11:46:14 11  upsetting?

11:46:15 12  A.       Yes.

11:46:16 13  Q.       And being here is not a picnic, either?

11:46:18 14  A.       Yes.

11:46:19 15  Q.       So in general, speaking about putting together the

11:46:23 16  sequence of time, is that a difficult thing for you to do to

11:46:28 17  remember blow by blow?  I mean, I saw that they played a

11:46:32 18  video, and I think you said in one of them, I think that's

11:46:35 19  what I did, I'm not sure.

11:46:37 20  A.       Yes.

11:46:37 21  Q.       So reconstructing this is not easy?

11:46:40 22  A.       Right.

11:46:45 23  Q.       In the periods of time that you spoke with

11:46:52 24  prosecutors and investigators and recounted what you were

11:46:56 25  doing, whatever it was, whether it involved your use of

Hallie Biden - cross

11:47:01  1  drugs or the events of October 22nd, you did tell them about
11:47:06  2  all that?
11:47:06  3  A.      Yes.
11:47:06  4  Q.      And you and they have an agreement that nothing that
11:47:10  5  you say to them can be used against you?
11:47:12  6  A.      Correct.
11:47:14  7  Q.      I want to turn to the beginning of October of 2018.
11:47:20  8  And see if we can -- will you help me construct the sequence
11:47:25  9  of events?
11:47:27 10  A.      Yes.
11:47:27 11  Q.      You talked about what happened later in October.  I
11:47:31 12  would like to start backwards a bit.
11:47:33 13          Hunter came back from Los Angeles on or about
11:47:38 14  October 6th of 2018, do you recall that?
11:47:40 15  A.      I believe so, I don't recall the dates.
11:47:42 16  Q.      I'm sorry, to ask you to do this, would you speak a
11:47:45 17  little bit into the microphone?
11:47:47 18  A.      Sure.
11:47:47 19  Q.      So it was around then, do you know that that's when
11:47:50 20  it was?
11:47:51 21  A.      I don't know the date, but if that's what it said,
11:47:56 22  then...
11:47:59 23          MR. LOWELL:  May I approach to point out
11:48:00 24  something to the witness?
11:48:02 25          THE COURT:  You may.

Hallie Biden - cross

```
11:48:03  1              MR. LOWELL:  Thank you, judge.

11:48:30  2              MR. WISE:  Your Honor, I don't know what's going

11:48:32  3    on.

11:48:32  4              MR. LOWELL:  I gave him the same thing as you

11:48:34  5    for the refreshing and other things.

11:48:36  6              MR. WISE:  All she said is she doesn't remember.

11:48:38  7              MR. LOWELL:  I'm asking to request if something

11:48:41  8    refreshes her recollection.

11:48:43  9              THE COURT:  As to when he came back to the East

11:48:47 10    Coast?

11:48:47 11              MR. LOWELL:  Yes.

11:48:47 12              THE COURT:  You can ask her to look at it, but

11:48:49 13    don't --

11:48:50 14              MR. LOWELL:  Yeah, I'll approach this a

11:48:52 15    different way.

11:48:52 16    BY MR. LOWELL:

11:48:53 17    Q.    Do you recall in the beginning of October, that

11:48:55 18    Hunter came back to be with you for something that you were

11:49:01 19    doing in the beginning of October, having to do with your

11:49:05 20    sobriety?

11:49:07 21    A.    I don't recall exactly.

11:49:10 22    Q.    Okay.  In the beginning of October, around the sixth,

11:49:14 23    were you familiar with a place called Caron, C-A-R-O-N?

11:49:19 24    A.    Yes.

11:49:19 25    Q.    What is Caron?
```

Hallie Biden - cross

11:49:21  1    A.      Caron is a rehab that I went to.

11:49:23  2    Q.      Do you recall a specific incident in which in that

11:49:27  3    period of time he came back so that he could attend one of

11:49:31  4    those sessions with you on October 6th?

11:49:34  5    A.      I think I know what you're referring to, but it's all

11:49:39  6    kind of vague.

11:49:41  7    Q.      Okay.  So generally speaking, you have a memory in

11:49:43  8    the beginning of October of Hunter coming back from Los

11:49:47  9    Angeles, that's true, right?

11:49:48 10    A.      Yes.

11:49:48 11    Q.      And I'm asking you whether, when he did that on the

11:49:51 12    beginning, do you recall in that same period, whether it's

11:49:54 13    the 5th or 6th or 4th, that he attended with you one of

11:49:59 14    those check-ins at Caron?

11:50:03 15    A.      Yes.

11:50:04 16    Q.      And that was right after he came back in that period?

11:50:08 17    A.      Okay.  Yes.

11:50:10 18    Q.      And where is that facility?

11:50:13 19    A.      Like an hour-and-a-half from Wilmington in

11:50:16 20    Pennsylvania.

11:50:16 21    Q.      It's in Pennsylvania.  And do you know that day

11:50:20 22    whether he came back on that day he flew into Philadelphia

11:50:26 23    so he could join you?

11:50:28 24    A.      I do not recall.

11:50:29 25    Q.      Do you know where he flew into?

Hallie Biden - cross

11:50:31 1   A.      I do not.

11:50:31 2   Q.      You had said and described incidents, occasions is a

11:50:36 3   better word, where you would go into his car or you would be

11:50:40 4   in his car, maybe you were traveling with his car and I

11:50:44 5   think you said that there were times when you saw remnants

11:50:47 6   and paraphernalia?

11:50:48 7   A.      Yes.

11:50:48 8   Q.      Now, that would be as early as when you and he were

11:50:53 9   starting to become involved at the end of 2015 into 2016 and

11:50:59 10  into '17, correct?

11:51:01 11  A.      Correct.

11:51:01 12  Q.      I'm not asking you, but I imagine given what you said

11:51:04 13  about putting all this together, can you be sure at any of

11:51:08 14  those times when your discoveries occurred at any time in

11:51:11 15  2016 or just generally?

11:51:13 16  A.      In 2016?

11:51:14 17  Q.      Like, for example, 2016?

11:51:17 18  A.      No.

11:51:18 19  Q.      Yes, sorry.

11:51:19 20  A.      Not if it wasn't a significant day or event.

11:51:22 21  Q.      And when you said you would go into the car or you

11:51:26 22  would see in the car, and you would find those things, if I

11:51:29 23  asked you, for example, to help me construct when in 2016 or

11:51:34 24  '17 or even in the beginning of 2018 before he went to Los

11:51:39 25  Angeles, could you do that?

Hallie Biden - cross

11:51:41  1    A.      No.

11:51:49  2    Q.      And then after he came back and you have this memory

11:51:52  3    that he attended with you a session that you were at Caron,

11:51:57  4    on that day when you were at Caron, you didn't see him using

11:52:01  5    drugs, did you?

11:52:02  6    A.      No.

11:52:02  7    Q.      In fact, from the time he came back to the time of

11:52:05  8    the incident with you finding the gun, you didn't use any

11:52:09  9    drugs in that period of time, right?

11:52:11 10    A.      I did not, no.

11:52:12 11    Q.      And did you see him?

11:52:13 12    A.      I did not see him.  I didn't see him for --

11:52:17 13    Q.      I understand you're not with him every time, correct,

11:52:19 14    is that what you were saying?

11:52:20 15    A.      Yes.

11:52:20 16    Q.      But there were times where you did?

11:52:23 17    A.      Right.

11:52:23 18    Q.      And you can see between the time he came back and

11:52:26 19    came to see you at Caron, and then later when you were on

11:52:29 20    the 22nd, for example, and in that period of time, you never

11:52:34 21    saw him using drugs?

11:52:35 22    A.      Correct.

11:52:35 23    Q.      You had seen him using drugs when he was at your

11:52:39 24    house before?

11:52:39 25    A.      Correct.

Hallie Biden - cross

11:52:40  1    Q.      He had been at your house in that window of time, but
11:52:42  2    you didn't see him using drugs then?
11:52:44  3               MR. WISE:   I'm going to object, I don't know
11:52:46  4    what window of time we're talking about.
11:52:48  5               MR. LOWELL:   October 6th through October 22nd.
11:52:50  6               THE WITNESS:   I honestly don't know if he was at
11:52:52  7    my house between that time.
11:52:54  8    BY MR. LOWELL:
11:52:54  9    Q.      Okay.  So then you would not have seen him if he
11:52:57 10    wasn't there?
11:52:57 11    A.      Correct.
11:52:57 12    Q.      We'll come back to whether he was there with some
11:53:00 13    documents, okay?
11:53:01 14    A.      Okay.
11:53:03 15    Q.      All right.  So now on the day that you said you went
11:53:06 16    into his truck, we'll come back to later in terms of the
11:53:09 17    remnants, I just wanted to clarify that in his return, there
11:53:12 18    was never an occasion where you found, for example, in your
11:53:16 19    house or even in his car a rock, a marble, a ping pong ball
11:53:21 20    size piece of crack, you used the words remnants?
11:53:25 21    A.      Correct.
11:53:25 22    Q.      I take it if they were where you say they were, you
11:53:30 23    would have no idea when they were, I mean when they were put
11:53:32 24    there --
11:53:32 25    A.      Correct.

Hallie Biden - cross

11:53:34  1    Q.      Sorry?

11:53:34  2    A.      Correct.

11:53:34  3    Q.      It could have been that day, it could have been a

11:53:37  4    week before, it could have been a month before, it could

11:53:40  5    have still been there, but you don't know?

11:53:42  6    A.      Correct.

11:53:48  7    Q.      You, I think, described your relationship over

11:53:51  8    whatever year, but I want to turn particularly to 2018.  And

11:53:55  9    in 2018 after he's back in that period of time, I think you

11:54:01 10    used generally the phrase "on and off."  Is that right?

11:54:05 11    A.      Yes.

11:54:05 12    Q.      Sometimes it was good and sometimes it was not as

11:54:08 13    good?

11:54:08 14    A.      Correct.

11:54:10 15    Q.      And sometimes it was intense, would that be a fair

11:54:14 16    statement?

11:54:15 17    A.      Yes.

11:54:15 18    Q.      And it was always complicated?

11:54:17 19    A.      Yes.

11:54:20 20    Q.      Is it a generally true statement that throughout your

11:54:23 21    relationship with him, he would say things to you or tell

11:54:26 22    you things or write you things that you knew were not true?

11:54:29 23    A.      Yes.

11:54:31 24    Q.      And in some occasions did he not want you to know

11:54:37 25    where he was and what he was doing?

Hallie Biden - cross

11:54:39 1    A.      Yes.

11:54:39 2            MR. WISE:  I'm going to object, I don't think

11:54:42 3    she can testify to what he wanted.

11:54:44 4    BY MR. LOWELL:

11:54:44 5    Q.      Sorry.  There were times that you --

11:54:46 6            THE COURT:  So hold on.

11:54:48 7            MR. LOWELL:  I'll withdraw the question.

11:54:49 8            THE COURT:  And that's sustained and stricken

11:54:52 9    because she did answer it.

11:54:53 10   BY MR. LOWELL:

11:54:54 11   Q.      There were periods of time that he did not tell you

11:54:56 12   where he was?

11:54:57 13   A.      Correct.

11:54:58 14   Q.      There were periods of time where he told you where he

11:55:00 15   was, and then you later found out yourself that that was not

11:55:04 16   true?

11:55:04 17   A.      Correct.

11:55:13 18   Q.      Before the 22nd, I think he was back, between that

11:55:20 19   time you were saying you're not sure or you are sure that

11:55:25 20   you saw him between the 6th and the 22nd?

11:55:28 21   A.      I'm not sure if there was the text messages then.

11:55:35 22           MR. LOWELL:  One moment.

11:55:41 23   BY MR. LOWELL:

11:55:41 24   Q.      If you'll look -- I'm sorry, if there was a text

11:55:46 25   exchange between you and Mr. Biden on a date, would that

Hallie Biden - cross

11:55:53 1    help refresh your recollection of whether or not he was with

11:55:56 2    you?

11:55:57 3    A.      Yes.

11:55:58 4    Q.      With that in mind, let me make sure I'm at the right

11:56:03 5    page, please.  If you'll look at the first entry on the

11:56:17 6    page, just look at it to yourself.  Tell me when you're done

11:56:24 7    looking up.

11:56:24 8    A.      You mean read it?

11:56:26 9    Q.      No, not out loud, just look at it to yourself.  If

11:56:31 10   you look at that document and I'm looking at the date of it

11:56:35 11   being October the 11th to start off with?

11:56:37 12            MR. WISE:  Your Honor, it shouldn't be read into

11:56:39 13   the record.

11:56:40 14            MR. LOWELL:  I'm not reading it, I'm just asking

11:56:40 15   her to read.

11:56:46 16            All right there is a row number.  Row one does

11:56:49 17   that work for you.  Reading that to yourself, does that

11:56:52 18   refresh your recollection that you were trying to see him

11:56:55 19   during that period of time.

11:56:56 20            MR. WISE:  I'm objecting, he asked whether he

11:56:59 21   stayed with her, not whether she was trying to see him.

11:57:02 22   BY MR. LOWELL:

11:57:03 23   Q.      Let me change that, does that refresh your

11:57:06 24   recollection as to whether or not, you and he saw each other

11:57:10 25   before the 22nd?

Hallie Biden - cross

11:57:20  1    A.      I believe that means he wasn't.

11:57:24  2    Q.      Okay.

11:57:24  3            THE COURT:  The question is does it make you

11:57:27  4    remember, refreshing your recollection is look at it and

11:57:30  5    think, gosh, I remember.

11:57:31  6            THE WITNESS:  Yes.  No, I think it's confusing

11:57:34  7    so I'm not sure, it confuses it further.

11:57:36  8    BY MR. LOWELL:

11:57:37  9    Q.      Let me change the question then.  In this period of

11:57:40 10    time, were you asking to see him?

11:57:42 11    A.      Yes.

11:57:42 12    Q.      And you're sitting here today not aware of whether

11:57:46 13    that happened or not?

11:57:46 14    A.      On that day, correct.

11:57:48 15    Q.      Until a later time in October where you testified?

11:57:50 16    A.      Yes.

11:57:51 17    Q.      And were there times where you would call him or text

11:57:55 18    him and ask him in that period of time where are you, will

11:57:58 19    you come home?

11:57:59 20    A.      Yes.

11:57:59 21    Q.      And he didn't respond?

11:58:02 22    A.      Correct.

11:58:02 23    Q.      And then he did respond after -- on one of the

11:58:09 24    occasions, you asked him, I think, maybe the government

11:58:12 25    heard you, you said you called him repeatedly and

879

Hallie Biden - cross

11:58:15  1   repeatedly, do you remember that you did that?

11:58:17  2   A.      Yes.

11:58:18  3   Q.      And if you will put up, Mr. Radic, the government

11:58:21  4   Exhibit 18, Row 119.  I'm going to bring your attention to

11:58:32  5   that date of October 13th, which is a week after he got --

11:58:37  6   and Row 119.

11:58:40  7           So you see on the above, can we go to 118, you

11:58:45  8   don't have to blow it up yet.  This is that occasion on the

11:58:48  9   13th, "why won't you answer my calls?  Where are you?  Are

11:58:53 10   you with someone?"  Correct?

11:58:54 11   A.      Correct.

11:58:54 12   Q.      When you said someone, were you thinking that he was

11:58:57 13   with a drug dealer or another woman?

11:59:00 14   A.      A woman.

11:59:00 15   Q.      And then he wrote, "yes, Bernard who hangs at 7-11 et

11:59:05 16   cetera" has been read to you, do you see that's his

11:59:08 17   response?

11:59:08 18   A.      Yes.

11:59:08 19   Q.      You mentioned that you can't trust what he says when

11:59:11 20   he writes you because you find out sometimes he's lying,

11:59:14 21   correct?

11:59:15 22   A.      Correct.

11:59:15 23   Q.      Do you know whether he was at the 7-11 on Greenhill

11:59:22 24   Maryland avenue, et cetera?

11:59:22 25   A.      I do not.

Hallie Biden - cross

11:59:24  1    Q.      And later I think there is government exhibit, the

11:59:33  2    next day, Row 14.  I'm sorry, no, I take that back, it's

11:59:38  3    Row 125.  And there on the date of the 14th, you say, "I

11:59:46  4    called you 500 times in the past 24 hours.  And you no

11:59:50  5    answer.  Practice what you preach."  Those were yours to

11:59:53  6    him, right?

11:59:54  7    A.      Correct.

11:59:54  8    Q.      And then he writes, a minute, not even a minute,

12:00:01  9    17 seconds after the last one, "I was sleeping on a car

12:00:03  10   smoking crack on 4th and Rodney", right?

12:00:06  11   A.      Yes.

12:00:06  12   Q.      And you have no idea whether he was just saying that

12:00:09  13   or whether he was actually there?

12:00:10  14   A.      Correct.

12:00:30  15   Q.      You can take that down.

12:00:33  16           So I would like to get to the time period of

12:00:36  17   what you testified to as being your discovery of the gun and

12:00:40  18   then the recovery of it, recovery by you.  And this is where

12:00:45  19   I'm going to ask your help to put together the sequence.

12:00:50  20   Okay?  You said that you found the gun sometime in the

12:00:53  21   morning of the 23rd of October.

12:00:57  22   A.      Yes.

12:00:58  23   Q.      The day before on October 22nd, you were not with

12:01:03  24   Hunter during the day; is that right?

12:01:06  25   A.      Not that I recall.

Hallie Biden - cross

12:01:08  1   Q.      And during that day, you were reaching out to see

12:01:11  2   whether you could see him?

12:01:14  3   A.      Is that the text messages that you have?

12:01:17  4   Q.      It is in a text message that I'll ask you about if

12:01:20  5   you need to have your memory refreshed about that.

12:01:25  6           If you'll turn to what I gave you and look at

12:01:30  7   Row 15.

12:01:31  8   A.      I'm sorry, under what?

12:01:33  9   Q.      And read that to yourself.

12:01:35 10           That same place that I showed you.

12:01:54 11           So if you'll look at -- on what I have just

12:02:01 12   given you on the 22nd, is it Row 15?  Tell me if Row 15 has

12:02:19 13   a date on it so you can acclimate yourself, is that on the

12:02:24 14   22nd I'm showing you something?

12:02:25 15   A.      On the 22nd.

12:02:26 16   Q.      Would you look at that?

12:02:28 17   A.      Yes.

12:02:29 18   Q.      Looking at it yourself?

12:02:30 19   A.      Uh-huh.

12:02:31 20   Q.      Were you seeking to see him that day?

12:02:33 21           MR. WISE:  I think the question has to be does

12:02:35 22   it refresh your recollection.

12:02:36 23   BY MR. LOWELL:

12:02:36 24   Q.      Does it refresh your recollection as to whether you

12:02:38 25   were trying to see him that day?

Hallie Biden - cross

12:02:40  1    A.      I don't recall that, but that sounds like --

12:02:43  2    Q.      It does, you were trying?

12:02:45  3    A.      That I was trying yes.

12:02:47  4            MR. WISE:   I think she said I don't recall that.

12:02:51  5    By MR. LOWELL:

12:02:51  6    Q.      Go slower for me, look down and read that, and when

12:02:55  7    you're done, look up?

12:02:56  8            THE COURT:   And the question was does it refresh

12:02:58  9    your recollection, which is to start answering yes or no

12:03:01  10   before we get further, we can take it in steps.

12:03:04  11           THE WITNESS:   Vaguely, but not times.

12:03:05  12   BY MR. LOWELL:

12:03:06  13   Q.      Not by the exact time?

12:03:07  14   A.      Correct.

12:03:08  15   Q.      But that day?

12:03:09  16   A.      Like that doesn't bring me back to that day.

12:03:12  17   Q.      In that period of time, as before texts when I asked

12:03:16  18   whether or not you were wondering with whom he was, were you

12:03:19  19   still wondering when whom he was spending time during this

12:03:23  20   period of time?

12:03:23  21   A.      Yes.

12:03:24  22   Q.      Did you sometimes write him and ask are you with

12:03:26  23   somebody, another woman?

12:03:28  24   A.      Yes.

12:03:28  25   Q.      And in that October 22nd period of time, in the day

Hallie Biden - cross

12:03:34  1    of the 22nd, does looking down at that refresh your

12:03:38  2    recollection of whether you were with him at that moment?

12:03:42  3                    MR. WISE:  Objection, she already said it

12:03:45  4    doesn't.

12:03:45  5                    THE WITNESS:  I was just asking "are you in New

12:03:47  6    York?"

12:03:47  7                    MR. LOWELL:  No, don't answer.  I'm sorry.

12:03:48  8                    THE COURT:  Again.  It's not your fault, it's

12:03:51  9    the way the rules of evidence work, you need to take these

12:03:55 10    when he's asking you to refresh your recollection, one step

12:03:58 11    at a time.

12:03:58 12                    THE WITNESS:  Okay.

12:03:59 13                    THE COURT:  Okay.  So you're looking at it and

12:04:02 14    basically what's in there doesn't come into evidence unless

12:04:05 15    it refreshes your recollection, we have to take it a step at

12:04:10 16    a time.

12:04:10 17                    If you start saying what you're reading, it kind

12:04:14 18    of defeats the purpose.  So we start with does it, and oh

12:04:17 19    gosh, now I remember, it could have been something where

12:04:20 20    someone said I saw you at the birthday party, you could be

12:04:24 21    like oh yeah, now I remember the birthday party.  You don't

12:04:28 22    need to know what the rules of evidence are.

12:04:30 23    BY MR. LOWELL:

12:04:31 24    Q.    So my question was on the 22nd, do you first and

12:04:33 25    foremost know whether you were with him?

Hallie Biden - cross

12:04:38  1    A.        I am not sure.

12:04:41  2    Q.        Okay.  And did you on that day send him a text asking

12:04:44  3    him where he was?

12:04:47  4    A.        Yes.

12:04:48  5    Q.        You did.  And did --

12:04:50  6    A.        Now -- are you not now doing what --

12:04:54  7    Q.        So far so good?

12:04:55  8            MR. WISE:  Well, no.

12:04:59  9            THE COURT:  You could be a lawyer.

12:05:01 10            MR. WISE:  Your Honor, you know, she asked if

12:05:04 11    you sent him a text, she looked at the exhibit, which is in

12:05:07 12    evidence, and said yes I did, that's not refreshing.

12:05:10 13            MR. LOWELL:  Now maybe go to side-bar.

12:11:28 14            (Side-bar discussion.)

12:11:28 15            MR. LOWELL:  We have provided the government at

12:11:28 16    the break what they asked for and put into individual texts

12:11:28 17    and individual sources and individual places to find them.

12:11:28 18    And then the government said okay, so where we're at is the

12:11:28 19    hearsay objections and that's where we're at.  Now it could

12:11:28 20    be a text from her that she does or does not remember.  If

12:11:28 21    she does, fine, if she doesn't then it's past recollection

12:11:28 22    recorded.  It's something that she did, it's something that

12:11:28 23    she said, that's what I asked you before, can you ask

12:11:28 24    somebody did you do something.  Her state of mind as to why

12:11:28 25    she was going into his car looking for drugs is what she

Hallie Biden - cross

12:11:28 1    said, she told the Delaware State Police she went into the

12:11:28 2    car because she was looking for evidence of him being with

12:11:28 3    another woman, I think her state of mind is an issue because

12:11:28 4    it was impeachment as to why he she went into his car is one

12:11:28 5    of the reasons.

12:11:28 6         MR. WISE:  There is a lot there.  He can't ask

12:11:28 7    us her to read-he can't ask her to use this to say what he

12:11:28 8    can't introduce.  So the question has to be, were you with

12:11:28 9    him on the 22nd, she said I don't remember, as you tried to

12:11:28 10   say, does that refresh your memory, if she says yes, then

12:11:28 11   she says I was with him on the 22nd, not anything about a

12:11:28 12   text, if she says no, he's got to move on.  Whatever she

12:11:28 13   says to the Delaware State Police he may be able to impeach

12:11:28 14   by calling somebody from the Delaware State Police but he

12:11:29 15   can't do with these text messages.

12:11:29 16        THE COURT:  It should be clearer to her that

12:11:29 17   she's not to testify from these text messages, she needs to

12:11:29 18   close it unless he gets somewhere where he needs to ask her

12:11:29 19   a question, she can look at it and do the same drill, does

12:11:29 20   this refresh your memory, fine, if she says no, she move on

12:11:29 21   to the next question.

12:11:29 22        MR. LOWELL:  I'm at the point now I will move

12:11:29 23   this line now that we have established the first obstacle of

12:11:29 24   getting this into evidence for the reasons I said.

12:11:29 25        THE COURT:  He said it's not hearsay, it's a

Hallie Biden - cross

12:11:29 1   recorded recollection, it's a past or recorded recollection.

12:11:29 2            MR. WISE:  I can bring the rule up, this is not

12:11:29 3   a recorded recollection.

12:11:29 4            MR. LOWELL:  But --

12:11:29 5            MR. WISE:  A recorded recollection is write down

12:11:29 6   what you remember.  These are contemporaneous text messages.

12:11:29 7            THE COURT:  In a matter the ones knew about but

12:11:29 8   cannot recall well enough to testify fully and accurately,

12:11:29 9   this is a recorded recollection is a record on a matter the

12:11:29 10  witness once knew about but now cannot recall well enough to

12:11:29 11  testify fully and accurately was made or adopted by the

12:11:29 12  witness when the matter was fresh in the witness's memory,

12:11:29 13  and accurately refreshes the witness's knowledge.  If

12:11:29 14  admitted the record may be read into evidence but may be

12:11:29 15  received only if offered by an adverse party.

12:11:29 16           MR. WISE:  So it doesn't -- the last part, the

12:11:29 17  accurately refreshes.

12:11:29 18           THE COURT:  Accurately reflects the witness's

12:11:29 19  knowledge.

12:11:29 20           MR. WISE:  So this is not, you know, on this --

12:11:29 21  for instance, this day I did the following things, this is a

12:11:29 22  text message that says I'm asking if he's there.  It's not

12:11:29 23  that if she remembers, she's written something down saying I

12:11:29 24  remember, I asked him if he was there.

12:11:29 25           THE COURT:  Well what I am -- so let's say you

Hallie Biden - cross

12:11:29  1    can get it in, you can't then ask her, so that means you

12:11:29  2    weren't -- because if her recollection is she was looking

12:11:29  3    for him, then -- and she says no, it doesn't refresh my

12:11:29  4    recollection and let's say you get the text in, you can't

12:11:29  5    then say so you -- you knew you weren't with him because

12:11:29  6    that's not her recollection.

12:11:29  7             MR. LOWELL:  No, that's right, that's right.

12:11:29  8             THE COURT:  You just want to argue it.

12:11:29  9             MR. LOWELL:  At some point I have the ability to

12:11:29 10    make an argument of whatever is in evidence, but it fits in

12:11:29 11    the exact definition that you just read into there, if she

12:11:29 12    identifies it as a text that she wrote at the time,

12:11:29 13    contemporaneously.

12:11:29 14             THE COURT:  So let me see this text, what is the

12:11:29 15    one we're talking about?

12:11:29 16             MR. WISE:  So it's --

12:11:29 17             MR. LOWELL:  Which one is it.

12:11:29 18             MR. WISE:  I think he said line 15, are you in

12:11:29 19    New York with Zoe.

12:11:29 20             THE COURT:  And you're going to say did you

12:11:29 21    wonder if he was with someone and then you show her that and

12:11:30 22    say does that refresh your recollection and let's say she

12:11:30 23    says no.

12:11:30 24             MR. LOWELL:  Then I'll move it into evidence,

12:11:30 25    I'll read it into the record, I mean, whatever the rules

Hallie Biden - cross

12:11:30 1  say.

12:11:30 2                Sorry, what was that part?

12:11:30 3                THE COURT:  A record that is on a matter the

12:11:30 4  witness once knew, and you're not going to say so you sent

12:11:30 5  this text -- I mean, what do you do when you get it in

12:11:30 6  evidence?  You just move on?

12:11:30 7                MR. LOWELL:  Yeah.  Well I move on and say did

12:11:30 8  you inquire where he was on that day and ask him whether he

12:11:30 9  was in New York?  And then she answers and then we find out.

12:11:30 10               MR. WISE:  I mean, you can ask that without

12:11:30 11 showing her the text.  At that point she's just testifying

12:11:30 12 about stuff she says she doesn't remember based on a text.

12:11:30 13               MR. LOWELL:  But based on past recollection

12:11:30 14 recorded.

12:11:30 15               MR. WISE:  All I can do even if you can get it

12:11:30 16 in, which I don't think you can, you can't say okay now that

12:11:30 17 you got this text in front of you.

12:11:30 18               THE COURT:  You know you did.

12:11:30 19               MR. WISE:  Right, let's talk about this.

12:11:30 20               THE COURT:  And he's saying he's not going to do

12:11:30 21 that, he's just going to say in argument she had no idea

12:11:30 22 where he was.

12:11:30 23               MR. LOWELL:  Right.  Okay.  Thank you, Judge.

12:11:30 24               (End of side-bar.)

12:11:30 25 BY MR. LOWELL:

Hallie Biden - cross

12:11:37  1    Q.      On October 22nd is where we were at and I was

12:11:40  2    asking --

12:11:41  3              THE COURT:  Can you hold on one second.  Let me

12:11:43  4    just look at one thing.  I apologize.  Okay.  Go ahead.

12:13:26  5              MR. LOWELL:  Thank you, judge.

12:13:27  6    BY MR. LOWELL:

12:13:28  7    Q.      Ms. Biden, on the 22nd is where we were place marking

12:13:31  8    the date, and I was trying to figure out whether on that

12:13:34  9    day, since you say you're not sure when Mr. Biden and you

12:13:38 10    saw each other.  So do you understand the context?

12:13:41 11    A.      Yeah.  Uh-huh.

12:13:42 12    Q.      On that date in the middle of the afternoon, if

12:13:45 13    you'll just look at me to begin with, don't read that yet,

12:13:49 14    please.  I'm sorry.  Did you inquire where he was?

12:13:52 15    A.      Yes.

12:13:52 16    Q.      And if you were inquiring where he was, it meant he

12:13:56 17    wasn't with you?

12:13:57 18    A.      Yes.

12:13:57 19    Q.      And in the middle of the afternoon, did you make a

12:14:00 20    specific inquiry if he was in New York?

12:14:02 21    A.      Yes.

12:14:03 22    Q.      And did you text him that way?

12:14:05 23    A.      Yes.

12:14:07 24    Q.      And do you remember what you said?

12:14:09 25    A.      Can I look --

Hallie Biden - cross

12:14:10  1    Q.      Do you remember as you're looking at me what you

12:14:13  2    said?

12:14:13  3    A.      No.

12:14:14  4    Q.      At the time, though, did you send a text, you do know

12:14:18  5    that?

12:14:18  6    A.      Yes.

12:14:19  7    Q.      And at the time that reflected what you said at the

12:14:23  8    time?

12:14:23  9    A.      Yes.

12:14:23  10   Q.      It is something you would do, you would text him?

12:14:26  11   A.      Yes.

12:14:26  12   Q.      And on that day you recall having texts with him?

12:14:29  13   A.      Yes.

12:14:29  14   Q.      Including in the middle of the afternoon?

12:14:31  15   A.      Yes.

12:14:31  16   Q.      In the middle of the afternoon?

12:14:33  17               MR. LOWELL:   Your Honor, pursuant to your bench

12:14:35  18   conference, I would like to read into the record the exhibit

12:14:38  19   -- the text we're talking about.

12:14:40  20               THE COURT:   Okay.

12:14:42  21   BY MR. LOWELL:

12:14:43  22   Q.      Now you can look down and I am going to ask you if I

12:14:46  23   read this correctly.  October 22nd, 2018, at 2:55 in the

12:14:51  24   afternoon.  Did you write him, "are you in NY with Zoe?"

12:14:57  25   A.      Yes.

Hallie Biden - cross

12:14:58  1  Q.      You did do that?

12:14:59  2  A.      From this paper, correct.

12:15:00  3  Q.      Yes.  You don't have to remember it now because your

12:15:03  4  text is something that you recognize as a text you sent?

12:15:06  5  A.      Yes.

12:15:06  6  Q.      And that's what you said, meaning you weren't with

12:15:09  7  him at that moment?

12:15:10  8  A.      Correct.

12:15:11  9  Q.      And then later that afternoon, did you inquire where

12:15:16 10  he was again?

12:15:17 11  A.      Yes.

12:15:18 12  Q.      And if you look up at me --

12:15:21 13          THE COURT:  Just to be clear, are you saying yes

12:15:23 14  because you remember that or because you're reading

12:15:25 15  something?

12:15:26 16          MR. LOWELL:  Let me take the book away for a

12:15:29 17  moment.  I'm just going to put this over here, don't look at

12:15:35 18  it until there is a moment.  Hopefully that works better.

12:15:35 19  BY MR. LOWELL:

12:15:41 20  Q.      Later in the afternoon, did you inquire again where

12:15:44 21  he was, do you recall?

12:15:47 22  A.      Not just from recalling without text messages.

12:15:51 23  Q.      Okay.  I understand.

12:15:52 24          Now, you can -- sorry.  I'll do this better if I

12:15:59 25  can.  Now, I'm just going to ask you to look at that just

Hallie Biden - cross

12:16:04  1    first for the purposes of seeing if it refreshes your

12:16:06  2    recollection about that.  So if you'll look at Row 17.

12:16:14  3    A.      Yes.

12:16:15  4    Q.      Look down and then read it to yourself.

12:16:18  5    A.      Wait a second.  Yes.

12:16:22  6    Q.      Now look up?

12:16:24  7    A.      Wait, 17?

12:16:26  8    Q.      Row 17, there are row numbers on the left side?

12:16:28  9    A.      Mine goes from 16 to 18.

12:16:31 10    Q.      I'm sorry, hold on.  No, no, no.  Look at Row 17.

12:16:44 11    Not 17, I got that wrong, I'm so sorry.  Look first at

12:16:51 12    Row 16.  And when you have read it to yourself, look up so

12:16:55 13    I'll know.

12:16:56 14            Looking at that, does it refresh your

12:16:58 15    recollection of sending him another text in the afternoon

12:17:01 16    seeking where he is?

12:17:02 17    A.      Yes.

12:17:03 18    Q.      And you did that then, and looking up, what were you

12:17:07 19    asking him at that point?

12:17:10 20    A.      Another way of saying I don't know where you are.

12:17:13 21    Q.      And that you recall the date, the time would be

12:17:18 22    4:32 in the afternoon, not that you recall it, but would it

12:17:20 23    be later than the first one?

12:17:22 24    A.      Yes.

12:17:23 25    Q.      And then proceeding, did you continue to text him?

Hallie Biden - cross

| 12:17:28 | 1 | A.      Yes. |

12:17:28  1    A.      Yes.

12:17:30  2    Q.      And --

12:17:31  3    A.      Can I look?

12:17:32  4    Q.      And later being after the time of the first two, so

12:17:37  5    do you remember it then getting to be later in the afternoon

12:17:41  6    around 5:30?  Do you remember?

12:17:44  7    A.      I don't remember that from like --

12:17:47  8    Q.      Now, can I --

12:17:48  9            THE COURT:  Time marches on.

12:17:52 10    BY MR. LOWELL:

12:17:52 11    Q.      Except when I'm asking questions?

12:17:53 12    A.      Right.  And if I could look at these, this refreshes

12:17:58 13    -- there is obviously a time stamp of my conversation.

12:18:01 14    Q.      If you could look at that and see that was later in

12:18:04 15    the afternoon around 5:30, would that refresh your

12:18:06 16    recollection around the time?

12:18:07 17    A.      Yes.

12:18:08 18            THE COURT:  So again.  Refreshing your

12:18:10 19    recollection is I read it, I don't remember it, but it says

12:18:13 20    it, so I'll believe it, that's not refreshing your

12:18:16 21    recollection.  Refreshing your recollection is if someone

12:18:21 22    says remember we met in 2024, or you say no but yes to be

12:18:25 23    polite, but you don't really, and then they say remember it

12:18:29 24    was Bob's birthday party and we talked about the pizza that

12:18:33 25    was great and you say oh my gosh, I remember that, so this

12:18:37  1   is a little bit different.  This is if you read a message

12:18:40  2   and you say oh my God, I do remember sending that message,

12:18:44  3   then it refreshes your recollection.  If not, the answer

12:18:49  4   does it refresh your recollection is no, and then he just

12:18:52  5   has to go through a few more steps to make sure we have the

12:18:56  6   evidence.

12:18:56  7                THE WITNESS:  It's a process.

12:18:57  8                THE COURT:  It's a legal process.

12:18:59  9                THE WITNESS:  Okay.

12:18:59 10   BY MR. LOWELL:

12:19:00 11   Q.    Let's try that again, okay.  All right.  So going

12:19:02 12   back to Row 16, right, look down and see whether it

12:19:07 13   refreshes your recollection of what time you sent a text to

12:19:11 14   Hunter and what it said.  And if you look up.  It does?

12:19:14 15   A.    Yes.

12:19:14 16   Q.    What time does that refresh your recollection.  Don't

12:19:17 17   look down, just look up at me.  What time does it refresh

12:19:21 18   your recollection that you sent that?

12:19:23 19   A.    4:30ish.

12:19:25 20   Q.    And in that, what is it that you recall asking him,

12:19:28 21   you were asking him-- what was it you recall you saying?

12:19:32 22   A.    Again, where are you, or --

12:19:35 23   Q.    Or what are you doing?

12:19:37 24   A.    What are you doing?

12:19:38 25   Q.    And then later in that same day, because we're trying

Hallie Biden - cross

12:19:42  1   to get the time sequence, okay?

12:19:44  2   A.    Okay.

12:19:44  3   Q.    Later than that, do you recall continuing to have a

12:19:47  4   text exchange with him?

12:19:49  5   A.    Likely.

12:19:50  6   Q.    Likely.  Well, to start, look down and see if you see

12:19:54  7   additional text that could refresh your recollection that it

12:19:57  8   continued to happen?

12:19:58  9   A.    Yes.

12:19:58 10   Q.    And did you then write to him, or do you recall

12:20:03 11   having another exchange where you are asking him further

12:20:08 12   either in words or to the effect where are you and what

12:20:11 13   you're doing?

12:20:12 14   A.    Yes.

12:20:12 15   Q.    And looking up, do you know that that was later than

12:20:15 16   that last one, this one now being at about 5:30?

12:20:19 17   A.    Yes.

12:20:19 18   Q.    And in that, do you recall telling him that you

12:20:22 19   thought you knew where he was?

12:20:25 20   A.    Yes.

12:20:27 21   Q.    And what is it that you recall you said?

12:20:32 22   A.    Like, I know where you are.

12:20:35 23   Q.    Okay.  And where did you think he was when you said

12:20:39 24   that?

12:20:39 25   A.    I don't know.

Hallie Biden - cross

12:20:40  1    Q.      But you said to him, "I know where you are"?

12:20:43  2    A.      I know, but I don't know if I really knew where he

12:20:46  3    was.

12:20:46  4    Q.      But that's what you wrote, why did you write it that

12:20:49  5    way?

12:20:49  6    A.      I don't recall.

12:20:52  7    Q.      Okay.  And then into the evening, in terms of where

12:20:59  8    you were and whether he was there, do you recall continuing

12:21:04  9    another text in which you are exchanging and sending to him

12:21:10 10    something reflecting whether you were with him at the time

12:21:13 11    that evening or not?

12:21:15 12    A.      Yes.

12:21:15 13    Q.      And was that in the evening?

12:21:18 14    A.      Yes.

12:21:18 15    Q.      Do you know what, without looking down, do you know

12:21:22 16    off hand what time in the evening?

12:21:24 17    A.      8ish.

12:21:25 18    Q.      Or later?

12:21:26 19    A.      Or later.

12:21:27 20    Q.      And in that period of time, did you reach out to him

12:21:29 21    and say come over or words to that effect?

12:21:34 22    A.      Yes.

12:21:34 23    Q.      Or if you asked -- offered for you to go wherever he

12:21:38 24    was?

12:21:38 25    A.      Right, correct.

Hallie Biden - cross

12:21:39  1    Q.    Okay.  So at 8:49 or later, eight something as far as

12:21:44  2    you can remember, you're still not with him?

12:21:46  3    A.    Correct.

12:21:47  4    Q.    And you're reaching out to him and asking him to

12:21:50  5    either come or for you to go wherever he is?

12:21:53  6    A.    Yes.

12:21:54  7    Q.    And then after that, did you text him again and

12:21:58  8    indicate how he could get there?

12:22:00  9    A.    Can I --

12:22:03 10    Q.    I'm sorry, I take that back.  Sorry, full day, never

12:22:07 11    mind, I'm in a different day.

12:22:11 12          MR. LOWELL:  Judge should I keep going or if I'm

12:22:13 13    in the next day should we take a lunch break, it's up to

12:22:16 14    you?

12:22:17 15          THE COURT:  Keep going.

12:22:18 16          MR. LOWELL:  Okay.  Thank you.

12:22:19 17    BY MR. LOWELL:

12:22:20 18    Q.    Then you testified that October 22nd, now having gone

12:22:23 19    through those texts, or at least refreshing on those that

12:22:28 20    you did, does that help you remember whether at any point on

12:22:33 21    the evening of the 22nd you ever went to wherever Hunter was

12:22:38 22    as you were asking him or he ever came to your house?

12:22:41 23    A.    I did not see him, no.

12:22:45 24    Q.    So we can pretty well establish you didn't see him

12:22:48 25    that night?

Hallie Biden - cross

| | | |
|---|---|---|
| 12:22:49 | 1 | A.      Correct. |
| 12:22:49 | 2 | Q.      Now, let's turn to the next day.  I get the sequence |
| 12:23:01 | 3 | the next morning, it was a weekday, I think on the 23rd of |
| 12:23:05 | 4 | October, yes? |
| 12:23:06 | 5 | A.      Yes. |
| 12:23:06 | 6 | Q.      And you were, your two children were school aged? |
| 12:23:10 | 7 | A.      Yes. |
| 12:23:10 | 8 | Q.      One is named Hunter? |
| 12:23:12 | 9 | A.      Yes. |
| 12:23:12 | 10 | Q.      And the other one's name is Natalie? |
| 12:23:15 | 11 | A.      Natalie, yes. |
| 12:23:16 | 12 | Q.      And you would normally in your routine get up and get |
| 12:23:22 | 13 | them ready for school? |
| 12:23:23 | 14 | A.      Yes. |
| 12:23:23 | 15 | Q.      And you would drive them? |
| 12:23:25 | 16 | A.      Correct. |
| 12:23:25 | 17 | Q.      And if it was a weekday, even though you don't have a |
| 12:23:29 | 18 | specific memory, it would be likely that that's what |
| 12:23:31 | 19 | happened that morning? |
| 12:23:32 | 20 | A.      Yes. |
| 12:23:32 | 21 | Q.      What time is it that they needed to get to school? |
| 12:23:35 | 22 | A.      By 8:00. |
| 12:23:38 | 23 | Q.      And then you would leave how early in the morning to |
| 12:23:41 | 24 | get them there, eight or when? |
| 12:23:43 | 25 | A.      It's like a mile away. |

Hallie Biden - cross

12:23:45  1    Q.      So you did that as far as we can reconstruct in the

12:23:48  2    morning of that morning?

12:23:49  3    A.      Yes.

12:23:49  4    Q.      And when you left, given that we have established

12:23:51  5    that Hunter wasn't there the night before, do you have any

12:23:55  6    recall that at that moment he was there?

12:23:57  7    A.      I do not.

12:23:59  8    Q.      Still don't know where he was.  So now you leave and

12:24:03  9    you bring your kids to school?

12:24:05  10   A.      Yes.

12:24:05  11   Q.      Did you stop after dropping them off at school before

12:24:09  12   you came back to the house?

12:24:10  13   A.      Not that I recall.

12:24:11  14   Q.      How long would it be between the time that you went,

12:24:14  15   left the house, dropped them off at school, and then would

12:24:17  16   have come back?

12:24:18  17   A.      15 minutes.

12:24:19  18   Q.      You were back at the house then perhaps by 8:30?

12:24:23  19   A.      Correct.

12:24:24  20   Q.      Now, in the sequence of events, you pull into your

12:24:28  21   driveway?

12:24:29  22   A.      Yes.

12:24:29  23   Q.      Is that right?  And is that when you see the truck?

12:24:33  24   A.      I don't recall when I first saw the truck.

12:24:37  25   Q.      Okay.  But somewhere you did?

Hallie Biden - cross

12:24:40  1    A.      Yes.

12:24:40  2    Q.      Sometime you did?

12:24:41  3    A.      Yes.

12:24:42  4    Q.      You don't know whether it was before you took them to

12:24:45  5    school, but certainly you saw it after you came back?

12:24:48  6    A.      Right.   I guess what I'm unclear about is if he came

12:24:54  7    in the middle of the night and that -- got into bed and then

12:24:57  8    I -- after I took the kids to school, cleaned it out, or if

12:25:02  9    he arrived at like the 10:00 a.m., I don't recall.

12:25:06 10    Q.      You just said something about got into bed.   I

12:25:09 11    thought a few moments ago we said that on the night of the

12:25:13 12    22nd he wasn't with you, you were asking where he is?

12:25:15 13    A.      It could have been at 2 in the morning.

12:25:18 14    Q.      It could have been, but what I'm asking is do you

12:25:21 15    recall?

12:25:21 16    A.      I do not recall.

12:25:22 17    Q.      You don't know when the truck was put there, whether

12:25:25 18    it was early morning hours of the 23rd, right?

12:25:28 19    A.      Right.

12:25:28 20    Q.      But certainly you know it's not before, and you're

12:25:31 21    asking him later in the evening around 9 o'clock where are

12:25:34 22    you?

12:25:34 23    A.      Yes.

12:25:35 24    Q.      And then you cannot tell whether at the point that

12:25:38 25    you saw the truck it was before or after you dropped your

Hallie Biden - cross

12:25:42 1  **kids off?**

12:25:44 2  A.      **Correct.**

12:25:44 3  Q.      **But certainly you didn't go into the truck until**

12:25:47 4  **afterwards?**

12:25:48 5  A.      **Right.**

12:25:48 6  Q.      **So you come back from dropping them off from school**

12:25:52 7  **as I get it, and do you go into the house, do you**

12:25:55 8  **immediately go to the truck, do you go inside to get the**

12:25:58 9  **keys, what are you doing?**

12:26:01 10  A.      **That's where I'm still unclear if he had even arrived**

12:26:05 11  **yet.  If he had already been there, because like I said it**

12:26:08 12  **was kind of a pattern.  So I don't -- I can do --**

12:26:14 13  Q.      **Sorry, go ahead?**

12:26:15 14  A.      **I can go from cleaning out the truck that day, does**

12:26:19 15  **that make sense?**

12:26:20 16  Q.      **It does.  But we do have two benchmarks right, we**

12:26:24 17  **know you're going to drop your kids of at around 8:30, and**

12:26:28 18  **we know of the time stamp of when you get to Janssen's?**

12:26:31 19  A.      **Which is what time?**

12:26:32 20  Q.      **11:20.**

12:26:33 21  A.      **Okay.  We have that.**

12:26:35 22  Q.      **We have that.**

12:26:36 23  A.      **We have that as your--**

12:26:38 24  Q.      **You are back at the house, but you don't remember**

12:26:41 25  **specifically, did you have a pattern, let's say the truck**

Hallie Biden - cross

12:26:43 1    was there, it was wherever it was on the grass, is that

12:26:46 2    where you're saying, it was on the grass?

12:26:48 3    A.    Yes.

12:26:48 4    Q.    Can you tell whether it was on the grass at your

12:26:51 5    house or behind or whether there was another lot, do you

12:26:54 6    remember that specifically at this point?

12:26:55 7    A.    Yeah, on the yard, on my --

12:26:58 8    Q.    On the grass and behind your house, is there another

12:27:01 9    property I think you said, I think the question was is there

12:27:03 10   a lot, but not a parking lot, there is another house?

12:27:08 11   A.    There is a house, there could be a half a mile

12:27:14 12   between us, not a mile, sorry, half an acre.

12:27:17 13   Q.    Sorry, half an acre?

12:27:19 14   A.    Yes.

12:27:19 15   Q.    Is that a property you know to be a house or a

12:27:22 16   property owned by a family named Hobbs?

12:27:25 17   A.    Yes.

12:27:25 18   Q.    Do you know whether the truck was on your part of

12:27:29 19   that, their parts of it, or do you have any specific memory

12:27:32 20   of that piece?

12:27:33 21   A.    I believe it was on my property.

12:27:35 22   Q.    But nevertheless it was on the grass?

12:27:37 23   A.    Correct.

12:27:37 24   Q.    Not on the driveway?

12:27:39 25   A.    Right.

Hallie Biden - cross

12:27:39  1    Q.      Given the normal way of dropping your kids off and

12:27:42  2    coming back, what I'm asking is do you recall today whether

12:27:45  3    when you came back, that's immediately when you went to the

12:27:48  4    truck, did you go inside, did you get keys, what can you

12:27:51  5    recall about the time you came back and the time you went

12:27:53  6    inside the truck?

12:27:54  7    A.      I don't recall if the car was there, the truck was

12:27:59  8    there, when I got back or if he drove it in at 9:00.  I

12:28:04  9    don't recall.

12:28:06 10    Q.      Okay.

12:28:06 11    A.      Sorry.

12:28:07 12    Q.      No, don't be sorry, that's why I asked if you'll help

12:28:12 13    me do the sequence.  In the sequence, I think in your

12:28:15 14    testimony prior to the break, you said at some point you do

12:28:17 15    have a memory of seeing him, but I don't know that you can

12:28:20 16    place that hour or a moment on the 23rd?

12:28:23 17    A.      Correct.

12:28:24 18    Q.      Is that right.  If you can't do that, can you tell me

12:28:27 19    then when he looked exhausted, when was it that he looked

12:28:30 20    like he hadn't slept, do you know where in the sequence that

12:28:34 21    would be?

12:28:36 22    A.      Either in 2:00 in the morning, those hours, if it was

12:28:42 23    then, or if it was from that 8:30 to 10 or 11:00 when I

12:28:52 24    threw it away.

12:28:54 25    Q.      Okay.  But what your memory, whenever you saw him,

Hallie Biden - cross

12:28:59  1    was tired and exhausted, right?

12:29:01  2    A.      Yes.

12:29:01  3    Q.      And I think you were asked whether or not then you

12:29:07  4    would suppose, guess, wonder, whether that was because he

12:29:12  5    was either using drugs or alcohol?

12:29:14  6            MR. WISE:  Objection, I didn't say "wonder" in

12:29:20  7    the question.

12:29:20  8    BY MR. LOWELL:

12:29:20  9    Q.      You didn't see him doing any alcohol or drugs,

12:29:22  10   correct?

12:29:23  11   A.      Correct.

12:29:23  12   Q.      Whether you saw him exhausted or whatever the phrase

12:29:26  13   you used, you don't know whether he was just exhausted and

12:29:31  14   didn't have any sleep?

12:29:33  15   A.      Correct.

12:29:35  16   Q.      Next step along the time sequence.

12:30:02  17           On the morning of the 23rd, I want to see if we

12:30:04  18   can construct when you saw him, okay?

12:30:06  19   A.      Okay.

12:30:07  20   Q.      Now, again on that morning, do you recall writing him

12:30:14  21   any texts or calling him and asking him where he was?

12:30:20  22   A.      Can I look at this?

12:30:22  23   Q.      Well first tell me if you can recall?

12:30:25  24   A.      I don't recall.

12:30:26  25   Q.      Now, if you'll look at Row 19.

12:30:37  1    A.      Okay.

12:30:38  2    Q.      When you have done that, look up.

12:30:41  3            Does that refresh your recollection as to

12:30:43  4    whether or not in the morning you reached out to him?

12:30:47  5    A.      I have on the 19th, that was the evening before.

12:30:51  6    Q.      I'm sorry, I did that wrong, didn't I?  Look at

12:31:05  7    Row 20.  And now look up after you have done that?

12:31:12  8    A.      Okay.

12:31:13  9    Q.      Okay.  So looking at Row 20, does that refresh your

12:31:17 10    recollection if you reached out to him in the morning of the

12:31:20 11    23rd mid-morning, in some fashion to find out where he was?

12:31:28 12    A.      I don't really understand that because of the

12:31:32 13    context, so I don't recall.

12:31:34 14    Q.      If he was with you at that time, and if he was, as

12:31:40 15    you pointed it out, may have been there, would you ask him

12:31:45 16    anything about an Uber?

12:31:47 17    A.      No.

12:31:48 18    Q.      So if you were asking him anything about an Uber,

12:31:52 19    would that be for him to come with an Uber to where you

12:31:56 20    were, or where?

12:32:01 21    A.      I don't know.

12:32:02 22    Q.      Okay.

12:32:03 23    A.      Because why wouldn't I drive?

12:32:06 24    Q.      I can't answer that.  But do you recall at the time

12:32:10 25    being in a text exchange with Hunter?  We've said on the

12:32:15  1   22nd and clearly we're on the 23rd, right?

12:32:19  2   A.      Right.

12:32:20  3   Q.      And you remember that you were sending texts in the

12:32:22  4   morning of the 23rd as well?

12:32:24  5   A.      Correct.

12:32:24  6   Q.      And when you sent him a text, you knew how to text

12:32:28  7   him, what number it was going to?

12:32:30  8   A.      Yes.

12:32:30  9   Q.      And with the texts that you have seen that the

12:32:35 10   government has shown you, and one that I have entered into

12:32:38 11   evidence by reading, would that be an accurate depiction of

12:32:42 12   what you would have sent him?

12:32:44 13   A.      Yes.

12:32:44 14           MR. LOWELL:  Your Honor, we move in, so that I

12:32:46 15   can read the text at ten, on October 23rd at 10:23.

12:32:53 16           THE COURT:  10/24?

12:32:57 17           MR. LOWELL:  10/23 at Row 20.

12:33:03 18           THE COURT:  You can read it in.

12:33:07 19           MR. LOWELL:  Thank you.

12:33:08 20   BY MR. LOWELL:

12:33:08 21   Q.      So on 10/23, October 23rd, 10:23 in the morning, did

12:33:14 22   you say to him "call Uber"?

12:33:17 23   A.      Yes.

12:33:17 24   Q.      And then following that, did you remember texting him

12:33:22 25   again.  Can you look up and tell me, was there an exchange

Hallie Biden - cross

12:33:27  1    with him, you texted him "call Uber."  Did you text him

12:33:31  2    again?

12:33:31  3    A.     I don't recall off the top of my head.

12:33:34  4    Q.     Now, would you please look down on Row 21, and look

12:33:37  5    up when you have done it?

12:33:40  6    A.     Yes.

12:33:40  7    Q.     Okay.  Having done that, does it refresh your

12:33:44  8    recollection that you were asking him to come home?

12:33:46  9    A.     Yes.

12:33:47 10    Q.     And that's a minute later than the one I read into

12:33:49 11    the record?

12:33:50 12    A.     Yes.

12:33:50 13    Q.     So if you're asking him to come home at 10:24, that

12:33:56 14    would obviously mean he wasn't there then?

12:33:58 15    A.     Correct.

12:34:07 16    Q.     Did you understand at that time in the morning or in

12:34:10 17    the night before, that he was staying at a hotel?

12:34:16 18    A.     I don't think I knew where he was.

12:34:18 19    Q.     Okay.  You do remember being in an exchange, will you

12:34:24 20    now look at Row 22?  And doing so, look up after you've read

12:34:29 21    it.  Do you remember having an exchange with him as the

12:34:35 22    morning progressed?  The last one I read in where the time

12:34:39 23    was 10:24.  Do you remember that you continued to text

12:34:43 24    exchange with him that morning?

12:34:45 25    A.     I see that.

Hallie Biden - cross

12:34:46  1   Q.      I'm asking if you remember?

12:34:47  2   A.      I don't remember, no.

12:34:48  3   Q.      And my question was do you remember whether he was

12:34:51  4   staying at a hotel?

12:34:52  5   A.      I don't remember.

12:34:53  6   Q.      Now looking down, does that refresh your recollection

12:34:56  7   that you did in fact know that he was staying at a hotel?

12:35:00  8           MR. WISE:  I'll object, that's not what the --

12:35:03  9   we're looking at the text, that's not what that said.

12:35:06  10          MR. LOWELL:  Row 22.

12:35:08  11          MR. WISE:  That doesn't mean she knows he was

12:35:11  12   staying at a hotel.

12:35:12  13          MR. LOWELL:  I asked whether it refreshed her

12:35:14  14   recollection whether or not she knew that he was at a hotel.

12:35:17  15          THE COURT:  She can say yes or no as to whether

12:35:19  16   that reminds her, refreshed her recollection that she knew

12:35:23  17   he was.

12:35:23  18          THE WITNESS:  Yes.

12:35:25  19          MR. LOWELL:  That's what I hoped I did, so if I

12:35:28  20   didn't, let me do it again.  Does that refresh your

12:35:31  21   recollection as to whether or not you knew he was at a

12:35:33  22   hotel?

12:35:34  23          THE WITNESS:  Yes.

12:35:34  24   BY MR. LOWELL:

12:35:34  25   Q.      So having looked at that, as of the mid-morning, you

Hallie Biden - cross

12:35:40  1    now are refreshed that he was not at your house, that he was

12:35:43  2    at a hotel?

12:35:47  3    A.      Yes.

12:35:50  4              MR. WISE:  Well which, that's a compound

12:35:52  5    question.

12:35:52  6              THE COURT:  I know.  It's very confusing because

12:35:56  7    I don't know if that means he left, he came back.

12:35:58  8              THE WITNESS:  Right, I don't remember either.

12:35:59  9              THE COURT:  So if -- it's just better if you

12:36:04 10    don't remember, you -- we want the record to be clear what

12:36:07 11    you remember and what you don't remember.  If you don't

12:36:09 12    remember, it's okay, nobody is going to think, as long as

12:36:13 13    it's truthfully you don't remember, that's okay.

12:36:16 14              THE WITNESS:  Okay.

12:36:16 15              THE COURT:  When he says does it refresh your

12:36:18 16    recollection, you can say yes or no.

12:36:21 17              THE WITNESS:  Okay.

12:36:21 18              THE COURT:  It does, I still don't remember it,

12:36:24 19    I see there is text, we all get e-mails and texts every day

12:36:27 20    that you don't remember.

12:36:29 21              THE WITNESS:  Okay, I don't remember.

12:36:30 22              THE COURT:  But then he can follow up and try

12:36:32 23    and say well, would you have recorded this at the time,

12:36:36 24    whatever, and he can try and deal with it differently.

12:36:38 25              THE WITNESS:  Okay.  I don't remember.

Hallie Biden - cross

12:36:39 1  **BY MR. LOWELL:**

12:36:40 2  Q.      So now you don't remember?

12:36:41 3  A.      I don't remember.

12:36:42 4  Q.      As I asked you before, you understand and you agree

12:36:45 5  that you're sending a text?

12:36:46 6  A.      Yes.

12:36:46 7  Q.      And the ones you identified are among those?

12:36:49 8  A.      Yes.

12:36:49 9  Q.      And that text exchange continued and it reflects what

12:36:53 10 you would have sent him that day?

12:36:55 11 A.      Yes.

12:36:55 12 Q.      It was the same day that you were identifying other

12:36:58 13 texts?

12:36:58 14 A.      Yes.

12:36:59 15 Q.      You knew where to send it to?

12:37:01 16 A.      Yes.

12:37:01 17 Q.      Having done that, I am now going to read into the

12:37:04 18 record what you in fact said in that text exchange.  And on

12:37:12 19 October 23rd, 2018, at 10:46, you wrote, if I say it right

12:37:19 20 "where is hotel and room number??"  Two question marks.

12:37:25 21 Right, I read that correctly?

12:37:26 22 A.      Yes.

12:37:27 23 Q.      And you sent that to him then?

12:37:30 24 A.      Yes.

12:37:30 25 Q.      That reflects that at that moment you had an

Hallie Biden - cross

12:37:33  1    understanding --

12:37:33  2              THE COURT:  Wait, wait, wait, no, we decided

12:37:35  3    that --

12:37:36  4              MR. LOWELL:  Okay, I stand corrected.  Judge, I

12:37:38  5    am trying to do this carefully.

12:37:40  6              THE COURT:  I know, you're trying to do it

12:37:42  7    carefully and it's difficult, but we had an agreement on

12:37:45  8    that.

12:37:46  9              MR. LOWELL:  Okay.  So you did send that text

12:37:48 10    and it does use the word "hotel"?

12:37:50 11              THE WITNESS:  Yes.

12:37:50 12    BY MR. LOWELL:

12:37:51 13    Q.    And then I want you to look at what I just read in

12:37:56 14    and the time.  Right?  And it says 10:46.  That's the time

12:38:01 15    of that one?

12:38:02 16    A.    Okay.

12:38:03 17    Q.    You dropped your kids off at 8:30, I'm sorry, before,

12:38:07 18    and you came back.  Had you yet gone into his truck at this

12:38:11 19    point?  It's two hours and change later?

12:38:19 20    A.    Then no, if he's not at my house.

12:38:22 21    Q.    Well, but you said you're not sure that the truck

12:38:25 22    wasn't there at that time.  The truck could be there and he

12:38:28 23    not be there, right?

12:38:29 24    A.    Well, how?

12:38:31 25    Q.    Okay.  I mean, he could drop the truck off--

Hallie Biden - cross

12:38:35  1                MR. WISE:  She can't ask him questions.

12:38:37  2                THE WITNESS:  Sorry.

12:38:38  3                THE COURT:  And what he says is not evidence.

12:38:42  4                THE WITNESS:  Okay.

12:38:43  5   BY MR. LOWELL:

12:38:43  6   Q.      Okay.  Somebody could have -- be in their car and

12:38:48  7   somebody else be in the car next to them and drop a truck

12:38:51  8   off and then go in that person's car and leave, could that

12:38:54  9   happen?

12:38:55 10   A.      That could.

12:38:55 11   Q.      Somebody could call an Uber, you saw a reference to

12:38:59 12   an Uber?

12:39:00 13   A.      Yes.

12:39:00 14   Q.      What I'm asking, again going backwards in time,

12:39:04 15   you're not sure when the truck was on the property you

12:39:07 16   identified?

12:39:08 17   A.      Correct.

12:39:08 18   Q.      But now that I'm looking at 10:46 as a time stamp,

12:39:13 19   you're not sure whether you did or did not find the gun

12:39:17 20   before then?

12:39:21 21   A.      If we're not talking about the gun, I don't think I

12:39:24 22   found it yet.

12:39:25 23   Q.      Okay.  That was going to be my next question to you.

12:39:29 24   If you had found the gun by any particular time in the

12:39:34 25   morning, you have testified about what you did when you did

Hallie Biden - cross

12:39:39  1    it, and we know from some time stamp that at 11:20 you're at

12:39:44  2    Janssen's, is there anything you recall, calling him

12:39:48  3    immediately and telling him?

12:39:50  4    A.      No, I did not call him and tell him.

12:39:54  5    Q.      Okay.  Then the next sequence is I think you were

12:40:06  6    asked whether or not you know when, if the truck left the

12:40:13  7    property you identified, do you remember?

12:40:18  8    A.      When it left?

12:40:19  9    Q.      The grass, the property?  You obviously found

12:40:24 10    something in it; right?

12:40:25 11    A.      Right.

12:40:26 12    Q.      And then at some point later when you came back, it

12:40:30 13    wasn't there, later in the day?

12:40:33 14    A.      Well, he drove it to Janssen's --

12:40:37 15    Q.      Do you know if he drove it directly to Janssen's.  Do

12:40:41 16    you know where he was before the incident when you and he

12:40:46 17    were at Janssen's?

12:40:47 18    A.      I'm not sure.

12:40:48 19    Q.      Do you know whether or not on that day he had an

12:40:50 20    indication that he was going to Washington D.C. on the 23rd?

12:40:54 21    A.      I don't recall.

12:40:55 22    Q.      Do you recall anything about one of his daughters

12:41:00 23    living in D.C. at the time?

12:41:01 24    A.      Yes.

12:41:02 25    Q.      Was there a daughter named Maisy that he had?

Hallie Biden - cross

12:41:05  1    A.      Yes.

12:41:05  2    Q.      Was Maisy in school in Washington at that period of

12:41:09  3    time?

12:41:09  4    A.      Yes.

12:41:10  5    Q.      And she was in high school?

12:41:12  6    A.      Yes.

12:41:13  7    Q.      Do you recall Mr. Biden, Hunter, telling you he was

12:41:18  8    going to see Maisy at Washington for a game?

12:41:23  9    A.      Via text message or in person?

12:41:25 10    Q.      I'm asking you, do you recall any conversation about

12:41:28 11    where he was intending to go on the 23rd?

12:41:30 12    A.      No, because I can only see it from the text messages.

12:41:35 13    Q.      I want you to look, see if this refreshes your

12:41:39 14    recollection, if you will look at Row 24?

12:41:42 15    A.      Mine says --

12:41:43 16    Q.      Don't say what it says?

12:41:44 17    A.      No, I meant I don't have Row 24.

12:41:47 18            THE COURT:  You're asking for hearsay, right,

12:41:49 19    are you asking what he said or what she said?

12:41:52 20            MR. LOWELL:  I'm asking whether looking at

12:41:53 21    anything refreshes her recollection, not whether it's in the

12:41:57 22    record, not whether it can be admissible, but anything can

12:42:00 23    refresh the witness so I'm asking.

12:42:03 24            MR. WISE:  I think there is no Row 24.

12:42:07 25            MR. LOWELL:  I'm sorry.  May I approach?

Hallie Biden - cross

12:42:13  1    BY MR. LOWELL:

12:42:13  2    Q.     What I want you to do is what we have done before,

12:42:16  3    take a look at this page and look at Row 24, just Row 24,

12:42:20  4    and read it to yourself.

12:42:22  5            THE COURT:  And then does it refresh your

12:42:23  6    recollection, not what you're reading.

12:42:28  7    BY MR. LOWELL:

12:42:28  8    Q.     Do you see it?  Does reading that refresh your

12:42:31  9    recollection of whether or not you understood he was on his

12:42:35 10    way to Washington D.C. to see his daughter Maisy?

12:42:39 11    A.     That that was the intention?

12:42:40 12    Q.     Yes.

12:42:41 13    A.     Yes.

12:42:44 14            MR. LOWELL:  Your Honor, keep going, I mean, I

12:42:47 15    just don't want to keep people.

12:42:49 16            THE COURT:  It's 12:42.  We'll take our lunch

12:42:53 17    break.

12:42:53 18            COURTROOM DEPUTY:  All rise.

12:42:56 19            (Jury exiting the courtroom at 12:42 p.m.)

12:43:18 20            THE COURT:  All right.  We usually take about an

12:43:26 21    hour.  Is that all right?

12:43:27 22            THE WITNESS:  Sure.

12:43:29 23            MR. LOWELL:  May we approach before you leave

12:43:30 24    the bench?

12:43:31 25            THE COURT:  You can go.

12:43:34  1                    (A luncheon recess was taken.)

13:14:28  2                    (Side-bar discussion:)

13:14:28  3                    THE COURT:  So one of the jurors said to Mark

13:14:28  4     when she was leaving that when we were over here at

13:14:28  5     side-bar, that they noticed that she was communicating with

13:14:28  6     someone in the back.  Now, I don't know if she has a lawyer

13:14:28  7     here.

13:14:28  8                    MR. HINES:  She does.

13:14:28  9                    MR. WISE:  Well, it's her husband.  She got

13:14:28 10     married this weekend and I can see him in back.

13:14:28 11                    THE COURT:  So she was communicating with

13:14:28 12     someone.  They were like mouthing something to her.  My

13:14:28 13     guess is it was something on the order of, you know --

13:14:28 14                    MR. LOWELL:  What a jerk I am.

13:14:28 15                    THE COURT:  My guess.

13:14:28 16                    MR. LOWELL:  Could you clean that one up.  What

13:14:28 17     a jerk I am.  Thank you.

13:14:28 18                    MR. HINES:  No objection.

13:14:28 19                    THE COURT:  Okay.  So they noticed -- so one

13:14:28 20     juror, it's the second alternate, so we know we have the two

13:14:28 21     younger women, so it's one of them.  And then she said to

13:14:28 22     him -- and you can ask Mark questions, too, she said to him

13:14:28 23     and other jurors noticed, too.

13:14:28 24                    MR. LOWELL:  So I'm sorry to get this right,

13:14:28 25     Mark, Mr. Buckson, the first -- second alternate says it to

Hallie Biden - cross

13:14:28  1    you?

13:14:28  2              COURTROOM DEPUTY:  She stays behind and says, "I

13:14:28  3    have to talk to you a minute."

13:14:28  4              MR. LOWELL:  When she did, she said other jurors

13:14:28  5    saw it, too?

13:14:28  6              COURTROOM DEPUTY:  She told me what happened and

13:14:28  7    said other jurors saw it, too.

13:14:28  8              MR. LOWELL:  Meaning that they talked about it.

13:14:28  9              THE COURT:  That's what I said to Mark, that's

13:14:28 10    why I want to tell you guys everything that they said.

13:14:28 11              Now what I don't know -- my guess is, it was on

13:14:29 12    the way out the door, so it wasn't like they had talked

13:14:29 13    about it in the jury room.  It was probably one of those

13:14:29 14    things where they were like this, you know, but I don't know

13:14:29 15    that.

13:14:29 16              MR. LOWELL:  I understand.

13:14:29 17              THE COURT:  So if you guys want to ask, you can.

13:14:29 18    So what I thought I would do is tell you now, even though I

13:14:29 19    interrupted your lunch, so you can go back, you can figure

13:14:29 20    out who the person was.

13:14:29 21              MR. WISE:  I saw him.

13:14:29 22              MR. LOWELL:  She also has her lawyer.

13:14:29 23              MR. WISE:  I mean, if someone is mouthing like

13:14:29 24    hang in there, doing, whatever it is, I'm guessing it's the

13:14:29 25    husband, I don't think a lawyer is mouthing something.

13:14:29  1          THE COURT:  I don't know who she was doing it

13:14:29  2   with.  Maybe you can go figure out.  Maybe you can find out

13:14:29  3   what they are saying and you guys can figure out what you

13:14:29  4   want to do if you want to talk to the jury or you want me to

13:14:29  5   talk to the jury.

13:14:29  6          MR. LOWELL:  Or maybe we let it be.

13:14:29  7          THE COURT:  Let it be with a reminder that don't

13:14:29  8   talk to each other.

13:14:29  9          MR. WISE:  My only concern if she think she's

13:14:29 10   being coached or something.

13:14:29 11          THE COURT:  If she's doing something improper.

13:14:29 12          MR. WISE:  I don't want that impression to be

13:14:29 13   left on them.

13:14:29 14          MR. LOWELL:  Unfortunately, to figure that out,

13:14:29 15   you would have to start inquiring who were you talking to,

13:14:29 16   what were you mouthing, what was he mouthing back, and that

13:14:29 17   concerns me as much as, you know, as anything because why --

13:14:29 18   how is that helpful, right.

13:14:29 19          Let's figure out before we bring them back what

13:14:29 20   is the least that is necessary, if anything, because if you

13:14:29 21   start inquiring, how is that helpful, right, I don't think

13:14:29 22   that's helpful.  I understand you don't want the jury to

13:14:29 23   think she's being coached, certainly not by my party.

13:14:29 24          MR. WISE:  Right.

13:14:29 25          MR. LOWELL:  But I wonder how do you do that

Hallie Biden - cross

13:14:29 1   with finesse.  Nothing comes to my mind at the moment, but

13:14:29 2   I'll try to put my mind to it.

13:14:29 3              Thank you for telling us.  And right now I don't

13:14:29 4   have anything I would suggest, but I'll talk to you all

13:14:29 5   about it.

13:14:29 6              THE COURT:  Maybe you guys, somebody can just

13:14:29 7   check with her lawyer and husband and find out what that

13:14:29 8   was.

13:14:29 9              MR. LOWELL:  Thanks, Your Honor, for bringing it

13:14:29 10  to our attention.

13:43:51 11             (End of side-bar.)

13:43:51 12             COURTROOM DEPUTY:  All rise.

13:48:37 13             THE COURT:  All right.  So can I just see

13:48:44 14  counsel for one second.

13:53:43 15             (Side-bar discussion.)

13:53:43 16             THE COURT:  So you want me to do what?

13:53:43 17             MR. LOWELL:  I thought the, we talked, I think

13:53:43 18  what we agreed was you don't have to do it right away or

13:53:43 19  whenever you would, it would just be the normal instructions

13:53:43 20  to the jury just a reminder that you shouldn't be talking to

13:53:43 21  each other about the case, among yourselves of anything

13:53:43 22  that's happening, you have that, I don't know exactly the

13:53:43 23  words.

13:53:43 24             THE COURT:  And then with respect to the

13:53:43 25  discussions, are you okay if they just want to ask her, do

13:53:43  1    you have someone here supporting you or something so the

13:53:43  2    jury understands?

13:53:43  3              MR. LOWELL:   I would object to that as somebody

13:53:43  4    here supporting you.

13:53:43  5              THE COURT:   Someone here --

13:53:43  6              MR. LOWELL:   I mean, if you want to say do you

13:53:43  7    have a relative -- I mean, I don't know.   My view is do the

13:53:43  8    least.   But if you feel like something needs to be said.

13:53:43  9    But I don't know how that doesn't make it worse.

13:53:43 10              MR. WISE:   Was your impression that they thought

13:53:43 11    it was something wrong going on?

13:53:43 12              COURTROOM DEPUTY:   Kind of.

13:53:43 13              MR. WISE:   Okay.

13:53:43 14              COURTROOM DEPUTY:   It was a suspicious.

13:53:43 15              MR. LOWELL:   Let's say she has a relative, the

13:53:43 16    problem, it still opens the door, what was your relative

13:53:43 17    saying to you, were they just giving you a high five.

13:53:43 18              MR. WISE:   The question would be Ms. Biden were

13:53:43 19    you recently married, yes, just this week, is your husband

13:53:43 20    here in audience to support you, yes.

13:53:43 21              MR. LOWELL:   Not support you.

13:53:43 22              MR. WISE:   Yeah, that's what spouses do.

13:53:43 23              THE COURT:   Is your husband here with you.

13:53:43 24              MR. WISE:   At the breaks, have you been looking

13:53:43 25    at him and exchanging supportive words, has anyone been

Hallie Biden - cross

13:53:43  1    telling you what to testify about.

13:53:44  2              MR. LOWELL:  I object to all those questions.

13:53:44  3              THE COURT:  Well, I don't object to has anyone

13:53:44  4    told you what to testify.

13:53:44  5              MR. LOWELL:  I mean in general, yeah.

13:53:44  6              MR. WISE:  I don't know what the prejudice is

13:53:44  7    for her to say my husband is in the audience, I have been

13:53:44  8    looking at him and he's been looking at me for support.

13:53:44  9              MR. LOWELL:  For support, how about I have been

13:53:44 10    looking at him and he's been looking at me.

13:53:44 11              THE COURT:  And anything in that, was he telling

13:53:44 12    you what to say, or something like that?

13:53:44 13              MR. WISE:  Okay.

13:53:44 14              THE COURT:  People are telling you what your

13:53:44 15    testimony should be, something like that.

13:53:44 16              MR. WISE:  Yeah.

13:53:44 17              THE COURT:  Because I -- look, I'm just

13:53:44 18    concerned that the jury, there was nothing -- I don't think

13:53:44 19    there is anything that she did wrong.

13:53:44 20              MR. WISE:  We confirmed with the lawyer, we said

13:53:44 21    is she talking to you, no, no, the husband is here.

13:53:44 22              He's not going to obviously tell her anything

13:53:44 23    about her testimony, but I am concerned that we're leaving

13:53:44 24    an impression with the jury that she's doing something

13:53:44 25    wrong, so if you just want to say, were you recently

Hallie Biden - cross

13:53:44 1    married, is your husband here with you, and then have you

13:53:44 2    during breaks looked to him, and did anything that you do --

13:53:44 3    any of your interactions about your testimony or something

13:53:44 4    like that.

13:53:44 5            MR. WISE:  Okay.

13:53:44 6            MR. LOWELL:  Say that, were any of your

13:53:44 7    interactions, sorry, were any of your interactions about

13:53:44 8    your testimony.

13:53:44 9            THE COURT:  Yes.

13:53:44 10           MR. LOWELL:  Is that the phrase?

13:53:44 11           THE COURT:  Yes.  I was just trying to get at

13:53:44 12   that it's not influencing her testimony, but if there is a

13:53:44 13   better word for that.

13:53:44 14           MR. WISE:  I think maybe while you are on the

13:53:44 15   stand.

13:53:44 16           THE COURT:  Yes.  While you were on the stand

13:53:44 17   did you occasionally look to him, was any of that about your

13:53:44 18   testimony?

13:53:44 19           MR. LOWELL:  I mean --

13:53:44 20           THE COURT:  I know, and you can object and if

13:53:44 21   you have to object now.

13:53:44 22           MR. LOWELL:  Why don't, we could that now, let

13:53:44 23   me do it now.  Yeah, I just think the more we inquire, the

13:53:44 24   worse it gets, so I object to anything other than the

13:53:44 25   instruction to the jury, telling them that you're not

Hallie Biden - cross

13:53:44  1    supposed to be talking about the case before you deliberate.

13:53:44  2              THE COURT:  I understand.  The problem is that

13:53:44  3    horse is out of the barn and I can instruct them on that

13:53:44  4    going forward, but for this particular horse and barn, I

13:53:44  5    don't want the jury left with the impression that something

13:53:44  6    nefarious was going on.  I have enough issues with her

13:53:44  7    testimony let alone something wrong.

13:53:44  8              MR. LOWELL:  Let's put this horse back in the

13:53:44  9    barn, but can we do it with the fewest number of kicks to

13:53:44 10    the side, to use the analogy.

13:53:44 11              THE COURT:  Yes.  I think that's what it is, if

13:53:44 12    you think there is a way that we can kick less, I took out

13:53:44 13    support.

13:53:44 14              MR. LOWELL:  Right.

13:53:44 15              THE COURT:  I took out support and all I wanted

13:53:45 16    to clarify is it didn't have anything to do with -- he

13:53:45 17    doesn't know anything about her testimony.

13:53:45 18              MR. LOWELL:  But we don't have to explain that.

13:53:45 19              THE COURT:  Exactly.

13:53:45 20              MR. LOWELL:  Okay.

13:53:53 21         (End of side-bar. )

13:53:57 22              THE COURT:  All right.  We can bring in the

13:54:00 23    jury.

13:54:17 24         (Jury entering the courtroom at 1:54 p.m.)

13:55:43 25              THE COURT:  All right, everyone, welcome back.

Hallie Biden - cross

13:55:50  1    You can be seated.  Members of the jury.  Welcome back.  And

13:55:53  2    I hope if you went outside, you're able to enjoy the less

13:55:58  3    humid weather in here if it's a little chilly.  Mr. Lowell

13:56:04  4    please continue.

13:56:05  5                MR. LOWELL:  Thank you, Your Honor.  Good

13:56:06  6    afternoon, ladies and gentlemen, good afternoon, Ms. Biden.

13:56:08  7    And thank you for helping put together the sequence and I

13:56:11  8    don't have a lot more.

13:56:12  9    BY MR. LOWELL:

13:56:13 10    Q.      Where we left off before lunch was still trying to

13:56:15 11    figure out the time sequence on the morning of the 23rd.  Do

13:56:19 12    you remember that that's where we left off?

13:56:21 13    A.      Yes.

13:56:22 14    Q.      So with that in mind, I want to turn first to

13:56:28 15    figuring out as best as you can you at some point we know go

13:56:34 16    into the truck, we know that.

13:56:36 17    A.      Yes.

13:56:36 18    Q.      And you're searching around, we know that?

13:56:39 19    A.      Yes.

13:56:39 20    Q.      We know that's when you found the gun?

13:56:42 21    A.      Correct.

13:56:42 22    Q.      And you said in your testimony this morning that you

13:56:44 23    believed you also had seen, I think what you called,

13:56:47 24    remnants or also paraphernalia?

13:56:51 25    A.      Yes.

Hallie Biden - cross

13:56:51  1    Q.      Okay.  You had done that many times in the past I
13:56:55  2    think you said in the earlier years when you and Mr. Biden
13:56:58  3    were using?
13:56:59  4    A.      Yes.
13:57:00  5    Q.      And I imagine there was more than one of those?
13:57:03  6    A.      Yes.
13:57:03  7    Q.      So on that day, I don't know if you said this and if
13:57:11  8    so I'll skip it again, remnants meaning, what did you think
13:57:15  9    you saw?
13:57:16 10    A.      Like dusting.
13:57:18 11    Q.      Dusting.  Okay.  Not a piece?
13:57:21 12    A.      No.
13:57:22 13    Q.      But a dust?
13:57:23 14    A.      Correct.
13:57:23 15    Q.      And search your memory, on the car seat, on the
13:57:29 16    steering wheel, on the outside of the console, on the mat?
13:57:35 17    A.      I don't recall.
13:57:37 18    Q.      And paraphernalia, not like the thing you said you
13:57:41 19    found in the pouch at the end of October, what do you
13:57:46 20    recall, if anything, about what that was that day?
13:57:49 21    A.      I don't recall exactly what it was.
13:57:53 22    Q.      And on that day as we've established, you don't have
13:57:57 23    a specific memory about where he was or when he was there,
13:58:03 24    and other of the details, and in here, too, you just have
13:58:07 25    this general memory of that?

13:58:10  1          MR. WISE:  Your Honor, I'll object, her

13:58:11  2     testimony was he was at the house, he didn't --

13:58:15  3          MR. LOWELL:  I'll withdraw and restate, okay.

13:58:17  4          THE COURT:  Okay.  So you're withdrawing your

13:58:21  5     question?

13:58:21  6          MR. LOWELL:  I withdraw the question.

13:58:23  7     BY MR. LOWELL:

13:58:24  8     Q.     So on that morning you're not certain when you went

13:58:26  9     in the car?

13:58:27 10     A.     Correct.

13:58:27 11     Q.     You're not certain when you saw him?

13:58:33 12     A.     Correct.

13:58:33 13     Q.     You're not certain as to the sequence of whether it

13:58:37 14     happened when after you came back from dropping your kids?

13:58:40 15     A.     Correct.

13:58:41 16     Q.     And similarly, you have this general impression that

13:58:43 17     there was, to use your phrase, some powder and some

13:58:48 18     paraphernalia and you don't know what that was?

13:58:50 19          MR. WISE:  Again, object, it wasn't a general

13:58:53 20     impression, she testified that's what she found.

13:58:56 21          THE COURT:  Okay.  So the jury can, both the

13:59:00 22     lawyers stuff is not evidence, you can remember what she

13:59:03 23     said.  And but Mr. Lowell, if you'll just ask her, take out

13:59:11 24     your generalizations and if you'll make an objection without

13:59:14 25     giving so many specifics.

Hallie Biden - cross

13:59:17  1           MR. WISE:  Thank you, Your Honor.

13:59:18  2           MR. LOWELL:  Okay.

13:59:20  3  BY MR. LOWELL:

13:59:20  4  Q.      I'm just trying to compare the specificity of what

13:59:24  5  you remember versus some general.  Okay?  And if I didn't do

13:59:29  6  it right, I'll try it again.

13:59:30  7           Powder I understand, remnants, you're not having

13:59:34  8  a memory of what, if anything, that was; is that right?

13:59:39  9  A.      Correct.

13:59:40 10  Q.      So we do know that at some point you're doing what

13:59:47 11  you described your morning events to be, and now I would

13:59:51 12  like to turn to in your book, if you'll turn to Exhibit 17.

14:00:09 13  In that morning you also -- I think you testified that you

14:00:13 14  had phone conversations with Hunter, as well.  On the

14:00:18 15  morning of the --

14:00:19 16  A.      Do I look at the book?

14:00:21 17  Q.      Sorry, no, first --

14:00:23 18  A.      Okay.

14:00:24 19  Q.      Before looking at anything.

14:00:26 20  A.      Okay.

14:00:27 21  Q.      In the morning, you had telephone conversations with

14:00:31 22  Hunter, as well as texts; is that a fair statement?

14:00:34 23  A.      I don't recall them.

14:00:36 24  Q.      Okay.  But I'm generally speaking, do you recall that

14:00:40 25  you guys talked by phone on the day that you recovered the

Hallie Biden - cross

14:00:44   1    gun?

14:00:45   2    A.      Yes.

14:00:45   3    Q.      And my question, then, is if you don't remember the

14:00:50   4    specifics, if you'll -- hold on.

14:01:02   5            So if you will turn, please, to page -- to

14:01:07   6    DX-17, it should be in the book and if you can't find it,

14:01:11   7    let me know.  It should have a tab.  Tell me when you're

14:01:21   8    there.

14:01:21   9    A.      I'm there.

14:01:21  10    Q.      Okay.  So for the purposes of my questioning of you,

14:01:25  11    I'm going to only read to you for the morning of

14:01:30  12    October 23rd, times of calls from you to him or him to you.

14:01:36  13    A.      Okay.

14:01:36  14    Q.      Okay.  So I would like you to look at that.  Am I

14:01:40  15    correct that on October 23rd of 2018 at 9:51 a.m., you

14:01:45  16    called him?

14:01:47  17    A.      I'm on the wrong --

14:01:49  18    Q.      I'm sorry.

14:01:50  19            MR. LOWELL:  Can I approach?

14:01:53  20            THE WITNESS:  Page 2 of that.

14:01:55  21    BY MR. LOWELL:

14:01:55  22    Q.      I think it's page -- 10/23.  I'm sorry.  Page 3.  And

14:02:04  23    I'll tell you which, look at the time stamp, please.  So if

14:02:12  24    you look at Row 68?

14:02:19  25    A.      Yes.

Hallie Biden - cross

14:02:20  1    Q.      I'm sorry, so yes, and at 9:51, you're calling him?

14:02:25  2    A.      Yes.   That's what this says.

14:02:28  3    Q.      And there is an indication in the columns that there

14:02:30  4    was no answer?

14:02:32  5    A.      Yes.

14:02:32  6    Q.      At 9:51, when you tried to call him, were you calling

14:02:39  7    him because by that point in the sequence of events you had

14:02:43  8    found the gun?

14:02:44  9    A.      I don't recall.

14:02:45 10    Q.      Then a few minutes later on the same morning, if

14:02:53 11    you'll look at Row 69 at 9:56, he calls you.   Yes?

14:03:00 12    A.      Yes.

14:03:01 13    Q.      Okay.   And that one was a call for a minute and

14:03:05 14    20 seconds?

14:03:06 15    A.      Yes.

14:03:06 16    Q.      Now, if you're calling him in the morning at those

14:03:09 17    two places, is it right that you wouldn't be calling him if

14:03:15 18    he was either in your house, or right in the driveway?

14:03:19 19    A.      Correct.

14:03:19 20    Q.      So he's someplace else?

14:03:21 21    A.      Yes.

14:03:21 22    Q.      In the morning?

14:03:23 23    A.      Yes.

14:03:23 24    Q.      And then if you'll look again, and that's a minute

14:03:26 25    and 20, yes?

Hallie Biden - cross

14:03:29  1    A.      Yes.

14:03:30  2    Q.      Okay.  And I'm sure that would be the case that five

14:03:34  3    years later, you don't know what was spoken in that minute

14:03:38  4    and 20?

14:03:38  5    A.      Correct.

14:03:39  6    Q.      Is it your memory, though, that at that point, you

14:03:44  7    had found the gun?  You just don't know?

14:03:45  8    A.      I don't recall.

14:03:46  9    Q.      And then six minutes later, if you look at Row 70,

14:03:50 10    it's now 10:02, right?

14:03:53 11    A.      Yes.

14:03:53 12    Q.      And he calls you, correct?

14:03:57 13    A.      Yes.

14:03:57 14    Q.      And that call is 1 minute and 33?

14:04:03 15    A.      Yes.

14:04:03 16    Q.      Now at 10:02 in the morning, I'm imaging from your

14:04:07 17    testimony and what we saw in the video that you're still

14:04:14 18    home?

14:04:14 19    A.      Yes.

14:04:15 20    Q.      So he's not there either?

14:04:17 21    A.      Yes.

14:04:18 22    Q.      And then 28 minutes later on the same morning, you

14:04:23 23    call him.  And that's at 10:30; right?

14:04:29 24    A.      Yes.

14:04:30 25    Q.      And that one lasts a little bit more than a minute?

Hallie Biden - cross

14:04:35  1    A.        Yes.

14:04:36  2    Q.        And so far at that point at 10:30, if you're calling

14:04:41  3    him, we can establish that at 10:30, he's not there?

14:04:47  4    A.        Yes.

14:04:58  5    Q.        In your testimony before lunch, you had talked about

14:05:04  6    finding the gun, looking for someplace to put it, and at

14:05:10  7    some point, you went in your house to get a bag.  Is that

14:05:17  8    right?

14:05:17  9    A.        Correct.

14:05:18 10    Q.        Now, I want to establish in the sequence whether you

14:05:22 11    went in the house to get a bag, and then you said you

14:05:27 12    retrieved a leather pouch, or it's the other way around?

14:05:31 13    A.        I don't recall.

14:05:33 14    Q.        But you went into the house and you got a bag and the

14:05:37 15    first bag was like -- how did you describe it, a gift bag?

14:05:41 16    A.        Like a little gift shopping bag.

14:05:44 17    Q.        Show me the size.

14:05:45 18    A.        Like that.

14:05:45 19    Q.        Is that where you ended up putting what you found?

14:05:48 20    A.        Yes.

14:05:49 21    Q.        Is that what you ended up bringing to Janssen's?

14:05:52 22    A.        Yes.

14:05:53 23    Q.        If you saw in the video that the government's

14:05:56 24    attorneys played, you see it and it was like a purple bag?

14:06:00 25    A.        Yes.

Hallie Biden - cross

14:06:02  1    Q.      And after you put it in the bag, and again, you can't

14:06:07  2    tell us today whether the gift bag or the pouch came first;

14:06:12  3    right?

14:06:13  4    A.      Correct.

14:06:13  5    Q.      But nevertheless, at some point they came together.

14:06:18  6    A.      Yes.

14:06:18  7    Q.      And I heard you say that you got the leather pouch

14:06:21  8    from the car as opposed to the library of your house or any

14:06:25  9    other place in the house or do you know?

14:06:27 10    A.      From the car.

14:06:28 11    Q.      Where in the truck, front seat, back seat, what would

14:06:34 12    you call that, truck bed?

14:06:35 13    A.      Like, just around, it was a lot of stuff.  I don't

14:06:40 14    recall exactly where I pulled it from.

14:06:44 15    Q.      Was it sitting on top of the stuff, was it underneath

14:06:48 16    the stuff, where was it?

14:06:51 17    A.      I don't recall.

14:06:52 18    Q.      And so the next thing that I understand is you, I

14:06:57 19    think the phrase that either Mr. Wise used or you used, "you

14:07:04 20    panicked" about finding the gun, certainly understandable?

14:07:07 21    A.      Yes.

14:07:07 22    Q.      But your reaction was to go put it in a bag, a gift

14:07:11 23    bag, is that right, not a gift bag, but to put it in a bag?

14:07:15 24    A.      I didn't want to hold it like a gun.

14:07:17 25    Q.      And you had no idea if it was loaded at the time?

Hallie Biden - cross

| 14:07:19 | 1 | A.    Correct. |

14:07:20  2  Q.    But you did see a box of bullets that were next to

14:07:23  3  it?

14:07:23  4  A.    Yes.

14:07:24  5  Q.    And it had bullets in it?

14:07:25  6  A.    I don't know.

14:07:26  7  Q.    You didn't shake it, open it up?

14:07:28  8  A.    The bullets?

14:07:29  9  Q.    The box.

14:07:30 10  A.    Some were out and I think it had some weight to it

14:07:33 11  too.

14:07:33 12  Q.     It had some weight.  But did you open it to see

14:07:36 13  whether they were all there, not all there, how did you

14:07:39 14  know?

14:07:39 15  A.    Some were loose out of the box.

14:07:42 16  Q.    Did you scoop those up?

14:07:44 17  A.    I did, I put those in there, as well.

14:07:46 18  Q.    You put those in where, as well?

14:07:48 19  A.    In the pouch.

14:07:49 20  Q.    So there were some in the box and you thought there

14:07:51 21  were some that were in the same steel underneath the console

14:07:56 22  part?

14:07:56 23  A.     In the console, there were some loose bullets that

14:08:00 24  were just sitting there, and then next to it was the box

14:08:04 25  that they came from.

14:08:05  1   Q.      So they had fallen out of the box?

14:08:07  2   A.      Correct.  But all of that, all of that, all into the

14:08:12  3   pouch.

14:08:12  4   Q.      They weren't in the gun, they were next to the box?

14:08:15  5   A.      Correct.

14:08:16  6   Q.      Now I understand.  So now you take -- and the speed

14:08:19  7   loader was there?  I'm sorry, speed loader, there was a

14:08:23  8   thing other than the box and the gun, right?

14:08:25  9   A.      I don't know what that is.

14:08:26 10   Q.      Was there another device, another object that you

14:08:33 11   scooped out?

14:08:33 12   A.      I--

14:08:33 13   Q.      Whatever was there, you scooped out.

14:08:36 14   A.      Whatever looked like it was gun related I put in the

14:08:39 15   pouch.

14:08:39 16   Q.      Okay.  There was whatever -- strike that.

14:08:43 17           So in the sequence you take it out and put it

14:08:47 18   either in the pouch in the bag, or the bag in the pouch, you

14:08:50 19   can't figure out which came first?

14:08:52 20   A.      Correct.

14:08:52 21   Q.      But either way it gets into the bag?

14:08:55 22   A.      Correct.

14:09:00 23   Q.      And then you were asked whether or not, and you saw a

14:09:02 24   text that there is a different pouch later at the very end

14:09:05 25   of the month?

Hallie Biden - cross

14:09:06  1    A.      Correct.

14:09:06  2    Q.      You saw a text that says the pouch with Hunter in the

14:09:11  3    library?

14:09:12  4    A.      Right.

14:09:12  5    Q.      In that pouch, lot of leather pouches?

14:09:16  6    A.      Yes.

14:09:16  7    Q.      There are a lot of leather pouches, you said you had

14:09:20  8    leather pouches, sometimes in cars or sometimes where he

14:09:23  9    would put his drugs?

14:09:24 10    A.      Right.

14:09:24 11    Q.      In that particular one, that you are texting him

14:09:28 12    about on October 31st, we established that's not the pouch

14:09:31 13    you threw away on October 23rd, when did that pouch get into

14:09:35 14    your house?

14:09:36 15    A.      I don't recall.

14:09:36 16    Q.      Could it have been there for a while?

14:09:39 17    A.      I mean --

14:09:40 18    Q.      You just don't know when?

14:09:42 19    A.      I don't know.

14:09:42 20    Q.      And when you said inside of it was a -- I forget what

14:09:53 21    you called it, a stem, a pipe or something?

14:09:55 22    A.      Yes.

14:09:56 23    Q.      Do you know when that was put into that pouch that

14:09:58 24    you found in your house on the 31st?

14:10:00 25    A.      I don't know.

Hallie Biden - cross

14:10:02  1   Q.      Was it your intention to go to Janssen's that morning

14:10:07  2   anyway?

14:10:07  3   A.      Yes.

14:10:08  4   Q.      And so when you first discovered the gun, in the time

14:10:14  5   sequence that I'm trying to recreate with you given the

14:10:17  6   phone calls and the texts, what we can establish is that you

14:10:20  7   find it and immediately you call him on the phone, that

14:10:23  8   didn't happen?

14:10:23  9   A.      That didn't happen.

14:10:24 10   Q.      You decided on your own to put it into the gift bag?

14:10:29 11   He didn't tell you to do that?

14:10:30 12   A.      No, he did not tell me to do that, he didn't know I

14:10:34 13   was doing that.

14:10:34 14   Q.      And so you decided on your own to put it in the

14:10:38 15   pouch?

14:10:38 16   A.      Correct.

14:10:39 17   Q.      And then you decided on your own that you were going

14:10:41 18   to take all that?

14:10:43 19   A.      Correct.

14:10:43 20   Q.      And drive it to the grocery store?

14:10:45 21   A.      Yes.

14:10:46 22   Q.      And so can I put up, please -- oh, wait.

14:10:55 23          MR. LOWELL:   I move into evidence Defense

14:11:01 24   Exhibit 22.

14:11:01 25          MR. WISE:   No objection.

Hallie Biden - cross

14:11:02  1              THE COURT:  Thank you.  It's admitted.

14:11:04  2              (DTX Exhibit No. 22 was admitted into evidence.)

14:11:05  3    BY MR. LOWELL:

14:11:06  4    Q.      Would you put it up on there?  I'm showing you on the

14:11:09  5    screen, a picture of a store called Janssen's Market.  Does

14:11:15  6    that fairly depict?

14:11:16  7    A.      Yes.

14:11:17  8    Q.      The Janssen's that you went to?

14:11:19  9    A.      Yes.

14:11:19 10    Q.      And I see in front there are -- there is at least one

14:11:23 11    trash can.  Do you see that one?

14:11:25 12    A.      Yes.

14:11:25 13    Q.      And I take it there were others just like that down

14:11:27 14    the row?

14:11:28 15    A.      Yes.

14:11:29 16    Q.      Were they behind -- I'm sorry, in between each of

14:11:33 17    those columns?

14:11:34 18    A.      Yes.

14:11:35 19    Q.      Okay.  But that's the kind of thing that you could

14:11:38 20    recall?

14:11:38 21    A.      Yes.

14:11:39 22    Q.      So we saw you pull up, and if you remember the

14:11:52 23    screen, I want to go backwards because colleagues with

14:11:55 24    better memories remind me of something.  When you gathered

14:11:59 25    the things, was there also an iPhone box?

                            Hallie Biden - cross

14:12:02  1    A.        I don't recall.

14:12:04  2    Q.        Okay.  Do you recall how many things fit into the

14:12:08  3    pouch that has been put into evidence, which was like this

14:12:11  4    big by that big?  You don't?

14:12:14  5    A.        I don't know.  I mean, the pouch wasn't that big.

14:12:16  6    Q.        I'm sorry, it wasn't that big?

14:12:18  7    A.        But you have the pouch, so I don't know what would

14:12:21  8    actually --

14:12:22  9    Q.        Do you have the pouch?

14:12:27 10    A.        They showed it to me.

14:12:29 11    Q.        Yeah I know they showed it to you, but sometimes with

14:12:33 12    a picture it's hard to get the dimensions.

14:12:44 13                  MR. LOWELL:  May I approach?

14:12:45 14                  THE COURT:  You may.

14:12:46 15    BY MR. LOWELL:

14:12:46 16    Q.        So this has been entered into evidence as exhibit,

14:12:49 17    government Exhibit 4.  And you have identified this as the

14:12:53 18    pouch?

14:12:53 19    A.        Yes.

14:12:53 20    Q.        So as you're looking at this, you're saying that in

14:12:58 21    this, you put a gun?

14:13:00 22    A.        Correct.

14:13:01 23    Q.        A box of bullets?

14:13:02 24    A.        Correct.

14:13:02 25    Q.        Whatever else you found?

Hallie Biden - cross

14:13:05   1    A.        Right.

14:13:05   2    Q.        And you can't remember what else?

14:13:10   3    A.        Correct.

14:13:12   4    Q.        So if an iPhone box was recovered in the bag, that

14:13:19   5    was thrown out by you and recovered by somebody else, do you

14:13:22   6    have any memory of that box?

14:13:24   7    A.        I don't recall the iPhone box.

14:13:27   8    Q.        All right.  So we -- you pulled up at 11:20 and you

14:13:31   9    saw that.  And by now, you definitely have found this.  The

14:13:36  10    video showed you throwing it out.  And then leaving.  I'm

14:13:42  11    sorry, then going into the store.  I think you were standing

14:13:45  12    at, it might have been an ATM machine, that is what that

14:13:49  13    was?

14:13:50  14    A.        That's what it looked like.

14:13:51  15    Q.        And then you got cash, I take it you got cash?

14:13:55  16    A.        Uh-huh.

14:13:55  17    Q.        And then you did or did not remember whether you went

14:13:59  18    shopping?

14:13:59  19    A.        I don't know if I did.

14:14:03  20    Q.        At that point still you hadn't called Hunter, right?

14:14:07  21    A.        Correct.

14:14:07  22    Q.        And what we do know, is that later than when you

14:14:11  23    arrived, that you arrived at 11:20, and then some minutes

14:14:15  24    later, Hunter texts you.  Can you put up the government

14:14:24  25    Exhibit 18, and turn to Row 139.  Row 139, please.

Hallie Biden - cross

14:14:40  1           And this is at 11:45, right?

14:14:44  2   A.     Correct.

14:14:44  3   Q.     So it's after you dropped it off before you return at

14:14:48  4   11:52?

14:14:50  5   A.     Correct.

14:14:50  6   Q.     And he writes you, "did you take that from me,

14:14:54  7   Hallie?"  Is that how you say your name, Hallie?

14:14:57  8   A.     Hallie.

14:14:58  9   Q.     I'm sorry, I knew that.  I listened to them and I got

14:15:02 10   it wrong.

14:15:03 11           "Are you insane.  Tell me now.  This is no game.

14:15:07 12   And you're being totally irresponsible", that's when he

14:15:12 13   first contacts you, is that right?

14:15:14 14   A.     Yes.

14:15:14 15   Q.     And then eight seconds or so later, he writes, "tell

14:15:19 16   me now Hallie."

14:15:26 17   A.     Yes.

14:15:26 18   Q.     And then about 13 minutes later, he text you again?

14:15:31 19   A.     Yes.

14:15:32 20   Q.     Okay.  But in between there was a phone call; right?

14:15:35 21   A.     I don't recall.

14:15:36 22   Q.     Okay.  So if you'll look back to what was in front of

14:15:41 23   you, and I had you stop at Row 71 at 10:30, will you look at

14:15:48 24   Row 72 in the book, Exhibit 17.  So it would be Row 72, it's

14:15:58 25   page 3.

14:16:07  1    A.      Yes.

14:16:08  2    Q.      When he calls you at 11:46, a minute after the text

14:16:14  3    that we ended up at 11:45, right, so to do the sequence

14:16:19  4    right, that's what happens next, he calls you?

14:16:21  5    A.      Correct.

14:16:22  6    Q.      You didn't call him, he calls you?

14:16:24  7    A.      Correct.

14:16:25  8    Q.      You speak for 1 minute and 56 seconds, almost two?

14:16:28  9    A.      Correct.

14:16:28 10    Q.      That's the conversation in which you do tell him that

14:16:31 11    you found the gun; is that right?

14:16:34 12    A.      Correct.

14:16:34 13    Q.      And by now, you have left the store?

14:16:39 14    A.      Yes.

14:16:40 15    Q.      And gone back --

14:16:41 16    A.      I don't recall.

14:16:42 17    Q.      Okay.  But you know you come back at 11:52, we know

14:16:47 18    that you've dropped it off at 11:20, you certainly weren't

14:16:52 19    there for the 32 minutes in between, right?  You dropped it

14:16:56 20    off and threw it out at 11:20, we have the video?

14:17:00 21    A.      Correct.

14:17:00 22    Q.      And then you left?

14:17:01 23    A.      Right, but I don't know where I went.

14:17:03 24    Q.      I know you don't -- I said home, I'm sorry.  You left

14:17:06 25    the store?

Hallie Biden - cross

14:17:07  1    A.        Correct.

14:17:07  2    Q.        And you came back later at 11:52, that's what the

14:17:11  3    video showed?  It's okay, it's in evidence.

14:17:15  4    A.        Okay.

14:17:15  5    Q.        What I'm trying to do is establish a timeline?

14:17:18  6    A.        Okay.

14:17:18  7    Q.        We know about, those are two bookmarks.  We left, and

14:17:22  8    that's when he text you and you told him for 1 minute 56

14:17:26  9    what happened, right?

14:17:27 10    A.        Yes.

14:17:28 11    Q.        I think you testified that in that conversation he

14:17:30 12    spoke to you and your understanding was he said among other

14:17:33 13    things I'm sure, "go back and get it"?

14:17:37 14    A.        Yes.

14:17:37 15    Q.        You had already left, okay.  Yes?

14:17:40 16    A.        Yes.

14:17:41 17    Q.        And then you go back; right?

14:17:44 18    A.        Yes.

14:17:45 19    Q.        And we saw the video.  You can take that down for

14:17:48 20    now, Mr. Radic.  And you went back and you looked and we saw

14:17:51 21    you looking and you didn't find it?

14:17:53 22    A.        Yes.

14:17:53 23    Q.        And then we saw you come back into your car and then

14:17:56 24    you called him to tell him I didn't find it?

14:18:01 25    A.        Yes.

Hallie Biden - cross

14:18:02  1   Q.      If you look at Row 73.  You see it says Row 73 at

14:18:11  2   11:53, you call him?

14:18:12  3   A.      Yes.

14:18:13  4   Q.      And it says 1:47?

14:18:16  5   A.      Yes.

14:18:16  6   Q.      So you spoke to him for 1 minute and 47 seconds after

14:18:20  7   it is that you found that the gun was gone?

14:18:23  8   A.      Right.

14:18:23  9   Q.      That the bag was gone?

14:18:25 10   A.      Yes.

14:18:25 11   Q.      And I think you said in that conversation, he said to

14:18:29 12   you, "go tell somebody", go tell or make, I think to use

14:18:33 13   your phrase, a police report; right?

14:18:37 14   A.      Right.

14:18:38 15   Q.      So he asked you to do that?

14:18:39 16   A.      Correct.

14:18:40 17   Q.      Okay.  So he wanted you to see what could be done to

14:18:44 18   recover the gun?

14:18:45 19   A.      Correct.

14:18:45 20   Q.      That's when -- what happens next, do you go back into

14:18:49 21   Janssen's?

14:18:50 22   A.      Yes.

14:18:51 23   Q.      Whom did you speak with there?

14:18:53 24   A.      I forget her name.

14:18:55 25   Q.      Somebody in the store?

Hallie Biden - cross

14:18:57 1    A.      Yeah, in the back office I went.  I think it's the

14:19:01 2    owner's daughter.

14:19:02 3    Q.      An office person?

14:19:03 4    A.      Yes.

14:19:03 5    Q.      And you told them what had happened?

14:19:06 6    A.      Yes.

14:19:06 7    Q.      Do you remember what you told them?

14:19:08 8    A.      I told her what happened, because at first I think I

14:19:12 9    was trying to see if they had any -- if you know, like did

14:19:16 10   you guys take the trash out that quickly, and do you have

14:19:20 11   some cameras that we could look at and then she was looking

14:19:24 12   for that, and then we saw we couldn't figure it out, I said

14:19:29 13   that Hunter told me to file a police report, and you know,

14:19:35 14   she said let's -- do you want me -- you know, we did it

14:19:38 15   together in her office.

14:19:39 16   Q.      Meaning you called the police?

14:19:40 17   A.      We called the police and had them come out and we

14:19:43 18   filed a report on the missing gun.

14:19:45 19   Q.      In terms of a minute by minute time sequence, you

14:19:48 20   went in the office and you spoke to the person you just

14:19:51 21   described?

14:19:51 22   A.      Correct.

14:19:52 23   Q.      Explained to her what happened, and then the two of

14:19:55 24   you, as you recall it, I don't know if both of you can dial.

14:19:58 25   A.      Yeah, she called on speaker, I was upset.

Hallie Biden - cross

14:20:01  1   Q.      I'm sure.  Who wouldn't be?

14:20:03  2   A.      Right.

14:20:03  3   Q.      So then you called the police, but she called on the

14:20:06  4   speaker phone?

14:20:07  5   A.      Correct.

14:20:07  6   Q.      Did you talk to the police at that point or just she

14:20:10  7   summoned them to come because there was an issue?

14:20:13  8   A.      Yeah, can you come here, we want to file a police

14:20:16  9   report, and yes.

14:20:16 10   Q.      On that phone call do you recall her or you saying

14:20:20 11   because I threw a gun out in a bag in the trash, or that

14:20:23 12   didn't happen until they came?

14:20:25 13   A.      I don't recall.

14:20:25 14   Q.      So do you remember how much later that happened that

14:20:29 15   they came?

14:20:30 16   A.      I don't recall.

14:20:32 17   Q.      But they did come?

14:20:33 18   A.      Yes.  I mean I sat there and waited.

14:20:36 19   Q.      And then in that period of time, that would be, if

14:20:40 20   you came back at 11:52, and he told you to please go in, and

14:20:45 21   maybe he didn't use the word please, to go have this report

14:20:49 22   done, then you have additional phone calls in this next

14:20:52 23   period of time.  You call him back at 11:59, if you'll look

14:20:59 24   at Row 74?

14:21:00 25   A.      Yes.

Hallie Biden - cross

14:21:01  1    Q.      And that one is 3 minutes and -- 3 minutes and

14:21:06  2    37 seconds.  Do you got that?

14:21:08  3    A.      Yes.

14:21:08  4    Q.      Now, in the sequence, were the police there yet?

14:21:15  5    A.      I don't know.

14:21:16  6    Q.      And then the next one -- by the way, when you were

14:21:19  7    calling him, you don't know where he is, I take it, or you

14:21:23  8    do at this point?

14:21:23  9    A.      He was at my house.

14:21:25 10    Q.      At this hour, are you sure?

14:21:28 11    A.      No, I don't, I don't know.

14:21:30 12    Q.      Before lunch you indicated that you did know his

14:21:33 13    intention was to drive to Washington D.C.?

14:21:35 14    A.      Well, that's what the text said.

14:21:37 15    Q.      Right.

14:21:38 16    A.      Right.

14:21:39 17    Q.      Okay.  Was it your understanding when he texted that

14:21:43 18    that could be a lie?

14:21:45 19    A.      I don't recall.

14:21:46 20    Q.      If you're at the store and you're calling him all

14:21:48 21    these times, you don't know where he is, do you, he's not at

14:21:52 22    your house at this period of time?

14:21:54 23    A.      At one point he was at my house, because when I

14:21:57 24    called -- when the police were there and I called and said

14:22:00 25    they want you to come over, he came over.

Hallie Biden - cross

14:22:03  1    Q.      20 minutes later?

14:22:04  2    A.      I don't know.

14:22:05  3    Q.      Well, the report of the police will indicate how

14:22:09  4    long?

14:22:09  5    A.      Yeah.

14:22:09  6    Q.      How far is your house from Janssen's?

14:22:12  7    A.      Two minutes.

14:22:14  8    Q.      So if when you called him and said that you need to

14:22:17  9    come back, if he was at your house, unless he decided to

14:22:22 10    delay for some period of time, that would have been two

14:22:26 11    minutes?

14:22:26 12    A.      If he left right away, yes.

14:22:29 13    Q.      But again, you're not at the house to know where he

14:22:32 14    was?

14:22:32 15    A.      Correct.

14:22:33 16    Q.      So now at the next period of time, 4 minutes later,

14:22:38 17    at 10/23/18 at 12:06, you call him again?

14:22:43 18    A.      Correct.

14:22:44 19    Q.      That's 1 minute and 12, do you see that?

14:22:47 20    A.      Yes.

14:22:47 21    Q.      And then without going through it laboriously, the

14:22:52 22    next four lines down the page are 12:14, 12:14, 12:15,

14:22:58 23    12:18, 12:23, correct?

14:23:01 24    A.      Correct.

14:23:01 25    Q.      And you're calling him each of those occasions and on

Hallie Biden - cross

14:23:06  1    12:27, if you look at Row 82, now you're talking to him for

14:23:12  2    four-and-a-half minutes; right?

14:23:14  3    A.      Yes.

14:23:16  4    Q.      And 15 minutes later, you call him and it's a 4

14:23:22  5    minute phone call; right?

14:23:24  6    A.      Correct.

14:23:25  7    Q.      So if you had already told him that the police were

14:23:29  8    there, or they want to speak to him, from the time that

14:23:32  9    happened, we're now, I don't know, at least 30 minutes from

14:23:38 10    that, if not more, and you keep calling him; right?

14:23:42 11    A.      Right.

14:23:43 12    Q.      Meaning he's not there yet?

14:23:45 13    A.      Right.  He didn't -- I didn't -- the police didn't

14:23:48 14    ask him to until like three quarters of the way for him to

14:23:52 15    come out there, so there was a lot of process.

14:23:55 16    Q.      Okay.  So what are these calls to him if you're still

14:23:59 17    in the process, that is lasting as many minutes as they're

14:24:03 18    lasting?

14:24:05 19    A.      I don't recall.

14:24:05 20    Q.      And then nevertheless, at some point he shows up and

14:24:09 21    your memory is is it's some time after you were talking to

14:24:14 22    the woman in the store and then the police came, sometime

14:24:17 23    after that?

14:24:17 24    A.      Correct.

14:24:17 25    Q.      And you can't place that from these calls?

Hallie Biden - cross

| | | |
|---|---|---|
| 14:24:20 | 1 | A.        Correct. |
| 14:24:20 | 2 | Q.        And so the next thing that happens, the police show |
| 14:24:23 | 3 | up, do you remember the names of the officers? |
| 14:24:25 | 4 | A.        I don't. |
| 14:24:26 | 5 | Q.        And did they talk to you? |
| 14:24:29 | 6 | A.        Yes. |
| 14:24:29 | 7 | Q.        Was the person from the store with you when you were |
| 14:24:32 | 8 | being talked to? |
| 14:24:32 | 9 | A.        Yes. |
| 14:24:33 | 10 | Q.        Was it in the office? |
| 14:24:34 | 11 | A.        In the office. |
| 14:24:35 | 12 | Q.        Okay.  So they asked you the questions they asked |
| 14:24:37 | 13 | you? |
| 14:24:38 | 14 | A.        Correct. |
| 14:24:38 | 15 | Q.        In the office? |
| 14:24:39 | 16 | A.        Correct. |
| 14:24:40 | 17 | Q.        With that person?  Okay.  That's right so far, I have |
| 14:24:44 | 18 | it right? |
| 14:24:44 | 19 | A.        Yes. |
| 14:24:44 | 20 | Q.        And then how long did that take? |
| 14:24:47 | 21 | A.        A long time, well it felt long. |
| 14:24:49 | 22 | Q.        Probably felt like an eternity. |
| 14:24:52 | 23 | A.        Yeah. |
| 14:24:52 | 24 | Q.        Just speaking here, you don't know -- |
| 14:24:54 | 25 | A.        I don't know. |

Hallie Biden - cross

14:24:55  1    Q.      Okay.  And was it one officer, or two, or do you
14:24:59  2    know?
14:24:59  3    A.      Two.
14:25:00  4    Q.      Was it two from the beginning, or one and then
14:25:03  5    another person came?
14:25:04  6    A.      I don't recall.
14:25:04  7    Q.      But by the time it was done, there were two?
14:25:07  8    A.      Yeah.
14:25:07  9    Q.      Were both of them taking notes or just one?
14:25:10 10    A.      I don't know who was taking notes.
14:25:11 11    Q.      Or if either of them were?
14:25:14 12    A.      Excuse me?
14:25:15 13    Q.      Or if either of them were?
14:25:17 14    A.      No, I don't recall note taking.
14:25:22 15    Q.      In that period of time, we saw a text, and that text
14:25:27 16    I think was the one where -- can you put up government
14:25:33 17    Exhibit 18.  Would you put up government Exhibit 18 and go
14:25:50 18    to Row 145, please.  If you look at 145, that is Row 145.
14:25:54 19    No, not that one.  I'm sorry.  Sorry.  You can pull that
14:26:00 20    down.
14:26:01 21            Would you put up government Exhibit 18 and go to
14:26:19 22    Row 144.  And you have read this before.  This is at 1:23
14:26:24 23    and you're texting him.
14:26:27 24    A.      Okay.
14:26:27 25    Q.      So if you remember the call exchanges that I asked

14:26:31  1   you about, they were 11:00, 11 and change, 12:00, all the

14:26:35  2   way until I asked you whether or not there is one on page 3

14:26:44  3   of the phone calls at 1:15.  Do you see Row 58?  Back on

14:26:55  4   Exhibit 17, page 3, Row 58.

14:27:09  5              MR. WISE:  Is that from the preceding day?

14:27:12  6              MR. LOWELL:  I'm sorry, I screwed that up again,

14:27:14  7   I'm back there.  Thank you for pointing that out.

14:27:18  8   BY MR. LOWELL:

14:27:18  9   Q.      Would you go to page 4, and look at Rows 84 and 85.

14:27:23 10   A.      Yes.

14:27:24 11   Q.      Do you see there is one at 12:55; correct?

14:27:28 12   A.      Correct.

14:27:29 13   Q.      And then one at 1:11.

14:27:32 14   A.      Correct.

14:27:33 15   Q.      The first one you call him, the second one he calls

14:27:36 16   you; right?

14:27:38 17   A.      Correct.

14:27:42 18   Q.      In Row 84, you're calling him.

14:27:46 19   A.      Yes.

14:27:46 20   Q.      And in 85, he's calling you.

14:27:48 21   A.      Yes.

14:27:49 22   Q.      And that's 15 minutes apart?

14:27:53 23   A.      Yes.

14:27:54 24   Q.      Okay.  But that last call is at 1:11 in the

14:27:57 25   afternoon, right?

14:27:58 1   A.      Yes.

14:27:58 2   Q.      And then this text, is your sending it to him ten

14:28:04 3   minutes later, 11-12 minutes later, do you see that one?

14:28:08 4   A.      Yes.

14:28:08 5   Q.      "Police coming to talk to me now, I'll take full

14:28:12 6   blame, I don't want to live like this anymore, this is too

14:28:15 7   much for me to handle."  You read that one before lunch.

14:28:19 8   You said you will a take full blame, because "blame" as I

14:28:21 9   understand it, you're the one who took the gun, put it in

14:28:25 10  the pouch, put it in the bag, put it in the trash, threw it

14:28:30 11  out, the gun is now missing, that's what you meant?

14:28:33 12  A.      Yes.

14:28:34 13  Q.      So we can at least know the police haven't arrived

14:28:37 14  yet because they say they're coming?

14:28:39 15  A.      Right.

14:28:47 16  Q.      I'm sorry, I said that, now can you please go back to

14:28:51 17  GX-18, and go to the right thereafter.  And that's the one

14:28:56 18  that you read in which Hunter says "the fucking FBI, it's

14:29:02 19  hard to believe" et cetera, and then it says at the end,

14:29:05 20  "who in their right mind would trust you to help them get

14:29:12 21  sober", do you see that?

14:29:13 22  A.      Yes.

14:29:15 23  Q.      "Me get sober", sorry, starting to wear glasses, it's

14:29:19 24  not working very well.  It says help me get sober, correct?

14:29:23 25  A.      Correct.

Hallie Biden - cross

14:29:24  1    Q.      When he, in prior text, you sometimes use the word

14:29:28  2    clean and sometimes the word sober, right?

14:29:30  3    A.      Correct.

14:29:31  4    Q.      And you testify that he's using alcohol in this

14:29:34  5    period of time?

14:29:35  6    A.      Yes.  Yes.

14:29:36  7    Q.      And so when he is saying to help me get sober, you

14:29:41  8    have no way of knowing whether when he uses that word he's

14:29:44  9    talking about alcohol, drugs, both, or whatever?

14:29:49 10    A.      Correct.

14:29:50 11    Q.      So now we've established that you got visited by the

14:29:53 12    police, you have given a statement or you have talked to

14:29:57 13    them and then Hunter shows up.  Were you there when he

14:30:01 14    showed up?

14:30:02 15    A.      Yes.

14:30:02 16    Q.      Did he come over to you and see how you were?  Were

14:30:07 17    you outside the office yet?

14:30:08 18    A.      No, I was still in the office with the -- but the

14:30:12 19    door, the back door was open, so he came up through the

14:30:15 20    back.

14:30:16 21    Q.      So he came through the back and he saw you?

14:30:18 22    A.      Yes.

14:30:19 23    Q.      Asked you how you were?

14:30:20 24    A.      I don't recall if he asked.

14:30:21 25    Q.      You don't know anything about what that exchange was?

Hallie Biden - cross

14:30:24  1  A.       Yeah, I don't recall.

14:30:25  2  Q.       And do you know then what happened next?  Did then

14:30:29  3  the police talk to him?

14:30:30  4  A.       The police talked to him, they went back out.

14:30:32  5  Q.       Together?

14:30:33  6  A.       Together, he walked with the police and I stayed in

14:30:36  7  there.

14:30:36  8  Q.       And how long was he with the police, do you remember?

14:30:39  9  A.       I don't recall.

14:30:41 10  Q.       But eventually he was done talking to them?

14:30:44 11  A.       Correct.

14:30:44 12  Q.       And at that point, both of you left after that all

14:30:49 13  occurred?

14:30:50 14  A.       Yeah.

14:30:51 15  Q.       Do you know how long that was between the time the

14:30:54 16  police came and spoke to you and spoke to him and then you

14:30:57 17  both left?

14:30:58 18  A.       I don't recall.

14:30:58 19  Q.       I know again it must feel like a week, but was it an

14:31:03 20  hour, two hours?

14:31:05 21  A.       I don't know.

14:31:05 22  Q.       I understand.  So then you went home?

14:31:08 23  A.       I believe so.

14:31:09 24  Q.       You don't remember where you went?  I'm sorry, I

14:31:12 25  didn't hear you?

Hallie Biden - cross

14:31:13  1    A.    I believe so.

14:31:14  2    Q.    No memory, this is a traumatic day and I'm not trying

14:31:19  3    to test your blow by blow unless I could give you something

14:31:23  4    that would help?

14:31:23  5    A.    Right.

14:31:24  6    Q.    Do you think you went home or do you think you went

14:31:26  7    someplace else?

14:31:27  8    A.    I mean, I would probably go home, but I just don't

14:31:32  9    recall driving and getting home.

14:31:34 10    Q.    Hunter didn't come back with you then?

14:31:36 11    A.    I don't recall.

14:31:37 12    Q.    So you don't know where he went?  All right.  So

14:31:41 13    that's on the 23rd.  And thereafter you guys started, poorly

14:31:48 14    phrased, Hunter and you started to continue to talk or text

14:31:54 15    or be communicating.  Yes?

14:31:57 16    A.    Yes.

14:31:57 17    Q.    And when you talked to the police, did you explain to

14:32:03 18    them, or did they ask you why it is that you were going into

14:32:08 19    his vehicle, his truck?

14:32:11 20    A.    I believe so, but I don't totally remember.

14:32:17 21    Q.    Okay.  And you would therefore not remember what you

14:32:21 22    told them at the time?

14:32:22 23    A.    I don't recall.

14:32:22 24    Q.    Did you tell them that you went in looking for drugs?

14:32:26 25    A.    I wouldn't have said that.

Hallie Biden - cross

14:32:27  1    Q.       I'm refreshing your recollection.  Did you tell them

14:32:30  2    you were looking for any evidence that he was with another

14:32:33  3    woman?

14:32:33  4    A.       Maybe, but I don't recall.

14:32:34  5    Q.       Again, ma'am, I'm sorry, I just need to make sure I

14:32:38  6    do know what you recall and what you don't.  On this issue,

14:32:41  7    you don't recall?

14:32:42  8    A.       I don't recall.

14:32:43  9    Q.       I can show you if you'll look at the exhibit in front

14:32:51 10    of you on the front of the book that's now put in front of

14:32:56 11    the book, it was 16, that should be right in front.  Let me

14:33:00 12    make sure it's where I want it to be.  Do you remember that

14:33:04 13    text back and forth?

14:33:06 14    A.       Yes.

14:33:07 15    Q.       Take a look at that.  Do you remember that then after

14:33:10 16    the incident with the gun on the 23rd --

14:33:12 17    A.       This is back to the 13th.

14:33:14 18    Q.       I know, but I'm going to a different page.

14:33:17 19    A.       What page?

14:33:19 20    Q.       I'll get there, I'm going to try to do this the right

14:33:23 21    way.  I'm asking you if you remember after the 23rd you're

14:33:26 22    in touch with him, by text or phone?

14:33:28 23    A.       Likely, yes.

14:33:29 24    Q.       But you don't know where he is on those days

14:33:32 25    necessarily?

Hallie Biden - cross

14:33:32  1  A.     I did not.

14:33:33  2  Q.     Did you reach out for him to come back to your house,

14:33:36  3  do you recall?

14:33:36  4  A.     I don't recall.

14:33:37  5  Q.     If you'll turn to Row 31 on that exhibit, just look

14:33:43  6  down.

14:33:50  7  A.     Yes.

14:33:54  8  Q.     I think I'm right about the row, let me check.  Yes,

14:34:02  9  if you look at Row 31?

14:34:04 10  A.     Yes.

14:34:04 11  Q.     Look at that.  And after you have read it to

14:34:08 12  yourself, would you look up and tell me whether it refreshes

14:34:11 13  your recollection as to whether or not you were reaching out

14:34:14 14  to come back?

14:34:14 15  A.     It doesn't recall a recollection.

14:34:16 16  Q.     But again, in this period of time, you're texting

14:34:19 17  him, right?

14:34:20 18  A.     Correct.

14:34:20 19  Q.     And you were texting him to the same place that this

14:34:24 20  morning I asked you about?

14:34:25 21  A.     Yes.

14:34:26 22  Q.     I mean his phone from your phone?

14:34:28 23  A.     Yes.

14:34:28 24  Q.     And you knew that at the time you were writing what

14:34:32 25  you were writing contemporaneously by texting him, this is

Hallie Biden - cross

14:34:36  1    not afterwards, this is at the time?

14:34:38  2    A.      Correct.

14:34:41  3              MR. LOWELL:  So with that I am going to ask to

14:34:43  4    read that line as I earlier did on other texts.

14:34:48  5              MR. WISE:  No objection, Your Honor.

14:34:49  6              THE COURT:  Excuse me?

14:34:51  7              MR. WISE:  No objection, Your Honor.

14:34:53  8    BY MR. LOWELL:

14:34:53  9    Q.      On October 27th of 2018 at 10:27, you write, "don't

14:34:58 10    come back to the house, obviously you have something in New

14:35:01 11    York more important to you than me."  Right?  That's what

14:35:06 12    that said?

14:35:07 13    A.      That's what that said.

14:35:08 14    Q.      So you were concerned that he was with somebody else?

14:35:12 15    A.      That's what that says, yes.

14:35:13 16    Q.      And that's on the 27th?  How would you characterize

14:35:18 17    at that point after the gun incident the nature of your

14:35:21 18    relationship with him, more tense, less tense, back to

14:35:25 19    normal?

14:35:26 20    A.      More tense.

14:35:28 21    Q.      Nevertheless, right after that, remember I asked you

14:35:32 22    before lunch whether Hunter came back from California, and

14:35:36 23    on that first day went with you to that facility that I

14:35:39 24    called, or I think it's named Caron?

14:35:42 25    A.      Yes.

Hallie Biden - cross

14:35:43  1   Q.      I think that's C-A-R-O-N?

14:35:45  2   A.      Correct.

14:35:46  3   Q.      At that period of time when you were still, or he was

14:35:49  4   doing check-ins or any rehabilitation, he went with you

14:35:53  5   again?

14:35:53  6   A.      I don't recall.

14:35:54  7   Q.      Do you recall going to either an AA, AA means

14:36:02  8   Alcoholics Anonymous, meeting later in the month right after

14:36:04  9   this event?

14:36:04 10   A.      I mean, I don't recall, but I was going every day.

14:36:09 11   Q.      And do you remember at the end of the month, he went

14:36:11 12   with you to one of them?

14:36:14 13   A.      I don't recall exactly.

14:36:16 14   Q.      Okay.  Again, to see if it refreshes your

14:36:23 15   recollection, if you'll look at Rows 39, 40, and 41.  Take a

14:36:34 16   look at that and tell me when you're done?

14:36:36 17           MR. WISE:  There is no 41.

14:36:38 18           THE WITNESS:  There is just 42.

14:36:39 19   BY MR. LOWELL:

14:36:40 20   Q.      Oh, I'm sorry, yes, I'm sorry.  I'm sorry, I did that

14:36:44 21   wrong, I just thought they were sequential.  39, 40 and 42.

14:36:50 22   Take a look and tell me when you have read that?

14:36:53 23   A.      Yes.

14:36:53 24   Q.      Does that refresh your recollection that you were at

14:36:55 25   a facility, facility is a bad word, doing what you said you

Hallie Biden - cross

14:37:00  1    were going every day?

14:37:01  2    A.      Yes.

14:37:01  3    Q.      Does that refresh your recollection that he joined

14:37:03  4    you there?

14:37:04  5    A.      I mean, I don't recall all this, but that's what that

14:37:07  6    says.

14:37:07  7    Q.      If you don't recall it, that's fine, again, I'm just

14:37:10  8    going to go through.

14:37:11  9    A.      Yes.

14:37:11 10    Q.      I'm sorry, this is the text you sent?

14:37:13 11            MR. WISE:   I'm going to object, Your Honor, this

14:37:16 12    doesn't actually reflect an AA meeting.

14:37:20 13    BY MR. LOWELL:

14:37:20 14    Q.      Did he at the end of the month -- I?

14:37:23 15            MR. LOWELL:   I withdraw the question and I'll do

14:37:24 16    it again.

14:37:25 17    BY MR. LOWELL:

14:37:26 18    Q.      You're not disputing with me that he would go with

14:37:29 19    you to such a meeting at the end of the month?

14:37:30 20    A.      I don't recall.

14:37:31 21    Q.      One way or the other, no recall at all?

14:37:35 22    A.      Right.

14:37:35 23    Q.      There are some things you remember and many things

14:37:37 24    you don't?

14:37:38 25    A.      I don't recall him coming to an AA meeting with me.

Hallie Biden - cross

14:37:41 1   Q.      And looking at this set of texts doesn't refresh your

14:37:45 2   recollection about that?

14:37:45 3   A.      It does not.

14:37:46 4   Q.      Later in November, this is at the end of the month,

14:37:49 5   you were shown some other texts, one of which he is telling

14:37:53 6   you on the 3rd, looking at himself, he says "I'm a drunk,

14:37:57 7   I'm an addict, I've ruined every relationship I have ever

14:38:02 8   been in", you were asked questions about that, right?

14:38:04 9   A.      Yes.

14:38:04 10  Q.      When you go to an Alcoholics Anonymous meeting, is it

14:38:08 11  typical for the meeting to start with saying "hi, I'm Hunter

14:38:12 12  Biden, and I'm an alcoholic" or "I'm an addict"?

14:38:16 13  A.      Yes.

14:38:17 14  Q.      You understand, have you ever had to say that, not

14:38:20 15  had to, do you ever say that?

14:38:21 16  A.      Yes, I do.

14:38:22 17  Q.      At the time you say that, that doesn't mean you're an

14:38:25 18  addict other than in the sense that you're always an addict?

14:38:28 19  A.      Correct.

14:38:29 20  Q.      And then at some point at the beginning of November,

14:38:32 21  you had a text where he said that and then you know that he

14:38:35 22  then in November, after the gun incident, went to a

14:38:38 23  different kind of treatment; correct?

14:38:41 24  A.      Correct.

14:38:41 25  Q.      In Massachusetts?

Hallie Biden - cross

14:38:42  1    A.    Yes.

14:38:42  2    Q.    And that was in November?

14:38:46  3    A.    Yes.

14:38:47  4    Q.    That was a month after the gun sale?

14:38:49  5    A.    Yes.

14:38:49  6    Q.    Weeks after the event with the police investigating

14:38:54  7    and talking to him?

14:38:55  8    A.    I don't know that.

14:38:57  9    Q.    In November, you know it was in November?

14:39:00 10    A.    What was in November?

14:39:01 11    Q.    That he went to Massachusetts?

14:39:03 12    A.    No, I thought you meant the police, and you said --

14:39:05 13    Q.    The police talking to you on October 23rd?

14:39:08 14    A.    Yeah, I'm sorry.

14:39:09 15    Q.    I'm sorry, again, bad question.  October 23rd and

14:39:12 16    then weeks later he's up going to Massachusetts?

14:39:15 17    A.    Yes.

14:39:15 18    Q.    And indeed you drove him?

14:39:18 19    A.    Yes.

14:39:18 20    Q.    That you remember; right?

14:39:21 21    A.    I do remember the drive.

14:39:23 22    Q.    Okay.  So he and you were still working together at

14:39:27 23    least in terms of trying to help him?

14:39:28 24    A.    Yes.

14:39:28 25    Q.    And you do remember he was attending some meetings

Hallie Biden - cross

14:39:32  1   with you even if you can't say that's one of them?

14:39:34  2   A.      Correct.

14:39:35  3   Q.      You drove him up, right?

14:39:36  4   A.      Yes.

14:39:36  5   Q.      And then you didn't see him for a bit I take it after

14:39:40  6   that?

14:39:41  7   A.      Correct.

14:39:41  8   Q.      So lastly, between October the 6th and October

14:39:48  9   the 12th, you don't know that you ever saw him in that

14:39:51 10   six-day period; right?

14:39:52 11   A.      Correct.

14:39:52 12   Q.      You don't know if he was drinking, using, or either

14:39:56 13   of the above?

14:39:57 14   A.      I don't know.

14:39:58 15   Q.      And between the 12th and the 23rd, when the gun

14:40:02 16   incident occurred, you did not see him do drugs or even

14:40:05 17   alcohol in that period of time, did you?

14:40:07 18   A.      Correct.

14:40:07 19   Q.      And then afterward back in November is when he's

14:40:11 20   checking himself back in to rehab in Massachusetts?

14:40:14 21   A.      Yes.

14:40:15 22           MR. LOWELL:  Sorry I took so long.  That's all

14:40:17 23   the questions I have.

14:40:19 24           THE COURT:  Thank you.

14:40:19 25           Mr. Wise, redirect.

Hallie Biden - redirect

14:40:22  1           MR. WISE:  Thank you, Your Honor.

14:40:23  2                 REDIRECT EXAMINATION

14:40:25  3    BY MR. WISE:

14:40:35  4    Q.    I just have a few questions, Ms. Biden.  The first is

14:40:39  5    were you married just this past weekend, recently?

14:40:42  6    A.    Yes.

14:40:43  7    Q.    And is your husband in the audience?

14:40:45  8    A.    Yes.

14:40:46  9    Q.    And at the breaks have you been looking at him and

14:40:49 10    him looking at you?

14:40:50 11    A.    Yes.

14:40:50 12    Q.    Has any of that had anything to do with your -- the

14:40:54 13    substance of your testimony?

14:40:55 14    A.    No, just support.

14:40:57 15    Q.    Now, Mr. Lowell asked you, he asked you about some

14:41:01 16    phone records, I want to briefly touch on that.  He asked

14:41:04 17    you whether you had a call on the morning of the 23rd at

14:41:08 18    9:51 with Mr. Biden, that he didn't answer, the defendant,

14:41:13 19    that he didn't answer.  Do you remember that, do you

14:41:15 20    remember him asking that?

14:41:16 21    A.    I'm getting awfully confused now with the phone calls

14:41:20 22    and I don't have a picture in front of me.

14:41:22 23           THE COURT:  Slow down.

14:41:24 24    BY MR. WISE:

14:41:24 25    Q.    I think Mr. Lowell asked you, he had you look at some

Hallie Biden - redirect

14:41:27 1  phone records, which was Defense Exhibit 17, which I think

14:41:30 2  is still -- in his book?

14:41:33 3          Yeah, it should be still up there.

14:41:35 4  A.      Uh-huh.  And the --

14:41:37 5  Q.      Go to the first one in a second, but just to be

14:41:41 6  clear, you saw the defendant, as you testified on direct,

14:41:45 7  either late in the evening on the 22nd or in the middle of

14:41:48 8  the night or that morning on the 23rd, right?

14:41:51 9  A.      Yeah.

14:41:52 10 Q.      And I think you used the phrase, if he came in in the

14:41:55 11 middle of the night, came into bed in the middle of the

14:41:59 12 night or the next morning, you put eyes on him?

14:42:02 13 A.      Yes.

14:42:02 14 Q.      That's when you testified that he looked exhausted,

14:42:05 15 you weren't sure if he had been using drugs, right?

14:42:08 16 A.      Correct.

14:42:08 17 Q.      And that's why you went and searched the car; right?

14:42:11 18 A.      Correct.

14:42:12 19 Q.      Based on your observations of him?

14:42:14 20 A.      Yes.

14:42:16 21 Q.      At some point that morning, he left your house;

14:42:20 22 right?

14:42:21 23 A.      Yes.

14:42:21 24 Q.      And you don't remember when?

14:42:23 25 A.      Correct.

Hallie Biden - redirect

14:42:23  1    Q.      And if you look at 17, defense 17 on page 3,

14:42:29  2    Mr. Lowell asked you about a phone call.  This is line 68.

14:42:35  3    The earliest phone call in this string is 9:51 a.m., right?

14:42:40  4    A.      Yes.

14:42:40  5    Q.      So if you come in the middle of the night or early in

14:42:43  6    the morning, this call would have been long after that,

14:42:46  7    right?

14:42:47  8            MR. LOWELL:  It depends on when in the early

14:42:49  9    morning you're talking about, judge, right?  Object to the

14:42:51  10   way he characterizes it, he's leading her.

14:42:55  11           MR. WISE:  I'm sorry, let me do that again.

14:42:57  12           MR. LOWELL:  Objection, leading.

14:42:58  13           THE COURT:  Okay.  Do you want to ask it in an

14:43:01  14   un-leading way?

14:43:02  15           MR. WISE:  Sure.

14:43:03  16   BY MR. WISE:

14:43:03  17   Q.      Did he come to your house?

14:43:05  18   A.      Yes.

14:43:05  19   Q.      Do you remember when?

14:43:08  20   A.      I don't.

14:43:10  21   Q.      Was it the middle of the night?

14:43:13  22   A.      I don't know.

14:43:15  23   Q.      Or the early morning?

14:43:16  24   A.      Could have been the early morning.

14:43:18  25   Q.      But you saw him at some point either middle of the

Hallie Biden - redirect

14:43:23 1    night or early morning?

14:43:24 2    A.      Yeah.

14:43:25 3              MR. LOWELL:  Objection, four times.

14:43:26 4              THE COURT:  Did you -- ask it in an open ended

14:43:30 5    way.

14:43:31 6              MR. LOWELL:  That's the fourth time he's asked

14:43:33 7    the same question.

14:43:33 8              THE COURT:  I think he's trying.

14:43:35 9              MR. LOWELL:  I understand, all right, just

14:43:37 10   leading.

14:43:37 11   BY MR. WISE:

14:43:38 12   Q.      Did you see him that morning?

14:43:39 13   A.      Yes.

14:43:39 14   Q.      At some point, you left, right?

14:43:42 15   A.      Correct.

14:43:43 16   Q.      And at some point he left?

14:43:45 17   A.      Correct.

14:43:45 18   Q.      And at some point you talked on the phone?

14:43:48 19   A.      Correct.

14:43:49 20   Q.      And the earliest phone call that Mr. Lowell asked you

14:43:54 21   about was defense 17, line 68, was 9:51 a.m.; right?

14:44:01 22   A.      Correct.

14:44:03 23   Q.      That's not in the middle of the night, right?

14:44:06 24   A.      Correct.

14:44:06 25   Q.      And that's not early in the morning?

Hallie Biden - redirect

14:44:08  1    A.      Correct.

14:44:08  2    Q.      And then he asked you about some text messages, the

14:44:11  3    first one was the one that referenced Uber, and this is

14:44:17  4    defense 16.  And the time, do you have that, 16?  Defense

14:44:29  5    16, it should be the one right before it.

14:44:41  6    A.      At what time now?

14:44:43  7    Q.      Line 20?

14:44:44  8    A.      Yes.

14:44:44  9    Q.      And that text he read into the record was even later,

14:44:49 10    that's 10:23 a.m.; right?

14:44:51 11    A.      Right.

14:44:52 12    Q.      Again, not the middle of the night; right?

14:44:55 13    A.      Right.

14:44:55 14    Q.      Not early in the morning?

14:44:57 15    A.      Correct.

14:44:58 16    Q.      Now he asked you about AA meetings, right?

14:45:08 17    A.      Yes.

14:45:08 18    Q.      And he said when people go to these meetings, they

14:45:12 19    introduce themselves and they say their name and they say

14:45:15 20    I'm an addict; right?

14:45:18 21    A.      Or an alcoholic, yes.

14:45:19 22    Q.      Or an alcoholic.  In your experience, why would they

14:45:23 23    say that?

14:45:25 24    A.      Because that's what you say -- I mean, because you

14:45:32 25    believe that's what you are.  But -- but I go to AA, which

Marley - direct

14:45:38  1    is alcoholics anonymous, even though, you know, my addiction

14:45:43  2    was drugs.  So I just like it better.  So you can, you know,

14:45:48  3    use it in all different ways.

14:45:50  4    Q.      Sure.  But you say it because you mean it, right?

14:45:55  5    A.      Correct.

14:45:55  6              MR. WISE:  Thank you.  Nothing further.

14:45:57  7              THE COURT:  All right.  Thank you.

14:46:27  8              THE COURT:  All right.  What's next?

14:46:29  9              MR. HINES:  Your Honor, the United States calls

14:46:33 10    Joshua Marley.

14:46:36 11              COURTROOM DEPUTY:  Please raise your right hand.

14:46:41 12    Please state and spell your full name for the record.

14:46:45 13              THE WITNESS:  Joshua Marley.  J-O-S-H-U-A,

14:46:55 14    M-A-R-L-E-Y.

14:46:56 15              JOSHUA MARLEY, having been duly sworn was

14:47:00 16    examined and testified as follows:

14:47:04 17                      DIRECT EXAMINATION

14:47:05 18    BY MR. HINES:

14:47:13 19    Q.      Good afternoon, sir.

14:47:14 20    A.      Good afternoon.

14:47:14 21    Q.      What do you do for a living?

14:47:16 22    A.      I'm a State Trooper for State of Delaware.

14:47:19 23    Q.      How long have you been a State Trooper for the

14:47:22 24    Delaware State Police?

14:47:23 25    A.      Approximately 15 years.

Marley - direct

14:47:24  1    Q.      And what is your current title?

14:47:26  2    A.      I am a master corporal with uniformed patrol division

14:47:31  3    troop 9.

14:47:32  4    Q.      Can you describe for us your training and experience

14:47:36  5    over the years?

14:47:36  6    A.      Sure.  The academy lasts six months, it's a live-in

14:47:40  7    academy, it's three months to the road with a seasoned

14:47:42  8    officer, and then ongoing education throughout the life span

14:47:47  9    of the career.

14:47:48 10    Q.      Are you familiar with Janssen's Market in the suburbs

14:47:53 11    of Wilmington here?

14:47:54 12    A.      Yes.

14:47:54 13    Q.      Where is Janssen's Market located?

14:47:57 14    A.      It's on Route 52 in Greenville.

14:48:00 15    Q.      Do you get many calls to that location?

14:48:02 16    A.      Rarely, Greenville is a pretty quiet neighborhood.

14:48:06 17    Q.      Did you respond to an incident at Janssen's Market on

14:48:09 18    October 23rd, 2018?

14:48:11 19    A.      I did.

14:48:11 20    Q.      Were you on patrol that day?

14:48:14 21    A.      Correct.

14:48:14 22    Q.      What was the incident you responded to on

14:48:17 23    October 23rd, 2018?

14:48:18 24    A.      A stolen handgun.

14:48:20 25    Q.      Did you go to the Janssen's Market?

14:48:22  1    A.      Yes.

14:48:23  2    Q.      What did do you when you arrived?

14:48:25  3    A.      I viewed video in reference to the handgun being

14:48:30  4    disposed of in a trash can on the east side of the exterior

14:48:33  5    and then searched the trash cans.

14:48:37  6    Q.      So had you been advised that a handgun was missing

14:48:41  7    and was in a trash can?

14:48:42  8    A.      Yes.

14:48:43  9    Q.      Is that why you began looking at the video

14:48:45 10    surveillance?

14:48:46 11    A.      Yes.

14:48:46 12    Q.      Ultimately, were you able -- did you take any steps

14:48:50 13    to look for the handgun?

14:48:51 14    A.      Yes, we emptied the trash cans.

14:48:53 15    Q.      Around the exterior?

14:48:54 16    A.      Yes, on the -- yeah.

14:48:56 17    Q.      How long did that take?

14:48:58 18    A.      Maybe 10 or 15 minutes.

14:49:01 19    Q.      Were there any other officers there with you that

14:49:05 20    day?

14:49:05 21    A.      Yes, Sergeant Clemons.

14:49:06 22    Q.      Did Hunter Biden arrive at the Janssen's Market at

14:49:11 23    some point in time later that day?

14:49:13 24    A.      Yes.

14:49:13 25    Q.      Was he interviewed in your presence, and did you

Marley - direct

14:49:16  1    participate in an interview with him?

14:49:18  2    A.    He was interviewed in my presence, I don't know if I

14:49:21  3    participated much.

14:49:22  4    Q.    How far away were you standing from him during the

14:49:25  5    course of this interview?

14:49:26  6    A.    If I recall correctly, just a couple of feet.

14:49:29  7    Q.    Who else was with you?

14:49:30  8    A.    Sergeant Clemons.

14:49:31  9    Q.    Was Sergeant Clemons asking the questions and you

14:49:34 10    were sort of recording the answers?

14:49:36 11    A.    Correct.

14:49:36 12    Q.    When you interviewed Hunter Biden, were you looking

14:49:39 13    for the missing gun?

14:49:41 14    A.    Yes, I think at that point, the gun, we couldn't find

14:49:45 15    the gun in the trash can.

14:49:47 16    Q.    Was it a voluntary interview in the sense that Hunter

14:49:51 17    Biden was not under arrest, he was there, he was free to

14:49:53 18    leave if he wanted to?

14:49:54 19    A.    Correct, I believed he was the victim the entire

14:49:57 20    time.

14:49:57 21    Q.    Do you believe he was the victim because his handgun

14:50:00 22    had been stolen, or was that at least the investigation at

14:50:03 23    that time?

14:50:03 24    A.    Yes.

14:50:04 25    Q.    And is that how it was reported at least?

Marley - direct

14:50:06  1    A.      Yes, that the gun was removed from his vehicle.

14:50:10  2    Q.      Did Hunter Biden say anything about who owned the gun

14:50:13  3    that was missing?

14:50:14  4    A.      Yeah, he said he had purchased the gun on either the

14:50:17  5    12th or the 13th from StarQuest Shooter.

14:50:20  6    Q.      Hunter Biden had said he himself had purchased the

14:50:23  7    gun?

14:50:24  8    A.      Yes.

14:50:24  9    Q.      Did he say anything about how he discovered the gun

14:50:27 10    was missing?

14:50:28 11    A.      I believe he just went into his vehicle and found it

14:50:32 12    was missing from the center console.

14:50:34 13    Q.      Did he say that?

14:50:34 14    A.      I think so.

14:50:35 15    Q.      Did you prepare a report?

14:50:36 16    A.      Yes.

14:50:37 17    Q.      Would that be reflected in your report, if he had

14:50:42 18    said it?

14:50:42 19    A.      Yes.

14:50:43 20    Q.      Would it refresh your recollection to see that

14:50:45 21    report?

14:50:45 22    A.      Sure, yeah.

14:50:54 23              MR. HINES:  May I approach, Your Honor?

14:50:56 24              THE COURT:  You may.

14:51:03 25    BY MR. HINES:

Marley - direct

14:51:04  1  Q.      Could you read that second sentence there, starting

14:51:07  2  with that word?

14:51:10  3  A.      To be advised --

14:51:12  4  Q.      No, just read it to yourself?

14:51:14  5  A.      I'm sorry, okay.

14:51:16  6  Q.      Does that refresh your recollection as to whether or

14:51:20  7  not Hunter Biden said where he had -- his gun had been?

14:51:25  8  A.      Yes.

14:51:25  9  Q.      What did he say?

14:51:26  10  A.      That it was missing from the center console of the

14:51:28  11  vehicle.

14:51:32  12  Q.      He indicated where he had purchased the gun?

14:51:37  13  A.      Yes.

14:51:37  14  Q.      What was the location where he had purchased it?

14:51:39  15  A.      The StarQuest Shooters gun shop on Concord Pike.

14:51:43  16  Q.      What did you do next in the course of your

14:51:46  17  investigation?

14:51:46  18  A.      I responded there to recover the serial number,

14:51:48  19  because Mr. Biden was not sure of what that was.

14:51:51  20  Q.      Before you had left, had you asked Mr. Biden what the

14:51:55  21  serial number was?

14:51:55  22  A.      I think Sergeant Clemons did.

14:51:57  23  Q.      Did he answer that he didn't know?

14:51:59  24  A.      That he didn't know.

14:52:00  25  Q.      Did he say anything about a case for the weapon?

Marley - cross

14:52:03  1    A.      That I think in my report it says that he wasn't

14:52:08  2    quite sure where the case was, and it wasn't with him at the

14:52:10  3    time, it was important that we got that serial number and

14:52:13  4    entered the gun as stolen in the NCIC in a timely fashion.

14:52:18  5    Q.      Ultimately, did you go to StarQuest and confirm what

14:52:21  6    that serial number was?

14:52:23  7    A.      No.

14:52:23  8    Q.      Did you write a report that day reflecting the events

14:52:27  9    of that day?

14:52:27 10    A.      Yes.

14:52:28 11    Q.      And then is it your understanding that Lieutenant

14:52:32 12    Millard Greer was assigned to follow-up on your report after

14:52:35 13    October 23rd, 2018?

14:52:36 14    A.      Correct.

14:52:41 15              MR. HINES:  No further questions.

14:52:43 16              THE COURT:  Mr. Lowell.

14:52:44 17              MR. LOWELL:  Yes, ma'am.

14:52:46 18                  CROSS-EXAMINATION

14:52:46 19    BY MR. LOWELL:

14:52:47 20    Q.      Good afternoon.

14:52:48 21    A.      Sir.

14:52:49 22    Q.      My name is Abbe Lowell, I'm one of Mr. Biden's

14:52:53 23    attorneys.

14:52:53 24              In the sequence of events, did you arrive at

14:52:58 25    Janssen's first or did Sergeant Clemons?

Marley - cross

14:53:02  1    A.       Sergeant Clemons.

14:53:03  2    Q.       How soon after he arrived did you arrive?

14:53:06  3    A.       I'm not sure.

14:53:08  4    Q.       Momentarily or could it have been some minutes?

14:53:11  5    A.       Probably some minutes.

14:53:12  6    Q.       Was he already in the office of the store talking to

14:53:17  7    Ms. Biden when you arrived?

14:53:18  8    A.       I'm not sure.

14:53:20  9    Q.       Okay.  But at some point did you also go into that

14:53:23 10    office?  You said that you saw him, him being Mr. Clemons?

14:53:28 11    A.       I spoke with Mr. Clemons, or Sergeant Clemons

14:53:32 12    outside, and I know I viewed the video, but I'm not sure if

14:53:35 13    I was ever in the office with anyone else at the same time.

14:53:38 14    Q.       So if there is any part of the police report about

14:53:44 15    the questions asked, like the ones that Mr. Hines just asked

14:53:48 16    you about what Mr. Biden said, that's not in your earshot

14:53:53 17    because you're outside and it's Mr. Clemons doing this, is

14:53:58 18    that right?

14:53:58 19    A.       Correct.  I was outside by the loading docks.

14:54:01 20    Q.       Right.

14:54:02 21    A.       But if there was --

14:54:04 22    Q.       Sorry go ahead?

14:54:05 23    A.       If there was something inside, I probably wasn't

14:54:08 24    there.

14:54:08 25    Q.       So anything that Ms. Biden said, you weren't there to

Marley - cross

14:54:13  1  hear?

14:54:13  2  A.      Correct.  I never -- I don't think I ever even saw

14:54:16  3  Ms. Biden.

14:54:17  4  Q.      And your arrival, did that come before, at the same

14:54:21  5  time or after Hunter arrived?

14:54:23  6  A.      I think I was there before.

14:54:25  7  Q.      You're not sure?

14:54:26  8  A.      I'm not sure.

14:54:28  9  Q.      And you have no idea where he came from?

14:54:30 10  A.      Like previous to the market?

14:54:32 11  Q.      Right.  Before the moment he arrives at Janssen's, do

14:54:36 12  you know where he was?

14:54:37 13  A.      No.

14:54:37 14  Q.      Do you know how long it took to get him there?

14:54:40 15  A.      No.

14:54:41 16  Q.      At some point you said that I think you were seeking,

14:54:44 17  of course, to get the serial number, to see if it was in the

14:54:48 18  system?

14:54:48 19  A.      Getting the serial number so we could enter it into

14:54:52 20  the system as stolen.

14:54:53 21  Q.      To enter it as stolen?

14:54:55 22  A.      Correct, with it being stolen by, we didn't know who

14:54:58 23  at that time, it was important to get it in as stolen before

14:55:02 24  it could be used in a crime.

14:55:04 25  Q.      Did you collaborate with Sergeant Clemons to write

Marley - cross

14:55:07  1    the police report that you were shown to refresh your

14:55:11  2    recollection?

14:55:11  3    A.      Collaborate as far as, I did my report and he also

14:55:17  4    wrote his report on his own.

14:55:18  5    Q.      Say that last part?

14:55:19  6    A.      He also did a report.

14:55:20  7    Q.      So if in the police report of that day at the bottom

14:55:24  8    of the page it has the name Sergeant Clemons, does that mean

14:55:27  9    what's on the page was his or it's something that you both

14:55:32 10    would have collaborated about, but he wrote it?

14:55:35 11    A.      I'm not --

14:55:37 12    Q.      Do you still have -- did you give him that?

14:55:42 13            MR. LOWELL:  May I approach?

14:55:43 14            THE COURT:  You may.

14:55:44 15            MR. LOWELL:  Thank you.

14:55:45 16    BY MR. LOWELL:

14:55:46 17    Q.      You were shown this to refresh your recollection.

14:55:48 18    Can you do that again for me?  Just take a look at that,

14:55:51 19    look down, I want you to see the bottom, I want you to see

14:55:55 20    where there are names, and tell us whether or not that

14:55:57 21    refreshes your recollection as to who is responsible for the

14:55:59 22    words on a page?

14:56:00 23    A.      So this one would be myself.

14:56:02 24    Q.      This one, meaning the front page?

14:56:05 25    A.      Correct.

Marley - cross

14:56:05  1   Q.      Now if you'll turn to the second page.

14:56:09  2   A.      Also myself.

14:56:11  3   Q.      Okay.  Third page?

14:56:12  4   A.      Still myself.

14:56:13  5   Q.      Now on the fourth page, if your report has again, as

14:56:17  6   I was asking, a name at the bottom, does that reflect what?

14:56:21  7   A.      That would be Sergeant Clemons.

14:56:23  8   Q.      That's not your writing, if he asked questions,

14:56:25  9   that's what is reflected in the report?

14:56:28 10   A.      Right.  So that would be his report.

14:56:31 11   Q.      Okay.  I understand.  Did you review what he wrote?

14:56:35 12   A.      No.

14:56:36 13   Q.      And whether he wrote this, it's all typed up in a

14:56:39 14   nice form.  That's not what was done on the scene, right?

14:56:43 15   A.      No, this would be later.

14:56:44 16   Q.      Later the day, later the next day, do you know when?

14:56:47 17   A.      We have three days to complete a report.  So I'm not

14:56:52 18   exactly sure.

14:56:53 19   Q.      Okay.  Before it becomes finalized, whatever that

14:56:57 20   means, do you read it?  The report?

14:57:01 21   A.      Before I submit it in for approval?

14:57:04 22   Q.      Yes.

14:57:05 23   A.      Yes, I read it.

14:57:06 24   Q.      At the point at which you did that for this form, had

14:57:09 25   Mr. Clemons already put his part in?

14:57:12  1    A.      I don't know.

14:57:13  2    Q.      But you see it in the report that it's a number of

14:57:16  3    pages, some his and some yours?

14:57:18  4    A.      Correct.  So it would be two separate reports under

14:57:22  5    the same number, so like a supplement.

14:57:24  6    Q.      So part could happen one time, and then the next part

14:57:28  7    happens another time, and at the end of the process it's one

14:57:31  8    report which has all the parts in it?

14:57:33  9    A.      Yes, if it's the same report number, yes, you could

14:57:36 10    do supplements at any given time, you know, a day later, a

14:57:40 11    month later if new evidence comes up or whatever.

14:57:43 12    Q.      Got it.  If there is something about what Ms. Biden

14:57:46 13    said, you weren't in her earshot, but it would be in the

14:57:50 14    report if Mr. Clemons took that interview?

14:57:52 15    A.      I would imagine.

14:57:53 16    Q.      Did you know, did you review what it was he wrote

14:57:57 17    down that she said?

14:57:58 18    A.      No.

14:57:58 19    Q.      And you have never looked at that?

14:58:00 20    A.      Not that I remember.

14:58:01 21    Q.      And the next thing that happened is after you were

14:58:05 22    there, Mr. Clemons was also the one, I'm going to use the

14:58:09 23    word interview, but asked questions of Mr. Biden?

14:58:12 24    A.      Yes.

14:58:13 25    Q.      And I think you were outside, but were you in

Marley - cross

14:58:16  1    earshot, did you say?

14:58:17  2    A.      Right, I think all three of us were outside.

14:58:20  3    Q.      Mr. Biden, Mr. Clemons and yourself?

14:58:23  4    A.      Yes.

14:58:24  5    Q.      And Ms. Biden was not there?

14:58:25  6    A.      Correct.  I don't really ever recall even seeing

14:58:29  7    here.

14:58:29  8    Q.      So he's interviewing Mr. Biden, you're not doing

14:58:34  9    that?

14:58:34 10    A.      Yes.

14:58:34 11    Q.      He would be responsible for putting down what you

14:58:38 12    were refreshed as to what Mr. Biden said?

14:58:39 13    A.      Yes.

14:58:40 14    Q.      When you were doing that, you were refreshed that he

14:58:43 15    admitted right away that he had been the one to buy the gun?

14:58:46 16    A.      Yes.

14:58:46 17    Q.      He told you where?

14:58:47 18    A.      Correct.

14:58:48 19    Q.      And he told you where he thought it was?

14:58:51 20    A.      Yes.

14:58:51 21    Q.      And then after that you were seeking the serial

14:58:55 22    number?

14:58:55 23    A.      Yes.

14:58:55 24    Q.      He didn't know that by heart I take it, right?

14:58:59 25    A.      Right.

Marley - cross

| | |
|---|---|
| 14:59:00 1 | Q. At some point, was it you or Mr. Clemons asked him if |
| 14:59:04 2 | he could go find the seal serial number for the box in which |
| 14:59:08 3 | it came, did you do that? |
| 14:59:09 4 | A. I did not. |
| 14:59:09 5 | Q. That would have been Mr. Clemons? |
| 14:59:11 6 | A. Yes. |
| 14:59:12 7 | Q. Were you there when he left to do that, or do you |
| 14:59:14 8 | know if he went to do that? |
| 14:59:15 9 | A. I don't know. I think I had left pretty quickly to |
| 14:59:19 10 | go try and attempt to get it on my own. |
| 14:59:21 11 | Q. So you went to StarQuest and you don't know whether, |
| 14:59:25 12 | or when Mr. Biden went wherever he went? |
| 14:59:27 13 | A. Right, I don't think I returned back to Janssen's. |
| 14:59:31 14 | Q. That was what I wanted to know if you went back, you |
| 14:59:34 15 | didn't? |
| 14:59:34 16 | A. No. |
| 14:59:35 17 | Q. You went to StarQuest? |
| 14:59:36 18 | A. Uh-huh. |
| 14:59:36 19 | Q. And when you went to StarQuest, you asked them if |
| 14:59:39 20 | they had a record for the sale? |
| 14:59:40 21 | A. Yes. |
| 14:59:40 22 | Q. And did you -- did they or did they just give you the |
| 14:59:44 23 | serial number which is what you were looking for? |
| 14:59:47 24 | A. I'm not sure if they gave me a register receipt or |
| 14:59:50 25 | they read it off the computer terminal and I copied it and |

Marley - cross

14:59:54  1    made the phone call and put it in NCIC.

14:59:57  2    Q.      Oh the report you made, there is no copy on of what

15:00:01  3    StarQuest gave you that day if they gave you anything?

15:00:03  4    A.      Okay.

15:00:04  5    Q.      I'm asking?

15:00:05  6    A.      Oh, yeah, if it's not.

15:00:06  7    Q.      If it's not there, it's not part of the report?

15:00:09  8    A.      Right.

15:00:09  9    Q.      You might have just asked for the serial number?

15:00:12 10    A.      Yes.

15:00:12 11    Q.      You didn't ask for an ATF Form 4473 on that day?

15:00:17 12    A.      No.

15:00:17 13    Q.      You just wanted the serial number?

15:00:19 14    A.      Exactly.

15:00:19 15    Q.      Were you involved after that, in getting the people

15:00:22 16    at StarQuest to send you the actual form that was filled out

15:00:25 17    by the gun buyer?

15:00:26 18    A.      No.

15:00:27 19    Q.      And then after you did that, after you went to

15:00:31 20    StarQuest you didn't go back, then your role in this would

15:00:35 21    then after, to then write your report?

15:00:36 22    A.      That was it.

15:00:37 23    Q.      And in that report, and in your dealings with

15:00:41 24    Mr. Biden, I think you said that he was listed as the victim

15:00:44 25    of a crime?

15:00:45  1    A.      Yes.

15:00:45  2    Q.      When you were there, did you hear him express

15:00:48  3    concerns about whether you were going to charge Ms. Biden?

15:00:51  4    A.      I don't remember.

15:00:52  5    Q.      But you called him a victim?

15:00:54  6    A.      Right.

15:00:55  7            MR. LOWELL:  That's all the questions I have.

15:00:57  8            THE COURT:  All right.  Redirect.

15:01:01  9            MR. HINES:  Just briefly

15:01:02 10                    REDIRECT EXAMINATION

15:01:02 11    BY MR. HINES:

15:01:03 12    Q.      There were a lot of questions about the reports and

15:01:05 13    who wrote them.  Corporal, just to be clear, the bottom of

15:01:10 14    the report clearly reflects who wrote the report, right?

15:01:13 15    A.      Yes.

15:01:13 16    Q.      And you wrote the first report in the sequence and

15:01:17 17    had nothing to do with the second report that Sergeant

15:01:20 18    Clemons wrote, right?

15:01:21 19    A.      Correct.

15:01:21 20            MR. HINES:  No further questions.

15:01:22 21            THE COURT:  Thank you.  Thank you, sir.  You're

15:01:25 22    excused.

15:01:26 23            Okay.  Should we take our afternoon break?

15:01:29 24            MR. HINES:  That would be fine, Your Honor.

15:01:31 25    Thank you.

15:01:31  1                THE COURT:  Let's take our afternoon break.

15:01:32  2     We'll come back in fifteen minutes.

15:01:34  3                COURTROOM DEPUTY:  All rise.

15:01:36  4                (Jury exiting the courtroom at 3:01 p.m.)

15:02:06  5                THE COURT:  All right.  Anything we need to talk

15:02:10  6     about?

15:02:11  7                MR. HINES:  No, Your Honor.

15:14:12  8                (A brief recess was taken.)

15:23:19  9                COURTROOM DEPUTY:  All rise.

15:23:20 10                THE COURT:  All right.  Bring in the jury.

15:23:28 11                (Jury entering the courtroom at 3:23 p.m.)

15:23:36 12                THE COURT:  All right.  Everyone, welcome back.

15:23:57 13     Everyone else may be seated.  Mr. Hines, what's next?

15:23:59 14                MR. HINES:  The United States calls Millard

15:24:02 15     Greer.

15:24:04 16                COURTROOM DEPUTY:  Please raise your right hand.

15:24:07 17     Please state and spell your full name for the record.

15:24:11 18                THE WITNESS:  Millard, M-I-L-L-A-R-D, middle

15:24:23 19     initial A, Greer, G-R-E-E-R.

15:24:26 20                MILLARD GREER, having been duly sworn, was

15:24:31 21     examined and testified as follows:

15:24:33 22                      DIRECT EXAMINATION

15:24:34 23     BY MR. HINES:

15:24:38 24     Q.     Good afternoon, sir.

15:24:39 25     A.     Good afternoon.

Greer - direct

15:24:40  1    Q.      Are you currently employed?

15:24:42  2    A.      Yes.

15:24:42  3    Q.      How are you currently employed?

15:24:44  4    A.      I'm a special investigator for the Delaware

15:24:48  5    Department of Justice.

15:24:48  6    Q.      How long have been a special investigator for the

15:24:51  7    Delaware Department of Justice?

15:24:53  8    A.      Just shy of three years.

15:24:55  9    Q.      What did you do prior to that?

15:24:56 10    A.      I worked for the Delaware State Police.

15:24:58 11    Q.      In what capacity?

15:25:00 12    A.      At retirement, I was a Lieutenant in the criminal

15:25:03 13    investigation unit for New Castle County.

15:25:04 14    Q.      How long were you a Delaware State Police Officer?

15:25:07 15    A.      Just shy of 25 years.

15:25:09 16    Q.      So Lieutenant was your last rank?

15:25:12 17    A.      Yes.

15:25:12 18    Q.      And what was your rank in 2018?

15:25:15 19    A.      Lieutenant.

15:25:16 20    Q.      I would like to direct your attention to October of

15:25:19 21    2018.  Were a signed to do follow-up investigative work

15:25:23 22    regarding an incident at Janssen's Market?

15:25:26 23    A.      Yes.

15:25:26 24    Q.      Who assigned you to that incident?

15:25:28 25    A.      My lead supervisor at the time was Captain Pete

Greer - direct

15:25:33  1    Sawyer.

15:25:33  2    Q.      When were you assigned to do investigative work?

15:25:36  3    A.      I believe that was the afternoon, evening of October

15:25:42  4    the 25th, 2018.

15:25:43  5    Q.      In connection with that follow-up investigation --

15:25:48  6    A.      24th, I believe that was the 24th.

15:25:50  7    Q.      So October 24th is your recollection?

15:25:52  8    A.      I believe -- is that a Thursday?

15:25:58  9    Q.      October 24th, 2018, is that what you believe the day

15:26:02 10    was?

15:26:02 11    A.      Yeah.  Yes.

15:26:03 12    Q.      Did you review video footage in connection with your

15:26:08 13    follow-up investigation?

15:26:08 14    A.      The following day, yes, the 25th I believe.  Friday.

15:26:14 15    I was assigned on a Thursday, on Friday I looked at the

15:26:17 16    video.

15:26:17 17    Q.      Tell us what steps you took to get that video footage

15:26:21 18    and what it showed and what you did with it?

15:26:24 19    A.      I responded up to Janssen's Market, initially I met

15:26:29 20    with Paul Janssen and reviewed the interior video footage.

15:26:35 21    I then met with the owner of the security company,

15:26:40 22    Addlestone Security, and went to a security room, and viewed

15:26:45 23    the video footage on their system.

15:26:48 24            Mr. -- the owner of that company then gave me a

15:26:54 25    U.S. B that contained all the video footage as did Ms.

Greer - direct

15:26:59 1    Janssen.  I went back to my office and reviewed it

15:27:03 2    extensively over the next few days.

15:27:05 3    Q.    Did some of those video show Hallie Biden arriving at

15:27:10 4    Janssen's Market, walking through Janssen's Market and

15:27:12 5    leaving Janssen's Market?

15:27:13 6    A.    It did.

15:27:14 7    Q.    The jury has already seen those.  Was there an

15:27:18 8    additional video that was of significance to the

15:27:20 9    investigation?

15:27:22 10   A.    Yes.

15:27:23 11   Q.    And what did that additional video show?

15:27:26 12   A.    There is exterior video that shows the -- an elderly

15:27:36 13   gentleman park a vehicle at the far end of the parking lot

15:27:40 14   and then begin to look through trash cans at the market.

15:27:47 15   Q.    And is that -- I'm going to show you in a moment, in

15:27:51 16   advance of your testimony today, did you look at

15:27:53 17   Government's Exhibit 39C, and review that video footage?

15:27:57 18   A.    I did.

15:27:58 19          MR. HINES:  With the Court's permission, I would

15:28:00 20   like to admit that exhibit and play it.

15:28:02 21          MR. LOWELL:  Without objection.

15:28:03 22          THE COURT:  All right.  Thank you.  It's

15:28:04 23   admitted.

15:28:05 24          (Exhibit No. 39C was admitted into evidence.)

15:28:07 25          MR. HINES:  Would you please play 39C, Ms. Vo.

Greer - direct

15:28:13 1                    (Video played.)

15:28:16 2     BY MR. HINES:

15:28:16 3     Q.      Does the video show the man that is approaching the

15:28:20 4     exterior trash can that you described a moment ago?

15:28:22 5     A.      It does.

15:28:22 6     Q.      Does it get cut off because there is sort of an

15:28:26 7     awning?

15:28:26 8     A.      It does.

15:28:27 9     Q.      Right here.  So the angle only shows kind of the

15:28:30 10    right side of the trash can?

15:28:32 11    A.      Correct.  He's currently at a trash can that's not

15:28:35 12    related to why we're here.  But he eventually makes his way

15:28:41 13    down.

15:28:41 14    Q.      All right.  So now at this time in the video, are we

15:28:46 15    seeing the man walk down to the trash can that is related to

15:28:49 16    this investigation?

15:28:50 17    A.      Yes.

15:28:50 18    Q.      Or in the vicinity of it?

15:28:53 19    A.      Yes.

15:28:54 20    Q.      Do you see him kind of bending over a head right

15:28:57 21    there, is that right?

15:28:58 22             MR. LOWELL:  I'm sorry, can you say that again?

15:29:01 23    BY MR. HINES:

15:29:01 24    Q.      Do you see a head right above the trash can that was

15:29:04 25    just bent over there a moment ago?

Greer - direct

15:29:06  1    A.      Yes.  To be honest I can't tell that it's a head, I

15:29:10  2    can tell that there is movement at that trash can.

15:29:13  3    Q.      All right.  So did you take any steps to try and

15:29:17  4    ascertain the identity of that man, that individual that

15:29:21  5    just walked toward that trash can?

15:29:23  6    A.      I did.

15:29:23  7    Q.      What steps did you try to take to ascertain his

15:29:27  8    identity?

15:29:27  9    A.      Interviewed a number of people at Janssen's Market

15:29:30 10    and at the Greenville Shopping Center and Greenville Center

15:29:35 11    Shopping Center next door, I think it's called.  There were

15:29:37 12    a lot of people familiar with, there was an elderly

15:29:41 13    gentleman that would routinely come and rummage the trash

15:29:44 14    cans for recyclables.  I eventually spoke to a maintenance

15:29:49 15    worker who had a first name of Ed for this subject.

15:29:53 16    However, that's all he could provide, he couldn't provide

15:29:56 17    any further name information or vehicle or anything of that

15:30:00 18    nature.

15:30:01 19            He did point me toward the Fidelity Investments

15:30:09 20    Office.

15:30:09 21    Q.      I didn't mean to cut you off, at some point in time

15:30:13 22    based on that information it was someone named Ed and the

15:30:16 23    location he was frequenting, did you begin to do some

15:30:19 24    surveillance to try to see this man looking for recyclables?

15:30:23 25    A.      I did, I did multiple days of surveillance.

Greer - direct

15:30:28  1    Eventually I did see him rummaging through trash cans.  I

15:30:35  2    actually received a phone call and was told that he was in

15:30:38  3    the area while I was there, so I was able to locate him.

15:30:43  4         I then watched him over the period of the next

15:30:47  5    15 minutes, I believe.  And then he approached a car, I

15:30:50  6    believe it was a Chevy Equinox, that was parked over near

15:30:54  7    Janssen's Market.  At that time I approached him.  I

15:30:57  8    identified myself as a Delaware State Trooper, and advised

15:31:02  9    him that I was there because somebody had placed something

15:31:05 10    in a trash can that shouldn't have been there.  His

15:31:08 11    immediate response was yes, they did.

15:31:10 12         I then asked him what might that be, he said a

15:31:15 13    .38 Special.  I then advised him that I immediately needed

15:31:19 14    that weapon, he says it's at my house.  I then took his ID

15:31:25 15    to make sure he didn't have any active warrants.  He

15:31:29 16    explained that he was a Navy veteran.  He was retired from

15:31:33 17    --

15:31:33 18         MR. LOWELL:  Objection, I was allowing the

15:31:35 19    context, now it's getting --

15:31:38 20         MR. HINES:  I'll move you forward a little bit,

15:31:41 21    Lieutenant Greer.  So after he indicated that he did have a

15:31:47 22    .38 Special, did he ultimately take you, with his consent,

15:31:50 23    to his residence to locate that firearm.

15:31:54 24         THE WITNESS:  He did.  Yes.

15:31:56 25    BY MR. HINES:

15:31:56  1    Q.        And you went there and did you retrieve any items?

15:32:01  2    A.        Yes.  We responded to ███████████████ in

15:32:06  3    Wilmington, Delaware, and he retrieved a black box from an

15:32:12  4    upstairs room, brought it down the steps, and presented it

15:32:17  5    to me.  He didn't present the box to me, he was holding it,

15:32:21  6    it had a number of socks in it.  He pulled a gun out of one

15:32:24  7    of the socks and handed it to me and it was a .38 Special.

15:32:29  8    Ultimately I was able to confirm the serial number of that

15:32:32  9    gun matched the serial number on the stolen -- theft of

15:32:36  10   firearm report taken by Trooper Marley.

15:32:39  11   Q.        And in that box, you said there was a .38 Special

15:32:44  12   revolver.  In advance of your testimony today, did you have

15:32:46  13   a chance to look at Government's Exhibit 1?

15:32:50  14   A.        Yes.

15:32:50  15   Q.        And is this -- is Government's Exhibit 1 the .38

15:32:54  16   Special revolver that Mr. Banner turned over to you?

15:32:57  17   A.        Yes.

15:32:57  18   Q.        Did you identify that based on the serial number

15:33:00  19   there?

15:33:00  20   A.        Yes.

15:33:00  21   Q.        How did he present the revolver to you, it was in the

15:33:04  22   sock you said?

15:33:04  23   A.        It was in a sock, yes.

15:33:06  24   Q.        And then in like a larger box?

15:33:08  25   A.        Yeah, a larger black box that I would describe as a

Greer - direct

15:33:13  1    shoe, it was a larger shoebox as maybe some high top

15:33:17  2    sneakers or boots came in it.

15:33:19  3    Q.      Is there anything else that he indicated that he

15:33:21  4    retrieved from the trash receptacle that day that he turned

15:33:25  5    over to you?

15:33:26  6    A.      Yes, he then handed me a leather pouch that contained

15:33:30  7    a number of other items, I believe some -- a tube of chap

15:33:38  8    stick, a speed loader, that holds bullets so you can load a

15:33:44  9    revolver at one time.  And a box of I believe it was Hornady

15:33:54 10    38-caliber ammunition.

15:33:59 11              MR. HINES:  May I approach, Your Honor?

15:34:00 12              THE COURT:  You may.

15:34:01 13    BY MR. HINES:

15:34:02 14    Q.      I'm showing you Government's Exhibit 4.  Is this the

15:34:05 15    leather pouch that you described?

15:34:07 16    A.      Yes.

15:34:07 17    Q.      And what is government Exhibit 3?

15:34:10 18    A.      That's the speed loader.

15:34:12 19    Q.      And I'm showing you Government's Exhibit 2, what is

15:34:16 20    2?

15:34:16 21    A.      That's the box of ammunition.

15:34:18 22    Q.      How were these items presented to you?

15:34:21 23    A.      As I recall, it was just kind of all cupped in his

15:34:25 24    hand and kind of handed it all over, these items were kind

15:34:29 25    of laying in the, cupped in the pouch.

Greer - direct

15:34:32 1   Q.      So this pouch was like sort of folded open?

15:34:36 2   A.      Yes.  Yes.  If I remember it's like a flap that goes

15:34:40 3   over and has a pocket inside of it, I believe.  And I think

15:34:44 4   everything was just laying in the center and it was just

15:34:46 5   opened.

15:34:47 6   Q.      So kind, he kind of presented it to you like this,

15:34:51 7   like altogether?

15:34:52 8   A.      Yes.

15:34:53 9   Q.      How many cartridges of ammunition were in the box

15:34:59 10  when he presented it to you?

15:35:02 11  A.      23.

15:35:03 12  Q.      So there were two missing from the 25 cartridge box?

15:35:07 13  A.      Yes.

15:35:07 14  Q.      Now, when you received those items, what did you do

15:35:14 15  with them?

15:35:16 16  A.      Well before I took it, I put latex gloves on, and I

15:35:24 17  placed them in an evidence bag that I put in my -- it wasn't

15:35:31 18  a patrol car, it was an administration car, put in my police

15:35:36 19  car and drove back to Troop 2, where it was later packaged

15:35:40 20  for storage for evidence.

15:35:42 21  Q.      When you say packaged and stored as evidence, did it

15:35:45 22  get placed in a Delaware State Police evidence vault?

15:35:48 23  A.      It did.

15:35:49 24  Q.      Is that where it remained for some period of time

15:35:52 25  thereafter?

Greer - direct

15:35:53  1   A.      Yes.   I turned it all over to the evidence Sergeant,

15:35:57  2   who placed it in the evidence area.  All that took place at

15:36:01  3   my office.

15:36:02  4   Q.      Before putting these items in, did you do anything to

15:36:06  5   examine the brown leather pouch closely, did you look at it

15:36:13  6   very closely?

15:36:14  7   A.      No.

15:36:15  8   Q.      At that time, what was the report you were

15:36:18  9   investigating?

15:36:19  10  A.      Theft of a firearm.

15:36:22  11  Q.      Did Mr. Banner indicate that all of these items, 1,

15:36:27  12  2, 3, and 4 had all come from that exterior trash can?

15:36:32  13  A.      He did.

15:36:35  14  Q.      Now, at that point of your investigation having

15:36:38  15  retrieved the missing items, did you reach out to the

15:36:41  16  defendant, Robert Hunter Biden?

15:36:44  17  A.      I did.

15:36:46  18  Q.      And did you end up communicating with Mr. Biden by

15:36:50  19  phone?

15:36:50  20  A.      I did.

15:36:51  21  Q.      Did Mr. Biden express anything about whether he

15:36:54  22  wanted to participate further in any investigation?

15:36:58  23  A.      He was the victim of a theft of a firearm, I advised

15:37:04  24  him that I was calling to see if he sought any prosecution

15:37:08  25  of the person who took that firearm and he did not.

15:37:12  1    Q.      Because Mr. Biden had declined further prosecution,

15:37:17  2    did you take any additional investigative steps at that

15:37:23  3    time?

15:37:23  4    A.      Investigative steps, no.

15:37:26  5    Q.      So did these items just get logged into evidence and

15:37:32  6    remain there until a federal investigation was underway and

15:37:37  7    agents retrieved these items for this case?

15:37:40  8    A.      Yes.  But I believe the firearm was probably sent

15:37:43  9    down to the forensic firearms services unit lab for a test

15:37:48 10    fire to -- for comparison to see if it came back for a match

15:37:54 11    in anything, what's known as the NIBIN system, a system that

15:37:59 12    identifies shell casings that has special markings so we

15:38:03 13    test fire all guns that we recover.

15:38:06 14    Q.      Was there any match in this case?

15:38:07 15    A.      I was not advised of any matches.

15:38:10 16    Q.      And there were two pieces of ammunition missing,

15:38:13 17    there was nothing in the system that suggested that those

15:38:16 18    had been linked to a known crime?

15:38:19 19    A.      No, if they were, that unit would have composed a

15:38:24 20    report and sent back to me and it would have been attached

15:38:27 21    to my report, and to the best of my knowledge, I never heard

15:38:31 22    anything back from them which indicates that it was not.

15:38:33 23    Q.      Did Mr. Banner also turnover an additional firearm to

15:38:37 24    you?

15:38:37 25    A.      He did.

Greer - direct

15:38:38  1   Q.       And what were the circumstances regarding that

15:38:41  2   additional firearm?

15:38:42  3   A.       Out of that same box he took out another sock and he

15:38:46  4   says you may want this as well, or something to that effect,

15:38:51  5   going on almost six years ago now.  But he handed over a

15:38:56  6   Sundance 25-caliber semiautomatic handgun, he advised that

15:39:02  7   it had been given to him by a coworker when he worked at

15:39:06  8   General Motors.

15:39:07  9          MR. LOWELL:  I'm sorry, objection to the hearsay

15:39:10 10   part of this, finish the sentence, finish that, but let's

15:39:13 11   not --

15:39:16 12          THE COURT:  So you can finish your sentence he

15:39:18 13   said, it's just talking about what someone told you is

15:39:23 14   different than saying what someone gave you or what you said

15:39:26 15   to someone, or what you understood, that's okay, it's what

15:39:31 16   they said.

15:39:31 17          MR. LOWELL:  He should finish the thought

15:39:33 18   because I interrupted him.

15:39:36 19          THE WITNESS:  I thought he did finish it.

15:39:39 20   BY MR. HINES:

15:39:40 21   Q.       Did you take that additional firearm?

15:39:42 22   A.       I did.

15:39:44 23   Q.       And why did you take it?

15:39:46 24   A.       For the same reason, I mean those are some very

15:39:49 25   suspicious circumstances there that we wanted to test fire

Greer - cross

15:39:53  1    that gun and make sure it wasn't related to another crime.

15:39:57  2    Q.      You said at this time you were investigating a theft

15:40:00  3    of a firearm, in this case, did investigators like you have

15:40:05  4    any iCloud messages or anything like that of the defendants

15:40:09  5    at that time?

15:40:09  6    A.      No.

15:40:10  7    Q.      This was in 2018, so had the defendant written a book

15:40:16  8    at that time indicating any drug activity to your knowledge?

15:40:19  9    A.      No.  I'm not sure when he wrote the book.  I wasn't

15:40:23 10    aware of a book in 2018, I'm pretty sure.

15:40:27 11    Q.      So based on the information known then, a separate

15:40:30 12    investigation of the defendant was not opened at that time

15:40:33 13    and at the state level, is that right?

15:40:36 14    A.      No.

15:40:38 15              MR. HINES:  No further questions, Your Honor.

15:40:39 16              THE COURT:  All right.  Thank you.  Cross-exam.

15:40:43 17                    CROSS-EXAMINATION

15:40:43 18    BY MR. LOWELL:

15:40:45 19    Q.      Good afternoon, Lieutenant Greer.  Is that in your

15:40:48 20    Delaware DOJ, what is your rank?

15:40:51 21    A.      I'm just an investigator there.

15:40:53 22    Q.      So I'll call you detective if that's okay?

15:40:57 23    A.      Millard would be just fine.

15:41:00 24    Q.      My name is Abbe Lowell, I'm one of the attorneys that

15:41:04 25    represents Hunter, okay?

999

Greer - cross

15:41:05  1   A.       Good afternoon, sir.

15:41:06  2   Q.       Good afternoon to you.  You were asked some questions

15:41:09  3   at the end, a few moments ago.  At the time of this incident

15:41:13  4   in 2018, I think you mentioned that it was being

15:41:15  5   investigated because Hunter was deemed to be the victim of a

15:41:20  6   gun theft; right?

15:41:21  7   A.       Yes, sir.

15:41:22  8   Q.       And that's what the report states, victim?

15:41:25  9   A.       Yes.

15:41:25 10   Q.       As I understand the sequence, when did you get

15:41:31 11   assigned to try to do what was needed in your investigation,

15:41:37 12   what day of October, can you recall that?

15:41:41 13   A.       The day after Marley took his report.

15:41:45 14   Q.       So if Marley took his report on the 23rd, that would

15:41:48 15   make it the 24th?

15:41:49 16   A.       Thank you, yes, the 24th.

15:41:50 17   Q.       You're welcome.

15:41:51 18            And so you're assigned and then the point is to

15:41:55 19   try to find the gun as I understand it?

15:41:57 20   A.       Yes.

15:41:57 21   Q.       And I think you said what you did, you went and

15:42:01 22   looked at the -- to find if there was surveillance video,

15:42:06 23   correct?

15:42:06 24   A.       Yes.  I was aware that there was surveillance video.

15:42:09 25   Q.       So you were looking to get it to review it?

Greer - cross

15:42:12  1    A.    Yes.

15:42:12  2    Q.    And I think you said the first time you did that was

15:42:15  3    where?  Was it at the store or at the security place?

15:42:18  4    A.    The first video I looked at was at the store, but

15:42:22  5    that was only interior.  There is two different systems, the

15:42:26  6    interior and the exterior.

15:42:27  7    Q.    Okay.  So which one did you see first, the interior

15:42:30  8    or the --

15:42:31  9    A.    Interior.

15:42:32 10    Q.    And anything of relevance did you see on the

15:42:36 11    interior?

15:42:37 12    A.    The reason I looked at the interior first is because

15:42:44 13    -- I was told that there was a person of interest who had

15:42:47 14    been seen carrying out something.  I don't know if I'm

15:42:52 15    getting into hearsay here or not.

15:42:54 16    Q.    No, you're not saying -- oh, you were told.  Were you

15:42:57 17    looking to see if it was evidence of who either put it in

15:43:00 18    the trash or took it out of the trash?

15:43:03 19    A.    Yeah, I was looking to see someone walking out with

15:43:06 20    something that was surrounded in some type of purple bag or

15:43:10 21    paper or tissue or something.  I can clear that up now if

15:43:14 22    you let me.

15:43:14 23    Q.    You can clear it up.  You obviously knew something

15:43:18 24    about a color being purple?

15:43:19 25    A.    Yes, the owners of the security company thought that

Greer - cross

15:43:22 1   the bag that it was placed into the trash can looked purple

15:43:26 2   to them.

15:43:27 3   Q.      Okay.  So you went -- you were looking at the

15:43:30 4   interior to see if you could find such a thing?

15:43:34 5   A.      Yes.

15:43:34 6   Q.      And you didn't see that in the interior?

15:43:36 7   A.      I saw the purple tissue that he was talking about.

15:43:40 8   Q.      Oh, that turned out not to be --

15:43:42 9   A.      Had nothing to do with this.

15:43:44 10  Q.      Understand.  The wrapping flowers?

15:43:47 11  A.      Yes.  They wrap every floral arrangement in purple

15:43:52 12  tissue paper.

15:43:52 13  Q.      Got it.  So you looked at that, and then the exterior

15:43:56 14  video was not there at that point or is it was?

15:43:59 15  A.      Janssen's does not have access to the exterior video,

15:44:04 16  only the security company does.  So I moved from inside

15:44:08 17  Janssen's Market, to an office that is in the rear of the

15:44:11 18  shopping center down underneath kind of like, in a basement

15:44:15 19  area where they had their Multiplex system set up for kind

15:44:21 20  of a command center for the security video.

15:44:23 21  Q.      And that's where you went?

15:44:24 22  A.      That's where I went, yes.

15:44:26 23  Q.      And that's where you saw the video?

15:44:28 24  A.      The first time, yes.

15:44:29 25  Q.      And then you got a USB?

Greer - cross

15:44:31  1    A.      Yes.

15:44:31  2    Q.      A thumb drive, right?

15:44:33  3    A.      Yes.

15:44:33  4    Q.      And you went back to your office to look at it and

15:44:36  5    review it again?

15:44:37  6    A.      Yes.

15:44:38  7    Q.      And I think that's where you were shown the actual

15:44:41  8    video.  I would like to put that back -- a moment ago you

15:44:46  9    were looking at it and identifying a video?

15:44:48 10    A.      Yes.

15:44:49 11    Q.      And that's government Exhibit 39C?

15:44:51 12    A.      Yes.

15:44:52 13    Q.      Would you put, Mr. Radic, 39C back up, please.

15:44:58 14            I want to run this again because of what

15:45:01 15    Mr. Hines and you discussed.  So in this video as it starts

15:45:05 16    you'll see a man wearing a purple shirt.  Stop there,

15:45:10 17    Mr. Radic.

15:45:11 18    A.      I think it's actually a blue jacket.

15:45:13 19    Q.      Blue purple, okay.  In that clip, that guy wasn't

15:45:18 20    carrying a bag, at this point you saw him walking with

15:45:21 21    nothing in his hand?

15:45:22 22    A.      Yes.

15:45:23 23    Q.      And then he goes into the interior, right?

15:45:26 24    A.      Yes.

15:45:26 25    Q.      And there is no camera of that?

Greer - cross

15:45:28   1    A.      Unfortunately there is not.

15:45:30   2    Q.      It would have made your job a lot easier than it was?

15:45:33   3    A.      Yes.

15:45:34   4    Q.      Keep going, Mr. Radic.  Then I think you were asked,

15:45:38   5    and this same person seems to be the person who comes out.

15:45:41   6    And when that happens, Mr. Radic, will you freeze it.

15:45:45   7            Stop there.  He's not carrying a bag in that

15:45:58   8    picture, is he?

15:46:00   9    A.      He does not appear to be.

15:46:04  10    Q.      Keep playing Mr. Radic.  He'll put his arm down.

15:46:08  11    Right there, stop, so he's not carrying a bag?

15:46:10  12    A.      No.

15:46:11  13    Q.      Now you'll see him go to that interior again?

15:46:14  14    A.      Yes.

15:46:15  15    Q.      Keep playing it.  And now he's gone.  Stop there.  So

15:46:18  16    you can't tell what he's doing there?

15:46:20  17    A.      No.

15:46:20  18    Q.      Keep going.  And then right there.  That's where

15:46:28  19    Mr. Hines asked you if that's -- do you see his head.  But

15:46:33  20    you can't identify that as a head, can you?

15:46:36  21    A.      I can't say it's a head.  I seen motion in the area.

15:46:42  22    Q.      You can see motion.  It's not a picture of him, it's

15:46:45  23    not a shirt that you saw the color of.  I just wanted to

15:46:49  24    identify what that was if you could and it doesn't look to

15:46:51  25    me --

Greer - cross

15:46:52  1   A.      I think we're a little bit out of sequence here if

15:46:55  2   you'll allow me to clarify, maybe.

15:46:57  3   Q.      Yeah, I just said --

15:46:59  4   A.      I viewed this video countless times.  It wasn't until

15:47:05  5   after I had encountered Mr. Banner and had the gun back and

15:47:10  6   went back and reviewed it more, because at that point, I

15:47:13  7   knew where he parked, how he walked up, and so prior to

15:47:17  8   recovering the gun, I had no idea that the person in that

15:47:22  9   blue jacket had anything, and I didn't notice that motion

15:47:28 10   over the trash can at that time because I had a 32-minute

15:47:34 11   window that I was looking at, not just -- I didn't notice

15:47:41 12   that motion at the trash can until after.

15:47:43 13   Q.      Right.

15:47:43 14   A.      I had recovered the gun.

15:47:45 15   Q.      I get it.  I'm just trying to figure out whether that

15:47:48 16   helps you determine that it was him at that moment with the

15:47:51 17   motion because all you I see is a little round thing and you

15:47:54 18   were asked whether or not that was the person's head and I

15:47:56 19   think you said you can't identify it as a head?

15:47:59 20   A.      I cannot.

15:47:59 21   Q.      Can you finish the video.  That was it?  Okay.  So in

15:48:08 22   that video, you don't see him putting his hand in the trash?

15:48:13 23   A.      No.

15:48:13 24   Q.      And you didn't see him taking a bag out?

15:48:16 25   A.      No.

15:48:16  1    Q.    And you don't see in what condition any bag came out;

15:48:20  2    correct?

15:48:21  3    A.    No.

15:48:21  4    Q.    And you didn't see whether the bag was right side up

15:48:24  5    or upside down?

15:48:25  6    A.    No.

15:48:26  7    Q.    And you don't know at that point what's in either the

15:48:28  8    bag or anything in the bag?

15:48:30  9    A.    No.

15:48:30 10    Q.    And that was the end of your ability to identify what

15:48:33 11    happened on the video?

15:48:36 12    A.    Yes.

15:48:36 13    Q.    As I understood it then you were doing your job and

15:48:39 14    trying to figure out if anybody knew what had happened?

15:48:42 15    A.    Yes.

15:48:42 16    Q.    And somebody told you that there was a person who

15:48:44 17    from time to time came and looked through the trash, did

15:48:49 18    that person tell you what that person's understanding was of

15:48:53 19    why the person went through trash?

15:48:56 20    A.    There were -- it was -- it seemed to be common

15:49:00 21    knowledge among the businesses there that this gentleman

15:49:06 22    rummaged for recyclables.

15:49:08 23    Q.    Okay.  So somebody who picks up things and then tries

15:49:11 24    to sell them --

15:49:14 25    A.    Yes, it's unusual for the area.  Greenville,

Greer - cross

15:49:18  1    Centerville, it's a very fluent area that's not a lot of

15:49:24  2    people rummaging.

15:49:24  3    Q.      You were told something about that and that was your

15:49:27  4    lead?

15:49:27  5    A.      Yes.

15:49:27  6    Q.      After that you then tried to track down people who

15:49:31  7    might identify the person who did this?

15:49:33  8    A.      Yes.

15:49:33  9    Q.      And you got a name, Ed, right?

15:49:35 10    A.      Yes.

15:49:35 11    Q.      And then at some point as I got the sequence, later,

15:49:41 12    a couple of days later, somebody called you and told you

15:49:44 13    that that person who was identified was back in the parking

15:49:47 14    lot looking through trash, is that kind of right?

15:49:50 15    A.      He was actually in an office when they called me.

15:49:54 16    Q.      He, being the person who grabbed the material?

15:50:00 17    A.      Ed was inside the Fidelity Investment Office at the

15:50:04 18    time.

15:50:04 19    Q.      He was inside.  Now I get it, he was inside the

15:50:07 20    offices of Fidelity doing something, not going through trash

15:50:11 21    at that point?

15:50:12 22    A.      Correct.

15:50:12 23    Q.      That's when you confronted him in the office?

15:50:16 24    A.      No.

15:50:17 25    Q.      You waited for him to come out?

Greer - cross

15:50:18  1   A.      I waited for him to come outside.

15:50:20  2   Q.      And that's when you interviewed him?

15:50:22  3   A.      No, I observed him for, close to an hour.

15:50:25  4   Q.      In that hour after Fidelity, to the hour, was it

15:50:29  5   after that amount of time that you saw him going through

15:50:32  6   trash again?

15:50:33  7   A.      Yes.

15:50:33  8   Q.      So in that hour after Fidelity, before the trash,

15:50:36  9   what was he doing, it's an hour, 60 minutes, what was

15:50:41 10   happening in that 60 minutes?

15:50:42 11   A.      So, I'm up there doing surveillance, I'm across the

15:50:46 12   street, I get a call from somebody at Fidelity Investments

15:50:51 13   saying hi, the subject you were looking for is here, I said

15:50:54 14   thank you, and that was because they had refused to identify

15:50:58 15   him, they knew who he was, but they wouldn't tell me his

15:51:03 16   name before because he was a client, they agreed to call if

15:51:05 17   he came back to the area and let me know he was in the area.

15:51:08 18   As luck would have it, they did call and I was there, so I

15:51:11 19   was able to see, they described his clothing, I was able to

15:51:14 20   see him come out of the office.  I then watched him for, I

15:51:19 21   would have to look at my report to be sure, I think it was

15:51:22 22   50 minutes, I think it was from 10:50 to 11 o'clock, I

15:51:26 23   believe.  Or 10:10 until 11 o'clock, 50 minutes.  During

15:51:32 24   that time, he went by each trash can in the two shopping

15:51:39 25   centers and would literally lean over and dig through and I

15:51:42  1    saw him pull out plastic and aluminum.

15:51:46  2    Q.     I'm just trying to suggest, not suggest, I'm trying

15:51:49  3    to ask, you said there was a period of time, 50, I'm just

15:51:52  4    asking if you're observing him going through trash for that

15:51:56  5    period of time?

15:51:57  6    A.     Yes.

15:51:57  7    Q.     Just in front of Janssen's?

15:51:59  8    A.     No, no, he was doing both shopping centers.

15:52:01  9    Q.     That's what I wanted to find out, it didn't seem like

15:52:05 10    he could be looking at three trash cans at Janssen's for 50

15:52:08 11    minutes.

15:52:09 12    A.     No, I didn't count the number of trash cans that he

15:52:11 13    went through, it was quite a few, it was two shopping

15:52:14 14    centers.

15:52:14 15    Q.     And then you saw him taking things out?

15:52:16 16    A.     Yes.

15:52:16 17    Q.     And that's when you went up to him?

15:52:18 18    A.     I waited until he went to his car.

15:52:21 19    Q.     Okay.  So now he's at his car and then you asked him

15:52:24 20    questions?

15:52:25 21    A.     Yes.

15:52:25 22    Q.     Did you introduce yourself?

15:52:27 23    A.     Yes, his car was parked at Janssen's, pretty much

15:52:31 24    where it was parked on that video.

15:52:32 25    Q.     So you identified yourself?

Greer - cross

15:52:34  1    A.      I did.

15:52:34  2    Q.      And I think you explained what you said that you were

15:52:37  3    looking for something that somebody threw out in the trash

15:52:40  4    and should not have, or something like that?

15:52:42  5    A.      Yes.

15:52:42  6    Q.      And he agreed that that's what the case was; is that

15:52:46  7    right?

15:52:46  8    A.      Yes.

15:52:46  9    Q.      At that point, did you ask or did he tell you what he

15:52:50 10    was doing to have obtained that, did he tell you that's what

15:52:54 11    I do, I go through trash cans?

15:52:56 12    A.      Yes.

15:52:56 13    Q.      And you asked him whether he found something and

15:53:00 14    that's when he told you he had?

15:53:03 15    A.      No, I didn't ask him if he found something, I said

15:53:05 16    the reason I'm contacting you, the reason I'm here in the

15:53:08 17    area and contacting you is because somebody placed something

15:53:12 18    in a trash can here that they should not have placed here.

15:53:16 19    Q.      And he said?

15:53:17 20    A.      And he immediately said oh, yes, they did.

15:53:19 21    Q.      When did you the discover that yes they did meant the

15:53:23 22    gun, right then than or later?

15:53:25 23    A.      Right then, I said what may that be.

15:53:27 24    Q.      And then he identified that may be, to be a gun?

15:53:30 25    A.      He said a .38 Special.

Greer - cross

15:53:33  1    Q.      And at that point is when you ran, a check, a

15:53:36  2    background on-- a check of any kind on him, you got his

15:53:40  3    name?

15:53:40  4    A.      I asked him for his license.  And the typical police

15:53:44  5    stuff, who are you, what's your date of birth, do you do

15:53:48  6    business abroad, blah, blah, blah, and he was very

15:53:52  7    cooperative.

15:53:52  8    Q.      And then at that point, you ran the check and seen

15:53:56  9    that he didn't have a criminal record or any outstanding

15:53:59 10    warrants, is that what you were looking for?

15:54:01 11    A.      Correct.

15:54:01 12    Q.      At that point, did you tell him in words or in effect

15:54:04 13    that it was not normal for law abiding citizens to place

15:54:09 14    guns in trash cans and that such items were critical pieces

15:54:12 15    of evidence related to the potential of serious crimes?

15:54:15 16    A.      Yes, something of that nature.

15:54:17 17    Q.      In words, I'm not quoting you directly.  At that

15:54:20 18    point his response was to apologize, right?

15:54:23 19    A.      Yes.

15:54:24 20    Q.      Now, at that point, did he indicate to you after you

15:54:27 21    told him that, and apologized, and by the way, I have

15:54:31 22    another gun in my house, did he say anything about that?

15:54:34 23    A.      He didn't say anything about that.

15:54:35 24    Q.      Then the two of you then, you asked him where he

15:54:39 25    lived or you had his license and he said, he told you where

Greer - cross

15:54:42  1   it was?

15:54:42  2   A.     Yeah --

15:54:43  3   Q.     I'm sorry, I asked a bad question.  He told you that

15:54:47  4   the gun he had identified was at his house?

15:54:49  5   A.     Yes, he did.

15:54:51  6   Q.     And then the two of you went there?

15:54:53  7   A.     We did, I held on to his license, he drove his car, I

15:54:57  8   followed him over.

15:54:58  9   Q.     And you get to the house, when you got to the house,

15:55:02 10   he opened the door, and was there anybody else there at the

15:55:09 11   time?

15:55:09 12   A.     Well, he got to the house, he didn't have his key, he

15:55:12 13   had locked himself out of the house.

15:55:15 14   Q.     He knew how to find a gun but not necessarily a key.

15:55:20 15   Okay.  Keep going?

15:55:20 16   A.     Yes.  So we tried calling, his wife was home he said.

15:55:27 17   There was no answer.  So we ended up pounding on -- he was

15:55:32 18   pounding on the door and side window, he was kind of

15:55:35 19   panicking a little bit, but eventually she woke up and

15:55:39 20   answered the door, yes.

15:55:40 21   Q.     Okay.  By the time you said you were there, and an

15:55:43 22   hour had went by, that started at 11ish in the morning, you

15:55:48 23   said --

15:55:48 24   A.     Those times are all on my supplement.

15:55:51 25   Q.     But you said that she eventually woke up, she had

Greer - cross

15:55:54  1    been sleeping?

15:55:54  2    A.      Yes.

15:55:55  3    Q.      In the middle of the day?

15:55:56  4    A.      Yes.

15:55:57  5    Q.      And she gets up and opens the door?

15:55:59  6    A.      Yes.

15:55:59  7    Q.      You did you talk to her?

15:56:03  8    A.      At that moment, at that moment, no.

15:56:09  9    Q.      Okay.

15:56:10 10    A.      Things got a little weird at that moment.

15:56:13 11    Q.      I would say so.

15:56:14 12    A.      So weird in that he is now pounding on the door, his

15:56:18 13    wife wakes up, opens the door, you both go in.  It's a split

15:56:25 14    level -- well there is a living room to the right, there is

15:56:28 15    steps that go up as soon as you go in, and as soon as she

15:56:32 16    finally opens, again he was kind of panicking that she

15:56:35 17    wasn't opening the door.  As soon as she opened the door, he

15:56:39 18    goes running up the steps.

15:56:40 19    Q.      He's started running up the steps?

15:56:42 20    A.      Yes.

15:56:44 21    Q.      You were still down --

15:56:45 22    A.      At that point I was like whoa, whoa, whoa, we're

15:56:48 23    dealing with guns here, hold on.

15:56:50 24    Q.      Well no gun here at the moment, right?

15:56:52 25    A.      No, I had a gun, too.

15:56:54  1   Q.      But not in a sock in his drawer?

15:56:57  2   A.      No, no, I'm sorry.

15:56:59  3   Q.      So he runs up and his spouse is still with you?

15:57:03  4   A.      Yes.

15:57:04  5   Q.      Do you run up after him at that point?

15:57:07  6   A.      No.  He stopped, I asked him to stop.

15:57:11  7   Q.      You asked him to stop?  Okay.  He stopped?

15:57:13  8   A.      Yes.  And I stood a couple of steps up, and he says

15:57:17  9   the box is right here, he's pointing towards what I assume

15:57:20 10   is a closet area and I said okay, well, bring it down here,

15:57:24 11   and he calmed down and slowly retrieved the box and walked

15:57:29 12   it down.

15:57:30 13   Q.      The box was upstairs, you're on stairs, he goes and

15:57:34 14   gets them in your eyesight and brings the box down is that,

15:57:37 15   is that right or tell me why it's wrong?

15:57:39 16   A.      I didn't see where the box was exactly staying.

15:57:42 17   Q.      Upstairs?

15:57:43 18   A.      It was upstairs.

15:57:44 19   Q.      And you're on the stairs or downstairs?

15:57:46 20   A.      I am probably standing 1 or 2 stairs up, because I

15:57:50 21   was beginning to chase him down.

15:57:52 22   Q.      I get it.  I get it.

15:57:54 23           So you're watching him, he goes and retrieves a

15:57:58 24   box?

15:57:58 25   A.      Yes.

Greer - cross

15:57:59  1    Q.      Shoebox, did you say?

15:58:01  2    A.      Similar to a shoebox.  I believe it was probably the

15:58:06  3    bottom part of a shoebox that had a lid, I didn't see the

15:58:10  4    lid if there was a lid.

15:58:11  5    Q.      At this point you're with his spouse, on the steps

15:58:16  6    going up, are you conversing with her?

15:58:18  7    A.      I may have had some small talk with her, said, I'm

15:58:23  8    Lieutenant Greer with the state police, please be calm,

15:58:26  9    we're okay here, I'm just conducting an investigation.

15:58:29  10   Q.      And did she say anything about a gun or anything like

15:58:33  11   that at the time?

15:58:34  12   A.      No.

15:58:34  13   Q.      So he comes back with the box, and is the box open or

15:58:38  14   closed at the point at which that happened?  I'm asking if

15:58:43  15   it has a cover or not?

15:58:45  16   A.      I describe it as a shoebox that didn't have the top.

15:58:49  17   Q.      Okay.  So in the box was whatever was in the box

15:58:51  18   without a cover?

15:58:52  19   A.      Yes.

15:58:53  20   Q.      And if I understand what you said, in the box were

15:58:59  21   socks?

15:58:59  22   A.      Socks, like if you're familiar when you take a pair

15:59:05  23   of socks and role them up in a ball and stick them in your

15:59:08  24   drawer, that's what I would describe that as.

15:59:10  25   Q.      But if they were rolled up in a ball, did you say the

Greer - cross

15:59:14  1    gun was in a sock?

15:59:15  2    A.      The gun was in a sock, yes.

15:59:17  3    Q.      But not -- that sock couldn't have been rolled up

15:59:20  4    with a gun in it?

15:59:21  5    A.      If I recall right, the rolled up socks were all on

15:59:24  6    top and these stocks that contained guns were under them.

15:59:27  7    Q.      There were multiple socks in this box, but the ones

15:59:30  8    that you are talking about --

15:59:31  9    A.      He had this pouch and all this other stuff were in

15:59:34 10    that box too.

15:59:35 11    Q.      What was on top, the socks or the pouch or the guns?

15:59:38 12    A.      The rolled up socks.

15:59:40 13    Q.      Sorry?

15:59:40 14    A.      The rolled up socks.  What I remember seeing is a

15:59:43 15    bunch of socks.

15:59:44 16    Q.      And under were the other things?

15:59:46 17    A.      Yes.

15:59:46 18    Q.      And the exhibit that you identified as the Colt gun,

15:59:51 19    it was inside a sock?

15:59:52 20    A.      A sock, yes.

15:59:53 21    Q.      See did you have the box, did he give it you to you

15:59:57 22    to look at it, or is he giving it to you himself?

16:00:01 23    A.      From what I recall, he's holding the box and he pulls

16:00:05 24    out -- he reaches down and he says I think this is what

16:00:09 25    you're looking for and he pulled out a sock that has the gun

Greer - cross

16:00:13  1   in it.  I put on latex gloves and pulled the gun out.

16:00:17  2   Q.      I'm going to come back to the latex gloves in a

16:00:20  3   second.  He gives you the sock and you pull the gun out of

16:00:22  4   the sock?

16:00:23  5   A.      Yes.

16:00:23  6   Q.      Now you have the gun out of the sock, right?  And you

16:00:27  7   indicated that there was also other things in that box,

16:00:31  8   right?

16:00:32  9   A.      Yes.

16:00:32 10   Q.      There was, for example, I think you mentioned a

16:00:37 11   leather pouch?

16:00:38 12   A.      Yes.

16:00:39 13   Q.      Now, at the point of there being a leather pouch, the

16:00:43 14   gun was not in that pouch at this point because you just

16:00:46 15   said it was in a sock?

16:00:48 16   A.      Yes.

16:00:48 17   Q.      So in the pouch was there-- was at that point, would

16:00:52 18   you call it a speed loader, was that inside the pouch, or

16:00:56 19   was that lying next to it?

16:00:58 20   A.      Again, we're almost six years out.

16:01:01 21   Q.      And if you don't remember, that's fine, I just want

16:01:03 22   to understand.

16:01:04 23   A.      What I remember is he just kind of handed me, this is

16:01:08 24   with it too, or something, I don't know the exact words.

16:01:10 25   Q.      Okay.

Greer - cross

16:01:11  1    A.      But he handed me this pouch and I believe it was kind

16:01:15  2    of like cupped with all this stuff laying inside.

16:01:18  3    Q.      And did it all fit in the pouch, so the gun is not

16:01:21  4    there, was the box of bullets inside or outside?

16:01:24  5    A.      I don't think it was -- by inside you mean --

16:01:27  6    Q.      Inside the pouch?

16:01:28  7    A.      It was laying -- I think the pouch was open and all

16:01:31  8    this stuff was kind of laying.

16:01:33  9    Q.      All the stuff, not the gun, bullets, speed loader you

16:01:36 10    mean, right?

16:01:37 11    A.      Everything but the gun.

16:01:38 12    Q.      Chap stick?

16:01:39 13    A.      Chap stick, yeah.

16:01:40 14    Q.      Was there a cell phone box in the box?

16:01:44 15    A.      I would have to look at my report.

16:01:47 16    Q.      You don't remember sitting here --

16:01:49 17    A.      If you bring one up, there probably was.

16:01:52 18    Q.      But that would have been in the pouch, or was it?

16:01:56 19    A.      It was with all the stuff.

16:01:59 20    Q.      The cell phone box?

16:02:03 21    A.      From what -- I don't think all this stuff would fit

16:02:04 22    inside the pocket of the pouch.

16:02:05 23    Q.      Exactly, that's what I'm asking.  So it was in the

16:02:08 24    shoebox but where in the shoebox, some of it was in the

16:02:11 25    pouch, some not, is that correct?

Greer - cross

16:02:14  1    A.      I'll agree with you on that, yeah.

16:02:18  2    Q.      All right.  So now you have the box and you have

16:02:20  3    among other things the bullets and you have the speed

16:02:24  4    loader.  There were no bullets in the gun when it was

16:02:26  5    retrieved were there?

16:02:27  6    A.      No.

16:02:28  7    Q.      And you have a box and you said there were 23 of the

16:02:31  8    bullets that there were holes for 25, correct?

16:02:35  9    A.      Correct.

16:02:35 10    Q.      And two loose bullets weren't in the box, right?

16:02:40 11    A.      No.

16:02:40 12    Q.      But they weren't in the gun?

16:02:42 13    A.      No.

16:02:43 14    Q.      As you looked at the gun, given your experience,

16:02:46 15    could you even see whether it had ever been fired?

16:02:51 16    A.      I didn't check to see if it had been fired.

16:02:54 17    Q.      You said earlier, too, that there was, you think,

16:02:59 18    maybe you're sure that there was some investigation to bring

16:03:01 19    the gun somewhere and fire it.  Are you sure about that?

16:03:05 20    A.      Am I sure about what?

16:03:06 21    Q.      That somebody after you got the gun, brought it to

16:03:10 22    someplace and put a bullet in it and fired it?

16:03:12 23    A.      I'm not sure, I never got a report back from them.

16:03:15 24    Q.      You're not sure that that happened, you assume, but

16:03:18 25    you don't know that that happened?

16:03:19  1    A.      I would be very surprised if it didn't.

16:03:21  2    Q.      I understand what you're saying about being

16:03:24  3    surprised, but I'm looking through the material and I'm

16:03:26  4    asking whether there is any report of that happening, did

16:03:29  5    you see one?

16:03:30  6    A.      I don't have one, no.

16:03:31  7    Q.      So you would be surprised but you don't know if

16:03:34  8    somebody did that?

16:03:35  9    A.      I do not, no.

16:03:36 10    Q.      Now we're back to the box and you get the material

16:03:39 11    and you put the latex gloves on, I'll come back to that,

16:03:43 12    too.

16:03:43 13            Did you find out that day when he got the

16:03:48 14    material that he was giving you?

16:03:52 15    A.      Did I --

16:03:54 16    Q.      Right.  Did you find out on October 29th when you are

16:03:57 17    in his house when it was that he -- did he tell you when he

16:04:04 18    had retrieved that material?

16:04:05 19    A.      Not that I recall.

16:04:06 20    Q.      Did he tell you anything about the specifics about

16:04:10 21    when he went into the trash, the pouch was upside down or it

16:04:13 22    was right side up or whether or not the bullets were full or

16:04:16 23    whether the bullets weren't full or anything like that that

16:04:19 24    day?

16:04:20 25    A.      No, I was just concerned with recovering a stolen

Greer - cross

16:04:25  1  firearm.

16:04:25  2  Q.      At any point did he tell you or did you come to learn

16:04:29  3  whether anybody went into the trash looking for the two

16:04:32  4  stray bullets?

16:04:33  5  A.      No.

16:04:34  6  Q.      So you get this material and if I understand it

16:04:37  7  correctly, you're now getting it and is he that volunteers

16:04:44  8  and by the way, you might want this, too?

16:04:50  9  A.      He did.

16:04:51 10  Q.      And that was another gun, right?

16:04:52 11  A.      It was.

16:04:53 12  Q.      And it was in a different sock in the same box?

16:04:57 13  A.      Yes.

16:04:57 14  Q.      And underneath where the other folded socks were?

16:05:00 15  A.      Yes.

16:05:01 16  Q.      When you got the gun from him, the first gun or

16:05:05 17  confronted him, did you ask him when you fished out this gun

16:05:10 18  from the trash, Mr. So and so, I don't know if he said his

16:05:14 19  name yet?

16:05:15 20  A.      Banner.

16:05:15 21  Q.      Banner, did you report it to the police, did you ask

16:05:18 22  him that?

16:05:21 23  A.      I did.

16:05:22 24  Q.      Did you ask Mr. Banner if he's the one who fished it

16:05:25 25  out, why did he not call the police when he fished out a

Greer - cross

16:05:29 1    gun, did you ask him that?

16:05:30 2    A.    Yes, I did.

16:05:31 3    Q.    And his response?

16:05:32 4    A.    He didn't have a response.

16:05:34 5    Q.    So now you've got him saying to you, and by the way,

16:05:38 6    you may want this too, right?

16:05:40 7    A.    Yes.

16:05:41 8    Q.    I think you identified he said that he had another

16:05:43 9    gun, right?

16:05:44 10   A.    Yes.

16:05:44 11   Q.    And you identified what it was, it was some sort of

16:05:47 12   semiautomatic?

16:05:48 13   A.    It was a Sundance 25-caliber semiautomatic.

16:05:52 14   Q.    So the Colt is a revolver with five chambers, right?

16:05:55 15   A.    Correct.

16:05:56 16   Q.    What's a semiautomatic?

16:05:59 17   A.    I wasn't allowed to bring a gun in here.

16:06:04 18   Q.    You don't have to, you can describe it, there are too

16:06:07 19   many guns in here right now.

16:06:09 20   A.    If you're holding a gun in your hand, the handle

16:06:11 21   comes down in your hand right here, from the bottom, there

16:06:15 22   is an item referred to as a magazine that slides up into the

16:06:19 23   handle.  It has bullets stacked in it, there is a spring at

16:06:25 24   the bottom, so there is, up at the top there is a thing

16:06:29 25   called a firing chamber and you pull the trigger there is a

16:06:33  1    hammer that comes forward, hits the back of that bullet

16:06:36  2    that's in the firing chamber, there is a primer, when it

16:06:39  3    strikes the primer it creates an explosion, and sends the

16:06:44  4    bullet out of the gun.

16:06:45  5    Q.      Thank you, that was way too much information than I

16:06:49  6    wanted.

16:06:50  7    A.      That's why it's a semiautomatic.

16:06:52  8    Q.      A different kind of a handgun than one that has a

16:06:56  9    revolving chamber?

16:06:56 10    A.      Yes.

16:06:57 11    Q.      So he gave you that one, too?

16:06:59 12    A.      Yes.

16:06:59 13    Q.      Was that one loaded at the time?

16:07:01 14            MR. HINES:  Objection, Your Honor may we

16:07:03 15    approach?

16:08:47 16            (Side-bar discussion.)

16:08:47 17            MR. HINES:  So we've obviously given Mr. Lowell

16:08:47 18    some leeway.  The crosses have been consistently lengthy,

16:08:47 19    two times our directs.  He's asked thirty questions about

16:08:47 20    Mr. Banners' socks.

16:08:47 21            THE COURT:  I was wondering if it was outside

16:08:47 22    the scope.

16:08:47 23            MR. HINES:  We're giving some leeway, I don't

16:08:47 24    know if we're running out the clock here, but we have two

16:08:47 25    witnesses waiting who are 80 years old and we're trying too

Greer - cross

16:08:47  1    move forward, I think it's irrelevant all these questions

16:08:47  2    about this other firearm.

16:08:47  3            MR. LOWELL:  As to outside the scope, he talked

16:08:47  4    about the man giving him another gun, he already talked

16:08:47  5    about the fact that the guy explained about that gun, I have

16:08:47  6    maybe three questions about that, I don't see how that's

16:08:47  7    outside the door since you open the door about where the gun

16:08:47  8    was, I didn't --

16:08:47  9            THE COURT:  This is going on a little long.

16:08:47 10            MR. LOWELL:  I will cut him off.

16:08:47 11            THE COURT:  I got jurors over there nodding off,

16:08:47 12    do that at your peril, but they are half sleeping.

16:08:47 13            MR. HINES:  The other thing I'm up here, I would

16:08:47 14    like to request, I did not intend to elicit this, and he

16:08:47 15    indicated the address of the Banners and I would like to

16:08:47 16    request that we strike that from the transcript.

16:08:47 17            MR. LOWELL:  I see that.

16:08:47 18            THE COURT:  I actually heard that and I was

16:08:47 19    wondering that so we'll strike that from the transcripts.

16:08:47 20            (End of side-bar.)

16:08:47 21    BY MR. LOWELL:

16:08:47 22    Q.    So we're at the part of the story where there is a

16:08:49 23    semiautomatic gun acquired, too.  Did you ask him how he got

16:08:52 24    that?

16:08:52 25    A.    I did.

16:08:53  1    Q.      Did you indicate that the friend gave it to him

16:08:57  2    because the friends's brother was in some form of trouble?

16:08:59  3    A.      Coworker.

16:09:00  4    Q.      Coworker's brother was in some form of trouble?

16:09:03  5    A.      Yes.

16:09:03  6    Q.      At that point you said you did run a check of that

16:09:07  7    gun, right?

16:09:08  8    A.      Yes.

16:09:08  9    Q.      Did you ask him anything about what was the name of

16:09:11 10    the coworker?

16:09:11 11    A.      Yes.

16:09:12 12    Q.      And did he tell you?

16:09:13 13    A.      He couldn't recall.

16:09:14 14    Q.      And did he ask you the name ---so he couldn't answer

16:09:19 15    that question, he didn't know the name of the brother who

16:09:21 16    was quote in trouble, is that correct?

16:09:24 17    A.      Correct.

16:09:24 18    Q.      So then he gave you both guns.  Then did you ask him

16:09:28 19    what was he going to do with the Colt if you had not come

16:09:31 20    and gotten it from him?

16:09:32 21    A.      I did.

16:09:33 22    Q.      What did he say?

16:09:34 23    A.      He said it would probably sit in that box for years

16:09:38 24    just like the other one did.

16:09:39 25    Q.      Did he say that the first one had been there for

Greer - cross

16:09:42 1   years?

16:09:42 2   A.      Yes.

16:09:42 3   Q.      So now you have both and you leave.  And you said

16:09:45 4   that you put latex gloves on?

16:09:47 5   A.      Yes.

16:09:47 6   Q.      Why did you do that?

16:09:49 7   A.      So that to protect the evidentiary value of the item.

16:09:54 8   Q.      At the point at which you were acquiring it, right?

16:09:58 9   A.      Yes.

16:09:58 10  Q.      But by then he had actually had the items in his

16:10:02 11  possession, right?

16:10:03 12  A.      Yes.

16:10:03 13  Q.      Without having latex gloves on as far as you could

16:10:06 14  tell?

16:10:07 15  A.      Correct.

16:10:07 16  Q.      And he, at that point, confirmed he had taken it from

16:10:10 17  the trash, right?

16:10:11 18  A.      Correct.

16:10:11 19  Q.      And you don't know if anybody touched it in that

16:10:14 20  period of time?

16:10:15 21  A.      I do not.

16:10:16 22  Q.      Right.  So at that point you're just making sure that

16:10:19 23  when you get it it's in the form that you got it?

16:10:21 24  A.      Yes, just trying not to contaminate it any further

16:10:25 25  than it's already been.

Greer - cross

16:10:26  1    Q.      Okay.  And so the next thing that happens is I hear

16:10:30  2    you took all the material.  Did you ask him as to that

16:10:34  3    second gun when he got it, did he call the police when he

16:10:40  4    got the first gun, whenever that first gun, the

16:10:43  5    semiautomatic, did you ask him why he didn't call the police

16:10:46  6    about that one?

16:10:47  7    A.      I don't recall.  I already knew he didn't call the

16:10:52  8    police about the first one.

16:10:53  9    Q.      You didn't have to ask him.  You put it in the box

16:10:55 10    and you take it to Delaware State Police headquarters and

16:10:58 11    put it in a vault?

16:10:59 12    A.      Troop 2.

16:11:00 13    Q.      Sorry?

16:11:01 14    A.      Troop 2, not headquarters.

16:11:04 15    Q.      I'm sorry, some Delaware State Police facility,

16:11:08 16    right?

16:11:08 17    A.      Yes.

16:11:08 18    Q.      After you did that, I hear you said that you

16:11:11 19    contacted Mr. Biden who was in the police report a victim of

16:11:14 20    a stolen gun?

16:11:16 21    A.      Yes.

16:11:16 22    Q.      And you told him you had recovered it?

16:11:18 23    A.      Yes.

16:11:18 24    Q.      And I think you were asked some questions, Mr. Biden

16:11:23 25    indicated he didn't want to press charges against anybody,

16:11:26  1    either the person who threw it out or the person who

16:11:28  2    retrieved it, right?

16:11:29  3    A.      Correct.

16:11:30  4    Q.      And at that point, he said he didn't want the gun

16:11:32  5    back, right?

16:11:34  6    A.      I don't recall him saying he didn't want the gun

16:11:36  7    back.

16:11:36  8    Q.      But you didn't give it back?

16:11:38  9    A.      I explained that there were some procedural things

16:11:40  10   that we needed to do before it could be returned.

16:11:43  11   Q.      But you said it could be returned?

16:11:45  12   A.      I said before it could be returned, yes.

16:11:47  13   Q.      And then what happened is I think Mr. Hines asked you

16:11:50  14   that that was in 2018 and then years later some new

16:11:54  15   investigation occurred, right?

16:11:55  16   A.      Correct.

16:11:56  17   Q.      And the gun stayed in the possession of the Delaware

16:12:00  18   State Police for all that time?

16:12:01  19   A.      Correct.

16:12:01  20   Q.      Meaning it was never returned to Mr. Biden?

16:12:03  21   A.      It was not.

16:12:04  22   Q.      And then when you say that it happened over a number

16:12:08  23   of years, these events are October of 2018, right?

16:12:11  24   A.      Yes.

16:12:12  25   Q.      And the number of years in which this investigation

16:12:15  1   that you understand occurred were how many years later?

16:12:18  2   A.      We're almost six years later now.

16:12:21  3   Q.      Now, but when the investigation began, a couple of

16:12:23  4   years, three years?

16:12:24  5   A.      I'm not certain.

16:12:26  6   Q.      Did you know what happened to the material that you

16:12:28  7   got from Mr. Banner that day that you put into the Delaware

16:12:32  8   State Police facility between the time it was retrieved and

16:12:35  9   the time that any other investigation occurred?

16:12:37 10   A.      I assume it stayed in the evidence lock.

16:12:40 11   Q.      I said you assumed.  Do you know?

16:12:44 12   A.      I never saw it again after I turned it over to

16:12:48 13   Sergeant Smith.

16:12:48 14   Q.      So you wouldn't know what happened in those

16:12:50 15   intervening years?

16:12:51 16   A.      No.

16:12:52 17           MR. LOWELL:  Thank you for the time.  I have no

16:12:54 18   other questions.

16:12:55 19           MR. HINES:  No questions.

16:12:56 20           THE COURT:  All right.  Thank you.  Thank you,

16:12:57 21   sir.  You're excused.  What's next.

16:12:59 22           MR. HINES:  The United States calls Edward

16:13:03 23   Thomas Banner.

16:13:18 24           COURTROOM DEPUTY:  Please raise your right hand.

16:13:31 25   Please state and spell your name for the record.

Banner - direct

16:13:41  1          THE WITNESS:  Edward T Banner.  E-D-W-A-R-D.  T

16:13:54  2    for Thomas.  B-A-N-N-E-R.

16:13:57  3          EDWARD THOMAS BANNER, having been duly sworn was

16:14:03  4    examined and testified as follows:

16:14:06  5                  DIRECT EXAMINATION

16:14:08  6          THE COURT:  All right.  You can sit down, sir.

16:14:10  7    Thank you.  Thank you, sir.  You can sit down.  You probably

16:14:18  8    want to get in the chair before it.

16:14:26  9          THE WITNESS:  Thank you.

16:14:30 10    BY MR. HINES:

16:14:31 11    Q.     Good afternoon, Mr. Banner.  Can you hear me okay

16:14:35 12    from there?  Mr. Banner, can you hear me?  Good afternoon,

16:14:51 13    Mr. Banner, can you hear me?  Testing, testing?

16:15:01 14          THE COURT:  Do you want to stand up a little

16:15:05 15    closer.

16:15:05 16          MR. HINES:  May I, Your Honor?  May I stand

16:15:17 17    here, Your Honor.

16:15:18 18          THE COURT:  Yes.

16:15:20 19    BY MR. HINES:

16:15:20 20    Q.     Good afternoon, Mr. Banner?

16:15:22 21    A.     Good afternoon.

16:15:23 22    Q.     If you could speak towards this microphone, I'm going

16:15:25 23    to position it right here for you.  Can you hear me okay

16:15:29 24    right now?

16:15:29 25    A.     Yes.

Banner - direct

16:15:30  1    Q.      Is it better if we speak when we're closer together

16:15:34  2    so you can see my lips moving when we talk?

16:15:37  3    A.      Yes.

16:15:37  4    Q.      How old are you, sir?

16:15:39  5    A.      80.

16:15:41  6    Q.      Are you retired?

16:15:42  7    A.      Yes.

16:15:43  8    Q.      How long have you been retired?

16:15:45  9    A.      Since '06.

16:15:47 10    Q.      What did you previously do for a living?

16:15:49 11    A.      I worked at General Motors for 43 -- well over

16:15:53 12    40 years.

16:15:53 13    Q.      What did you do while you were working at General

16:15:56 14    Motors for over 40 years?

16:15:58 15    A.      I did production, and they shipped me out and I was

16:16:02 16    the janitor, or environmental one, and they would sometimes

16:16:13 17    they would send me to the body shop when I was working in

16:16:18 18    production.

16:16:20 19    Q.      Prior to working at General Motors, did you serve in

16:16:23 20    the military?

16:16:24 21    A.      I served four years while I was working at General

16:16:30 22    Motors, so I went in -- I worked about a year at General

16:16:33 23    Motors, then I went in the Navy for four years.

16:16:36 24    Q.      Now, after you retired, did you acquire a hobby where

16:16:42 25    you would collect recyclables from trash cans and then

Banner - direct

16:16:45  1    recycle them?

16:16:46  2    A.     Yes, I actually started doing that before I retired

16:16:50  3    from General Motors, mostly with the aluminum cans and

16:16:54  4    plastic bottles and I would take them to New York a lot of

16:16:59  5    times, and got a nickel a piece then.  But now you only get

16:17:06  6    so much a pound.  Anywheres, I was getting anywhere from

16:17:09  7    $0.25 a pound to $0.75 a pound.  And they take them to a

16:17:15  8    recycle place because in New York, it's too dangerous for me

16:17:22  9    to go up there and too far, but I would get like a $120 when

16:17:27 10    I took them to New York for plastic and cans.  Now I only do

16:17:31 11    cans because plastic is not -- I don't know nothing about

16:17:35 12    plastic now.

16:17:36 13    Q.     So you're both saving the environment and making a

16:17:39 14    little money on the side?

16:17:40 15    A.     Yes, especially now with the gas prices.

16:17:43 16    Q.     And did you have a family member in New York that you

16:17:46 17    would go visit and use that money --

16:17:48 18    A.     Oh, absolutely, yes, I had family up there.  And they

16:17:51 19    had two restaurants, I think they're sort of getting out of

16:17:56 20    it now, I don't know for sure.

16:17:57 21    Q.     Well, let's -- I would like to direct your attention

16:18:01 22    to a particular date, October 23rd, 2018.  Do you recall

16:18:07 23    finding something special at the Janssen's Market that day?

16:18:12 24    A.     Yes.  I don't remember the date specifically but I

16:18:17 25    definitely remember finding that, yes.

Banner - direct

16:18:22  1    Q.      And we'll go over that in a moment.  In advance of

16:18:23  2    your testimony today, were you shown a video of exterior

16:18:27  3    footage from the Janssen's Market?  In advance of your

16:18:31  4    testimony today, were you shown a video of the exterior of

16:18:36  5    Janssen's Market?

16:18:36  6    A.      Oh, yes, yes.

16:18:37  7    Q.      Did that video show you in it?

16:18:40  8    A.      Yes.  Yes it did.

16:18:42  9    Q.      Play what's been in evidence of video 39C,

16:18:46 10    Exhibit 39C, please.  And if you look at the screen before

16:18:51 11    you, Mr. Banner, it should come up in a moment.  All right.

16:19:10 12    If we can pause it right there, Ms. Vo.  Is that you,

16:19:15 13    Mr. Banner, in the video?

16:19:16 14    A.      It sure looks like me.

16:19:18 15    Q.      And now if we keep playing the video a little

16:19:23 16    further.  What are you doing as you dip out of the frame

16:19:26 17    here in this first part of the video?

16:19:28 18    A.      Apparently I'm looking in the trash can bin.

16:19:31 19    Q.      Does Janssen's have a couple of exterior trash cans?

16:19:34 20    A.      They have two right there by where you enter, one at

16:19:38 21    the entrance and one just down a little bit.

16:19:41 22    Q.      We'll wait a moment.  And is that you now continuing

16:19:47 23    to walk to the next trash can?

16:19:50 24    A.      Uh-huh.

16:19:53 25    Q.      And now when you dip out of frame again, is there a

16:19:56  1    trash can right near where that white box is on the screen?

16:19:59  2    A.      Right.

16:20:00  3    Q.      Do you see a little object here above the trash can?

16:20:03  4    A.      Yeah.

16:20:04  5    Q.      Were you looking in that trash can?

16:20:06  6    A.      Absolutely.

16:20:08  7    Q.      What did you find in that trash can on that day?

16:20:11  8    A.      Apparently I found a 38.

16:20:13  9    Q.      A 38 what?

16:20:14 10    A.      Pistol, or handgun.

16:20:18 11    Q.      Now, I remember --

16:20:20 12    A.      And there was a lot of other stuff with it, like a

16:20:24 13    black cylinder type thing that you load the gun with or

16:20:29 14    whatever, and it was within a floss or parchment, the gun

16:20:38 15    was, there was other stuff along with it.  That pertained to

16:20:42 16    the gun.

16:20:43 17    Q.      Okay.  You found several items in that trash can?

16:20:47 18    A.      Yes.

16:20:47 19    Q.      We're going to go through each of them.  In advance

16:20:50 20    of your testimony today, did you have an opportunity to look

16:20:52 21    at some of those items again?

16:20:55 22    A.      Yes, I did.

16:21:03 23    Q.      Let me first show you what's in evidence of, and

16:21:09 24    still in the same condition as yesterday, Government's

16:21:11 25    Exhibit 1.  Do you recognize this, sir, Government's

Banner - direct

16:21:16  1    Exhibit 1?

16:21:16  2    A.    More than likely, yes.

16:21:18  3    Q.    How do you recognize it?

16:21:19  4    A.    It's a .38.  And the ammo was with it.  And it was

16:21:25  5    two cartridges missing.

16:21:28  6    Q.    Now, Government's Exhibit 2, is this the ammunition?

16:21:34  7    A.    I assume that it is, if there is two missing, it's

16:21:38  8    more than likely the one.

16:21:39  9    Q.    Would you please put up Exhibit 2A.  And if you go to

16:21:45 10    the second page, the third page.

16:21:51 11    A.    Yeah, that's it.

16:21:52 12    Q.    Do you see how there is two missing there?

16:21:54 13    A.    Yeah, that's it.

16:21:55 14    Q.    And was there two missing when you found it out of

16:21:59 15    the trash can?

16:22:00 16    A.    Yes, there was.

16:22:01 17    Q.    Is this the other item that you were describing?

16:22:03 18    A.    Yeah, that's a black thing I was just referring to.

16:22:06 19    Q.    Do you know what this is?

16:22:08 20    A.    You put the shells in it to load the gun, fast load

16:22:11 21    or something.

16:22:14 22    Q.    Okay.  For the record that was Government's Exhibit 3

16:22:19 23    that I was just showing Mr. Banner.

16:22:21 24          Now, was this the parchment that you were just

16:22:27 25    describing, Government's Exhibit 4?

16:22:32 1    A.      Is this the what?

16:22:33 2    Q.      You mentioned there was a parchment, I think your

16:22:37 3    word was parchment or words to that effect, was there an

16:22:43 4    item that had the items inside of it when you found it?

16:22:46 5    A.      The parchment, the gun was in that.

16:22:52 6    Q.      This was in a sealed envelope.  Can I show him 4A,

16:22:54 7    please.  I'm going to show you a photograph.

16:22:57 8    A.      Yeah, that looks like it.

16:22:59 9    Q.      If you scroll down a little bit.

16:23:01 10   A.      Because it was brown leather.

16:23:03 11   Q.      There on page 3?

16:23:04 12   A.      Yeah.  No, I would say that was it.

16:23:10 13   Q.      So when you got these items out of the trash can,

16:23:14 14   what did you do with them?

16:23:17 15   A.      Well, I had a lunch thing that I got at General

16:23:26 16   Motors, and I put the items in that.  And I didn't -- I

16:23:30 17   never looked at it again until the police officer come and

16:23:35 18   wanted to know about this particular situation.

16:23:39 19   Q.      All right.  So you took the items home after you

16:23:41 20   found them in the trash can?

16:23:42 21   A.      Right.

16:23:43 22   Q.      Did they stay in that object that you were

16:23:46 23   describing, did you put them in that object and did they

16:23:49 24   stay there until the police came?

16:23:51 25   A.      Yes, they did.

Banner - direct

16:23:52  1    Q.      Did you do anything with the gun, did you shoot it,

16:23:54  2    did you play with it?

16:23:55  3    A.      No, no, I put it up on the top shelf in the closet,

16:24:01  4    actually it was, I can't think of the name, but it was the

16:24:07  5    lunch box that we got from General Motors, and I put it in

16:24:11  6    there.

16:24:11  7    Q.      Did you have other items in there as well, like

16:24:14  8    clothing or other things like that?

16:24:16  9    A.      Oh, in the closet.  It was on a shelf like and that

16:24:21 10    was on the top shelf.

16:24:23 11    Q.      And then --

16:24:24 12    A.      Or definitely near the top, you know.

16:24:28 13    Q.      Is your next memory that the police came and asked

16:24:32 14    you about the firearm?

16:24:34 15    A.      Yes.  Yes.  I don't know whether it was weeks or

16:24:37 16    months or how long it was, but yeah, it was after that.

16:24:40 17    Q.      But between the time that the police -- between the

16:24:44 18    time that you found the firearm and the police came, you

16:24:47 19    didn't touch the firearm after putting it away?

16:24:50 20    A.      No, I didn't look at the items until I sort of got a

16:24:54 21    little hazy about them because I never looked at them again

16:24:58 22    until they -- until I gave him the gun.

16:25:00 23    Q.      Now, did the police officer come to your home and ask

16:25:03 24    you to provide him with the gun?

16:25:06 25    A.      They came to my home and they started asking me

Banner - direct

16:25:09  1    questions and they got to that subject, yes.

16:25:12  2    Q.      And had the police officer first approached you in a

16:25:15  3    parking lot before he came to your home and talked to you?

16:25:18  4    A.      In the parking lot, possibly, I don't remember

16:25:21  5    exactly how that all came about.  But I was amazed, I'm glad

16:25:28  6    that he took all this stuff down because I didn't record

16:25:32  7    anything, you know, I didn't write down when I got it, I

16:25:35  8    didn't, you know.

16:25:36  9    Q.      So did you just turn everything over to the police

16:25:39 10    that you had gotten out of that trash can?

16:25:41 11    A.      Yes, I did, as a matter of fact, I had another gun

16:25:44 12    that somebody at General Motors gave me years before this,

16:25:49 13    and I retired in '06 so it was years before that, and I gave

16:25:54 14    him that one, too, because I had that, either in that one or

16:25:58 15    in another lunch box just like it because somebody at work

16:26:02 16    had given me another one.  I got one from the plant and then

16:26:06 17    they give me another one, so I had it either in the same one

16:26:10 18    or in a different one, you know another one.

16:26:12 19    Q.      Did you ever fire or use that second gun from the

16:26:16 20    plant?

16:26:16 21    A.      No, no, all fifty ammunition was with that one, but

16:26:20 22    my nephew got rid of it when I lived there because he didn't

16:26:24 23    want to take any chance on anybody getting-- start using it

16:26:29 24    for something you know, because it was in the garage then.

16:26:32 25    Q.      I see like someone breaking in and taking it?

Banner - direct

16:26:35   1    A.      Yeah.

16:26:36   2    Q.      So you had no ammunition for that firearm in this

16:26:39   3    house?

16:26:39   4    A.      No, I gave him that gun, too.

16:26:41   5    Q.      The police officer, you gave him both guns?

16:26:44   6    A.      Yes, I did.

16:26:44   7    Q.      Turned it over.  Was your wife home that day?

16:26:47   8    A.      I think she was.

16:26:48   9    Q.      And your wife's first name is?

16:26:50  10    A.      Joanne.

16:26:51  11    Q.      And how long have you guys been married?

16:26:55  12    A.      I think eleven years.

16:26:58  13    Q.      Eleven years?

16:26:59  14    A.      Yeah, I think so.  She'll know better than I do.

16:27:05  15    Q.      All right.  Mr. Banner, this may sound like an

16:27:09  16    unusual question, but does anyone in your household use

16:27:13  17    cocaine?

16:27:14  18    A.      No.  No.

16:27:16  19    Q.      And in your closet or your dresser or your bedroom,

16:27:21  20    have you ever seen cocaine or residue or anything like that?

16:27:24  21    A.      Not that I know of.

16:27:27  22    Q.      All right.

16:27:27  23            MR. HINES:  I have no further questions.  Thank

16:27:29  24    you.

16:27:30  25            THE COURT:  Mr. Lowell.

16:27:31  1            MR. LOWELL:  Thank you.

16:27:32  2            Is it okay if I do the same thing?

16:27:35  3            THE COURT:  You may come on down.

16:27:37  4            MR. LOWELL:  Thank you

16:27:38  5                 CROSS-EXAMINATION

16:27:39  6  BY MR. LOWELL:

16:27:39  7  Q.     Good afternoon, Mr. Banner.  Can you hear me okay?

16:27:41  8  A.     I hear you better the closer you get.

16:27:43  9            MR. LOWELL:  Can I be this close?

16:27:45 10            THE WITNESS:  Yeah, that's all right.

16:27:47 11  BY MR. LOWELL:

16:27:47 12  Q.     I'll tell you as a word of wisdom, one is best

16:27:51 13  knowing how many years you have been married to a spouse, I

16:27:54 14  can tell you.

16:27:54 15  A.     What.

16:27:55 16  Q.     You best know how many years you have been married to

16:27:58 17  a spouse, you said eleven years?

16:27:59 18  A.     Yeah, absolutely.

16:28:00 19  Q.     I just have a few questions.  You said you were at

16:28:03 20  Janssen's --

16:28:04 21  A.     No, I don't work there.

16:28:05 22  Q.     No, not work there, I'm sorry, that's where you found

16:28:08 23  the gun, is that right?

16:28:10 24  A.     Yeah, that's where I found the gun.

16:28:11 25  Q.     And do you that because you were looking for

Banner - cross

16:28:14  1  recyclable material?

16:28:16  2  A.    Right.

16:28:16  3  Q.    When you found the gun in the trash, was it in a bag

16:28:19  4  or not in the bag?

16:28:21  5  A.    Was it what?

16:28:23  6  Q.    Was it in a bag?

16:28:24  7  A.    Well, that piece of brown material, whatever it is.

16:28:27  8  Q.    That's where it was, but was it in a shopping bag or

16:28:30  9  a gift bag?

16:28:32 10  A.    I don't recall that.

16:28:33 11  Q.    Okay.

16:28:34 12  A.    But all the parts were there, whatever I found, they

16:28:36 13  were all in the trash can.  I don't think they were in a

16:28:39 14  bag, they could have been in a bag, I don't recall that.

16:28:42 15  Q.    Okay.  And do you recall or other than today, whether

16:28:47 16  or not at the time you remember getting a leather pouch?

16:28:54 17  A.    The gun was apparently in that.

16:28:56 18  Q.    I know apparently.  But were you interviewed prior to

16:29:00 19  today by anybody in the prosecution in which you said you do

16:29:03 20  not recall the leather pouch?

16:29:05 21  A.    I recall it to a large degree, but exactly whether it

16:29:10 22  was wrapped in it real tight or if it was loose or what, but

16:29:15 23  it was all in there in the trash can with it.

16:29:18 24  Q.    So in your understanding, whether it was in a bag,

16:29:22 25  there is the gun, yes, the gun, the gun?

Banner - cross

16:29:25  1    A.       As far as I know it wasn't in a bag, it might have

16:29:28  2    been in that parchment but it wasn't in a bag, as far as I

16:29:32  3    know.

16:29:32  4    Q.       And the bullets, a box of bullets?

16:29:34  5    A.       Yes, there was.

16:29:35  6    Q.       When you retrieved the gun, it wasn't loaded, was it?

16:29:39  7    A.       I don't think so, unless it's loaded now.  If it was

16:29:42  8    loaded, it should be still loaded.  I didn't --

16:29:46  9    Q.       You didn't look?

16:29:47 10    A.       Well, not that I recall, because I certainly didn't

16:29:50 11    take any out and I didn't put any in.

16:29:53 12    Q.       Did you look in the trash to see if there were any

16:29:57 13    bullets that had fallen out of the box?

16:29:59 14    A.       No, no, because if they -- I only processed the top,

16:30:04 15    I don't dig down to the bottom.  Especially if they're full.

16:30:09 16    Q.       Okay.  So you took it out of the trash?

16:30:12 17    A.       Yes, sir.

16:30:12 18    Q.       And then did you put it or was it in a bag or was it

16:30:16 19    all just in the parchment?

16:30:18 20    A.       I might have put it in a bag with the cans, or

16:30:22 21    whatever, plastic bottles, whatever I was doing at the time.

16:30:25 22    Q.       And then you brought it home to your house?

16:30:28 23    A.       Yes.  I don't know if I brought it directly home, I

16:30:31 24    might have been around somewhere else in town there.

16:30:34 25    Q.       At some point?

Banner - cross

16:30:35  1    A.        Greenville.

16:30:36  2    Q.        At some point you did bring it home?

16:30:38  3    A.        Absolutely.

16:30:40  4    Q.        Okay.  And you said when you did, you put it in a

16:30:44  5    lunch box kind of thing?

16:30:47  6    A.        Yeah.

16:30:47  7    Q.        Like a lunch box?

16:30:48  8    A.        Not a lunch box.

16:30:50  9    Q.        Tell me.

16:30:51 10    A.        It's sort of like a bag, it's about that big, and I

16:30:55 11    can't think of the name of it, but suggestion plan, a

16:31:01 12    suggestion plan lunch box from General Motors and I put the

16:31:05 13    stuff in there.

16:31:06 14    Q.        Now I understand like a suggestion box where people

16:31:09 15    put suggestions in?

16:31:10 16    A.        Sort of like a cloth thing that you would put a lunch

16:31:13 17    in, but I never put lunches in them, I apparently used it

16:31:17 18    for that.

16:31:18 19    Q.        Okay.  Do you have any recall about taking the gun

16:31:21 20    you found and putting it in a sock, a sock, you know, a

16:31:26 21    sock, did you put it in a sock?

16:31:28 22    A.        I didn't put it in no sock, no.

16:31:31 23    Q.        Okay.  So as far as you remember, no sock?

16:31:34 24    A.        No sock, I don't remember no sock.

16:31:36 25    Q.        And you said this box was put on the top shelf, is

Banner - cross

16:31:39  1    that right?

16:31:40  2    A.      Either the top or at near the top, you know, there

16:31:44  3    might have been something else above it, I don't know.

16:31:46  4    Q.      And then when the officer came and asked you

16:31:50  5    questions and you gave it to them?

16:31:52  6    A.      I went up and got it, yeah.

16:31:54  7    Q.      And then did you then tell him you had another gun?

16:31:59  8    A.      Yeah, I might have had it right in the same one, I'm

16:32:02  9    not sure, that's a box.

16:32:06 10    Q.      And when you have that other gun in the same or

16:32:09 11    another box, was that also in a sock?

16:32:13 12    A.      Was what?

16:32:14 13    Q.      Was that in a sock, the second one?

16:32:16 14    A.      In a sock?

16:32:17 15    Q.      In a sock.

16:32:19 16    A.      I know nothing about a sock, that parchment or

16:32:23 17    whatever was shown there, it was in that.  The other gun was

16:32:26 18    never in that.

16:32:26 19    Q.      Where was the other gun?

16:32:28 20    A.      It was in a -- in a suggestion plan box, the same one

16:32:34 21    or another one just like it because somebody at work had

16:32:37 22    given me a second one that was theirs, and I had two of them

16:32:42 23    as far as I know.  And it might have been in a separate one

16:32:45 24    or whatever, but I didn't need either gun, I mean, I wasn't

16:32:50 25    --

Banner - cross

16:32:50   1   Q.      But you had two guns in the boxes, two?

16:32:53   2   A.      Yeah, I had two guns up there together, one might

16:32:57   3   have been in one suggestion plan lunch box and the other one

16:33:01   4   could have been in the other one or they both could have

16:33:04   5   been in the same one, but I don't know if they would fit, so

16:33:07   6   I didn't want to try to differentiate that, but they were

16:33:12   7   definitely separate guns.

16:33:13   8   Q.      I understand, but I want to follow-up on just one

16:33:16   9   thing.  When you got that first gun, the one from your

16:33:19  10   co-worker, I think you said there were bullets when you got

16:33:22  11   it?

16:33:22  12   A.      No, they were not bullets in the gun, there were

16:33:25  13   fifty bullets in a box just like the other box, there was

16:33:29  14   two black men, the one that gave me the gun was the brother

16:33:33  15   and he said it was his brother's gun and he didn't want his

16:33:37  16   brother to get in trouble with it, that's why he gave it to

16:33:40  17   me, so I had that one several years longer than the other

16:33:43  18   one.

16:33:43  19   Q.      And it had a box of ammunition?

16:33:46  20   A.      Yes.

16:33:47  21   Q.      Your nephew took it away early, after that?

16:33:50  22   A.      The ammunition was gone when I put the other gun in

16:33:53  23   the other.

16:33:54  24   Q.      Right.

16:33:55  25   A.      Because my nephew at the time I was living at my

16:33:59  1    nephews and, or where he lives, and he didn't want the

16:34:05  2    ammunition because he had two little, they were little, but

16:34:10  3    he was worried about the ammunition, somebody getting the

16:34:14  4    gun and using it, the same as I was about the other gun.

16:34:17  5    Q.      When you took the material out of the trash, you held

16:34:19  6    it in your hands, you held the gun, you held the pouch?

16:34:23  7    A.      I imagine I held it one way or the other when it was

16:34:27  8    in the pouch or whether it was out of the pouch, but I took

16:34:32  9    it out and looked at it at some point or I wouldn't have

16:34:35  10   known what it was.

16:34:36  11   Q.      And then on October 29th when Detective Greer came to

16:34:40  12   your house, you gave it all to him?

16:34:42  13   A.      That's right.

16:34:43  14              MR. LOWELL:  I have no other questions.

16:34:44  15              THE COURT:  Thank you.  Any redirect?

16:34:47  16              MR. HINES:  No, Your Honor.  Thank you.

16:34:48  17              THE COURT:  Thank you, sir.  Thank you very

16:34:50  18   much.

16:34:51  19              THE WITNESS:  You're welcome.

16:34:52  20              THE COURT:  You're excused.  Be careful stepping

16:34:55  21   down there.

16:34:57  22              THE WITNESS:  All right.

16:35:01  23              THE COURT:  Mr. Hines, what's next?

16:35:03  24              MR. HINES:  We're going to move on to --

16:35:08  25              THE COURT:  You're not going to call her.

16:35:11  1          MR. HINES:  No.

16:35:12  2          THE COURT:  So then we can finish.  All right.

16:35:18  3   So at this point we're going to take our evening break and

16:35:21  4   I'll just ask you not to talk to anybody, listen to anybody,

16:35:24  5   do any internet search or listen to any reports anywhere of

16:35:28  6   any kind.  And I'll see you here tomorrow at 9 o'clock.

16:35:33  7          Thank you.

16:35:34  8          COURTROOM DEPUTY:  All rise.

16:35:36  9          (Jury exiting the courtroom at 4:35 p.m.)

16:36:03 10          THE COURT:  Mr. Lowell, like the movies, you get

16:36:10 11   to get right in their face when you cross-examine, it's not

16:36:13 12   like it's made out to be like it's in movies.

16:36:17 13          MR. LOWELL:  No, it's not like Perry Mason did.

16:36:20 14          THE COURT:  All right.  I forgot to ask the

16:36:25 15   jurors not to talk to each other, but I will do that

16:36:28 16   tomorrow, I promise, before we do anything, and they're

16:36:31 17   going to leave right now anyway.

16:36:33 18          The government, so defendant put in a

16:36:40 19   supplemental jury instruction document last week, a couple

16:36:48 20   weeks ago.  For the most part I think I understand what

16:36:53 21   their positions are and what yours are from our prior

16:36:56 22   discussions and from their written part.  There is a good

16:37:00 23   faith instruction.  I don't know what the government's

16:37:02 24   position is on that.  If you guys can -- you don't have to

16:37:05 25   tell me right now, but you can either submit something or

16:37:08  1    tell me in the morning so I can understand where we are.

16:37:11  2                    MR. HINES:  Yes, Your Honor.  Will do.

16:37:13  3                    THE COURT:  Anything else we need to talk about?

16:37:15  4                    MR. LOWELL:  I'm sorry, Judge.

16:37:16  5                    MR. HINES:  We have two witnesses in the

16:37:20  6    morning, it's the chemist and then the drug expert.  We

16:37:23  7    anticipate we will rest in the morning.

16:37:28  8                    THE COURT:  The drug expert?

16:37:29  9                    MR. HINES:  Yeah, Joshua Romig from the DEA,

16:37:33 10    both we will qualify as experts in the case, the chemist is

16:37:37 11    Dr. Jason Brewer of the FBI, he's a very short witness and

16:37:40 12    the drug expert, Joshua Romig from the DEA, he is in our

16:37:45 13    view not a long witness, we think we will rest in the

16:37:48 14    morning.

16:37:48 15                    THE COURT:  Okay.

16:37:48 16                    MR. LOWELL:  On that, Judge, one holdover item.

16:37:52 17    So if you remember on our last --

16:37:55 18                    THE COURT:  Everybody else can be seated.  I

16:37:57 19    apologize.

16:37:59 20                    MR. LOWELL:  On our lab expert, you wanted to

16:38:02 21    hear from them, we're not deciding whether we're going to

16:38:04 22    call him until I hear Agent Brewer, but he'll be here if we

16:38:08 23    decide to do that so you can voir dire him if that's what

16:38:11 24    you want to do.

16:38:12 25                    THE COURT:  Yes.

16:38:13  1          MR. LOWELL:  Okay.  Thank you.

16:38:15  2          THE COURT:  And so yeah, actually why don't we

16:38:18  3  do this, if they rest, then maybe we can take a little bit

16:38:21  4  longer of a break if you want before you put on your case,

16:38:25  5  if you want to do that, or you can -- we can do it at

16:38:28  6  lunchtime, take a little bit longer lunch and you can think

16:38:32  7  about whether you want to put him on.

16:38:34  8          MR. LOWELL:  That would be helpful, also in

16:38:37  9  terms of timing, this is not going to delay the game because

16:38:40 10  no matter what we would have on this point depending on that

16:38:44 11  witness, very few, two or three, maybe not even witnesses,

16:38:47 12  we told the government who they are, and then we would make

16:38:50 13  the decision as to whether Mr. Biden is going to testify.

16:38:53 14  Even if that happened, Judge, the whole thing can be done by

16:38:57 15  Monday at the end of the day, so if we took a longer break,

16:39:01 16  that may be good because we also want to present to you,

16:39:03 17  which we'll file whatever way you want it, the Rule 29.

16:39:07 18          THE COURT:  Got it.  Okay.

16:39:08 19          MR. LOWELL:  Thank you.

16:39:09 20          THE COURT:  Anything you all have?

16:39:10 21          MR. HINES:  No, Your Honor, thank you.

16:39:12 22          THE COURT:  All right.  Then we'll see you in

16:39:13 23  the morning.

16:39:14 24          COURTROOM DEPUTY:  All rise.  Court is

16:39:26 25  adjourned.

16:39:26    1          (Court adjourned at 4:39 p.m.)

2

3

4          I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

5

6                          /s/ Dale C. Hawkins
                        Official Court Reporter
7                         U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25