08:20:04

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, ) VOLUME 5
                         )
                         ) CRIMINAL ACTION
v.                       ) NO. 23cr61(MN)
                         )
ROBERT HUNTER BIDEN,     )
                         )
          Defendant.     )


                    Friday, June 7, 2024
                    9:00 a.m.
                    Jury Trial


                    Courtroom 4A
                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge


APPEARANCES:


                    SPECIAL COUNSEL'S OFFICE
                    BY:  DEREK E. HINES, ESQ.
                    BY:  LEO WISE, ESQ.


                         Counsel for the
                         United States of America

1    APPEARANCES CONTINUED:

2

3
              DALTON & ASSOCIATES, P.A.
4             BY:  BARTHOLOMEW J. DALTON, ESQ.
              BY:  CONNOR DALTON, ESQ.
5
              -and-
6
              WINSTON & STRAWN LLP
7             BY:  ABBE DAVID LOWELL, ESQ.
              BY:  DAVID KOLANSKY, ESQ.
8             BY:  ISABELLA OISHI, ESQ.

9
                     Counsel for the Defendant
10

11

12                _ _ _ _ _ _ _ _ _ _ _

13

08:26:24 14

08:45:38 15          COURTROOM DEPUTY:  All rise.

08:58:46 16          THE COURT:  All right.  Good morning, everyone.

08:58:50 17   Does someone want to talk?

08:58:51 18          MR. LOWELL:  Yes, ma'am.

09:10:04 19          (Discussion off the record.)

09:10:23 20          THE COURT:  Mr. Lowell, have you given us your

09:11:10 21   direct exhibits?

09:11:11 22          MR. LOWELL:  We did, yes, we sent it to the

09:11:14 23   Court when we sent it to the government.

09:11:16 24          THE COURT:  I don't have it.

09:11:18 25          MR. LOWELL:  Would you let me know, and we can

09:11:20 1    do it again?

09:11:27 2                    (Jury entering the courtroom at 9:12 a.m.)

09:12:57 3              THE COURT:  All right.  Members of the jury,

09:13:15 4    welcome back.  Everyone else, please be seated.

09:13:18 5              Members of the jury, it's time for me to ask my

09:13:23 6    daily question.  Have you spoken to anyone, has anyone

09:13:27 7    spoken to you or tried to speak to you or even had a

09:13:30 8    conversation about this case in your presence that you were

09:13:35 9    listening to?

09:13:37 10             THE JURY:  No.

09:13:37 11             THE COURT:  All right.  Anyone do any research,

09:13:41 12   listen to any news reports, or even accidentally listen to,

09:13:45 13   read, hear anything about this case?

09:13:47 14             THE JURY:  No.

09:13:48 15             THE COURT:  All right.  Thank you.

09:13:49 16             And then it's been about a week, so I'll just

09:13:52 17   remind you also again, don't talk to anybody, and when I say

09:13:57 18   don't talk to anybody, that includes each other about the

09:13:59 19   case, now that you guys have got to know each other

09:14:03 20   sometimes I like to remind you because it gets easier as you

09:14:06 21   know each other better.

09:14:07 22             THE COURT:  Okay, alright, who do we have next?

09:14:09 23             MR. WISE:  Thank you, Your Honor.  The United

09:14:19 24   States calls Dr. Jason Brewer.

09:14:23 25             COURTROOM DEPUTY:  Please raise your right hand.

09:14:27 1    Please state and spell your full name for the record.

09:14:36 2              THE WITNESS:  Jason Brewer, J-A-S-O-N,

09:14:41 3    B-R-E-W-E-R.

09:14:43 4              JASON BREWER, having been duly sworn, was

09:14:48 5    examined and testified as follows:

09:14:51 6                   DIRECT EXAMINATION.

09:15:05 7              MR. WISE:  Thank you, Your Honor.

09:15:06 8    BY MR. WISE:

09:15:07 9    Q.      Good morning, Dr. Brewer.

09:15:09 10   A.      Good morning.

09:15:09 11   Q.      Where do you work?

09:15:10 12   A.      I work at the FBI Laboratory in Quantico, Virginia.

09:15:15 13   Q.      How long have you been with the FBI?

09:15:16 14   A.      A little over twenty years.

09:15:18 15   Q.      Can you describe briefly the positions you have held

09:15:21 16   in your twenty years with the FBI?

09:15:23 17   A.      I was first hired as a research chemist through a

09:15:27 18   contract post-doctoral program, I did that for approximately

09:15:33 19   11 months.  Then I was hired on permanently as a forensic

09:15:36 20   chemist in the chemistry unit.  I spent approximately two

09:15:40 21   years in that position, and then was promoted to my current

09:15:43 22   position of chemist forensic examiner.

09:15:46 23   Q.      Have you been there ever since?

09:15:49 24   A.      Yes, approximately seventeen-and-a-half years.

09:15:51 25   Q.      And can you describe what your duties and

Brewer - direct

09:15:54 1  responsibilities are as a chemist and forensic examiner in

09:15:57 2  the chemistry unit?

09:15:58 3  A.      So when evidence is submitted to the FBI Laboratory,

09:16:02 4  when there is a question about the chemical nature of the

09:16:05 5  item, I will analyze that item of evidence, and write an FBI

09:16:10 6  Laboratory report stating my conclusions.  And then testify

09:16:13 7  in court when requested.

09:16:15 8  Q.      And tell us about your educational background?

09:16:18 9  A.      I have a bachelor of science degree in chemistry from

09:16:22 10 James Madison University.  And a Ph.D. in chemistry from the

09:16:26 11 University of North Carolina, Chapel Hill.

09:16:29 12 Q.      Are you a member of are any professional

09:16:31 13 organizations?

09:16:32 14 A.      Yes, I am a member of SWGDRUG, which is the

09:16:36 15 scientific working group for the analysis of seized drugs.

09:16:39 16 Q.      And what does that group do?

09:16:43 17 A.      It's a group of international forensic chemists that

09:16:48 18 help write guidelines and best practices for analyzing

09:16:52 19 controlled substances.

09:16:52 20 Q.      Have you ever had previous experience testifying as

09:16:55 21 an expert?

09:16:56 22 A.      Yes, I have.

09:16:57 23 Q.      Approximately how many times?

09:16:59 24 A.      Approximately 25 times.

09:17:01 25 Q.      And have you had any specialized training that

Brewer - direct

09:17:05  1    qualified you as a forensic chemist with the FBI lab at

09:17:09  2    Quantico?

09:17:10  3    A.      Yes.   The first permanent position I described as a

09:17:13  4    forensic chemist, that required an approximately one year

09:17:17  5    training program to be qualified and authorized in that

09:17:20  6    position.   And then the current position I hold of chemist

09:17:24  7    forensic examiner, also required approximately one year of

09:17:27  8    training to become qualified and authorized.

09:17:35  9    Q.      Can you tell us, and again, it's only an

09:17:35 10    approximation, but can you tell us the number of suspected

09:17:39 11    controlled substances you have examined in your career?

09:17:42 12    A.      Probably thousands of items.

09:17:45 13              MR. WISE:   Your Honor, at this time I would move

09:17:47 14    to qualify Dr. Jason Brewer as an expert in the field of

09:17:50 15    forensic chemistry.

09:17:52 16              THE COURT:   Any objection?

09:17:53 17              MR. KOLANSKY:   No objection.

09:17:54 18              THE COURT:   Thank you.   He'll be recognized as

09:17:55 19    such.   So what that means, members of the jury, fact

09:17:58 20    witnesses can testify to facts, what they know, what they

09:18:02 21    experience.   An expert witness is qualified, so the expert

09:18:06 22    can give opinions, so that's why we had to do that, and he

09:18:10 23    can only give opinions in what he's been qualified as an

09:18:13 24    expert.

09:18:15 25              MR. WISE:   May I approach, Your Honor?

Brewer - direct

09:18:23  1          THE COURT:  You may.

09:18:29  2   BY MR. WISE:

09:18:31  3   Q.      Dr. Brewer, I have just handed you what's been

09:18:34  4   already admitted in evidence as government Exhibit 4.  Do

09:18:37  5   you recognize that?

09:18:39  6   A.      Yes, I do.  Within the interior package I can see my

09:18:44  7   name and initials where I sealed the evidence.

09:18:46  8   Q.      And is this an exhibit, a piece of evidence you were

09:18:49  9   asked to analyze?

09:18:50  10  A.      Yes, it is.

09:18:52  11  Q.      And if I can have government Exhibit 4C, which I also

09:18:56  12  believe is in evidence?

09:18:57  13          MR. WISE:  I would offer 4C in evidence, Your

09:18:59  14  Honor, it's a photo of the pouch, if there is no objection.

09:19:03  15          MR. KOLANSKY:  No objection.

09:19:04  16          THE COURT:  Thank you.  It's admitted.

09:19:06  17          (Exhibit No. 4C was admitted into evidence.)

09:19:07  18  BY MR. WISE:

09:19:07  19  Q.      Do you see 4C on your screen or on the big screen,

09:19:11  20  Dr. Brewer?

09:19:12  21  A.      Yes.

09:19:12  22  Q.      Generally speaking, what is this?

09:19:14  23  A.      Those are the photographs I took of what we called

09:19:18  24  Item 1 at the FBI Laboratory, which is a brown pouch.

09:19:22  25  Q.      And that's the brown pouch in government Exhibit 4

Brewer - direct

09:19:24  1    that I have just handed you?

09:19:26  2    A.    Yes, sir.

09:19:26  3    Q.    Now, I'm going to ask you what you did to analyze any

09:19:30  4    substances found in this pouch, but before I do, I just want

09:19:34  5    to ask a couple of questions about what you didn't do.

09:19:37  6    Okay?

09:19:37  7          Now, were you asked to analyze this pouch for

09:19:41  8    fingerprints or DNA?

09:19:44  9    A.    No, I was not.  And those are not areas of my

09:19:48 10    expertise.

09:19:49 11    Q.    So those aren't tests you conduct?

09:19:51 12    A.    No.

09:19:51 13    Q.    Is there a test that can determine when a drug or

09:19:55 14    controlled substance is put on a physical item like this

09:19:58 15    pouch, is there such a test?

09:20:01 16    A.    No.

09:20:01 17    Q.    So that wasn't a test you conducted; correct?

09:20:04 18    A.    Correct.

09:20:04 19    Q.    Is there a forensic test that can determine who put

09:20:13 20    drugs on a physical item?

09:20:13 21    A.    No.

09:20:13 22    Q.    So that wasn't a test you were asked to conduct,

09:20:17 23    correct?

09:20:18 24    A.    Correct.

09:20:18 25    Q.    And to be clear, you received the pouch in the

Brewer - direct

09:20:22  1    condition it's in, right?

09:20:23  2    A.    Yes.

09:20:24  3    Q.    Your analysis does not address what might have

09:20:29  4    happened with the pouch before you received it; right?

09:20:32  5    A.    Correct.

09:20:33  6    Q.    And I think this probably goes without saying, but

09:20:41  7    you weren't asked to test, or do a test to determine who put

09:20:45  8    the drugs, if drugs were found on the object, correct?

09:20:48  9    A.    That's correct.

09:20:49  10   Q.    Now I want to ask you about what you did, the tests

09:20:52  11   you did.

09:20:53  12         Can you tell the members of the jury what

09:20:55  13   qualitative tests you performed to determine whether or not

09:20:59  14   the exhibit contained controlled substances?

09:21:02  15   A.    So the first thing I do in any exam is a visual

09:21:07  16   examination.  In this type of case I am looking for any

09:21:10  17   solid material that I can directly remove from the item to

09:21:15  18   then test for controlled substances.

09:21:17  19   Q.    Did you find any?

09:21:18  20   A.    Yes.  In this instance I found a minimal amount of

09:21:22  21   white powder, or off-white powder, on the inside of the

09:21:26  22   flap, and then another small amount within the bottom

09:21:30  23   interior of the pouch.

09:21:31  24   Q.    Ms. Vo, if you could enlarge the bottom half of

09:21:35  25   government Exhibit 4C.

Brewer - direct

09:21:36  1          Whose handwriting is that Dr. Brewer?

09:21:42  2  A.       That's my handwriting, and I took this photo.

09:21:44  3  Q.       What are you pointing at?

09:21:46  4  A.       As you can see, there is a small amount of white

09:21:49  5  material or off-white material that the arrow is pointing

09:21:52  6  to.

09:21:52  7  Q.       And that's what you saw from your visual examination?

09:21:55  8  A.       Yes.

09:21:57  9  Q.       And did you see anything else in your visual

09:22:02 10  examination of the pouch?

09:22:04 11  A.       Yes.  So this picture shows the interior flap, but

09:22:09 12  also in the bottom, the bottom interior, I also saw similar

09:22:13 13  looking material.

09:22:14 14  Q.       Could we go to the next page in Exhibit 4C?

09:22:19 15          So is the top another larger image of what we

09:22:23 16  saw, the material from the inside flap?

09:22:26 17  A.       Yes, the top is an enlarged image of the previous

09:22:29 18  page.

09:22:29 19  Q.       And if we could -- if you could enlarge, Ms. Vo, the

09:22:33 20  bottom half of 4C.

09:22:34 21          What's that?

09:22:36 22  A.       So this is inside of the pouch in the bottom, you can

09:22:39 23  see a small amount of white or off-white solid material.

09:22:43 24  Q.       Okay.  So after visually identifying these two places

09:22:47 25  on the brown leather pouch where there was a small amount of

Brewer - direct

09:22:50  1    white material, what did you do?

09:22:52  2    A.      So I used a metal spatula to remove a few particles

09:22:57  3    from both areas and I combined those particles into a test

09:23:01  4    tube for further testing.

09:23:03  5    Q.      And then what did you do?

09:23:04  6    A.      So I then dissolved these solid particles in a liquid

09:23:09  7    chemical known as methyl alcohol.  Methyl alcohol would

09:23:13  8    dissolve most controlled substances that we would be

09:23:16  9    analyzing for.

09:23:17 10    Q.      Once you dissolved it, what did you do?

09:23:19 11    A.      The first instrumental exam I did was called direct

09:23:23 12    analysis, in real time, time of flight, mass spectrometry,

09:23:28 13    or DART for short.

09:23:30 14    Q.      And can you explain how DART works?

09:23:36 15    A.      DART is what's known as a mass spectrometer.  So the

09:23:38 16    liquid sample will be volatilized into a gas state, formed

09:23:45 17    into an ion, or a charged particle, and traveled through the

09:23:48 18    mass spectrometer, where we would get what is known as a

09:23:52 19    mass discharge ratio.  This mass discharge ratio can be used

09:23:57 20    to determine the chemical formulas of any compounds that

09:24:00 21    were present in the liquid, and became ionized and went

09:24:04 22    through the instruments.

09:24:05 23    Q.      Do you know what that is, that mass discharge ratio

09:24:09 24    for instance, for cocaine?

09:24:10 25    A.      So for instance, cocaine has a chemical formula that

09:24:14 1  consists of 17 carbons, 21 hydrogens, one nitrogen, and four

09:24:19 2  oxygen's.  So when passed through this instrument, it should

09:24:23 3  give a peak of 304.154 for its mass discharge.

09:24:30 4  Q.    So if the substance you're examining shows that mass

09:24:32 5  discharge, is that an indication of cocaine?

09:24:34 6  A.    That's a presumptive indication that it could be

09:24:37 7  cocaine.  The building blocks that I described that make up

09:24:40 8  cocaine also make up other compounds that are not cocaine.

09:24:43 9  Q.    What did you do next?

09:24:44 10 A.    So the next technique I did on that methyl alcohol

09:24:48 11 solution is called gas chromatography mass spectrometry, or

09:24:55 12 GCMS.

09:24:55 13 Q.    And how did GCMS work?

09:24:58 14 A.    The GCMS is basically two instruments coupled

09:25:03 15 together, the first instrument is the gas chromatograph, or

09:25:08 16 the GC, the solution that I talked about may contain a

09:25:11 17 mixture of the compounds, they're injected in the GC where

09:25:15 18 they're instantly converted to the gas phase and then they

09:25:18 19 travel through a 30-meter long column.  This column has

09:25:22 20 what's known as a stationary phase on it and different

09:25:25 21 compounds will interact differently with that stationary

09:25:28 22 phase, so they will travel through the instrument in

09:25:30 23 different times.

09:25:31 24         So essentially, we get a, what's called a

09:25:37 25 chromatogram which shows various compounds coming through

Brewer - direct

09:25:39 1  the instrument at different times, so that piece of data is

09:25:42 2  called the chemicals retention time.  And a particular

09:25:46 3  chemical will demonstrate a similar retention time each time

09:25:51 4  it goes through the instrument.

09:25:52 5  Q.     And would a chemical that demonstrates a similar

09:25:55 6  time, for example, be cocaine?

09:25:56 7  A.     Yes, time is one of the pieces of data, we will

09:26:00 8  compare our unknown material to a reference material of a

09:26:04 9  known substance, for example, cocaine.

09:26:05 10  Q.     So based on these two tests, the DART and the GCMS,

09:26:10 11  after your visional examination, did you reach a conclusion

09:26:13 12  about the substance you were testing?

09:26:15 13  A.     Yes.  But I do have something to add for that

09:26:18 14  particular instrument.

09:26:19 15  Q.     Sure.  Go ahead.

09:26:20 16  A.     So for the GCMS, what I described in the first part

09:26:24 17  is the GC.  Once the compounds pass through the GC, they go

09:26:29 18  into the mass spectrometer, which is somewhat similar to the

09:26:33 19  DART that I described earlier, except that it's a higher

09:26:36 20  energy ion station, so the compound gets broken into its

09:26:40 21  building blocks in a repeatable manner, and they can use

09:26:44 22  that spectrum of how it's broke into its pieces to help

09:26:48 23  identify the material.

09:26:49 24  Q.     Thank you for that clarification.  Once you had done

09:26:51 25  all that, did you reach a conclusion?

Brewer - direct

09:26:53  1   A.      Yes, I did.

09:26:54  2   Q.      And what was your conclusion?

09:26:56  3   A.      Cocaine was identified within the residual white

09:27:00  4   particles that I had sampled.

09:27:02  5   Q.      Are there multiple forms of cocaine?

09:27:04  6   A.      Yes, there are.

09:27:05  7   Q.      And what are they?

09:27:07  8   A.      Cocaine can exist as many drugs, in either its base

09:27:12  9   form or a salt form.

09:27:14 10   Q.      And does what is commonly known as crack cocaine

09:27:17 11   present in one of those two forms?

09:27:18 12   A.      Crack cocaine is a -- the base form of cocaine.

09:27:22 13   Q.      Was the form of cocaine, whether cocaine base or

09:27:28 14   cocaine salt or hydrochloride, I think you said, determined

09:27:32 15   scientifically in this case?

09:27:34 16   A.      No, it's not.

09:27:34 17   Q.      Why is that?

09:27:35 18   A.      Because I had such little material, I went straight

09:27:39 19   to extracting it in solution, and once I had that material

09:27:42 20   in solution, if it was a salt it would disassociate, so the

09:27:46 21   base of the salt can't be differentiated.

09:27:51 22   Q.      Was the conclusion that cocaine was present in the

09:27:53 23   sample taken from the brown leather pouch memorialized in a

09:27:56 24   laboratory report?

09:27:58 25   A.      Yes, it was.

Brewer - direct

Q.      Did you prepare the report at or around the time near
your analysis?

A.      Yes.

Q.      Do you routinely prepare reports in the course of
regularly conducted examinations in controlled substances?

A.      Yes I do.

Q.      Is that a regular practice of yours required by the
FBI lab at Quantico?

A.      Yes.

        MR. WISE:  At this time Your Honor, I would move
in admission government Exhibit 108.

        MR. KOLANSKY:  No objection.

        THE COURT:  Thank you.  It's admitted.

        (Exhibit No. 108 was admitted into evidence.)

BY MR. WISE:

Q.      Do you see government Exhibit 108, Dr. Brewer?

A.      Yes.

Q.      And what's that?

A.      That's the first page of the laboratory report.

Q.      And is this the laboratory report you prepared?

A.      Yes, it appears to be based on the item description,
the second page would have my name on it.

Q.      Now, if we go to the, I believe it's the second page
under the title results of examination, what were the
results of the examination as reflected in this report?

Brewer - cross

09:28:59  1    A.      So this summarizes the fact that cocaine was

09:29:02  2    identified within the Item 1 residue.

09:29:05  3    Q.      And you said at the very beginning that Item 1 is the

09:29:08  4    brown leather pouch that has been marked, at least for

09:29:10  5    court, as government Exhibit 4; right?

09:29:13  6    A.      Yes.

09:29:17  7    Q.      Is cocaine a controlled substance?

09:29:22  8    A.      Yes, it is.

09:29:23  9            MR. WISE:  No further questions, Your Honor.

09:29:25 10            THE COURT:  Thank you.

09:29:26 11            Cross-exam.

09:29:29 12                    CROSS-EXAMINATION

09:29:34 13    BY MR. KOLANSKY:

09:29:44 14    Q.      Good morning, Dr. Brewer.

09:29:45 15    A.      Good morning.

09:29:46 16    Q.      My name is David Kolansky, I am one of the counsel

09:29:49 17    for Hunter Biden.  Good morning, ladies and gentlemen.

09:29:51 18            Dr. Brewer, you testified about residue that was

09:29:56 19    positive for trace amounts of cocaine, I believe your report

09:30:00 20    described it as a minimal amount; is that right?

09:30:02 21    A.      I believe the term was residue, but yes.

09:30:05 22    Q.      Residue, so a minimal amount of residue?

09:30:08 23    A.      Yes.

09:30:09 24    Q.      And that residue you said was combined when you did

09:30:13 25    your tests based on what was extracted from the pouch?

Brewer - cross

09:30:16  1   A.       Yes, I combined the two areas that were shown in the

09:30:19  2   photo, I combined those into one sample.

09:30:23  3   Q.       That residue that you collected, though, it was not a

09:30:26  4   lot of residue, it was minimal?

09:30:29  5   A.       Correct.

09:30:29  6   Q.       And that came from the pouch -- if I may, do you have

09:30:35  7   the pouch?

09:30:37  8            MR. KOLANSKY:  May I approach, Your Honor?

09:30:39  9            THE COURT:  You may.

09:30:41 10   BY MR. KOLANSKY:

09:30:41 11   Q.       So this is the pouch that you tested?

09:30:53 12   A.       Yes.

09:30:53 13   Q.       This was the pouch and it was collected in October,

09:30:56 14   from your investigation, it was collected in October of

09:31:00 15   2018, is that right?

09:31:00 16   A.       I am not aware of those details, I can speak to when

09:31:04 17   I received it.

09:31:04 18   Q.       And you received it in October of 2023?

09:31:06 19   A.       Yes, sir.

09:31:07 20   Q.       So if this investigation began in October of 2018,

09:31:13 21   and you received this pouch in October of 2023, that would

09:31:18 22   be five years between the time that it was first collected

09:31:23 23   and when you received it; is that right?

09:31:24 24   A.       Yes, based on those dates, that would be five years.

09:31:27 25   Q.       When you received the pouch in October of 2023, to

09:31:33 1    put that in sequence, that's after the charges were filed in

09:31:37 2    this case; is that right?

09:31:38 3    A.    I am not aware of those timelines.

09:31:41 4    Q.    Do you know when the charges were filed in this case?

09:31:44 5    A.    No.

09:31:45 6    Q.    But you know that after you received the pouch, it

09:31:49 7    had been requested by investigators in the course of this

09:31:52 8    investigation?

09:31:53 9    A.    Yes.   Generally we don't receive items until there is

09:31:56 10   a case that has been opened.

09:31:58 11   Q.    So you don't know, for example, if this case was

09:32:01 12   charged in September or August or October?

09:32:04 13   A.    No, sir.

09:32:08 14   Q.    When you received this pouch and you took the

09:32:11 15   evidence from it, you took the residue from it, excuse me,

09:32:15 16   there were no tests done on that residue prior to you having

09:32:18 17   received it?

09:32:19 18   A.    None that I'm aware of.

09:32:20 19   Q.    And no tests were done on the pouch itself prior to

09:32:23 20   when you had received it, there was nothing to go off of, is

09:32:27 21   that right?

09:32:27 22   A.    Can you rephrase that, please?

09:32:29 23   Q.    Yes, sure.   So when you received the pouch and you

09:32:32 24   collected the residue, from your investigation, your test

09:32:36 25   was the first test that was done on that residue sample, is

Brewer - cross

09:32:41 1    that correct?

09:32:41 2    A.    To my awareness, yes.

09:32:44 3    Q.    When you collected the residue, tested the sample,

09:32:49 4    tested positive for trace amounts, I think minimal amounts

09:32:55 5    of cocaine, is that right?

09:32:55 6    A.    Yes, residue.

09:32:55 7    Q.    Your tests, though, they don't indicate when that

09:32:58 8    residue got on this pouch, do they?

09:33:01 9    A.    They do not.

09:33:02 10   Q.    They don't indicate who put that residue on this

09:33:05 11   pouch or when that residue was put there?

09:33:07 12   A.    That is correct.

09:33:07 13   Q.    And they certainly don't indicate how long the

09:33:11 14   residue had been on the pouch?

09:33:14 15   A.    That's correct.

09:33:14 16   Q.    It could have been 2015?

09:33:16 17   A.    Any time before when I analyzed it.

09:33:18 18   Q.    '16?

09:33:19 19   A.    Yes, sir.

09:33:20 20   Q.    '17?

09:33:20 21   A.    Correct.

09:33:21 22   Q.    Even 2018?

09:33:23 23   A.    Sure.

09:33:24 24   Q.    But as far as you know, you can't date when that

09:33:27 25   residue got there or who put it there?

Brewer - cross

09:33:30 1    A.      I cannot.

09:33:35 2    Q.      And so I think you would agree that in your line of

09:33:39 3    work, chain of custody analysis is an important piece of

09:33:45 4    evidentiary testing, is that a fair assessment?

09:33:48 5    A.      Yes, chain of custody is very important.

09:33:50 6    Q.      And sample integrity from what comes from that pouch

09:33:55 7    or that piece of evidence is also important; right?

09:33:58 8    A.      In terms of chain of custody, is that what you mean

09:34:01 9    by sample integrity?

09:34:04 10   Q.      Yes.

09:34:04 11   A.      Yes.

09:34:05 12   Q.      And it's something that's routinely done in your line

09:34:08 13   of work in forensic toxicology and chemistry, is that fair?

09:34:13 14   A.      Do you mean maintaining the chain of custody?

09:34:17 15   Q.      I mean testing the chain of custody or analyzing the

09:34:20 16   chain of custody.

09:34:23 17   A.      We are required to maintain an accurate chain of

09:34:26 18   custody, I wouldn't say I analyze it or test it.

09:34:29 19   Q.      But in this case, when you received the pouch, no one

09:34:33 20   asked you to do fingerprint testing on this pouch, only to

09:34:38 21   test the residue, is that right?

09:34:39 22   A.      This came into the laboratory as what's called a

09:34:42 23   single unit submission, so it came in strictly for chemistry

09:34:46 24   exam.

09:34:47 25   Q.      I understand.

Brewer - cross

09:34:47  1          So you tested the residue that you would collect

09:34:51  2  from this pouch and that's it?

09:34:53  3  A.      Correct.

09:34:54  4  Q.      Not the pouch itself, not the fingerprints, not the

09:34:56  5  DNA that might have been on this pouch?

09:34:59  6  A.      Those are outside my area of expertise.

09:35:02  7  Q.      But you wouldn't know from your testing who had

09:35:05  8  handled this pouch, before, how long, how many people, you

09:35:09  9  wouldn't know that?

09:35:09 10  A.      No, chemistry exams do not determine that.

09:35:12 11  Q.      And so, in your test, you can't tell when the residue

09:35:24 12  got on here, who put it there, how long it had been there or

09:35:28 13  who handled that?

09:35:30 14  A.      Correct.

09:35:30 15  Q.      And that's because it's not possible from your tests?

09:35:33 16  A.      Correct, my testing is limited to chemistry.

09:35:36 17          MR. KOLANSKY:  Thank you, Dr. Brewer.  No

09:35:38 18  further questions.

09:35:38 19          THE COURT:  Thank you.

09:35:39 20          Any redirect.

09:35:40 21          MR. WISE:  No, Your Honor.  Thank you.

09:35:42 22          THE COURT:  All right.  Thank you, sir, you may

09:35:44 23  step down.

09:35:45 24          Mr. Hines, what's next.

09:35:46 25          MR. HINES:  The United States calls Special

Romig - direct

09:35:50  1    Agent Joshua Romig.

09:35:59  2                 COURTROOM DEPUTY:  Please raise your right hand.

09:36:03  3    Please state and spell your full name for the record.

09:36:16  4                 THE WITNESS:  Joshua Romig, R-O-M-I-G.

09:36:23  5                 JOSHUA ROMIG, having been duly sworn, was

09:36:28  6    examined and testified as follows:

09:36:30  7                          DIRECT EXAMINATION

09:36:31  8    BY MR. HINES:

09:36:37  9    Q.      Good morning, sir.

09:36:38 10    A.      Good morning.

09:36:39 11    Q.      Sir, where do you work?

09:36:41 12    A.      For the Drug Enforcement Administration in

09:36:43 13    Philadelphia, Pennsylvania.

09:36:45 14    Q.      What is your title?

09:36:46 15    A.      I am currently the Assistant Special Agent in charge.

09:36:49 16    Q.      How long have you served with the DEA?

09:36:51 17    A.      Since 2008.

09:36:53 18    Q.      What are the various titles you have had over that

09:36:56 19    course of time?

09:36:56 20    A.      With the DEA?

09:36:58 21    Q.      Yes, sir?

09:36:58 22    A.      I was a Special Agent, when I got hired, we're all

09:37:02 23    Special Agents, and then in 2018, I got promoted to group

09:37:11 24    supervisor of a group in Philadelphia, and then for about a

09:37:11 25    year before I did my headquarters time, I was the resident

Romig - direct

09:37:15  1    agent in charge in Allentown, Pennsylvania.

09:37:17  2    Q.      How about prior law enforcement experience before you

09:37:21  3    got into the DEA?

09:37:21  4    A.      I started my law enforcement career in 1999, in the

09:37:25  5    Baltimore City Police Department, I was a patrol officer,

09:37:28  6    and then assigned to the patrol division, I should say, and

09:37:31  7    then I was a Berks County Detective assigned to the

09:37:34  8    narcotics unit there for about seven years.

09:37:37  9    Q.      In Berks County, Pennsylvania?

09:37:39 10    A.      In Reading, Pennsylvania, yes, sir.

09:37:41 11    Q.      During the course of your, what is that, 24-year

09:37:46 12    career with law enforcement?

09:37:47 13    A.      It will be 25 in August.

09:37:48 14    Q.      Have you investigated narcotic offenses sort of

09:37:53 15    throughout that time period?

09:37:54 16    A.      Primarily over that 25 years, that's what I have

09:37:56 17    done.

09:37:57 18    Q.      What kind of experience have you obtained during the

09:38:00 19    course of investigating narcotics offenses over that time

09:38:05 20    period?

09:38:06 21    A.      That's an interesting -- I mean that's literally all

09:38:10 22    I've done for the last quarter century, even in the patrol

09:38:14 23    division in Baltimore, one of my primary duties was to

09:38:18 24    investigate drug offenses, I was assigned to the Northwest

09:38:23 25    District, which is, the general area is Park Heights,

Romig - direct

09:38:27 1    Pimlico Raceway, the Preakness, and very high drug

09:38:30 2    distribution area back then, open air drug markets, guys

09:38:34 3    selling on the street, open air hand to hand, so one of my

09:38:38 4    duties was to investigate drug crimes even as a uniformed

09:38:43 5    Patrolman.  Even in the patrol division, I had the

09:38:45 6    opportunity to work in a plain clothes capacity, also in an

09:38:49 7    undercover capacity to purchase drugs as, I was pretending

09:38:54 8    to be a drug user.  And then once I left the Baltimore

09:38:59 9    Police Department, and got hired by the Berks County

09:39:02 10   District Attorney's office, my primary function in the drug

09:39:04 11   unit there, was to investigate drug crimes.

09:39:07 12           I did that for over five of the years that I was

09:39:13 13   assigned to the DA's office, was just investigate drug

09:39:17 14   trafficking offenses.  I was very briefly assigned to the

09:39:21 15   warrant unit before I got hired by DEA, because my boss

09:39:25 16   didn't want me to get involved in anymore court cases

09:39:28 17   because he knew I was leaving.  And then since I have been a

09:39:33 18   DEA agent, the only thing, we're a single mission agency,

09:39:37 19   all we do is investigate drug trafficking.  There are

09:39:40 20   nuances to those drug trafficking cases, we investigate

09:39:45 21   money laundering when it comes to drugs, we investigate some

09:39:49 22   firearm offenses when it comes to drug traffickers, theft of

09:39:49 23   firearms, but my primary responsibility is to investigate

09:39:54 24   drug trafficking.

09:39:54 25   Q.    During the course of that experience, have you

Romig - direct

09:39:56  1    investigated both small scale drug trafficking and large

09:40:00  2    scale drug trafficking?

09:40:01  3    A.      Over the last 25 years both, certainly, I mean, the,

09:40:05  4    I will say the more my career has progressed, especially

09:40:10  5    with DEA, we want to target the higher level drug

09:40:15  6    traffickers with the Drug Enforcement Administration, we

09:40:18  7    don't want to target smaller level distributors.

09:40:21  8    Q.      During the course of those investigations, do you

09:40:24  9    often have to start off the small scale level and work your

09:40:28 10    way up within an organization to get to the top?

09:40:30 11    A.      Yes, very rarely, unless you have a highly placed

09:40:34 12    informant or some other method to start big.  Typically you

09:40:38 13    will have to start on a smaller scale, and I have had the

09:40:42 14    ability or the -- I have had to do that numerous times,

09:40:49 15    especially in New York when I first started, I was assigned

09:40:51 16    to the New York Division, and then moving on to Allentown,

09:40:55 17    Pennsylvania when I left New York, I had to start with some

09:40:58 18    smaller purchases and then work my way up to federal wire

09:41:02 19    taps on bigger targets.

09:41:03 20    Q.      Is the goal to work your way up to disrupt and

09:41:06 21    dismantle the ultimate source of supply?

09:41:09 22    A.      Yes, always.

09:41:10 23    Q.      During the course of your investigations, have you

09:41:13 24    had the occasion to interview arrestees, confidential

09:41:18 25    sources, and individuals who are using or purchasing

Romig - direct

09:41:20  1   narcotics?

09:41:21  2   A.      Yes.  Over the last 25 years, or almost 25 years,

09:41:25  3   that's primarily been one of my main functions.

09:41:28  4   Q.      Have you reviewed messages, electronic evidence,

09:41:33  5   phone messages, things of that nature by individuals who use

09:41:38  6   narcotics or seek to purchase them?

09:41:40  7   A.      Yes.

09:41:40  8   Q.      And during the course of that experience, have you

09:41:43  9   learned the language in which drug users and drug addicts

09:41:47 10   speak with drug sellers to communicate about purchasing

09:41:51 11   drugs?

09:41:52 12   A.      Yes.

09:41:52 13   Q.      Have you previously been qualified as an expert in

09:41:55 14   the field of drug trafficking and coded language?

09:41:59 15   A.      I have.

09:41:59 16   Q.      In which courts have you been qualified as an expert

09:42:03 17   to the best you can recall?

09:42:04 18   A.      Yeah, so I was qualified as an expert for the first

09:42:07 19   time in the Circuit Court of Maryland, which is the, we're

09:42:12 20   not in Pennsylvania, we're in Delaware, disregard, Circuit

09:42:16 21   Court of Maryland I was qualified in a crack cocaine case,

09:42:19 22   again, as I described earlier where I was also actually the

09:42:22 23   affiant in that case, the investigating agent, I was in

09:42:26 24   uniform, but hiding out in an abandoned house watching a guy

09:42:32 25   sell crack cocaine, doing hand to hand with users, I

09:42:35  1    testified as an expert and gave an opinion of whether the

09:42:38  2    drugs we seized from him were for the purpose of delivering

09:42:42  3    the drugs or for the purposes of using the drugs and that

09:42:45  4    was again, Circuit Court of Maryland, probably 2001.

09:42:49  5    Q.    Since that time, and I don't mean to interrupt,

09:42:52  6    moving forward, have you been qualified on a number of

09:42:54  7    occasions?

09:42:55  8    A.    Common Pleas Court, which is the equivalent of

09:42:59  9    Circuit Court in Pennsylvania, the Circuit Court of

09:43:01 10    Maryland, the Common Pleas Court of Pennsylvania, numerous

09:43:05 11    times as an expert witness to render opinions as to whether

09:43:08 12    drugs were possessed for purpose of selling them, or for the

09:43:13 13    purpose of using them.

09:43:14 14           And then I was qualified as an expert in New

09:43:17 15    York in a grand jury proceeding, I was qualified in a

09:43:21 16    special narcotic court proceeding, I was qualified as an

09:43:24 17    expert in Federal Court, in Philadelphia, in the Eastern

09:43:27 18    District of Pennsylvania several times, I was qualified as

09:43:29 19    an expert in coded language and drug money laundering in

09:43:33 20    this district, in Wilmington, in Federal Court in this

09:43:37 21    building two years ago, maybe a little less than two years

09:43:42 22    ago.  And I think that's it.

09:43:48 23    Q.    Okay.

09:43:48 24           MR. HINES:  At this time, Your Honor, we offer

09:43:50 25    Special Agent Romig as an expert in the manner and means of

Romig - direct

09:43:53  1    drug trafficking and coded language.

09:43:55  2                    MR. LOWELL:  No objection.

09:43:57  3                    THE COURT:  Thank you.  He will be recognized as

09:44:00  4    an expert.

09:44:00  5    BY MR. HINES:

09:44:01  6    Q.      Agent Romig, I would like to start by asking you some

09:44:04  7    general questions about the drug trade.  Based on your

09:44:07  8    training and experience, can you please describe how

09:44:10  9    generally the drug product like cocaine makes its way into

09:44:14 10    the United States and gets to the distributors?

09:44:18 11    A.      If you're saying specifically cocaine --

09:44:20 12                    MR. LOWELL:  Your Honor, I object, can we go to

09:44:22 13    side-bar?

09:46:08 14                    (Side-bare discussion.

09:46:08 15                    MR. LOWELL:  Your Honor, the reason that I am

09:46:08 16    objecting is that I don't understand the relevance of -- if

09:46:08 17    it is relevant beyond its prejudice versus probative value

09:46:08 18    of having long testimony about how cocaine is grown,

09:46:08 19    processed, distributed -- shipped into the United States, I

09:46:08 20    mean, that's not what this case is about.  He's talked about

09:46:08 21    his purpose is to stop distribution.  We don't have any

09:46:08 22    objection to the idea that he can interpret texts or

09:46:08 23    messages, but the idea that we're now going to take a long

09:46:08 24    road from how it's grown to how it's produced to how it's

09:46:08 25    brought in the United States, I don't see the relevance in

Romig - direct

09:46:08 1    the case.

09:46:08 2              MR. HINES:  It's not going to be a long road,

09:46:08 3    I'm merely establishing if the jury understands what cocaine

09:46:08 4    is and generally where it comes from to get to its source

09:46:08 5    distribution points, and that forms the basis for Mr. Romig

09:46:08 6    to testify about how he knows what the drugs are and how the

09:46:08 7    language works in the drug trade so he can give an opinion

09:46:08 8    to the messages which I seek to put up.  This won't be a

09:46:08 9    long road.

09:46:08 10             MR. LOWELL:  Ten feet, 2 miles, what's the

09:46:08 11   length of the road?

09:46:08 12             MR. HINES:  Not as long as the roads you travel,

09:46:08 13   Mr. Lowell.

09:46:08 14             MR. LOWELL:  Well, that's very -- okay.  I just

09:46:08 15   want to see.  I may object if it goes longer, but

09:46:08 16   understanding that, let's go.

09:46:08 17             (End of side-bar.

09:46:12 18   BY MR. HINES:

09:46:12 19   Q.     Agent Romig, I'll re-ask the question.  Could you

09:46:16 20   briefly describe how, where cocaine originates and then

09:46:20 21   ultimately how it gets to a state like Delaware or

09:46:23 22   California?

09:46:23 23   A.     Sure.  So cocaine is different from the other drugs,

09:46:27 24   in that it's produced primarily in the South American Andean

09:46:33 25   region, which is Columbia, Peru, the countries in South

Romig - direct

09:46:37  1  America.  And then it is transported numerous ways.  The

09:46:45  2  main method of transportation is through Mexico.  The

09:46:48  3  Mexican Cartels control transportation as they have for

09:46:51  4  years.  And it will be transported across our land, southern

09:46:56  5  boarder.  That's the main method.  There are dozens of other

09:47:00  6  methods where cocaine, how it gets here from Columbia,

09:47:03  7  including airplanes, through the Caribbean corridor, also

09:47:09  8  ships, container ships through Ecuador and the Dominican

09:47:13  9  Republic, but again the primary method is across our

09:47:17 10  southern boarder through Mexico.

09:47:19 11  Q.     Why is there a demand for it in the United States?

09:47:22 12  A.     That's an interesting question.  We have a lot of

09:47:24 13  cocaine users in the United States, so Colombians and

09:47:32 14  Peruvians continue to produce it and the distributors

09:47:34 15  continue to sell it, it's basic economics, it's no different

09:47:38 16  than any other product, anything that there is demand for,

09:47:40 17  the distributors will find a way to distribute it to make

09:47:44 18  money.

09:47:44 19  Q.     And what is crack cocaine?

09:47:46 20  A.     Crack cocaine is cocaine.  There is really only a

09:47:51 21  level difference on chemistry, it's a more easily smokeable

09:47:56 22  form of cocaine and it's actually -- it's actually cocaine

09:48:00 23  based, so it's a more pure form of cocaine powder.  Cocaine

09:48:06 24  powder, which is how the cocaine is transported to the

09:48:09 25  United States, cocaine hydrochloride, when you -- you can

09:48:14  1    cut cocaine, as distributors typically do, to make more

09:48:18  2    money on their product, they add adulterants to it or other

09:48:25  3    products to it.  One of the more common products that they

09:48:27  4    add to make more of it, to make more money, is an inositol

09:48:31  5    which is a dietary supplement.  If you cook it to make it

09:48:35  6    into a crack cocaine the inositol actually falls to the

09:48:40  7    bottom and wouldn't stick to the crack cocaine.  An example,

09:48:42  8    if you have an ounce, 28.35 grams of powdered cocaine and

09:48:49  9    you cook that into crack, if there is inositol or another

09:48:54 10    nonactive, or noncontrolled substance or ingredient that's

09:48:56 11    cut there, you will lose that product.  So if the drug

09:48:59 12    dealer had cut his cocaine powder with three grams of

09:49:03 13    inositol, when you cook it into crack, you'll only have like

09:49:09 14    25 grams of crack, you wouldn't have a full ounce.  That's a

09:49:12 15    long winded way of explaining that, but that's the best I

09:49:15 16    can do.

09:49:15 17    Q.    Now, do agents routinely consult you for interpreting

09:49:20 18    electronic messages, texts, things of that nature in

09:49:24 19    connection with their drug investigation?

09:49:26 20    A.    Yes.  My primarily, when I started with DEA, one of

09:49:30 21    the ways that we use to be able to target higher level

09:49:35 22    violators was through wire taps.  So for nine years as a

09:49:40 23    working Special Agent with the DEA in New York and

09:49:42 24    Allentown, my primary function was to conduct wire tap

09:49:47 25    investigations.  So I have literally listened to thousands

Romig - direct

09:49:50  1    and thousands and thousands of calls, intercepted calls

09:49:53  2    between buyers and sellers, and then looked at or reviewed

09:50:00  3    thousands of text messages, WhatsApp messages, again,

09:50:07  4    between buyers and sellers.

09:50:08  5    Q.    So wire taps occur when law enforcement is actively

09:50:13  6    investigating an individual as they're committing the crime,

09:50:17  7    is that right?

09:50:17  8    A.    It can, yes.

09:50:18  9    Q.    Are there cases in which you review or testify where

09:50:22 10    you are sort of looking back, looking back at a set of data

09:50:25 11    like messages from someone's phone without the benefit of a

09:50:28 12    wire tap at that time?

09:50:30 13    A.    Yes.  I mean, again, before -- sorry to cut you off.

09:50:34 14    Before conducting dozen of federal wire taps when I was a

09:50:40 15    County Detective, I had the ability to participate in state

09:50:43 16    wire tap investigations, but I also had the ability to

09:50:46 17    download defendant's cell phones, look at defendant's cell

09:50:50 18    phones upon arrest, and you know, again, interpret codes and

09:50:54 19    language, you know, intricate codes, rudimentary codes, yes.

09:50:59 20    Q.    So in those instances, when you're looking back, do

09:51:03 21    you only have the benefit of what is actually written out in

09:51:06 22    the form of a message usually?

09:51:09 23    A.    I mean, sometimes there is some context if I was able

09:51:12 24    to interview the defendant, if I was able to interview

09:51:16 25    somebody who knew the defendant, like an informant who could

Romig - direct

09:51:20  1   help with the coded language.  Sometimes there is none of

09:51:22  2   that at all, and all you have to go on is the messages.

09:51:25  3   Q.      And does that, in cases in which you reviewed, are

09:51:30  4   there sometimes gaps in messages with where a person, a

09:51:34  5   target, a defendant isn't actually communicating by written

09:51:37  6   message during a period of time?

09:51:38  7   A.      Of course, especially this day and age, there is so

09:51:44  8   many different applications that people use, so it's

09:51:48  9   sometimes frustrating for law enforcement, but there is --

09:51:51 10   you know, there is standard text messages, SMS, there is

09:51:56 11   iMessages, there is WhatsApp, there is Signal, there is

09:51:59 12   Telegram, there is Serena, so many telecommunications

09:52:03 13   platforms, and if a user switches to a different platform,

09:52:06 14   you're not going to have those communications sometimes.

09:52:09 15   Q.      Do some of those platforms have end to end encryption

09:52:12 16   where the communications are not preserved?

09:52:15 17   A.      They do.

09:52:16 18   Q.      In this case, first of all, did you have any personal

09:52:19 19   involvement in the investigation of the defendant, Robert

09:52:22 20   Hunter Biden?

09:52:22 21   A.      None whatsoever.

09:52:23 22   Q.      Were you consulted as you are in other cases to

09:52:26 23   review a summary chart of some text messages that you

09:52:30 24   understand were on the defendant's electronic devices?

09:52:34 25   A.      Yes.

Romig - direct

09:52:34  1    Q.      I'm going to show you was been marked as government

09:52:39  2    Exhibit 18, and we're going to go through some of those

09:52:42  3    messages that have been read into the record previously but

09:52:46  4    without the benefit of interpretation.

09:52:48  5            If you could please go and look at this first

09:52:50  6    string of messages, the one I'm going to ask you about

09:52:53  7    specifically is Row 3, but there is some context around that

09:52:57  8    that I would like you to indicate for us, Mr. Romig, if it

09:53:03  9    helps to interpret it.  The message on Row 3 says "if you

09:53:06 10    can be here by 6:45, I can do another 1.4 on top what you

09:53:13 11    owe," looks like a typo, top of what you owe, from Mr. Biden

09:53:19 12    to Clifford O'Brien.  Do you see that message there?

09:53:22 13    A.      Yes.

09:53:23 14    Q.      Based on your training and experience, do you have an

09:53:26 15    opinion as to what 1.4 means and what this message means?

09:53:31 16    A.      Yeah, but just to be clear -- yes, but just to be

09:53:35 17    clear, not just based on this message independent of

09:53:37 18    anything else, it's based on my review of all of the

09:53:41 19    testimony, all of the messages, and based on that, this

09:53:46 20    message and the messages that precede it, I would say that

09:53:50 21    he's asking for another 1.4 grams on top of whatever O'Brien

09:53:56 22    is bringing, or whoever is running for O'Brien, is bringing.

09:53:59 23    Q.      Turning to row-- well, you said 1.4 grams.  Is grams

09:54:05 24    a weight or a term used in drug trafficking?

09:54:09 25    A.      Yes.  So it is, yes.  So it's a little confusing in

09:54:13 1    the United States because the traffickers like I said, the

09:54:17 2    producers are from South America, the traffickers are from

09:54:21 3    Mexico, so there are two different measuring systems that

09:54:24 4    we're using obviously, there is kilograms and pounds.

09:54:28 5    However, to make it more easily understandable, a dime bag,

09:54:33 6    a $10 bag of crack cocaine is typically around a 10th of a

09:54:38 7    gram of crack cocaine, which is one hit, that's one dosage

09:54:43 8    unit of crack cocaine.  So if somebody is on the street and

09:54:45 9    wants to get high and has $10, they'll buy a $10 bag.  So

09:54:51 10   1.4 grams would be the equivalent of about 14 dime bags of

09:54:55 11   crack cocaine.  Obviously, just like any other product, if

09:54:58 12   you buy in bulk, the price is going to come down, the more

09:55:01 13   you buy, the price gets cheaper.  The smaller dosage units

09:55:06 14   you buy, the more expensive it's going to be.

09:55:08 15   Q.    And the follow-up message here on Row 4 to that

09:55:14 16   message when Mr. O'Brien says "I'm stuck in traffic, bro,

09:55:20 17   with all your shit, ha, ha, ha, ha, ha", did that inform

09:55:24 18   your understanding of the 1.4 in the prior message?

09:55:27 19   A.    That to me would mean he's on the highway with all

09:55:30 20   the product in the car.

09:55:31 21   Q.    Turning to Rows 20 and 21.  Were you asked to look at

09:55:36 22   the images that are in Rows 20, 21, that Clifford O'Brien

09:55:42 23   exchanged with Hunter Biden and that Hunter Biden exchanged

09:55:44 24   with Clifford O'Brien?

09:55:46 25   A.    Yes.

Romig - direct

09:55:46  1  Q.      And did you see the title on the photograph in Row 21

09:55:51  2  in which Mr. -- the defendant sent Clifford O'Brien?

09:55:55  3  A.      Yes.

09:55:56  4  Q.      And what does that title say, can you see it?

09:55:59  5  A.      Yes, which under any value known to any market in the

09:56:04  6  world, what I paid is 60 percent greater.

09:56:06  7  Q.      What do you see in the photographs here, based on

09:56:09  8  your training and experience?

09:56:10  9  A.      I mean, I see what appears to be crack cocaine.

09:56:13 10  Again just to be clear, could be compressed powder, again,

09:56:17 11  cocaine comes into this country, they press it into kilogram

09:56:21 12  bricks, they can press it into a million things based on how

09:56:26 13  it's hidden, it can be hidden in tires, car parts, I have

09:56:31 14  seized 150 kilograms hidden in fake bananas, plantains, in a

09:56:37 15  55,000 pound shipping container, it can be hidden inside

09:56:40 16  anything.  But typically the cocaine powder is pressed into

09:56:44 17  kilogram bricks with hydraulic presses.  Even when the coke

09:56:48 18  gets here, typically dealers can repress it once it's cut

09:56:52 19  like we talked about with the inositol, it can be repressed

09:56:56 20  to appear that it hasn't been tampered with for

09:57:01 21  distribution.  When it's pressed, the powder, not crack, but

09:57:04 22  cocaine hydrochloride, cocaine powder is pressed into a

09:57:08 23  brick, it appears very similar to crack, this to me looks

09:57:11 24  like crack, but without the chemistry knowledge, it could

09:57:15 25  also be pressed cocaine off of a brick of cocaine, but

09:57:18  1    again, it appears to be cocaine.

09:57:20  2    Q.    In the second image that the defendant sent, is there

09:57:23  3    a digital scale in the background?

09:57:26  4    A.    There is.

09:57:26  5    Q.    Are digital scales used by drug purchasers and drug

09:57:30  6    sellers?

09:57:30  7    A.    Yes.

09:57:31  8    Q.    Why are digital scales used?

09:57:33  9    A.    To verify that the person paying for the product got

09:57:37 10    what they paid for.

09:57:37 11    Q.    When Mr. Biden says "which under any value known to

09:57:42 12    any market in the world, what I paid is 60 percent greater,"

09:57:45 13    based on your training and experience, do you have an

09:57:46 14    understanding or an opinion about what he's talking about

09:57:48 15    there?

09:57:49 16    A.    I do, the person that sent that message is clearly

09:57:52 17    upset that the amount is a lot smaller than what he paid

09:57:55 18    for, only 4.7 grams it appears by the scale.

09:57:59 19    Q.    Based on the arithmetic that you were doing earlier,

09:58:02 20    as far as a tenth of a gram being a hit, roughly how many

09:58:07 21    uses is 4.7 grams for a user?

09:58:09 22    A.    Mr. Hines, don't ask me to do math, I'm sorry, it's

09:58:13 23    4.7 times .1, I would need a calculator for it.  3.5 grams

09:58:19 24    is commonly referred to as an 8-Ball on the street, an

09:58:23 25    eighth of an ounce, when I was doing undercover or using

Romig - direct

09:58:27 1    CI's, an eighth of an ounce varied for $120 all the way up

09:58:32 2    to $220 based on the buyer/seller relationship.

09:58:35 3    Q.    Directing your attention to the rows 27 and 28, and

09:58:40 4    there is surrounding messages here, actually let's go to the

09:58:46 5    previous page, please.  The defendant says "come get, how

09:58:54 6    much I owe?  Can you get baby powder?"  On the following

09:58:58 7    page says "the really soft stuff."  Based on your training

09:59:01 8    and experience, do you have an opinion on what the coded

09:59:04 9    language is that we see in this messages?

09:59:06 10   A.    Yes.  They're asking for powdered cocaine, not crack

09:59:11 11   cocaine.

09:59:11 12   Q.    And as you testified earlier, powdered cocaine can be

09:59:15 13   cooked into crack cocaine; is that right?

09:59:17 14   A.    Correct, very easily, baking soda, water, heat.

09:59:20 15   Q.    And the date of this message, is that May 6, 2018, on

09:59:25 16   the bottom there, do you see that May 6, 2018?

09:59:28 17   A.    It is.  May 5th is the first message and then May 6th

09:59:33 18   is the second.

09:59:34 19   Q.    Thank you.  "Really soft stuff", does that also

09:59:37 20   inform your interpretation?

09:59:39 21   A.    Yes, he's asking for cocaine powder, again, this is a

09:59:42 22   rudimentary pretty standard code.

09:59:47 23   Q.    Turning next to Row 32, actually Row 31.  The word

09:59:57 24   "party favor" is used there from the defendant to an

10:00:00 25   individual named Vladimir Peteov, as stated in his contacts,

Romig - direct

10:00:07 1    do you have an opinion based on your training and experience

10:00:09 2    as to what "party favor" is a reference to?

10:00:11 3    A.      Generally drugs, but if this is buyer/seller

10:00:16 4    dependent, generally drugs, I can't tell you whether it's

10:00:21 5    cocaine, crack cocaine, but just generally drugs.  That's

10:00:24 6    going to be based on whatever the relationship was between

10:00:27 7    the buyer and seller prior to this message, or prior to the

10:00:30 8    last time that they met or did some sort of deal, drug deal.

10:00:35 9    Q.      Now, I would like to turn to Rows 74 to 80, please.

10:00:42 10   The series of messages that the jury has seen between

10:00:45 11   someone named Michael and the defendant, do you see where it

10:00:49 12   starts, "you want ten grams", in the middle of the page?

10:00:52 13   A.      Yes.

10:00:52 14   Q.      Again, grams is a language in the drug trade used

10:00:58 15   about the weight of the drug, right?

10:00:59 16   A.      Yeah, again, based on all the other messages and my

10:01:03 17   review of the testimony, I would say this is either ten

10:01:06 18   grams of crack, cocaine base, or cocaine powder.

10:01:10 19   Q.      You said in review of the testimony, have you been

10:01:12 20   listening to some of the testimony during this trial?

10:01:14 21   A.      I have, been on the third floor in the overflow room

10:01:19 22   watching on a closed circuit.

10:01:21 23   Q.      Does the language in which those witnesses have

10:01:24 24   spoken inform the basis of your testimony here today as well

10:01:30 25   in addition to your experience?

Romig - direct

10:01:30  1    A.        Yes, and the review of all the messages.

10:01:33  2    Q.        You heard, for example, Zoe Kestan testify in this

10:01:37  3    case?

10:01:37  4    A.        I did.

10:01:39  5    Q.        And this message is in July of 2018, correct, the end

10:01:43  6    of July, July 25th?

10:01:45  7    A.        July 25th, 2018, all three of these messages.

10:01:49  8    Q.        If you look at the following page, when after the

10:01:53  9    defendant says "Y" do you understand "Y" to be a reference

10:02:01 10    to yes?

10:02:01 11    A.        Yes.  Yes and yes.

10:02:03 12    Q.        At the bottom of the page, Michael tells the

10:02:06 13    defendant "he said 600".  Do you have an opinion as to what

10:02:10 14    he's referencing?

10:02:11 15    A.        $600 for the ten grams.

10:02:13 16    Q.        Is that about the fair market value of cocaine or

10:02:19 17    crack cocaine around July of 2018?

10:02:22 18    A.        I think it's pretty significantly higher than the

10:02:24 19    fair market value, but again, those are based on

10:02:29 20    buyer/seller relationships.  I can give you plenty of

10:02:31 21    examples of where I would make an undercover purchase or I

10:02:34 22    would have a CI make a purchase, a confidential informant

10:02:38 23    make a purchase, and we go to the same dealer on the same

10:02:42 24    day and a different confidential source, or a different

10:02:47 25    undercover would get the product for a lot more, or a lot

Romig - direct

10:02:50  1   less, that's based on a seller buyer relationship.

10:02:53  2   Q.      Based on your experience, do the sellers size up the

10:02:57  3   client or customer and see what they might be willing to pay

10:02:59  4   for the product?

10:03:00  5   A.      100 percent, that's what happens, like any other

10:03:03  6   sale, drugs are no different.

10:03:04  7   Q.      Turning to Row 87, the defendant says "I need more

10:03:13  8   chore boy, but regardless come back and yes."  What is chore

10:03:17  9   boy?

10:03:17  10  A.      It's a -- it's a scouring pad, so it's the pieces of

10:03:24  11  the scouring pad that are used as a filter for the pipe, for

10:03:28  12  a crack pipe, or a meth pipe, or you know --

10:03:32  13  Q.      Is that common?

10:03:33  14  A.      Yes, very common.

10:03:35  15  Q.      Turning to Rows 172 to 181, someone asked the

10:03:43  16  defendant "what did you need", on that first row.  And then

10:03:47  17  there is a series of text messages and then the defendant

10:03:50  18  responds "ounce", is ounce another term used in the drug

10:03:56  19  trade?

10:03:56  20  A.      Yeah, that's just based on the difference between our

10:04:00  21  measuring systems, but an ounce is 28.35 grams, and it's one

10:04:05  22  of the most commonly distributed quantities of cocaine and

10:04:10  23  crack cocaine.

10:04:11  24  Q.      And this message is in November of 2018, correct?

10:04:14  25  A.      Correct, November 27th, 2018.

10:04:17 1    Q.    Turning to the following page, an individual says

10:04:26 2    "it's only going to be 1450 instead of the 16", what did you

10:04:30 3    understand that to mean based on your training and

10:04:32 4    experience?

10:04:32 5    A.    $1,450.

10:04:37 6    Q.    Instead of $1,600?

10:04:39 7    A.    Yes.

10:04:39 8    Q.    Turning to the next page on the line, on Row 180,

10:04:46 9    individual says "yes and then 17 gram pure, give him 1,100,

10:04:50 10   you'll be happy."  What did you understand that to be based

10:04:53 11   on your training and experience?

10:04:54 12   A.    That the distributor didn't have access to the ounce,

10:04:58 13   he only had 17 grams instead of 23.85, and the discount was

10:05:03 14   going to be $1,100 for the 17 grams, not $1,100 discount, it

10:05:07 15   was going to cost $1,100 for the 17 grams.

10:05:11 16   Q.    Turning to Row 208.  Have you looked at this video in

10:05:19 17   advance of your testimony today?

10:05:21 18   A.    I have.

10:05:22 19   Q.    And the object displayed in the defendant's hand, do

10:05:27 20   you have an opinion as to what that is based on your

10:05:29 21   training and experience?

10:05:30 22   A.    Based on my training and experience, but also based

10:05:33 23   on again the totality of all the evidence that I have

10:05:36 24   reviewed, it appears to be a crack pipe.

10:05:39 25   Q.    And this is another line item in the year 2018;

10:05:44  1    correct?

10:05:45  2    A.    It's 12/22/2018.

10:05:50  3    Q.    Turning to Row 213, could we please play that video,

10:06:04  4    Ms. Vo?

10:06:05  5          Agent Romig, did you review this video in

10:06:23  6    advance of your testimony that we're about to play?

10:06:26  7    A.    I did.

10:06:27  8          (Video played.)

10:06:40  9    BY MR. HINES:

10:06:41 10    Q.    Did you hear in that video, an individual say "2.07

10:06:46 11    without the bag", or words to that effect?

10:06:48 12    A.    Correct.  I did hear that.

10:06:50 13    Q.    And do you have an opinion based on your training and

10:06:52 14    experience and your hearing the testimony in this case as to

10:06:56 15    what that's in reference to?

10:06:57 16    A.    Yes, visually you could see the scale, it appears to

10:07:01 17    be just over two grams of either crack cocaine, or again

10:07:04 18    could potentially be compressed powder that looks like crack

10:07:09 19    cocaine, cocaine powder that looks like crack cocaine.

10:07:12 20    Q.    Is that consistent with how you testified earlier

10:07:14 21    that drug purchasers will sometimes weigh the product that

10:07:17 22    they get to verify that they received what they paid for?

10:07:21 23    A.    Correct.

10:07:22 24    Q.    Now, turning next to the next row, page -- Row 214 in

10:07:30 25    the summary chart.  Do you have an opinion based on your

Romig - direct

10:07:36 1  training and experience and hearing the witnesses in this

10:07:38 2  case, as to what is in the hand of that individual in

10:07:43 3  Row 214?

10:07:44 4  A.    Yes, it looks like a crack pipe.

10:07:48 5  Q.    Row 216, if we zoom in on the object next to the book

10:07:58 6  in the right photograph, just the right photograph?

10:08:03 7  A.    Yep, a little bit more elaborate, the object, but

10:08:07 8  again, it appears to be a crack pipe.

10:08:09 9  Q.    Is this a device that you have seen or similar

10:08:13 10 looking devices during the course of your investigations

10:08:15 11 when you, for example, arrested defendants or searched

10:08:19 12 locations?

10:08:20 13 A.    Yes.

10:08:22 14 Q.    Can you describe how that device works?

10:08:24 15 A.    You can see the burn mark on the side of the glass

10:08:30 16 pipe.  You put the crack in there, you have the filter

10:08:34 17 pretty much close to where the burn mark is, and you can

10:08:37 18 smoke out of the top, a white piece out of the top.  The

10:08:40 19 smoke will go in the bottom and come up through the stem

10:08:43 20 into your mouth.

10:08:45 21 Q.    Row 222?

10:08:47 22 A.    Not your mouth, but whoever's mouth is smoking the

10:08:50 23 pipe, sorry.

10:08:51 24 Q.    Thank you for that clarification, agent.

10:08:53 25       Row 222, the defendant says, "one full."  Based

10:08:59  1    on everything we have been talking about, training,

10:09:01  2    experience, hearing the witnesses, and the reviewing of the

10:09:04  3    surrounding context, do you have an opinion as to what that

10:09:06  4    message is in reference to?

10:09:08  5    A.      I would say that's one full ounce, but again, it

10:09:10  6    could be dependent on the prior codes between the buyer and

10:09:14  7    seller, so it could be one full eight ball, 3.5 grams, could

10:09:19  8    be one gram, you know, probably not one gram, you wouldn't

10:09:22  9    say one full for that.  Mostly it's one ounce, 28.35 grams.

10:09:29 10    Q.      Turning to Row 271, the defendant says "I think it

10:09:36 11    may be fentan.  What did you understand fentan to mean?

10:09:41 12    A.      Fentanyl.

10:09:42 13    Q.      What is Fentanyl?

10:09:43 14    A.      Fentanyl, for lack of a better description or a -- I

10:09:48 15    should say as a simple description, it's synthetic heroin,

10:09:53 16    it's replaced, really, Columbian heroin in this country.

10:09:58 17    Fentanyl is produced in Mexico and it's probably, I would

10:10:06 18    argue, one of the more, if not the most dangerous drug being

10:10:07 19    distributed in America today, it's certainly the focus of

10:10:12 20    DEA.

10:10:12 21    Q.      Is --

10:10:13 22    A.      One of our primary focuses, I should say.

10:10:16 23    Q.      Do drug resellers sometimes cut or mix Fentanyl into

10:10:22 24    cocaine related products and sell those to drug purchasers?

10:10:25 25    A.      They do, unfortunately.

Romig - direct

10:10:27  1    Q.      And in some instances, do drug purchasers buy, by

10:10:34  2    mistake Fentanyl instead of cocaine or crack cocaine?

10:10:37  3    A.      They do, unfortunately.  Just to be clear, Fentanyl

10:10:40  4    is like heroin, a narcotic, not a stimulant like cocaine, so

10:10:45  5    it's not what the user of cocaine or crack cocaine is

10:10:48  6    looking for.

10:10:49  7    Q.      Is cocaine and cocaine base, crack, a stimulant?

10:10:53  8    A.      Stimulants.

10:10:54  9    Q.      And are they also a controlled substance?

10:10:57 10    A.      They're both schedule two controlled substances,

10:11:00 11    they're the same.

10:11:01 12    Q.      And that's a matter of Federal Law, they're

10:11:05 13    controlled substances?

10:11:06 14    A.      Correct.

10:11:06 15    Q.      Now, the final message I would like to ask you about,

10:11:10 16    Row 287, Agent Romig, an individual says "I have a ball on

10:11:18 17    me", and then if we zoom out, Ms. Vo, the defendant

10:11:25 18    responds, "dude, did you just scam me.  Feels like it."

10:11:29 19    There is later messages in which they're talking about

10:11:32 20    whatever they're talking about.  Based on your training and

10:11:34 21    experience and everything you have heard in this case, do

10:11:37 22    you have an opinion as to what is being referenced when the

10:11:40 23    individual says I have a ball on me?

10:11:42 24    A.      Yeah, I would say that that's an eight ball, which

10:11:44 25    we've talked about or I have talked about, 3.5 grams of

Romig - cross

10:11:49  1  cocaine or crack cocaine.  The descriptions from some of the

10:11:53  2  other witnesses about a marble, that's fairly accurate for

10:11:58  3  an eight ball, three-and-a-half grams, the ping pong ball or

10:12:01  4  a little bit larger, you're probably getting closer to an

10:12:05  5  ounce, 28.35 grams.

10:12:10  6  Q.     All right, Agent Romig.  Thank you.

10:12:12  7         MR. HINES:  I have no further questions at this

10:12:14  8  time, Your Honor.

10:12:15  9         THE WITNESS:  Thank you.

10:12:15 10         THE COURT:  Thank you.

10:12:17 11         Cross-exam.

10:12:17 12         MR. LOWELL:  Yes, Your Honor.

10:12:19 13                   CROSS-EXAMINATION

10:12:19 14  BY MR. LOWELL:

10:12:25 15  Q.     Good morning, agent, my name is Abbe Lowell, I'm one

10:12:29 16  of Hunter's lawyers.

10:12:30 17  A.     Good morning, sir.

10:12:31 18  Q.     Good morning to you all.

10:12:33 19         I would like if I can in the time I'm here to

10:12:36 20  talk to you about this case and not generalities about how

10:12:41 21  various drugs are grown and processed, okay?

10:12:45 22  A.     Yes, sir.

10:12:47 23  Q.     To begin with, I just wanted to make sure I got this

10:12:50 24  right.  In your background, in your work experience, you

10:12:54 25  said you were a member of the Baltimore Police?

Romig - cross

| | | |
|---|---|---|
| 10:12:57 | 1 | A.    I was. |
| 10:12:57 | 2 | Q.    Tell me those years again? |
| 10:12:59 | 3 | A.    August of 1999, and I left for the Berks County |
| 10:13:05 | 4 | Detectives in April 2001. |
| 10:13:07 | 5 | Q.    So that was about two years? |
| 10:13:08 | 6 | A.    Yes, sir. |
| 10:13:09 | 7 | Q.    Berks County in? |
| 10:13:10 | 8 | A.    Reading, Pennsylvania. |
| 10:13:12 | 9 | Q.    Okay.  When you were in Baltimore, what was your job? |
| 10:13:16 | 10 | A.    I was assigned to the patrol division. |
| 10:13:19 | 11 | Q.    Meaning you were on the street? |
| 10:13:20 | 12 | A.    I was. |
| 10:13:20 | 13 | Q.    And you were working drugs when you were on the |
| 10:13:23 | 14 | street? |
| 10:13:23 | 15 | A.    Yes. |
| 10:13:23 | 16 | Q.    In the City of Baltimore? |
| 10:13:25 | 17 | A.    Yes, sir. |
| 10:13:29 | 18 | Q.    In your introducing your expertise and what you are |
| 10:13:33 | 19 | testifying about, you indicated that your job and the job of |
| 10:13:37 | 20 | your colleagues is to be trying to break up large scale |
| 10:13:42 | 21 | distribution of drugs? |
| 10:13:45 | 22 | A.    Correct. |
| 10:13:46 | 23 | Q.    Usually not individual users? |
| 10:13:48 | 24 | A.    That's correct. |
| 10:13:49 | 25 | Q.    And you don't have any reason to understand that what |

10:13:53  1    Mr. Biden is on trial for has anything to do with him being

10:13:57  2    a distributor?

10:13:58  3    A.      Nothing that I have reviewed would indicate that.

10:14:00  4    Q.      And you're not investigating, or you didn't

10:14:04  5    investigate him for the time he was using?

10:14:06  6    A.      I have never done that, no.

10:14:08  7    Q.      You went over all those texts that had people's names

10:14:11  8    and numbers, some of which you just went over with

10:14:14  9    Mr. Hines, and there were people that seemed to be the

10:14:17 10    distributors, or at least the people that were selling him

10:14:21 11    narcotics.  Did you see those people's texts?

10:14:24 12    A.      Yes, sir.

10:14:24 13    Q.      So as your job to try to break up large scale

10:14:28 14    distribution, did you look into those people?

10:14:31 15    A.      I didn't look into anybody in this investigation.

10:14:34 16    This is not my investigation.

10:14:36 17    Q.      Got it.  So did you see anything in trying to sort

10:14:39 18    out those messages to confirm their meaning that you went to

10:14:43 19    try to find those people that were being communicated with?

10:14:48 20    A.      No.  Again, this is -- was, I should say, an FBI

10:14:53 21    investigation, and I did not do anything as a DEA agent to

10:14:58 22    target any of the individuals, including the sellers.

10:15:00 23    Q.      Notwithstanding that, you said your mission is to

10:15:04 24    break up large scale distribution.

10:15:07 25    A.      I'm not sure what you're asking.

10:15:09  1    Q.      My question was, you didn't do that, not that you

10:15:12  2    don't know that it was done, not withstanding that you said

10:15:16  3    your goal --

10:15:17  4    A.      The DEA, as far as I know, but specifically me, or

10:15:21  5    any of the groups that I supervise did not investigate any

10:15:24  6    of the people based on my review of the sellers in this

10:15:28  7    investigation.

10:15:28  8    Q.      You mentioned something about a process that mixes

10:15:32  9    and I think you used the word inositol right?

10:15:36 10    A.      Inositol, it is a dietary supplement.

10:15:38 11    Q.      And you mentioned that cocaine comes from a variety

10:15:42 12    of sources in the world, South America I think is what you

10:15:45 13    mentioned?

10:15:46 14    A.      Primarily South America, Columbia.

10:15:49 15    Q.      Again, turning to this case, do you have any idea

10:15:53 16    where the drugs that were used by Hunter at any point, where

10:15:56 17    those came from?

10:15:56 18    A.      Meaning what country they were produced in?

10:15:59 19    Q.      Yeah, to the extent he was using what you saw he was

10:16:03 20    using, did you --

10:16:04 21    A.      Most likely --

10:16:05 22    Q.      I didn't say most likely, I'm asking do you know,

10:16:08 23    because there were multiple countries that you mentioned

10:16:10 24    where these come from?

10:16:12 25    A.      I don't know which country they came from.

Romig - cross

10:16:14 1    Q.    How are they imported into the United States?

10:16:17 2    A.    I do not know.

10:16:18 3    Q.    How were they distributed once they were imported

10:16:21 4    into the United States?

10:16:22 5    A.    By the distributors that were --

10:16:25 6    Q.    In this case?

10:16:26 7    A.    By the distributors in these messages.

10:16:29 8    Q.    How do you know, once it came in, how did they

10:16:32 9    distribute to the people they were selling it to, do you

10:16:35 10   know?

10:16:35 11   A.    Specifically in this case, by the review of the

10:16:37 12   messages.

10:16:38 13   Q.    You know somebody was in the car with his stuff in

10:16:41 14   it, but other than that with those other messages, when you

10:16:45 15   know amounts, how did that get to the place where it was

10:16:47 16   provided to Hunter?

10:16:48 17   A.    How did the distributors in these messages get those

10:16:52 18   drugs?

10:16:52 19   Q.    Yeah.

10:16:53 20   A.    I can only surmise, I don't know.

10:16:54 21   Q.    So you didn't do that?

10:16:56 22   A.    No.

10:16:56 23   Q.    You mentioned, I think at one point, a number of

10:17:00 24   times where you would see a large amount of product that is

10:17:03 25   imported in some fashion, I think once you said stuffed into

Romig - cross

10:17:06  1    a plantain?

10:17:08  2    A.      Hundreds of plantains, yes.

10:17:11  3    Q.      I'm sorry, a crate.  But you weren't referring to

10:17:14  4    anything in this case?

10:17:16  5    A.      No.

10:17:21  6    Q.      So I would like to go back over with you some of the

10:17:25  7    things that you identified.  Mr. Radic, would you put back

10:17:33  8    on the screen, please, government Exhibit 18.  Did you

10:17:48  9    receive this summary chart from others in the investigation?

10:17:48 10    A.      I did.

10:17:49 11    Q.      And then your job, I think as you explained it, was

10:17:52 12    to go through and as you just did interpret based on your

10:17:56 13    expertise what terms mean, correct?

10:18:01 14    A.      Yes, sir.

10:18:02 15    Q.      Would you go please to the first one you did.  That

10:18:06 16    would be Row 3, Mr. Radic.  Do you see it?  You said there

10:18:09 17    was one reference to 1.4, and I think there is a typo.  But

10:18:15 18    you saw that and you interpreted that to be a reference to

10:18:19 19    an amount of drug?

10:18:20 20    A.      Yes, sir.

10:18:20 21    Q.      And would you go, Mr. Radic, please, to the next one,

10:18:24 22    which was Row 20 and 21 -- oh, I'm sorry.  And what's the

10:18:28 23    date of that?

10:18:29 24    A.      The date of this text?

10:18:32 25    Q.      Yeah, when it was flashed on the screen and enlarged,

Romig - cross

10:18:35  1  I didn't see the column with the date, so I'm asking you

10:18:38  2  what the date is for that?

10:18:39  3  A.    4/18/2018.

10:18:42  4  Q.    Mr. Radic, could you go to rows 20 and 21.  You see

10:18:46  5  that you identified and you explained that it could be

10:18:49  6  powder, it could be compressed powder, it could be crack,

10:18:52  7  and you have identified a scale.  Yes?

10:18:55  8  A.    Yes, sir.

10:18:55  9  Q.    And the date of that row and the row under it, 20 and

10:19:00  10  21, the date of that one?

10:19:01  11  A.    4/27/2018 and 4/28/2018.

10:19:13  12  Q.    Mr. Radic, could you go to Row 26, which you talked

10:19:13  13  about, please?  You talked about baby powder and you

10:19:16  14  referenced baby powder as being a reference to I think

10:19:19  15  powder cocaine?

10:19:21  16  A.    Correct.

10:19:21  17  Q.    And the date of that one?

10:19:23  18  A.    May 6, 2018.

10:19:27  19  Q.    And then you identified Row 27 right below it.

10:19:31  20  Mr. Radic, the real soft stuff, which was right after that

10:19:34  21  row before, and you interpreted that again as being in

10:19:37  22  reference to powder?

10:19:39  23  A.    Yes.

10:19:39  24  Q.    And the date of that one?

10:19:41  25  A.    Also May 6, 2018.

Romig - cross

10:19:43 1   Q.      And if you go to the next one you did, which was

10:19:48 2   Row 31.  And that's party favor, right?

10:19:51 3   A.      Yes.

10:19:52 4   Q.      Which didn't mean a little hat or little candle?

10:19:56 5   A.      I do not believe it means that, I believe it's a

10:19:58 6   reference to drugs.

10:19:59 7   Q.      And again if it is, what is the date of that one?

10:20:02 8   A.      May 6, 2018.

10:20:03 9   Q.      Would you go to the one that you did next, which is

10:20:07 10  Row 74, please, Mr. Radic.  And there is a reference there

10:20:11 11  to ten grams.  Do you see that?

10:20:12 12  A.      Yes, sir.

10:20:13 13  Q.      And you interpreted that as being a reference to a

10:20:15 14  weight of some drug; yes?

10:20:17 15  A.      Yes, again, I'm assuming either cocaine or crack

10:20:21 16  cocaine.

10:20:21 17  Q.      Right.  And the date of that one?

10:20:22 18  A.      July 25th, 2018.

10:20:25 19  Q.      And then you went to Row 87.  And that's a reference

10:20:31 20  to chore boy that you said?

10:20:33 21  A.      Yes, sir.

10:20:33 22  Q.      And that's what you explained.  And the date of that

10:20:37 23  one?

10:20:38 24  A.      August 8, 2018.

10:20:40 25  Q.      And then the next reference that you did was to

10:20:44  1    Row 174.  And that is ounce, and again your interpretation

10:20:50  2    of that was to a weight of, or an amount of drugs?

10:20:54  3    A.    Yes, that would make an ounce of cocaine or crack

10:20:58  4    cocaine.

10:20:58  5    Q.    And the date of that one?

10:20:59  6    A.    November 27th, 2018.

10:21:03  7    Q.    Okay.  And then you went to Row 180.  And there was,

10:21:17  8    do you see that reference on 180?

10:21:19  9    A.    Yes, sir.

10:21:19 10    Q.    And the date of that one?

10:21:21 11    A.    November 28, 2018.

10:21:25 12    Q.    And then you went to Row 208.  That was a picture

10:21:38 13    that you identified, and there is something in Mr. Biden's

10:21:44 14    hand and you identified that as a crack pipe?

10:21:47 15    A.    Yes.  Just to be clear, I had the benefit of viewing

10:21:50 16    the whole video, so it's a little bit clearer.

10:21:53 17    Q.    Yeah, I'm sorry, I know you read it.  And the date of

10:21:58 18    that one?

10:21:58 19    A.    Is December 22nd, 2018.

10:22:01 20    Q.    Okay.  Then you went and identified Row 213, 213.

10:22:09 21    And that was the one that there was also a video, and I

10:22:12 22    think that was played, perhaps, and the date of that one?

10:22:15 23    A.    December 29th, 2018.

10:22:18 24    Q.    And then you identified the row that's 214 right

10:22:24 25    below it or the next page.  And that one you identified as

Romig - cross

10:22:28  1   him holding a pipe, a hand holding a pipe?

10:22:32  2   A.      Yes, sir.

10:22:33  3   Q.      And the date of that one is now in the next year,

10:22:36  4   right, what's the date?

10:22:37  5   A.      January 14th, 2019.

10:22:41  6   Q.      And then you identified what's on Row 222.  And you

10:22:49  7   were talking about what this meant, one full, to you is a

10:22:53  8   reference, to again, an amount of drugs?

10:22:55  9   A.      Yes, I would suspect an ounce of cocaine or crack

10:23:00 10   cocaine based on everything else.

10:23:01 11   Q.      And that's even a month later than the one before,

10:23:04 12   that's at the end of February right, what's the date?

10:23:07 13   A.      February 26, 2019.

10:23:09 14   Q.      And then you went to Row 271.  And the reference

10:23:20 15   there was it may be fentan, and you explained to us what

10:23:24 16   fentan was, right?

10:23:25 17   A.      Yes, sir.

10:23:25 18   Q.      And the date is at the end of, again, that same day

10:23:29 19   of February 26th of 2019?

10:23:33 20   A.      Yes, sir.

10:23:33 21   Q.      And when you were reviewing this chart, not to do it

10:23:37 22   again, you did see how many on that one day on February 26th

10:23:43 23   of the backs and forth for the potential person that's

10:23:46 24   supplying him drugs, correct, quite a number?

10:23:48 25   A.      Yeah, I would have to go over it again.

10:23:51  1    Q.      More than one?  I withdrawal the question, it's been

10:23:57  2    established.

10:23:57  3    A.      Okay.

10:23:58  4    Q.      Would you look at Row 287, which was maybe the last

10:24:01  5    one you did, and that's talking about "dude, did you try --

10:24:05  6    that's the, I have a ball on me", do you see that?

10:24:08  7    A.      Yes, sir.

10:24:09  8    Q.      You identified a ball as being maybe that 8-ball?

10:24:12  9    A.      Correct.

10:24:12 10    Q.      What's the date of this one?

10:24:14 11    A.      March 4th, 2019.

10:24:16 12    Q.      So with all those references, let me ask you this.

10:24:19 13    In part of what you did to interpret the texts and to get as

10:24:23 14    you say the "full flavor" of the backs and forth, did you

10:24:26 15    read Hunter Biden's book?

10:24:28 16    A.      No, I had excerpts from the book provided to me, and

10:24:34 17    I listened to the FBI agent's testimony, who is seated at is

10:24:39 18    the table, Erika, but I did not read the book.

10:24:43 19    Q.      But you did hear those or see the excerpts?

10:24:46 20    A.      I heard the ones played in court and I read over some

10:24:50 21    of the excerpts in the book.

10:24:51 22    Q.      If you did that, you know that Hunter in his book

10:24:54 23    wrote about all the use of his drugs in 2016 and 2017 and

10:24:58 24    the parts of 2018, you heard that played in court, correct?

10:25:02 25    A.      Yes, sir.

Romig - cross

10:25:03 1    Q.    When you combined that, you saw that the things that

10:25:06 2    you have identified as being references to drug use, he

10:25:09 3    himself identified for the time he was using?

10:25:11 4    A.    Yes, sir.

10:25:15 5    Q.    Now, please, I would like you -- I'm sorry, one more.

10:25:19 6    Could you go to, Mr. Radic, Row 216.    Remember when you

10:25:29 7    identified somebody holding a crack pipe that's a tube, do

10:25:34 8    you remember that?

10:25:34 9    A.    Yes, well nobody is holding it, it's on the table it

10:25:38 10   appears.

10:25:38 11   Q.    I don't mean here, I mean on the earlier one when you

10:25:42 12   saw a hand?

10:25:43 13   A.    Yes, sir.

10:25:43 14   Q.    It's a tube, a thin straight tube?

10:25:46 15   A.    Yes, sir.

10:25:47 16   Q.    On this one, which is 216, in 2019, you identified

10:25:53 17   this object on the table?

10:25:55 18   A.    Yes, sir.

10:25:56 19   Q.    Isn't that what's familiarly known as a bong?

10:25:59 20   A.    It doesn't appear to be a water bong for marijuana,

10:26:04 21   the reason why I say that is the charred part of the pipe,

10:26:09 22   but yes, it absolutely could be used as a bong as well.

10:26:12 23   Q.    Meaning it could be used to smoke weed?

10:26:15 24   A.    You could smoke meth out of there, you could smoke

10:26:19 25   heroin out of there.

| | | |
|---|---|---|
| 10:26:20 | 1 | Q.      You could smoke weed out of there? |
| 10:26:22 | 2 | A.      You could smoke pipe tobacco. |
| 10:26:26 | 3 | Q.      It's a water pipe? |
| 10:26:27 | 4 | A.      No, I don't know that it is a water bong. |
| 10:26:30 | 5 | Q.      It has the ability, you see that bottom part, isn't |
| 10:26:33 | 6 | that a place where people could do that, they would fill it |
| 10:26:36 | 7 | with water? |
| 10:26:36 | 8 | A.      I do, but it doesn't appear, what it looks like on |
| 10:26:40 | 9 | the bottom. |
| 10:26:40 | 10 | Q.      At that occasion where the photo was taken? |
| 10:26:43 | 11 | A.      Correct. |
| 10:26:43 | 12 | Q.      It doesn't mean it wasn't used in that fashion? |
| 10:26:46 | 13 | A.      Absolutely. |
| 10:26:47 | 14 | Q.      So weed could be in there at some point? |
| 10:26:50 | 15 | A.      Any drug could be in there, even a noncontrolled |
| 10:26:53 | 16 | substance. |
| 10:26:54 | 17 | Q.      The date of that photo is January 31, 2019? |
| 10:27:01 | 18 | A.      Yes, sir. |
| 10:27:02 | 19 | Q.      Could you please, Mr. Radic, go on government |
| 10:27:06 | 20 | Exhibit 18, to start with Row 88.  I want to pick up this. |
| 10:27:14 | 21 | First, on Row 87, what's the date with the chore boy? |
| 10:27:22 | 22 | A.      August 8th, 2018. |
| 10:27:24 | 23 | Q.      You see the next one is October 8th of 2018, do you? |
| 10:27:29 | 24 | A.      Yes, sir. |
| 10:27:31 | 25 | Q.      And now I don't know if you have it in front of you, |

Romig - cross

10:27:34  1   so we're going to skim through Rows 88 to the next page,

10:27:39  2   please, Mr. Radic.  Stay there.  Can you look up and see --

10:27:42  3   you can see it on your screen?

10:27:43  4   A.      I can.

10:27:44  5   Q.      Do you see those texts?

10:27:46  6   A.      I do.

10:27:46  7   Q.      And then could you go to the next page, Mr. Radic, do

10:27:51  8   you see those texts?

10:27:52  9   A.      I do.

10:27:52 10   Q.      You see the date, these are now October of 2018;

10:27:56 11   right?

10:27:57 12   A.      Yes, sir.

10:27:57 13   Q.      Take a look at those.  All right.  If you go to the

10:28:01 14   next page, please.  And you see those texts?

10:28:04 15   A.      Yes, sir.

10:28:06 16   Q.      Okay.  Now, you see on the 13th, go back one, please,

10:28:15 17   Mr. Radic.  Now go forward one, and go forward one.  Okay.

10:28:21 18   Look at those texts.  Go forward one.  Go forward one.

10:28:33 19   That's still in October of '18.  Please go forward one.

10:28:40 20   Would you go another one?  Do you see a reference to a

10:28:44 21   Bernard at 10:13; right?

10:28:49 22   A.      Yes.  119.

10:28:51 23   Q.      Do you see that one?

10:28:52 24   A.      I do.

10:28:53 25   Q.      You didn't do any independent investigation of who

Romig - cross

10:28:57 1   Bernard is or whether he even exists did you?

10:29:00 2   A.    No, I didn't do any investigation in this case.

10:29:02 3   Q.    Got it.

10:29:02 4   A.    I just was provided the messages that you see in

10:29:05 5   front of you.

10:29:06 6   Q.    And no need to interpret, because there is a word

10:29:10 7   dealer there, so you didn't need to interpret that one?

10:29:13 8   A.    A lot of these messages don't need much

10:29:16 9   interpretation for me, correct.

10:29:17 10  Q.    Go to the next one.  That's to Rows 125.  Please go

10:29:22 11  one more, please.  I'm sorry, go back, you saw there is a

10:29:26 12  reference in that to sleeping on a car, smoking crack, you

10:29:30 13  don't need to interpret that?

10:29:31 14  A.    I don't think I need to interpret that, no, sir.

10:29:34 15  Q.    You don't know whether that's accurate or not,

10:29:36 16  whether that's where he was at the time; right?

10:29:40 17  A.    I don't.

10:29:41 18  Q.    Next one.  Look at those.  Next one, please,

10:29:49 19  Mr. Radic.  And again, we're in October of 2018, right?

10:29:58 20  A.    Correct.

10:29:59 21  Q.    If you go to the next one, take a look at those.

10:30:04 22  Like, for example, 1:35 on the 16th of October is one that

10:30:09 23  says "hey buddy, it's Richie Jones, checking in", that's no

10:30:15 24  reference to drugs or anything like that, right?

10:30:17 25  A.    It doesn't appear to be, no.

10:30:19   1   Q.        Go to the next one, Mr. Radic.  With that.  Go to one

10:30:24   2   more, please.   Okay.  We're in the end of October 2018.  Go

10:30:28   3   to one more.  1:49.  And we're still in October.  Right?

10:30:35   4   And then the next one.  Do you see that's at the going into

10:30:42   5   November and after, do you see that?

10:30:43   6   A.        Yes, sir.

10:30:44   7   Q.        When you reviewed this chart before you came to court

10:30:47   8   or at any point in your investigation, in what I just showed

10:30:52   9   you from the period of time from August of 2018 through

10:30:55  10   November of '18, there is no reference in what you saw or

10:31:00  11   analyzed of 1.4, is there, in those texts that I just went

10:31:06  12   through with you?

10:31:08  13   A.        No, I'm not sure when that 1.4 text was, but no, not

10:31:12  14   in the ones we just reviewed.

10:31:14  15   Q.        No reference or photo of any scale with white rocks

10:31:17  16   on it in the texts I identified for you between August and

10:31:22  17   November of 2018; correct?

10:31:25  18   A.        Correct.

10:31:25  19   Q.        No reference to baby powder in that period of time?

10:31:29  20   A.        Correct.

10:31:29  21   Q.        No reference to soft stuff in that period of time?

10:31:33  22   A.        Correct.

10:31:34  23   Q.        No reference to party favor in that period of time?

10:31:38  24   A.        Correct.

10:31:39  25   Q.        No reference to grams in that period of time?

Romig - cross

10:31:43  1    A.       Correct.

10:31:44  2    Q.       No reference to chore boy in that period of time?

10:31:48  3    A.       That's correct.

10:31:48  4    Q.       No reference to one full in that period of time?

10:31:52  5    A.       Correct.

10:31:52  6    Q.       No reference to fentan in that period of time?

10:31:55  7    A.       Yes.  Correct.

10:31:57  8    Q.       And no reference of a ball in that period of time?

10:32:02  9    A.       Correct.

10:32:02 10    Q.       Those last 4 or 5 were all the way into 2019 as we

10:32:05 11    went through on the screen a moment ago, right?

10:32:08 12    A.       Yes, sir.

10:32:08 13    Q.       And in that period of time, there is no pictures of a

10:32:12 14    drug being used, right, no holding of a pipe, right?

10:32:15 15    A.       None that I reviewed.

10:32:16 16    Q.       No bags on a scale, right?

10:32:18 17    A.       No, sir.

10:32:19 18    Q.       No bags at all?

10:32:20 19    A.       Correct.

10:32:21 20    Q.       No videos of him weighing any drugs, right?

10:32:24 21    A.       None that I reviewed, no.

10:32:26 22    Q.       So all that you identified and what I went through

10:32:31 23    with you, were for the years I said before and after the

10:32:35 24    period of August of 2018 through the time that we identified

10:32:41 25    those in November of '18, that would be a fair statement I

Romig - redirect

10:32:45 1   just made, isn't it?

10:32:46 2   A.      With the exception of the October text that we talked

10:32:49 3   about, where he said he was smoking crack.

10:32:51 4   Q.      I did those too.  We identified those too.  You'll

10:32:56 5   agree with me, no pictures, no photos, no scales, no white

10:32:59 6   rocks, no chore boy, no fentan, no ball, no ounce, no grams,

10:33:04 7   none of that?

10:33:05 8   A.      Yes, sir, outside those two messages, you are

10:33:08 9   correct.

10:33:08 10          MR. LOWELL:  That's all I have.

10:33:11 11          THE COURT:  Redirect?

10:33:12 12                  REDIRECT EXAMINATION

10:33:12 13  BY MR. HINES:

10:33:12 14  Q.      Mr. Lowell asked you some questions about those

10:33:14 15  October messages and in response you said some messages

10:33:18 16  don't really need interpretation?

10:33:20 17  A.      Correct.

10:33:20 18  Q.      What did you mean by that?

10:33:22 19  A.      I think those messages are pretty clear, I don't

10:33:24 20  think you need me as an expert to provide any kind of

10:33:27 21  information about those texts.

10:33:29 22  Q.      One of them, for example, the one we've seen over and

10:33:32 23  over, sleeping on a car smoking crack, crack is a controlled

10:33:37 24  substance as you talked about earlier?

10:33:39 25  A.      Correct.

Romig - redirect

| | |
|---|---|
| 10:33:40 1 | Q.    Mr. Lowell asked you in that time frame of October |
| 10:33:43 2 | whether you saw anything related to, you know, the messages |
| 10:33:50 3 | that were code, while you have been sitting in this trial, |
| 10:33:54 4 | did you see any other evidence regarding the month of |
| 10:33:57 5 | October or that time frame that is consistent with someone |
| 10:34:01 6 | who is using narcotics? |
| 10:34:02 7 | A.    Yes.  Special Agent Jensen's testimony, where she |
| 10:34:07 8 | went over some of the cash withdrawals. |
| 10:34:10 9 | Q.    Those were large cash withdrawals -- |
| 10:34:13 10 | MR. LOWELL:  That's beyond the scope, but I'm |
| 10:34:15 11 | happy to get the cash -- we can talk about that.  I'm happy |
| 10:34:22 12 | to, but I want to point out it's beyond the scope. |
| 10:34:27 13 | MR. HINES:  I have one follow-up since he opened |
| 10:34:29 14 | the door about October in asking what he saw. |
| 10:34:33 15 | THE COURT:  Okay. |
| 10:34:33 16 | BY MR. HINES: |
| 10:34:34 17 | Q.    So there were almost daily large cash withdrawals in |
| 10:34:39 18 | the amounts of hundreds and thousands of dollars that you |
| 10:34:42 19 | saw that have informed your interpretation in this case, is |
| 10:34:46 20 | that right? |
| 10:34:46 21 | A.    Can you repeat that one more time, did you say |
| 10:34:49 22 | hundreds of thousands of dollars? |
| 10:34:50 23 | Q.    There were almost daily withdrawals of hundreds of |
| 10:34:53 24 | dollars or thousands of dollars? |
| 10:34:56 25 | A.    Yes, that I heard correctly, correct. |

10:34:58  1    Q.      That's consistent with someone who is using and

10:35:02  2    abusing narcotics, right?

10:35:03  3    A.      Well, again, coupled with all the other evidence, I

10:35:07  4    can review that and make an interpretation as to what at

10:35:10  5    least some of that cash is being used for, correct.

10:35:12  6    Q.      And what is your interpretation?

10:35:14  7    A.      That some of that cash is being used to purchase

10:35:17  8    drugs.

10:35:19  9              MR. HINES:  No further questions.

10:35:23 10              RECROSS-EXAMINATION

10:35:24 11    BY MR. LOWELL:

10:35:25 12    Q.      Is large withdrawals of cash on any day that is in

10:35:29 13    the amounts that they said used for things other than drugs?

10:35:32 14    A.      It absolutely can be, yes.

10:35:34 15    Q.      Can it be used to give your family cash to pay for

10:35:38 16    their expenses or living?

10:35:40 17    A.      Absolutely.

10:35:41 18    Q.      And can it be used to purchase goods if you don't

10:35:44 19    have a usable credit card at the time?

10:35:46 20    A.      Absolutely.

10:35:47 21    Q.      Can it be used to pay for the place that you checked

10:35:51 22    yourself in for rehabilitation if they'll take it that way?

10:35:54 23    A.      Yes, as far as I know.

10:35:55 24    Q.      Can it be used for a person's living expenses

10:35:59 25    themselves to pay for their rent, their groceries, anything?

Romig - recross

10:36:04  1    A.      Yes, sir.

10:36:05  2    Q.      So when Mr. Hines asked you a moment ago whether you

10:36:09  3    heard Agent Jensen give her view as to whether there is --

10:36:14  4    defined large amounts of cash, you don't know in this case

10:36:18  5    as opposed to your experience what that cash was used for,

10:36:22  6    right?

10:36:22  7    A.      No, actually I'm -- I'm specifically looking at those

10:36:27  8    cash withdrawals in reference to this case because of all

10:36:31  9    the other evidence.

10:36:32 10    Q.      Correct.

10:36:34 11    A.      The exact opposite is true, if this was someone who

10:36:37 12    didn't have all these other messages and was withdrawing

10:36:41 13    $1,600, $1,500 in cash, I may think that there is absolutely

10:36:46 14    nothing to that.  The reason that it stands out is because

10:36:49 15    of the other evidence.

10:36:50 16    Q.      I understand your connection, but it's your making

10:36:53 17    that connection.  So when you were doing that to make that

10:36:56 18    connection, did you look at his bank account statements to

10:36:58 19    see where the cash went, if there was a debit, whether or

10:37:01 20    not there was a specific withdrawal that went to a rehab

10:37:04 21    place, did it go to another person's account like his

10:37:07 22    daughter, did you see and make the evaluation yourself as to

10:37:11 23    where this money went?

10:37:12 24    A.      I don't know where the cash went.  I did not trace

10:37:17 25    the cash, if that's what you're asking.  I didn't

Romig - recross

10:37:20 1  participate in this investigation, again I'll reiterate,

10:37:23 2  only reviewed the evidence that was provided to me.

10:37:25 3  Q.    Okay.  So as I leave this podium, other than seeing

10:37:29 4  the cash, you cannot say on any particular day with any

10:37:34 5  amount whether it was used for -- I'm sorry, that's not my

10:37:37 6  last question, I apologize.  I think you said for example

10:37:40 7  1.4 could cost $140, right?

10:37:45 8  A.    Correct.

10:37:46 9  Q.    You mentioned three point something could be 220?

10:37:50 10  A.    Correct.

10:37:51 11  Q.    That's dollars meaning 120, 140, 220, right?

10:37:56 12  A.    Yes, sir.

10:37:56 13  Q.    Thousands and thousands of dollars, how much was --

10:38:00 14  how much is a kilo, 2.2 pounds?

10:38:03 15  A.    2.2 pounds, yes, sir.

10:38:05 16  Q.    And how much does that cost?

10:38:07 17  A.    Depends.

10:38:08 18  Q.    Upwards of perhaps $60,000, right?

10:38:11 19  A.    No, probably not.  In 2018, I would say probably

10:38:14 20  somewhere in the range of 35 to $40,000.

10:38:17 21  Q.    So when we're talking about a buy of hundred dollars

10:38:20 22  here and a hundred dollars there, that's not thousands and

10:38:23 23  thousands of dollars that's being withdrawn right?

10:38:26 24  A.    No the amounts I saw in the thousand dollar range

10:38:29 25  were some of the references, the $1,400 an ounce, then I saw

10:38:32  1    the withdrawals of 1,600, which is pretty close.  I think

10:38:35  2    there may have even been a reference in a text to 1,600, but

10:38:39  3    I'm not certain, it could have been 14.

10:38:42  4    Q.    This will be my last questions.

10:38:44  5          The period of time that I asked you if you saw

10:38:47  6    any scales, saw any powders, saw anything you identified,

10:38:51  7    did you compare that to the withdrawals at that time that

10:38:54  8    were happening in cash?

10:38:55  9    A.    Say that one more time.

10:38:56 10    Q.    Turning to October of 2018, on the things that people

10:38:59 11    can use cash for.

10:39:01 12    A.    Yes.

10:39:01 13    Q.    You didn't see any reference in those to the cash

10:39:04 14    being used for drugs in that period, did you?

10:39:06 15    A.    In other words, were those specific messages lined up

10:39:09 16    with the cash withdrawals.

10:39:10 17    Q.    Yes.

10:39:11 18    A.    No.

10:39:12 19                MR. LOWELL:  Thank you.

10:39:13 20                THE COURT:  Anything further?

10:39:14 21                MR. HINES:  No, Your Honor.

10:39:15 22                THE COURT:  Thank you, sir.  You're excused.

10:39:17 23                THE WITNESS:  Thank you, ma'am.

10:39:19 24                MR. HINES:  Your Honor, subject to the admission

10:39:24 25    of exhibits in this case, at this time the United States

10:39:28  1    rests.

10:39:29  2            THE COURT:  All right.  Thank you.  All right,

10:39:32  3    members of the jury we're going to take our morning break

10:39:34  4    now.  We may have some procedural things that we need to

10:39:38  5    address, so it might be a little bit longer, but it will

10:39:42  6    probably be maybe 20 to 30 minutes.  All right.  Thank you.

10:39:46  7            COURTROOM DEPUTY:  All rise.

10:39:48  8            (Jury exiting the courtroom at 10:39 a.m.)

10:40:15  9            THE COURT:  All right.  Mr. Lowell, you can be

10:40:28 10    seated.  Mr. Lowell, why don't you make your motion.  But

10:40:32 11    before you do, I would asked you before if you gave us all

10:40:35 12    your exhibits and we have the exhibits you sent us, is that

10:40:41 13    all the exhibits you have for any witnesses you are going to

10:40:44 14    call?

10:40:48 15            MR. LOWELL:  I'm sorry, for the ones today you

10:40:51 16    mean, if we're calling any of the witnesses today?  I mean

10:40:54 17    for any of the witnesses we're calling or potentially

10:40:57 18    calling, you have all the exhibits today.

10:40:59 19            THE COURT:  I have seven exhibits and they are

10:41:01 20    things like --

10:41:03 21            MR. LOWELL:  My colleagues are nodding their

10:41:05 22    heads.

10:41:05 23            THE COURT:  So you have no exhibits for

10:41:07 24    Mr. Clemons, Mr. Turner, Mr. Palimere.

10:41:10 25            MR. LOWELL:  Other than the government Exhibits,

10:41:12   1    which are in evidence.

10:41:13   2           THE COURT:  Other than the government exhibits

10:41:14   3    which are in evidence.

10:41:15   4           MR. LOWELL:  Or if they're not in evidence,

10:41:17   5    they're a government exhibit that has yet to be, but I don't

10:41:20   6    know that there is one.

10:41:21   7           THE COURT:  But I asked that you give them to me

10:41:24   8    so that if there are disputes, I have them handy.

10:41:27   9           MR. LOWELL:  I understand, I'm a little confused

10:41:30 10    myself.  If government Exhibit 10A is in evidence, and it's

10:41:33 11    been talked about.

10:41:34 12           THE COURT:  Yeah.

10:41:35 13           MR. LOWELL:  That would be -- did I need to give

10:41:37 14    it to you again?

10:41:38 15           THE COURT:  Because what we did is you're

10:41:40 16    supposed to give them to me in like a direct folder so I

10:41:44 17    have --

10:41:44 18           MR. LOWELL:  I didn't understand that, I thought

10:41:46 19    it was in evidence.

10:41:47 20           THE COURT:  So the only exhibits that you're

10:41:49 21    going to use with those folks are things that are already in

10:41:52 22    evidence?

10:41:53 23           MR. LOWELL:  Yes, ma'am.  I'm sorry I didn't

10:41:55 24    know that you wanted them again.

10:41:57 25           THE COURT:  Okay.

10:41:57 1          MR. LOWELL:  And so with the government resting

10:42:01 2    subject to that, as we have talked about in terms of the

10:42:04 3    schedule, we are orally now making a motion under federal

10:42:09 4    rule of criminal procedure 29 for a judgment of acquittal.

10:42:14 5    Orally, I will tell the Court the three grounds, and as I

10:42:19 6    promised this afternoon, we will be submitting to the Court

10:42:22 7    and to counsel a motion that will explain the grounds, the

10:42:27 8    first ground, as we talked about at the beginning of the

10:42:30 9    case, will be a motion for a judgment of acquittal based on

10:42:34 10   this case's charges being unconstitutional under the second

10:42:38 11   amendment.  As applied to the facts and the people, the

10:42:41 12   person in this case.

10:42:43 13          The second, and it's hard to describe, is that

10:42:45 14   the section that is being charged in Count 3, which is a

10:42:50 15   combination of 922(g) and I think 924(a).  We will present

10:42:55 16   to Your Honor that that section has been amended and its

10:42:58 17   amendment means the period of time about which this case

10:43:02 18   depends did not have an offense as charged in Count 3.  It's

10:43:06 19   hard to describe better than that, but I think --

10:43:08 20          THE COURT:  As I understand the change in 924

10:43:11 21   was a change that was made in 2021 or 2022 to increase the

10:43:18 22   penalty from the maximum of 10 years to a maximum of

10:43:22 23   15 years.

10:43:22 24          MR. LOWELL:  Yes, but in that period of time it

10:43:24 25   had an effect on the statute that was in effect when the

10:43:27  1    offense was charged, when it was created.

10:43:29  2             THE COURT:  So can you help me understand what

10:43:31  3    you're talking about?

10:43:32  4             MR. LOWELL:  I can try orally, but I am in the

10:43:36  5    process of putting it together.  When a statute is amended,

10:43:40  6    and we will give you the case law, it has an impact on

10:43:43  7    whether or not it is the affect of repealing the statute

10:43:45  8    that existed at the time at which the statute was amended.

10:43:49  9    And we will set out the case law to indicate that that's the

10:43:53 10    event in this case, that's the best I can do at the moment.

10:43:55 11    I'm not prepared to make the argument, but I promise you it

10:43:58 12    will be spelled out quickly.

10:44:02 13             THE COURT:  So essentially, the argument is that

10:44:04 14    in increasing the penalty, there was a wiping out of the

10:44:14 15    statute for times before that?

10:44:19 16             MR. LOWELL:  A period of time before that.

10:44:21 17             THE COURT:  Okay.

10:44:21 18             MR. LOWELL:  All right.  And third, you're

10:44:24 19    smiling.

10:44:25 20             THE COURT:  That's something only congress could

10:44:27 21    do, right, intend to increase the penalty for a gun charge

10:44:33 22    and essentially wipe out the statute?

10:44:39 23             MR. LOWELL:  Wipe out the statute, judge, but it

10:44:39 24    will be as a defect in this case.

10:44:40 25             THE COURT:  We'll take a look.

10:44:42  1            MR. LOWELL:  And that's all I'm asking you to

10:44:43  2     do.

10:44:44  3            THE COURT:  Okay.

10:44:44  4            MR. LOWELL:  I know by your smile that means

10:44:46  5     you're likely skeptical.

10:44:48  6            THE COURT:  No, no, I didn't mean I was

10:44:51  7     skeptical, it's kind --

10:44:53  8            MR. LOWELL:  Interesting concept.

10:44:54  9            THE COURT:  Interesting concept.

10:44:56 10            MR. LOWELL:  Thank you, I think it's an

10:44:57 11     interesting concept myself, the third is something the Court

10:45:00 12     is used to, which will be the standard on the sufficiency,

10:45:03 13     especially as connected to the Second Amendment as applied.

10:45:07 14     As indicated, that will be in Your Honor's and the counsel's

10:45:11 15     possession by midafternoon at the latest.

10:45:13 16            THE COURT:  Okay.

10:45:14 17            MR. LOWELL:  And I understand the Court's

10:45:16 18     intentions is to reserve accordingly.

10:45:18 19            THE COURT:  But I appreciate you letting me know

10:45:20 20     what is coming.

10:45:24 21            Anything else that we need to address?

10:45:29 22            MR. HINES:  I think for just housekeeping, who

10:45:33 23     are they calling?

10:45:34 24            MR. LOWELL:  The first witnesses depending on

10:45:37 25     who is in the courtroom is Jason Turner, and the second

Turner - direct

10:45:39  1    witness will be Ron Palimere, and then we'll see where we're

10:45:44  2    at.

10:45:52  3                    MR. HINES:  All right.  We'll take the morning

10:45:54  4    recess I guess and continue.  Is that what Your Honor would

10:45:57  5    like us to do?

10:45:58  6                    THE COURT:  Sure.

10:45:58  7                    MR. HINES:  Thank you.

10:46:01  8                    COURTROOM DEPUTY:  All rise.

10:46:39  9                    (A brief recess was taken.)

11:10:17 10                    COURTROOM DEPUTY:  All rise.

11:12:02 11                    (Jury entering the courtroom at 11:12 a.m.)

11:12:19 12                    THE COURT:  All right, everyone, welcome back,

11:12:36 13    again, everyone else please be seated.  Mr. Lowell, what's

11:12:39 14    next?

11:12:40 15                    MR. LOWELL:  What's next, Your Honor, is that we

11:12:42 16    would like Jason Turner to be a witness in this case.

11:12:48 17                    COURTROOM DEPUTY:  Please raise your right hand.

11:12:57 18    Please state and spell your full name for the record.

11:13:09 19                    THE WITNESS:  Jason Turner, J-A-S-O-N,

11:13:15 20    T-U-R-N-E-R.

11:13:17 21                    JASON TURNER, having been duly sworn was

11:13:22 22    examined and testified as follows:

11:13:25 23                         DIRECT EXAMINATION

11:13:26 24    BY MR. LOWELL:

11:13:33 25    Q.      Good morning, Mr. Turner.  Without giving us your

Turner - direct

11:13:37  1    specific address, can you tell us where you live?

11:13:40  2    A.    Wilmington, Delaware.

11:13:41  3    Q.    How long have you lived in Wilmington?

11:13:43  4    A.    Five years.

11:13:46  5    Q.    Calling your attention to the year of 2018, where

11:13:50  6    were you employed?

11:13:51  7    A.    StarQuest Shooters and Survival Supply.

11:13:54  8    Q.    What is that store?

11:13:55  9    A.    It's a gun shop and survival store.

11:13:58 10    Q.    And how long had you been employed there by 2018?

11:14:01 11    A.    Five or six years.

11:14:03 12    Q.    Prior to that, did you work in some other form of

11:14:06 13    store that sold firearms or survival equipment?

11:14:09 14    A.    No.

11:14:10 15    Q.    Where are you employed today?

11:14:11 16    A.    U.S. Mint, Philadelphia.

11:14:14 17    Q.    Got it.

11:14:15 18          So calling your attention to that day, do you

11:14:18 19    remember a day of -- I'm sorry, who is the owner of that

11:14:21 20    store?

11:14:22 21    A.    Ron Palimere, junior.

11:14:24 22    Q.    Is he presently still the owner of that store?

11:14:27 23    A.    As far as I know.

11:14:28 24    Q.    Do you have any contact with him these days?

11:14:31 25    A.    No.

Turner - direct

11:14:31  1   Q.      At that time in-- I want to call your attention to

11:14:35  2   the month of October of 2018, and specifically, I want to

11:14:38  3   talk to you about October the 12th of 2018, okay?

11:14:42  4   A.      Okay.

11:14:43  5   Q.      Were you employed and working on that day?

11:14:45  6   A.      October the 12th, and October 18th.

11:14:51  7   Q.      Those are the two days you remember working?

11:14:53  8   A.      Yeah, as far as I remember.

11:14:55  9   Q.      So let's talk about the 12th, okay?

11:14:57 10   A.      Okay.

11:14:57 11   Q.      What's your normal schedule, do you work every day --

11:15:01 12   in that period of time did you work every day in the store?

11:15:04 13   A.      At least two days off a week depending.

11:15:07 14   Q.      Okay.  But you remember on the 12th, when we're

11:15:10 15   talking about a gun sale that occurred with Hunter, you were

11:15:13 16   there that day?

11:15:15 17   A.      Yes.

11:15:15 18   Q.      What is your job at that period, on that day, what's

11:15:19 19   your job at the store?

11:15:20 20   A.      Key holder, background, like run the NIC system, sell

11:15:27 21   firearms.

11:15:28 22   Q.      Sometimes you would sell?

11:15:30 23   A.      Correct.

11:15:30 24   Q.      When you say run the NICS, N-I-C-S, that is the

11:15:33 25   background check?

11:15:34 1   A.        Correct.

11:15:35 2   Q.        You're not just the person who works in the back,

11:15:38 3   sometimes you're selling, is that true?

11:15:40 4   A.        Correct.

11:15:40 5   Q.        So on that date in particular, were you on the sales

11:15:44 6   floor, do you remember?

11:15:45 7   A.        I might have been on the sales floor, might have not

11:15:48 8   been on the sales floor.

11:15:50 9   Q.        On that day, do you recall the first the time that

11:15:53 10  you became aware that Hunter was in the store?

11:15:55 11  A.        When the background check was brought to me because

11:15:58 12  at that time it was in the evening, and I was running

11:16:01 13  background checks.

11:16:02 14  Q.        So at that point of the day, your job was to run

11:16:05 15  background checks?  Were there others that day that were

11:16:08 16  purchasing weapons?

11:16:10 17  A.        Correct.

11:16:11 18  Q.        So you would run those for whoever needed to have

11:16:14 19  that done?

11:16:14 20  A.        Yup.

11:16:14 21  Q.        At that point then, you're in the back room, is that

11:16:17 22  right?

11:16:17 23  A.        In the back room, out front, answering questions for

11:16:21 24  the staff.

11:16:21 25  Q.        Right.  When it comes to running a background check,

11:16:24  1    do you do that in the front or do you do that in the back?

11:16:27  2    A.      In the back.

11:16:28  3    Q.      You do it by way of some computer or laptop?

11:16:31  4    A.      Yes.

11:16:31  5    Q.      Looking at that day, you became aware of Hunter being

11:16:34  6    in the store when you ran a background check?

11:16:37  7    A.      Background check, paper was brought to me, so the

11:16:42  8    4473 was brought to me.

11:16:44  9    Q.      When you say the 4473, you mean the ATF form that

11:16:49 10    somebody filled out?

11:16:50 11    A.      Correct.

11:16:50 12    Q.      You said evening.  Do you know the time period?

11:16:53 13    A.      Not off the top of my head.

11:16:55 14    Q.      Can we put on the screen government Exhibit 12.  12A,

11:17:09 15    I'm sorry.  Can you see that on your screen, Mr. Turner?

11:17:13 16    A.      Uh-huh.

11:17:14 17    Q.      Do you recognize what that is?

11:17:16 18    A.      That would be the printout from the NIC system.

11:17:19 19    Q.      And the NIC system is what we are referring to as the

11:17:21 20    background check?

11:17:22 21    A.      Correct.

11:17:23 22    Q.      And was it your understanding by looking at this that

11:17:26 23    you're the one who ran that check that day?

11:17:28 24    A.      Submitted by me.

11:17:30 25    Q.      Do you see at the bottom it says your name?

Turner - direct

11:17:33  1    A.      Yes, that's me.

11:17:34  2    Q.      You would have done that.  Do you see the time of

11:17:37  3    this, it says created 6:36 on top, created date

11:17:43  4    October 12th?

11:17:43  5    A.      Yes.

11:17:44  6    Q.      That would indicate what?

11:17:45  7    A.      The time.

11:17:45  8    Q.      The time of?

11:17:47  9    A.      When it was created.

11:17:48 10    Q.      Meaning the time you ran the check?

11:17:50 11    A.      Correct.

11:17:51 12    Q.      And if you look at the bottom, it says retrieve date,

11:17:54 13    do you see that?

11:17:56 14    A.      Correct.

11:17:56 15    Q.      And you see the time?

11:18:00 16    A.      One minute apart.

11:18:01 17    Q.      Meaning that you ran the check and the results came

11:18:03 18    back in a minute?

11:18:04 19    A.      Yes.

11:18:04 20    Q.      And the results were to proceed?

11:18:06 21    A.      Correct.

11:18:06 22    Q.      So looking at this, would this be the time that you

11:18:10 23    first became aware that Hunter was in the store seeking to

11:18:13 24    purchase something?

11:18:15 25    A.      No, I would have had his paperwork in my hand, I

11:18:18 1   would have read the paperwork.

11:18:19 2   Q.      Somewhat right before 6:36?

11:18:23 3   A.      Correct.

11:18:23 4   Q.      So you're in the back room, who brings you the

11:18:30 5   paperwork?

11:18:30 6   A.      Gordon brought me the paperwork.

11:18:30 7   Q.      Gordon Cleveland?

11:18:31 8   A.      Correct.

11:18:31 9   Q.      When he brought you the paperwork, when you say

11:18:34 10  paperwork, am I understanding you to say that that included

11:18:37 11  the 4473 form?

11:18:39 12  A.      Yes.

11:18:39 13  Q.      Was there anything else?

11:18:40 14  A.      A copy of the passport.

11:18:42 15  Q.      Was it a copy of the passport or the actual passport?

11:18:45 16  A.      Whatever is in that paperwork bundle from, with the

11:18:51 17  4473, that's what he brought me.

11:18:52 18  Q.      And when you got the form, I want you to be clear

11:18:56 19  about this, you got the 4473, was Hunter's signature on the

11:19:02 20  form at that point?

11:19:04 21  A.      No, it was not, because it was my -- the way you do

11:19:09 22  it, is you review the form making sure that all the boxes

11:19:13 23  are checked, making sure that all the information is on the

11:19:17 24  form properly.  You can't run a background check until it's

11:19:20 25  been signed.

Turner - direct

11:19:20  1    Q.      But you just told me a minute ago --

11:19:23  2    A.      I did not run his background check until it was

11:19:26  3    signed.

11:19:26  4    Q.      So let me --

11:19:28  5    A.      When I --

11:19:29  6    Q.      Stop, stop, stop, let's me get the sequence, a moment

11:19:33  7    ago you said when you got the form it was not signed?

11:19:35  8    A.      Correct.

11:19:36  9    Q.      Did you get the form later when it was signed?

11:19:38 10    A.      Yes.

11:19:38 11    Q.      Let's talk about the sequence?

11:19:40 12    A.      Okay.

11:19:40 13    Q.      Mr. Cleveland comes in and brings the form and it's

11:19:43 14    not signed?

11:19:44 15    A.      Correct.

11:19:45 16    Q.      And he brought in a copy of some form of

11:19:52 17    identification at that point or the actual thing?

11:19:53 18            MR. WISE:  Your Honor, I object at this point,

11:19:55 19    the questions are all leading.  Which is fine on cross,

11:19:57 20    they're calling him, they should ask sort of what happened.

11:20:01 21            MR. LOWELL:  Okay, I will do it.

11:20:02 22    BY MR. LOWELL:

11:20:03 23    Q.      All right.  Let's start over.  What is it, the first

11:20:06 24    time that you saw the form, that you saw along with the

11:20:10 25    form, if anything?

Turner - direct

11:20:12  1   A.      So the form should have had the form itself, and a

11:20:18  2   copy of the identification because that's what the form

11:20:21  3   requires.  Everything on there, on that form, all the

11:20:25  4   directions are right there.  Not only for the purchaser, but

11:20:28  5   for the person disposing of the firearm.  The person selling

11:20:31  6   the gun.  It's all on there.

11:20:34  7   Q.      That's in the -- sorry, I want to take this in small

11:20:38  8   pieces.  When you say it's all there, you mean the

11:20:41  9   directions --

11:20:42 10   A.      The directions are on there.

11:20:43 11   Q.      Sir --

11:20:44 12           THE COURT:  Mr. Turner, see this guy down here,

11:20:47 13   that's Dale, he's my court reporter and he can only take

11:20:51 14   down one person at a time, so if you talk while Mr. Lowell

11:20:54 15   is talking, he gets mad at me, so you've got to wait for him

11:20:58 16   to finish and then he'll wait for you to finish your answer.

11:21:00 17   Got it.

11:21:01 18           THE WITNESS:  Be mad at me, that's all right.

11:21:04 19   BY MR. LOWELL:

11:21:04 20   Q.      That's all right, he's been mad at me the whole

11:21:07 21   trial.

11:21:07 22           So when my question was, Mr. Cleveland comes in

11:21:13 23   with a copy and you said to me there are everything, all

11:21:18 24   that's on the form, that means directions for the seller and

11:21:21 25   for the buyer, right?

Turner - direct

11:21:23  1    A.      Correct.

11:21:24  2    Q.      And what are some of the directions for the seller?

11:21:29  3    A.      In the individual boxes, it says sign here, or this

11:21:34  4    information is required here.

11:21:36  5    Q.      For the seller?

11:21:37  6    A.      Yeah.

11:21:38  7    Q.      And what --

11:21:39  8    A.      You need to have a copy, a photographic copy, so I

11:21:42  9    need a picture of a state ID, or some other federally issued

11:21:47 10    identification.

11:21:49 11    Q.      Okay.

11:21:49 12    A.      So a passport.

11:21:51 13    Q.      In this case you said a passport?

11:21:54 14    A.      Correct.

11:21:54 15    Q.      When Mr. Cleveland first comes in, just to be as

11:21:58 16    clear as we can be about the sequence, he has the form which

11:22:01 17    is not signed; is that right?

11:22:03 18    A.      Yes.

11:22:04 19    Q.      And he has a copy of the passport?

11:22:06 20    A.      Yes.

11:22:06 21    Q.      Now, when he came in with that form, was Mr. Palimere

11:22:10 22    in the office at the same time?

11:22:12 23    A.      No.

11:22:12 24    Q.      Where was he?

11:22:13 25    A.      I don't know.

Turner - direct

11:22:14  1    Q.       Did Mr. Palimere come on the scene in this exchange

11:22:18  2    with Mr. Cleveland at any time?

11:22:20  3    A.       Not that I know of.

11:22:22  4    Q.       So Mr. Cleveland came in, and he presented this to

11:22:25  5    you, and he handed this to you, right?

11:22:28  6    A.       No, he put it in a pile because there are four other

11:22:32  7    checks that were going on.

11:22:33  8    Q.       So it wasn't just -- are you indicating that what you

11:22:36  9    were working on was not just the form that had anything to

11:22:39 10    do with Hunter?

11:22:40 11    A.       No, I was running probably three other backgrounds.

11:22:43 12    Q.       Was this put on the pile?

11:22:44 13    A.       Right next to it, right in order.

11:22:47 14    Q.       And did Mr. Cleveland wait when you did that then?

11:22:51 15    A.       No, he went back out to attend to the sales floor.

11:22:54 16    Q.       Without the form and without the copy of the

11:22:56 17    passport?

11:22:57 18    A.       Correct.

11:22:58 19    Q.       When he went back out to the floor, did you see what

11:23:02 20    he did?

11:23:02 21    A.       No.

11:23:03 22    Q.       How long did it take you, then, to run the checks you

11:23:07 23    did by the time you went to the one that's up on the screen?

11:23:11 24    A.       I have no idea.  That was 2018.

11:23:13 25    Q.       So -- but is it your memory, though, that there were

Turner - direct

11:23:18  1    ones you were working on before this?

11:23:20  2    A.      Yes.

11:23:20  3    Q.      So in a time sequence, if you run this at 6:36, that

11:23:25  4    would mean that you got this form sometime prior and you

11:23:30  5    were working on other things before you got this?

11:23:32  6    A.      On other background checks, correct.

11:23:34  7    Q.      But you're sure that the form you got had no

11:23:38  8    signature on it?

11:23:38  9    A.      Positive.

11:23:40 10    Q.      Then you get to this one.  Did you have any

11:23:43 11    conversation with Mr. Cleveland when he first brought you

11:23:46 12    the form without the signature and then the copy?

11:23:49 13    A.      No.

11:23:49 14    Q.      He just left it for you?

11:23:51 15    A.      Yes.

11:23:51 16    Q.      And then he left?

11:23:53 17    A.      Went back out on the sales floor.

11:23:55 18    Q.      And what did you do next?

11:23:57 19    A.      Took the next one in the pile.

11:23:59 20    Q.      Which was not yet Hunter's?

11:24:02 21    A.      Probably not Hunter's, maybe it was.

11:24:04 22    Q.      You don't know?

11:24:05 23    A.      I don't remember.

11:24:06 24    Q.      Okay.  Eventually you got to his?

11:24:08 25    A.      Yep.

Turner - direct

11:24:08 1    Q.    And you ran that at that point?

11:24:11 2    A.    No.

11:24:11 3    Q.    What did you do?

11:24:12 4    A.    You have to review the form.

11:24:13 5    Q.    Okay.  So you reviewed the form and what happened?

11:24:16 6    A.    Make sure there is a first name in the first name box

11:24:19 7    and a last name in the last name box, make sure all of the

11:24:22 8    boxes are checked correctly, and then you open it up and you

11:24:26 9    make sure that the buyer has signed the form.

11:24:29 10   Q.    But when you did that --

11:24:30 11   A.    Before you would even type in your log in, you look

11:24:33 12   at all these things.

11:24:35 13   Q.    Okay.

11:24:35 14   A.    If it was missing information, close the form, go

11:24:40 15   find my salesperson, make him get me the right information.

11:24:45 16   Q.    Was it missing information?

11:24:46 17   A.    It was missing information.

11:24:48 18   Q.    Okay.  So among other things, it was missing a

11:24:51 19   signature?

11:24:51 20   A.    Yes.

11:24:52 21   Q.    So then what happened?

11:24:53 22   A.    Took it to the sales floor, to my sales associate.

11:24:56 23   Q.    You went outside?

11:24:57 24   A.    Went out to the front of the store, correct.

11:25:00 25   Q.    Did you bring anything with you when you went out to

Turner - direct

11:25:02 1  the floor?

11:25:03 2  A.    The paperwork.

11:25:03 3  Q.    Meaning?

11:25:04 4  A.    The 4473 and a copy of the passport.

11:25:07 5  Q.    And then when you went back to the floor, did you

11:25:10 6  speak to Mr. Cleveland?

11:25:11 7  A.    Yes.

11:25:11 8  Q.    What is it that you said to Mr. Cleveland?

11:25:14 9  A.    I told him that he was missing the supplementary

11:25:17 10 identification because you can't do just a passport alone,

11:25:21 11 it has no address on it.  And it didn't have a signature.

11:25:24 12 Q.    It did not yet?

11:25:26 13 A.    Correct.

11:25:26 14 Q.    So part of the form was filled, whatever you said,

11:25:31 15 you went out and spoke to Mr. Cleveland and told him what

11:25:34 16 you just said?

11:25:35 17 A.    Uh-huh.

11:25:36 18 Q.    You only spoke to Mr. Cleveland?

11:25:38 19 A.    Correct.

11:25:38 20 Q.    Did you at any point when you went back out talk to

11:25:42 21 Mr. Biden at all?

11:25:43 22 A.    No.

11:25:43 23 Q.    Never?

11:25:44 24 A.    No.

11:25:44 25 Q.    Not a word?

Turner - direct

| | | |
|---|---|---|
| 11:25:46 | 1 | A. **No.** |
| 11:25:46 | 2 | Q. **You didn't ask Mr. Biden for anything?** |
| 11:25:48 | 3 | A. **No.** |
| 11:25:48 | 4 | Q. **You didn't seek him to go and get some other form of** |
| 11:25:51 | 5 | **papers?** |
| 11:25:52 | 6 | A. **No.** |
| 11:25:52 | 7 | Q. **You just spoke to Mr. Cleveland?** |
| 11:25:54 | 8 | A. **Correct.** |
| 11:25:54 | 9 | Q. **After you spoke to Mr. Cleveland, what did** |
| 11:25:57 | 10 | **Mr. Cleveland do?** |
| 11:25:57 | 11 | A. **He went and followed the orders that he was given, he** |
| 11:26:00 | 12 | **got a supplementary I.D., and had him sign the paperwork.** |
| 11:26:06 | 13 | Q. **At that point?** |
| 11:26:06 | 14 | A. **At that point.** |
| 11:26:07 | 15 | Q. **How do you know that that is what Mr. Cleveland did?** |
| 11:26:08 | 16 | A. **Because I waited by the back office door.** |
| 11:26:11 | 17 | Q. **Say it again?** |
| 11:26:12 | 18 | A. **I waited by the back office door.** |
| 11:26:15 | 19 | Q. **And watched Mr. Cleveland?** |
| 11:26:16 | 20 | A. **Correct.** |
| 11:26:16 | 21 | Q. **Where was Mr. Biden?** |
| 11:26:18 | 22 | A. **In the front of the store.** |
| 11:26:20 | 23 | Q. **Where?** |
| 11:26:21 | 24 | A. **Over by the sales counter.** |
| 11:26:23 | 25 | Q. **You told Mr. Cleveland something and you went back to** |

1139

Turner - direct

11:26:26  1    the door?

11:26:26  2    A.      Yep.

11:26:27  3    Q.      And Mr. Cleveland went outside?

11:26:28  4    A.      No, Mr. Cleveland never left the store.

11:26:31  5    Q.      You didn't talk to Mr. Biden, we understand that?

11:26:33  6    A.      Correct.

11:26:34  7    Q.      You just said something about a supplemental form of

11:26:36  8    identification?

11:26:37  9    A.      Uh-huh.

11:26:38 10    Q.      Because you told Mr. Cleveland that the passport was

11:26:40 11    not sufficient?

11:26:41 12    A.      Correct.

11:26:43 13    Q.      Can you put up government Exhibit 12 -- 10A, please.

11:26:54 14    And it's in evidence.

11:26:55 15             So do you recognize this five years later as the

11:26:59 16    form or just because it's on the screen?

11:27:05 17    A.      That looks about right.

11:27:07 18    Q.      Okay.  Can you turn to the next page?  And you see on

11:27:11 19    the next page it says U.S. passport 01052027?

11:27:17 20    A.      Uh-huh.

11:27:17 21    Q.      Do you recognize that writing?

11:27:19 22    A.      That looks like mine.

11:27:20 23    Q.      And you are the person that put that on that says

11:27:24 24    U.S. passport, correct?

11:27:26 25    A.      Correct.

Turner - direct

11:27:26 1  Q.      A minute ago you said you went to speak to

11:27:29 2  Mr. Cleveland and you said to him that that wasn't

11:27:31 3  sufficient because it did not have an address on it.  And

11:27:34 4  you see the passport is what you wrote on, right?

11:27:37 5  A.      Correct.

11:27:39 6  Q.      When did you write that on it?

11:27:40 7  A.      Somewhere in filling out his NICS check.

11:27:44 8  Q.      You see the books next to it, line 18(b), right under

11:27:51 9  it?

11:27:51 10 A.      Correct.

11:27:51 11 Q.      It says supplemental government issued documentation,

11:27:55 12 if the identification document does not show current

11:27:58 13 residence, government issued photo identification, do you

11:28:05 14 see that?

11:28:05 15 A.      Yes.

11:28:05 16 Q.      If it doesn't show residence, do you see that?

11:28:09 17 A.      Correct.

11:28:09 18 Q.      You a moment ago said that the passport doesn't have

11:28:13 19 somebody's address?

11:28:14 20 A.      Correct.

11:28:14 21 Q.      Then you said that you told Mr. Cleveland something,

11:28:16 22 right?

11:28:16 23 A.      He needed to get further government issued

11:28:22 24 identification with an address on it.

11:28:25 25 Q.      Right.  And if he did, what would you do with that?

Turner - direct

11:28:29 1    A.        I would have written it right in there.

11:28:32 2    Q.        But you don't see such writing in there, do you?

11:28:33 3    A.        When I wrote that out, I wrote the car registration.

11:28:34 4    Q.        You don't see such a writing in there, do you?

11:28:36 5    A.        When I wrote that out, I wrote car registration.

11:28:40 6    Q.        When you wrote this out, you wrote car registration

11:28:47 7    here or car registration there?

11:28:49 8    A.        18(b), car registration.

11:28:53 9    Q.        You wrote it?

11:28:54 10   A.        I wrote it.

11:28:56 11   Q.        Where is it?

11:28:57 12   A.        I wrote vehicle registration in there.

11:29:00 13   Q.        I'm asking you if you did and this is the form, where

11:29:03 14   is it on the form that you say you wrote?

11:29:06 15   A.        It's not there.

11:29:07 16            MR. WISE:  Your Honor, may we approach side-bar?

11:29:09 17            (Side-bar discussion.

11:31:03 18            MR. WISE:  So this line of questioning was

11:31:03 19   excluded, he has a memory of writing it, he hasn't

11:31:03 20   established when, he's not impeached him, he said he

11:31:03 21   remembered writing it in.  He's asking him about the day,

11:31:03 22   but he's not distinguishing, and this is simply irrelevant,

11:31:03 23   a secondary form of ID is irrelevant.

11:31:03 24            MR. LOWELL:  Wow.  I have no idea he was about

11:31:03 25   to say what he just said, that he wrote in a different form

Turner - direct

11:31:03  1    of identification.

11:31:03  2                    THE COURT:  He's confused as to the time.

11:31:03  3                    MR. LOWELL:  I know he is and I'm not going

11:31:03  4    there but he said it, so I just wanted to ask who wrote it,

11:31:03  5    where is it, I didn't know he was going to say that, judge.

11:31:03  6                    MR. WISE:  He did know that because the Jencks

11:31:03  7    that we gave you from Palimere, said Palimere told him to

11:31:03  8    write it.

11:31:03  9                    MR. LOWELL:  Two years later.

11:31:03 10                    MR. WISE:  That's not your question.

11:31:03 11                    MR. LOWELL:  I'm asking him on that day, I'm

11:31:03 12    asking him on that day.

11:31:03 13                    THE COURT:  What you can do now is you can just

11:31:03 14    say there is nothing about the vehicle registration.  It is

11:31:03 15    not written in this box on this version of the form.

11:31:03 16                    MR. LOWELL:  Okay.  But let's be clear on the

11:31:03 17    record, when you say I knew he was going -- I had no idea he

11:31:03 18    was going to say that.

11:31:03 19                    THE COURT:  I take your word for that.  I didn't

11:31:03 20    know he was going to say that.

11:31:03 21                        (End of side-bar.

11:31:06 22    BY MR. LOWELL:

11:31:15 23    Q.      So what I was asking you is from whatever you just

11:31:17 24    said about the testimony of anything having to do with the

11:31:20 25    registration, you and I can be clear that on this form that

Turner - direct

11:31:24 1  has the date on it, there is no such reference in

11:31:27 2  line 18(b), right?

11:31:28 3  A.      There should be.

11:31:29 4  Q.      Okay.  So you went out, spoke to Mr. Cleveland, you

11:31:37 5  saw Mr. Biden do something, come back, right?  And then did

11:31:42 6  you then go back into the back room?

11:31:45 7  A.      Yes.  Sat down and entered his information into the

11:31:48 8  NICS system.

11:31:49 9  Q.      With the form as it presently then stood?

11:31:53 10 A.      Correct.

11:31:53 11 Q.      As the form as it then was in existence?

11:31:57 12 A.       (Witness nodded.

11:31:59 13 Q.      Did Mr. Cleveland go back inside with you?

11:32:01 14 A.      He was still on the sales floor.

11:32:03 15 Q.      And Mr. Biden was still on the sales floor?

11:32:05 16 A.      Correct.  Nobody left the store.

11:32:07 17 Q.      I'm sorry?

11:32:09 18 A.      None of the staff left the store.

11:32:11 19 Q.      Okay, I understand, I'm just trying to create the

11:32:15 20 time sequence, okay?

11:32:16 21 A.      Sure.

11:32:16 22 Q.      Now you get the form as you understood it to exist as

11:32:19 23 that looked, or maybe not, and you went and did the NICS?

11:32:23 24 A.      Correct.

11:32:23 25 Q.      And we showed you the NICS form.  After that, how did

11:32:30   1   you communicate, if you did, the results of that background

11:32:34   2   check to Mr. Cleveland or anybody else?

11:32:37   3   A.      Well, if you scroll or focus on that form --

11:32:44   4   Q.      I should go to the next page anyway, Mr. Radic, just

11:32:48   5   to make sure we're acclimated.   On top where it says Colt

11:32:53   6   manufacturer, do you recognize that handwriting?

11:32:56   7   A.      That looks like my handwriting.

11:32:58   8   Q.      Where would you have put that on?

11:33:00   9   A.      While I was running the form.

11:33:02  10   Q.      Okay.   And then there is a StarQuest Shooters stamp

11:33:06  11   and a number on the right, what is that, do you recognize

11:33:13  12   that?

11:33:13  13   A.      That would be an address and the number on the right

11:33:15  14   would be the FFL.

11:33:18  15   Q.      FFL meaning the license?

11:33:20  16   A.      Correct.

11:33:20  17   Q.      Who put that on?

11:33:22  18   A.      That gets put on by the filing secretary.

11:33:24  19   Q.      Is that stamp of the store's name and its license

11:33:27  20   number on the forms already?

11:33:28  21   A.      No.

11:33:28  22   Q.      Are they put in each time a gun is purchased?

11:33:32  23   A.      Each time a gun is purchased.

11:33:34  24   Q.      And then I see that there is, the blue name of Gordon

11:33:39  25   Cleveland and the signature, do you see that?

Turner - direct

11:33:41  1    A.      Yes.

11:33:42  2    Q.      And it says sales, do you see that?

11:33:43  3    A.      Uh-huh.

11:33:44  4    Q.      There is a date and that looks like your handwriting;

11:33:47  5    is that right?

11:33:47  6    A.      Correct.

11:33:48  7    Q.      How did that come about?

11:33:49  8    A.      I probably dated it while sitting there.

11:33:53  9    Q.      Was that before or after Mr. Cleveland signed it?

11:33:56 10    A.      It would have been after Mr. Cleveland signed it.

11:33:58 11    Q.      Would that be before or after you saw the form with

11:34:02 12    Mr. Hunter Biden's signature on it?

11:34:04 13    A.      It would have been after.

11:34:05 14    Q.      So now you ran the check, and my question was how did

11:34:09 15    you communicate proceed to whoever you needed to communicate

11:34:14 16    it to?

11:34:14 17    A.      On the other page, I would have finished filling out

11:34:17 18    the document where it said proceed.  Right there.

11:34:22 19    Q.      So now --

11:34:23 20    A.      He --

11:34:25 21    Q.      Go ahead?

11:34:26 22    A.      Proceed, put the date on there, and the NTN number,

11:34:30 23    which is a transaction number, and I would have put my name

11:34:33 24    in the box that said I ran it.

11:34:35 25    Q.      Okay.  I see that this date and the NICS number is in

Turner - direct

| 11:34:41 | 1 | red ink, do you see that? |

11:34:41 1 red ink, do you see that?

11:34:42 2 A.    Uh-huh.

11:34:43 3 Q.    As was the date next to Mr. Cleveland's name and

11:34:46 4 signature, and your name, Jason V. Turner is in black ink?

11:34:52 5 A.    Right.

11:34:52 6 Q.    Is that your handwriting for your name?

11:34:55 7 A.    Yes.

11:34:55 8 Q.    When did you put that on versus the red?

11:34:59 9 A.    All at the same time.

11:35:01 10 Q.    You switched pen colors?

11:35:03 11 A.    Yes.

11:35:03 12 Q.    How come?

11:35:04 13 A.    Because the date, proceed and NTN number now stand

11:35:08 14 out on the form so during the yearly ATF audit it makes it

11:35:13 15 easier to see those numbers.

11:35:15 16 Q.    And then when you did that, now you put the red in

11:35:18 17 and put your name, you still have that form; right?

11:35:22 18 A.    Yes.

11:35:22 19 Q.    And then what did you do with it?

11:35:24 20 A.    Took the form and the firearm out front.

11:35:27 21 Q.    So at the point at which you did this, did you have

11:35:30 22 the firearm back there as well?

11:35:32 23 A.    Yes, because I needed the information off the gun.

11:35:35 24 Q.    So Mr. Cleveland brought you the form at one point,

11:35:40 25 right?

Turner - direct

11:35:40  1    A.      Uh-huh.

11:35:41  2    Q.      And a copy of the passport; right?  You went out and

11:35:48  3    spoke to Mr. Cleveland.  When you went out to get

11:35:50  4    Mr. Cleveland and tell him about the form, is that when you

11:35:54  5    picked up the gun?

11:35:54  6    A.      No, he brought the gun with him the first time.

11:35:57  7    Q.      So I'm sorry I got confused.  So the first time when

11:36:00  8    he comes in, he brings in the form, the copy of the

11:36:03  9    passport, and the gun?

11:36:04 10    A.      Uh-huh.

11:36:05 11    Q.      So the gun is no longer out on the showroom?

11:36:08 12    A.      No.

11:36:09 13    Q.      And you went back outside to tell Mr. Cleveland --

11:36:13 14    A.      Out front, not outside.

11:36:15 15    Q.      Outside of the back room?

11:36:17 16    A.      Correct.

11:36:17 17    Q.      To see Mr. Cleveland and talk to him, the gun was

11:36:20 18    behind, back in the back room?

11:36:22 19    A.      Uh-huh.

11:36:22 20    Q.      That never left?

11:36:23 21    A.      No.

11:36:23 22    Q.      Until you were done?

11:36:25 23    A.      Correct.

11:36:26 24    Q.      So now after you did this, you communicated to

11:36:29 25    Mr. Cleveland by bringing what?

Turner - direct

| | | |
|---|---|---|
| 11:36:30 | 1 | A.     The form and the firearm. |
| 11:36:32 | 2 | Q.     The form, the firearm, and the copy of the passport? |
| 11:36:35 | 3 | A.     Correct. |
| 11:36:35 | 4 | Q.     Did you ever see the actual passport? |
| 11:36:37 | 5 | A.     No. |
| 11:36:38 | 6 | Q.     Did he ever -- so you're saying he never, as you |
| 11:36:42 | 7 | remembered it, brought the actual passport, only a copy? |
| 11:36:46 | 8 | A.     Mr. Cleveland made a copy. |
| 11:36:48 | 9 | Q.     In the back room or in the front? |
| 11:36:50 | 10 | A.     In the book room where the copier was. |
| 11:36:52 | 11 | Q.     Did you see him do that? |
| 11:36:54 | 12 | A.     It's down the hallway. |
| 11:36:55 | 13 | Q.     I'm just asking, did you see him do that? |
| 11:36:57 | 14 | A.     No. |
| 11:36:58 | 15 | Q.     When did he do that? |
| 11:36:59 | 16 | A.     Somewhere in between Mr. Biden filling out the form |
| 11:37:01 | 17 | and picking out his firearm. |
| 11:37:04 | 18 | Q.     And then you took the gun, the form, and you went |
| 11:37:08 | 19 | back outside after the NICS check? |
| 11:37:11 | 20 | A.     Uh-huh. |
| 11:37:11 | 21 | Q.     And you gave them to Mr. Cleveland? |
| 11:37:13 | 22 | A.     Correct. |
| 11:37:14 | 23 | Q.     Still no conversation with Hunter? |
| 11:37:16 | 24 | A.     Correct. |
| 11:37:17 | 25 | Q.     And then what did you do thereafter? |

Turner - direct

11:37:19  1   A.      I went back to the back office to run more background

11:37:22  2   checks.

11:37:22  3   Q.      And that was the end of your involvement at that

11:37:25  4   point that day?

11:37:27  5   A.      Yes.

11:37:27  6   Q.      Had any conversations with Mr. Palimere that day

11:37:30  7   about the form?

11:37:32  8   A.      No.

11:37:32  9   Q.      And he was not in the back room with you?

11:37:34 10   A.      No.

11:37:35 11   Q.      And then when the sale ended, did you have any

11:37:38 12   further conversations with Mr. Cleveland?

11:37:41 13   A.      About football, whatever was going on that day, yeah.

11:37:46 14   Q.      Say that again.

11:37:47 15   A.      We worked together.

11:37:48 16   Q.      No, I mean about the sale?

11:37:50 17   A.      About the sale, no.

11:37:52 18   Q.      Can I also show you what is in evidence as

11:37:56 19   Government's Exhibit 13, and put it up on the screen,

11:38:00 20   please, Mr. Radic.

11:38:01 21           So we saw the NICS checks dated, you're doing it

11:38:08 22   at 6:36 and it comes back at 6:37, and you can see that this

11:38:12 23   is what, do you recognize this document?

11:38:14 24   A.      That looks like a sales receipt from the shop.

11:38:16 25   Q.      That's the way those sales receipts looked?

Turner - direct

11:38:19   1    A.      At the time, yeah.

11:38:20   2    Q.      And you see the date is the same date and the time is

11:38:24   3    6:53?

11:38:25   4    A.      All right.

11:38:26   5    Q.      Do you see that on top?

11:38:28   6    A.      Yes.

11:38:28   7    Q.      Okay.  And you see the user of this is Gordon, that

11:38:32   8    means he's the salesperson?

11:38:34   9    A.      Correct.

11:38:34  10    Q.      And did you see that that day?

11:38:37  11    A.      Maybe at night when we were locking up and doing the

11:38:41  12    last minute paperwork.

11:38:42  13    Q.      So do you remember that you ran the check, and it

11:38:45  14    came back at 6:37, right?

11:38:48  15    A.      Yes.

11:38:48  16    Q.      And you see that this sale was completed at 6:53,

11:38:53  17    right?

11:38:53  18    A.      Correct.

11:38:54  19    Q.      That's 16 minutes between the two, right?

11:38:56  20    A.      Yes.

11:38:56  21    Q.      So did you know what happened between the time that

11:38:59  22    you ran the check and the time that the sale was completed?

11:39:03  23    A.      No.

11:39:04  24    Q.      Would that have been the time in which you brought

11:39:06  25    back the gun, the form, the copy of the passport?

Turner - direct

11:39:11  1    A.       Probably.

11:39:12  2    Q.       Because according to your sequence you --

11:39:15  3    A.       You're not understanding how gun shop life is.  It's

11:39:19  4    like going to the barber shop, we have regular customers

11:39:24  5    that would come in every day just to hang out, talk about

11:39:27  6    the local news.  I can go to a gun shop today and spend two

11:39:34  7    hours in there and it not seem like anything.

11:39:38  8    Q.       Okay.

11:39:38  9    A.       So you're trying to set a time frame.  That's not

11:39:43 10    going to happen.  Like, I can literally go to a gun shop and

11:39:49 11    be there for an hour-and-a-half and it not seem like I was

11:39:52 12    there for an hour-and-a-half.

11:39:53 13    Q.       I understand what you're saying.  I get it.  What I'm

11:39:56 14    asking you, though, since we have two date parts, we know

11:40:00 15    when the NICS was done and received right, that's not

11:40:03 16    anything but what it says, 6:36 and 37, and we know that

11:40:08 17    this sale occurs at 6:53, I'm asking you, is it in that

11:40:15 18    period between the two, that you had testified, that you

11:40:20 19    went back out, you had the gun, you had the form, you had

11:40:22 20    the photo ID, it had to happen in that period of time?

11:40:23 21    A.       You're saying that the form ran in a minute.

11:40:26 22    Q.       6:37 is when it came back?

11:40:27 23    A.       Now I got to sit and write all that information that

11:40:30 24    was on there.  So there is your 16 minutes, I write slow.

11:40:34 25    Q.       I see.  So that time was taken from the time between

Turner - direct

11:40:38  1   your writing it, coming back out, and that's when the sale

11:40:40  2   was consummated?

11:40:42  3   A.     Yes.

11:40:42  4   Q.     Did you see that sale being running up then in that

11:40:45  5   period?

11:40:46  6   A.     No.  I literally would have been going back to run

11:40:50  7   more backgrounds.

11:40:51  8   Q.     I understand, but your understanding is that time

11:40:53  9   period between the NICS and the sale, was taken up by you?

11:40:57 10   A.     Okay.

11:40:58 11          MR. WISE:  Objection, that's not what he said.

11:41:00 12   BY MR. LOWELL:

11:41:00 13   Q.     Let me ask him, let me do it again.  We know two

11:41:03 14   times, right?

11:41:05 15   A.     Yes.

11:41:06 16          MR. WISE:  Now he's leading him.

11:41:07 17   BY MR. LOWELL:

11:41:08 18   Q.     Well that's already been established?

11:41:10 19          MR. WISE:  He should ask non-leading questions.

11:41:12 20   BY MR. LOWELL:

11:41:12 21   Q.     So between the time of 6:37 when the NICS check was

11:41:16 22   done, and 6:53 when this is consummated, what happened?

11:41:20 23          MR. WISE:  Asked and answered, he's already

11:41:22 24   answered it.

11:41:23 25          THE WITNESS:  I put on my ritual robes and went

Turner - direct

11:41:26  1    and sat in a marble room, what do you want me to say to you

11:41:30  2    counselor?

11:41:30  3    BY MR. LOWELL:

11:41:30  4    Q.    I would like to you to tell me as best as you can

11:41:33  5    remember -- let me finish sir, whether that was the time

11:41:36  6    period it took for to you run the NICS check and then to do

11:41:39  7    the paperwork, come back outside with the gun, the form, the

11:41:43  8    NICS check completed?

11:41:44  9            MR. WISE:  He's already asked the question and

11:41:46 10    he's answered it.

11:41:48 11            THE COURT:  So Mr. Turner, if anything that you

11:41:51 12    remember, you can respond, you can respond.  If you don't

11:41:55 13    remember something, you don't have to make something up,

11:41:58 14    whatever you remember to answer Mr. Lowell's question, you

11:42:01 15    can do so.

11:42:02 16            THE WITNESS:  Sure.  I ran his background check.

11:42:06 17    I filled out the rest of the form.  I took the gun out to

11:42:10 18    the front.

11:42:13 19    BY MR. LOWELL:

11:42:13 20    Q.    And then the sale was consummated?

11:42:16 21    A.    As far as I know.

11:42:17 22    Q.    Thank you.  I have no other questions.  Thank you.

11:42:22 23            THE COURT:  Thank you.

11:42:23 24            Cross.

11:42:24 25            MR. WISE:  Thank you, Your Honor.

Turner - cross

**CROSS-EXAMINATION**

11:42:26  1

11:42:26  2  BY MR. WISE:

11:42:32  3  Q.      Good morning, Mr. Turner.

11:42:33  4  A.      Good morning.

11:42:34  5  Q.      So you were subpoenaed by the defense as a witness,

11:42:37  6  right?

11:42:38  7  A.      Correct.

11:42:38  8  Q.      Did they try to talk with you before they did that,

11:42:41  9  before you testified here today?

11:42:43 10  A.      That's a whole mess of stuff right there.

11:42:47 11  Q.      Really?

11:42:49 12  A.      I got the subpoena, I had to call them.

11:42:51 13  Q.      Uh-huh.

11:42:53 14  A.      And they can't be on time for nothing.

11:42:57 15  Q.      What does that mean?

11:42:58 16  A.      I work third shift.

11:43:00 17  Q.      Uh-huh.

11:43:01 18  A.      And so I should be sleeping right now.

11:43:05 19  Q.      What does third shift mean?

11:43:07 20  A.      Third shift, that's on the other side of the clock

11:43:10 21  from everybody else, I go in at 6:00 p.m., I get done at 5

11:43:15 22  a.m.

11:43:15 23  Q.      Is that what you got done today?

11:43:17 24  A.      Yes.

11:43:18 25  Q.      All right.  So I just have a -- you and I have never

Turner - cross

11:43:22  1   met, right, Mr. Turner?

11:43:24  2   A.      I don't even know you from nobody.

11:43:26  3   Q.      I just have a couple of questions?

11:43:29  4            THE COURT:  Did you introduce yourself?

11:43:32  5            MR. WISE:  I'm not sure.  I will.

11:43:35  6            THE COURT:  He said he doesn't know you.

11:43:37  7   BY MR. WISE:

11:43:37  8   Q.      My name is Leo wise, I represent the United States in

11:43:40  9   this case.  Nice to meet you.

11:43:43 10            So if we could have government Exhibit 10A on

11:43:48 11   the screen.  This is the form that Mr. Biden filled out that

11:43:53 12   Mr. Lowell asked you about, right?

11:43:55 13   A.      Correct.  Actually that form is wrong.

11:43:58 14            THE COURT:  Just take it one step at a time,

11:44:00 15   only answer the questions that he asks.

11:44:02 16            THE WITNESS:  Yes, ma'am.

11:44:03 17   BY MR. WISE:

11:44:03 18   Q.      So the first page, this is all filled out by the

11:44:06 19   person buying the gun; right?

11:44:09 20   A.      Except for that top corner on the right-hand side.

11:44:13 21   Q.      Got it.  So looking at the form as it is on the

11:44:16 22   screen, this is all information that comes in this case from

11:44:21 23   Mr. Biden himself, right?

11:44:23 24   A.      Correct.

11:44:23 25   Q.      That includes, if we could highlight the questions in

Turner - cross

11:44:27  1    the middle, and it's question E, if you could enlarge that

11:44:35  2    as well.   That includes are you an unlawful user of or

11:44:43  3    addicted to marijuana or depressant stimulant narcotic drug

11:44:48  4    or any other controlled substance, right?

11:44:51  5    A.     Correct.

11:44:51  6    Q.     Now you run the background checks, correct?

11:44:53  7    A.     Correct.

11:44:53  8    Q.     The background checks don't tell you whether the

11:44:58  9    person trying to buy the gun has answered that question

11:45:01 10    truthfully or they've lied, right?

11:45:04 11    A.     Correct.

11:45:04 12    Q.     For that question, you have to depend on whoever is

11:45:08 13    buying the gun, being truthful about their own drug use or

11:45:12 14    addiction; right?

11:45:14 15    A.     Correct.

11:45:14 16    Q.     Nothing you do in the one minute when they run that

11:45:18 17    check tells you whether they're using drugs or addicted to

11:45:23 18    it, right?

11:45:24 19    A.     Correct.

11:45:24 20    Q.     And when you got this form, we can come out of that

11:45:29 21    -- when you got this form to run the background check like

11:45:32 22    you said you did every day or whenever you worked, this was

11:45:36 23    all filled out; right?

11:45:38 24    A.     Correct.

11:45:38 25    Q.     And it had been filled out by Mr. Biden, right?

Turner - redirect

| | | |
|---|---|---|
| 11:45:42 | 1 | A.      Correct. |
| 11:45:42 | 2 | Q.      And you said you noticed it was missing his |
| 11:45:47 | 3 | signature; correct? |
| 11:45:48 | 4 | A.      Correct. |
| 11:45:48 | 5 | Q.      So that's what you raised; right? |
| 11:45:52 | 6 | A.      Yes. |
| 11:45:52 | 7 | Q.      You raised it with Mr. Cleveland or whomever? |
| 11:45:55 | 8 |         But there was nothing, nothing from this first |
| 11:45:58 | 9 | page that he hadn't filled out? |
| 11:46:00 | 10 | A.      No, the first page was correct. |
| 11:46:04 | 11 |         MR. WISE:  That's it, Your Honor.  Thank you. |
| 11:46:06 | 12 |         THE COURT:  Thank you. |
| 11:46:08 | 13 |         Redirect. |
| 11:46:08 | 14 |              REDIRECT EXAMINATION |
| 11:46:09 | 15 | BY MR. LOWELL: |
| 11:46:10 | 16 | Q.      You understand, sir, can we go back to the first page |
| 11:46:14 | 17 | of government Exhibit 10A, please?  There we are again.  You |
| 11:46:25 | 18 | said that this is not right.  Why wasn't this right? |
| 11:46:28 | 19 |         MR. WISE:  Objection, Your Honor. |
| 11:46:29 | 20 |         THE COURT:  Sustained. |
| 11:46:31 | 21 |         MR. LOWELL:  All right. |
| 11:46:32 | 22 | BY MR. LOWELL: |
| 11:46:32 | 23 | Q.      Did you see Mr. Biden check those boxes? |
| 11:46:35 | 24 | A.      No. |
| 11:46:36 | 25 | Q.      So when Mr. Wise just asked you whether Mr. Biden |

Turner - redirect

11:46:41 1    checked those, you have no idea whether he did or not or

11:46:44 2    when?

11:46:45 3    A.      Well, it wouldn't have been Gordon, so unless

11:46:49 4    somebody else filled that form out for him.

11:46:51 5    Q.      Right.  But the next page, when you saw the boxes

11:46:57 6    checked, that signature wasn't on it?

11:46:59 7    A.      It was not on it.  And I went out front.

11:47:03 8    Q.      As between-- that's all I asked.  As between you and

11:47:07 9    Mr. Cleveland, who was having interactions with Mr. Biden?

11:47:11 10    A.      Mr. Cleveland.

11:47:12 11    Q.      So you didn't see Mr. Biden in any state that you

11:47:16 12    could tell whether he was drunk or using anything that would

11:47:19 13    cause you any concern?

11:47:20 14    A.      No.

11:47:20 15    Q.      As between you and Mr. Cleveland, that would be

11:47:24 16    Mr. Cleveland then if that was the case?

11:47:25 17    A.      If that was the case, yes.

11:47:28 18    Q.      And the last question that I have for you, then, is

11:47:39 19    when -- do you know what --

11:47:40 20              MR. LOWELL:  I don't have any other questions

11:47:43 21    for you.

11:47:44 22              THE COURT:  All right.  Thank you, sir.  You are

11:47:46 23    excused.  I hope you get some sleep.

11:47:48 24              THE WITNESS:  Thank you, ma'am.

11:47:50 25              THE COURT:  All right.  Mr. Lowell, what's next?

Palimere - direct

11:47:53  1          MR. LOWELL:  We would like the jury to hear from

11:47:56  2   Ron Palimere.

11:48:02  3          COURTROOM DEPUTY:  Please raise your right hand.

11:48:06  4   Please state and spell your full name for the record.

11:50:02  5          THE WITNESS:  Ronald Palimere, Jr.  R-O-N-A-L-D,

11:50:25  6   P-A-L-I-M-E-R-E, Jr.

11:50:29  7          RONALD PALIMERE, JR., having been duly sworn was

11:50:34  8   examined and testified as follows:

11:50:36  9                    DIRECT EXAMINATION

11:50:37 10   BY MR. LOWELL:

11:50:41 11   Q.     Good morning, Mr. Palimere.

11:50:43 12   A.     Good morning.

11:50:43 13   Q.     My name is Abbe Lowell, we've never met?

11:50:46 14   A.     No, sir.

11:50:46 15   Q.     Never spoken?

11:50:47 16   A.     No, sir.

11:50:48 17   Q.     You have spoken to the prosecutors and investigators

11:50:50 18   in the case, right?

11:50:51 19   A.     Yes, sir.

11:50:52 20   Q.     And we have --

11:50:54 21          MR. WISE:  Your Honor, I object to that

11:50:56 22   question, prosecutors and investigators, we've never met as

11:51:01 23   well.

11:51:01 24          MR. LOWELL:  I'm sorry.

11:51:02 25   BY MR. LOWELL:

Palimere - direct

11:51:03  1   Q.      You have met with members of the FBI?

11:51:07  2   A.      Yes, sir.

11:51:07  3   Q.      Even recently; correct?

11:51:08  4   A.      Yes, sir.

11:51:09  5   Q.      And you're here because we have subpoenaed you,

11:51:14  6   meaning, we, the lawyers that are representing Mr. Biden?

11:51:17  7   A.      Yes, sir.

11:51:18  8   Q.      What do you do for a living?

11:51:20  9   A.      I own StarQuest Shooters and Survival Supply.

11:51:23 10   Q.      For how long have you owned the store?

11:51:25 11   A.      About 12 years.

11:51:27 12   Q.      And before that, did you have any other stores like

11:51:30 13   that, any other survival or shooting stores or gun stores?

11:51:34 14   A.      No, sir.

11:51:35 15   Q.      You're still the owner?

11:51:37 16   A.      Yes, sir.

11:51:37 17   Q.      And as an owner, other than of course owning it, in

11:51:44 18   terms of day to day sales, what's your responsibility?

11:51:47 19   A.      Just general operations, you know, the bookkeeping,

11:51:51 20   the sales, the ordering of products, that kind of stuff.

11:51:56 21   Q.      Did you yourself ever make sales?

11:51:59 22   A.      No, sir.

11:52:00 23   Q.      You have salespeople for that?

11:52:01 24   A.      Yes, sir.

11:52:02 25   Q.      I want to call your attention to October of 2018, the

Palimere - direct

11:52:06  1    date about which this trial is.  Okay.  You were the owner

11:52:09  2    of the store?

11:52:10  3    A.    Yes, sir.

11:52:10  4    Q.    Were you in the store on that day?

11:52:14  5    A.    At some point I was in the store, yes.

11:52:17  6    Q.    Do you know what time or what part of the day you

11:52:20  7    were there?

11:52:20  8    A.    I'm usually in and out of the store during the day.

11:52:24  9    Q.    Did there come a time in the afternoon that you

11:52:27 10    recall who you now know to be Hunter Biden came in the

11:52:32 11    store?

11:52:32 12    A.    Yes, sir.

11:52:32 13    Q.    Where were you then?

11:52:34 14    A.    I believe I was next door at -- I had owned another

11:52:39 15    business next door at the time and I was called over to the

11:52:42 16    shop.

11:52:43 17    Q.    Who called you over to the shop?

11:52:45 18    A.    I don't remember.

11:52:46 19    Q.    At the time, was there a person named Gordon

11:52:49 20    Cleveland who worked in the shop?

11:52:50 21    A.    Yes, sir.

11:52:51 22    Q.    Was there a person named Jason Turner who worked in

11:52:54 23    the shop?

11:52:54 24    A.    Yes, sir.

11:52:55 25    Q.    Do you recall whether it was either one of those two

Palimere - direct

11:52:58  1    people?

11:52:58  2    A.      I believe it was one of those people.

11:53:00  3    Q.      But did you cannot remember which one?

11:53:03  4    A.      I do not remember which one.

11:53:04  5    Q.      Whoever it was called you to come over?

11:53:06  6    A.      Correct.

11:53:07  7    Q.      Was that because Mr. Biden was in the store?

11:53:09  8    A.      Any time we have certain, we call them celebrities,

11:53:15  9    they usually will call me in.

11:53:16 10    Q.      Did you at that point that they called you already

11:53:19 11    know that the celebrity was Hunter Biden?

11:53:22 12    A.      No, sir, they just called me over and said we need

11:53:26 13    you next door.

11:53:27 14    Q.      He didn't use the word celebrity, they called just

11:53:30 15    you over?

11:53:31 16    A.      Yes.

11:53:31 17    Q.      Did you come over?

11:53:32 18    A.      Yes.

11:53:32 19    Q.      When you came in, what did do you?

11:53:34 20    A.      I have a desk in the back off the floor, I went and

11:53:37 21    sat at my desk.

11:53:38 22    Q.      Did you go through the back to get to your office?

11:53:40 23    A.      Yes, sir.

11:53:40 24    Q.      You didn't come through the store?

11:53:42 25    A.      No.

Palimere - direct

11:53:42  1    Q.       Now as I understand it, you're sitting in the back

11:53:45  2    room?

11:53:46  3    A.       Correct.

11:53:46  4    Q.       And who is there with you?

11:53:48  5    A.       Typically it would be my desk and then across from me

11:53:52  6    would be a desk where Jason would be sitting doing

11:53:56  7    background checks.

11:53:57  8    Q.       By Jason, you mean Jason Turner?

11:54:00  9    A.       Jason Turner, yes.

11:54:02 10    Q.       When you came back from wherever you were back into

11:54:04 11    the store, Mr. Turner was in the office then?

11:54:07 12    A.       Correct, yes.

11:54:08 13    Q.       As far as you know, what was he doing?

11:54:10 14    A.       Typically he would be doing background checks or

11:54:13 15    whatever clerical stuff he was doing off to the side.

11:54:16 16    Q.       So you came back, you're in the office and he's in

11:54:19 17    the office, do you see Mr. Cleveland at that moment?

11:54:22 18    A.       I don't believe he was in the back at the time, no.

11:54:25 19    Q.       Did there come a time that you did see Mr. Cleveland?

11:54:28 20    A.       Yes, at some point he came back, yes.

11:54:30 21    Q.       So one thing I want to establish from the beginning,

11:54:33 22    from the moment you got back in the store, in the office,

11:54:36 23    Jason Turner was there?

11:54:38 24    A.       I believe to the best of my recollection he was in

11:54:41 25    the back when I arrived.

Palimere - direct

11:54:42 1    Q.    Okay.  So when in the sequence then did you have any

11:54:45 2    interaction with Mr. Cleveland?

11:54:48 3    A.    Gordon came back, there was discussion about the use

11:54:54 4    of a passport, he just asked if I was okay with him using a

11:54:58 5    passport for the sale.

11:55:00 6    Q.    When Mr. Cleveland came in the back room, what was he

11:55:08 7    holding in his hand or bringing in?

11:55:09 8    A.    I don't recall.

11:55:10 9    Q.    Well, did he have a passport to show you?

11:55:15 10   A.    I don't recall what he had in his hands at the time.

11:55:17 11   Q.    Did he have a copy of a passport?

11:55:20 12   A.    He should have, but I can't --

11:55:23 13   Q.    You can't remember?

11:55:24 14   A.    I can't remember.

11:55:25 15   Q.    When he came in the back room with that, was he also

11:55:28 16   carrying a firearm?

11:55:30 17   A.    His personal firearm?

11:55:31 18   Q.    No, no, a sales firearm from the front, do you

11:55:34 19   remember him --

11:55:35 20   A.    I don't believe he would have brought that back, no.

11:55:37 21   Q.    So what you can recall, he was there, and he asked

11:55:40 22   you a question?

11:55:41 23   A.    Correct.

11:55:42 24   Q.    And the question was about the passport?

11:55:44 25   A.    Correct.

Palimere - direct

| 11:55:45 | 1 | Q. | What did you understand, what was the question? |

11:55:45  1   Q.      What did you understand, what was the question?

11:55:48  2   A.      We typically, or at that point, I don't know that

11:55:51  3   we've ever had a passport used as a form of identification

11:55:55  4   and he just said is it okay if we use this.

11:55:58  5   Q.      And does a passport have an address on it?

11:56:01  6   A.      At that time, I believe it had an address and it was

11:56:06  7   a type of identification just like any other type of

11:56:10  8   identification.

11:56:12  9   Q.      Mr. Radic, can you put up, please, government 10A.

11:56:20 10   You recognize this form, right?

11:56:21 11   A.      Yes.

11:56:21 12   Q.      It's a 4473 ATF form?

11:56:25 13   A.      Yes.

11:56:25 14   Q.      Would you flip through it, Mr. Radic, to the last

11:56:29 15   page.  Before do you that, you see it says in 18(a) U.S.

11:56:34 16   passport, correct?

11:56:35 17   A.      Yes.

11:56:35 18   Q.      Mr. Radic, would you flip to the end, do you see

11:56:38 19   that?

11:56:38 20   A.      Yes, sir.

11:56:39 21   Q.      Do you recognize what that is?

11:56:40 22   A.      That's a United States passport.

11:56:42 23   Q.      Can you look at it carefully?

11:56:45 24   A.      Yes.

11:56:46 25   Q.      Do you see it?

Palimere - direct

| 11:56:47 | 1 | A. | Yes. |

11:56:47  2    Q.      Does it have an address on it?

11:56:49  3    A.      No, sir.

11:56:50  4    Q.      You see the handwriting on the left, do you see it?

11:56:52  5    A.      Yes, sir.

11:56:53  6    Q.      Do you recognize that, I mean whose it is, do you

11:56:56  7    recognize whose that is?

11:56:58  8    A.      Would you want me to guess?

11:57:00  9    Q.      No, if you can't recognize it, just tell me you can't

11:57:04 10    recognize it?

11:57:04 11    A.      I can't say with any certainty whose it is.

11:57:07 12    Q.      That's fine.  You can take that down.

11:57:09 13            Go back to the first page, Mr. Radic, and then

11:57:15 14    go to the second page.

11:57:16 15            And you see on the form, the form of

11:57:18 16    identification that's used says U.S. passport, right?

11:57:22 17    A.      Yes.

11:57:22 18    Q.      But as we just established, it doesn't have a

11:57:25 19    residence on it, does it, the passport?

11:57:29 20    A.      What you just showed me, no, I don't see an address

11:57:31 21    on it.

11:57:32 22    Q.      So Mr. Cleveland comes in and he asks you, can you

11:57:35 23    take a passport?

11:57:36 24    A.      Correct.

11:57:36 25    Q.      What did you say?

Palimere - direct

11:57:38  1   A.      I said yeah, sure, not thinking anything else about

11:57:43  2   it, yeah, sure, take a passport.

11:57:45  3   Q.      Even though it didn't have a residence on it?

11:57:47  4   A.      We didn't discuss that, not that I can recall.

11:57:50  5   Q.      Why did you understand he was asking if you could

11:57:53  6   take a passport?

11:57:54  7               MR. WISE:  Objection, he can't --

11:57:56  8               MR. LOWELL:  I agree, bad question.  What did he

11:57:59  9   say to you about the passport?

11:58:00 10               MR. WISE:  And then that's hearsay.

11:58:01 11               THE COURT:  That's hearsay.

11:58:03 12   BY MR. LOWELL:

11:58:03 13   Q.      I'll withdraw that question.

11:58:04 14               What did you tell Mr. Cleveland when

11:58:07 15   Mr. Cleveland came in holding or asking anything?

11:58:10 16   A.      Yeah, sure, take the passport.

11:58:13 17   Q.      And after he did that, do you recall him having

11:58:18 18   anything in his hand, paper, passport, or just asked the

11:58:22 19   question?

11:58:22 20   A.      I don't recall.  The only thing I can remember is

11:58:25 21   this-- him asking hey, can we take this as a form of

11:58:30 22   identification.

11:58:30 23   Q.      And you said sure?

11:58:31 24   A.      Sure.

11:58:31 25   Q.      Were you trying to have the sale go in a hurry?

Palimere - direct

11:58:36  1   A.      Yeah, I was trying to --

11:58:42  2   Q.      I just asked --

11:58:43  3   A.      Yeah.

11:58:43  4   Q.      Were you trying for it to happen in a hurry?

11:58:46  5   A.      I was trying to not hold the sale up.

11:58:49  6   Q.      How is that different than trying to get it done in a

11:58:52  7   hurry?

11:58:52  8   A.      By not having him in the back for 20 minutes and

11:58:56  9   going through a bunch of discussion, just saying yep, take

11:58:59 10   it and proceed with running the background check.

11:59:02 11   Q.      Are you familiar with the expression about

11:59:07 12   Mr. Cleveland called "whale hunter"?

11:59:09 13   A.      Yes.

11:59:10 14   Q.      You're smiling, so you do?

11:59:11 15   A.      Yes.

11:59:12 16   Q.      What is that?

11:59:13 17   A.      He is very good at selling a lot of the more

11:59:18 18   expensive products that we have in the store.

11:59:22 19   Q.      Okay.  Meaning bringing in the whale?

11:59:26 20   A.      You can draw however you want from a term whale

11:59:29 21   hunter, it's just --

11:59:31 22   Q.      But that's what it means to you, being very

11:59:34 23   successful at bringing in and selling more expensive items?

11:59:38 24   A.      He's very good at selling the expensive items that we

11:59:42 25   have for sale in the store.

Palimere - direct

11:59:43  1    Q.    So Mr. Cleveland leaves and is Mr. Turner still in

11:59:46  2    the back room with you?

11:59:47  3    A.    Yes.

11:59:47  4    Q.    What do you recall happening next after you have told

11:59:50  5    Mr. Cleveland go ahead?

11:59:52  6    A.    That's it.  You know, I don't -- I didn't have

11:59:55  7    anymore interaction at that point.

11:59:57  8    Q.    With whom?

11:59:58  9    A.    Cleveland or Turner.

12:00:02 10    Q.    Okay.  You mean when you say interaction, Mr. Turner

12:00:05 11    is in there doing his background checks, right?

12:00:08 12    A.    Correct.

12:00:08 13    Q.    Did there come a time that you observed Mr. Turner

12:00:11 14    taking any form and running the background check that was

12:00:14 15    involved in this purchase?

12:00:15 16    A.    No, I went about doing my work at my desk.

12:00:18 17    Q.    Not paying attention to what he was doing?

12:00:20 18    A.    No.

12:00:21 19    Q.    After Mr. Cleveland went out the first time, did you

12:00:23 20    see Mr. Cleveland come back in with any form or that was it?

12:00:26 21    A.    I don't recall anything else.

12:00:29 22    Q.    Okay.  So the one exchange is the thing you remember?

12:00:32 23    A.    The exchange between me and, I believe it was Gordon,

12:00:37 24    about the passport, yes.

12:00:38 25    Q.    Did you go outside from the point at which

Palimere - direct

12:00:41 1    Mr. Cleveland came in the back room to the point at which

12:00:43 2    the sale was completed?

12:00:45 3    A.    Can you ask that again?

12:00:47 4    Q.    Did you go to the showroom?

12:00:49 5    A.    No.

12:00:49 6    Q.    From the time that you -- Mr. Cleveland and you had

12:00:53 7    the conversation and then you went back -- he went back

12:00:56 8    outside?

12:00:56 9    A.    No, sir, I stayed in my station.

12:00:58 10   Q.    So you never went back in the storeroom?

12:01:01 11   A.    No.

12:01:01 12   Q.    The showroom?

12:01:02 13   A.    I wasn't in the showroom at all.

12:01:04 14   Q.    You just came to the back?

12:01:06 15   A.    Correct.

12:01:06 16   Q.    So you have no idea whether or not Mr. Cleveland

12:01:10 17   spoke to Mr. Biden at that point or not?

12:01:12 18   A.    No.

12:01:12 19   Q.    And you had no conversations after that exchange with

12:01:16 20   Mr. Turner?

12:01:17 21   A.    No.

12:01:17 22   Q.    Did you see him run a NICS check for any gun that

12:01:23 23   Mr. Biden sought, or did, bought that day?

12:01:25 24   A.    Did I observe him running a NICS check?

12:01:28 25   Q.    Yes.

Palimere - direct

12:01:28  1   A.      No I did not.

12:01:29  2   Q.      Do you know that he did?

12:01:30  3   A.      Yes, I did.

12:01:31  4   Q.      Can you place in time when the exchange you just said

12:01:35  5   happened that day of October 12th, 2018?

12:01:38  6   A.      If you bring up the NICS check, I can tell you

12:01:42  7   exactly the time.

12:01:43  8   Q.      Will you bring up the government Exhibit 12A.   And

12:01:47  9   now looking at that, does that help tell you when it

12:01:51 10   happened?

12:01:51 11   A.      So, yeah, October 12th, 2018, at 6:36 p.m. was

12:01:58 12   created and status date one minute later, 6:37 got a status

12:02:03 13   proceed.

12:02:04 14   Q.      When you see that time of 6:37, does that help

12:02:08 15   acclimate or help the sequence of when the exchange with you

12:02:11 16   and Mr. Cleveland about the passport occurred?

12:02:14 17   A.      That would tell me that prior to 6:36 when the

12:02:19 18   background check was created, Mr. Cleveland would have asked

12:02:22 19   me if he could take a passport, yeah.

12:02:24 20   Q.      Do you know how many minutes or time before that,

12:02:27 21   that that happened?

12:02:28 22   A.      No.

12:02:30 23   Q.      For Mr. Turner to run a background check, what does

12:02:34 24   he have to have in his possession?

12:02:37 25   A.      All of the necessary requirements to fill in the data

Palimere - direct

12:02:41  1   to fill in on the screen there, all these questions have to

12:02:45  2   be answered for him to run this background check.

12:02:47  3   Q.      That would be the last name, middle name, age,

12:02:52  4   height, weight, whatever is there?

12:02:54  5   A.      Correct.

12:02:54  6   Q.      Whatever he needs?

12:02:56  7   A.      Yes.

12:02:56  8   Q.      He doesn't need the form itself, he just needs the

12:03:00  9   information that's reflected on that?

12:03:01 10   A.      He's pulling the information from the form and typing

12:03:04 11   it in on the FBI NICS website to fill in the blanks to get

12:03:09 12   this answer.

12:03:09 13   Q.      And the NICS form has the need for that information?

12:03:12 14   A.      Correct.

12:03:13 15   Q.      You can see from the bottom who is the one who then

12:03:15 16   ran it?

12:03:16 17   A.      Submitted by Jason V. Turner, retrieved by

12:03:20 18   Jason V. Turner.

12:03:21 19   Q.      So did you observe him running this?

12:03:24 20   A.      No, I did not observe him running this.

12:03:26 21   Q.      But this is the form that's generated if that's

12:03:29 22   happening?

12:03:30 23   A.      That is the form, yes, that's printed out from the

12:03:33 24   actual NICS website.

12:03:35 25   Q.      Before you said that somebody called you to come into

Palimere - direct

12:03:37  1    the store because there was -- I'm sorry, somebody called

12:03:42  2    you, and you came in the store through the back?

12:03:45  3    A.      Correct.

12:03:45  4    Q.      And I think you said they do that customarily when

12:03:49  5    there is a "celebrity"?

12:03:53  6    A.      A celebrity, or some sale, something they need me to

12:03:58  7    be involved with.

12:03:58  8    Q.      Is that what you needed to be involved with that day,

12:04:04  9    was the issue of the passport?

12:04:04 10    A.      I don't recall.  I don't recall why I was called

12:04:06 11    over.

12:04:07 12    Q.      But whatever the reason was you never went out to the

12:04:11 13    showroom?

12:04:11 14    A.      No.

12:04:12 15    Q.      Did you therefore never see anything that Mr. Biden

12:04:17 16    did that day?

12:04:17 17    A.      I didn't observe anything that he did that day, no.

12:04:20 18    Q.      And one last time, when Mr. Cleveland came in, at the

12:04:25 19    point he asked you about the passport, are you clear that he

12:04:30 20    did not carry with him the gun he was selling to Mr. Biden?

12:04:35 21            MR WISE:  I don't understand, objection, he's

12:04:37 22    already asked and answered this, one last time is to repeat

12:04:41 23    the same thing over and over again.

12:04:43 24            MR. LOWELL:  Over and over, twice, I'm sorry I

12:04:45 25    thought because you did that, I could do that.

Palimere - direct

12:04:47  1          THE COURT:  All right.  We'll let him ask it one

12:04:50  2     last time.

12:04:50  3     BY MR. LOWELL:

12:04:51  4     Q.     You never saw the gun that Mr. Biden purchased that

12:04:53  5     day being brought to the back room?

12:04:55  6     A.     Yeah, I don't recall anything that Mr. Cleveland

12:04:58  7     brought back at the time.

12:04:59  8     Q.     Would it be unusual for the person to bring the gun

12:05:02  9     back in the room, that backroom for the check to occur?

12:05:05 10     A.     It could be, it could go either way, there isn't a --

12:05:10 11     there isn't a set rule that says the firearm being purchased

12:05:13 12     stays on the floor or comes to the back.  It's up to the

12:05:16 13     discretion of the salesman, I guess if he wants to bring it

12:05:19 14     in the back.

12:05:20 15     Q.     On that day you have no memory of which happened?

12:05:23 16     A.     No.

12:05:23 17          MR. LOWELL:  That's all I have, Judge.

12:05:25 18          THE COURT:  Thank you.

12:05:25 19          Cross-exam?

12:05:26 20          MR. WISE:  No thank you.  I don't have any

12:05:29 21     questions.

12:05:29 22          THE COURT:  Thank you, sir.  Thanks for coming

12:05:31 23     in.  You are excused.

12:05:32 24          All right.  Mr. Lowell, what's next?

12:05:37 25          MR. LOWELL:  Your Honor, based on our

N. Biden - direct

12:05:39  1   conversation with counsel -- can you approach?

12:06:59  2                    (Side-bar discussion:)

12:06:59  3                    MR. LOWELL:  I thought our plan was because we

12:06:59  4   wanted the opportunity to consider Naomi and Jimmy Biden

12:06:59  5   that we were going to wait and do it at the break so we

12:06:59  6   could get ready, we told her that, I don't know if she's

12:06:59  7   available at this moment, I can find her just because I

12:06:59  8   thought we said we were going to do an early lunch.

12:06:59  9                    MR. WISE:  Our understanding is she's got an

12:06:59 10   scheduling issue, too, my preference we start with her, get

12:06:59 11   her done.

12:06:59 12                    MR. LOWELL:  I didn't mind, I just wanted to

12:07:12 13   start with her.

12:07:13 14                    (End of side-bar.)

12:07:24 15                    MR. LOWELL:  Your Honor, we would like the jury

12:07:25 16   to hear from Naomi Biden.

12:07:30 17                    COURTROOM DEPUTY:  Please raise your right hand.

12:07:32 18   Please state and spell your full name for the record.

12:07:42 19                    THE WITNESS:  Naomi King Biden, N-A-O-M-I,

12:07:47 20   K-I-N-G, B-I-D-E-N.

12:07:51 21                    NAOMI KING BIDEN, having been duly sworn was

12:07:56 22   examined and testified as follows:

12:07:58 23                         DIRECT EXAMINATION

12:07:59 24   BY MR. LOWELL:

12:08:01 25   Q.      Good afternoon, Naomi.

N. Biden - direct

| | | |
|---|---|---|
| 12:08:03 | 1 | A.    Hi. |
| 12:08:03 | 2 | Q.    Can you tell the jury a little bit about yourself, |
| 12:08:07 | 3 | where you live? |
| 12:08:07 | 4 | A.    I live in D.C., in Georgetown. |
| 12:08:11 | 5 | Q.    And what do you do for a living? |
| 12:08:13 | 6 | A.    I'm an attorney, at a law firm in D.C. |
| 12:08:16 | 7 | Q.    And where did you go to college? |
| 12:08:20 | 8 | A.    I went to UPenn. |
| 12:08:22 | 9 | Q.    University of Pennsylvania? |
| 12:08:24 | 10 | A.    Uh-huh. |
| 12:08:25 | 11 | Q.    And you went to law school? |
| 12:08:26 | 12 | A.    Yes. |
| 12:08:26 | 13 | Q.    Where did you go to law school? |
| 12:08:28 | 14 | A.    Columbia. |
| 12:08:30 | 15 | Q.    That's in New York? |
| 12:08:31 | 16 | A.    Yes. |
| 12:08:32 | 17 | Q.    You are the daughter of Hunter Biden? |
| 12:08:36 | 18 | A.    Yes. |
| 12:08:37 | 19 | Q.    And your mom is? |
| 12:08:38 | 20 | A.    Kathleen Buhle. |
| 12:08:40 | 21 | Q.    Do you have any siblings? |
| 12:08:42 | 22 | A.    Two sisters. |
| 12:08:44 | 23 | Q.    And their names? |
| 12:08:45 | 24 | A.    And a brother, who I love. |
| 12:08:47 | 25 | Q.    And their names are? |

N. Biden - direct

12:08:48  1    A.    Finnegan, Maisy, and Beau.

12:08:53  2    Q.    When your mom and dad got divorced, how old were you?

12:08:59  3    A.    I was --

12:09:02  4    Q.    Already an adult?

12:09:04  5    A.    An adult, 23 maybe.

12:09:06  6    Q.    You were in college or after.  Before that you and

12:09:09  7    your sisters, you lived together?

12:09:12  8    A.    Yes.

12:09:12  9    Q.    I want to call your attention to the year of 2018,

12:09:17 10    and particularly in the summer, meaning August and in

12:09:25 11    September of 2018.  Can I call your attention to that?

12:09:27 12    A.    Yes.

12:09:27 13    Q.    Did there come a time in that period of August and

12:09:31 14    September that you understood that your dad was living in

12:09:34 15    Los Angeles?

12:09:35 16    A.    Yes.

12:09:35 17    Q.    And when that happened, did there come a time that

12:09:38 18    you visited him there?

12:09:39 19    A.    Yes, I visited him with my boyfriend, now my husband.

12:09:44 20    Q.    What's his name?

12:09:45 21    A.    Peter.

12:09:46 22    Q.    So how did it turn about that you and Peter went to

12:09:50 23    Los Angeles?

12:09:51 24    A.    I hadn't seen my dad in a really long time and I knew

12:09:56 25    he was in rehab facility there and he reached out and he

N. Biden - direct

| | | |
|---|---|---|
| 12:10:00 | 1 | said that he would organize the trip if we came to visit |
| 12:10:05 | 2 | him. |
| 12:10:05 | 3 | Q.    So you and Peter both flew out and he made the |
| 12:10:05 | 4 | arrangements? |
| 12:10:10 | 5 | A.    We drove actually, but yes. |
| 12:10:12 | 6 | Q.    You drove across? |
| 12:10:13 | 7 | A.    We drove from Wyoming. |
| 12:10:15 | 8 | Q.    Where were you at the time, you were in Wyoming? |
| 12:10:17 | 9 | A.    In Wyoming, at Peter's parents house. |
| 12:10:21 | 10 | Q.    You went from Wyoming and you drove to LA? |
| 12:10:25 | 11 | A.    Yes. |
| 12:10:25 | 12 | Q.    Do you remember whether that was towards the end of |
| 12:10:27 | 13 | August? |
| 12:10:28 | 14 | A.    Yes. |
| 12:10:28 | 15 | Q.    And when you got to LA, did you see your dad? |
| 12:10:31 | 16 | A.    Yeah, we did. |
| 12:10:33 | 17 | Q.    How so, where was he, and where were you? |
| 12:10:36 | 18 | A.    We met him at a coffee shop, and we had lunch with |
| 12:10:43 | 19 | him, and we met his sober coach. |
| 12:10:47 | 20 | Q.    Okay.  So back to that period of time where he asked |
| 12:10:51 | 21 | you to come, you said you knew that he was in a period of |
| 12:10:54 | 22 | rehab, right? |
| 12:10:56 | 23 | A.    Yeah. |
| 12:10:56 | 24 | Q.    And do you remember the name of that rehab place? |
| 12:10:59 | 25 | A.    Um -- |

N. Biden - direct

| | | |
|---|---|---|
| 12:11:02 | 1 | Q. Do you think it was called The View? |
| 12:11:04 | 2 | A. Yeah, it was, sorry. |
| 12:11:06 | 3 | Q. It's okay. |
| 12:11:07 | 4 | A. I'm nervous. |
| 12:11:08 | 5 | Q. Don't be nervous, can I get you water? |
| 12:11:11 | 6 | A. No, I'm good. |
| 12:11:12 | 7 | Q. When you got there to see your dad, he was in a rehab |
| 12:11:16 | 8 | place, when you actually got to see him, was he already in |
| 12:11:19 | 9 | the residence, or did you know whether he now left, was he |
| 12:11:23 | 10 | still there in residence? |
| 12:11:24 | 11 | A. Yes. |
| 12:11:24 | 12 | Q. You said something about a sober coach, what's that? |
| 12:11:27 | 13 | A. Like a sponsor, I guess. |
| 12:11:29 | 14 | Q. So you, the sober coach, Peter, and your dad went to |
| 12:11:33 | 15 | lunch? |
| 12:11:34 | 16 | A. Yes. |
| 12:11:34 | 17 | Q. How did your dad seem? |
| 12:11:36 | 18 | A. He seemed like the clearest that I had seen him since |
| 12:11:39 | 19 | my uncle died, and he just seemed really great. |
| 12:11:43 | 20 | Q. And you spent some time with him then? |
| 12:11:45 | 21 | A. Yeah. |
| 12:11:46 | 22 | Q. And then after you and your dad and Peter had lunch, |
| 12:11:49 | 23 | where did you and Peter go? |
| 12:11:51 | 24 | A. We went to Santa Barbara. |
| 12:11:54 | 25 | Q. Did you drive there? |

N. Biden - direct

12:11:55  1   A.      Yeah.

12:11:56  2   Q.      And after you saw your dad on that date, did there

12:12:00  3   come a time that you communicated with him?

12:12:05  4   A.      Yes.

12:12:06  5   Q.      How did you communicate, by phone or text or both?

12:12:09  6   A.      Text.

12:12:09  7   Q.      Do you recall what you told your dad after seeing

12:12:12  8   him?

12:12:12  9   A.      Yeah, I told him that I was so proud of him and I was

12:12:16 10   so proud to introduce Peter to him.

12:12:18 11   Q.      So then you and Peter went to Santa Barbara, and he,

12:12:22 12   as far as you knew, went back to The View?

12:12:25 13   A.      Yes.

12:12:27 14   Q.      I would like to take you forward from that date to a

12:12:31 15   time in October.  In October, were you yet in law school --

12:12:40 16   of 2018?

12:12:41 17   A.      Yes, so I was in my second year.

12:12:43 18   Q.      And so calling your attention to the end of the month

12:12:45 19   of October of 2018, were you going to, or already in New

12:12:53 20   York by the end of the month?

12:12:55 21   A.      I was going to New York.

12:12:57 22   Q.      Where were you going from?

12:12:58 23   A.      From D.C.

12:13:01 24   Q.      And how did you get from D.C. to New York?

12:13:04 25   A.      We borrowed my dad's truck because we had to -- Peter

N. Biden - direct

12:13:10 1    was moving in with me in New York, so we had to move his

12:13:13 2    furniture from D.C. where he was living to New York and the

12:13:17 3    truck was big.

12:13:18 4    Q.     And the truck at that point and where you wanted to

12:13:22 5    use it, was located in D.C.?

12:13:23 6    A.     Yes.

12:13:24 7    Q.     Did your sisters use the truck as well?

12:13:27 8    A.     Yes, from time to time.

12:13:28 9    Q.     So you picked up the truck in D.C. but your dad

12:13:31 10    wasn't there when you picked it up, right?

12:13:33 11    A.     No.

12:13:33 12    Q.     So you and Peter got the car, the truck loaded and

12:13:37 13    you drove it where?

12:13:38 14    A.     To New York.

12:13:40 15    Q.     When you got to New York, what did you do?

12:13:45 16    A.     We unloaded the truck.

12:13:48 17    Q.     At your apartment?

12:13:49 18    A.     Yes.

12:13:50 19    Q.     And so did there come a time when you, Peter, and the

12:13:54 20    truck in New York got to see your dad?

12:13:57 21    A.     Yes.

12:13:57 22    Q.     How did that come about?

12:13:58 23    A.     He was coming to New York to see me and because he

12:14:03 24    needed the truck back.

12:14:04 25    Q.     And so how did he get to New York, do you know?

N. Biden - direct

12:14:07  1    A.      He drove my pop's Cadillac.

12:14:10  2    Q.      When you say pops, that means your grandfather?

12:14:14  3    A.      Yes.

12:14:14  4    Q.      Hunter's dad, Joe Biden?

12:14:17  5    A.      Yes.

12:14:17  6    Q.      When he drove it up, do you recall about what day it

12:14:20  7    was in October, was that October 15th?

12:14:22  8    A.      Yeah.

12:14:23  9    Q.      And you were already -- where were you, were you

12:14:26 10    moved into your apartment?

12:14:27 11    A.      Yeah.

12:14:27 12    Q.      When your dad drove up in pop's car, did you get to

12:14:31 13    see him?

12:14:32 14    A.      Yeah.

12:14:33 15    Q.      Did you and Peter have any occasions to interact with

12:14:36 16    him?

12:14:37 17    A.      Yes.

12:14:37 18    Q.      How did he seem at that point at the end of October?

12:14:40 19    A.      He seemed great, he seemed hopeful.

12:14:43 20    Q.      Did he seem in comparison to the way you saw him when

12:14:47 21    he was at The View?

12:14:48 22    A.      Yes.

12:14:48 23    Q.      And you had occasion to see him that day, or that

12:14:51 24    period?

12:14:52 25    A.      Yes.

N. Biden - direct

12:14:52  1    Q.      Did there come a time that -- and Peter did something

12:14:57  2    to, with the truck, or pop's car?

12:15:00  3    A.      Yes, they switched the cars, we had my pop's car, and

12:15:05  4    my dad took the truck back.

12:15:07  5    Q.      Do you know -- that was a couple of days later?

12:15:10  6    A.      Yes.

12:15:10  7    Q.      So Peter and you kept the black Cadillac, right?

12:15:14  8    A.      Yes.

12:15:15  9    Q.      And then your dad took the truck back?

12:15:18 10    A.      Witness nodding yes.

12:15:21 11    Q.      When you took the truck from Washington D.C. to New

12:15:25 12    York, what was the condition of the inside of the truck?

12:15:27 13    A.      It was in good condition.

12:15:28 14    Q.      By that I mean was there any laundry thrown around,

12:15:32 15    any things that you could determine were left in the truck

12:15:36 16    by your dad?

12:15:37 17    A.      No.

12:15:39 18    Q.      I want to talk about the Raptor truck a minute.

12:15:47 19    Would you put up DX -- can you look at Exhibit 12 in your

12:15:56 20    book.  So the condition of the truck is where we were at.  I

12:16:29 21    asked you what was inside and you said there was nothing

12:16:32 22    particular left behind.

12:16:34 23            When you gave the truck to your dad in New York,

12:16:38 24    did you see strewn about, any, what we'll call drug

12:16:43 25    paraphernalia?

N. Biden - direct

12:16:43 1    A.      No.

12:16:44 2    Q.      Did you see any white powder residue or anything like

12:16:48 3    that?

12:16:48 4    A.      No.

12:16:49 5    Q.      And we're clear that's at the end of October, or at

12:16:53 6    least 18th, 19th?

12:16:54 7    A.      Yes.

12:16:55 8    Q.      That would be before October 13th, right -- I'm

12:16:58 9    sorry, that would be after October 13th?

12:17:00 10   A.      Yes.

12:17:00 11   Q.      And after October 14th?

12:17:02 12   A.      Yes.

12:17:02 13   Q.      So if there is an exchange between your dad and

12:17:06 14   Hallie Biden on the 13th and the 14th, this is all

12:17:10 15   afterwards?

12:17:11 16   A.      Yes.

12:17:11 17           MR. WISE:  Objection.  Exchange between Hallie

12:17:14 18   Biden.

12:17:14 19           MR. LOWELL:  If there is a text between the two

12:17:16 20   or any communications -- I'm sorry, judge, I'll withdraw, if

12:17:21 21   there is any communication between your dad and Hallie Biden

12:17:25 22   that would be on those days, 13th, 14th, you saw him after.

12:17:29 23           MR. WISE:  Objection, he hasn't established a

12:17:31 24   foundation she knows --

12:17:32 25           THE COURT:  I mean, everybody knows dates

N. Biden - direct

12:17:34  1    Mr. Lowell so I don't think you need to --

12:17:36  2              MR. LOWELL:  Thank you.

12:17:37  3    BY MR. LOWELL:

12:17:38  4    Q.       So now, your dad has the truck, when you gave your

12:17:43  5    dad the truck, I want you to describe the inside of it.

12:17:46  6    Does the truck have a console?

12:17:48  7    A.       Yes.

12:17:49  8    Q.       And underneath the console, what's there?

12:17:52  9    A.       It's like a safe.

12:17:54 10    Q.       And meaning it's a steel or metal object?

12:17:59 11    A.       Yeah.

12:17:59 12    Q.       Does it have a lock or does it not have a lock?

12:18:01 13    A.       It has a lock.

12:18:03 14    Q.       And when you and Peter had it at the period of time

12:18:07 15    in October, was the safe working?

12:18:09 16    A.       Yes.

12:18:10 17    Q.       Was it broken?

12:18:11 18    A.       No.

12:18:13 19    Q.       Was the combination lock working?

12:18:16 20    A.       We couldn't open it, so yeah.

12:18:18 21    Q.       How do you know all the things that I just asked you

12:18:21 22    about?

12:18:21 23    A.       Because we tried to open it.

12:18:23 24    Q.       And?

12:18:25 25    A.       And we were not successful.

N. Biden - cross

12:18:27  1   Q.      And so after your dad picked up the truck that was

12:18:31  2   the condition you understood it was in still, it still had

12:18:34  3   the lock, I mean the safe, et cetera?

12:18:36  4   A.      Yes.

12:18:36  5   Q.      When you had the truck in New York and your father

12:18:41  6   left, and you're describing what was under the console, was

12:18:47  7   there any leather pouch lying around the car?

12:18:53  8   A.      No.

12:18:53  9   Q.      And that's where you left it?

12:18:56 10   A.      Yes.

12:18:56 11   Q.      And then you left to go with Peter or you stayed in

12:19:00 12   New York?

12:19:00 13   A.      I stayed in New York, yes.

12:19:02 14           MR. LOWELL:  Thank you, Ms. Biden.

12:19:03 15           THE COURT:  Thank you.

12:19:05 16           Cross-exam.

12:19:05 17           MR. WISE:  Thank you, Your Honor.

12:19:06 18                  CROSS-EXAMINATION

12:19:09 19   BY MR. WISE:

12:19:18 20   Q.      Good afternoon, Ms. Biden.

12:19:20 21   A.      Hi.

12:19:20 22   Q.      My name Leo Wise, I represent the United States.

12:19:23 23   We've never met before, right?

12:19:25 24   A.      No.

12:19:26 25   Q.      So I'll try to perhaps go in the order that

N. Biden - cross

12:19:33  1    Mr. Lowell did.  When you visited your dad in California,

12:19:36  2    you said it was for lunch?

12:19:38  3    A.        Yes.

12:19:39  4    Q.        Was that an hour or two?

12:19:42  5    A.        We went to lunch and then we went shopping.

12:19:46  6    Q.        Okay.  So all told, sort of an afternoon?

12:19:49  7    A.        Yeah, an afternoon.

12:19:50  8    Q.        I think you said you hadn't seen him for a really

12:19:54  9    long time before that?

12:19:55  10   A.        Perhaps, yeah, at least a few months because Peter

12:19:59  11   hadn't met him.

12:20:02  12   Q.        Were you aware before that your father reached out to

12:20:06  13   you about visiting him in rehab that he had been using

12:20:10  14   drugs?

12:20:11  15   A.        Yes, I knew that he was struggling with addiction.

12:20:16  16   Q.        Had he ever used drugs in front of you?

12:20:19  17   A.        No.

12:20:19  18   Q.        So you knew when he was struggling -- you knew he was

12:20:24  19   struggling with addiction but he didn't use drugs in front

12:20:27  20   of you?

12:20:28  21   A.        No, I mean, I knew when he was struggling, I didn't

12:20:32  22   see him, we didn't communicate.

12:20:34  23   Q.        Before he went to California -- when did you first

12:20:41  24   become aware that he was struggling with addiction?

12:20:45  25   A.        I can't recall, but after my uncle died things got

N. Biden - cross

12:20:51 1   bad.

12:20:51 2   Q.      And so that was in 2015; right?

12:20:56 3   A.      Yeah.

12:20:57 4   Q.      And then you saw him again in 2018, right, in August?

12:21:03 5   A.      Yes.  I mean, I saw him in between 2015 and 2018.

12:21:08 6   Q.      In that period of time from 2015 I guess, to whenever

12:21:11 7   you hadn't seen him leading up to the visit in 2018, you

12:21:17 8   understood he was struggling with addiction in that period

12:21:18 9   of time?

12:21:19 10   A.      Yes.

12:21:19 11   Q.      So in that period of time when you were seeing him

12:21:22 12   and you knew he was struggling with addiction, he still

12:21:25 13   wasn't using in front of you, right?

12:21:28 14   A.      Yeah -- yeah, I mean we didn't see him for whenever

12:21:33 15   he was using, no.

12:21:36 16   Q.      You never saw -- you say you never saw him when he

12:21:40 17   was using.  Would you know if he was using or not?

12:21:43 18   A.      No, but I don't remember -- I don't recall any

12:21:47 19   prolonged periods of time, hours, that we spent with him.

12:21:52 20   Q.      What -- what do you mean by that?

12:21:55 21   A.      Just that we would see him for like an hour, maybe,

12:22:00 22   at a time, during that period, but no, I never saw him use.

12:22:05 23   Q.      So did you ever observe what it looked like when he

12:22:16 24   was using?

12:22:18 25   A.      I -- I don't -- I don't know.

N. Biden - cross

12:22:23  1    Q.       So if he was using, is it fair to say you don't know

12:22:28  2    what that looks like?

12:22:31  3    A.       I guess.  I guess not.

12:22:37  4    Q.       So I want to -- I want to talk about -- ask you some

12:22:43  5    questions to follow-up on Mr. Lowell about when he came up

12:22:45  6    to New York, okay?  Do you remember being asked about that?

12:22:50  7    A.       Yes.

12:22:50  8    Q.       So we're talking about the week, I wasn't sure on the

12:23:00  9    dates, we're talking about the week of October the 15th,

12:23:03 10    does that sound about right?

12:23:04 11    A.       Yes.

12:23:05 12    Q.       Just to put a kind of bookend on it, do you remember

12:23:11 13    when he actually got the truck back, do you remember the day

12:23:15 14    when he got the truck back in that week?

12:23:19 15    A.       Right before he left.

12:23:21 16    Q.       Do you remember what day he left on?

12:23:24 17    A.       No.

12:23:27 18    Q.       All right.  Do you remember texting him or did you

12:23:30 19    text him when he was up in New York when you were trying to

12:23:34 20    arrange to see him?

12:23:38 21    A.       Yes.  I mean, yeah, it refreshed my memory.

12:23:43 22    Q.       You have refreshed your memory.  Did you look at some

12:23:45 23    of those text messages?

12:23:47 24    A.       Yes.

12:23:47 25    Q.       Before testifying?

N. Biden - cross

12:23:51  1    A.       The texts, yes.

12:23:58  2    Q.       Now, it was difficult to actually get to see him;

12:24:02  3    right?

12:24:03  4    A.       I don't recall.

12:24:05  5    Q.       Would it refresh your memory to show you some of the

12:24:10  6    text messages from that time?

12:24:11  7    A.       Sure.

12:24:12  8              MR. WISE:  Your Honor, I have government

12:24:14  9    Exhibit 120, which are text messages.  I can provide a copy

12:24:20 10    to defense counsel.

12:24:23 11              MR. LOWELL:  We haven't seen these.

12:24:26 12              MR. WISE:  We didn't know she was testifying.

12:24:29 13              MR. LOWELL:  I haven't seen them.

12:24:30 14              THE COURT:  It's cross.

12:24:31 15              MR. LOWELL:  I understand that, but in terms of

12:24:33 16    source, authenticity, things that we discussed when it was

12:24:36 17    my presenting, I haven't seen them before.  I would like to

12:24:39 18    have a moment, if I may.

12:24:41 19              THE COURT:  You can have a moment.

12:24:42 20              MR. WISE:  If I can approach, I'll give

12:24:45 21    Ms. Biden a copy.

12:24:47 22              MR. LOWELL:  Can you tell me, this is like

12:24:50 23    twenty pages in it?

12:24:51 24              MR. WISE:  Yes.

12:24:52 25              MR. LOWELL:  Are you using all twenty pages?

N. Biden - cross

12:24:54  1            MR. WISE:  It depends if her memory needs to be

12:24:58  2   refreshed for them or not.

12:25:01  3            MR. LOWELL:  It's for refreshing purposes for

12:25:04  4   right now.

12:25:05  5            MR. WISE:  We'll start there.

12:25:06  6            THE COURT:  May I have a copy?

12:25:08  7            MR. WISE:  Yes, Your Honor, I think and we have

12:25:10  8   it electronically.

12:25:19  9   BY MR. WISE:

12:25:46 10   Q.    So the first one, the first text I want to ask you

12:25:50 11   about if you recall, and we'll start it that way, Ms. Biden,

12:25:53 12   is actually I think one of the messages you may have

12:25:55 13   reviewed in preparation for your testimony, just a point of

12:26:00 14   reference, I think the first one I'm going to ask you about

12:26:03 15   is in defense 16C, I'm not sure if they gave you a binder.

12:26:09 16   Is a defense binder up there?  Just to be clear, what I'm

12:26:13 17   asking you about, the first one is from that binder, there

12:26:18 18   is a message -- well, you remember your father on December

12:26:30 19   the 17th asking you where, or I guess it's you, you asking

12:26:36 20   your father "when are you getting the car?"

12:26:39 21            MR. LOWELL:  That's a misstatement, it's

12:26:42 22   October.

12:26:43 23            MR. WISE:  I'm sorry.  October.

12:26:45 24   BY MR. WISE:

12:26:45 25   Q.    Do you remember on the 17th you asking your father

N. Biden - cross

12:26:48 1   when he was getting the car?  Do you remember that?

12:26:53 2   A.    Yes.

12:26:53 3   Q.    So was he in New York by the 17th?

12:26:59 4   A.    I assume so because he asked when I'm getting the

12:27:04 5   car.

12:27:04 6   Q.    The first text, do you remember texting him asking

12:27:08 7   when he was coming to get it?

12:27:10 8   A.    I mean, I don't recall sending the text.  But looking

12:27:15 9   at them, I know that I sent them.

12:27:18 10  Q.    Well, does it -- first of all, seeing the text does

12:27:23 11  that refresh your memory about whether you sent it or not?

12:27:27 12  A.    Yeah, I mean this is my number, it was like five

12:27:30 13  years ago, I don't remember every text I sent.

12:27:32 14  Q.    If you don't remember, that's fine just to say you

12:27:35 15  don't remember.  But if you do, that's equally fine.

12:27:40 16  A.    I remember.

12:27:43 17  Q.    And is that because you hadn't seen him yet?

12:27:46 18  A.    No, it was because he needed the car back, if I

12:27:51 19  recall.

12:27:51 20  Q.    Do you remember how many times you saw him in New

12:27:55 21  York?

12:27:55 22  A.    No.

12:27:55 23  Q.    Was it once?

12:27:59 24  A.    Probably, if he was only there for three days.

12:28:01 25  Q.    So in that three days, you think you saw him one

N. Biden - cross

12:28:05  1    time?

12:28:06  2    A.       Probably.

12:28:07  3    Q.       So the time on that message, do you remember sending

12:28:13  4    that text at like 2:45 in the afternoon?

12:28:22  5    A.       I see the text.

12:28:24  6    Q.       Well, is the time on that text 2:45?

12:28:29  7    A.       Yes.

12:28:30  8    Q.       All right.  And then do you remember getting a

12:28:35  9    response from your father much later that day around almost

12:28:41 10    midnight?

12:28:44 11    A.       Yeah.  I mean, I see the text.

12:28:47 12    Q.       Would you remember -- do you remember you texted him

12:28:49 13    in the afternoon on the 17th and then he didn't respond

12:28:52 14    until almost midnight?

12:28:54 15    A.       No, I don't remember it.

12:28:56 16    Q.       All right.  If you now look at then government

12:29:00 17    Exhibit 120, on the second page of the exhibit, which is

12:29:09 18    1717, do you see the text from your father that reads, "are

12:29:15 19    you up?"  At 11:40 p.m.?

12:29:18 20    A.       Yes.

12:29:19 21    Q.       And then again, he says, "please call me."  Right?

12:29:24 22    A.       Yeah.

12:29:24 23    Q.       So at this point, he didn't have the truck back on

12:29:27 24    the 17th and if I understand, he's responding to you trying

12:29:31 25    to set that up; is that right?

12:29:33  1    A.      Yeah, that's what it looks like.

12:29:36  2    Q.      And then did you respond to him much later, sort of

12:29:43  3    in the middle of the night?

12:29:46  4    A.      Yeah.

12:29:47  5    Q.      And did he actually ask you then at 2 o'clock in the

12:29:51  6    morning "where are the keys to the truck?"  And "can Peter

12:29:54  7    bring to 57th and 5th, and I'll trade cars with him?"

12:29:58  8    A.      Yes.

12:29:59  9    Q.      So your father is asking if you can exchange the car

12:30:03  10   at 2 o'clock in the morning on the 18th now at 57th and 5th?

12:30:12  11   A.      Yes.  Well, I don't drive.

12:30:23  12   Q.      But --

12:30:24  13   A.      That's why he's saying will Peter bring it.

12:30:27  14   Q.      But it's 2 o'clock in the morning when he's asking

12:30:29  15   you to do this, right?

12:30:30  16   A.      That's what the time stamp says, but I don't recall

12:30:33  17   it being that late.

12:30:36  18   Q.      All right.  But that is -- do you recall even the

12:30:38  19   text exchange?

12:30:40  20   A.      I recall trying to coordinate with him about

12:30:45  21   exchanging the cars.

12:30:47  22   Q.      And you said you don't recall it being that late, but

12:30:50  23   if you look at the text, did you send him a text immediately

12:30:53  24   before that saying you had fallen asleep and that's why you

12:30:58  25   had missed his earlier text closer to midnight?

N. Biden - cross

12:31:01  1    A.      Yeah.

12:31:03  2    Q.      All right.  Do you know what your father was doing at

12:31:05  3    2 o'clock in the morning and why he was asking you for the

12:31:08  4    car then?

12:31:09  5    A.      No.

12:31:16  6    Q.      And then --

12:31:22  7             MR. LOWELL:  Hold on a second.

12:31:25  8             THE WITNESS:  Thank you.

12:31:28  9    BY MR. WISE:

12:31:44  10   Q.      And were you surprised that he was reaching out to

12:31:46  11   you in the middle of the night to get the car?

12:31:49  12   A.      To be honest, I don't remember any of this except

12:31:52  13   that I remember that I exchanged -- we exchanged the car

12:31:56  14   with my dad and he still seemed good and I was hopeful, the

12:32:07  15   specifics of all these --

12:32:09  16   Q.      The next text, after asking Peter to bring to 57th

12:32:14  17   and 5th, and I'll trade cars with him at 2:21, you asked him

12:32:18  18   "right now?"  With a question mark, right?

12:32:22  19   A.      Yes.

12:32:22  20   Q.      And then you said "keys are with us at my apartment."

12:32:26  21   Because he had asked you where the keys were, right?

12:32:29  22   A.      Uh-huh.

12:32:30  23   Q.      And then it looks like he didn't respond again;

12:32:35  24   right?

12:32:40  25   A.      Yeah.

N. Biden - cross

12:32:41  1    Q.      All right.  So did you try -- well, it is sort of the

12:32:47  2    next day, but did you try then in the daytime on the 18th,

12:32:51  3    just like you had done on the 17th to try to set up when

12:32:55  4    you're going to get him this car back?

12:33:01  5    A.      Yeah.

12:33:03  6    Q.      And so did you text him -- did you send him a text

12:33:07  7    sort of in the afternoon on the 18th trying to do that?

12:33:11  8    A.      Yes.

12:33:13  9    Q.      And again, were you unsuccessful in trying to set up

12:33:24 10    a meeting with your father to get him the car back?  Now on

12:33:39 11    the 18th?

12:33:42 12    A.      I think they did exchange the car.

12:33:46 13    Q.      Well, if we go to the next page, did you send your

12:33:52 14    father a series of texts where you told him that you were in

12:33:59 15    Brooklyn, but that you could have Peter meet him and trade,

12:34:05 16    then did you ask your father if he had seen Peter and did he

12:34:10 17    ask if -- and did you ask if you would get to see him, in

12:34:14 18    other words, your dad?

12:34:15 19    A.      Yes.

12:34:16 20    Q.      And was your dad's response no?  This is on

12:34:34 21    page 1719?

12:34:35 22    A.      I think he's saying no to did he call.

12:34:37 23    Q.      Your next message then is "so no see you?!"

12:34:46 24    A.      Yeah.

12:34:47 25    Q.      And then you said, it looks like you did sort of an

N. Biden - cross

12:34:51  1    unhappy face, and the next text?

12:34:56  2    A.      Are you asking?

12:34:57  3    Q.      Yes.

12:34:58  4    A.      Yes.

12:34:58  5    Q.      And then the next one is "I'm really sorry, dad, I

12:35:02  6    can't take this."  And then "I don't know what to say, I

12:35:06  7    just miss you so much, I just want to hang out with you."

12:35:11  8    Right?

12:35:11  9    A.      Yeah.

12:35:12 10    Q.      And then it looks like -- by this point it's about

12:35:15 11    10 o'clock in the night on the 18th; right?  And then your

12:35:22 12    father says "I'm sorry, I have been so unreachable, it's not

12:35:30 13    fair to you."  And that's at 10:30 now on the 18th; right?

12:35:36 14    A.      Uh-huh.

12:35:38 15    Q.      Do you know why he had been so unreachable?

12:35:51 16    A.      No.

12:35:52 17    Q.      Do you know what he had been doing on the 17th and

12:35:55 18    the 18th when you were trying to set up giving the car back

12:35:58 19    to him?

12:35:59 20    A.      I don't remember.

12:36:01 21    Q.      Did he tell you he was meeting with someone named

12:36:08 22    Frankie?

12:36:08 23    A.      I don't remember.

12:36:10 24    Q.      Did he tell you that he had Frankie come to his hotel

12:36:14 25    room?

N. Biden - cross

| | | |
|---|---|---|
| 12:36:15 | 1 | A.       No.  I don't remember. |
| 12:36:18 | 2 | Q.       I'm sorry, I didn't hear you? |
| 12:36:20 | 3 | A.       I don't remember. |
| 12:36:21 | 4 | Q.       Did he tell you he had given someone named Frankie an |
| 12:36:26 | 5 | access code to his Wells Fargo account? |
| 12:36:30 | 6 | A.       No. |
| 12:36:39 | 7 | Q.       And then I guess, it's now 10:40, 10:30, 10:45 on the |
| 12:36:47 | 8 | 18th.  Was it finally then on the 19th that you were able to |
| 12:36:51 | 9 | arrange to meet your dad to get him the car? |
| 12:37:03 | 10 | A.       Yes. |
| 12:37:03 | 11 | Q.       And I think Mr. Lowell asked you this, and I want to |
| 12:37:08 | 12 | pick up there.  So -- or I don't know that he did ask you. |
| 12:37:12 | 13 | When did you actually get the truck?  If the 19th is when |
| 12:37:17 | 14 | you gave it back to your father, when did you get it? |
| 12:37:21 | 15 | A.       Whenever we picked -- got Peter's stuff from his |
| 12:37:27 | 16 | house in D.C. |
| 12:37:28 | 17 | Q.       Do you remember how many days -- do you remember how |
| 12:37:31 | 18 | many days you had the truck? |
| 12:37:33 | 19 | A.       No. |
| 12:37:34 | 20 | Q.       All right.  So you got it at some point, drove it up |
| 12:37:40 | 21 | to New York, and then gave it back to your father on the |
| 12:37:43 | 22 | 19th; right? |
| 12:37:45 | 23 | A.       I guess, yes. |
| 12:37:47 | 24 | Q.       Okay.  I think Mr. Lowell asked you this, but you |
| 12:37:51 | 25 | said when you got it, the condition it was in was, it was in |

12:37:55  1    good condition, I think that's the phrase.  So when you got

12:38:04  2    it, did you see what I am going to refer to as drug remnants

12:38:10  3    in the interior of the car?

12:38:12  4    A.     No.

12:38:13  5    Q.     Did you see drug paraphernalia in the interior of the

12:38:17  6    car?

12:38:17  7    A.     No.

12:38:17  8    Q.     And this may seem like a strange question, but in the

12:38:24  9    period of time that you had it, did you put any drug

12:38:28 10    paraphernalia in the car?

12:38:29 11    A.     No.

12:38:32 12    Q.     Did you put any, it's going to seem like an even

12:38:37 13    weirder question, but did you ever use drugs?

12:38:41 14    A.     No.

12:38:41 15    Q.     So you wouldn't have done anything that left any drug

12:38:47 16    remnants in the truck, is that fair to say?

12:38:49 17    A.     Yes.

12:38:51 18    Q.     And when you gave it back to your father on the 19th,

12:38:59 19    there was no drug paraphernalia in it, right?

12:39:02 20    A.     No.

12:39:03 21    Q.     And there were no drug remnants in it, right?  Is

12:39:09 22    that right?

12:39:09 23    A.     Yes, that's right.

12:39:11 24    Q.     So if drug paraphernalia was later found in the car,

12:39:14 25    that would had to have been put there after you gave it back

12:39:18 1   to your father on the 19th; right?

12:39:23 2          MR. LOWELL:  And the assumption is she doesn't

12:39:26 3   know, it's the same thing they objected when I did that,

12:39:29 4   judge.

12:39:30 5          THE COURT:  Yes.

12:39:33 6   BY MR. WISE:

12:39:33 7   Q.     Just to be clear, no drug paraphernalia in the car

12:39:37 8   when you had it on the 19th, right?

12:39:39 9   A.     No.

12:39:39 10  Q.     And no drug remnants on the car when you had it on

12:39:42 11  the 19th, right?

12:39:44 12  A.     No.

12:39:45 13  Q.     And that's when you gave it back to your father and

12:39:47 14  he left with it, right?

12:39:49 15  A.     Yes.

12:39:59 16         MR. WISE:  Nothing further, Your Honor.  Thank

12:40:01 17  you.

12:40:07 18                  REDIRECT EXAMINATION

12:40:09 19  BY MR. LOWELL:

12:40:11 20  Q.     Naomi, almost done.

12:40:12 21         In the text that Mr. Wise showed you about what

12:40:15 22  time of night, you didn't understand, or did you when he's

12:40:19 23  in the middle of the night asking you whether he was asking

12:40:22 24  you to drive in the middle of the night to exchange the car

12:40:25 25  in the middle of the night or whenever?

N. Biden - redirect

12:40:27  1    A.        Yes.

12:40:27  2    Q.        And when you were hard to see him in that period of

12:40:30  3    time, didn't you tell him that that was part your fault

12:40:35  4    because you were going to court, you were doing other

12:40:37  5    things?

12:40:37  6    A.        Yes, I was doing an internship at the court house in

12:40:42  7    Brooklyn, and it was like an hour commute.

12:40:46  8    Q.        Notwithstanding which day you were asked about, there

12:40:49  9    is no confusion in your head that you had time to spend with

12:40:52 10    your father while he was in New York, even if it's not in

12:40:55 11    that one day that this exchange occurred, is that true?

12:40:58 12    A.        To the best of my recollection.

12:41:03 13    Q.        And there is no doubt in your mind when you left the

12:41:06 14    truck off with him, the safe was intact?

12:41:08 15    A.        Yeah, there is no doubt.

12:41:11 16    Q.        And when you were asking -- when he was asking

12:41:15 17    questions and you were talking about the years that you knew

12:41:18 18    him and saw him, et cetera, you were saying when he was

12:41:21 19    struggling, he was not communicative, you're not seeing him,

12:41:25 20    right?

12:41:26 21    A.        Yeah.

12:41:26 22    Q.        Is that what you meant?

12:41:28 23    A.        Yes.

12:41:29 24    Q.        But in October of '18, was he communicative?

12:41:34 25    A.        Yes.

12:41:34  1    Q.      Were you seeing him?

12:41:36  2    A.      Yes.

12:41:37  3    Q.      Was that after you said you were proud of him?

12:41:40  4    A.      Yes.

12:41:42  5              MR. LOWELL:  That's all I have.

12:41:44  6              THE COURT:  All right.  Thank you.  You may step

12:41:48  7    down.

12:41:49  8              We are going to take our lunch break.

12:41:52  9              MR. LOWELL:  Yes, ma'am.

12:41:53 10              THE COURT:  We're going to take our lunch break

12:41:55 11    and come back in about an hour.

12:41:57 12              COURTROOM DEPUTY:  All rise.

12:41:59 13              (Jury exiting the courtroom at 12:41 p.m.)

12:42:28 14              THE COURT:  Very quick side-bar.

12:43:52 15              (Side-bar discussion.

12:43:52 16              THE COURT:  I just want to make sure we're

12:43:52 17    candid about anything, it was in the courtroom and the juror

12:43:52 18    on the end.

12:43:52 19              MR. LOWELL:  Back row.

12:43:52 20              THE COURT:  Back row on the end, at one point it

12:43:52 21    was when you were waiting for Ms. Biden to come -- no, it

12:43:52 22    was after Mr. Turner testified, and he just pulled Mark over

12:43:52 23    and said, if the prosecutor, and Mark said, can't talk about

12:43:52 24    it.  But that was -- I just wanted you to know so that there

12:43:52 25    is no discussions going on that you don't know about.

12:43:52  1              MR. LOWELL:  Thank you for that.

12:43:52  2              MR. HINES:  Thank you, Your Honor.

12:43:52  3              MR. LOWELL:  See you after lunch.

12:43:52  4              (End of side-bar.)

12:43:52  5              COURTROOM DEPUTY:  All rise.

12:44:21  6              (A luncheon recess was taken.)

13:38:25  7              THE COURT:  All right.  So I understand with

13:38:29  8    timing and everything we're going to break for the day?

13:38:32  9              MR. LOWELL:  Yes, ma'am.

13:38:32 10              THE COURT:  Normally -- everyone can sit down.

13:38:35 11    I would normally just allow the jury to go, but given that

13:38:40 12    it's Friday, I just want to give them sort of an admonition

13:38:44 13    of don't talk, don't listen, don't do anything, just because

13:38:47 14    it's a weekend, if that's okay with you guys.

13:38:51 15              MR. LOWELL:  What we are going to ask you to

13:38:53 16    add, I heard it and it makes sense, it's not a surprise to

13:38:56 17    the outside world that in the middle of this trial this week

13:38:59 18    a few members of Congress decided to make news by making

13:39:03 19    accusations against my client, that's not about this case,

13:39:07 20    so the question is not to read anything --

13:39:09 21              THE COURT:  Not just the case, but anybody

13:39:12 22    involved in the case.

13:39:12 23              MR. LOWELL:  Could you do that?

13:39:14 24              THE COURT:  Yes, I'm happy to do that.

13:39:16 25              MR. HINES:  Your Honor, just so I'm clear, at

13:39:18 1  this point we understand that no more defense witnesses

13:39:21 2  absent a decision by the defendant.

13:39:23 3          MR. LOWELL:  We've decided not to call that

13:39:25 4  witness regardless of the timing issue and that's fair to

13:39:27 5  you, of course.  But we have to make that other decision and

13:39:30 6  do the other things.  Okay.

13:39:33 7          THE COURT:  There were two other potential ones.

13:39:35 8          MR. LOWELL:  Again, because of the wonderful job

13:39:37 9  that my colleague did, we don't need to call Dr. Coyer, we

13:39:44 10 are down to that last decision.

13:39:46 11         THE COURT:  The last decision.  And I do have

13:39:48 12 jury instructions which I'll send out to you guys and let's

13:39:51 13 plan to be here, can we do 8:15 on Monday?

13:39:55 14         MR. HINES:  Yes.  I just want to make clear that

13:39:59 15 we are still considering whether we may do a rebuttal case

13:40:02 16 in light of some of the information.

13:40:04 17         THE COURT:  That's fine.  I want to make sure

13:40:06 18 we're ready to go to the extent --

13:40:08 19         MR. LOWELL:  Assuming that there is only one

13:40:10 20 potential witness, will you know with that decision will be

13:40:14 21 made.

13:40:15 22         MR. HINES:  I will know when you make the

13:40:16 23 decision.  If you tell me over the weekend I can let you

13:40:19 24 know.

13:40:19 25         MR. LOWELL:  We'll figure that out together.

13:40:22  1          THE COURT:  Let's bring the jury in, and
13:40:24  2   hopefully they're back.
13:40:29  3          I'm just going to tell them that I have some
13:41:53  4   things that I need to work out so that's why I'm letting
13:41:57  5   them go.
13:43:33  6          (Jury entering the courtroom at 1:43 p.m.)
13:43:39  7          THE COURT:  All right.  Members of the jury,
13:44:01  8   thanks for coming back.  So everyone can be seated.
13:44:06  9          So we are starting to wrap up the evidence in
13:44:09 10   this case.  And that means that I have some things I need to
13:44:12 11   take care of in terms of making sure I have the jury
13:44:15 12   instructions that I am going to give to you ultimately when
13:44:18 13   all the evidence is finished.
13:44:21 14          So in order for us to get that done in an
13:44:23 15   efficient manner, what I am going to do is I am going to
13:44:27 16   excuse you all early today so you can enjoy a long weekend,
13:44:31 17   maybe get some warmth outside of this courtroom because I
13:44:35 18   know it's crazy cold, but trust me, it's better than when
13:44:39 19   it's hot because that's gross.
13:44:41 20          I wanted to bring you in before I did that so I
13:44:44 21   can just remind you, it's going to be a weekend and you may
13:44:47 22   be hanging out with your family, may be hanging out with
13:44:50 23   friends and they might just be curious because you're on
13:44:53 24   this jury.  You really cannot talk with anyone.  It's
13:44:56 25   graduation season.  You may be at a party or a barbecue.

13:45:00  1    You may go to religious services where people want to talk

13:45:04  2    about it or hear about it.  You cannot be involved in that.

13:45:08  3    Okay?  And if you are, you have to get yourself out of it

13:45:12  4    and you're going to have to tell us about it just so that we

13:45:16  5    can ensure that nothing has been said that would affect your

13:45:19  6    opinions because we just really want to make sure this is

13:45:22  7    fair for everybody involved.  Okay.

13:45:24  8            And so, I know you're not going to do any

13:45:27  9    research on your own, but just I ask you don't look at

13:45:31 10    anything about this case, and when I say this case, I mean

13:45:34 11    any of the parties involved in it, anything that could

13:45:37 12    possibly get you to a place where you might accidentally see

13:45:41 13    something about this case.

13:45:42 14            All right.  With that, I will wish you a very

13:45:45 15    happy long weekend or longish weekend and a half a day.

13:45:49 16            Safe travels to you all and we'll see you here

13:45:52 17    on Monday morning.

13:45:54 18                    COURTROOM DEPUTY:  All rise.

13:45:56 19                (Jury exiting the courtroom at 1:45 p.m.)

13:46:26 20                    THE COURT:  All right.  Anything we need to

13:46:28 21    discuss?

13:46:29 22                    MR. HINES:  Did you say 8:15 Monday?

13:46:32 23                    THE COURT:  8:15, does that work for everybody.

13:46:34 24                    MR. HINES:  Yes.

13:46:35 25                    THE COURT:  8:15.  Have a good weekend.

13:46:38  1          COURTROOM DEPUTY:  Court is adjourned.

13:46:45  2              (Court adjourned at 1:46 p.m.)

3

4          I hereby certify the foregoing is a true and
      accurate transcript from my stenographic notes in the proceeding.

5

6                              /s/ Dale C. Hawkins
                               Official Court Reporter
7                              U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25