09:48:43

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA, ) VOLUME 6
                             )
                             ) CRIMINAL ACTION
v.                           ) NO. 23cr61(MN)
                             )
ROBERT HUNTER BIDEN,         )
                             )
              Defendant.     )

Monday, June 10, 2024
8:15 a.m.
Jury Trial

Courtroom 4A
844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge

APPEARANCES:

        SPECIAL COUNSEL'S OFFICE
        BY:  DEREK E. HINES, ESQ.
        BY:  LEO WISE, ESQ.

               Counsel for the
               United States of America

1

APPEARANCES CONTINUED:

2

3

        DALTON & ASSOCIATES, P.A.

4         BY:  BARTHOLOMEW J. DALTON, ESQ.
        BY:  CONNOR DALTON, ESQ.

5

        -and-

6

7         WINSTON & STRAWN LLP
        BY:  ABBE DAVID LOWELL, ESQ.

8         BY:  DAVID KOLANSKY, ESQ.
        BY:  ISABELLA OISHI, ESQ.

9

10                Counsel for the Defendant

11

12

13               - - - - - - - - - - -

07:49:29 14

08:17:05 15       THE COURT:  All right.  Good morning, everyone.

08:17:07 16 Please be seated.  Okay.  So I have the written objections

08:17:20 17 and a proposed addition to the jury instructions.  I thought

08:17:28 18 we could go -- let's go through them so that I can figure

08:17:32 19 out what -- I know the government has proposed a few

08:17:36 20 changes, I want to find out if the defendant has any

08:17:38 21 objections.

08:17:39 22       So let me start with defendants proposed

08:17:43 23 additions and changes.  The theory of the defense

08:17:50 24 instruction I will not add, that is argument and I don't

08:17:52 25 think it's appropriate in instructions that I give to the

08:17:58 1  jury.  With respect to reasonable doubt, we have had this

08:18:03 2  before in connection with the preliminary instructions, and

08:18:08 3  I am going to go with the current version of reasonable

08:18:12 4  doubt that we have, which is consistent with the Third

08:18:19 5  Circuit's proposed -- Third Circuit's model instruction.

08:18:30 6          With respect to impeachment of defendant prior

08:18:36 7  inconsistent statement, I agree with you, that was just

08:18:40 8  weird, but it was in there so I italicized it.  Can we take

08:18:44 9  that out?

08:18:44 10          MR. LOWELL:  Yes.

08:18:45 11          THE COURT:  So we're going to remove that one.

08:18:50 12 Materially defined, flat out wrong according to the

08:18:54 13 defendant, but it is essentially the Third Circuit model

08:19:00 14 instructions, so what is flat out wrong?

08:19:07 15          MR. LOWELL:  In the material that we provided,

08:19:11 16 from the --

08:19:12 17          THE COURT:  There is no case cited in what you

08:19:15 18 provided to me, so if you're telling me it's contrary to

08:19:18 19 law, it would be nice to have a case.

08:19:20 20          MR. LOWELL:  I'm sorry, it's contrary to --

08:19:23 21 that's -- that reflects back to our 29 motion on the Second

08:19:28 22 Amendment that BROADENS the definitions we believe that the

08:19:31 23 law that makes that improper is that motion for the 29

08:19:36 24 Second Amendment, it makes it a much broader category, which

08:19:41 25 reflects back to that motion itself, that's what we're

08:19:44  1    referring to.

08:19:44  2                THE COURT:  Okay.  So your objection is noted

08:19:46  3    and overruled.

08:19:48  4                Unlawful user of a controlled substance, the

08:19:52  5    definition proposed, we've had this one before and your

08:20:00  6    objections are preserved, but I am going to overrule that

08:20:06  7    one.

08:20:09  8                I think that the Third Circuit did cite to

08:20:21  9    eighth circuit precedent with respect to that and the eighth

08:20:28 10    circuit has -- and the eighth circuit has said that you

08:20:35 11    address the constitutional vagueness issue with respect to

08:20:38 12    the timing by saying it needs to be contemporaneous around

08:20:42 13    that time, so I am going to overrule that objection.

08:20:45 14                Knowing possession.  I am going to overrule.

08:20:54 15    Again, I think this is the model instruction, while I'm not

08:21:02 16    bound to it, at least currently it appears to be an accurate

08:21:10 17    state of the law in this circuit.

08:21:19 18                And other objections.  Oh, not including the

08:21:25 19    knowledge of a user or good faith, I think that those are

08:21:29 20    included in the Third Circuit as said I don't need to

08:21:33 21    include, for example, good faith when it would be redundant

08:21:37 22    of other instructions, which I think it is here.

08:21:40 23                All right.  So those are the defendant's

08:21:43 24    proposed changes and objections.  The stipulations and fact,

08:21:52 25    government proposes some additional stipulations or to

08:21:57  1  change, the language is changed of the stipulations.

08:22:01  2  Mr. Lowell, your position.

08:22:01  3           MR. LOWELL:  I only got these right before I

08:22:03  4  came back.

08:22:04  5           THE COURT:  Can you guys just take a look?

08:22:06  6           MR. LOWELL:  That was on page 1 and if the

08:22:08  7  government would explain to me what difference it was, that

08:22:11  8  would probably expedite.

08:22:13  9           MR. HINES:  In our proposed jury instructions,

08:22:15 10  which the court utilized in the proposed final instructions

08:22:19 11  which included a draft version of the instructions, this

08:22:23 12  represents the entered into evidence stipulation which was

08:22:25 13  entered into trial, which the language was slightly tweaked

08:22:28 14  from what we had initially proposed to the court.

08:22:31 15           MR. LOWELL:  That one I have no objection.

08:22:33 16           THE COURT:  Okay.  So we will include

08:22:35 17  government's proposed instruction on stipulations and

08:22:38 18  replace the stipulations in the draft.

08:22:44 19           Credibility of witness, immunized witnesses.  I

08:22:49 20  know that there was testimony that Ms. Kestan was immunized,

08:22:53 21  and I remember you saying that in opening, I don't remember

08:22:56 22  that that's in evidence.

08:22:57 23           MR. LOWELL:  I asked her, judge.

08:22:59 24           THE COURT:  You did.

08:22:59 25           MR. LOWELL:  Yes.

08:23:00 1            THE COURT:  All right.  So with that,

08:23:02 2 Mr. Lowell, do you have any thoughts, objections?

08:23:09 3            MR. LOWELL:  I think the difference is just in

08:23:11 4 that first sentence, putting in the names of the people.

08:23:14 5            THE COURT:  Yes.  So that's what he did.  But

08:23:18 6 there were like multiple paragraphs -- oh, I see, so we take

08:23:24 7 out -- all we're going to do is just put in the first

08:23:30 8 sentence, add the two names.  So we're using the not against

08:23:39 9 her in a criminal case as opposed to not prosecuted.

08:23:44 10            MR. HINES:  Correct.  That was the, in terms of

08:23:46 11 the immunity for both, Ms. Biden and Ms. Kestan.

08:23:50 12            THE COURT:  So Mr. Lowell, any objection to

08:23:53 13 using the language proposed by the government?

08:23:56 14            MR. LOWELL:  The difference is in the draft that

08:23:58 15 has received a promise from the government that her

08:24:00 16 testimony will not be used, and here it says the promise

08:24:04 17 from the government is her testimony will not be used.  I

08:24:07 18 think the only difference is that we've added the two names,

08:24:10 19 otherwise --

08:24:11 20            THE COURT:  And I'm asking you if you're okay

08:24:14 21 with it.

08:24:14 22            MR. LOWELL:  Of course.  Those are the two, I'm

08:24:16 23 sorry, I thought there was a change.

08:24:18 24            THE COURT:  No, no, it's fine.

08:24:19 25            Credibility of witnesses, testimony of addict or

08:24:23  1    substance abuser, the government said nobody who testified

08:24:29  2    was addicted to drugs or using drugs when the events took

08:24:33  3    place, and so the government proposes to omit that.

08:24:39  4              MR. LOWELL:  And I agree with the government,

08:24:41  5    except probably with one fewer person, because that includes

08:24:45  6    Mr. Biden in that, having said that I don't think there is

08:24:48  7    any testimony that any of the witnesses were so, so that

08:24:51  8    should be struck.

08:24:53  9              THE COURT:  Okay.  So we will strike number

08:24:55 10    eight.

08:24:55 11              Then we have defendant's choice not to testify

08:25:02 12    or present evidence.

08:25:05 13              MR. LOWELL:  So that one just needs to say

08:25:08 14    testify.

08:25:08 15              THE COURT:  Okay.  And you're fine with the rest

08:25:10 16    of it?

08:25:12 17              MR. LOWELL:  Let me see for a moment.  Yes.

08:25:20 18              THE COURT:  Okay.  So we will take out did not

08:25:24 19    present evidence in both of those places, leave in did not

08:25:29 20    testify, remove the brackets, and remove the italics.  I

08:25:37 21    think that should do it.  Okay.

08:25:39 22              So then we remove ten, defendant's testimony.

08:25:49 23    We remove 11, impeachment of defendant.  And the next

08:26:04 24    objection or addition that the government has is that the

08:26:10 25    parties have stipulated and agreed that StarQuest Shooters

08:26:15  1    and Survival Supply was a licensed dealer, you should

08:26:20  2    therefore treat this, this is to page 3 of the government's

08:26:23  3    submission -- you should therefore treat this fact as having

08:26:27  4    been proved, you are not required to do so, however, because

08:26:30  5    you are the sole judge of the facts.

08:26:34  6              MR. LOWELL:  Yes.

08:26:35  7              THE COURT:  Are you fine with that?

08:26:38  8              MR. LOWELL:  Yes, that's fine.

08:26:40  9              THE COURT:  So we'll make that change.

08:26:47 10              MR. LOWELL:  Sorry, I'm now confused, on their

08:26:53 11    page 4, versus --

08:26:56 12              THE COURT:  I haven't gotten there yet, okay.

08:26:59 13              MR. LOWELL:  No, no, I wasn't there, I was on

08:27:02 14    page 3.

08:27:02 15              THE COURT:  Okay.

08:27:03 16              MR. LOWELL:  We were just talking about which

08:27:10 17    Roman numeral were you just referring to, please?

08:27:14 18              THE COURT:  14.

08:27:15 19              MR. LOWELL:  Sorry.  One moment, please.

08:27:29 20              Yes, that's okay.

08:27:30 21              THE COURT:  Thank you.

08:27:32 22              MR. HINES:  Your Honor, with respect to 14, just

08:27:35 23    to shortcut something -- I'm sorry, 13.

08:27:41 24              MR. LOWELL:  13?

08:27:43 25              MR. HINES:  Sorry, my apologies, it's 18, I'll

08:27:46 1    wait a second, Your Honor.

08:27:48 2          THE COURT:  Okay.  The Roman numerals are

08:27:52 3    killing us all.

08:27:54 4          Okay.  18, the government's proposed

08:27:59 5    instruction, can you tell me what you did?

08:28:02 6          MR. HINES:  So what we intended to do was just

08:28:06 7    really add the last sentence, which is that stipulation

08:28:09 8    language that we had referenced that the jury can treat this

08:28:13 9    fact as having been proved, they're not required to do so.

08:28:16 10    So the Court could ignore what we put up until that last

08:28:20 11    sentence, which appears to be put in there in error.

08:28:23 12          MR. LOWELL:  When you say that last sentence,

08:28:25 13    that last sentence on your submission?

08:28:28 14          MR. HINES:  On our submission, number 18, which

08:28:32 15    is page 3 into 4, where it's just asking that the Court

08:28:35 16    include the last two sentences, you should therefore treat

08:28:38 17    this fact as having been proved, you're not required to do

08:28:41 18    so however, since you are the sole judges of the facts.

08:28:48 19          THE COURT:  All right.  It's the same language

08:28:50 20    that we used with respect to the other stipulation.

08:28:53 21          MR. LOWELL:  Yes, ma'am, I'm just asking, is

08:28:56 22    that on your proposed instructions where it was highlighted

08:28:59 23    instruction number 13, these say it has the same definition

08:29:06 24    as provided in that definition and then state what you said

08:29:09 25    before or do you repeat 13, I'm just not sure what that

08:29:14  1    means, you had highlighted that.

08:29:16  2             THE COURT:  That's because I want to be sure if

08:29:19  3    the numbering changed we be sure to change the numbering.

08:29:23  4    All I'm going to say is that's the same definition provided

08:29:26  5    in whatever the instruction did it, so I don't have to sit

08:29:30  6    here and use extra words.

08:29:32  7             MR. LOWELL:  I agree with that.

08:29:33  8             THE COURT:  Okay, so we'll just make sure that

08:29:34  9    number is correct, that's why it's highlighted.  But the

08:29:37 10    addition that's being proposed by the government is that we

08:29:40 11    add, if you look at theirs, page 4.

08:29:43 12             MR. LOWELL:  Right.

08:29:43 13             THE COURT:  The last two sentences, which are

08:29:44 14    the same two sentences we used with the prior stipulation.

08:29:48 15             MR. LOWELL:  Correct.

08:29:48 16             THE COURT:  You're fine with those.

08:29:51 17             MR. LOWELL:  I am.

08:29:52 18             THE COURT:  Thank you.  23.  Interstate

08:29:58 19    commerce.

08:30:04 20             MR. HINES:  This is again just the same --

08:30:07 21             THE COURT:  Add those two sentences.

08:30:08 22             MR. HINES:  Yes.

08:30:09 23             MR. LOWELL:  Again, the same, that's fine.

08:30:11 24             THE COURT:  Okay.  Thank you.

08:30:15 25             And then with respect to the 25, which the

08:30:24  1    government called 14, but I know you meant 25, so what I

08:30:31  2    didn't understand was, I mean, I always give people

08:30:35  3    exhibits, I mean, not a gun, but I always give them the

08:30:39  4    exhibits.  What is this, you can ask me for an exhibit?

08:30:44  5            MR. HINES:  So our understanding is the practice

08:30:46  6    is not to allow things like firearms, ammunition, drug

08:30:50  7    evidence to go back with the jury.  That is essentially

08:30:53  8    almost all of the physical exhibits.  Certainly documents,

08:30:56  9    evidence that's been introduced in paper format can go back,

08:31:00 10    but there are limited physical evidentiary items, that's off

08:31:03 11    the top of my head, it's the gun, the ammunition, the speed

08:31:08 12    loader, the brown leather pouch.

08:31:11 13            THE COURT:  Right.  But doesn't this seem like

08:31:13 14    we're saying that they're not getting any exhibits?  If you

08:31:17 15    want to see any of the exhibits, you mean, we could say any

08:31:20 16    of the physical exhibits, but this is sort of weird, it

08:31:25 17    sounds like they're just going to go back there and look at

08:31:29 18    each other.

08:31:29 19            MR. HINES:  I agree we can make that change.

08:31:32 20            MR. LOWELL:  The language that you highlighted I

08:31:34 21    thought worked before it was attempted to be changed.  If

08:31:37 22    you want to see any of the exhibits that were admitted in

08:31:42 23    evidence, and if I can I will have those exhibits provided,

08:31:45 24    that's what you need to say and we understand that language

08:31:48 25    includes physical ones, but I don't think you need to say

08:31:51  1    more than what you had proposed.

08:31:52  2            THE COURT:  Just so that we're clear, I'm not

08:31:55  3    proposing, this subject that the jury will have no exhibits,

08:31:58  4    that's not my practice.  They would have exhibits, but not

08:32:01  5    the physical exhibits like the gun, and so I think what the

08:32:06  6    government is proposing is that if they're really desperate

08:32:11  7    to see the gun and checkout the serial number on it, they

08:32:16  8    could ask to come back to the courtroom to look at it.  Is

08:32:19  9    that what you're saying?

08:32:20 10            MR. HINES:  Exactly.  One question I had --

08:32:23 11            THE COURT:  I don't know that we actually need

08:32:24 12    to tell them that, because if we say provided, that's one

08:32:28 13    way we could provide it, right?

08:32:29 14            MR. HINES:  That's fine.  For my clarification

08:32:31 15    with respect to the audio that was played from the audio

08:32:34 16    book, they obviously have the physical book back there, but

08:32:37 17    to the extent the jury wants to hear the words again, is

08:32:40 18    there a mechanism for them the listen to it in the jury room

08:32:43 19    or do they need to come back out here in the courtroom?

08:32:47 20            THE COURT:  They could listen to it in the jury

08:32:49 21    room.

08:32:49 22            MR. LOWELL:  Could you please tell me what your

08:32:51 23    proposed 29 -- what that will now say?

08:32:54 24            THE COURT:  If you want to see any of the

08:32:55 25    physical exhibits that were admitted in evidence, you may

08:32:58 1  send me a message and then if I can legally do so -- or if

08:33:02 2  you want to say if you want to see any exhibit you don't

08:33:05 3  have.

08:33:06 4             MR. LOWELL:  So you're going to give them all

08:33:08 5  the exhibits except --

08:33:09 6             THE COURT:  I'm going to give them all the

08:33:11 7  exhibits except for the ones I can't give them, like the

08:33:15 8  gun.

08:33:15 9             MR. LOWELL:  Okay.  I just was confused because

08:33:17 10 it did say any.

08:33:19 11            THE COURT:  That's why it was highlighted

08:33:20 12 because that's the way you all proposed it to me, and I

08:33:23 13 didn't understand it, but I didn't want to delete it without

08:33:27 14 talking to you.

08:33:28 15            MR. LOWELL:  Okay, if it's your practice to do

08:33:29 16 that, we'll follow your practice.  Now I understand.

08:33:33 17            THE COURT:  Okay.  Thank you.  So that one we'll

08:33:36 18 say -- what I am going to say is if you want to see any of

08:33:41 19 the exhibits that were admitted in evidence that you don't

08:33:44 20 have, you may send me a message and if I can legally do so,

08:33:48 21 I will have those exhibits provided.

08:33:54 22            Okay.  Is there any objection, proposed addition

08:34:01 23 that I have not addressed?

08:34:02 24            MR. LOWELL:  I'm sorry, you go first.

08:34:04 25            MR. HINES:  No, Your Honor.

08:34:04  1          MR. LOWELL:  There is a few, judge, that I would

08:34:06  2  like to bring to your attention if I might.

08:34:09  3          THE COURT:  Sure.

08:34:09  4          MR. LOWELL:  You skipped over 24, that was in

08:34:13  5  italics about activities not charged given all the evidence

08:34:17  6  about drug use in other rooms, we would suggest that that

08:34:21  7  was as proposed, we give it.

08:34:23  8          THE COURT:  I wasn't sure what that was talking

08:34:25  9  about, yes, that's fine, we will un-italicize 24.

08:34:29 10          MR. LOWELL:  62.  In addition to which,

08:34:32 11  generally for example on your proposed 27, page 27, that

08:34:35 12  would be in 25 so -- sorry, Roman numeral 25, there are

08:34:41 13  occasions where you do this, but on a couple of occasions

08:34:44 14  here, for example, whenever you use the phrase prove the

08:34:49 15  defendant, say beyond the reasonable doubt that is the

08:34:52 16  standard, here you say if the defendant has proved the

08:34:58 17  defendant guilty beyond a reasonable doubt.

08:35:00 18          MR. HINES:  The previous section says that and

08:35:03 19  this is the Third Circuit model instructions, I don't think

08:35:06 20  we need to say over and over and over again, it becomes

08:35:09 21  cumbersome, but in the previous paragraph it says twice

08:35:13 22  beyond a reasonable doubt.

08:35:14 23          MR. LOWELL:  Three words doesn't make it

08:35:17 24  cumbersome but it's a standard of proof, if you remove it

08:35:21 25  any time the word guilty is, it can then become confusing,

08:35:25 1    you because it was omitted --

08:35:29 2                THE COURT:  I'm sorry, I don't mean to cut you

08:35:31 3    off but I think you were talking to Mr. Hines and not me.

08:35:33 4    Is the only place I -- I see it in the second -- I'm sorry,

08:35:37 5    in the paragraph that begins third, if you decide that the

08:35:43 6    government has proved the defendant guilty beyond a

08:35:47 7    reasonable doubt.  Is there any other place you want it?

08:35:49 8                MR. LOWELL:  I think that's the one I found.

08:35:51 9                THE COURT:  So we'll add that.

08:35:54 10                MR. LOWELL:  The only other -- and then on the

08:35:57 11    next page, judge, where you're talking that you can go about

08:35:59 12    notes, that's slightly different than the preliminary and we

08:36:03 13    want you to add the sentence that you did in preliminary

08:36:06 14    here which is -- hold on a second.  In the preliminary, you

08:36:18 15    said your notes are memory aids, they are not evidence.  And

08:36:23 16    it says -- the phrase, in your deliberations do not give

08:36:27 17    anymore or less weight to the views of a fellow juror just

08:36:31 18    because a juror did or did not take notes, that was in the

08:36:34 19    preliminary, that sentence makes sense to clue in this one

08:36:39 20    as well.

08:36:40 21                MR. HINES:  I don't have the preliminary in

08:36:42 22    front of me but if that tracks the preliminary, then that's

08:36:45 23    fine.

08:36:45 24                THE COURT:  We'll cut and paste it from the

08:36:47 25    preliminary.

08:36:48  1                     MR. HINES:  Okay.

08:36:50  2                     MR. LOWELL:  Let me see if there is anything

08:36:52  3    else.

08:36:52  4                     THE COURT:  Thank you.

08:36:59  5                     MR. LOWELL:  I'm sorry, judge.

08:37:09  6             On your proposed 22, unanimity, Roman 22, in the

08:37:18  7    last paragraph, third line, it reads presently if you

08:37:23  8    unanimously agree that he was either an unlawful user of a

08:37:27  9    controlled substance or was addicted to a control substance

08:37:30 10    or both, you may find the defendant guilty.  We ask that you

08:37:34 11    include and met the other elements as to each count, it

08:37:38 12    looks like that's the only element that's missing here.  Do

08:37:44 13    you see where I'm referring?

08:37:46 14                     THE COURT:  Yes.

08:37:46 15                     MR. LOWELL:  So the phrase would be "and met the

08:37:49 16    other elements as to each count."

08:37:52 17                     MR. HINES:  No objection.

08:37:56 18                     THE COURT:  So in 22, at the end of the -- or in

08:38:01 19    the middle of the second sentence after "or was both," then

08:38:12 20    we put "and met the other elements of the offense, you may

08:38:16 21    find him guilty," right?

08:38:18 22                     MR. LOWELL:  I would ask to say as to each

08:38:21 23    count, as to each count.

08:38:22 24                     THE COURT:  I'm sorry, as to each count.

08:38:24 25                     MR. HINES:  I think it should say the offense,

08:38:26  1  because this instruction covers three different counts and

08:38:29  2  it could create confusion that somehow the elements from

08:38:32  3  each of the following counts link to the first count, for

08:38:38  4  example.

08:38:38  5          MR. LOWELL:  The opposite I think judge, each

08:38:41  6  one of them does have a separate one, that's why you have to

08:38:44  7  say each, because each one is different and it's not saying

08:38:47  8  each.  That can make them understand and meld, we ask them

08:38:51  9  to say and the other elements of each count.

08:39:37 10          THE COURT:  Where I'm getting confused is it

08:39:40 11  almost sounds like you have to you find that he -- if they

08:39:49 12  met them for every count to find him guilty, so we need --

08:39:55 13          MR. LOWELL:  I'm sorry, this is referring only

08:39:58 14  to one count, then it can say and met the other elements as

08:40:03 15  to this count.  That's what the government is saying.

08:40:06 16          MR. HINES:  I would suggest, Your Honor, that

08:40:07 17  the sentence could read something like if you unanimously

08:40:11 18  agree that he was either an unlawful user of a controlled

08:40:15 19  substance, or was addicted to a controlled substance, or was

08:40:19 20  both, and met the other elements of the offense, you may

08:40:22 21  find the defendant guilty of that offense.

08:40:32 22          MR. LOWELL:  I prefer each count, but if Your

08:40:35 23  Honor thinks "of the offense" does it, then that's better

08:40:39 24  than what it does now for my purposes.

08:40:42 25          THE COURT:  We'll make that change.  Anything

08:40:44  1    else?

08:40:44  2                MR. LOWELL:  We have not -- I don't know that

08:40:47  3    the Court has yet provided what will be a verdict form.

08:40:51  4                THE COURT:  Oh, I did want to talk about the

08:40:53  5    verdict form.  So the government, it seems like your issue

08:40:56  6    was knowing in the verdict form.  So I guess my question

08:41:06  7    was, in the indictment, it says knowing.  So why are we not

08:41:13  8    including that in the verdict form?

08:41:16  9                MR. HINES:  So knowingly is obviously an element

08:41:18 10    and the Court is instructing on knowingly, there is a whole

08:41:22 11    host of other elements.

08:41:24 12                THE COURT:  So what happened was I was trying to

08:41:26 13    put in everything from the indictment and then it became

08:41:29 14    bigger.  So I took that point.  But how do we -- what do we

08:41:40 15    call it in -- so you're saying essentially just use the

08:41:48 16    terminology that is in the jury instructions?

08:41:55 17                MR. HINES:  Just use the terminology that's in

08:41:57 18    is the statute, the statute doesn't specifically read the

08:42:00 19    word knowingly, because that's ordinarily the practice that

08:42:03 20    I have experienced with respect to jury verdict forms, you

08:42:07 21    don't include the additional terminology as an element in

08:42:11 22    the verdict form itself because the Court is already

08:42:14 23    instructing on that element.

08:42:16 24                MR. LOWELL:  Yes, but this is the last moment

08:42:18 25    when they have to make a decision, and as Your Honor knows,

08:42:22  1   knowingly is a very key aspect and it is to each of those

08:42:27  2   counts and adding a word to remind them as opposed to taking

08:42:31  3   it out if they may if they just looked at the verdict form

08:42:34  4   decide it is a different standard is prejudicial and it is

08:42:38  5   not redundant because it is part of each count as it was

08:42:41  6   when we proposed it.

08:42:44  7        THE COURT:  Right.  But then the question is why

08:42:47  8   aren't we including all of the other elements.  And that's

08:42:50  9   what I was trying -- when I saw yours, I was trying to do

08:42:53 10   that and went back to the indictment, and I was like well,

08:43:00 11   the indictment says knowing, but it also says a lot of other

08:43:06 12   stuff.

08:43:06 13        MR. LOWELL:  Well, the other stuff is hardly

08:43:08 14   contested, whether or not interstate commerce, whether it

08:43:12 15   was a dealer, so the only one in dispute for all intents and

08:43:17 16   purposes is this one critical phrase, so I don't think you

08:43:20 17   have to, especially given the stipulation, include every

08:43:23 18   other -- almost of every count when the only one between us

08:43:28 19   and the government being disputed is the one that it lacks.

08:43:32 20        MR. HINES:  Your concern would be including the

08:43:35 21   one element as opposed to the other would lead to the

08:43:37 22   confusion in the jury when they wonder why there is an

08:43:43 23   inconsistency between the jury form and the instruction, we

08:43:45 24   think a general description that's standard that tracks the

08:43:49 25   language of the statute is sufficient, obviously we can

08:43:52 1    argue knowingly in closing arguments which I expect will be

08:43:56 2    the focus of both counsel's presentation.

08:44:00 3            MR. LOWELL:  I don't want to -- if we're trying

08:44:08 4    to make sure the jury is not confused and you take out the

08:44:11 5    critical element, which is at the core of the defense,

08:44:14 6    you're actually providing more of an ability to make for at

08:44:17 7    least not confusion, but contradiction.

08:44:19 8            THE COURT:  I will leave it with what the

08:44:21 9    government has, but I will when I talk to them about the

08:44:24 10   jury verdict form tell them that when they look at these,

08:44:28 11   they have to go back and look at the instructions that were

08:44:32 12   provided for each count.  The other thing on the jury

08:44:36 13   verdict form, we usually have all the jurors sign.  Any

08:44:40 14   objections to that?

08:44:41 15           MR. HINES:  No, Your Honor.

08:44:42 16           MR. LOWELL:  You said it's the foreperson.  This

08:44:51 17   says presiding jurors.  So what would that say?

08:44:55 18           THE COURT:  It would say once you have a

08:44:58 19   verdict, everybody sign it, I mean, we have spaces for --

08:45:02 20           MR. LOWELL:  That's what I meant.

08:45:03 21           THE COURT:  We have foreperson plus 11 spaces.

08:45:06 22           MR. LOWELL:  Got it.  If that's the Court's

08:45:08 23   practice, again I'm not going to change something that you

08:45:11 24   always do, unless --

08:45:13 25           THE COURT:  Unless you tell me it's flat out

08:45:16  1    wrong and then I may reconsider.

08:45:17  2                 MR. LOWELL:  But that's not flat out wrong.

08:45:20  3                 THE COURT:  Thank you.

08:45:21  4                 Okay.  All right.  Anything else?

08:45:31  5                 MR. HINES:  Nothing on jury instructions.

08:45:33  6                 MR. LOWELL:  Nothing on jury instructions, but

08:45:35  7    we do have another issue.

08:45:38  8                 (Side-bar discussion:)

08:53:21  9                 MR. LOWELL:  Last night at 9:30 or whatever

08:53:21 10    after the government said they would not have a rebuttal

08:53:21 11    case, they wrote while preparing for closing argument, and

08:53:21 12    reviewing transcript this evening, we realized that Naomi

08:53:21 13    Biden provided inaccurate testimony about the date when the

08:53:21 14    defendant traveled to New York.  That's what they wrote,

08:53:21 15    that's the need for rebuttal.  I understand, we can address

08:53:21 16    that.

08:53:21 17                 What they have done after that late at night was

08:53:21 18    to provide us a new set of texts, forty-two of them, to

08:53:21 19    propose in between before he got to New York where he was,

08:53:21 20    who he was talking with, and what he was doing, which

08:53:21 21    includes references that could be to try to contact or have

08:53:21 22    people that were contacting him for possible drug use, that

08:53:21 23    was not put in their case-in-chief.  If what they said, and

08:53:21 24    this is rebuttal, this is a rebuttal case as to where he was

08:53:21 25    or whether Naomi was wrong, then that's what the rebuttal

08:53:21 1    is.  That doesn't need forty-two texts that includes all

08:53:21 2    kinds ever other language.

08:53:21 3              We would be prepared to stipulate that either he

08:53:21 4    you heard evidence from Naomi Biden that he arrived and was

08:53:21 5    there the 15th, that's not correct it was a few days later,

08:53:21 6    or we can stipulate as to whether he got there, on or we can

08:53:21 7    stipulate as to what locations he was, but then to have

08:53:21 8    forty-two texts of all this other material that they could

08:53:21 9    have proposed is not rebuttal for the proposition, which

08:53:21 10   would be proper rebuttal, and if it was even remotely

08:53:21 11   relevant to that which was the date, then it would be

08:53:21 12   prejudicial beyond any relevance.

08:53:21 13             THE COURT:  So what date did she say?

08:53:21 14             MR. LOWELL:  The 15th.

08:53:21 15             THE COURT:  And what is the correct date?

08:53:21 16             MR. LOWELL:  17th.  It's two days for that.

08:53:21 17             THE COURT:  And he left New York on the 19th?

08:53:22 18             MR. LOWELL:  20th.

08:53:22 19             THE COURT:  20th.  And so what are the dates of

08:53:22 20   these texts?

08:53:22 21             MR. HINES:  The first thing I'll say is all of

08:53:22 22   these text messages do link to our proof that he was still

08:53:22 23   in Delaware on October 15th, but nonetheless our rebuttal

08:53:22 24   case is not limited, there is no rule of evidence that

08:53:22 25   limits a rebuttal case to exactly the words that the defense

08:53:22 1    witness testified to.

08:53:22 2            What I'll say on how it relates to the 15th is

08:53:22 3    that we have location information showing him at a 7-Eleven

08:53:22 4    on October 14th, 15th and 16th, I believe those are the

08:53:22 5    dates that's reflected in the summary chart.

08:53:22 6            And location information and a photograph is

08:53:22 7    just that, it's location information, it does not identify

08:53:22 8    whether the person themself was actually necessarily at that

08:53:22 9    location because the photograph shows a geolocation, it

08:53:22 10   could have been someone else's photograph.  So the other

08:53:22 11   messages that we included are all messages, et cetera, that

08:53:22 12   show the defendant did frequent a 7-Eleven, they are just

08:53:22 13   messages from October 9th through that date when he left the

08:53:22 14   area showing that he was communicating with other

08:53:22 15   individuals to meet at a 7-Eleven.

08:53:22 16           So it shows that, in fact, in that photograph

08:53:22 17   from the date before he goes up to New York of a 7-Eleven

08:53:22 18   does reflect that the defendant does, you know, frequent

08:53:22 19   that location.  Relative, probative, including of the fact

08:53:22 20   that defense elicited that he went up to New York on the

08:53:22 21   15th, but it directly refutes that.

08:53:22 22           Moreover, I will also say Naomi Biden testified

08:53:22 23   as to her observations of the defendant in August and then

08:53:22 24   also in October of 2018 and sort of his -- her view, her

08:53:22 25   perception of his state of mind at that time.  What these

08:53:22 1    messages show was that, in fact, during that time period,

08:53:22 2    the same period she testified about, he's meeting with other

08:53:22 3    individuals at a 7-Eleven, including around the time of the

08:53:22 4    drug purchase, and the defense has argued that that 7-Eleven

08:53:22 5    text where he's meeting the dealer named Mookie is a lie but

08:53:22 6    what we do see around that time period is, in fact, the

08:53:22 7    defendant is meeting at a 7-Eleven with other individuals.

08:53:22 8    So all of this directly rebuts both the arguments of counsel

08:53:22 9    and the testimony of Ms. Biden.

08:53:22 10                THE COURT:  Forty-two?  You need forty-two

08:53:22 11    texts?

08:53:22 12                MR. HINES:  They're succinct texts.  Obviously

08:53:23 13    if there was an issue with any one of them we would be happy

08:53:23 14    to address them with defense counsel.  I have a -- would

08:53:23 15    Your Honor like a physical copy?

08:53:23 16                THE COURT:  Yes.

08:53:23 17                MR. HINES:  So the first page is a series of

08:53:23 18    messages with someone who identifies himself as Junior and a

08:53:23 19    couple of places they talk, both him and defendant talk

08:53:23 20    about meeting at a 7-Eleven.

08:53:23 21                On page 2, number 11, Junior asks, "Do you want

08:53:23 22    the same?"

08:53:23 23                MR. LOWELL:  Exactly.

08:53:23 24                MR. HINES:  He then begins texting from another

08:53:23 25    phone, I'm at a 7-Eleven now, that's at Row 13.  And then

1  the defendant on October 11th says, "Meet me at 7-Eleven at

2  3:00."  So the messages --

3          MR. LOWELL:  Which row was that?

4          MR. HINES:  Row 23.  So there is five messages

5  including the Row 25 in which the defendant is communicating

6  about meeting at a 7-Eleven.

7          MR. LOWELL:  Judge, even that one -- first of

8  all, again, this is an interesting way to try to get into a

9  rebuttal case that which they could have done in their

10  case-in-chief.  And they are trying to take a small item

11  that they said they need to rebut which was when he got to

12  New York into now something way farther and way more

13  prejudicial.

14          For example, this row is on October 11th.  Naomi

15  did not say he was on the 11th or the 12th or the 13th or

16  the 14th or the 15th.  Again, to create not the prejudice,

17  the possibility we can create the stipulation that would say

18  that he did not get to New York the 15th, it was later and

19  the days that he was in Delaware, he would go to a 7-Eleven

20  if that's what their point is.  You can do that in two

21  sentences.  But this is extraordinary.  This is prejudicial.

22  This is what they could have done, if they had to do it,

23  they didn't do it in their case-in-chief.  I got it late

24  night, because it needs to happen in the way that they're

25  saying what they are seeking --

08:53:23  1                THE COURT:  Let me take a look at these and take

08:53:23  2     a break.

08:53:23  3                (End of side-bar.)

08:53:23  4                THE COURT:  All right.  We're going to take just

08:53:23  5     a couple minute break.

08:53:23  6                COURT CLERK:  All rise.

09:15:35  7                THE COURT:  All right.  Everyone can be seated.

09:59:51  8                (Side-bar discussion:)

09:59:51  9                MR. LOWELL:  So what I just noticed since we

09:59:51 10     didn't get this and I didn't see it until morning, this

09:59:51 11     starts off with something, now as I look at the testimony it

09:59:51 12     is when he drove it up, do you recall about what day.

09:59:51 13                THE COURT:  So I get it, but what I went -- I

09:59:51 14     mean, I just went back and I read her testimony and the

09:59:51 15     problem is she said that he was -- he was in good shape and

09:59:51 16     he -- you asked her, she had said he was clear as I had ever

09:59:51 17     seen him or I had seen him in years and then you said was in

09:59:51 18     October on a par with how clear he was back when you saw him

09:59:51 19     -- and this was you said at the end of October.  You were

09:59:51 20     asking her was he sober.

09:59:51 21                MR. LOWELL:  Yes, and sober can mean alcohol and

09:59:51 22     sober can mean other things.  But judge, again they didn't

09:59:51 23     cross her on any of those.  But the point is let's say he

09:59:51 24     was using -- let's assume for the purposes of this that they

09:59:52 25     wanted to put evidence in and there is none directly, all

09:59:52  1    these texts aren't responded to this person he was texts

09:59:52  2    that he was using drugs on the 11th, the 12th, the 13th, the

09:59:52  3    14th the 15th, let's assume that's what they want to say.

09:59:52  4    That has no bearing when she saw him on the 19th whether he

09:59:52  5    looked the same as he did.

09:59:52  6         That is extraordinary taking and shoehorning a

09:59:52  7    proposition that they had the ability -- I looked it up,

09:59:52  8    there is lots of cases talking about rebuttal evidence has

09:59:52  9    to rebut what they say they are seeking to rebut which is

09:59:52 10    what they told us is when, now they're saying they didn't

09:59:52 11    say that before, it is about how she could say on the 20th

09:59:52 12    or the 19th when they saw each other he looked as good as he

09:59:52 13    did, to talk about what he did on the 9th, the 10th, the

09:59:52 14    11th or 12th, they could have confronted her, they did which

09:59:52 15    was something that wasn't true, sending a code to somebody

09:59:52 16    that night which they know was probably a month later.

09:59:52 17    That's the point.

09:59:52 18         Some of these texts I find out are to Finnegan

09:59:52 19    in this period of time, his daughter.  To get now to a

09:59:52 20    number of texts -- yeah, Row 12, I understand that, but he

09:59:52 21    doesn't even respond.  It's just an extraordinary attempt to

09:59:52 22    shoehorn in a rebuttal case which the case law says you

09:59:52 23    rebut the thing you are rebutting which is where he was,

09:59:52 24    they have all this evidence of where he was, there is not

09:59:52 25    anything on the 15th where they want to rebut that she was

09:59:52  1   wrong, and then on the 16th, for example, is one where there

09:59:52  2   is a text to Finnegan.

09:59:52  3           Judge, I'm sorry, I don't know how to say this

09:59:52  4   better because I'm just flustered by this, but if you think

09:59:52  5   that this -- the door opens because I asked her about what

09:59:52  6   day on the issue of dates and locations, then I don't have

09:59:52  7   any objection to them pointing out where she -- he actually

09:59:52  8   was.

09:59:52  9           THE COURT:  Right.  But she was testifying that

09:59:52 10   -- she was testifying that he was in the same shape as he

09:59:52 11   was when he was sitting with his sober coach in August.

09:59:52 12           MR. LOWELL:  Indeed.

09:59:52 13           THE COURT:  And this is circumstantial evidence

09:59:52 14   that he wasn't in that same shape.

09:59:52 15           MR. LOWELL:  But there you just made the leap

09:59:52 16   which is terribly, terribly unfair.  She said that he

09:59:52 17   looked, she didn't say she gave him a drug test.

09:59:53 18           THE COURT:  I know, but Mr. Lowell the reason

09:59:53 19   you put her up there was so that she could say he looked

09:59:53 20   like he wasn't on drugs, that why you put her up there,

09:59:53 21   that's why you were asking her those questions.

09:59:53 22           MR. LOWELL:  No, I was asking her to show where

09:59:53 23   the truck was which we did and whether the lock box was

09:59:53 24   intact and she did mention other things.

09:59:53 25           Judge, to be really fair about this, think about

09:59:53 1    what you just said to me, you're saying on the 19th and 20th

09:59:53 2    when her perception is that he looked the same, evidence

09:59:53 3    about what he was doing with whom and where on the 11th or

09:59:53 4    12th or any other day is probative of what she perceived.

09:59:53 5    They asked every witness could he be using drugs and hide

09:59:53 6    it, could he be using drugs and be functional, it is so

09:59:53 7    terrible prejudicial beyond the rebuttal law what is allowed

09:59:53 8    in rebuttal to allow them what they could have done in their

09:59:53 9    case-in-chief, which is exactly what this is about.  I don't

09:59:53 10   know why they didn't try.  To shoehorn her perception on the

09:59:53 11   20th based on their own evidence which says over and over

09:59:53 12   again that he could be using drugs and you wouldn't even

09:59:53 13   know it.  They made that point.  They can argue that point.

09:59:53 14              But if Naomi Biden thought on the 20th or the

09:59:53 15   19th he looked the same then we've told you over and over

09:59:53 16   again that he had the ability to do that, but it was not

09:59:53 17   rebuttal to her perception of what he was really doing or

09:59:53 18   who a week before, if you look at these, that's what they're

09:59:53 19   trying to do and if you're suggesting that they can do that,

09:59:53 20   that they can open the door based on one line, two lines,

09:59:53 21   one is about when, and that he looked the same that is so

09:59:53 22   far beyond what rebuttal evidence could be, you see it,

09:59:53 23   Judge, you see what's going on here, they're trying to wedge

09:59:53 24   in because of the about language or her perception and her

09:59:53 25   perception on a day doesn't link to what he was doing a week

09:59:53  1    before.

09:59:53  2              I have said before if that's what they're

09:59:54  3    honestly doing, we can either stipulate to where he was,

09:59:54  4    including if they want to say that on those days he's in

09:59:54  5    Delaware, location data says he's at a 7-Eleven and that

09:59:54  6    does it, but everything else, why, if you allow this in in

09:59:54  7    their rebuttal case, it is beyond what I have just been able

09:59:54  8    to look for in the rebuttal evidence law about what

09:59:54  9    specifically they're going to rebut.

09:59:54 10              And your view that her ability to say that he

09:59:54 11    looked the same to me, and you asked me, I did that, in fact

09:59:54 12    I did that, but it doesn't undercut her saying that given

09:59:54 13    what they have said and admitted, that many times when he

09:59:54 14    was using you wouldn't know he was using drugs, they made

09:59:54 15    that point.  What he did on the 11th, now I'm repetitive but

09:59:54 16    this is really changing events.

09:59:54 17              THE COURT:  Are you going to say --

09:59:54 18              MR. LOWELL:  No, I am not going to say in

09:59:54 19    closing arguments if that's what you're asking that she said

09:59:54 20    he looked the same.

09:59:54 21              MR. HINES:  We have to be able to rebut that.

09:59:54 22    What we're proposing is about five, maybe ten minutes of

09:59:54 23    direct about messages over a six-day period that immediately

09:59:54 24    precedes what their defense witness talked about and her

09:59:54 25    observations of the defendant on that date in question and

09:59:54 1    the inaccurate testimony that she provided on the location.

09:59:54 2    All of that rebutting is the defendant, as if Mr. Lowell's

09:59:54 3    argument we're presenting messages from the entire year,

09:59:54 4    it's a very limited window of a very limited purpose which

09:59:54 5    rebuts what she was put on the stand for of which we had no

09:59:54 6    knowledge of what she was going to testify to, no Jencks, no

09:59:54 7    reciprocal discovery, so it's perfectly appropriate for us

09:59:54 8    to use the weekend to go back and see what he was saying and

09:59:54 9    rebut that testimony.

09:59:54 10            MR. LOWELL:  I am going to be repetitive, this

09:59:54 11   is a case changing event and it shouldn't be a case changing

09:59:54 12   event where they shoehorn in this.  What is relevant to

09:59:54 13   rebut her perception of him on the 19th can be what?  If he

09:59:54 14   didn't use drugs two weeks before does that rebut her

09:59:54 15   perception?  Six days before we know when he is on crack.

09:59:54 16   He has to do it every twenty minutes according to the

09:59:54 17   testimony.  There is a disconnect, there is an extraordinary

09:59:54 18   disconnect from her saying I saw him, maybe she wants to

09:59:54 19   look at him in blinders, maybe she doesn't say what he does,

09:59:55 20   but that's not --

09:59:55 21            THE COURT:  Yes.  Look.

09:59:55 22            MR. LOWELL:  If you're going to allow all those

09:59:55 23   in, Judge, you're going to allow all those in, but I am

09:59:55 24   saying as clearly as I can --

09:59:55 25            THE COURT:  I understand.  I understand.  I

09:59:55  1    mean --

09:59:55  2              MR. LOWELL:  Look at the prejudice in each one

09:59:55  3    of those messages.

09:59:55  4              THE COURT:  I get it.  I get it.  But it is

09:59:55  5    rebuttal and the standard is is it unfairly prejudicial.

09:59:55  6    And I don't --

09:59:55  7              MR. LOWELL:  How --

09:59:55  8              THE COURT:  How is it not -- how is it unfairly

09:59:55  9    prejudicial, I guess because you're saying he was sober and

09:59:55 10    the stuff about Mookie was a lie, and this is contrary to

09:59:55 11    that?

09:59:55 12              MR. LOWELL:  She didn't see him on the 10th, the

09:59:55 13    11th, the 12th, the 13th, the 14th, and now we know the

09:59:55 14    15th, she doesn't see him until the 19th.  By the way as I

09:59:55 15    said these include people texting him for which he does not

09:59:55 16    text back.  And in this it's including him meeting up with

09:59:55 17    women, not drug dealers.  And that is again something that

09:59:55 18    if this comes in, I have to start exploring and it just

09:59:55 19    changes the focus of the case which we have scrupulously not

09:59:55 20    done.  I see your inclination, but I think you can do this

09:59:55 21    with less.

09:59:55 22              THE COURT:  So what about the point that

09:59:55 23    Mr. Lowell just made which is that some of these he doesn't

09:59:55 24    even respond to?  So these ones on the 9th, they don't seem

09:59:55 25    to be responded to.

09:59:55 1          MR. HINES:  He responds the following day on the

09:59:55 2    tent, meet me at the 7-Eleven now.

09:59:55 3          THE COURT:  There is the 10th from the person.

09:59:55 4          MR. HINES:  Correct.

09:59:55 5          THE COURT:  And then he says can you meet me

09:59:55 6    now.

09:59:55 7          MR. HINES:  Right.  So the first row is the

09:59:55 8    person asking to meet at the 7-Eleven.  The fifth row

09:59:55 9    ultimately the following day Mr. Biden agrees to meet him at

09:59:55 10   the 7-Eleven.  So we could cut out numbers 2, 3, and 4 in

09:59:55 11   the middle.

09:59:55 12         MR. LOWELL:  Number 8, for example, is this guy

09:59:55 13   saying I have to get off at 3:30, we're going all the way

09:59:55 14   back to the tent for what she perceived to the 19th, that's

09:59:55 15   where I'm saying.

09:59:56 16         THE COURT:  The problem is, yes, it's what she

09:59:56 17   perceived to 19th, but the questions were elicited to make

09:59:56 18   it seem like he was doing great from -- I mean, you

09:59:56 19   basically brought her from --

09:59:56 20         MR. LOWELL:  Judge, that's unfair to me, I said

09:59:56 21   she saw him one time in Los Angeles, she does not see him in

09:59:56 22   between, I never suggested as your suggestion to me is that

09:59:56 23   she saw him in between.  There is a point of time in August

09:59:56 24   and a point of time in on October.

09:59:56 25         THE COURT:  Right.  And the reason that it was

09:59:56 1    done was to suggest that this had been a longer period of

09:59:56 2    sobriety.

09:59:56 3            MR. LOWELL:  You're giving me too much credit.

09:59:56 4            MR. WISE:  The question was specifically linking

09:59:56 5    the two.

09:59:56 6            THE COURT:  That's why I took the break.  I

09:59:56 7    wanted to read the transcript.

09:59:56 8            MR. WISE:  He linked the two, it wasn't just one

09:59:56 9    isolated incident.

09:59:56 10           MR. LOWELL:  Was he of the same condition, use

09:59:56 11   whatever the phrase was, I'm prepared to live by the phrase

09:59:56 12   but that doesn't do what this says.  Here as an example, all

09:59:56 13   the texts that he doesn't respond to, the next day, or the

09:59:56 14   next night he says give me ten, please, that's to his

09:59:56 15   daughter, Finnegan.  And he's in Philadelphia.  And that's

09:59:56 16   what I have to start unwinding now because each of these has

09:59:56 17   a different possibility.

09:59:56 18           MR. HINES:  So immediately after he gets this

09:59:56 19   message he responds give me ten, it is to Finnegan, but it's

09:59:56 20   in this response to a message above it to another person.

09:59:56 21           MR. KOLANSKY:  Look at the entire abstract --

09:59:56 22           THE COURT:  You don't talk to each other when

09:59:56 23   I'm here, you talk to me.  So we're taking out 12.

09:59:56 24           MR. LOWELL:  Judge, I'm asking that this is far

09:59:56 25   in excess even for the proposition that you want, and I

09:59:56  1  would -- you seem to be inclined to let them do this, and I

09:59:56  2  think it's wrong.

09:59:56  3          THE COURT:  I understand.  And I -- I understand

09:59:56  4  what the problem is, and I wish we weren't in this

09:59:56  5  situation, but the fact is that I do think it's fair

09:59:56  6  rebuttal, it may be prejudicial, but I don't think it's

09:59:56  7  unfairly prejudicial.

09:59:56  8          MR. LOWELL:  How can it not be unfairly

09:59:56  9  prejudicial to allow texts which most of all of them are not

09:59:56 10  responded to and are misleadingly so when he says ten

09:59:56 11  minutes for more than a week from the time the witness

09:59:56 12  testified that she perceived him as evidence that the way

09:59:57 13  that she perceived him on August the 19th or the 20th is

09:59:57 14  anyway rebuttal by what he was doing five days before.

09:59:57 15          The question in evidence is how she perceived

09:59:57 16  him, not whether he was or was not using.  And it is unfair

09:59:57 17  in another way as you tried to suggest that my question said

09:59:57 18  that she was well aware of how he was from the moment he

09:59:57 19  left Los Angeles all the way to the time she saw him in New

09:59:57 20  York, that is what this does.

09:59:57 21          MR. HINES:  May I offer a proposal?  So there

09:59:57 22  are messages in between the 7-Eleven stamps where the dealer

09:59:57 23  is sending a series of messages in a row and it doesn't

09:59:57 24  relate to 7-Eleven, some of them we can take out to truncate

09:59:57 25  them, we included them so Mr. Lowell could have a full

09:59:57 1    snapshot, we're happy to remove rows 2 through 4.

09:59:57 2                MR. LOWELL:  Need less to say --

09:59:57 3                THE COURT:  You're going to have to --

09:59:57 4                MR. LOWELL:  Go ahead.

09:59:57 5                MR. HINES:  On the following page we've agreed

09:59:57 6    to remove Row 12, we can also remove rows 14, 1516 -- 16

09:59:57 7    through 20, we can delete those.  So all those middle

09:59:57 8    messages with the drug dealer can be taken out.  So it's

09:59:57 9    limited to the set up and the meets on the 7-Eleven.

09:59:57 10               MR. LOWELL:  I'm sorry, which -- it just says --

09:59:57 11               THE COURT:  16 through 21.

09:59:57 12               MR. LOWELL:  And then, Your Honor, 21, this is

09:59:57 13   if guy not saying anything about a 7-Eleven, just --

09:59:57 14               MR. HINES:  He's texting from a new phone number

09:59:57 15   now.

09:59:57 16               MR. LOWELL:  He is, he being Q.

09:59:57 17               MR. HINES:  Correct.  He's texting from a new

09:59:57 18   phone saying I lost my cell and Mr. Biden responds to that

09:59:57 19   later in the evening at 6:41 saying meet me at the 7-Eleven.

09:59:57 20               MR. LOWELL:  Not -- I'll come back to this, then

09:59:57 21   if you're looking about saying meet me at the 7-Eleven at

09:59:57 22   3:00, the one before it is "come on dude, you can do it, the

09:59:57 23   way you invited to my bro to join a private party."

09:59:57 24               I mean, that's the one, then you don't need 21,

09:59:57 25   you need 22 for that, his response.

09:59:57  1          MR. HINES:  I mean, 21 shows it's the same

09:59:57  2  person as the previous messages.

09:59:57  3          MR. LOWELL:  Right, but so does the next one, so

09:59:57  4  does 22.

09:59:57  5          MR. HINES:  He doesn't say my name is Q in 22.

09:59:57  6          MR. LOWELL:  Yeah, but the phone number is

09:59:57  7  exactly the same.

09:59:57  8          MR. HINES:  But it's a different phone number

09:59:57  9  from the messages in the beginning, he changes his phone

09:59:58 10  number so he reaches out to Mr. Biden with his new phone

09:59:58 11  number and says it's Q and Mr. Biden says meet me at the

09:59:58 12  7-Eleven at 3:00.

09:59:58 13          MR. LOWELL:  21 should be in and 22 is out

09:59:58 14  because that's, you're saying you read it for the purposes,

09:59:58 15  it's a guy named Q with a new phone number.

09:59:58 16          MR. HINES:  We can take 22 out.

09:59:58 17          MR. LOWELL:  And then 23, meet me at 7-Eleven,

09:59:58 18  and then the guys says, that's not necessary because you

09:59:58 19  have made your point and then we're back to the ones with

09:59:58 20  Hallie and all the rest are not necessary.

09:59:58 21          MR. HINES:  The other ones are location

09:59:58 22  information showing him in Delaware and at a 7-Eleven.

09:59:58 23          MR. LOWELL:  I haven't checked that location

09:59:58 24  data, Judge, and we have made that 7-Eleven point by what he

09:59:58 25  has just said it does that when he says in his response, and

09:59:58  1    I haven't been able to check this, I don't know that it's

09:59:58  2    necessary.  I stipulated that he was between the -- whatever

09:59:58  3    the date and the date he left in Delaware or wherever he was

09:59:58  4    --

09:59:58  5              THE COURT:  So there were questions asked,

09:59:58  6    somebody, do you know, it might have been the FBI woman, do

09:59:58  7    you know if he was actually at the 7-Eleven.  Maybe it was

09:59:58  8    Ms. Biden.

09:59:58  9              MR. WISE:  It was Special Agent Janssen and

09:59:58 10    Romig, both of them.

09:59:58 11              THE COURT:  Do you know if he was there?  Are

09:59:58 12    you going to contest that he was there?

09:59:58 13              MR. LOWELL:  On the 13th, but not on the 16th I

09:59:58 14    won't contest it if this is accurate, but that's not the

09:59:58 15    same as on the 13th.  I mean, people go to 7-Elevens other

09:59:58 16    than to meet up with people.  I think they sell slurpies, so

09:59:58 17    I don't contest that on the 16th.

09:59:58 18              MR. WISE:  I mean it's highly probative that

09:59:58 19    it's a 7-Eleven on the 16th, it's not just somewhere, it's

09:59:58 20    not that he is in Delaware.

09:59:58 21              MR. LOWELL:  But it's three days later, to say

09:59:58 22    that somebody frequents a 7-Eleven when they're on in

09:59:58 23    Delaware on three days later when he says he was at the

09:59:58 24    7-Eleven, doesn't mean he was at the 7-Eleven, it would be

09:59:58 25    if it was a unique place, I don't know what could be a

09:59:58  1   unique place in downtown Wilmington that would make sense,

09:59:58  2   but to make the leap of what that means on the 16th or 17th

09:59:58  3   means that he was there on the 13th, that's just a leap.

09:59:58  4           MR. WISE:  He's setting up meetings at the

09:59:58  5   7-Eleven, he's not going into to buy ChapStick.

09:59:58  6           MR. HINES:  Just to explain what we're looking

09:59:58  7   at, rows 26 to 28 Mr. Biden is placing himself in Delaware

09:59:58  8   with his communications with Hallie Biden, the address in

09:59:58  9   Greenville is her address, I can't get in, it's not just

09:59:58 10   looking at the following line which advertise 7-Eleven.

09:59:58 11           MR. LOWELL:  Exactly.

09:59:59 12           THE COURT:  So she actually saw him on the 16th.

09:59:59 13           MR. HINES:  So he's saying I'm at her address.

09:59:59 14           MR. LOWELL:  I'm here, I can't get in.

09:59:59 15           MR. HINES:  Right.

09:59:59 16           MR. LOWELL:  So it doesn't mean that he saw, and

09:59:59 17   more importantly, after she says that, he can't get in is

09:59:59 18   when he goes to the 7-Eleven at 4 o'clock in the morning,

09:59:59 19   probably to get coffee.

09:59:59 20           MR. HINES:  So we can delete 26 to 28.  We put

09:59:59 21   them in for clarity, if you're not going to cross on that

09:59:59 22   topic.

09:59:59 23           MR. LOWELL:  25 is already in and therefore it's

09:59:59 24   not rebuttal, that would be cumulative.

09:59:59 25           MR. HINES:  But 25 is reference to 7-Eleven, so

09:59:59 1    that's the one message from the summary chart that we've

09:59:59 2    included here from before for context so the jury

09:59:59 3    understands.

09:59:59 4              MR. WISE:  It's already in evidence.

09:59:59 5              MR. HINES:  So we'll keep 29, we'll keep 30,

09:59:59 6    that also keeps him at the 7-Eleven.

09:59:59 7              MR. LOWELL:  Hold on a second.

09:59:59 8              MR. HINES:  We can delete 31.

09:59:59 9              MR. LOWELL:  It's five minutes apart, we don't

09:59:59 10   need to point out multiple times in the same cup of coffee

09:59:59 11   that he's at the 7-Eleven at 5 or 75 or 7 '07 later.

09:59:59 12             MR. HINES:  That's exactly why, you're calling

09:59:59 13   it a cup of coffee, once I remove that second message you'll

09:59:59 14   call it a drive by so having that is important to show a

09:59:59 15   meet.

09:59:59 16             MR. LOWELL:  Showing a meet.

09:59:59 17             MR. HINES:  Showing he's at the 7-Eleven.

09:59:59 18             MR. LOWELL:  We'll stipulate that he was at the

09:59:59 19   7-Eleven after he can't get into Hallie's house.

09:59:59 20             MR. HINES:  He's still there on Row 30, we'll

09:59:59 21   delete Row 31.

09:59:59 22             MR. LOWELL:  Where he's asking four minutes

09:59:59 23   later, are you up, as if he's waiting for her to be up, not

09:59:59 24   that he's sitting there waiting, he's at the 7-Eleven.

09:59:59 25             MR. HINES:  We'll take it out.  We'll take out

09:59:59  1    Row 32 as well.

09:59:59  2              MR. LOWELL:  I don't see why 30 and 31 is

09:59:59  3    necessary if the point he was there and you see it, I

09:59:59  4    mean --

09:59:59  5              MR. HINES:  29 and 30 establish he was at the

09:59:59  6    7-Eleven.

09:59:59  7              MR. LOWELL:  29 establishes he was at the

09:59:59  8    7-Eleven.

09:59:59  9              MR. HINES:  And 30 establishes he's at the

09:59:59 10    7-Eleven seven minutes later, eight minutes later.

09:59:59 11              MR. LOWELL:  Yeah, with what probative value,

09:59:59 12    that means for sure it means what you want it to mean at

09:59:59 13    five in the morning.

09:59:59 14              THE COURT:  Look.  You're going to say he was

09:59:59 15    getting a cup of coffee and maybe he was getting a cup of

09:59:59 16    coffee, but this is circumstantial evidence that he was --

10:00:00 17              MR. LOWELL:  Why do we need both is what I'm

10:00:00 18    saying, what difference does it make?

10:00:00 19              THE COURT:  Because it's the time.

10:00:00 20              MR. LOWELL:  5:12, four minutes later from

10:00:00 21    Row 29.  How is that probative that he was there for four

10:00:00 22    minutes.

10:00:00 23              MR. HINES:  I think we count differently, seven

10:00:00 24    minutes is the difference in time.

10:00:00 25              MR. LOWELL:  Wait, 5 or 5, 12, you're right my

```
10:00:00  1    math is wrong.
10:00:00  2              THE COURT:  29 and 30, okay.
10:00:00  3              What's next?
10:00:00  4              MR. HINES:  So then we agreed to take out 31,
10:00:00  5    32.
10:00:00  6              MR. LOWELL:  No, I want 32 in.
10:00:00  7              MR. HINES:  All right.  So then we got to go
10:00:00  8    back to the ones that we took out on the previous page.
10:00:00  9              MR. LOWELL:  You took out one on this page, the
10:00:00 10    Judge is saying 29 and 30.
10:00:00 11              MR. HINES:  Look, you just us to take out rows
10:00:00 12    26 through 28 which were messages with Hallie.
10:00:00 13              MR. LOWELL:  Let's do that, then?
10:00:00 14              MR. HINES:  So 26 and 28 are the same thing as
10:00:00 15    32, they're messages with Hallie about trying --
10:00:00 16              MR. LOWELL:  26, 27, 28 is out, 29 you're saying
10:00:00 17    you would keep in.  30 --
10:00:00 18              THE COURT:  Hold on.  26 through 28 are
10:00:00 19    communications with Hallie Biden.
10:00:00 20              MR. HINES:  Correct.
10:00:00 21              THE COURT:  And you're saying if he wants the
10:00:00 22    later communication with Hallie Biden in, you want the
10:00:00 23    earlier communications with Hallie Biden.
10:00:00 24              MR. HINES:  Correct.
10:00:00 25              MR. LOWELL:  Wait.  Starting with 20 --
```

10:00:00  1          THE COURT:  Six.

10:00:00  2          MR. LOWELL:  Yeah, you can put 26 back in.  You

10:00:00  3   can put 27 back in.  Then he goes to 28 out, 29 gets you

10:00:00  4   what you just said you needed, that's where he is at that

10:00:00  5   hour.  And then I still object to 30 because we've made the

10:00:00  6   point.  And then I guess the end of the story is 32, that

10:00:00  7   "are you up" because you have now included the others.

10:00:00  8          MR. HINES:  So the end of the story will be 33

10:00:00  9   because he goes back to the place in the middle of the

10:00:00 10   night.

10:00:00 11          MR. LOWELL:  Wait.  Goes back to -- he's there.

10:00:00 12          MR. HINES:  That's her location in Greenville.

10:00:00 13          MR. LOWELL:  He doesn't leave, there is no

10:00:00 14   indication that Hallie was up and he went there and went

10:00:00 15   back.

10:00:00 16          MR. HINES:  Row 33, Mr. Lowell is Greenville

10:00:00 17   Delaware, that is her specific geolocation information for

10:00:00 18   her residence, so he does go back in the middle of the night

10:00:01 19   and you want us to keep those messages in with Hallie, we're

10:00:01 20   happy to do it, do you want them in or out?

10:00:01 21          MR. LOWELL:  As I said to not get beyond where

10:00:01 22   we are, I take out 32, 33, 34, 35.

10:00:01 23          THE COURT:  You now want 32 out?

10:00:01 24          MR. LOWELL:  Well, to get 32 in which ends where

10:00:01 25   he is, we need to get in that he goes back somewhere else,

10:00:01 1    it's Greenville on 33, it's Greenville on 34, I thought I

10:00:01 2    just heard him say that that means he's at Hallie's, that

10:00:01 3    Greenville is her, Lancaster is 7-Eleven so I don't mind

10:00:01 4    keeping 33 and 34 in if it indicates where he is on those

10:00:01 5    two days.

10:00:01 6              THE COURT:  So 32 to 34 okay.

10:00:01 7              MR. LOWELL:  Yes.

10:00:01 8              MR. HINES:  We can remove 35.

10:00:01 9              MR. LOWELL:  35 is out.  And then --

10:00:01 10             MR. HINES:  We can remove 36, 37.

10:00:01 11             MR. LOWELL:  38 is in New York where there is --

10:00:01 12   and, Your Honor, that is not about as I pointed out before

10:00:01 13   any drug dealing, that's a woman.

10:00:01 14             MR. HINES:  So 38 shows he's in New York on the

10:00:01 15   17th which rebuts Naomi which she says in answer to your

10:00:01 16   question that he was there on October 15th.

10:00:01 17             MR. LOWELL:  Yes, but the problem is to get that

10:00:01 18   point you're actually, can you hang out tonight the

10:00:01 19   inference is with a drug dealer and that's what's improper

10:00:01 20   about it.  That's not what that is.  Use the location data

10:00:01 21   in 39 if that's what you want to point out.

10:00:01 22             MR. HINES:  I mean, it's an admission that he's

10:00:01 23   in New York on the 17th and it rebuts a point that you

10:00:01 24   elicited from Naomi.

10:00:01 25             THE COURT:  He's saying you can rebut it with

10:00:01 1   line 39, it does sort of sound like he's setting up a drug

10:00:01 2   deal, actually I have no idea if he was meeting up with a

10:00:01 3   woman or a drug dealer.

10:00:01 4          MR. LOWELL:  But I have to suggest that with

10:00:01 5   crossing the agent and that opens a door that I don't want

10:00:01 6   to open it's unnecessary.

10:00:01 7          MR. HINES:  We'll delete 38 and we can take out

10:00:01 8   --

10:00:01 9          MR. LOWELL:  40 is the same.  41 would be the

10:00:01 10  same.  I mean, there is no context that on the 18th 19th and

10:00:01 11  20th he's in New York had, these are the dates, they're

10:00:01 12  trying to say let's shoehorn all this because it's she said

10:00:01 13  it's about the 15th and consequently why are we contesting

10:00:01 14  it was the 18th, 19th and 20th?

10:00:01 15         MR. HINES:  It was elicited by you, so we have a

10:00:01 16  right to rebut this.

10:00:01 17         MR. LOWELL:  It's inconsistent with what she

10:00:02 18  said.

10:00:02 19         MR. HINES:  39 is the location but it is the

10:00:02 20  same issue as before, a location on a photo shows that the

10:00:02 21  photo was taken at a certain location, its doesn't show that

10:00:02 22  the person necessarily who was using the device was in that

10:00:02 23  place so these messages confirm, both 30, 29 and 41 show he

10:00:02 24  was at the Four Seasons so it shows his location in New York

10:00:02 25  was accurate on Row 39.

10:00:02 1          MR. LOWELL:  They can say for 30 it's okay to

10:00:02 2   use the location data which doesn't necessarily mean he was

10:00:02 3   there and now they're saying.

10:00:02 4          THE COURT:  No, they're saying it by itself

10:00:02 5   doesn't show he was there, that's why they want the stuff

10:00:02 6   surrounding it.  With respect the one where we said okay,

10:00:02 7   for the location data --

10:00:02 8          MR. LOWELL:  For example --

10:00:02 9          THE COURT:  29 and 30.

10:00:02 10          MR. LOWELL:  That doesn't have the text that

10:00:02 11  confirms that's where it is, it just has the location data,

10:00:02 12  no differently than the location data that they're pointing

10:00:02 13  out where they can get in can you hang out tonight, I'm in

10:00:02 14  New York, that is just not necessary for the proposition and

10:00:02 15  it opens the door and that is unfair prejudice because 39

10:00:02 16  says where he is, it's okay to say where he is.

10:00:02 17          THE COURT:  Here is my question though, you know

10:00:02 18  he's in New York on the 18th right?  Why are we showing he's

10:00:02 19  in New York on the 18th.

10:00:02 20          MR. WISE:  One of the things I brought out on

10:00:02 21  cross is this kind of frenetic erratic attempt to get

10:00:02 22  together after the testimony that he was clear eyed and that

10:00:02 23  is contradicted by that.  And this rebuts the testimony that

10:00:02 24  they had this meeting and he was clear eyed and this shows

10:00:02 25  that he's there and he's not meeting with her and instead

10:00:02  1    he's having people come to his hotel room in the middle of

10:00:02  2    the night.  And I asked her about that and she said she

10:00:02  3    didn't know anything about that.  And this goes to that.

10:00:02  4            MR. LOWELL:  Two different points there, Judge.

10:00:02  5    There is no contest about what's already in, this is now

10:00:02  6    beyond rebuttal.  It's beyond rebuttal.  We know he's in New

10:00:02  7    York.  They've already established what's going on in the

10:00:02  8    middle of the night.  And now they want to introduce

10:00:02  9    something which says can you hang out for the proposition

10:00:02 10    that he's in New York.  If that's not unfair prejudice for

10:00:02 11    the point they're making, then I don't know what is.

10:00:02 12            They don't do that because -- there is no

10:00:03 13    contest that he's there.  And the fact that Hallie -- sorry,

10:00:03 14    that Naomi -- I take it back.  The idea that Naomi and he

10:00:03 15    cannot get together is something that they've pointed out.

10:00:03 16    This does nothing to elucidate or rebut that point, nothing

10:00:03 17    at all, and he's in New York, there is no rebuttal, because

10:00:03 18    we know he's there and she says he's there, and the text and

10:00:03 19    evidence already point out that he's there and he's having

10:00:03 20    this issue with her.

10:00:03 21            By the way I want to state something on the

10:00:03 22    record something that I only alluded to before as long as

10:00:03 23    we're doing this, they asked Naomi Biden in that exchange in

10:00:03 24    the middle of the night, did you know he was, I forgot the

10:00:03 25    exact phrase, but texting, and then ultimately, we didn't

10:00:03 1    have that material, we have gone back and found it over the

10:00:03 2    weekend.   Judge, it was a month later in November and they

10:00:03 3    made her and the jury believe that that's what was happening

10:00:03 4    in that period of time.   And they're yelling, and that's

10:00:03 5    what this is about.

10:00:03 6              THE COURT:   I am going to instruct the jury,

10:00:03 7    once again, I added in the evidence what is and is not

10:00:03 8    evidence, I'm going to tell the jury that any questions are

10:00:03 9    not evidence.

10:00:03 10             MR. LOWELL:   I just wanted the record to show

10:00:03 11   that.

10:00:03 12             MR. WISE:   And I'll say that there are messages

10:00:03 13   both in October with Frankie, and in December.

10:00:03 14             MR. LOWELL:   It's not what you said to Naomi

10:00:03 15   Biden and it's not what you said to the jury.   You said --

10:00:03 16             MR. WISE:   I get yelled at now?

10:00:03 17             MR. LOWELL:   You said in the middle of the night

10:00:03 18   did you --

10:00:03 19             THE COURT:   Again --

10:00:03 20             MR. LOWELL:   That's not what they said, and the

10:00:03 21   idea.

10:00:03 22             THE COURT:

10:00:03 23             MR. HINES:   Now you get yelled at.

10:00:03 24             MR. LOWELL:   You didn't say it, they said it.

10:00:03 25             MR. WISE:   Your Honor, just on the rebuttal

10:00:03  1  points, Mr. Lowell then elicited on redirect on the reason

10:00:03  2  you weren't getting together was because you were too busy

10:00:03  3  with court or whatever, this goes to show that's not the

10:00:03  4  case.

10:00:03  5         MR. LOWELL:  Well, it doesn't say -- actually

10:00:03  6  you're wrong, it says can you hang out, there is no response

10:00:03  7  that the person came.

10:00:03  8         THE COURT:  All right.  I think it's rebuttal.

10:00:03  9  What about these last two.

10:00:03 10         MR. HINES:  We can delete these last 2, 42 and

10:00:03 11  43.

10:00:03 12         MR. LOWELL:  Wait, can you leave out in New

10:00:03 13  York, I thought that was out.

10:00:03 14         THE COURT:  No, it was again because of her

10:00:04 15  schedule, not his, so I'm going to let that in.

10:00:04 16         All right.  What 62 what about 39?  39 is

10:00:04 17  unnecessary, then.

10:00:04 18         MR. HINES:  We can take out -- no, 39 is

10:00:04 19  necessary.

10:00:04 20         THE COURT:  We have 39, 40, 41, can we take out

10:00:04 21  42 and 43?

10:00:04 22         MR. LOWELL:  41, 42 and 43.

10:00:04 23         MR. HINES:  Take out 42 and 43.

10:00:04 24         MR. LOWELL:  40, 41 -- we don't need room 810.

10:00:04 25  Judge, that is a woman.  And I don't get it, we're putting

10:00:04 1    in can you hang out already, that's kind of enough.

10:00:04 2              THE COURT:  I thought we took "can you hang

10:00:04 3    out," out.

10:00:04 4              MR. LOWELL:  Yes, it's out.

10:00:04 5              MR. HINES:  I think that's in because it shows

10:00:04 6    he's in New York.

10:00:04 7              MR. LOWELL:  No, the location data in number 39,

10:00:04 8    which is in the afternoon of 12:36 is beyond the point of

10:00:04 9    what's happening on the 17th in the middle of the night,

10:00:04 10   there is no contest by the 18th at 12:36, if you want that,

10:00:04 11   fine, but hang out tonight.  Judge, what would I have to do

10:00:04 12   to try to clear up that that's not a drug deal?  I would

10:00:04 13   have to ask her something she does or does not know.  Agent,

10:00:04 14   do you know whether he was meeting with somebody for drugs

10:00:04 15   or for a woman to have sex with?  And I don't want to have

10:00:04 16   to do that.

10:00:04 17             THE COURT:  All right.  I'm sorry, I had 38 was

10:00:04 18   out.

10:00:04 19             MR. LOWELL:  38 is out.  So did I, that's why.

10:00:04 20             THE COURT:  But I'm going to let 39, 40 and 41?

10:00:04 21             MR. LOWELL:  40 and 41, that's out, you're

10:00:04 22   putting it back in.

10:00:04 23             THE COURT:  I never took it out.  I have no

10:00:04 24   cross out marks on here.  I took out 42 and 43.

10:00:04 25             MR. LOWELL:  Right.  But 41 is room 810, 41 has

10:00:04  1   been, that's the same issue as the one above, it's not a

10:00:04  2   drug deal.  And I have to do the same for that as I would

10:00:04  3   have to do for that, and then the next one, call me is.

10:00:04  4           THE COURT:  Call me is kind of point less, but

10:00:04  5   whatever.

10:00:04  6           MR. LOWELL:  How can I -- what do I deal with

10:00:04  7   with Room 810 at Four Seasons, why is that relevant to the

10:00:04  8   rebuttal point, the rebuttal point is he's in New York,

10:00:04  9   that's not what he said as to why he can't be seen, they've

10:00:04 10   already established that, that is as prejudicial as 38 when

10:00:04 11   you say Room 810 at The Four Seasons, I can't possible deal

10:00:04 12   with that, that's something I don't want them to have to

10:00:04 13   open the door for unless they want to have him tried for

10:00:04 14   using a prostitute, that's just wrong.  How could that not

10:00:04 15   be what you used the phrase unfair prejudice beyond the

10:00:04 16   probative value in rebuttal, they got what they needed in

10:00:04 17   the location.

10:00:05 18           THE COURT:  Do you want to respond?

10:00:05 19           MR. HINES:  I think we have argued this

10:00:05 20   significantly.  It shows he is in New York.  It has zero

10:00:05 21   location information, in New York, the message Room 810 at

10:00:05 22   The Four Seasons is not unduly prejudicial, we're not going

10:00:05 23   to be suggesting he's leaving with a prostitutes or whatever

10:00:05 24   Mr. Lowell is saying, there is no evidence that is what he

10:00:05 25   is doing in these messages, I think it's fine --

10:00:05 1          THE COURT:  The jury can decide whether -- so 2,

10:00:05 2  3, 4 out.  12 out.  14, 15, 16, 17, 18, 19, 20, out.  22,

10:00:05 3  out.  24, out.

10:00:05 4          MR. LOWELL:  I'm sorry, what about 23 -- okay,

10:00:05 5  24 out.

10:00:05 6          THE COURT:  28 out.

10:00:05 7          MR. LOWELL:  No, 26, 27, 28, they said were out.

10:00:05 8          THE COURT:  So are we in with Hallie's house or

10:00:05 9  out?

10:00:05 10          MR. HINES:  We're okay with out, but Mr. Lowell

10:00:05 11  is reversed on the following page and then he asked for

10:00:05 12  these to stay back in.

10:00:05 13          THE COURT:  The question is 32 goes with 26 and

10:00:05 14  27, either all in or all out.

10:00:05 15          MR. LOWELL:  26 and 27 are in, I'm sorry.  28

10:00:05 16  you said was out.  30 is his geolocation at the 7-Eleven.

10:00:05 17          THE COURT:  So 29 and 30 are in.

10:00:05 18          MR. HINES:  I'm sorry, what did we say about 26

10:00:05 19  through 28?

10:00:05 20          MR. LOWELL:  We said 26 is in.  27 is in.

10:00:05 21          THE COURT:  And then you don't need 28, right?

10:00:05 22  Or do you need 28, it's at her house.

10:00:05 23          MR. HINES:  We do because it shows that he does

10:00:05 24  go back there.

10:00:05 25          MR. LOWELL:  Goes back to Hallie's house.

10:00:05 1              THE COURT:  26, 27, 28, 29, 30 are in.

10:00:05 2              MR. LOWELL:  I'm sorry, 29 is that -- okay, 29

10:00:05 3    is in.  30?

10:00:05 4              THE COURT:  Is in?

10:00:05 5              MR. LOWELL:  31 is out.

10:00:05 6              THE COURT:  31 is out.

10:00:05 7              MR. LOWELL:  What did we decide about 32?

10:00:05 8              THE COURT:  I thought you wanted it in.

10:00:05 9              MR. LOWELL:  Right the other ones are in, are

10:00:05 10   you up?

10:00:05 11             THE COURT:  35 is out.

10:00:05 12             MR. LOWELL:  33 is out.

10:00:05 13             THE COURT:  No.

10:00:05 14             MR. LOWELL:  33 is in because he's with Hallie.

10:00:05 15             THE COURT:  Yes.

10:00:05 16             MR. LOWELL:  34 he's still with Hallie.

10:00:05 17             THE COURT:  35 is out.

10:00:05 18             MR. LOWELL:  36 is out.  37 is out.  38 is out.

10:00:05 19             MR. WISE:  Why don't we let you do it?

10:00:05 20             THE COURT:  Are you ruling?

10:00:05 21             MR. LOWELL:  No, I'm checking.  I'm checking.

10:00:05 22             THE COURT:  All right.  39, 40, 41 are in.  42

10:00:05 23   and 43 are out.

10:00:05 24             MR. LOWELL:  Room 810 after you just got can you

10:00:05 25   hang out, I thought that one is out.  They get 40 in.  38 is

10:00:06  1    out.  So why if 38 is out, 40 is in, if it's the same

10:00:06  2    problem when they have the location data in between that

10:00:06  3    tells where he is.

10:00:06  4              THE COURT:  I think the difference is 38 -- 38

10:00:06  5    says -- well, he says he's in New York, I don't remember why

10:00:06  6    we're putting that out.  But 39 you have the location data

10:00:06  7    plus you have additional support for the fact that he was

10:00:06  8    there at that location in the message.

10:00:06  9              MR. HINES:  Correct.

10:00:06 10              MR. LOWELL:  So tell me what -- I'm sorry, now

10:00:06 11    I'm confused.  38 we decided is out.

10:00:06 12              THE COURT:  Yes.  I don't know why, if you want

10:00:06 13    it in, we can put it in, but they agreed to take it out, so

10:00:06 14    I was not fighting with people who want to take things out.

10:00:06 15              MR. LOWELL:  Right.  And then 40 that says Room

10:00:06 16    810.

10:00:06 17              THE COURT:  Four Seasons because it is the

10:00:06 18    location data, 58th and Madison at The Four Seasons and

10:00:06 19    that's additional evidence.  I don't know what the call me

10:00:06 20    does for you.

10:00:06 21              MR. LOWELL:  Can you redact Room 810 and just

10:00:06 22    say Four Seasons to confirm that, what room is just

10:00:06 23    unnecessary, just redact that that says what room is he in,

10:00:06 24    if the point that they say is to corroborate the location

10:00:06 25    data, that does it.

10:00:06 1                THE COURT:  I'm going to leave the room in, but

10:00:06 2  do you need 41?

10:00:06 3                MR. HINES:  No.

10:00:06 4                THE COURT:  Take out 41.

10:00:06 5                MR. LOWELL:  42 and 43.

10:00:06 6                THE COURT:  Yes.

10:00:06 7                MR. HINES:  We'll need about five minutes to

10:00:06 8  update this summary chart.

10:00:06 9                THE COURT:  All right.  Do you want me to do

10:00:06 10  this colloquy of your client on not testifying?

10:00:06 11                MR. LOWELL:  Do you need to do that, can I just

10:00:06 12  state it when I rest?

10:00:06 13                MR. HINES:  No.

10:00:06 14                MR. WISE:  No we need the colloquy.

10:00:06 15                THE COURT:  I think we need the colloquy.  Can

10:00:06 16  you just bring him up here?

10:00:06 17                MR. LOWELL:  Yes.  Can I do that now?

10:00:06 18                THE COURT:  All right.  So I have to do this

10:00:06 19  colloquy just to make sure that you knowingly decided not to

10:00:06 20  testify.  Okay?

10:00:06 21                THE DEFENDANT:  Yes.

10:00:06 22                THE COURT:  You understand you have the right to

10:00:06 23  testify in your own defense?

10:00:06 24                THE DEFENDANT:  I do.

10:00:06 25                THE COURT:  If you don't testify, you understand

10:00:06 1    your decision not to testify cannot be held against you and

10:00:06 2    I will instruct the jury to that effect?

10:00:06 3                    THE DEFENDANT:  Agreed.

10:00:06 4                    THE COURT:  It's your decision and yours alone

10:00:06 5    to make, do you understand that?

10:00:06 6                    THE DEFENDANT:  I do.

10:00:06 7                    THE COURT:  It's not your attorney's decision,

10:00:06 8    it's not the government's decision, it's not my decision,

10:00:06 9    you understand all that?

10:00:06 10                   THE DEFENDANT:  I do.

10:00:06 11                   THE COURT:  I do these for lots of different

10:00:06 12   folks, so I understand you're a lawyer, but I'm going to do

10:00:06 13   it anyway.

10:00:06 14                   Did you make a decision not to testify

10:00:06 15   voluntarily?

10:00:06 16                   THE DEFENDANT:  I did.

10:00:06 17                   THE COURT:  Did anyone threaten you or force you

10:00:07 18   to make that decision?

10:00:07 19                   THE DEFENDANT:  No.

10:00:07 20                   THE COURT:  Do you feel like you're being

10:00:07 21   pressured not to testify against your own will?

10:00:07 22                   THE DEFENDANT:  No.

10:00:07 23                   THE COURT:  Have you discussed if you should

10:00:07 24   testify with your counsel?

10:00:07 25                   THE DEFENDANT:  I have.

10:00:07  1          THE COURT:  Are you satisfied with the advice

10:00:07  2    and representation you have gotten from him?

10:00:07  3          THE DEFENDANT:  Yes.

10:00:07  4          THE COURT:  Anything else?

10:00:07  5          MR. LOWELL:  No.

10:00:07  6          THE COURT:  Anything else?

10:00:07  7          MR. HINES:  No.

10:00:07  8          THE COURT:  All right.  Thank you very much.

10:00:07  9          The other thing I was going to do is what I

10:00:07 10    typically do for when we start closing is just to minimize

10:00:07 11    disruption, I have them close off the doors, lock the doors,

10:00:07 12    and anyone else who comes and goes will be in the overflow

10:00:07 13    room.  Any problems with that?

10:00:07 14          MR. LOWELL:  No, I think if that's Your Honor's

10:00:07 15    practice.

10:00:07 16          MR. HINES:  We have no issue with that.

10:00:07 17          MR. LOWELL:  A couple things at the bench just

10:00:07 18    to have time saving, please.  First, so we'll fix this.

10:00:07 19    Then Agent Jensen will get to stand, we'll cross her as much

10:00:07 20    as I am able on this.  But before that, I have to rest, I

10:00:07 21    have to renew my Rule 29, the material, and I expect you

10:00:07 22    will say you reserve as you did, but I need to do that.

10:00:07 23          THE COURT:  Absolutely.

10:00:07 24          MR. LOWELL:  And then I have this one issue, did

10:00:07 25    you check in terms of before I rest, I have to move in your

10:00:07  1    Exhibit 31 A if you said it hasn't been.

10:00:07  2              MR. HINES:  That's fine, we have no objection.

10:00:07  3              MR. LOWELL:  Can we do that now, is that

10:00:07  4    already --

10:00:07  5              THE COURT:  It's admitted.

10:00:07  6              MR. LOWELL:  So without any objection, we have

10:00:07  7    moved in government Exhibit 31A so I don't have do that.

10:00:07  8              THE COURT:  Admitted.

10:00:07  9              (Government Exhibit No. 31A was admitted into

10:00:07 10    evidence.)

10:00:07 11              MR. LOWELL:  Anything else I missed?  No, I

10:00:07 12    don't want to do that.  He's good.  I think that's it.

10:00:07 13              THE COURT:  Okay.  So that's all fine, you can

10:00:07 14    do all of that -- so you haven't rested yet, so you can't

10:00:07 15    make your motion.

10:00:07 16              MR. LOWELL:  I haven't rested yet, but I can't

10:00:07 17    make my motion.  I guess for the purposes --

10:00:07 18              THE COURT:  You can just say Your Honor, I renew

10:00:07 19    my motion, and I'll say thank you, I reserve.

10:00:07 20              MR. LOWELL:  Okay.  And then timing wise, how do

10:00:07 21    we do this, it's 10:00, so this will take a little time for

10:00:07 22    their rebuttal case, do they rest again, I have forgotten --

10:00:07 23              MR. HINES:  I'm sorry?

10:00:07 24              MR. LOWELL:  Do you rest after you do a rebuttal

10:00:07 25    case, I don't know that you say that on a rebuttal case, I

10:00:07  1    don't think so.  Where do we go from there?

10:00:07  2              THE COURT:  What I typically do, I typically do

10:00:07  3    jury instructions first.

10:00:07  4              MR. LOWELL:  I thought you said last.

10:00:07  5              THE COURT:  What I usually do is jury

10:00:07  6    instructions up to the point where I tell the jury what they

10:00:07  7    have to do when they go back into the jury room.

10:00:07  8              MR. LOWELL:  It would be my request that you do

10:00:07  9    the jury instructions at one time in a continuous basis

10:00:07 10    after argument.  I saw that in your materials somewhere,

10:00:08 11    that's what -- is there any good reason not, let the lawyers

10:00:08 12    talk and then you instruct them what the lawyers say

10:00:08 13    afterwards before we open our mouths or would it be better

10:00:08 14    afterwards after we argue?

10:00:08 15              THE COURT:  Okay.  Look, I'm fine with that.

10:00:08 16              MR. LOWELL:  And then lastly, in terms of the

10:00:08 17    timing of the rest of the day, it might make sense depending

10:00:08 18    on how long they are for them to do theirs, there should be

10:00:08 19    a break.  I don't want to be interrupted for a lunch break

10:00:08 20    for example, for closing, I don't know how all that's going

10:00:08 21    to play out time wise.

10:00:08 22              THE COURT:  Let's figure out where we are.

10:00:08 23              MR. LOWELL:  Thank you.

10:00:08 24              (End of side-bar.)

10:00:08 25              COURT CLERK:  All rise.

| | | |
|---|---|---|
| 10:00:08 | 1 | (A brief recess was taken.) |
| 10:28:31 | 2 | COURTROOM DEPUTY:  All rise. |
| 10:28:34 | 3 | THE COURT:  All right.  Bring the jury in. |
| 10:28:47 | 4 | (Jury entering the courtroom at 10:28 a.m.) |
| 10:29:05 | 5 | THE COURT:  All right, everyone.  Welcome back. |
| 10:29:07 | 6 | Please be seated. |
| 10:29:08 | 7 | All right.  Members of the jury, I hope you |
| 10:29:11 | 8 | enjoyed your weekend.  I have to ask you questions because |
| 10:29:15 | 9 | it wouldn't be morning if I didn't ask you these questions. |
| 10:29:18 | 10 | So, did anyone talk to anyone about this case or anyone |
| 10:29:21 | 11 | involved in this case over the weekend? |
| 10:29:24 | 12 | JURY:  No. |
| 10:29:24 | 13 | THE COURT:  All right.  Did anyone try and talk |
| 10:29:26 | 14 | to you about this case or anyone involved in this case? |
| 10:29:30 | 15 | JURY:  No. |
| 10:29:31 | 16 | THE COURT:  All right.  Were you present when |
| 10:29:33 | 17 | other people were talking about this case or anyone involved |
| 10:29:36 | 18 | in this case? |
| 10:29:37 | 19 | JURY:  No. |
| 10:29:38 | 20 | THE COURT:  Did you read anything about this |
| 10:29:40 | 21 | case? |
| 10:29:41 | 22 | JURY:  No. |
| 10:29:42 | 23 | THE COURT:  Well, watch anything on TV, listen |
| 10:29:45 | 24 | to anything on the radio, the internet or podcasts or |
| 10:29:48 | 25 | whatever? |

Jensen - direct - rebuttal

| | | |
|---|---|---|
| 10:29:49 | 1 | JURY:  No. |
| 10:29:49 | 2 | THE COURT:  All right.  And did you do any |
| 10:29:51 | 3 | research on this case? |
| 10:29:53 | 4 | JURY:  No. |
| 10:29:53 | 5 | THE COURT:  All right.  Thank you so much. |
| 10:29:56 | 6 | We're in the home stretch here. |
| 10:29:59 | 7 | Mr. Lowell. |
| 10:30:01 | 8 | MR. LOWELL:  Thank you, Your Honor.  Good |
| 10:30:03 | 9 | morning, ladies and gentlemen. |
| 10:30:04 | 10 | On the completion of what we did on Friday, |
| 10:30:13 | 11 | Mr. Biden rests his case with the admission of that exhibit. |
| 10:30:17 | 12 | And we renew our previous motion. |
| 10:30:20 | 13 | THE COURT:  All right.  Thank you very much.  I |
| 10:30:22 | 14 | will reserve on that. |
| 10:30:24 | 15 | Mr. Hines, anything from the government? |
| 10:30:26 | 16 | MR. HINES:  Yes.  In rebuttal, Your Honor, the |
| 10:30:29 | 17 | United States calls Special Agent Erika Jensen. |
| 10:30:36 | 18 | THE COURT:  Special Agent Jensen, I'll just |
| 10:30:38 | 19 | remind you you're still under oath. |
| 10:30:45 | 20 | THE WITNESS:  Yes. |
| 10:30:46 | 21 | DIRECT EXAMINATION |
| 10:30:46 | 22 | BY MR. HINES: |
| 10:30:48 | 23 | Q.    Agent Jensen, Naomi Biden testified on Friday, |
| 10:30:51 | 24 | correct? |
| 10:30:51 | 25 | A.    Yes. |

Jensen - direct - rebuttal

10:30:51  1    Q.       And during her testimony, was she asked when the

10:30:56  2    defendant drove a truck up, if she recalled about what day

10:30:59  3    it was in October, was that October 15th?

10:31:02  4                MR. LOWELL:  Objection, Your Honor, it misstates

10:31:04  5    the evidence, it was that he drove the Cadillac up.

10:31:09  6                MR. HINES:  Rephrase.

10:31:11  7    BY MR. HINES:

10:31:11  8    Q.       Was Ms. Biden asked when he drove it up, do you

10:31:15  9    recall about what day it was in October, was it

10:31:18 10    October 15th?

10:31:19 11    A.       Yes.

10:31:19 12    Q.       And did Ms. Biden answer, "yeah"?

10:31:21 13    A.       Yes.

10:31:22 14    Q.       Over the course of the weekend, did you do anything

10:31:26 15    to investigate when, in fact, Mr. Biden was -- went up to

10:31:31 16    New York?

10:31:31 17    A.       Yes.  I took a look at both the banking data and the

10:31:35 18    extraction reports to see if I could get any further

10:31:39 19    information about where Mr. Biden was, in particular on

10:31:44 20    these days to try to frame out the sequence as best I could.

10:31:48 21    Q.       Did your review of that data show that he was still

10:31:52 22    in Delaware on October 16th, 2018?

10:31:54 23    A.       Yes.

10:31:55 24    Q.       Specifically, did you identify information in the

10:31:58 25    back ups showing a 7-Eleven location that was associated

Jensen - direct - rebuttal

10:32:04  1    with a photograph, movies, on his phone?

10:32:08  2    A.      Yes.

10:32:09  3    Q.      That 7-Eleven location, did you look for more

10:32:13  4    messages to corroborate whether in fact Mr. Biden went to

10:32:17  5    that 7-Eleven in that week prior?

10:32:18  6    A.      Yes.

10:32:19  7    Q.      Did you prepare a summary chart limited to that sort

10:32:22  8    of information during that week prior to his trip to New

10:32:29  9    York and his trip to New York?

10:32:30 10    A.      Yes.

10:32:31 11    Q.      Is that summary chart Government's Exhibit 125A?

10:32:43 12    A.      Yes.

10:32:44 13            MR. HINES:  Move for the admission of 125A.

10:32:47 14            THE COURT:  No further.

10:32:48 15            MR. LOWELL:  No further.

10:32:49 16            THE COURT:  All right.  Thank you.  It's

10:32:50 17    admitted.

10:32:51 18            (Government's Exhibit No. 125A was admitted into

10:32:52 19    evidence.)

10:32:52 20    BY MR. HINES:

10:32:53 21    Q.      All right.  So the first row we're going to look at

10:32:55 22    is actually Row 29 and 30, Ms. Vo on page 3, you can pull up

10:33:06 23    rows 29 and 30.  What do rows 29 and 30 in the summary chart

10:33:12 24    show?

10:33:13 25    A.      So this is pulled from one of the extraction reports

Jensen - direct - rebuttal

10:33:18  1    and what it shows is there was, it was either a movie or an

10:33:24  2    image, it's something with the way Apple saved the data, but

10:33:28  3    it included location data, and the location if you would put

10:33:31  4    that 39.7 minus 75 in Google Maps, it will pull up a

10:33:36  5    location.  And those locations when I put them in the map

10:33:39  6    came up as 7-Eleven, either right at or right next to the

10:33:44  7    7-Eleven in Wilmington at the corner of Lancaster and

10:33:49  8    Greenhill, I think.

10:33:50  9    Q.    So just based on the fact that the movies depict that

10:33:54 10    location, can you tell definitively if the defendant was in

10:33:59 11    fact at that 7-Eleven at that time?

10:34:01 12    A.    No.

10:34:01 13    Q.    Did you look at other evidence to see whether the

10:34:05 14    defendant frequented that location prior to this date?

10:34:07 15    A.    Yes.

10:34:08 16    Q.    We're going to start at the beginning of the chart,

10:34:12 17    Row 1.  Does page 1 include some of the messages showing

10:34:19 18    references to 7-Eleven?

10:34:20 19    A.    Yes.

10:34:21 20    Q.    What is the date of the first message that you pulled

10:34:25 21    on this exhibit?

10:34:26 22    A.    The earliest message is dated October 9th, 2018.

10:34:30 23    Q.    That's three days prior to the gun purchase, correct?

10:34:35 24    A.    Yes.

10:34:35 25    Q.    What is shown in the first row, can you please

Jensen - direct - rebuttal

10:34:40  1    describe that message?

10:34:40  2    A.      Sure.  So it's again, like the other summary chart

10:34:44  3    with the date, the time is actually UTC time, so it's a

10:34:47  4    little bit off by four hours, it shows a date and time, who

10:34:51  5    the message is from, the telephone number in this case, who

10:34:54  6    the message was to, and then what we are looking at when you

10:34:58  7    see the SMS, you're looking at the actual content from the

10:35:02  8    extraction report and that shows the very same thing, in the

10:35:05  9    very bottom is the contents of the message.

10:35:07 10    Q.      And does the 302 number send a message to the

10:35:11 11    defendant?

10:35:11 12    A.      Yes.

10:35:12 13    Q.      And what does the message read?

10:35:14 14    A.      It says, "hey, this junior the one you got that at

10:35:18 15    the 7-Eleven."

10:35:20 16    Q.      Now the following day, does the defendant on

10:35:24 17    October 10th, 2018, write back to that 302 number?

10:35:28 18    A.      Yes.

10:35:29 19    Q.      And what does the defendant say?

10:35:34 20    A.      So this message is from the defendant to that 302

10:35:38 21    number and it says "can you meet me at 7-Eleven now?"

10:35:42 22    Q.      And then what is the following message on Row 6?

10:35:47 23    A.      It's a response almost immediately saying "I BWT off

10:35:53 24    at 330."

10:35:55 25    Q.      And then how does the defendant respond?

Case 1:23-cr-00061-MN    Document 260    Filed 08/12/24    Page 66 of 214 PageID #: 4942
1273
Jensen - direct - rebuttal

10:35:58  1    A.       Question mark.

10:35:59  2    Q.       And then how does the 302 number reply?

10:36:03  3    A.       "I have get off at 330 I can call you when I am on my

10:36:09  4    way."

10:36:10  5    Q.       The time reference there to 3:30, I note the column

10:36:17  6    on the left says 4:49 p.m., what does 4:49 p.m. reflect?

10:36:22  7    A.       That would be UTC time, so that would be four hours

10:36:25  8    later than eastern time for the time it was in Wilmington.

10:36:28  9    It would have been before 3:30 when he sent that message.

10:36:32 10    Q.       Turning to Row 9, how does the defendant respond?

10:36:36 11    A.       With a "K".

10:36:39 12    Q.       And then how does the 30 number reply?

10:36:44 13    A.       Almost at the exact same time, "IGHT".

10:36:51 14    Q.       What does the 302 number say?

10:36:53 15    A.       "You want the same."

10:36:55 16    Q.       So this is October 10th, two days prior to the gun

10:36:59 17    purchase; correct?

10:37:00 18    A.       Yes.

10:37:01 19    Q.       Now the following day, October 11th, did you identify

10:37:04 20    another message with this same individual?

10:37:07 21    A.       Yes.

10:37:07 22    Q.       What does that message say?

10:37:09 23    A.       It says "it's Q, I'm at 7-Eleven now."

10:37:15 24    Q.       The 302 number, perhaps Q, is sending this to Hunter

10:37:19 25    Biden?

Jensen - direct - rebuttal

10:37:19  1    A.      Yes.

10:37:20  2    Q.      On this same day, October 11th, does the 302 number

10:37:25  3    send another message in Row 21?

10:37:27  4    A.      Yes.  Some number of hours later, eight hours later

10:37:33  5    or nine.  It says "yo, it's Q (smiley face).  Hoping my

10:37:39  6    texts reached you.  Already lost cell.  This number is a

10:37:44  7    contact number for me, feel free to hit me back...."

10:37:48  8    Q.      So the 302 number in Row 13 and the 302 number in

10:37:52  9    number 21 are different numbers, correct?

10:37:54 10    A.      Yes.

10:37:55 11    Q.      But the person who is sending the message identifies

10:37:59 12    himself as Q in both messages, correct?

10:38:01 13    A.      Yes.

10:38:01 14    Q.      Turning to Row 23 on this same date, October 11th,

10:38:05 15    does the defendant respond to the 302 number that ends in

10:38:11 16    9246?

10:38:12 17    A.      Yes.

10:38:13 18    Q.      What does the defendant say?

10:38:15 19    A.      "Meet me 7-Eleven at three."

10:38:18 20    Q.      Again the time stamp is 6:41 p.m.  How does that

10:38:22 21    correlate to what the actual time is that day?

10:38:25 22    A.      So it would be four hours earlier.  So it would be

10:38:30 23    4:03.

10:38:33 24    Q.      The message would have been sent at 2:41 once you do

10:38:37 25    the conversion?

Jensen - direct - rebuttal

10:38:38  1    A.      Yes.

10:38:39  2    Q.      Turning to Row 25, in the course of looking for

10:38:42  3    messages identifying 7-Eleven to see if the defendant

10:38:46  4    frequented that location, was there also a message that we

10:38:50  5    had utilized in your previous summary chart that referenced

10:38:53  6    7-Eleven?

10:38:54  7    A.      Yes.

10:38:54  8    Q.      And just for reference, what does that message say in

10:38:57  9    Row 25 and who is it sent by?

10:38:59  10   A.      This message is sent by Mr. Biden to Hallie Biden, it

10:39:06  11   says "yes Bernard who hangs at 7-Eleven on Greenhill and

10:39:10  12   Lancaster.  I'm now off MD Avenue behind Blue Rocks Stadium

10:39:15  13   waiting for a dealer named Mookie."

10:39:18  14   Q.      So there are messages in which the defendant was

10:39:20  15   referencing 7-Eleven both before and now after the gun

10:39:24  16   purchase, is that right?

10:39:24  17   A.      Yes.

10:39:25  18   Q.      Turning to October 16th, did you find additional

10:39:34  19   messages in these next rows that show the defendant in

10:39:36  20   Delaware?

10:39:36  21   A.      Yes.

10:39:37  22   Q.      What does Row 26 say?

10:39:39  23   A.      Row 26 is at, this now is the correct time, so the

10:39:45  24   bubble will have the UTC minus four, so this is 2:19 a.m.,

10:39:50  25   and it's from Mr. Biden to Hallie Biden on the 16th, it says

Jensen - direct - rebuttal

10:39:55  1    "I'm almost there."  And then maybe over an hour later,

10:40:00  2    there is a message again saying, "I'm here.  Can't get in."

10:40:05  3    Q.       Now turning to page 3, Row 28, did you identify

10:40:10  4    location information, which put him in the vicinity of

10:40:14  5    Hallie Biden's residence?

10:40:16  6    A.       Yeah, this first one is at 4:16, it's the earliest

10:40:20  7    one I could find, it does show the location in the vicinity.

10:40:24  8    Q.       And that's in the middle of the night at 4:16 a.m.;

10:40:28  9    correct?

10:40:28 10    A.       At this point it's 4:16 a.m.

10:40:32 11    Q.       Now turning to the next row, Row 29, from Ms. Biden's

10:40:38 12    house, where does the location information show that

10:40:43 13    Mr. Biden's phone went?

10:40:45 14    A.       So, that changes at 5:05 a.m., with a different GPS

10:40:52 15    coordinate, so when I map those, it came up at a 7-Eleven.

10:40:58 16    Q.       And turning to the next row, Row 30, is this

10:41:03 17    approximately seven minutes later, another movie that has a

10:41:08 18    geolocation information placing it at the 7-Eleven?

10:41:12 19    A.       Yes.

10:41:13 20    Q.       And that 7-Eleven is on Lancaster Avenue, correct?

10:41:19 21    A.       Yes, that's the intersection of Lancaster and

10:41:23 22    Greenhill in Wilmington.

10:41:27 23    Q.       Then does the defendant send a message in Row 32?

10:41:31 24    A.       Yes.

10:41:32 25    Q.       What does the message say and who is it sent to?

Jensen - direct - rebuttal

10:41:36 1  A.      Mr. Biden sent a message to Hallie Biden saying "are

10:41:40 2  you up?"

10:41:42 3  Q.      This is at approximately 5:41 in the morning?

10:41:45 4  A.      Yes, correct.

10:41:45 5  Q.      The next row, Row 33, what does Row 33 show?

10:41:49 6  A.      This is a couple of more items of location data,

10:41:52 7  either an image or a movie file and they both indicated back

10:41:57 8  to her, the vicinity of her residence.

10:42:00 9  Q.      So the testimony we heard Friday about October 15th,

10:42:03 10 in fact Mr. Biden was still in Delaware on October 16th, is

10:42:08 11 that right?

10:42:08 12 A.      Yes, this data, along with financial data, indicated

10:42:12 13 that he was still in the greater Wilmington area.

10:42:15 14 Q.      Now, rows 33 and 34 show he's in the vicinity of

10:42:21 15 Ms. Biden's residence in Greenville, Delaware, is that

10:42:25 16 correct?

10:42:25 17 A.      Yes.

10:42:25 18 Q.      Turning to Row 39, were you able to identify

10:42:28 19 information from the defendant's devices that showed when he

10:42:33 20 in fact went up to New York?

10:42:34 21 A.      Yes, and again the data is a combination of both the

10:42:37 22 financial and the location data and other messages.

10:42:47 23 Q.      What does Row 39 show?

10:42:48 24 A.      So this is a location point when you map it, it comes

10:42:53 25 out to be 58th and Madison Avenue, New York at 1018, 12:36

Jensen - cross - rebuttal

10:43:04  1   p.m., that's adjacent to what's now the Midtown, Four

10:43:08  2   Seasons hotel is closed.

10:43:10  3   Q.      What does the defendant say in Row 40?

10:43:14  4   A.      So this is a little bit earlier in the day, it was

10:43:18  5   reversed chronologically, but room 810, Four Seasons.

10:43:24  6   Q.      With respect to the 7-Eleven.  With respect to the

10:43:27  7   7-Eleven that we identified in the summary chart, in his

10:43:32  8   book, did the defendant also reference meeting individuals

10:43:35  9   in front of 7-Eleven's?

10:43:37 10   A.      Yes.

10:43:37 11   Q.      Turning to Exhibit 19, page 208, directing your

10:43:43 12   attention to the final paragraph, does Mr. Biden state "no

10:43:48 13   dealer works off a user's urgent time table, so you arrange

10:43:53 14   to meet in front of a 7-Eleven on such and such street, and

10:43:57 15   then sit in your car and wait"?

10:43:58 16   A.      Yes.

10:43:59 17                MR. HINES:  No further questions, Your Honor.

10:44:01 18                THE COURT:  Thank you.  Cross-examine, rebuttal.

10:44:04 19                MR. LOWELL:  Thank you.

10:44:05 20                       CROSS-EXAMINATION

10:44:05 21   BY MR. LOWELL:

10:44:05 22   Q.      Hello again.  I wanted to start where he started.

10:44:11 23                He started by being asked a question about

10:44:13 24   whether Hunter's daughter, Naomi, had said when asked when

10:44:19 25   Hunter got to New York, it was quote "about" a date, and

Jensen - cross - rebuttal

10:44:22  1  then she said when I suggested the 15th, and she said

10:44:25  2  "yeah," right?

10:44:27  3  A.      Yes.

10:44:27  4  Q.      That's what she said.  The date that you have figured

10:44:31  5  out that he got to New York was just two days later, is that

10:44:34  6  right?

10:44:34  7  A.      I believe he went on the 17th.

10:44:35  8  Q.      That would be two days later?

10:44:37  9  A.      Yes.

10:44:38 10  Q.      And I want to start therefore with the texts you

10:44:44 11  said, the first text, do we have the first three or can we

10:44:52 12  put it on the screen?  Okay.  You can leave it just like

10:44:53 13  that.  So you started by trying to figure out when he got to

10:44:56 14  New York, right, and that was now we establish on the 17th?

10:44:59 15  A.      Yes.  That was a little broader than that, but

10:45:03 16  essentially in this whole period I was looking to see what I

10:45:06 17  could figure out timetable wise where he was.

10:45:10 18  Q.      Got it.  Okay.  So you started by the 17th minus

10:45:15 19  eight, you started with October 9th, that's eight days prior

10:45:19 20  to when you just said he gets to New York; right, on the

10:45:22 21  ninth?

10:45:23 22  A.      I looked at the bank statements first and I went back

10:45:27 23  --

10:45:27 24  Q.      I'm sorry, I didn't mean -- sorry, I want to talk

10:45:32 25  about the same chart?

Jensen - cross - rebuttal

10:45:33  1    A.        Sure.

10:45:33  2    Q.        So the chart says October 9th?

10:45:35  3    A.        Yes, that's the earliest entry in the chart yes.

10:45:38  4    Q.        So on the first one on the 9th at whatever time, it

10:45:41  5    says somebody is typing "hey, this is junior the one you

10:45:44  6    just identified at 7-Eleven," right?

10:45:46  7    A.        Yes.

10:45:47  8    Q.        To be clear, in Mr. Biden's book, or as you just

10:45:52  9    said, there were occasions where the book or other data

10:45:55 10    would indicate that he could be buying drugs at a 7-Eleven,

10:45:58 11    right?

10:45:58 12    A.        He discussed that along with liquor stores and other

10:46:01 13    gas stations that he would yes, absolutely.

10:46:03 14    Q.        Those are also in that same vicinity.  There is a gas

10:46:07 15    station, there is a car wash, did you check for that?

10:46:09 16    A.        I did, there is actually a gas station next door to

10:46:12 17    the 7-Eleven.

10:46:13 18    Q.        So when you're talking about the 7-Eleven and its

10:46:16 19    location as you pointed out, there are other things right in

10:46:18 20    that vicinity?

10:46:19 21    A.        Yes.

10:46:19 22    Q.        And on occasion, you were asked by Mr. Hines to look

10:46:25 23    at the phone or look at the data and you were able to do

10:46:29 24    that and get a location and you did that because sometimes

10:46:33 25    there might be something that you could find, right, and you

Jensen - cross - rebuttal

10:46:35  1  were looking for that?

10:46:36  2  A.    Yes.

10:46:36  3  Q.    And notice on those first few when it says something

10:46:39  4  about the 7-Eleven, you have no location data to determine

10:46:42  5  if he was there or ever went, do you?

10:46:44  6  A.    That's correct, I do not have any location data.

10:46:47  7  Q.    And then you kept going and you said, again, this

10:46:52  8  person who is texting with him back and forth a few times,

10:46:56  9  that's on the next day again, the 10th, right?

10:46:59 10  A.    Yes.

10:47:00 11  Q.    And Mr. Hines asked you isn't that two days before he

10:47:03 12  purchased the gun at StarQuest, right?

10:47:07 13  A.    Yes.

10:47:08 14  Q.    So we know those two days exist, but you don't know

10:47:11 15  whether he met up with this person or whether this was an

10:47:15 16  exchange that never happened.  Take a look?

10:47:17 17  A.    Yes.  From my interpretation I believe that it's

10:47:21 18  unclear.

10:47:22 19  Q.    Indeed.  And do you know as well that from your many

10:47:26 20  hours of investigation and doing what you did this weekend

10:47:29 21  that on the 11th -- I'm sorry, before we get there.  Strike

10:47:33 22  that.  Then we're on the 10th, I notice later you find

10:47:37 23  location data, but there is nothing on the 10th that you did

10:47:40 24  either, is there, that actually confirms where he is on the

10:47:43 25  10th?

Jensen - cross - rebuttal

10:47:44  1   A.       Correct.

10:47:46  2   Q.       And then I was saying that you then go the next day

10:47:49  3   to the 11th on the chart that's the next day.  Now, you did

10:47:55  4   a lot of investigation to figure out where he was, correct?

10:47:59  5   A.       As I stated, I looked through all the financial

10:48:02  6   records and all the extraction records for anything I could

10:48:05  7   find.

10:48:05  8   Q.       On the 11th, you also know he went to Philadelphia

10:48:09  9   where his daughter Finnegan lives?

10:48:11 10   A.       Yes, I do know that, in the evening I think.

10:48:13 11   Q.       That's where he was headed that day and that's where

10:48:15 12   he went, right?

10:48:16 13   A.       Yes.

10:48:17 14   Q.       And then on the Row 23, again, this back and forth,

10:48:21 15   and by the way, do you notice that when whoever is writing

10:48:25 16   him, there is often a text by that person, a text by that

10:48:28 17   person, and a text by that person, and then there could be

10:48:32 18   hours before Mr. Biden responds, right?

10:48:36 19   A.       There were definitely breaks in conversations, I

10:48:40 20   can't tell you from memory because not every text is

10:48:43 21   depicted here what those breaks are.

10:48:45 22   Q.       I understand, but there were breaks for sure?

10:48:48 23   A.       Yes.

10:48:48 24   Q.       But then on the 23rd which is on the 11th, the day

10:48:51 25   you know he went to Philadelphia depending on what we're

Jensen - cross - rebuttal

10:48:56  1    talking about, the time, 23 would be, if you did the

10:48:58  2    conversion, 2:41 in the afternoon, UTC is confusing?

10:49:05  3    A.      Yes.

10:49:05  4    Q.      And he writes "meet me at 7-Eleven at 3:00," do you

10:49:10  5    see that?

10:49:10  6    A.      Yes.

10:49:10  7    Q.      Now right there, right then, right time before --

10:49:16  8    where was the location data as to whether he ever went that

10:49:19  9    day, I didn't see it?

10:49:21 10    A.      Yeah, I don't have it there.

10:49:23 11    Q.      Okay.  And then Mr. Hines asked you, 23 and 24 skips

10:49:29 12    two days later, right, now we're on the 13th, right?

10:49:32 13    A.      Yes.

10:49:32 14    Q.      And that would be after you went to Philadelphia and

10:49:36 15    came back then?

10:49:37 16    A.      Yes.  I don't know if he spent the night in

10:49:40 17    Philadelphia, but I do see a record that he went that

10:49:44 18    evening to meet his daughter.

10:49:45 19    Q.      And then you were identifying texts with something

10:49:48 20    that said Q, do you remember that, a guy named Q or somebody

10:49:53 21    who identified themselves as Q, right?

10:49:55 22    A.      Yes.

10:49:56 23    Q.      In this exchange, prior, not a guy named Bernard,

10:50:02 24    right?

10:50:03 25    A.      Correct, I do not see a reference.

Jensen - cross - rebuttal

10:50:05 1    Q.      Not a guy named Mookie, right?

10:50:07 2    A.      No.

10:50:08 3    Q.      And then as we're going down, we're on the 16th, on

10:50:12 4    rows 26 and 27, do you see that?

10:50:14 5    A.      Yes.

10:50:14 6    Q.      And in that, in the morning, I'm trying to decide if

10:50:19 7    it's UTC.  Yeah.  So on the 16th, Row 26, at 2:00 a.m. in

10:50:26 8    the morning, he's not texting to any of those people, he's

10:50:30 9    texting to Hallie Biden?

10:50:32 10   A.      Yes.

10:50:32 11   Q.      And asks "I'm almost there," right?

10:50:35 12   A.      Yes.

10:50:36 13   Q.      Do you know where he was coming from on the 16th to

10:50:40 14   say I'm almost there?

10:50:41 15   A.      No.

10:50:42 16   Q.      And then an hour later, I mean -- I'm sorry, do you

10:50:49 17   know -- I'm sorry to have asked this, I didn't ask that

10:50:52 18   right.  You don't know if he was coming from right around

10:50:54 19   there or from a distance, Philadelphia or somewhere else,

10:50:59 20   when he says I'm almost there?

10:51:01 21   A.      Correct.

10:51:01 22   Q.      And then a long time -- well not a long time, an

10:51:05 23   hour-and-a-half passes and then the next text that says "I'm

10:51:08 24   here, can't get in."  That's still to Hallie, right?

10:51:12 25   A.      Yes.

Jensen - cross - rebuttal

10:51:12  1   Q.      And on Row 28, you could then have location data,

10:51:17  2   which indicated that he was actually in the vicinity of

10:51:22  3   where Ms. Biden and the house she owned with her ex-husband

10:51:26  4   and his -- or deceased husband and his brother lived, right?

10:51:31  5   A.      Yeah, I believe it was the first location I found

10:51:33  6   that morning.

10:51:34  7   Q.      So you know that he was there.  And by the way, you

10:51:36  8   said you could do that by looking for videos or movies or

10:51:42  9   photos or texts, there are no movies during this period of

10:51:45 10   time with him and Q and Mookie or anybody, just what you

10:51:48 11   were able to find for the purposes of doing location data, I

10:51:51 12   don't see it presented here?

10:51:53 13   A.      There were no movies that were in the data that I had

10:51:57 14   that could be played and there were thumbnail images

10:52:01 15   representative of some of the data points.

10:52:02 16   Q.      I'm sorry, let me move on to the next time period,

10:52:05 17   the next time slot.  So you can see that at 4:16 on Row 26,

10:52:12 18   Hallie Biden hasn't responded to him that hour in the early

10:52:17 19   morning hours at that point, right, when he's asked "I'm

10:52:20 20   here and can't get in," right?

10:52:22 21   A.      Yes.  3:55 a.m., "I'm here, can't get in."

10:52:26 22   Q.      Right.  So at that hour at four something in the

10:52:29 23   morning, five in the morning, you then have him going back

10:52:32 24   to the 7-Eleven at 5 o'clock in the morning, right?

10:52:38 25   A.      Yes.

10:52:38  1    Q.    Row 29?

10:52:39  2    A.    But as far as the 16th, I think that's the first time

10:52:43  3    I have location data at the 7-Eleven on the 16th.

10:52:47  4    Q.    So when you have indicated that he said I can't get

10:52:50  5    in, the location data has him going back to the 7-Eleven at

10:52:57  6    5:00 a.m. in the morning?

10:52:59  7    A.    Right.

10:52:59  8    Q.    Was he going there to meet Q or get a cup of coffee

10:53:04  9    before Hallie wrote him back?

10:53:06 10    A.    I don't know.

10:53:06 11    Q.    And then at -- he's still at the 7-Eleven according

10:53:11 12    to your chart, and then not even 30 minutes later, Row 32,

10:53:15 13    he asked, "are you up?"  Right?

10:53:20 14    A.    Yes.

10:53:20 15    Q.    Still apparently waiting for her to be up, if he

10:53:25 16    wrote "are you up," it would generally indicate that he has

10:53:27 17    not responded and he's still waiting?

10:53:29 18    A.    Yes, my interpretation was that he had not been able

10:53:33 19    to get a hold of her.

10:53:34 20    Q.    And then he was -- he wrote that you say at the

10:53:38 21    7-Eleven?

10:53:39 22    A.    Well, the --

10:53:40 23    Q.    I'm sorry, the time stamp before on 30?

10:53:43 24    A.    It was closer in the time that he was already back at

10:53:47 25    the residence than when he was at -- this does not indicate

Jensen - cross - rebuttal

10:53:51  1    every location.

10:53:52  2    Q.       If you're putting together a sequence from every

10:53:55  3    point in the morning and he's writing the person he was

10:53:58  4    involved with at various times, if you look at this, it's

10:54:01  5    the hours in the early morning hours and "are you up", and

10:54:04  6    he was waiting, according to your location, at the 7-Eleven?

10:54:07  7    A.       I think he goes, he can't get in, I think he leaves

10:54:10  8    and then he comes back over some time and tries again.

10:54:14  9    Q.       As I said to you, when he's at the 7-Eleven, you see

10:54:17 10    no reference to anybody back and forth other than with

10:54:21 11    Hallie Biden?

10:54:22 12    A.       Correct.

10:54:22 13    Q.       And I think I asked this, but if not, I will, so at

10:54:26 14    that early morning hour when he goes back to the 7-Eleven,

10:54:30 15    you don't know whether it was for a donut, a coffee, I don't

10:54:33 16    think anybody eats a slurpy at that point, but you don't

10:54:37 17    know?

10:54:37 18    A.       No, I have no further context.

10:54:39 19    Q.       And then we get to when Mr. Biden actually got to New

10:54:42 20    York, which you were looking at line 39, and that is on the

10:54:48 21    18th; right, do you see that?

10:54:52 22    A.       Yes.

10:54:53 23    Q.       And Naomi, his daughter actually said the 18th was a

10:55:00 24    time that Hunter was in New York where he was; right?

10:55:05 25    A.       I don't recall her testimony specifically but I think

Jensen - cross - rebuttal

10:55:08 1    that's reasonable that at this point he was in New York and

10:55:12 2    she would have thought that.

10:55:13 3    Q.    There is nothing that she said that disagrees with

10:55:16 4    what you put on 39?

10:55:19 5    A.    I don't believe so.

10:55:20 6    Q.    And you have -- this is an example on 39 where you

10:55:23 7    have location data to confirm that, right?

10:55:26 8    A.    Correct.  In this case --

10:55:28 9    Q.    Sorry, I didn't mean to cut you off.  Please.

10:55:31 10   A.    In this case, my purpose was just to figure out where

10:55:34 11   he was on each day, this is a location point I was able to

10:55:38 12   find that correlated with messages that indicated he was

10:55:41 13   where he was saying, he was in New York at The Four Seasons.

10:55:44 14   Q.    Whereas in some other locations back and forth where

10:55:48 15   somebody says come to the 7-Eleven or don't come, or I'm

10:55:51 16   coming at 3:30, what I went over with you, you didn't find

10:55:55 17   that location data, did you?

10:55:56 18   A.    Sometimes we have location data without text

10:55:59 19   messages, sometimes we have text messages without location

10:56:02 20   data.

10:56:02 21   Q.    And then Row 40 after we established he's in New

10:56:06 22   York, and Naomi is in New York, and Naomi also mentioned

10:56:09 23   that she was there with her now husband Peter, right?

10:56:14 24   A.    Yes.

10:56:14 25   Q.    That's where he confirms he's staying at the Four

| | | |
|---|---|---|
| 10:56:18 | 1 | Seasons and what room he's at? |
| 10:56:19 | 2 | A.    Yes. |
| 10:56:20 | 3 |         MR. LOWELL:  Thank you, agent.  No further |
| 10:56:21 | 4 | questions. |
| 10:56:24 | 5 |              REDIRECT EXAMINATION |
| 10:56:25 | 6 | BY MR. HINES: |
| 10:56:26 | 7 | Q.    Agent Jensen, we heard on Friday the testimony about |
| 10:56:30 | 8 | the defendant saying he was unreachable in New York.  Do you |
| 10:56:34 | 9 | remember that testimony? |
| 10:56:35 | 10 | A.    Yes. |
| 10:56:35 | 11 | Q.    Just to be clear, Row 40, that's not a message to |
| 10:56:40 | 12 | Naomi Biden; correct? |
| 10:56:42 | 13 | A.    No, it's a different individual. |
| 10:56:45 | 14 |         MR. HINES:  No further questions for this |
| 10:56:47 | 15 | witness, Your Honor. |
| 10:56:48 | 16 |         At this time, the United States has no further |
| 10:56:51 | 17 | rebuttal, and we rest our case. |
| 10:56:54 | 18 |         THE COURT:  All right.  Thank you. |
| 10:56:55 | 19 |         Thank you, agent, you are excused. |
| 10:56:59 | 20 |         All right.  Let me see counsel up here for a |
| 10:57:03 | 21 | moment. |
| 10:57:03 | 22 |         (Side-bar discussion:) |
| 11:18:38 | 23 |         THE COURT:  It's 11:00.  How long is your |
| 11:18:38 | 24 | closing? |
| 11:18:38 | 25 |         MR. WISE:  Your Honor, I'm going to be giving |

11:18:38 1    it.   Our request is that you instruct now and they have

11:18:38 2    their lunch, they get refreshed after the instructions which

11:18:38 3    afternoon with be a little taxing and then we do the

11:18:38 4    closing.   Looking at the length of the instructions, I think

11:18:39 5    we'll definitely be able to do that before we break for

11:18:39 6    lunch.

11:18:39 7            MR. LOWELL:  My suggestion would be we still

11:18:39 8    stay with what I requested and give the instructions after

11:18:39 9    argument.   We could let them go to an early lunch and start

11:18:39 10   after that and then just go through.  I don't see -- I mean,

11:18:39 11   having a break and having lunch and then coming back, why

11:18:39 12   can't we do it that way, it would put it altogether with

11:18:39 13   argument and instructions and we'll get done by the end of

11:18:39 14   the day for sure.

11:18:39 15           THE COURT:  How long do you think your closing

11:18:39 16   is going to be?

11:18:39 17           MR. WISE:  At least an hour.

11:18:39 18           MR. LOWELL:  About an hour.

11:18:39 19           THE COURT:  I mean, what's the harm in me

11:18:39 20   instructing now, because it seems like it makes a good use

11:18:39 21   of time.

11:18:39 22           MR. WISE:  I'm also -- I don't like arguing

11:18:39 23   before the instructions because I'm saying the Court will

11:18:39 24   instruct you and then you tell them they're supposed to

11:18:39 25   consider all the instructions, I think it's better.

11:18:39  1          THE COURT:  I understand, but his preference --

11:18:39  2   your preference I take in into account like I take Mr.

11:18:39  3   Lowell's preference into account.  I'm trying to do this --

11:18:39  4   I usually do it beforehand, but I was willing to do it the

11:18:39  5   way you asked except that I think we're wasting some time

11:18:39  6   here.

11:18:39  7          MR. LOWELL:  Well, my view is what I said

11:18:39  8   before, which is the last thing the jury should hear is what

11:18:39  9   they're going to do with all they've heard and how they're

11:18:39 10   going to do it.  You instruct now and many hours later

11:18:39 11   before they would hear your instructions, I would like them

11:18:39 12   to hear your instructions after we have done what we have

11:18:39 13   done.  Counsel and I have always said Judge Noreika will say

11:18:39 14   or instruct and that's not a problem, it is still my

11:18:39 15   preference, I'm sure we can truncate to the lunch and we get

11:18:39 16   it all done in the afternoon.

11:18:40 17          THE COURT:  I am going to instruct on the

11:18:40 18   substantive stuff now just to be, use this time efficiently.

11:18:40 19   Can we get the instructions?

11:18:40 20          MR. LOWELL:  Do we have the new ones?

11:18:40 21          THE COURT:  So I would stop before 22, after

11:18:40 22   closings we do this, and whatever comes last.  Not here, but

11:18:40 23   we'll do whatever comes next.

11:18:40 24          MR. LOWELL:  I'm sorry, Judge, I just didn't

11:18:40 25   follow you.

11:18:40  1                THE COURT:  So I go up to 22 and I stop before

11:18:40  2    22.

11:18:40  3                MR. LOWELL:  So it's just two instructions?

11:18:40  4                THE COURT:  After the closing, three, because I

11:18:40  5    say, I did that extra one, don't take anything I say or do.

11:18:40  6    I was willing to defer but I just want to use time.  Okay?

11:18:40  7                (End of side-bar.)

11:18:40  8                THE COURT:  All right.  So I am going to read

11:18:40  9    you most of the jury instructions up to you get to the point

11:18:40 10    that you do your deliberating, we are going to take a short

11:18:40 11    lunch, have your lunches brought in, and after lunch we'll

11:18:40 12    go right to the closing arguments, I'll finish up with the

11:18:40 13    instructions for deliberations, show you the verdict sheet,

11:18:40 14    and then you can begin your deliberations.

11:18:40 15                Okay.  All right.

11:18:40 16                The defendant, Robert Hunter Biden -- you can

11:18:40 17    read along or listen, or whatever you prefer.

11:18:40 18                The defendant, Robert Hunter Biden, pleaded not

11:18:40 19    guilty to the offenses charged.  He is presumed to be

11:18:40 20    innocent.  He started the trial with a clean slate, with no

11:18:40 21    evidence against him.  The presumption of evidence stays

11:18:40 22    with the defendant unless and until the government has

11:18:40 23    presented evidence that overcomes that presumption by

11:18:40 24    convincing you that the defendant is guilty of offenses

11:18:40 25    charged beyond a reasonable doubt.  The presumption of

innocence requires you to find the defendant not guilty,
unless you are satisfied the government has proven guilt
beyond a reasonable doubt.

The presumption of innocence means the defendant
has no burden or obligation to present any evidence at all
or to prove that he is not guilty.  The burden or obligation
of proof is on the government to prove the defendant is
guilty, and this burden stays with the government throughout
trial.

In order for you to find the defendant guilty of
the offenses charged, the government must convince you that
the defendant is guilty beyond a reasonable doubt.  That
means the government must prove each and every element of
the offenses charged beyond a reasonable doubt.  A defendant
may not be convicted based on suspicion or conjecture, but
only on evidence proving guilty beyond a reasonable doubt.

Proof beyond a reasonable doubt does not mean
proof beyond all possible doubts or to a mathematical
certainty.  Possible doubts or doubts based on conjecture,
speculation, or hunch are not reasonable doubts.  A
reasonable doubt is a fair doubt based on reason, logic,
common sense, or experience.  It is a doubt that an ordinary
reasonable person has after carefully weighing all of the
evidence and is a doubt of the sort that would cause him or
her to hesitate to act in matters of importance in his or

her own life.  It may arise from the evidence, or from the lack of evidence, or from the nature of the evidence.

If, having now heard all the evidence, you are convinced that the government proved each and every element of the offense charged beyond a reasonable doubt, you should return a verdict of guilty for that offense.  However, if you have a reasonable doubt about one or more of the elements of the offense charged, then you must return a verdict of not guilty for that offense.

You must make your decision in this case based only on the evidence that you see and hear in this courtroom.  Do not let rumors, suspicions, or anything else you may see or hear outside the Court influence your decision in any way.

Let me remind you what the evidence from which you are to find the facts consists of:

1.  The testimony of the witnesses;

2.  Documents and other things received as exhibits;

3.  Anything to which the parties have stipulated or agreed, which we will address in a moment.

What is not evidence?

1.  Statements and arguments of the lawyers are not evidence.  That includes opening statements and closing arguments.

2.   Questions by the lawyers are not evidence. You should not assume that a fact is true just because one of the lawyers or I ask a question about it.   It's the witness's answers that are evidence.   Of course, you may need to consider the questions to know what a witness means by his or her answer.   For example, if a witness answers yes to a question, you will have to consider what the question was to understand what the witness is saying.

3.   Objections by lawyers, including objections in which the lawyers state facts are not evidence.

4.   Any testimony I struck or told to you disregard is not evidence,.

5.   Anything you may have seen or heard about this case outside the courtroom is certainly not evidence.

You should use your common sense in weighing the evidence.   Consider it in light of your every day experience with people and events and give it whatever weight you believe it deserves.   If your experience and common sense tell you that certain evidence reasonably leads to a conclusion, you may reach that conclusion.

Recall that I told you that the rules of evidence control what can be received into evidence.   When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

An objection simply means that the lawyer is asking me to decide whether the evidence should be allowed under the rules.

Lawyers have a responsibility to their clients to make objections when they think evidence is being offered is improper under the rules of evidence, or improperly under the rules every evidence. You should not be influenced by the fact that an objection was made.

You should also not be influenced by my rulings on objections to evidence. If I overruled an objection, the question was answered or the exhibit was received as evidence, and you should treat that testimony or exhibit like any other.

If I sustained an objection, the question should not be answered or the exhibit should not be received in evidence. Whenever I sustained an objection, you were to disregard the question or the exhibit entirely. Do not think about or guess what the witness might have said as an answer to a question. Do not think about or guess what the exhibit might have shown. Sometimes a witness might have already answered before a lawyer objected or before I ruled on the objection. If I sustained the objection, you should disregard the answer that was given.

Also, at certain points throughout the trial, I may have ordered that some testimony or other evidence be

stricken or removed from the record.  I instruct you if I
did that to disregard the testimony or evidence that was
stricken from the record, that means when you are deciding
this case, you must not be consider or be influenced in any
way by the testimony or other evidence that I told you to
disregard.

Certain charts and summaries were admitted as
evidence.  You may use those charts and summaries as
evidence even though the underlying documents and records
have not been admitted into evidence.

The government and the Defendant have stipulated
or agreed that the following facts are true:

1.  On October 12th, 2018, StarQuest Shooters
and Survival Supply, located in Wilmington, Delaware,
possessed a federal firearms license and was authorized to
deal in firearms under federal laws, therefore StarQuest
Shooters and Survival Supply was a "licensed dealer" as
defined in Title 18, of the United States Code, Section
921(a)(11).

2.  The Colt Cobra 38SPL revolver with Serial
Number RA551363 is a "firearm" as defined in Title 18,
United States Code, Section 921(a)(3).

3.  The frame of the Colt Cobra 38 Special
revolver with Serial Number RA551363 was manufactured in the
state of Massachusetts, and Colt's manufacturing company

assembled the frame and remaining components of the Colt
Cobra 38 Special revolver with Serial Number RA551363 at
their facility in the state of Connecticut.  By virtue of
its presence in the State of Delaware, the Colt Cobra 38
Special revolver with Serial Number RA551363 traveled in
interstate commerce.

        You should, therefore, treat these facts as
having been proved, you are not required to do so, however,
because you are the sole judges of the facts.

        During the trial you heard testimony of
witnesses and argument by counsel that the government did
not use specific investigative techniques such as -- well
this one was not completely addressed, but in any event,
that's for us to fill in, so you can ignore that note.  But
to the extent there was testimony that the government
suggested that this government should have used other
specific investigative techniques, that's what this is
about.

        You may consider these facts in deciding whether
the government has met its burden of proof, because as I
told you, you should look at all the evidence or lack of
evidence in deciding whether the defendant is guilty.
However, there is no legal requirement that the government
use any of these specific investigative techniques or all
possible techniques to prove its case.  There is no

11:18:44  1    requirement to -- again, that's our note to us, so you can

11:18:44  2    ignore that, there is no requirement to use any particular

11:18:44  3    investigative techniques.

11:18:44  4           Your concern, as I have said, is to determine

11:18:44  5    whether or not the evidence admitted in this trial proves

11:18:44  6    the defendant's guilt beyond a reasonable doubt.

11:18:44  7           The rules of evidence ordinarily do not permit

11:18:44  8    witnesses to state their own opinions about important

11:18:44  9    questions in a trial, but there are exceptions to these

11:18:44 10    rules.

11:18:44 11           In this case, you heard testimony from experts.

11:18:44 12    Because of their knowledge, skill, expert experience,

11:18:44 13    training, or education in their respective fields, experts

11:18:44 14    were permitted to offer opinions in that field and the

11:18:44 15    reasons for those opinions.

11:18:44 16           The opinion of these witnesses -- the opinion

11:18:44 17    these witnesses state should receive whatever weight you

11:18:44 18    think appropriate, given all the other evidence in the case.

11:18:44 19    In weighing this opinion testimony you may consider the

11:18:44 20    witness's qualifications, the reasons for the witness's

11:18:44 21    opinions, and the reliability of the information supporting

11:18:44 22    the opinions, as well as the other factors discussed in

11:18:45 23    these instructions for weighing the testimony of witnesses.

11:18:45 24    You may disregard the opinions entirely if you decide their

11:18:45 25    opinions are not based on sufficient knowledge, skill,

experience, training, or education.  You may also disregard the opinions if you conclude that the reasons given in support of the opinions are not sound, or if you conclude that the opinions are not supported by the facts shown by the evidence, or if you think that the opinions are out weighed by other evidence.

You have heard evidence that Hallie Biden and Zoe Kestan have received a promise from the government that their testimony will not be used against them in a criminal case.

Their testimony was received into evidence and may be considered by you.  The government is permitted to present testimony of someone who has received immunity in exchange for their testimony, but you should consider the testimony with great care and caution.  In evaluating that testimony, you should consider this factor along with the others I have called to your attention.  Whether or not their testimony may have been influenced by the government's promise is for you to determine.  You may give their testimony such weight as you think it deserves.

The defendant did not testify in this case.  A defendant has an absolute constitutional right not to testify.  The burden of proof remains with the prosecution throughout the entire trial and never shifts to the defendant.  The defendant is never required to prove that

11:18:45 1   he's innocent.  You must not attach any significance to the

11:18:45 2   fact that the defendant did not testify.  You must not draw

11:18:45 3   any adverse inference against him because he did not take

11:18:45 4   the witness stand.  Do not consider, for any reason at all,

11:18:45 5   the fact that the defendant did not testify.  Do not discuss

11:18:45 6   that fact during your deliberations or let it influence your

11:18:45 7   decision in any way.

11:18:45 8           Count One charges that the defendant knowingly

11:18:45 9   made a false statement in the purchase of a firearm, in

11:18:45 10  violation of Title 18 of the United States Code,

11:18:45 11  Section 922(a)(6).

11:18:45 12          To find the defendant guilty of this offense,

11:18:45 13  you must find that the government proved each of the

11:18:45 14  following four elements beyond a reasonable doubt:

11:18:45 15          First.  The seller was a licensed dealer;

11:18:45 16          Second.  That the defendant made a false

11:18:45 17  statement while acquiring a firearm from the seller;

11:18:45 18          Third.  That the defendant knew the statement

11:18:45 19  was false;

11:18:45 20          And fourth, that the false statement was

11:18:45 21  intended or likely to deceive the seller with respect to any

11:18:46 22  fact material to the lawfulness of the sale of the firearm.

11:18:46 23          A statement is false if it was untrue when made.

11:18:46 24          The term "firearm" means any weapon which will

11:18:46 25  expel, or is designed to or may readily be converted to

expel, a projectile by the action of an explosive.

A "dealer" -- a dealer for this in terms of firearms dealers, a dealer is any person engaged in the business of selling firearms at wholesale or retail.

The term "licensed dealer" means any dealer who is licensed under the provisions of the Gun Control Act of 1968.

As I mentioned before when I talked about the stipulations, the parties have stipulated and agreed that StarQuest Shooters and Survival Supply was a "licensed dealer".  You should therefore treat this fact as having been proved, though you are not required to do so because you are the sole judges of the facts.

A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in connection with the sale of the firearm.  In determining whether a fact was material to the lawfulness of the sale of the firearm, you may consider that the law prohibits any person who is an unlawful user or addicted to any controlled substance from purchasing or possessing any firearm.

Count Two charges that the defendant made a false statement related to information required to be kept by law by a federal firearms licensed dealer, in violation of Title 18 of the United States Code, Section 924(a)(1)(A).

To find the defendant guilty of this offense,

you must find that the government proved each of the following four elements beyond a reasonable doubt:

First.  The defendant knowingly made a statement or representation in an ATF Form 4473;

Second.  The defendant made the statement or representation to a federally licensed firearms dealer;

Third.  The statement or representation was false; and

Fourth.  The defendant knew the statement or representation was untrue when he made the statement or representation.

As I told you for Count One, a statement is "false" if it was untrue when it was made.

Knowingly.  A person acts knowingly if that person acts voluntarily and intentionally and not because of a mistake or accident or any innocent reason.  This means that the government must prove beyond a reasonable doubt that the defendant was conscious and aware of the nature of his actions and of the surrounding facts and circumstances, as specified in the definition of the offenses charged.

In deciding whether the defendant acted "knowingly" you may consider evidence about what the defendant said, what the defendant did, and failed to do, how the defendant acted, and all the other facts and circumstances shown by the evidence that may prove what was

in the defendant's mind at the time.

Count Three.  Count Three charges the defendant, knowing that he was an unlawful user of a controlled substance, or addicted to a controlled substance, did knowingly possess a firearm in violation of Title 18, United States Code, Section 922(g)(3).

To find the defendant guilty of this offense, you must find that the government proved each of the following four elements beyond a reasonable doubt".

First.  The defendant was an unlawful user of a controlled substance or addicted to a controlled substance;

Second, the defendant knowingly possessed a firearm, that is a Colt Cobra .38 SPL revolver with Serial Number RA551363, while he was an unlawful user of a controlled substance or addicted to a controlled substance;

Third.  At the time the defendant knowingly possessed the firearm, he knew he was an unlawful user of a controlled substance or addicted to a controlled substance.

And fourth.  The firearm was transported across a state line at some time during or before the defendant's possession of it.

The term "firearm" has the same definition as previously provided that these instructions.

You are instructed that crack cocaine, commonly referred to as crack, is a controlled substance.

You are also instructed that as to the fourth element, that the "firearm was transported across a state line at some time during or before the defendant's possession of it."  The parties have agreed that the Colt Cobra .38 SPL revolver with Serial RA551363 traveled in interstate commerce, and that this element is met.  You should therefore treat this fact as having been proved, but you are not required to do so, because you are the sole judge of the facts.

The phrase "unlawful user of a controlled substance" means a person who uses a controlled substance in a manner other than as prescribed by a licensed physician. The defendant must have been actively engaged in use of a controlled substance or controlled substances during the time he possessed the firearm, but the law does not require that he used the controlled substances or -- controlled substance or controlled substances at the precise time he possessed the firearm.  Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.

An inference that a person was a user of a controlled substance may be drawn from evidence of a pattern of use or possession of a controlled substance that

11:19:25 1    reasonably covers the time that the firearm was possessed.

11:19:27 2             The term "addict" means any individual who

11:19:32 3    habitually uses any controlled substance so as to endanger

11:19:33 4    the public morals, health, safety, or welfare, or who is so

11:19:36 5    far addicted to the use of the controlled substance as to

11:19:39 6    have lost the power of self control with reference to his

11:19:43 7    addiction.

11:19:44 8             To establish the second element of Count Three,

11:19:50 9    the government must prove that the defendant possessed the

11:19:53 10   firearm in question.  To "possess" means to have something

11:19:55 11   within a person's control.  The government does not have to

11:19:59 12   prove that the defendant physically held the firearm, that

11:20:02 13   is, he had actual possession of it.  As long as the firearm

11:20:05 14   was within the defendant's control, he possessed it.  If you

11:20:09 15   find that the defendant either had actual possession of the

11:20:12 16   firearm or had power and intention to exercise control over

11:20:17 17   it, even though it was not in the defendant's physical

11:20:20 18   possession, that is, that the defendant had the ability to

11:20:22 19   take actual possession of the object when the defendant

11:20:26 20   wanted to do so, you may find that the government has proven

11:20:29 21   possession.

11:20:30 22            Possession may be momentary or fleeting.

11:20:33 23            The law also recognizes that possession may be

11:20:36 24   sole or joint.  If one person alone possesses the firearm,

11:20:40 25   that is sole possession.  However, more than one person may

have the power and intention to exercise control over a
firearm.  This is called joint possession.

If you find that the defendant had power and
intention, then he possessed the firearm even if he
possessed it jointly with another.

Proof of ownership of the firearm is not
required.

The government must prove that the defendant
knowingly possessed the firearm described in the indictment.
This means that the defendant possessed the firearm
purposely and voluntarily, and not by accident or mistake.
It also means that defendant knew the object was a firearm.

The indictment charges the defendant with being
an unlawful user of a controlled substance or addicted to a
controlled substance.  The government is not required to
prove both, that he was an unlawful user of a controlled
substance, and also addicted to a controlled substance.  It
is sufficient for the government to prove, beyond a
reasonable doubt, that he was either an unlawful user of a
controlled substance or addicted to a controlled substance.

Each of you have must agree with the other
jurors as to whether the defendant was an unlawful user of a
controlled substance, or was addicted to controlled
substances, or both.  If you unanimously agree that he was
either an unlawful user of a controlled substance, or was

11:22:02 1    addicted to a controlled substance, or was both, and met the

11:22:07 2    other elements as to the offense, you may find the defendant

11:22:10 3    guilty of that offense.

11:22:13 4         Unless each of you agree that the government has

11:22:17 5    proven that he was either an unlawful user of a controlled

11:22:20 6    substance or he was addicted to a controlled substance, then

11:22:24 7    you must find the defendant not guilty.

11:22:26 8         The fourth element listed in Instruction number

11:22:33 9    18, let's just make sure that's right.  It isn't.  It is, if

11:22:53 10   you can correct that, it should be, the fourth element

11:22:57 11   listed in instruction number 15.  The fourth element listed

11:23:04 12   in instruction number 15 that the government must prove

11:23:08 13   beyond a reasonable doubt is that the firearm specified in

11:23:19 14   the indictment had at some time traveled in interstate

11:23:23 15   commerce.

11:23:24 16        I already told you this before, but in this

11:23:26 17   case, the parties have agreed that the Colt Cobra 38SPL

11:23:29 18   revolver with Serial Number RA551363 traveled in interstate

11:23:34 19   commerce.  You should therefore treat this fact as having

11:23:37 20   been proven.  Though you are not required to do so given

11:23:42 21   your role as the sole judge of facts.

11:23:46 22        Remember that you are here only to determine

11:23:48 23   whether the defendant is guilty or not guilty of the charges

11:23:51 24   in the indictment.  The defendant is not on trial for any

11:23:54 25   conduct or offense not charged in the indictment.

11:23:57   1                    So that is the end of the substantive

11:24:01   2      instructions.  And after closing arguments, I'll give you

11:24:05   3      the other instructions on the foreperson and your

11:24:08   4      deliberations.

11:24:09   5                    But for now, what we are going to do is take a

11:24:13   6      break.  It's 11:24.  Let's come back at about 12:05, and

11:24:18   7      we'll start with the closing arguments.

11:24:21   8                    COURTROOM DEPUTY:  All rise.

11:24:23   9                    (Jury exiting the courtroom at 11:24 a.m.)

11:24:52  10                    THE COURT:  All right.  Anything we need to

11:24:56  11      address?

11:24:56  12                    MR. HINES:  No, Your Honor.

11:24:57  13                    MR. LOWELL:  No.

11:25:11  14                    (A luncheon recess was taken.)

12:12:32  15                    COURTROOM DEPUTY:  All rise.

12:12:42  16                    (Jury entering the courtroom at 12:12 p.m.)

12:12:55  17                    THE COURT:  All right, everyone.  Welcome back.

12:13:08  18      Everyone else can please be seated.

12:13:10  19                    Mr. Wise.

12:13:15  20                    MR. WISE:  All of this is not evidence.  The

12:13:44  21      people sitting in the gallery are not evidence.  You may

12:13:48  22      recognize some of them from the news or from the community.

12:13:54  23      In the course of this trial, you may have looked at them and

12:13:58  24      they may have looked at you.  You may have seen them

12:14:02  25      reacting to the testimony or the photographs, or something

12:14:06  1    that one of the lawyers said.  But respectfully, none of

12:14:12  2    that matters.  The only evidence in this case is what came

12:14:19  3    from the witness stand and the physical and documentary

12:14:24  4    evidence that has been admitted by Judge Noreika.

12:14:29  5            And your decision can only be made based on

12:14:33  6    evidence and the law.

12:14:36  7            As Mr. Hines said in opening, no one is above

12:14:41  8    the law.  And this case stands for that simple proposition.

12:14:48  9    Your responsibility to apply the law to the facts is the

12:14:52 10    same task that every jury faces in every courtroom in every

12:14:58 11    court house in America.  It is no more important or less

12:15:04 12    important because of who the defendant is.

12:15:09 13            This afternoon, I will summarize the evidence

12:15:12 14    that has been presented to you in the course of this trial

12:15:15 15    and discuss how it establishes beyond a reasonable doubt

12:15:20 16    each of the elements of the three charges in this case.

12:15:28 17            These are the charges.  The first two are false

12:15:36 18    statement charges.  The third is a possession charge.  Judge

12:15:40 19    Noreika has already instructed you on the law you are to

12:15:42 20    apply as to each of these charges.  I will be discussing how

12:15:46 21    the facts establishes those elements.  But obviously, what

12:15:52 22    Judge Noreika says is what matters.

12:15:55 23            So if I say anything that is in contradiction to

12:15:59 24    or contrast to what the Court has instructed you, you are to

12:16:03 25    follow the law as Her Honor gave it.

12:16:06  1          Now, there is overlap between the elements of

12:16:09  2    these offenses, although there are differences between each

12:16:14  3    count that I'll highlight.  And as Her Honor instructed you,

12:16:20  4    the United States must prove each element of each offense

12:16:23  5    beyond a reasonable doubt.  That is a burden we embrace and

12:16:27  6    a burden I submit we have met.

12:16:30  7          The parties have stipulated to a limited number

12:16:33  8    of facts which prove some but not all the elements of the

12:16:37  9    offenses beyond a reasonable doubt.  And I submit that for

12:16:40 10    some of the other elements, even though the parties haven't

12:16:43 11    stipulated, the evidence is undisputed and proves those

12:16:47 12    statements beyond a reasonable doubt.

12:16:49 13          The central issue in this case is whether the

12:16:53 14    defendant was an unlawful user of, or addicted to a

12:16:57 15    controlled substance.  And whether he knew that fact.  And

12:17:01 16    as Her Honor instructed you, the United States doesn't have

12:17:05 17    to prove both.  But I believe the evidence does.

12:17:10 18          Most of the time we have spent in this trial has

12:17:12 19    been introducing evidence of the defendant's drug use,

12:17:17 20    addiction, and his knowledge of it.  In opening, Mr. Lowell

12:17:20 21    said the prosecutors plan to call witness after witness who

12:17:24 22    will tell you, and they plan to show you dozens of e-mails

12:17:27 23    or texts which reference what Hunter does not dispute.  He

12:17:32 24    had abused alcohol since he was a teenager, and drugs as an

12:17:36 25    adult.  The defendant does dispute it.  He pleaded not

guilty to the charges, which is his right.  And what
Mr. Lowell says isn't evidence.  The fact that he said the
defendant doesn't dispute his drug use isn't a stipulation
to it.  You heard Mr. Hines read the stipulations.  They're
Exhibit 43.  None of them are that the defendant admits he
used drugs as an adult.  So the United States had to prove
it.  And that's why we had to call witnesses, and show you
photographs and text messages, and play parts of the
nonfiction book that the defendant wrote and read.  All of
which establishes, beyond a reasonable doubt, that the
defendant used crack and was addicted to crack, and that he
knew he used crack and was addicted to it during the
relevant time period.

        To be clear the evidence was personal, it was
ugly, and it was overwhelming.  It was also absolutely
necessary.  There is no other way to prove the use of drugs
or addiction to drugs than through the kind of evidence that
you saw.  And so this afternoon, I will spend most of my
time talking about the evidence that the defendant was a
user of or addicted to crack and that he knew it, and that
evidence applies to all three of these charges.  And I'll
address that evidence once I have spoken to some of the
other elements that are not related to those facts.

        To begin with, Her Honor instructed you on the
elements of Count 1, false statement in purchase of a

firearm.  These are the elements, and I will go through each of them in turn.

The first element is that the seller was a licensed dealer.  There is a stipulation that StarQuest was a licensed dealer.  So the first element is proved beyond a reasonable doubt.

The second element of Count 1 is that the defendant made a false statement while acquiring a firearm from a seller.  There is a stipulation that the Colt Cobra 38 SPL revolver that he purchased was a firearm, so that is proved beyond a reasonable doubt.

This is the defendant's false statement.  The no answer to question 11E on the ATF Form 4473, which the defendant made on October 12th, 2018 is the false statement the defendant is charged with making.

I want to be very clear about that.  This is the statement that the evidence proves is false.

The defense called Jason Turner and Ronald Palimere, two StarQuest Shooters employees who had nothing to do with whether the defendant answered question 11E falsely.

The defense elicited testimony about the form of identification the defendant used, but that's irrelevant to the charges in this case.  The undisputed evidence is that the defendant bought the gun regardless of what ID he gave

12:20:56  1    or didn't give.  Again, to be clear, he is not charged with

12:21:01  2    giving a false address or trying to use a phony ID.

12:21:05  3            So to the extent Gordon Cleveland, the man who

12:21:10  4    sold him the gun, who was the only relevant witness from

12:21:14  5    StarQuest on the question of how the defendant answered

12:21:17  6    question 11E, and Jason Turner, the employee who ran the

12:21:21  7    background check, who was not present when the defendant

12:21:24  8    filled out Section A of the form, have different

12:21:27  9    recollections of who asked for secondary ID or whether a

12:21:30 10    secondary ID was provided is irrelevant.

12:21:35 11            Now, the evidence shows that this statement was

12:21:38 12    false because while the defendant checked no, that he wasn't

12:21:42 13    a user or addicted to a controlled substance, in fact he

12:21:48 14    was.  And I will discuss that in some detail.

12:21:52 15            The third element is that the defendant knew

12:21:54 16    that that statement was false.  In other words, he knew he

12:21:57 17    was a user of or addicted to crack cocaine when he filled

12:22:01 18    out that form.  And again, I will address that evidence in

12:22:06 19    response -- in referring to all three of the counts where

12:22:09 20    that is the central issue.

12:22:11 21            And then the fourth element of Count 1 is that

12:22:14 22    the false statement was intended or likely to deceive the

12:22:17 23    seller with respect to any fact material to the lawfulness

12:22:22 24    of the sale of the firearm, and her Honor has instructed you

12:22:28 25    on what material means.  And material means a fact which

would reasonably be expected to be of concern to a reasonable and prudent person in connection with the sale of the firearm.  Whether the individual employees at StarQuest thought the statement was material is not the question.  And the Court instructed you in determining whether a fact was material to the lawfulness of the sale of the firearm, you may consider that the law prohibits any person who was an unlawful user or addicted to any control substance from purchasing or possessing the firearm.  The form itself, the highlighted portion on the screen establishes that an answer to question 11E is material, because if you answer yes, you are prohibited from buying a firearm.  In other words, the answer matters, it is material.

Count 2 is another related false statement offense, what was referred to as a record keeping offense, an offense about the record that is kept by an FFL that contained the false statement.  And these are the elements.

Again, Count 1 and 2 charge that the defendant made a false statement.  And the difference is that Count 1 requires that the statement be material, but it doesn't have to be made on any particular government form.  Count 2 doesn't require the United States to prove that the statement was material, but it does require that the statement be on a particular form, specifically an ATF Form 4473.  The first element of Count 2 is that the

12:24:13 1   defendant knowingly made a statement or representation in an

12:24:18 2   ATF Form 4473.  And Exhibit 10(a) is the ATF Form 4473 that

12:24:25 3   the defendant filled out.

12:24:27 4        The undisputed evidence is that he did fill

12:24:32 5   question 11E, Gordon Cleveland testified to that, and there

12:24:37 6   is nothing to the contrary.  I will return to the evidence

12:24:41 7   that the statement was false, and he knew it was false after

12:24:43 8   I discuss the other element of Count 2 and Count 3.  Second,

12:24:48 9   the defendant made the statement or representation to a

12:24:51 10   federally licensed firearms dealer.  Again the parties have

12:24:55 11   stipulated that StarQuest was a licensed dealer, so Count 2,

12:25:01 12   element 2 of Count 2, like element 1 of Count 1, is proof

12:25:06 13   beyond a reasonable doubt.

12:25:07 14        Third, the statement or representation was

12:25:12 15   false, and fourth, the defendant knew the statement or

12:25:14 16   representation was untrue when he made the statement or

12:25:16 17   representation, and a statement is false if it was untrue

12:25:22 18   when it was made.  I will establish the evidence of that at

12:25:27 19   the conclusion of reviewing the elements of all three

12:25:30 20   offenses.  Count 3 charges the defendant of violating the

12:25:35 21   law that makes it a crime for a drug user or a drug addicted

12:25:39 22   to possess a firearm.  These are the elements.  Count 3 is a

12:25:43 23   possession offense, it's different from Count 1 and 2

12:25:48 24   because it makes it unlawful to possess a firearm if you are

12:25:51 25   a user or addicted to do a controlled substance.  It doesn't

12:25:55 1  require the government to prove the defendant made a false

12:25:58 2  statement.  It doesn't have anything to do with a federally

12:26:02 3  licensed firearm dealer or the purchase of a gun.  In fact,

12:26:05 4  a defendant who stole a gun or acquired it illegally could

12:26:09 5  be guilty of this crime.  In other words, unlike Count 1 and

12:26:14 6  2, which is all about how a defendant tries to acquire a gun

12:26:18 7  by making false statements, how a defendant acquires a gun

12:26:23 8  is irrelevant to Count 3.  But Count 3 does require that the

12:26:29 9  government prove that the defendant possessed a firearm.

12:26:31 10  The important overlap between all three charges is that the

12:26:35 11  United States must prove the defendant was an unlawful user

12:26:38 12  of or addicted to a controlled substance and that he knew

12:26:41 13  it.  The first element of Count 3 was that the defendant was

12:26:44 14  an unlawful user of a controlled substance or addicted to

12:26:47 15  it.  Second, that the defendant knowingly possessed a

12:26:50 16  firearm, that is a Colt Cobra 38 SPL revolver with that

12:26:55 17  serial number, while he was an unlawful user of a controlled

12:26:59 18  substance or addicted to a controlled substance.  The

12:27:06 19  evidence establishes beyond a reasonable doubt that the

12:27:09 20  defendant possessed this gun.  You heard the testimony of

12:27:11 21  Gordon Cleveland that he sold the defendant the firearm.

12:27:15 22  You saw the receipt from StarQuest that shows the firearm

12:27:19 23  serial number.  You heard testimony from Hallie Biden that

12:27:22 24  she found the firearm in the center console of the

12:27:26 25  defendant's truck on October 23rd, 2018.  You saw messages

to Hallie Biden from the defendant where he admits the gun
was his.  The serial number of the recovered gun we have in
testimony matches the serial number on the StarQuest
receipt.  And the defendant made a statement to the police
that the gun was his.  In fact, there was no evidence that
anyone else possessed the gun from October 12th to
October 23rd, other than the defendant.

Count 3 of -- element 3 of Count 3 is that at
the time the defendant knowingly possessed the firearm, he
knew he was an unlawful user of a controlled substance or
addicted to a controlled substance.

And I'll return to that as I said.  In Count 4,
the firearm was transported across the state line at some
time during or before the defendant's possession of it.  And
here there is a stipulation that the firearm traveled in
interstate commerce, so the fourth element of Count 3 is
proven beyond a reasonable doubt.

And so now I turn to, as I said is the central
issue in this case, and that is the evidence has established
beyond a reasonable doubt that the defendant was an unlawful
user of and addicted to a controlled substance when he
bought the gun on October 12th, 2018, during the period when
he possessed it from October 12th to October 23rd, and for
more than six months after.  Judge Noreika has given you a
series of legal instructions that relate to this evidence.

12:29:02  1    The first was a definition of "knowing".  And in opening,

12:29:06  2    Mr. Lowell said that knowingly is a very high state of mind.

12:29:13  3    Well the instruction says what it says about knowingly.  It

12:29:17  4    means in sum that the defendant knew what he was doing.  It

12:29:21  5    means he didn't use drugs by accident.  That he didn't smoke

12:29:25  6    a cigarette laced with cocaine that someone gave him without

12:29:29  7    his knowledge.

12:29:30  8          He knew he was using drugs.  That's what the

12:29:32  9    evidence shows.  And he knew he was addicted to drugs,

12:29:35 10    that's what the evidence shows.

12:29:38 11          Maybe if he had never been to rehab, he could

12:29:41 12    argue that he didn't know he was an addict when he bought

12:29:44 13    the gun on October the 12th, but he had been to rehab over

12:29:48 14    and over again, and he kept going to rehab, which evidences

12:29:52 15    that he knew he was -- he had an addiction when he bought

12:29:57 16    and possessed the gun.

12:29:58 17          Maybe if he hadn't used crack for a long period

12:30:02 18    of time before he bought the gun he could claim he didn't

12:30:05 19    know he was an addict.  But the evidence is he was using in

12:30:10 20    Malibu at the end of September, just two weeks before.  And

12:30:14 21    as the instruction provides, the evidence that a defendant

12:30:18 22    acted knowingly includes what a defendant said, what a

12:30:22 23    defendant did and failed to do, how the defendant acted, and

12:30:26 24    all other facts and circumstances shown by the evidence that

12:30:29 25    may prove what was in the defendant's mind at the time.  And

12:30:34  1    we have presented evidence in all of those categories.

12:30:37  2    We've presented evidence of what the defendant said at the

12:30:41  3    time in his messages, and shortly thereafter in his memoir,

12:30:45  4    what he did setting up drug purchases, talking about drug

12:30:49  5    use, talking about addiction with others, how he acted.  You

12:30:53  6    heard testimony from witnesses about how he could present

12:30:56  7    himself even when he was using drugs in a coherent way, and

12:31:04  8    other facts and circumstances that I will summarize for you.

12:31:07  9         Now Judge Noreika also instructed you on what is

12:31:11 10    meant by an unlawful user of a controlled substance.  And

12:31:17 11    the instruction she read, what the law says, is that the

12:31:24 12    phrase "unlawful user of a controlled substance means a

12:31:27 13    person who uses a controlled substance in a manner other

12:31:30 14    than as prescribed by a licensed physician."  Of course

12:31:33 15    there is no evidence that the defendant was using anything

12:31:35 16    prescribed by a physician.

12:31:36 17         The defendant must have been actively engaged in

12:31:39 18    the use of a controlled substance or controlled substances

12:31:43 19    during the time he possessed the firearm.  But the law does

12:31:46 20    not require that he used the controlled substance or

12:31:49 21    controlled substances at the precise time he possessed the

12:31:54 22    firearm.  I want to be very clear about that.  The United

12:32:02 23    States is not required to prove that the defendant used

12:32:05 24    drugs on October 12th when he bought the gun, Mr. Hines told

12:32:10 25    you that in opening, that's what the law is.  Or at any time

12:32:16  1    between October 12th and October 23rd when he possessed it.

12:32:21  2    I'll repeat that as well.

12:32:23  3         The United States is not required to prove that

12:32:25  4    he used drugs from October 12th to October 23rdrd.  And to

12:32:31  5    the extent Mr. Lowell said anything in his opening or will

12:32:35  6    say anything in closing or has given you the impression with

12:32:38  7    his questions that the government has to prove that the

12:32:41  8    defendant used drugs on October 12th or between October 12th

12:32:45  9    and 23rd, you should put that aside and follow Judge

12:32:49 10    Noreika's instructions.

12:32:51 11         And as the instruction continues, such use is

12:32:55 12    not limited to the use of drugs on a particular day, or

12:32:58 13    within a matter of days or weeks before, but rather that the

12:33:02 14    unlawful use has occurred recently enough to indicate that

12:33:05 15    the individual is actively engaged in such conduct.

12:33:11 16         So again, the United States is not required to

12:33:17 17    prove drug use on a particular day, whether it's

12:33:21 18    October 12th, or any day between October 12th and

12:33:24 19    October 23rd, or within a matter of days or weeks before

12:33:29 20    that period.  In other words, there is no requirement that

12:33:32 21    the United States prove use in the month of October.

12:33:37 22    Nothing in the instructions tell you you are required to

12:33:41 23    find that he used in October.

12:33:44 24         Rather, the instructions say the -- rather that

12:33:50 25    the unlawful use has occurred recently enough to indicate

that the individual is actively engaged in such conduct.

And so the testimony from Zoe Kestan is the defendant used in Malibu on September 23rd. That was a little less than two weeks before the defendant bought his gun. That is unlawful use that occurred recently enough to indicate that the defendant is actively engaged in the use of drugs when he bought and then possessed the gun. You could convict on those facts alone.

Now, obviously there is evidence that he was using in the month of October, which I will discuss in detail after I summarize all the evidence that the defendant was a user of or an addict, and that he knew it. But to be clear, the evidence is not limited to October. And that is because as the instruction provides, an inference that a person was a user of a controlled substance may be drawn from evidence of a pattern of use or possession of a controlled substance that reasonably covers the time the firearm was possessed.

That's why we introduced evidence from 2015 to 2019. In other words, before, during, and after the time when the defendant bought the gun and when he possessed it, because that establishes the pattern of use or possession of a controlled substance that reasonably covers the time that the firearm was possessed. Of course on October 12th, the day he bought the gun is when the -- is the beginning of

12:35:44  1   when the firearm was possessed, so you can consider the

12:35:47  2   evidence of the defendant's pattern of use of a controlled

12:35:52  3   substance to conclude that he was using at the time he

12:35:55  4   bought the gun, as well, and that he knew it.  Judge Noreika

12:36:01  5   also instructed you on the definition of an addict, and

12:36:05  6   again the government doesn't have to prove, and you need not

12:36:08  7   find to convict, that the defendant was both a user of and

12:36:11  8   an addict, but I would submit the evidence supports both.

12:36:15  9   And the definition of addict is any individual who

12:36:20 10   habitually uses any controlled substance so as to endanger

12:36:23 11   the public morals, health, safety, or welfare, or who is so

12:36:28 12   far addicted to the use of a controlled substance as to have

12:36:32 13   lost the power of self control with reference to his

12:36:34 14   addiction.  And again, the evidence and the reason it was

12:36:38 15   introduced from 2015 to '19 shows the defendant habitually

12:36:42 16   used a controlled substance.  It isn't something that

12:36:46 17   started the day before he bought and then possessed the gun,

12:36:50 18   or the week before, or the month before, it started years

12:36:53 19   before and it continued for months thereafter.  All of that

12:36:57 20   is part of the pattern of use.

12:37:00 21           And he had lost the power of self control with

12:37:03 22   reference to the addiction.  That's why he kept going to

12:37:06 23   rehab.  He couldn't stop on his own.  Now I would like to

12:37:15 24   turn to the evidence of a pattern of use or possession of a

12:37:20 25   controlled substance that reasonably covers the time the

firearm was possessed, including October 12th.  First, you

see the defendant's own words and messages from 2018 and

2019, a year worth of messages from the spring of 2018 to

the spring of 2019.  And these messages alone establish a

pattern of use of a controlled substance that reasonably

covers the time the firearm was possessed, including

October 12th when he bought the gun.  And I'm not going to

go through all of them, you saw them when Special Agent

Jensen testified, you seen them with other witnesses, you'll

have them.  But briefly we see in these messages, him buying

drugs, telling other people he's using drugs, describing

himself as an addict, and we see it over this whole period

of time.  We see messages from April of 2018.  We see

pictures from April of 2018 of drugs and the defendant

weighing drugs on scales.  We see messages from May of 2018

where he's using coded language.  We see messages from May

of 2018 where he's buying from multiple dealers.  We see

messages from June of 2018 where he's making purchases.  And

in July of 2018.  And we see messages in October where he's

buying, that's what he's telling Hallie Biden on October

the 13th, and then later we see what he is buying when he

tells her that he's with Bernard who hangs out at 7-Eleven

on Greenhill and Lancaster, and that he's waiting for a

dealer named Mookie, and that his brother L is get in the

car, and that he has my money and I'm getting pissed.  And

12:39:19  1    we see on the 14th, him telling Hallie Biden that he's

12:39:23  2    sleeping on a car smoking crack on 4th and Rodney, what he

12:39:27  3    calls his truth.

12:39:28  4         And we see addiction messages in October when

12:39:35  5    Hallie Biden tells him she wants to help him get sober, she

12:39:40  6    testified she was referring to both drugs and alcohol, not

12:39:42  7    just alcohol.  And in response, he says what one thing have

12:39:47  8    you done to help me get sober?  And we see other addiction

12:39:51  9    messages in October where she talks about, where Hallie

12:39:55 10    Biden talks about getting him into a rehab.  And other

12:40:00 11    addiction messages in November where the defendant calls

12:40:04 12    himself an addict and where Hallie Biden pleads with him to

12:40:09 13    try to address his addiction.

12:40:12 14         And other messages in November where he calls

12:40:17 15    himself separately both a drunk and an addict.

12:40:24 16         And in messages in November, we see the word,

12:40:30 17    relapse, which we see appear in his book, and it's clear

12:40:35 18    from his own use of the word that relapse refers to his

12:40:39 19    addiction to crack cocaine.  We see drug messages in 2018

12:40:49 20    where he's texting with a woman and talking about his crack

12:40:53 21    use.

12:40:54 22         We see messages in November 18th where he's

12:40:57 23    buying.  We see addiction messages in 2018.  We see both

12:41:04 24    drug messages and addiction messages later in December of

12:41:09 25    2018, including images.  And we see messages in 2019.  And

12:41:19  1   in February of 2019.  And in March of 2019.

12:41:26  2          We don't just have his messages from the time,

12:41:31  3   although I submit that would be enough to convict.  We also

12:41:35  4   have his own words in his memoir describing buying and using

12:41:39  5   drugs during that whole period from 2015 to 2019,

12:41:44  6   four years, what he called four years of active addiction,

12:41:52  7   and how he relapsed after numerous attempts at rehab,

12:41:54  8   including after The View, the rehab center he went to for

12:41:58  9   about a week late in August of 2018 in California.

12:42:03 10          And I'm not going to play the audio again, I'm

12:42:06 11   not going to go back through all of the excerpts, just by

12:42:11 12   way of book ends in his prologue, he referred to himself as

12:42:15 13   a drug addict, and what is searingly painful, but I would

12:42:20 14   submit personal and honest descriptions, and at the end when

12:42:27 15   he talked about, at the end of his book when he talked about

12:42:30 16   his four years of active addiction.  His memoir also

12:42:35 17   establishes a pattern of use of a controlled substance that

12:42:39 18   reasonably covers the time the firearm was possessed,

12:42:42 19   including October 12th when the gun was bought.  Now we

12:42:50 20   heard testimony from Kathleen Buhle, and this is also part

12:42:53 21   of the pattern that she learned he was smoking crack in 2015

12:42:57 22   and in that period of time she searched his cars and found

12:43:01 23   drug remnants and drug paraphernalia on approximately a

12:43:05 24   dozen occasions, including in 2018, and that in that period

12:43:08 25   the defendant discussed his addiction with her.

12:43:11   1          And we heard detailed testimony from Zoe Kestan,

12:43:16   2   who was his companion through what he called his California

12:43:21   3   Odyssey.  The months and months and months of by his own

12:43:25   4   description what he called debauchery rolling from one

12:43:29   5   expensive hotel to another in Los Angeles.  In sum, she saw

12:43:36   6   the defendant smoking crack from December 17th from when she

12:43:40   7   first met him, from the very first meeting, thru November of

12:43:44   8   2018 when she was with him at a rehab facility where he was

12:43:49   9   using drugs.  And importantly, and I'll come back to this,

12:43:52  10   including after his stay at The View, which again was at the

12:43:55  11   end of August.  She saw him at the end of September in that

12:43:58  12   house in Malibu, and he was using crack cocaine again, just

12:44:03  13   a few weeks before he bought the gun.

12:44:06  14          Again, she testified he was smoking something

12:44:12  15   she assumed to be crack in their first meeting at Vivid

12:44:17  16   Cabaret in Midtown Manhattan in 2017, the next time she saw

12:44:22  17   him at the Soho Grand, he was smoking crack within 10 to

12:44:27  18   15 minutes of her arrival.  Within the next ten days she

12:44:30  19   observed the defendant smoking crack often, sometimes as

12:44:34  20   often as every 20 minutes.  She also said importantly when

12:44:37  21   they were out and about or busy talking to people, he would

12:44:42  22   excuse himself once an hour.  She testified he was smoking

12:44:45  23   crack in January of 2018 when she stayed with him at the

12:44:49  24   Borgata in Atlantic City.  He was smoking crack in February

12:44:53  25   of 2018, when he stayed with her at The Four Seasons, and

12:44:56 1   she also testified that the defendant bought drugs from a

12:44:59 2   dealer named Frankie in New York in February of 2018 when

12:45:04 3   they were staying at The Four Seasons.

12:45:06 4          The defendant was smoking habitually and

12:45:09 5   frequently in March of 2018 while staying with Ms. Kestan

12:45:12 6   for six days at The 6 Columbus Hotel in New York, and he was

12:45:16 7   using in March of '18 at the Mercer Hotel in New York, and

12:45:21 8   we saw pictures from that time depicting crack pipes in a

12:45:25 9   glasses case next to the defendant in a bathroom.  The

12:45:29 10  defendant was smoking crack in April and May when they moved

12:45:33 11  to California and stayed at the Chateau Marmont and we

12:45:37 12  showed a picture of the defendant and Ms. Kestan in a

12:45:40 13  bathtub with the defendant smoking crack on May 11th:

12:45:44 14  Ms. Kestan testified that the defendant was purchasing crack

12:45:47 15  and cocaine from various dealers in California at the

12:45:51 16  Chateau Marmont in April and May of 2018.  And that he began

12:45:55 17  cooking powder cocaine into crack in May and began to do so

12:46:01 18  in June of 2018.  We saw pictures that reflected that,

12:46:05 19  burned residue, substances used for cooking cocaine into

12:46:08 20  crack, and for cleaning crack pipes and other crack

12:46:12 21  paraphernalia.  Ms. Kestan testified the defendant was

12:46:14 22  smoking crack in June, and that he was smoking crack in July

12:46:18 23  and August, and that he was smoking crack in late September

12:46:23 24  at the house in Malibu, again, after he had gone to The

12:46:27 25  View.  And then when she saw him again in early -- in early

to mid November, he was again using, this time while he was receiving rehab in Massachusetts. She also testified that the defendant withdrew large sums of cash with which to buy drugs and that he also provided ATM codes to drug dealers so that they could withdraw money from his account to pay for his drug purchases.

She testified that the defendant stored drugs in leather pouches, that he discussed his addiction with her, and again, you saw photographs from her phone that shows the defendant with drugs and drug paraphernalia in 2018.

You also heard testimony from Hallie Biden that she saw the defendant smoke crack in 2016, '17 and '18. That he discussed his addiction with her. That he -- that she searched his car on multiple occasions including the day we spent so much time focusing on in October of 2018 as part of a pattern, and that pattern was to find drugs and drug paraphernalia and that was throughout that whole period in 2016, 2017, and 2018. And she testified that when she saw the defendant on October the 23rd, he looked like he was exhausted and he was using drugs and that she searched his truck because she wanted to help him get sober, which she said included off drugs.

You also heard testimony from Hallie Biden that she found drug remnants and drug paraphernalia in the defendant's truck on October 23rd, 2018, and that she found

12:48:09  1    the defendant's leather pouch in that truck which we've

12:48:13  2    learned contained trace amounts of cocaine.

12:48:15  3            On October the 31st, you saw that she texted the

12:48:20  4    defendant that she had found another one of his brown

12:48:23  5    leather pouches, this time in her home next to her son with

12:48:27  6    a crack pipe sticking out of it.  And you heard testimony

12:48:32  7    and saw the pouch, that there was in fact cocaine on the

12:48:35  8    inside of the pouch, the pouch that she retrieved from his

12:48:38  9    truck to put the gun in.

12:48:40 10            Now, as I said, we don't have to prove that the

12:48:44 11    defendant used in October.  But you heard the argument from

12:48:49 12    counsel, and it is just argument, that the defendant went to

12:48:54 13    a rehab program in California at the end of August and then

12:48:59 14    for a brief period of time had a sober companion, and that

12:49:03 15    with that experience, he moved forward back to Delaware to

12:49:11 16    October the 12th and that StarQuest Shooters and bought his

12:49:15 17    gun, but critically there is overwhelming evidence that he

12:49:19 18    used drugs after that rehab at The View.

12:49:24 19            We saw from the records again that it was a

12:49:27 20    relatively brief period of rehab or detox.  It ran, the

12:49:33 21    residential part, only from August the 21st to August

12:49:38 22    the 27th, and he then had a sober companion live with him,

12:49:43 23    apparently, at least some of the time at this house he was

12:49:46 24    renting in Malibu, where Zoe Kestan later said there was no

12:49:52 25    sober companion by the time she got there, and he was using

drugs there regularly.  We're really only talking 13 days at the end of August into very early September.  And again, Zoe Kestan saw him after that.  She testified he was smoking crack at The Freehand Hotel in Los Angeles on the 17th, and she testified that he was smoking crack at his house in Malibu between September 13th, when she got there and the 23rd, when she left.  She saw it in the bedroom, master bathroom, in the kitchen, she said it was all over.  There was no sober companion there.  And critically the defendant never even mentioned the rehab, the supposedly life changing rehab he had gone through at The View just a few days earlier.

Why didn't he mention it?  Perhaps because he relapsed, as he told us.  In Chapter 9, the chapter of his book about his time in California in 2018, he wrote, Uncle Jim had his own super power, he gets things done.  So he jumped on a plane to Los Angeles, pulled me out of a room in the Hollywood Roosevelt, and said I found a place.  Let's go.  This is how the defendant described his rehab experience, not what you heard in opening, not that it was this event that propelled him clean and sober to October the 12th, this is what he said.  "I went, he checked me into a rehab center in Brentwood, where I stayed clean for about two weeks.  I then lived in a rental off Nichols Canyon, in the hills, with a sober coach.  It was great, the beauty,

12:51:33  1    the peace, the support, right up until the moment I

12:51:37  2    relapsed."  Again, that searingly honest account of his

12:51:43  3    time, he tells us he relapsed.  Not that he started drinking

12:51:49  4    again, as the defense lawyer argued in opening, but that he

12:51:52  5    relapsed and was using crack again, because that's what this

12:51:56  6    chapter talks about.

12:51:57  7           And he does it again in Chapter 10 of his book

12:52:04  8    where he talks specifically about coming back to Delaware,

12:52:09  9    where defense counsel said he came back clean and sober with

12:52:13 10    a clear head, not thinking he was an addict anymore even

12:52:18 11    though he had been one for years, knew he had been one for

12:52:23 12    years, and only gone through this brief period of detox or

12:52:26 13    rehab.  What he said, what the defendant said was "I had

12:52:29 14    returned that fall of 2018 after my most recent relapse in

12:52:33 15    California with the hope of getting clean, (not staying

12:52:36 16    clean), through a new therapy and reconciling with Hallie

12:52:43 17    and neither happened."

12:52:48 18           And then moving into October, we see messages

12:52:54 19    that the defendant was using again.  You saw these messages

12:52:59 20    this morning.  You saw his setting up meetings in the days

12:53:04 21    right before he purchased the gun on October 9th and

12:53:08 22    October 10th, meetings at the 7-Eleven.  And you see the

12:53:13 23    person he's talking about ask him, "you want the same."

12:53:17 24    This is Q who tells him he's at the 7-Eleven."  And the

12:53:21 25    defendant tells him on the 11th, the day before he bought

12:53:26  1    the gun, "meet me at the 7-Eleven at three."

12:53:31  2            Now that's the 11th, the day before he bought

12:53:35  3    the gun.  On the 13th, the day after he bought the gun, he

12:53:41  4    tells Hallie Biden he's buying, and then if you look at the

12:53:46  5    time, shortly thereafter telling her he's buying, he

12:53:50  6    describes that he's with Bernard, who hangs out at the

12:53:53  7    7-Eleven on Greenhill and Lancaster, the same 7-Eleven that

12:53:58  8    you saw from the location data this morning where he went on

12:54:02  9    the 16th, and he tells her "I'm now off Maryland Avenue

12:54:06 10    behind Blue Rock Stadium waiting to for a dealer named

12:54:10 11    Mookie", I read it to you, you seen it, he describes it

12:54:14 12    almost in real time, this drug purchase almost in real time.

12:54:17 13            And then moving forward in time to the 16th, we

12:54:21 14    see he's at that 7-Eleven, the 7-Eleven where he said the

12:54:26 15    dealer was.  And what does he say about meeting at 7-Eleven

12:54:29 16    in his book?  He said "no dealer works off a user's urgent

12:54:35 17    timetable so you arrange to meet in front of a 7-Eleven on

12:54:39 18    such and such street, then you sit in your car and wait."

12:54:43 19            Now, in between those messages on the 11th and

12:54:50 20    the 13th and the 16th, it specifically referenced 7-Eleven,

12:54:55 21    there are other messages obviously on the 14th, and you're

12:54:59 22    familiar with them, you have seen them.  The one where he

12:55:02 23    tells Hallie Biden he's sleeping on a car smoking crack on

12:55:05 24    4th Street and Rodney, and he says that's my truth.  The

12:55:09 25    defense counsel argued in opening that that was somehow a

12:55:14 1 lie.  Take the defendant's word for it.  That's his truth.

12:55:18 2          And defense counsel argued well he didn't want

12:55:23 3 to see Hallie Biden, so he made up the elaborate story of

12:55:27 4 the names of dealers and these locations and the play by

12:55:30 5 play.  Well you were instructed, you use your common sense.

12:55:34 6 The evidence is in this room, but you bring your common

12:55:37 7 sense into that jury box, use your common sense, if he

12:55:40 8 didn't want to see Hallie Biden on October the 13th, let's

12:55:43 9 look at what he could have said.  He asked her where she

12:55:46 10 was.  She responded she's home.  And then she asks where are

12:55:51 11 you, Delaware or D.C., he says New Castle, he says Delaware.

12:55:55 12 If he didn't want to see her, he didn't have to makeup this

12:55:58 13 elaborate story of two drug deals, he could have just said

12:56:03 14 D.C.  You don't leave your common sense behind when you come

12:56:07 15 into that jury box and you should apply it here to that

12:56:10 16 argument.

12:56:11 17          And we saw addiction messages in October of

12:56:16 18 2016.  Lots of addiction messages in October of 2018, in the

12:56:20 19 period of time after he bought the gun and when he possessed

12:56:24 20 it.

12:56:24 21          Now, the drug messages that I just highlighted

12:56:30 22 several of, as I said covered April of 2018 into March of

12:56:36 23 2019, and there was also testimony obviously about habitual

12:56:41 24 drug use in that period.  And there is frankly undisputed

12:56:44 25 testimony that the defendant was using crack in July of

12:56:47 1  2018.  And defense counsel asked a lot of questions of

12:56:50 2  various witnesses about whether there were messages in

12:56:55 3  October that were like messages in other months.  And

12:56:59 4  sometimes, he even used the specific words, if a message

12:57:03 5  said eight ball, was there a message that said eight ball in

12:57:06 6  October.  Well, there was one message that said eight ball,

12:57:10 7  of course it was later, we're not expecting to see that

12:57:14 8  exact same phrasing, and the absence of that isn't evidence

12:57:17 9  of anything.  If you step back and you wonder in a month

12:57:20 10  with habitual use, if the contrast defense counsel is trying

12:57:25 11  to draw is between October and other months, what does that

12:57:29 12  look like?  How many -- on how many days do we see drug

12:57:34 13  messages in a month like July where he's using heavily.  One

12:57:38 14  day.  Why is that?  Well, these messages are only one of the

12:57:46 15  ways you heard testimony about how he bought drugs.  He

12:57:51 16  called people on the phone, you heard testimony about that.

12:57:54 17  In his book, he described driving into certain parts of town

12:57:58 18  to buy drugs.  And you can imagine and he talked about all

12:58:04 19  of the ways he got drugs other than specifically sending

12:58:09 20  messages.  But for comparison purposes, this is what you

12:58:13 21  see, a month of heavy drug use, one day with those kind of

12:58:17 22  messages.  What does October look like, twice as many.  We

12:58:26 23  see drug messages on the 13th and 14th, we saw meeting

12:58:30 24  messages, as I said, on the day before drugs were purchased.

12:58:33 25  But this idea that there was heavy drug use and that

12:58:37  1    correlates with many messages over many days, and there

12:58:41  2    isn't that in October and therefore that -- you should draw

12:58:44  3    the inference from that that he wasn't using or wasn't

12:58:47  4    addicted, simply isn't born out by the evidence.

12:58:50  5            What do we know specifically about that month of

12:58:56  6    October.  You see on the screen those drug messages on the

12:59:00  7    13th and the 14th.  You see the addiction messages depicted

12:59:04  8    on the 15th and the 23rd.  You see the meeting messages on

12:59:08  9    the 10th and the 11th, the day before he bought the gun on

12:59:11 10    the 12th, and you see on the 23rd both addiction messages

12:59:15 11    and drug remnants and drug paraphernalia recovered by Hallie

12:59:20 12    Biden in the truck.  That's a lot of evidence of drug use

12:59:26 13    and addiction in the month of October.  It is evidence

12:59:29 14    beyond a reasonable doubt.

12:59:30 15            And what else do we see in October?  We see that

12:59:34 16    persistent cash withdraws, hundreds and thousands of dollars

12:59:39 17    every day.  And that's part of a pattern that was over

12:59:43 18    September, October, and November, almost a hundred -- more

12:59:51 19    than $150,000 that was pulled out of ATMs in those three

12:59:56 20    months, day-to-day, over and over and over again.  And we

12:59:59 21    know, we know that he was using in both October and November

13:00:03 22    and the cash is consistent across September, October, and

13:00:07 23    November.

13:00:09 24            Zoe Kestan testified cash was used to pay for

13:00:13 25    drugs, and you heard other testimony that you can't use a

13:00:15  1    credit card to pay for drugs, and that goes without saying.

13:00:18  2    And what kind of amounts did the defendant pay?  Well we

13:00:22  3    heard in his book when he was in Nashville about $1,500.

13:00:26  4    And then we see in November an amount about that.  And that

13:00:31  5    range, in the mid thousands, occurs over and over again in

13:00:39  6    this three-month period, including October.

13:00:44  7            Now, defense counsel asked questions about

13:00:47  8    whether the money, the cash was used for rehab.  And the

13:00:53  9    evidence is it wasn't.  And that's because the rehab was

13:00:56 10    paid for in August.  None of the cash in September, October,

13:01:02 11    or November was for rehab.  You see each of the invoices,

13:01:06 12    and these are in evidence, show that there was no balance,

13:01:12 13    they didn't take credit.  The defendant was required to pay

13:01:16 14    for the rehab on the day it started.  And you see that over

13:01:19 15    and over again.  It was paid on August the 21st for that

13:01:24 16    day, on the 23rd for the next couple of days, on the 24th

13:01:27 17    for that day, on the 24th for the next few days after that,

13:01:34 18    on the 27th for that day, and the sober companion was all

13:01:40 19    paid up by the 27th as well, so no money, none of that cash

13:01:45 20    was used to pay for rehab.

13:01:47 21            Defense also suggested or asked through his

13:01:50 22    questions whether the cash in September was for Airbnb, and

13:01:54 23    again we see in the evidence that that is not the case.  The

13:01:57 24    defendant paid for the Airbnb where he was staying using his

13:02:00 25    Visa check card, which is not an ATM withdraw.

13:02:06  1          Now, you heard testimony that the defendant was
13:02:11  2  in New York in between when he bought the gun and when
13:02:14  3  Hallie Biden found it.  Naomi Biden testified that the
13:02:18  4  defendant came to New York on October 15th to get back his
13:02:22  5  Ford Bronco, you heard testimony this morning that that date
13:02:25  6  wasn't accurate, he actually was still in Delaware, and was
13:02:29  7  -- and the evidence you saw was that there were these
13:02:32  8  meetings set up and his location put him at the 7-Eleven
13:02:37  9  that's described in that text message where he met Bernard,
13:02:47 10  and by October the 17th he still hadn't retrieved his truck
13:02:51 11  and his daughter messaged him in the afternoon.  He didn't
13:02:55 12  respond until a little before midnight.
13:03:00 13          And then at 2:42 in the morning, he asked "where
13:03:06 14  are the keys to the truck" and more remarkably whether her
13:03:11 15  fiance could bring the truck to 57th and 5th, so he could
13:03:15 16  trade with them, this is 2:40 in the morning on a Thursday
13:03:18 17  and he's asking his daughter, who lives in Brooklyn, if her
13:03:23 18  fiance can drive into Manhattan to exchange cars when he's
13:03:27 19  been there for some amount of time by this point, and his
13:03:31 20  daughter responded by asking right now, and then the
13:03:34 21  defendant never responded.
13:03:35 22          We know from the text message that he was
13:03:38 23  actually at The Four Seasons in New York on the 18th.  Then
13:03:42 24  she texted him later on the 18th, this time in the daytime,
13:03:46 25  in the afternoon, asking to try to set up an exchange for

13:03:50  1  the car, and asking if she could see him, and her father

13:03:56  2  told her no.  And she said I'm sorry, really sorry, dad, I

13:04:01  3  can't take this, and then I don't know what to say, I just

13:04:04  4  miss you so much.

13:04:05  5          Remember, the testimony, the reason I think she

13:04:09  6  was called was to try to suggest he was somehow okay.  Well,

13:04:14  7  this isn't okay.  Texting at 2:40 in the morning asking to

13:04:21  8  come to Midtown Manhattan to exchange the truck means the

13:04:27  9  defendant is not okay when he's in New York on the 18th.

13:04:30 10          And then hours later at 10:30 the defendant

13:04:33 11  texts her, "I'm sorry I have been so unreachable.  It's not

13:04:39 12  fair to you."  You remember her testifying that when he was

13:04:42 13  using, it was difficult to communicate with him.  And she

13:04:45 14  testified she didn't know why he had been unreachable.

13:04:51 15          And then finally on the following day on the

13:04:51 16  19th, they were able to set up a time to meet and the

13:04:54 17  defendant picked up his truck, days after, no matter when

13:04:59 18  you start the time frame, he got to New York.

13:05:04 19          Critically when she returned the truck to her

13:05:14 20  father on the 19th, there was no drug remnants in it and no

13:05:18 21  drug paraphernalia, and I'll return to that in a moment.  As

13:05:20 22  I said, Hallie Biden testified she saw the defendant on the

13:05:23 23  morning of the 23rd, which would be 10/23.  He looked

13:05:27 24  exhausted and it looked like he had been using drugs.  After

13:05:31 25  he got to her house, he went to sleep.  Then she searched

13:05:35 1    the truck, which was part of a pattern of looking for drugs

13:05:38 2    and alcohol, a pattern, that's the word the jury

13:05:41 3    instructions uses, a pattern of active use, that included

13:05:45 4    October of 2018.  And she testified that she did this in an

13:05:49 5    effort to try to help him get or stay sober.

13:05:52 6          And if you compare what Naomi Biden said that

13:05:56 7    she returned the truck to her father clean on October 19th,

13:06:01 8    2018, that there were no drug remnants in it and there was

13:06:06 9    no drug paraphernalia in it, to Hallie Biden's testimony

13:06:10 10   that she searched the truck on October 23rd, just a few days

13:06:14 11   later, that she found drug remnants.  Remember, the way she

13:06:18 12   testified what a drug remnant is, is when you break pieces,

13:06:23 13   smaller pieces of crack off a larger rock, a lot of it falls

13:06:27 14   and breaks off, that's what a remnant is, and that's what

13:06:31 15   Hallie Biden saw in that truck on October the 23rd, and she

13:06:35 16   also found drug paraphernalia.

13:06:37 17         So what does that mean?  What does a clean truck

13:06:41 18   with no drug remnants and no drug paraphernalia on

13:06:45 19   October 19th, as in the testimony of the defendant's own

13:06:48 20   daughter, and then a truck with drug remnants and drug

13:06:51 21   paraphernalia on the October the 23rd, what does that mean?

13:06:56 22   It means the defendant used crack in the truck between

13:07:00 23   October 15th, 2018, and October 23, 2018, October 19th, when

13:07:05 24   he got it back.  Now nobody saw it, right?  But you heard

13:07:10 25   Her Honor instruct you that we rely on circumstantial

13:07:14  1    evidence just as much as we rely on direct evidence.  And

13:07:19  2    this is circumstantial evidence beyond a reasonable doubt

13:07:21  3    that he used drugs in that truck in that period.

13:07:24  4         It's like if you go to bed at night in the

13:07:27  5    winter and there is no snow on the ground, and you wake up

13:07:30  6    the next morning and there is snow on the ground, you know

13:07:33  7    it snowed.  And that's what this evidence showed.  The

13:07:35  8    defendant used drugs in that truck in between the time his

13:07:39  9    daughter returned it, whenever it was in that week and when

13:07:44 10    Haley Biden found the gun in it.

13:07:48 11         So to be clear, what leads to the three felony

13:07:51 12    charges in this case are the defendant's choices, not anyone

13:07:55 13    else's.  The testimony, the texts, and the photographs that

13:08:00 14    are evidence of his addiction may provoke disgust or

13:08:05 15    sympathy, or both, but the defendant wasn't charged with

13:08:08 16    being an addict and as Mr. Hines said in opening, while

13:08:12 17    addiction is not a choice, buying a gun is.  And lying to

13:08:16 18    buy that gun is a choice.  And that, that is why we're here.

13:08:22 19         The evidence that the defendant made those

13:08:26 20    choices to buy a gun and to lie about it and that he knew he

13:08:31 21    was lying about it, that he did it knowing exactly what he

13:08:35 22    was doing is beyond a reasonable doubt.

13:08:38 23         It supports only one verdict, guilty as to all

13:08:44 24    three charges.

13:08:45 25         Thank you.

13:08:55  1          THE COURT:  All right.  Thank you.  Mr. Lowell.

13:08:58  2          MR. LOWELL:  Thank you, Your Honor.

13:09:01  3          Thank you, ladies and gentlemen.

13:09:05  4          When we met a week ago, it seems a lot longer

13:09:15  5  doesn't it, I told you some of the things the evidence would

13:09:17  6  show.  And told you some of the things that the prosecutors

13:09:22  7  could not satisfy to meet their very high burden of proof on

13:09:28  8  these very serious charges beyond a reasonable doubt.  So

13:09:34  9  how did they just begin their closing argument?  With

13:09:39 10  raising whether Hunter's mom, or wife, or sister, or other

13:09:47 11  relatives were sitting in the courtroom.

13:09:52 12          Judge Noreika then at opening will -- has

13:09:58 13  explained some of these important concepts and will when

13:10:01 14  we're done.  And these concepts about the burden and these

13:10:06 15  concepts about how high that burden is are there to ensure

13:10:12 16  that no person in your country is convicted improperly.

13:10:17 17          She has instructed you that the presumption of

13:10:21 18  innocence means that the defendant has no burden or

13:10:24 19  obligation to present any evidence at all or to prove he is

13:10:30 20  not guilty.  That burden of, or obligation of proof is on

13:10:33 21  the government to prove that the defendant is guilty, and it

13:10:37 22  stays with the government throughout the trial.

13:10:41 23          Reasonable doubt.  A reasonable doubt is a fair

13:10:47 24  doubt based on reason, logic, common sense, or experience.

13:10:50 25  Here is the important part.  It's a doubt that an ordinary

13:10:55 1    reasonable person has after carefully weighing the evidence,

13:11:00 2    and it's a doubt of the sort that would cause him or her to

13:11:04 3    hesitate to act in the matters of importance in his or her

13:11:09 4    own life.

13:11:10 5        It can also arise by a lack of evidence.  This

13:11:14 6    is such an "important matter."

13:11:18 7        You will see in the instructions as well, an

13:11:22 8    incredibly important phrase, which I will come back to you a

13:11:26 9    couple of times while I'm standing here, because what that

13:11:30 10   instruction also says is that reasonable doubt and the

13:11:34 11   burden of proof beyond reasonable doubt does not occur by

13:11:38 12   the phrase in the instruction is suspicion or conjecture.

13:11:44 13       So, because his daughter, Naomi said that he

13:11:49 14   came to New York and she thought about and then said the

13:11:54 15   15th, they then proceed to try to put in as they did texts

13:11:58 16   that would suggest that it was later, or what happened

13:12:02 17   before, and I'll come back to this one, is exactly that

13:12:07 18   conjecture and suspicion.

13:12:10 19       With this very high burden, it's time to end

13:12:14 20   this case.  So let me start with what you just heard as

13:12:20 21   well.

13:12:21 22       In opening, I told you that the prosecutors

13:12:25 23   would do what they just did again, they would take various

13:12:29 24   years and make a continuum and then like an accordion sling

13:12:36 25   it all down as if it happened in the period of relevance

13:12:40  1    here.  What is that burden to convince each and every one of

13:12:43  2    you individually that you should convict Hunter on these

13:12:46  3    three felony charges.

13:12:48  4           As I said, the key requirement in each of these

13:12:51  5    is that Mr. Biden made a false statement while acquiring a

13:12:58  6    firearm from the seller.  And you will see that statement

13:13:04  7    when made was not what he believed to be false.

13:13:08  8           You see as you are expressed that it has to be

13:13:14  9    material, and I'll come back to that one, and you will see

13:13:18 10    why on that day we presented the questions that we did so

13:13:21 11    that you will see what was or was not material.

13:13:23 12           In Count 2, it says Mr. Biden knowingly made a

13:13:27 13    statement or representation, knowingly in an ATF form that

13:13:32 14    he knew the statement or representation was true.  And we

13:13:36 15    have said and spoken and showed you that the word knowingly

13:13:40 16    cannot be proved beyond reasonable doubt, or that his

13:13:44 17    representation was false, or that he at the time, and I'll

13:13:50 18    come back, knew the statement was untrue.

13:13:54 19           And the third is that Hunter knowing, knowing

13:13:58 20    that he was an unlawful user of a controlled substance or

13:14:02 21    addicted to a controlled substance did knowingly possess a

13:14:06 22    firearm, and again, the critical phrase or word that the

13:14:11 23    prosecutors leave out are the issue of knowing.  And I will

13:14:16 24    come back to that.

13:14:17 25           You just heard that Mr. Wise said he knew he was

13:14:23 1  an addict and wrote about that he was an addict and spoke

13:14:27 2  about the fact that he was an addict as if that was in real

13:14:30 3  time.  But this is what you will have heard already.  A

13:14:34 4  person accounts knowingly if the person acts voluntarily and

13:14:37 5  intentionally and not because of a mistake, an accident, or

13:14:41 6  some other innocent reason.  That means the government must

13:14:44 7  prove beyond a reasonable doubt that the defendant was

13:14:46 8  conscious and aware of the nature of the actions and of the

13:14:50 9  surrounding facts and circumstances as specified in the

13:14:53 10 definition of offenses charged.

13:14:56 11        That means that knowingly is not just what you

13:15:00 12 heard, that it applies to the count about simply whether he

13:15:03 13 thought at the time a form was run, but knowingly also

13:15:08 14 applies to the other count about possessing.

13:15:12 15        I want to address this issue of his use, of

13:15:15 16 course I want to address that.  And then how do the

13:15:18 17 prosecutors try to prove that that occurred beyond a

13:15:23 18 reasonable doubt.  They spent hours, I mean literally hours

13:15:26 19 recounting Hunter's terrible journey through alcohol and

13:15:31 20 drug abuse.  Most, of what I explained when I first met you,

13:15:35 21 that he admitted, as you just heard.  As if him saying I am

13:15:39 22 an addict after the fact meant that he was an addict

13:15:43 23 throughout the period and knew it in the way it was

13:15:45 24 expressed.

13:15:46 25        But remember what they did again.  They blurred

all those years before he walked into StarQuest Shooters, and a year and two later. What they did was squeeze 2016, 2017, early 2018, and when they say 2018, please pay close attention to how they take the first part, wherein his own words, his own book, he doesn't deny that he was in that period of time, and then skip as if the same would apply later in the year. Remember again the book with all that's said and written by him was after the fact, looking readily backwards, not what he thought at the time. And as Agent Jensen said, it was not a diary.

And I told you when we met and I'll tell you again now, that to do what I just said about condensing all that time, and telling you when he writes he's readily admitting in every part of those years that he was what the law forbids him from being.

Have you ever seen the magicians trick of having you look at this hand, while in the other hand is where the trick is being done? Look at this, and then see that in the hand that matters, there is nothing there.

Because when you got to 2018, what was missing? Remember that book, Beautiful Things, that he wrote and was published in 2021, what did it say about the time in Los Angeles from August, when he went to The View, to the time he bought the gun? Not after the incident in which the gun was thrown out and he had that occasion to be involved with

13:17:47  1    Hallie, but in that period, in that book, do you remember?

13:17:51  2    Nothing.

13:17:51  3            Remember what the text said about the time in

13:17:54  4    Los Angeles from August when he went to The View to the time

13:17:58  5    he bought the gun, again, nothing.

13:18:03  6            Yes, I'll come back to what you saw this

13:18:06  7    morning.  In fact, you recall the very specifics that Hunter

13:18:10  8    writes about his use in 2016, 2017, and the earlier 2018,

13:18:16  9    and all the other years before and after the fall of 2018.

13:18:22 10    You will remember that in 2016 or '17, you will recall

13:18:28 11    specific photos as you saw them a moment ago, right?  Look

13:18:36 12    at the spring of 2018.  There are packages of drugs.  There

13:18:41 13    is a scale with drugs.  You'll remember that there are

13:18:45 14    pipes, a photo with ashes in a bathroom, for 2016 and 2017

13:18:51 15    and the first part of 2018, but then when we got to the

13:18:57 16    period between August and the time you have been talking

13:19:03 17    about in this case, what did you not see?  Any such photos.

13:19:08 18            And then they did it again.  With crunching

13:19:12 19    texts from the period before October the 9th into October

13:19:18 20    the 16th, you can keep going, where I point out and show

13:19:23 21    you, you won't see those kinds of photos.  You won't see

13:19:27 22    those kind of words.  You won't see those kinds of scales or

13:19:32 23    the like.

13:19:41 24            So let's go to the proof that they have tried to

13:19:47 25    show you weighs the scale beyond reasonable doubt.  Zoe

13:19:53  1    Kestan, who said Hunter was going and was -- when she saw

13:19:57  2    him in late -- no, whenever she said, August into September,

13:20:02  3    late September, says that he was using drugs in the two days

13:20:05  4    she saw him.  First of all, remember even then, that's a few

13:20:11  5    weeks before he returns, even so.  Consider that against the

13:20:14  6    evidence that when he left The View, you have already seen

13:20:19  7    some of the evidence of what he was doing.  He was at The

13:20:24  8    View, and I'll come back to that time period, and he was

13:20:28  9    working with what are called sober coaches, and you know

13:20:33 10    that that happened in that period of time as well.  He was

13:20:37 11    living with, and you can see from the evidence, continuing

13:20:41 12    on occasion to see something called that sober coach.  And

13:20:45 13    you also know in this period of time that he was visited by

13:20:51 14    his daughter who was introducing him to her now husband when

13:20:55 15    she --

13:20:57 16              MR. WISE:  Your Honor, I object.  Can we come to

13:20:59 17    side-bar?

13:23:15 18              THE COURT:  Yes, you may.

13:23:15 19              (Side-bar discussion:)

13:23:15 20              THE COURT:  OKAY.

13:23:15 21              MR. WISE:  My objection, using rough transcripts

13:23:15 22    is improper.  This is a rough transcript.  This is not the

13:23:15 23    final.  They are not going to get to see the transcript.

13:23:15 24    This makes them think they can see transcript.  It's their

13:23:15 25    memory that controls.  They put their thumb on the notes,

13:23:15  1    this puts a thumb on the scale that somehow it weighs what

13:23:15  2    they know.  We asked them to exchange demonstratives.  If I

13:23:15  3    knew he was going to use transcript quotes, I would have

13:23:15  4    objected.  We never used them.

13:23:15  5              MR. LOWELL:  Never in twenty-five trials have I

13:23:15  6    heard that.  I can introduce it as what your memory says as

13:23:15  7    to what he said, but I certainly can point to something and

13:23:15  8    I can certainly read it to see if --

13:23:15  9              THE COURT:  Yes, it's a question of whether you

13:23:15 10    put it up on the screen which makes it seem more vouched

13:23:15 11    for.

13:23:15 12              MR. LOWELL:  Can I stipulate that?  I don't have

13:23:15 13    to put it on the screen.

13:23:15 14              THE COURT:  Just like Mr. Wise said, Zoe Kestan

13:23:15 15    testified whatever, you can say she testified whatever, it's

13:23:15 16    a difference between putting a rough transcript on the

13:23:15 17    screen so it just -- it sort of --

13:23:15 18              MR. LOWELL:  I have never heard that before,

13:23:15 19    said before, their memory would do, it's an aid, you're

13:23:15 20    telling me I can't do it, I can introduce as your memory

13:23:15 21    will prevail this is what he said.

13:23:15 22              THE COURT:  Why don't you not put it on the

13:23:15 23    screen.

13:23:16 24              (End of side-bar.)

13:23:16 25              MR. LOWELL:  Let me say again that of course you

13:23:18  1    have to use your own memory, but you'll remember, for

13:23:21  2    example, that his daughter said that we met him at a coffee

13:23:24  3    shop and we had lunch with him and we met his sober coach.

13:23:29  4    That wasn't all.  Agent Jensen told you that as well.  She

13:23:35  5    said does this exhibit contain records showing the

13:23:38  6    defendant's stay at a rehab center and with a sober coach.

13:23:42  7    And her answer was yes.

13:23:44  8            So I want you to weigh Zoe Kestan's immunized

13:23:50  9    testimony and I'll come back to a special instruction that

13:23:53 10    you heard Judge Noreika say about her, that came about after

13:23:56 11    seeing the prosecutors, if you will you remember to prepare

13:23:59 12    or should I say rehearse.

13:24:03 13            MR. WISE:  Objection, Your Honor.  Objection.

13:24:08 14            THE COURT:  They can make -- you can't give your

13:24:10 15    opinion of those things, but they can make their own

13:24:13 16    determination.

13:24:14 17            MR. LOWELL:  To meet three times for a total of

13:24:17 18    how many?  Six hours with the fact that she admitted that

13:24:23 19    she would not go out with Hunter until after she found out

13:24:27 20    who he was, was more than willing to use drugs with him,

13:24:31 21    even introduce him to sellers in Rhode Island when Hunter

13:24:35 22    was trying to be in rehab, spent lots of his money, and also

13:24:39 23    showed you the only photos of drug use in prior and later

13:24:44 24    years from her phone.  And Mr. Wise referred to her and her

13:24:52 25    photos.  But for all she could do to back up her word after

13:24:57 1    all she had done to meet with the prosecution team, when she

13:25:02 2    said she could show that in those prior times in 2018 and

13:25:06 3    later in 2018 in the fall, winter and into 2019, remember

13:25:12 4    what her photos showed in September when she said she was

13:25:18 5    with Hunter for two days?  This was the photo she showed.

13:25:23 6    It's a selfie of her, at the hotel called Freehand.  Unlike

13:25:29 7    those other photos, Hunter is not in the hotel room, not

13:25:34 8    bathroom, not ashes, not any of the things that the

13:25:38 9    government kind of went through piece by piece in her photos

13:25:45 10   when it was in fact Hunter was using.  What about the next

13:25:48 11   one?  This was when he said -- she said she visited him at

13:25:52 12   the Malibu house.  And what is it?  It's a picture of Hunter

13:25:57 13   in the house smoking a cigarette.  Not a crack pipe.  No

13:26:05 14   bongs, no other paraphernalia, smoking a cigarette.  In the

13:26:10 15   critical time that you have to believe Zoe Kestan when Zoe

13:26:14 16   Kestan has photo after photo after photo when he is using

13:26:19 17   what the government readily points to you, what does she not

13:26:23 18   have?  In this case no pipes, no scales, no drugs, not even

13:26:29 19   alcohol bottles.  Once again, the lack of photos can speak

13:26:34 20   more loudly than the spoken by her under her grant of

13:26:41 21   immunity.

13:26:42 22        Where else did they go?  Poor Hallie Biden, who

13:26:47 23   had to be dragged through this period of her life again, who

13:26:51 24   understandably did not remember a lot of the details.  But

13:26:54 25   even she said she did not see Hunter using drugs in this

13:26:58  1    period.  And said only that when she went into the truck on

13:27:04  2    October 23rd, first she said there were remnants and

13:27:07  3    paraphernalia, but then when asked said a dusting of powder,

13:27:12  4    I guess.  And when I asked her to be more specific and tell

13:27:17  5    us whether those remnants were on the console, steering

13:27:21  6    wheel, floor mats, or car seat, all do you remember she said

13:27:25  7    is, I do not recall.

13:27:28  8         And when asked what type of paraphernalia, she

13:27:32  9    again said, I do not recall.

13:27:36 10         Was she remembering what she saw that day or

13:27:40 11    dozens of other days when she, too, was using, where that

13:27:47 12    more likely than not happened, okay.  But if you noticed,

13:27:52 13    she could remember that which the prosecutors asked her, the

13:27:54 14    prosecutors who also gave her immunity, but not so much for

13:27:59 15    any number of things.  When she saw Hunter when he came back

13:28:03 16    from LA, even if it was on the day he came back to go with

13:28:08 17    her at an appointment she had at a Caron rehabilitation

13:28:12 18    center or facility, when she saw him -- or when she saw him,

13:28:16 19    whether it was October 22nd or 23rd, whether it was the

13:28:20 20    night, whether it was the night before, whether it was the

13:28:22 21    early morning or when.  And you'll remember that I asked her

13:28:27 22    whether or not when I could refresh her recollection, did

13:28:31 23    she know that she was not with him that morning.  And do you

13:28:35 24    remember when I had to do that by saying do you remember the

13:28:39 25    reference to calling an Uber?  And then she said yes.  You

13:28:44  1    don't need an Uber to go from her driveway into the house.

13:28:49  2            And again, it was the government's own exhibit,

13:28:53  3    which showed in Hunter's accounts that on the day of the

13:28:59  4    22nd, and on the day of the 23rd, there are debits for the

13:29:08  5    Best Western Hotel in Wilmington, Delaware.  Only after my

13:29:11  6    reminding her of her own texts about a hotel did she then

13:29:19  7    say yes, that's where he was, not at her house.

13:29:24  8            She also could not explain those exchanges I had

13:29:28  9    with her about where those calls back and forth, where are

13:29:33 10    you, meant she obviously wasn't with him.  Or when I asked,

13:29:40 11    where the pouch was in the truck, or where and when it got

13:29:45 12    there, or whether her going to the truck was to look for

13:29:49 13    drugs, or in the context of her are you with someone texts,

13:29:54 14    for another reason.  Why won't you answer my calls?  Where

13:29:59 15    are you?  Are you with someone?"  And then I asked her

13:30:04 16    whether that someone was her concern about being with

13:30:09 17    somebody who might be with drugs or another woman?  You

13:30:13 18    remember what she said.  Another woman.

13:30:15 19            And there are the two texts right after this

13:30:20 20    accusatory set of texts asking where he was and with whom,

13:30:26 21    which you have seen now all sorts of times, where he writes

13:30:30 22    her and says he's with that dealer named Mookie, or he's at

13:30:34 23    the 7-Eleven, and indeed, he did write those.

13:30:37 24            And you saw only this morning Agent Jensen

13:30:40 25    saying he then at various times in the weeks before -- a

13:30:44 1  week before or at some other time went to the 7-Eleven, and

13:30:47 2  you saw in the text this morning if you remember that one of

13:30:51 3  those occasions was that 4 or 5 o'clock in the morning where

13:30:55 4  he writes to her "are you up?"  Or when he said "I am locked

13:31:00 5  out of the house."  And at that hour, where was he,

13:31:05 6  according to Agent Jensen, at the 7-Eleven.  They want to

13:31:09 7  give you the inference that what he was doing at that

13:31:13 8  7-Eleven was buying drugs in the morning as opposed to a cup

13:31:17 9  of coffee while he waited for Hallie to wake up.

13:31:21 10      And when they can or when they dig or when they

13:31:29 11  try, they have shown you when they can corroborate where he

13:31:34 12  was with location data, and when they suggest, as I asked

13:31:39 13  Agent Jensen, when they went backwards to find other

13:31:41 14  occasions, was he really at the place, whether he is just

13:31:46 15  putting somebody off and saying meet me at the 7-Eleven.

13:31:50 16      Do you notice this morning that a person writes

13:31:52 17  to him, writes to him and then it could be any number of

13:31:57 18  hours or time in which he responds, then, you remember what?

13:32:02 19  No location data.

13:32:03 20      And Hallie told you what you didn't need her to

13:32:09 21  tell you given the nature of their relationship at any given

13:32:13 22  time, he would lie to her about where he was and that would

13:32:17 23  certainly include when he was with another woman.  And she

13:32:21 24  said just to be clear about it, you mention that you cannot

13:32:25 25  trust what he says when he writes to you because you find

13:32:27 1    out sometimes he's lying, correct?  And of course she said

13:32:33 2    correct.

13:32:33 3            And I asked whether she knew on that occasion

13:32:36 4    when he said he was sleeping on a car, or at the

13:32:40 5    7-Eleven that day for that reason as opposed to any other

13:32:44 6    reason, she did not know.

13:32:47 7            Now, let me stop here.  I am not suggesting that

13:32:49 8    the years that he was in Delaware and that he was using

13:32:52 9    drugs, that couldn't happen at a 7-Eleven, it couldn't

13:32:56 10   happen at some other place, but that's what they did do,

13:32:59 11   they take an event in which is in the middle of what they're

13:33:02 12   trying to prove, and they push it forward as if it means the

13:33:06 13   same thing at the same time, that's the accordion.

13:33:09 14           So you get to hear an exchange not that day,

13:33:18 15   earlier day, later day, and there is a guy named Q, earlier

13:33:23 16   in 2018 you hear a man named Frankie.  What didn't you hear?

13:33:28 17   You didn't see in those exchanges that they want you to

13:33:31 18   focus on versus the time that is important any reference to

13:33:35 19   a Bernard, any reference to a Mookie.  In retrospect, this

13:33:43 20   was not the best way as even Mr. Wise said to put Hallie

13:33:46 21   off, yes, he could have written I'm in D.C. instead of DE

13:33:50 22   and he writes New Castle.  When he wrote that in the midst

13:33:53 23   of their relationship, he wasn't thinking that five years

13:33:56 24   later he would be sitting in a courtroom trying to explain

13:33:59 25   the way they talked to each other.

13:34:02  1        Then they tried to show that they had proof

13:34:07  2    beyond a reasonable doubt with testimony by FBI Agent Jason

13:34:12  3    Brewer about that leather pouch.  I told you when we first

13:34:16  4    met that that was going to be what they were going to try to

13:34:19  5    do.  Another watch this hand, I'm holding the pouch, don't

13:34:26  6    look at this hand as to what that pouch means.

13:34:31  7        So what do we know about that?  First Hallie

13:34:34  8    said she found it in the truck, yet we know Hunter and her

13:34:38  9    pouches or his pouches often were in her house as she said.

13:34:43 10    We know she was looking around for what to do with a gun and

13:34:46 11    the other things that she found.  And that she went into the

13:34:49 12    house to find a bag.  We know that Hunter did not get the

13:34:53 13    truck back until he got it in New York, and of course it's

13:34:57 14    possible, there is suspicion or conjecture, that some time

13:35:02 15    then and sometime on the 23rd that's when that pouch got

13:35:06 16    into the truck.  No evidence of that.  It's just her word

13:35:11 17    that that's what she found it.

13:35:13 18        But most importantly, no one can say anything

13:35:17 19    about this exhibit that actually counts.  Right?  Except

13:35:22 20    that five years after it was taken, by the Delaware State

13:35:27 21    Police, and stayed in some fashion until after the charges

13:35:31 22    in this case were filed, the prosecutors then decided to

13:35:34 23    have it tested, and when they did, they did not find finger

13:35:41 24    prints.  But what did they find?  They found that trace that

13:35:45 25    the chemist, Mr. Brewer said very small amounts which he had

13:35:52  1    it combined.  But what did he not show you?  Just remember,

13:35:54  2    the proof beyond reasonable doubt is not on us, it is a

13:36:00  3    suggestion they make and what do you now know about that

13:36:03  4    pouch?  You don't know when any residue was put there.  You

13:36:06  5    don't know by whom.  You don't know where it was at the

13:36:11  6    time.  You don't know if there was that residue, whether

13:36:15  7    Hunter put it there, Hallie put it there, or anybody else

13:36:18  8    they were with.  It's a big piece of evidence to them, but

13:36:21  9    when you actually think about it, doesn't it actually point

13:36:24 10    out the problem with suspicion or conjecture?

13:36:31 11            And Judge Noreika said during the trial, you

13:36:34 12    heard testimony of witnesses and argument by counsel, that

13:36:37 13    the government did not use specific investigative

13:36:42 14    techniques.  She told you very specifically, especially when

13:36:45 15    they want to make something of that pouch that you may

13:36:48 16    consider these facts in deciding whether the government has

13:36:51 17    met its burden of proof.

13:36:52 18            So how else did the prosecutors try to meet this

13:36:57 19    heavy burden?  By calling witnesses who often did no more

13:37:01 20    than to again confirm what Hunter admitted.  When I told you

13:37:06 21    he would not be contesting his use in other times, but they

13:37:12 22    spent time doing it anyway.  They subpoenaed his ex-wife to

13:37:16 23    tell you about his past alcoholism and drug use in 2015 and

13:37:21 24    2016, and a vague reference that she would find

13:37:26 25    paraphernalia in a car or a truck without my asking which

13:37:30 1    one and when, she didn't know that.  But what you do know

13:37:34 2    was by this period in 2018, they were not together.  I think

13:37:39 3    she even confirmed to me that their contact was other than

13:37:43 4    being together.  And she certainly didn't see him using any

13:37:46 5    drugs in that period.  But they called her anyway.

13:37:49 6            There was no actual witness to the drug use in

13:37:53 7    this period of time, but again, Agent Jensen, who is sat at

13:37:58 8    table and you see her now, but did not get assigned to this

13:38:01 9    case she said until the fall of 2023, and could compile her

13:38:06 10   text charts, which again if you look at them carefully have

13:38:10 11   distinct differences between what you can show in the

13:38:13 12   earlier years and what you can show when it counts.  So many

13:38:18 13   texts about real drug use, versus I am on the top of the my

13:38:25 14   car smoking crack.  And again, when you get the

13:38:30 15   instructions, I want you to remember that proof beyond

13:38:33 16   reasonable doubt is not allowed to be arrived with suspicion

13:38:37 17   or conjecture.

13:38:39 18           And then there was the so-called evidence of DEA

13:38:44 19   agent Joshua Romig.  Again, watch this hand, pay no

13:38:51 20   attention to that one.  He can tell you as he did where does

13:38:55 21   cocaine come from, he can tell you how it was made, he can

13:38:58 22   tell you how it's distributed, he can tell you how much it

13:39:02 23   could cost in any period of time, he could tell you that his

13:39:06 24   job is to go after large distributors to prevent drugs from

13:39:10 25   being sold, when this case is about a single user.  And then

13:39:14  1    he could tell you about drug lingo and how Hunter used that

13:39:18  2    lingo in various years.  But the more he told you about

13:39:22  3    that, again, it should have emphasized what's different.

13:39:27  4    The lack of proof beyond reasonable doubt because of that

13:39:33  5    stubborn fact that comes up time and time again, that this

13:39:38  6    lingo that they spent so much time to go over with you was

13:39:43  7    in 2016 or '17 or '18, whether they're talking about his

13:39:48  8    book, or the texts.  And in the period where he was telling

13:39:53  9    you about this lingo, do you recall what I had him do?  Go

13:39:57 10    through every one of the texts in which he was trying to

13:40:02 11    condense the time period and confirm that no such lingo

13:40:07 12    existed at that time.

13:40:09 13             So the next thing they did when they saw me

13:40:15 14    doing that was to ask agent Romig when they came back up,

13:40:20 15    was use of cash, and do you remember his word, inference of

13:40:24 16    drug use.  Of course it is.  They wanted to leave that off

13:40:30 17    right there, but then I had agent Romig point out the

13:40:37 18    obvious, that cash or debit withdrawals are also to be used

13:40:42 19    for as the witness said, especially for other purposes if

13:40:47 20    there is no operative credit card at the time.  If you

13:40:51 21    remember the back and forth with me and with agent Romig

13:40:54 22    after they left off with doesn't cash show drugs, this is

13:40:58 23    what it was.  Is large withdrawals of cash on any day that

13:41:01 24    is in the amounts they said used for things other than

13:41:04 25    drugs?  The agent said it absolutely can be.

13:41:08  1          Can it be used to give your family cash to pay
13:41:10  2  for their expenses or living?  Expert Romig, absolutely.
13:41:15  3  Can it be used to purchase goods if you don't have a usable
13:41:18  4  credit card at the time?  Absolutely.  Can it be used to pay
13:41:22  5  for the place you checked in for rehab if they'll take it
13:41:26  6  that way?  Yes, as far as I know.  Can it be used for a
13:41:31  7  person's living expenses themselves to pay for their rent,
13:41:34  8  their groceries, or anything?  Yes, it can.
13:41:37  9          Proof beyond reasonable doubt is not making a
13:41:43 10  suggestion that is suspicion or conjecture and then hope
13:41:46 11  that you won't see the difference.  Of course he used cash
13:41:49 12  when he bought drugs, but all those amounts that were in
13:41:53 13  each year or each month or each time, is that what they're
13:41:57 14  trying to say that a $10,000 withdraw on a day is for drugs?
13:42:03 15  These are serious charges that will change Hunter's life,
13:42:07 16  but when the prosecutor wants to make their case beyond
13:42:11 17  reasonable doubt by pointing to a pouch that says nothing,
13:42:14 18  texts from prior years or later months, which highlight
13:42:17 19  what's not there in the operative time, witnesses who are
13:42:20 20  given immunity for their conduct, and then something called
13:42:24 21  an inference that cash means drugs, your job as sworn jurors
13:42:31 22  is to declare that that is not the definition of proof
13:42:34 23  beyond reasonable doubt.
13:42:36 24          What did you hear about Hunter's addiction in
13:42:39 25  those years?  By the time of early 2018, by his own words,

13:42:44 1    he was smoking crack as often as 20 minutes, every

13:42:48 2    20 minutes.  He had literally fled the East Coast as you

13:42:52 3    remember.  Do you remember the word he used, to disappear.

13:42:57 4    To get away from things in D.C. or in Delaware.

13:43:01 5         He did not see his family until one of them

13:43:05 6    visited, or two of them visited in that fall at the end of

13:43:10 7    the summer of 2018.

13:43:13 8         Did you see or hear anything about the type of

13:43:17 9    that 20-minute use in terms of his ability to have "self

13:43:22 10   control" in that instruction when he came back from Los

13:43:26 11   Angeles.  When did you hear what -- and then you did hear

13:43:30 12   that he was doing things totally inconsistent with that

13:43:34 13   previous habit that they played for you in his book, and

13:43:37 14   that people testified about him sneaking off and being

13:43:42 15   unavailable, but what did you hear in that period of time?

13:43:44 16   He returned to Delaware who help Hallie with her recovery.

13:43:48 17   He spent him with his family.  Had not done that for more

13:43:52 18   than half a year.  He did not sit in a car missing

13:43:56 19   airplanes.  He was able to pack and get out.  Those were not

13:44:00 20   by comparison the actions of a person who believed knowingly

13:44:05 21   that he was what the law forbids him to be.  Or a form asks

13:44:11 22   him if he is.  The evidence you did see in this period is

13:44:17 23   what I said when we met, kicking crack cocaine is hard.

13:44:21 24   Kicking alcohol, much harder.  Even after The View, he ended

13:44:27 25   up drinking, but drinking alcohol while buying or possessing

13:44:32  1    a gun is not the charge, it's not against the law.

13:44:36  2              Mr. Wise said and asked you to look at

13:44:40  3    references to the word sober, to his phrase "I relapsed", as

13:44:45  4    if that meant drugs.  Conjecture and suspicion.  But what do

13:44:52  5    you have in evidence in that period of time we're talking

13:44:55  6    about?  This is what you have.  You have all of his bank

13:44:59  7    records, the government's exhibit, on October 1st,

13:45:04  8    October 6th, October 17th, October 18th, October 19th,

13:45:09  9    October 21st, October 24th, and October 30th.  You may have

13:45:13 10    a text that they want to say means that he was meeting

13:45:16 11    somebody at 7-Eleven without a location data, okay,

13:45:19 12    conjecture and suspicion, but what you do have is what he

13:45:23 13    was doing and what he met when he uses the word sober.  When

13:45:26 14    he says I relapsed, and that is real evidence.

13:45:30 15              Let's turn to the gun sale.  Let me turn to the

13:45:36 16    day of October 12th.  And the total lack of proof let alone

13:45:41 17    beyond reasonable doubt that on that day Hunter to use the

13:45:45 18    expression in the charge "knowingly" and with intent to

13:45:48 19    deceive was lying on a form asking him in the present tense

13:45:55 20    if he was a user or an addict.  Now you know what I said in

13:45:59 21    opening I think, on October 12th, Hunter was shopping for a

13:46:03 22    new phone.  This is government Exhibit 24.  It is date dated

13:46:07 23    as a status change history, and its time is October 12th of

13:46:12 24    2018.

13:46:12 25              You see that status change history on the 12th.

13:46:17  1    And then you'll remember that Mr. Cleveland identified that

13:46:21  2    AT&T store was just across the parking lot from StarQuest

13:46:27  3    Shooters and Supply.  And across that parking lot from the

13:46:32  4    AT&T store was StarQuest Shooters.  And then you saw at some

13:46:40  5    point Hunter went inside.  And this is what he saw when he

13:46:43  6    did.  Given what the evidence the government had but didn't

13:46:48  7    show you about the AT&T store, was he going that day to the

13:46:53  8    shopping center to buy a gun?  And what you also saw was the

13:47:03  9    actual sales slip of that day.  What is on that sales slip?

13:47:06 10    Yes, there is the gun, yes, there is the bullets, yes there

13:47:10 11    is a speed loader, but you'll see there is also a

13:47:14 12    flashlight, that utility tool, and a BB gun.

13:47:19 13           And you were asked a moment ago to use your

13:47:22 14    common sense.  Of course that's what you will bring into

13:47:25 15    your deliberations.  So you see all of those, and then you

13:47:30 16    have to you figure out how actually it occurred that day.

13:47:33 17    Mr. Cleveland is a great guy, he's a wonderful salesman, he

13:47:38 18    is as he and others said "the whale hunter."  But I think

13:47:41 19    the evidence shows that the more likely sequence of events

13:47:45 20    is what I suggested in opening it would be.  A person does

13:47:48 21    not go in, take the time, bought the choices, hear him out,

13:47:54 22    hear about guns, buy the bullets, explains about them, hears

13:47:58 23    something about a speed loader that he never knew before and

13:48:02 24    asks about that, discusses a lock box, and then says by the

13:48:05 25    way, I want to throw in a BB gun across the room on a

13:48:09  1    different shelf, and only after I had decided to buy the

13:48:12  2    other things.

13:48:13  3           Look, I don't know the actual sequence, but I

13:48:16  4    can suggest to you to look at the evidence and figure out

13:48:18  5    why that is the case.  Why does it matter?  Not because

13:48:24  6    Gordon Cleveland does not remember it correctly, why would

13:48:28  7    he five years later remember whether Hunter went into the

13:48:31  8    store and was killing time and looked to see if there was

13:48:34  9    something that he might like, why would he, he wouldn't.

13:48:37 10    But it does reflect on whether or not Hunter had the

13:48:41 11    necessary intent on the government's charges against him.

13:48:46 12    Let alone whether he went in with the intent to buy a gun

13:48:51 13    knowing that he was not somebody who was allowed to do so.

13:48:54 14           And what I just said the sequence is, again, not

13:48:58 15    using suspicion or conjecture makes sense from what you have

13:49:03 16    in real evidence.  You saw the background check's time.  If

13:49:08 17    you remember, it was 6:36.  And you remember that the sale

13:49:13 18    of all those items with what was discussed with him,

13:49:16 19    explained to him about guns and speed loaders and bullets

13:49:20 20    and all the rest happened in that 16-minute period,

13:49:23 21    according, if that's the way the prosecutors want to suggest

13:49:26 22    it occurred.

13:49:27 23           I think the natural inference is it's not the

13:49:31 24    way it happened.

13:49:32 25           And you also know this anyway because

13:49:36 1   Mr. Cleveland confirmed that between him and Hunter, Hunter

13:49:40 2   did not know about guns, bullets, loaders, and the like.

13:49:45 3   And if you remember my question to him, it went like this.

13:49:50 4   When you and he were talking, you have behind the store as

13:49:53 5   we saw it, a display of guns?  And he said yes.  I said did

13:49:57 6   he know which ones were which?  He said no, that's why I had

13:50:04 7   to explain it to him.  Yes, I explained it to him:  So when

13:50:08 8   he came in, he didn't say I want a Colt, he didn't say I

13:50:11 9   want a whatever, you're saying he was interested in a

13:50:13 10  handgun?  Answer yes.  But to be clear, you're the one who

13:50:17 11  explained the various hand guns.  Yes, I did.  So I asked,

13:50:21 12  when he came in, did he appear to you to be somebody who

13:50:24 13  would even know the difference between a hollow tip bullet

13:50:28 14  and something called a full metal jacket.  And he said no,

13:50:31 15  that's why I explained it to him.

13:50:33 16          When he came in the store, did he look like

13:50:36 17  somebody who would even know what a speed loader was?

13:50:40 18  Answer:  No.

13:50:41 19          Did you explain that to him as well?

13:50:44 20          Answer:  Yes.

13:50:46 21          Then what do we know for sure, surely at some

13:50:50 22  point Hunter was given that 4473 form, but when and by whom

13:50:54 23  is not clear at all.  And then the issue came up about the

13:50:59 24  ID.  Gordon Cleveland said he got the passport and he needed

13:51:03 25  to check it with Mr. Palimere or Mr. Turner.  He said,

13:51:07  1    Mr. Turner said, "we would need for the passport another

13:51:11  2    form of like identification stating his address."  Because

13:51:15  3    you can see on the last page of the exhibit that that is

13:51:19  4    what was there.  That the passport that was attached to the

13:51:25  5    form, as all passports, don't have the residence address.

13:51:31  6    Mr. Cleveland then said it was Jason Turner who talked with

13:51:34  7    Hunter and I asked, did you see him, meaning Mr. Turner talk

13:51:40  8    -- I asked Mr. Turner, did you see him talk to Mr. Turner at

13:51:43  9    that point, Mr. Cleveland said yes.  But then we called

13:51:49 10    Jason Turner.  And I said as between you and Mr. Cleveland

13:51:53 11    who was having interactions with Mr. Biden.  And Mr. Turner

13:51:57 12    said Mr. Cleveland.  And then Mr. Cleveland said that when

13:52:01 13    he was back in the room, only Jason Turner was there.  But

13:52:06 14    then Mr. Turner said when Mr. Cleveland came back into the

13:52:10 15    office, that Ron Palimere was there as well, and that's what

13:52:14 16    Ron Palimere said as well.

13:52:16 17           And you saw on the government's exhibit that

13:52:19 18    passport that was written in by Mr. Turner on lines 18 and

13:52:26 19    line 18, and you saw and I asked whether or not given this

13:52:30 20    exchange about what was happening that day was any other

13:52:32 21    form of ID presented?  And if so, where would you find it?

13:52:37 22    And you saw A did not.  You remember in opening, there was

13:52:43 23    this form with instructions and it made very clear the

13:52:45 24    transferor/buyers must provide a valid government issued

13:52:53 25    photo identification, document to the transferor that

13:52:53 1  contains the transferors/buyers name, residence address, and

13:52:56 2  date of birth, and that's what I asked them about.  Mr. Wise

13:53:02 3  said that's irrelevant.

13:53:05 4       Why is that important for you to try to put

13:53:08 5  together when you're figuring out what happened, why, and

13:53:10 6  what Hunter's intent was?  Because Judge Noreika has

13:53:15 7  explained that question, that issue of materiality.  And she

13:53:19 8  gave you the instruction on materiality, which would

13:53:24 9  reasonably be expected to be of concern to a reasonable and

13:53:27 10  prudent person in connection with the sale of the firearm.

13:53:30 11  Who is selling the firearm that day?  The folks at StarQuest

13:53:34 12  Shooters.

13:53:35 13       So then ask yourself how material was any of

13:53:39 14  what you heard them say on that form because you heard that

13:53:43 15  both Mr. Cleveland and Mr. Palimere said that Ron Palimere

13:53:47 16  wanted to get the sale done quickly once they knew who

13:53:51 17  Hunter was.

13:53:52 18       And Hunter did check the boxes and he did sign

13:53:56 19  the form, but when was that?  Mr. Turner said that the gun

13:54:00 20  came into the back room with the paperwork, Mr. Cleveland

13:54:03 21  said that did not happen.  In addition, Mr. Turner said that

13:54:07 22  when he got the form and the boxes were checked, Hunter had

13:54:10 23  not yet signed the form.

13:54:11 24       Mr. Cleveland did not say that's the way it

13:54:14 25  occurred.  And again, I raise these things because you have

13:54:18  1    to decide whether that materiality issue has been satisfied

13:54:26  2    beyond a reasonable doubt.

13:54:26  3            Now to determine if Hunter was knowingly and

13:54:28  4    intentionally lying on the form with any intent to deceive,

13:54:31  5    you have to look at the form again.  So let's do that.  And

13:54:34  6    you didn't need me and Mr. Cleveland to tell you what is

13:54:37  7    undisputed.  There are 13 questions, which carefully ask a

13:54:42  8    buyer and Hunter that day whether he fit into certain

13:54:46  9    categories.  And you know now, right, that some ask in the

13:54:50 10    present tense, are you, and you know many ask in the past

13:54:55 11    tense, have you ever.  And the all important question 11E

13:55:01 12    that Mr. Wise put up again, that's one of the are you's.

13:55:08 13    When the form wants to ask somebody buying a gun, the

13:55:11 14    question is have you ever used, have you ever been an

13:55:16 15    illegal alien, have you ever had a domestic order against

13:55:21 16    you, that form knows how to ask that question.  And you also

13:55:25 17    know that the form has lots of instructions and lots of

13:55:28 18    definitions.  And you remember here what Mr. Cleveland said

13:55:33 19    when I asked him or the government's lawyers asked him

13:55:36 20    whether or not how Hunter filled out the form.  This is what

13:55:39 21    he said.  "In your testimony you observed Mr. Biden looking

13:55:41 22    at the form, you told him to take his time."  Answer:  "Yes:

13:55:46 23    And you remember that, right?

13:55:47 24            And I asked, the form has multiple pages to

13:55:52 25    look, right?  And what did he say.  "Yes."

13:55:55  1          So what does that mean?  What you know it means

13:55:59  2    is that there are definitions for questions 11A, question

13:56:03  3    11B, question 11C, question 11D, question 11F, question 11G,

13:56:10  4    question 11H, question 11I, 12D, 13 and on and on, but what

13:56:18  5    is undisputed, not conjecture, not suspicion, but actual

13:56:22  6    evidence.  There is no definition for what 11E asks.  It

13:56:28  7    just skips from F to G -- I'm sorry, D to F.

13:56:33  8          So Hunter, who had returned from The View, where

13:56:36  9    he saw his daughter and his future son-in-law, and who came

13:56:41 10    back on the day he did to be with Hallie when she was doing

13:56:45 11    to her own rehab, now was engaging with his family, which he

13:56:51 12    did not do in his worse drug periods.  What would he see, a

13:56:55 13    question not in the past tense, but in the present tense

13:57:00 14    are, and with all you heard about those periods of sobriety

13:57:03 15    and periods of rehab, Hunter's form said no.

13:57:08 16          Remember that instruction I read to you earlier

13:57:12 17    that what these knowingly and with intent to deceive

13:57:15 18    requirements are, that they need to prove beyond reasonable

13:57:19 19    doubt.  And as I suggested when we first met, this does not

13:57:24 20    mean what Hunter thinks about himself in 2024, what he wrote

13:57:28 21    about in 2020 or 2021, when he was writing a retrospective

13:57:34 22    about his time, or what the prosecutors think of him, it

13:57:38 23    means what he thought on those key days in October of 2018.

13:57:46 24    And Mr. Wise talked about Gordon Cleveland again, and when

13:57:51 25    he did that, I just thought of something.  You know

13:57:54 1    something else that Mr. Cleveland told us?  He was the

13:57:58 2    person who spent the most time with Hunter that day, close

13:58:02 3    up.  He said he was careful who he would sell guns to.  He

13:58:07 4    would even deny a sale to someone who he thought was an

13:58:10 5    alcoholic.  Even if he thought so strangely in the law, that

13:58:17 6    he could do so because that is not forbidden in the law here

13:58:21 7    or in the form.

13:58:23 8          And as we pointed out, the form doesn't ask

13:58:26 9    about it or forbid it.

13:58:28 10          Why is it important?  You can conjecture about

13:58:34 11    what Hunter was doing, that's conjecture.  But you have a

13:58:37 12    person who actually saw him on the day of the sale on the

13:58:41 13    morning on -- or the afternoon where it happened, who spent

13:58:44 14    lots of time with him explaining all those things, who said

13:58:48 15    that's real evidence.  And what did he say?  I asked.  And

13:58:52 16    you don't want to sell a gun, I imagine, to somebody you

13:58:56 17    know to be either high or drunk or using a drug or alcohol,

13:59:00 18    right, Mr. Cleveland said no.  Is it your practice to try to

13:59:04 19    understand or glean or observe a person?  Mr. Cleveland said

13:59:07 20    yes.  And as I understand it, your practice would be that

13:59:09 21    you would try to see whether somebody is glassy eyed, right?

13:59:13 22          THE WITNESS:  Yes.  Or smells of alcohol.  Yes.

13:59:17 23    Or smells ever marijuana.  Yes.  Or any other indication of

13:59:20 24    a person not being in their normal sober condition.

13:59:25 25          Mr. Cleveland said yes.

13:59:27  1          And then finally in terms of what you know,

13:59:32  2    their high burden and what will make sense given how they

13:59:36  3    describe how Hunter is when he uses drugs, when he was using

13:59:40  4    drugs, this is what he said.  And on that day Mr. Biden did

13:59:44  5    not exhibit any of the things you try observe?  And he said

13:59:47  6    not at all.

13:59:51  7          Look, it has to be clear from what you heard

13:59:54  8    from Mr. Cleveland and what you see in the form and what you

13:59:57  9    see in the back and forth, that neither Mr. Cleveland nor

14:00:02 10    Hunter were anywhere near trying to deceive each other.  So

14:00:05 11    even when you heard the evidence about Hunter's constant use

14:00:09 12    of alcohol or saw pictures where he's doing that, in this

14:00:13 13    case using alcohol as you saw real evidence of those days in

14:00:19 14    October does not forbid him from doing what he is accused of

14:00:23 15    in this case.

14:00:25 16          Odd, but the fact.

14:00:28 17          Let's talk about possession.  So what Hunter did

14:00:31 18    do with the gun, what did he do after he bought the gun?

14:00:35 19    This is what Mr. Cleveland said about how it left the store.

14:00:39 20    It came with its own lock box, do you remember that, again a

14:00:42 21    piece of evidence I had to submit to you because the

14:00:44 22    government didn't do it when they were asking him questions.

14:00:46 23    And that is what Mr. Cleveland said about this.  I asked,

14:00:51 24    and did you see the lock that you were just talking about

14:00:54 25    has the same name Colt on it?  "Yes."  It comes with a box?

14:00:58  1    Answer.  "Yes."  Inside?  "Yes."  And then I said and then

14:01:02  2    it gets put on the outside?  "Yes."

14:01:05  3             And after Mr. Biden left the store with the

14:01:07  4    material that he had purchased and the gun was in the lock

14:01:10  5    box, correct.

14:01:11  6             Answer:  "Yes."

14:01:14  7             Mr. Wise said and I'm quoting him there is no

14:01:20  8    evidence this gun was, "not in Hunter's possession."  But

14:01:26  9    again, it's their burden of proof, not Hunter's, to fill in

14:01:32 10    a gap as to what happened between October 12th and

14:01:37 11    October 23rd when we know the gun existed.  There is no

14:01:41 12    evidence in the record, I don't know that the gun was ever

14:01:46 13    loaded, the speed loader had any bullets in it, we know

14:01:50 14    there was a box of bullet's, so where was that gun between

14:01:54 15    the 12th and the 23rd when Hallie Biden found it.  Did it

14:01:58 16    even ever come out of that lock box between those two dates?

14:02:03 17    When Hunter traveled in that period of time, whether it was

14:02:06 18    to Philadelphia that the agent knew he would go to see one

14:02:11 19    of his daughters, or New York where he saw Naomi, when bank

14:02:15 20    records that you can look at say that he might have been in

14:02:17 21    D.C. or any other place, where was it?  You don't know.

14:02:28 22             In his argument to you then Mr. Wise talked

14:02:32 23    about the exchange on the night of the 18th with his

14:02:36 24    daughter Naomi in New York.  Look at this, pay no attention

14:02:45 25    to that.  Because if you look at what was said and you

14:02:48  1    remember when Hunter got to New York and reached out to try

14:02:52  2    to set up their meeting, and it turns out that a text is

14:02:56  3    returned after Hunter calls at the 2 o'clock in the morning,

14:03:02  4    you'll see that Naomi is involved in that exchange.  He

14:03:05  5    didn't wake her up.

14:03:08  6           When he says that is Mr. Wise, pointing you to

14:03:13  7    one text that says, "I can't take this", conjecture and

14:03:21  8    suspicion does not make for reasonable doubt.  What does

14:03:24  9    that mean?  Did you remember what she said, she was

14:03:28 10    unavailable, she was in Brooklyn in court, in that text.

14:03:32 11    Could it mean that she was mad at him because she felt like

14:03:36 12    he was doing something with somebody he shouldn't have.  Did

14:03:40 13    it mean something else?  That's how they fill in the gaps

14:03:45 14    when they don't have proof.

14:03:46 15           As I indicated in my opening statement, there is

14:03:48 16    no evidence from that day he bought the gun to the day that

14:03:52 17    Hallie threw it out that the gun was anywhere but in its

14:03:56 18    lock box.  And then what do you know?  On October 23rd,

14:04:03 19    Hallie did something incredibly stupid, and she may have

14:04:07 20    done it for love or she may have done it in my exchange with

14:04:10 21    her because she's always concerned where is Hunter and if

14:04:15 22    he's with somebody else.  We know that around 11:15 in the

14:04:18 23    morning, she said she went to the truck and found the

14:04:20 24    StarQuest gun and bullets and speed loader.  She was the one

14:04:24 25    to decide to then take it out of that safe in the middle of

14:04:27  1    the car and put it in a bag and take the bag and actually

14:04:31  2    throw it in an open trash can at Janssen's market.  Hunter

14:04:38  3    didn't do that.

14:04:39  4            And one more thing.  Hallie said that the safe

14:04:42  5    was not working.  I'm not sure why she would remember that,

14:04:46  6    she could, she might.  As opposed to all the specifics about

14:04:49  7    the dusting or where else everything was including the

14:04:53  8    pouch.  And you heard Naomi said that when she left the

14:04:57  9    truck with her dad, that safe was working.  The combination

14:05:02 10    was locked.  So the prosecutors I guess want you think that

14:05:06 11    somehow got the truck, busted the safe, and that when Hallie

14:05:11 12    got to it, rather than either getting in because she knows

14:05:16 13    the combination or she has her own keys to the truck, that's

14:05:20 14    conjecture and suspicion.

14:05:22 15            And then we saw in the government's exhibit, a

14:05:25 16    video that it's 11:20 that she goes to the store and threw

14:05:29 17    the bag out into the trash.  And you saw the texts that at

14:05:34 18    11:45, Hunter is in his truck and he writes the following:

14:05:42 19    "Did you take that from me Hallie?  Are you insane.  Tell me

14:05:47 20    now.  This is no game and you're being totally irresponsible

14:05:50 21    and unhinged."

14:05:52 22            Ms. Biden confirmed what I said to you in

14:05:57 23    opening about Hunter told her what to do next.  To go back

14:06:01 24    into the store or go back and find the gun that she had so

14:06:05 25    dangerously thrown out.  And he texted her and then called

14:06:09 1    her, as she reported, a minute later.  You know, a person

14:06:14 2    who is as the government wants to suggest, he was in that

14:06:17 3    period of time, who is using drugs, can't operate, is a,

14:06:25 4    "danger to the public safety," is the very person who as you

14:06:29 5    heard in a minute later when Hallie Biden told him the gun

14:06:34 6    was gone, what did he say?  He said "go inside and get the

14:06:41 7    police."

14:06:42 8            And then you saw in the video her of going from

14:06:47 9    trash to trash to find and surely she was continuously

14:06:52 10   freaked out.  But Ms. Biden confirmed as she said she would

14:06:56 11   that Hunter called her back and this is what she said he

14:07:01 12   said.  Then when you -- when we saw you get back into the

14:07:05 13   car and then you called him to tell him I didn't find it,

14:07:07 14   yes, and I think you said in that conversation he said to

14:07:10 15   you go tell somebody, got to tell or make, I think to use

14:07:16 16   your phrase, Ms. Biden, a police report.

14:07:20 17           Answer:  Right.

14:07:21 18           Hallie then went back into the store as Hunter

14:07:24 19   asked her to do, and the Janssen's store people called the

14:07:28 20   police.  And Delaware State troopers, Vincent Clemons and

14:07:33 21   later Josuha Marley arrived.  You heard that Trooper Clemons

14:07:38 22   interviewed Hallie and asked her to ask Hunter to come as

14:07:41 23   well.  Hunter was 20 minutes away and did just that and also

14:07:46 24   gave trooper Clemons a statement.  And corporal Marley

14:07:49 25   confirmed the following:  "He was the victim the entire

14:07:54  1    time."  And he also said, "Hunter's reaction to what has

14:08:01  2    happened, don't file any charges against Hallie."  Hunter

14:08:05  3    and Hallie then left the store that day, certainly that day

14:08:10  4    did not help their relationship.  Neither of them.  And you

14:08:14  5    saw as I put on the screen the Best Western debit,

14:08:18  6    indicating that on that day he was at the Best Western

14:08:22  7    later.  Already too late as to what she said his intention

14:08:25  8    was was to get to Washington D.C.  So from October 12th to

14:08:29  9    the 23rd as to gun the prosecutors as I predicted present no

14:08:35 10    evidence that it was ever loaded, carried around, been in

14:08:41 11    public until Hallie did that, or ever used in any way.  And

14:08:45 12    then you heard how it all ended, that loveable man, Edward

14:08:51 13    Banner, fishes for recyclables and came up with something

14:08:54 14    more valuable than a soda can or a plastic bottle.  And

14:08:58 15    eventually, Delaware State Trooper Billy Greer tracked

14:09:02 16    Mr. Banner down.  Again what do you know, it was only Hallie

14:09:07 17    Biden or Ed Banner who ever, ever took the gun in public.

14:09:11 18    When Mr. Banner took officer Greer to the his to get the gun

14:09:18 19    even though he didn't remember what box it was in or what

14:09:22 20    box, he did remember he gave it to the police that day, and

14:09:24 21    than as he said in opening he had a different gun in a box,

14:09:28 22    which he was keeping for a friend whose brother was in some

14:09:31 23    type of trouble, the police took both guns that day and

14:09:33 24    that's what happened to him.  On October 29th, the police

14:09:36 25    contacted Hunter again to tell him that they had recovered

14:09:40  1    the gun and he told them he didn't want it back.  And again,

14:09:44  2    what do you remember the police officer saying.  He again

14:09:47  3    said, I don't want to press charges against Hallie, and I

14:09:50  4    assume he meant Mr. Banner as well.  So that's what happened

14:09:54  5    between the time on that day that Corporal Marley wrote in

14:09:57  6    his report that Hunter was the victim of a crime to where we

14:10:01  7    are today.

14:10:01  8            That is the story about the gun that Hunter

14:10:08  9    bought and which existed somewhere for that period of time

14:10:11 10    where there is no evidence of when it came out of his own

14:10:14 11    lock box or whether or not he had it in anyplace he

14:10:18 12    traveled.  That's the story about the two days.  That's the

14:10:21 13    story about the form with the words is or are, given to

14:10:25 14    Hunter.  That's the story about what people at StarQuest

14:10:29 15    told him, or more importantly, for the charges in this case,

14:10:32 16    what they didn't tell him.  That's the story of what the

14:10:35 17    form says, not about anything that that question 11E

14:10:40 18    actually means.  And that's the story of what people other

14:10:44 19    than Hunter, Mr. Cleveland, Mr. Palimere, Mr. Turner, Hallie

14:10:48 20    Biden, and Mr. Banner did.

14:10:50 21            If there is one thing that the prosecutors did

14:10:54 22    that I think is most unfair as all is to take Hunter's words

14:10:58 23    about being an addict out of the context in which they were

14:11:02 24    spoken at the time.  You know this, but even Zoe Kestan and

14:11:06 25    Hallie Biden also explained in the case that the prosecutors

14:11:10  1    put on that a person was an addict in the past means they

14:11:15  2    always refer to themselves as an addict for treatment, but

14:11:19  3    not in the way the law asks about when the words say is, or

14:11:24  4    are.  When the prosecutors kept pointing to the times Hunter

14:11:28  5    called himself an addict or a drunk, you now understand what

14:11:32  6    that meant.  It meant both that there were times he was and

14:11:35  7    times he was not.  But a person saying that in that context

14:11:39  8    at an alcoholic's anonymous meeting, or a narcotic's

14:11:43  9    anonymous meeting, or in a text about himself afterwards, or

14:11:46 10    in a book is not the same as it means when you are

14:11:51 11    understanding what he thought on a particular day at a

14:11:54 12    particular time.

14:11:57 13            Hi, I'm Hunter.  And I am an addict.

14:12:01 14            This is what was meant when after the stress of

14:12:06 15    October 23rd when all that gun things occurred, the

14:12:11 16    government showed you this.  On October 3rd, a week later,

14:12:16 17    with all that occurred, that's when he writes, "I'm a liar

14:12:21 18    and a thief, and a blamer, and a user, and I'm delusional,

14:12:24 19    and an addict unlike beyond and above all other addicts that

14:12:28 20    you know, I've ruined every relationship I've ever

14:12:32 21    cherished."  Is Hunter saying he is an addict on the 23rd in

14:12:36 22    the way the law requires, or is this what you do when you're

14:12:40 23    going back and saying this is what I have been.

14:12:44 24            That's not an admission that the prosecutors

14:12:51 25    want it to be.  It is a claim for what he had been, but in

14:12:57  1   November, a cry for help with someone looking back, seven

14:13:03  2   days, 10 days after the gun incident occurred.  And you've

14:13:09  3   already heard that there is a definition.  The term addict

14:13:14  4   means an individual who habitually uses and even dangers

14:13:18  5   that public safety or welfare and lost the power of self

14:13:22  6   control.  I know the government argues that that applies to

14:13:25  7   him, but applies equally to what he was not, because their

14:13:29  8   proof about that is telling you to look at all those prior

14:13:32  9   years, including his book and what happens after the events

14:13:35 10   that matter in this case.

14:13:37 11        As I asked his former spouse Kathleen, and his

14:13:44 12   friend, and his brother's widow, Hallie Biden, confirmed

14:13:48 13   that there were many times when he was in periods of nonuse

14:13:53 14   of alcohol and nonuse of drugs.  And remember, I said that

14:13:57 15   he had various times of being in rehab, and Mr. Wise wanted

14:14:01 16   to point to that to show that he was out of control, as

14:14:06 17   opposed to instigating and initiating a period that he was

14:14:09 18   very much in control and not using.

14:14:12 19        And with the evidence you heard from these

14:14:15 20   individuals, Kathleen Buhle and Ms. Biden.  Kathleen told

14:14:19 21   you about his rehabilitation, and this is what she said.

14:14:23 22   "He was at crossroads treatment center.  He was at an

14:14:27 23   outpatient program at the University of Pennsylvania.  He

14:14:30 24   was at a treatment center in Sedona, Arizona.  He was at The

14:14:34 25   View in Los Angeles, and later you heard he was in treatment

14:14:38 1    at Newburyport, Massachusetts.  You heard from Hallie tell

14:14:42 2    you that Hunter's brother and her ex husband Beau died in

14:14:46 3    2015.  You heard Naomi tell you that "he seemed the clearest

14:14:50 4    I had seen him since my uncle died."  So that you can

14:14:53 5    understand that Hunter might deal with those traumatic

14:14:58 6    issues in his life, like the death of his brother in 2015,

14:15:02 7    by succumbing to his escape to alcohol or drugs, but in all

14:15:08 8    of his life periods, using and when he was not, Hunter lived

14:15:11 9    that successful life I told you about.  He was as Kathleen

14:15:16 10   mentioned, and they met at the Jesuit Volunteer Corp in

14:15:21 11   North West.  He graduated law school, he was of counsel at

14:15:23 12   that international law firm of Boies Schiller, and he

14:15:27 13   started his business, Rosemont Seneca.

14:15:29 14           When I hope pointed out in opening why the

14:15:33 15   evidence of his accomplishments, his periods of nonuse, and

14:15:37 16   his recovery was important to you, why, because again, of

14:15:42 17   that requirement that Hunter knowingly or intending to

14:15:46 18   deceive violated the laws that you were told about, or

14:15:49 19   believing when the form asks him whether he is or are,

14:15:54 20   thought himself that way.  As I also asked you to consider

14:15:58 21   when I first met you, Hunter has not asked anyone to excuse

14:16:02 22   or forgive him for his mistakes, in using alcohol or drugs,

14:16:06 23   to dull the pain that he felt.  In fact, the prosecutors

14:16:10 24   actually played for you his telling you that story, and you

14:16:13 25   heard it in his own voice in the book that you heard.  And

14:16:17  1    remember what Agent Jensen said about how they picked out

14:16:20  2    what they played for you in court.   They were not looking

14:16:23  3    for the whole story she said, the focus was on excerpts that

14:16:28  4    evidence addiction, and the use of narcotics.

14:16:32  5          Do you recall they spent 40 minutes on 2016 and

14:16:36  6    2017.   They spent 20 minutes plus on the first half of 2018.

14:16:42  7    And then some minutes following in 2019.   But did you hear

14:16:47  8    even a minute about any of the events that happened in this

14:16:51  9    period of time in 2018, when he came back from Los Angeles

14:16:57 10    to be back home?

14:16:59 11          But even then, I think you can understand what

14:17:02 12    Hunter was saying when you heard this.

14:17:10 13              (Government Exhibit 20(h) audio book played.)

14:17:37 14          MR. LOWELL:   Shame and guilt, how far he's come.

14:17:58 15    And then you remember the next thing he said.

14:18:03 16              (Government Exhibit 20(l) audio played. )

14:18:12 17          MR. LOWELL:   So you heard that it was Uncle

14:18:16 18    Jimmy that found The View in the summer of 2018.   In total

14:18:21 19    of the case, what do you know about this.   You saw the

14:18:23 20    government's exhibit, which talked about how much it costs a

14:18:25 21    day of $2,500.   And I asked Agent Jensen, who told you that

14:18:32 22    he was at The View for twelve days, and then you know that

14:18:36 23    Hunter paid for many of these days from his own funds.   And

14:18:41 24    then Agent Jensen told you that it was also for services

14:18:44 25    that were provided by something called the sober companion

14:18:48  1    between the dates of August 27th and the 2nd.  And you saw

14:18:52  2    that he paid for those as well in the forms and in the bank

14:18:58  3    records you saw.

14:18:59  4            Agent Jensen also told you that Hunter rented a

14:19:03  5    house in Malibu, where you heard people visited him.  Now

14:19:07  6    let me show you what the prosecutors might have suggested

14:19:10  7    were for different things.  You saw that there were large

14:19:14  8    withdrawals on September 13th, $14,000; September 27th,

14:19:22  9    $10,000, in their form, in their chart, in their summary,

14:19:27 10    they put that there.  Drugs, or for the Malibu house that he

14:19:33 11    rented when he was with his sober companion?

14:19:37 12            And for the many years, and again, I'm sorry,

14:19:41 13    you have to decide what the actual evidence suggests, not a

14:19:45 14    calendar with all the amounts of money that you have no idea

14:19:49 15    whether it paid for rent or what Agent Romig agreed when I

14:19:53 16    asked him it could be paid for.

14:19:58 17            For the many years and the number of people the

14:20:01 18    prosecutors worked with on the case, do you remember what I

14:20:03 19    asked, because I wanted to get to the real proof, I did want

14:20:06 20    there to be suspicion and conjecture, I asked Agent Jensen

14:20:10 21    when I asked her about The View and the invoices and the

14:20:13 22    bank withdrawals and this is what we said to each other.

14:20:15 23    When you were pointing out, for example the issues of the

14:20:18 24    bank account and the $5,000 here and the other amounts that

14:20:21 25    you talked with Mr. Hines about and other amounts of

14:20:25  1  thousands of dollars, did you match up those withdrawals?

14:20:30  2  Answer.  "No."

14:20:31  3      And when I asked how about the Malibu house that

14:20:34  4  he rented, did you try to find out what that house was, how

14:20:38  5  much it cost per month, and whether any of those withdrawals

14:20:41  6  and payments of cash matched that?  She indicated that she

14:20:44  7  had not.  Because just like in the excerpts from the book,

14:20:50  8  they were looking only for the excerpts that basically

14:20:53  9  supported their conjecture and suspicions.

14:20:57 10      The prosecutors told you that they were not

14:21:00 11  charging Hunter because of his use of drugs, or past

14:21:03 12  addictions, but honestly, at so many times in this trial,

14:21:08 13  didn't that seem exactly what they were doing?  And so Judge

14:21:14 14  Noreika read you the following instruction.  You are here

14:21:18 15  only to determine whether the defendant is guilty or not

14:21:20 16  guilty of the charges in this indictment.  The defendant is

14:21:24 17  not on trial for any conduct or offense not charged in the

14:21:29 18  indictment.

14:21:29 19      Ladies and gentlemen, I don't know how you come

14:21:35 20  into the courthouse every day.  If you come in from the

14:21:39 21  front, right outside is a monument of our nation's Bill of

14:21:44 22  Rights.  Those rights are what are at stake in this case.

14:21:47 23  They define Hunter's right to a fair trial, or the

14:21:51 24  responsibility as you jurors have as being the judges of the

14:21:56 25  fact.  They are the basis for what Judge Noreika has

14:22:00 1    instructed you and will instruct you again in a bit.  Those

14:22:03 2    rights are where you, the jury, get this enormous power, the

14:22:07 3    most we can have in our system to judge another person and

14:22:10 4    determine their life.  But as I said, that power comes from

14:22:13 5    tremendous responsibility.  Whether you thought it was going

14:22:16 6    to happen or not, and I don't know what you think back a

14:22:19 7    week ago, you were the ones who because you said that you

14:22:23 8    would be fair and impartial were chosen to do just that.

14:22:27 9    And those rights that are on that monument, and the rules

14:22:32 10   that Judge Noreika has given you are the ones that provide

14:22:36 11   you the roadmap for doing the job you swore you would do.

14:22:41 12         Those rights and rules require each and every

14:22:44 13   one of you to hold Hunter's presumption of innocence until

14:22:49 14   the evidence shows each and every one of you individually

14:22:52 15   that they have met that burden of proof beyond reasonable

14:22:56 16   doubt.

14:22:56 17         So let me go back to these one last time.  In

14:22:59 18   opening Judge Noreika gave you some and she did again and

14:23:03 19   she will in a bit.  Remember, the indictment is not

14:23:07 20   evidence.  You heard that numerous times and you know that

14:23:10 21   indictments are written by prosecutors without the

14:23:13 22   involvement of either Hunter or his lawyers.

14:23:15 23         And on our first day, Judge Noreika told you the

14:23:19 24   indictment is not evidence of anything, and you should not

14:23:22 25   give any weight of it ever being filed.  And I have told you

14:23:26  1  before and I'll say again, the next is the presumption of

14:23:29  2  innocence.  Hunter responded to the charges in this case by

14:23:33  3  saying he was not guilty, and you should have seen by now

14:23:36  4  that he is not guilty given reasonable doubt, the burden of

14:23:39  5  proof, and the presumption of innocence.  But if you think

14:23:42  6  that the prosecutors tell you that that's the case, you know

14:23:45  7  that's not the law.

14:23:47  8          And the burden of proof, as Judge Noreika has

14:23:52  9  explained, is always to the prosecutors, to convince each

14:23:54 10  and every one of you individually that each element, there

14:23:58 11  is no contesting that there was a handgun, there is no

14:24:02 12  contesting that handgun wasn't made at StarQuest Supply that

14:24:05 13  day, of course it came in interstate commerce, that's why we

14:24:10 14  stipulated to that.  But those elements are the ones that

14:24:13 15  talk about intention to deceive knowingly and all of that is

14:24:16 16  in context.

14:24:17 17          Again, that burden of proof does not allow you

14:24:24 18  to consider or even convict on suspicion or conjecture.  We

14:24:30 19  surely pointed out those holes in the prosecutor's evidence,

14:24:34 20  but remember in the burden, a defendant doesn't have to

14:24:37 21  prove anything.

14:24:38 22          In his opening statement, Mr. Hines said, and

14:24:43 23  now Mr. Wise has repeated, "no one is above the law."  It

14:24:50 24  does not matter what your name is, the law applies equally

14:24:55 25  they said to all people.  You know, he was right, but I

think he missed the point.  It means that Hunter deserves

those rights and protections and the prosecutor's heavy

burden of proof as much as anyone, whether it was you, or

your parents, or your sister, or your children, or your

brothers, or your sisters.  And finally, you remember that

that burden of proof is the highest that we have in our

system of justice.  It is beyond a reasonable doubt, which

means it would cause an individual of ordinary

responsibility to act in the most important issues in your

own life.  This is such a matter.

          And finally, there is that requirement, which is

the final protection for somebody not being convicted

improperly and that requires each and every one of you to

unanimously agree that each and every element has been

proven beyond that reasonable doubt.

          So, when you are considering the evidence, each

of you has to determine that that did not happen.

          Applying these rules in our system, designed to

protect the innocent, you do not have to figure out why the

prosecutors see the evidence differently to support their

three felony charges, but you must focus on that all

important set of rules about the burden, about what it

means, about reasonable doubt, and when you do, when you

consider that, this is what you will see.  If you present

hours of Hunter's book about his use of addiction in 2016,

14:26:45  1   17, before the fall of 2018, or in 2019, but not even a full

14:26:51  2   page about October of 2018, that's reasonable doubt.  If you

14:26:55  3   prepare seventy-five pages of texts and photos of Hunter's

14:26:59  4   use of drugs in the early parts of 2018, and ends as you

14:27:04  5   remember with those sixty-two texts in February, and then

14:27:07  6   you try to fill in the gap by going backwards and suggest by

14:27:11  7   suspicion or conjecture that something must have happened

14:27:15  8   before the gun sale because of the text exchange, that's

14:27:18  9   reasonable doubt.

14:27:19 10        If your evidence of October is those facetious

14:27:24 11   texts with Hallie or there after the fact trying to figure

14:27:27 12   out whether 7-Eleven means he was getting a cup of coffee or

14:27:31 13   a gram of drugs, that's reasonable doubt.  If you show

14:27:36 14   literally dozens of photos or texts with them not having

14:27:43 15   location data to back them up until those that you can pick

14:27:48 16   and choose, that is reasonable doubt.

14:27:51 17        If you make a case on Hunter's knowing with an

14:27:56 18   intent to deceive lies on a form, the question that he asked

14:28:00 19   does not say have you ever, but on the key question says are

14:28:04 20   you, that's reasonable doubt.  If that important all

14:28:10 21   encompassing question, with all the pages of definitions,

14:28:14 22   doesn't have anything to elucidate what "are" means, that is

14:28:19 23   reasonable doubt.

14:28:20 24        If the gun shop employers cannot figure out who

14:28:23 25   did what and when, and despite seeking an ID with a

14:28:27  1   residence, and the passport doesn't have one on the issue of

14:28:30  2   materiality, that is reasonable doubt.

14:28:31  3         If the correct inference of what happened that

14:28:36  4   day has evidence of a new phone at an AT&T store, and that

14:28:42  5   indicates what could have happened that day, not being an

14:28:46  6   intent to buy a gun, but an intent to replace a phone by

14:28:49  7   that wonderful whale hunter, that's reasonable doubt.

14:28:54  8         And if you suggest to Naomi Biden that when she

14:28:58  9   was texting him early in the morning hours, it is as

14:29:02 10   Mr. Wise asked her because Hunter was with a man named

14:29:06 11   Frankie or giving him a bank code, but you don't produce

14:29:09 12   that man or any actual evidence that that exchange happened,

14:29:16 13   and then you ask her if she uses cocaine, that is reasonable

14:29:21 14   doubt.  And extraordinarily cruel to his daughter.

14:29:26 15         If you want to plug your gaping holes and proof

14:29:29 16   by asking your own FBI agent the total amounts that went

14:29:33 17   into a business account over the course of a year so that

14:29:36 18   you can flash the number $3 million up on a screen as if to

14:29:40 19   say what, at some point in his life there were funds and he

14:29:43 20   was wealthy, as if that is the reason that's anything in

14:29:46 21   this case, that's reasonable doubt.

14:29:49 22         And instead of real proof, you want to embarrass

14:29:53 23   Hunter by asking in your last questions what Zoe Kestan's

14:29:59 24   age was when they were together, that's reasonable doubt.

14:30:02 25         If after he bought the gun on October 12th there

14:30:07 1  is absolutely no evidence that it ever was loaded, used,

14:30:11 2  taken out in any of that period until Hallie Biden threw it

14:30:14 3  out, or Ed Banner fished it out, and you know that it was

14:30:18 4  Hunter, when hearing that who made sure that the police were

14:30:23 5  called, that's reasonable doubt.

14:30:25 6      And if the government wants you to believe that

14:30:28 7  Hunter was using, knowing he was violating the law by

14:30:32 8  suggesting that the leather pouch had a few particles of

14:30:35 9  residue but no one knew who put it there, when it was put

14:30:39 10  there, where the pouch had been, and no one even bothered to

14:30:43 11  get fingerprints, that is reasonable doubt.

14:30:46 12      And if the prosecutors want to use suspicion or

14:30:50 13  conjecture, instead of Gordon Cleveland who had the most

14:30:55 14  contact with Hunter on October 12th, and saw him on the day

14:30:59 15  that matters and told you what he did not see, that is

14:31:04 16  reasonable doubt.

14:31:05 17      And if the evidence, the prosecutors want you to

14:31:09 18  believe, even about alleged use of drugs before he came back

14:31:14 19  East, comes from somebody like Zoe Kestan, let me read what

14:31:20 20  Judge Noreika has instructed you about her.

14:31:24 21      You have heard evidence that Hallie and Zoe

14:31:35 22  Kestan have received promises from the government that their

14:31:38 23  testimony will not be used against them in a criminal case.

14:31:40 24      The testimony was received in evidence and may

14:31:43 25  be considered by you.  The government is permitted to

14:31:46  1    present the testimony of someone who has received immunity

14:31:50  2    in exchange for their testimony, but you should consider the

14:31:54  3    testimony with great care and caution.  You won't find that

14:32:00  4    instruction for anyone else.

14:32:04  5         Ladies and gentlemen, you have been patient with

14:32:08  6    me and my colleagues and I know I've taken a bit of time

14:32:12  7    today, but that is because of the importance of this issue

14:32:15  8    and this case to Hunter's life.

14:32:17  9         The evidence here on these key issues is so

14:32:21 10    lacking that many doubts about what they have presented or

14:32:25 11    more importantly failed to present should now be clear to

14:32:29 12    you.  You can go back to the jury room and take hours to

14:32:32 13    review the so many texts and documents again, but you

14:32:36 14    already know what they show, and more importantly you know

14:32:39 15    what they don't show.  There is no proof beyond that

14:32:42 16    reasonable doubt that Hunter knowingly possessed a gun when

14:32:45 17    he believed himself to be a drug addict, or lied with that

14:32:48 18    intent to deceive on a form that asked him that.

14:32:51 19         One more thing that I need to explain to you,

14:32:54 20    when I sit down, because of that very, very high burden of

14:32:58 21    proof, the prosecutors get to have one more argument.  They

14:33:02 22    may think they have the last word, but actually you have the

14:33:06 23    last word.  Each of you individually.

14:33:12 24         When Mr. Hines gets up and does all over again,

14:33:16 25    going through that which Mr. Wise said, and tries to say

14:33:19  1    what I said is not right, they have that occasion, when they

14:33:25  2    do that, please remember the two different hands, and notice

14:33:30  3    what's not in the one that matters.

14:33:33  4          So let me ask you this.  If someone in the jury

14:33:36  5    room asks you well, what about that 2016 period?  What about

14:33:40  6    the 2017 period?  What about the first part of 2018 period,

14:33:44  7    or bring up the texts that you heard only after the weekend

14:33:47  8    when they this morning put it up as if that's more than

14:33:51  9    conjecture and suspicion and doesn't have location data.  I

14:33:54 10    want you one of you to say as follows, please one of you

14:33:57 11    remember when Zoe Kestan has photos when he's using drugs

14:34:00 12    but has no photos for the key period in September, I want

14:34:05 13    one of you to point out that the lack of texts with drug

14:34:07 14    lingo, I'd like one of you to point out the lack of photos

14:34:08 15    or videos using pipes or scales, and I would like one of you

14:34:11 16    to make sure that when you see the texts, which says I am

14:34:15 17    with Mookie, or Bernard, or I'm sitting on top of a car

14:34:18 18    smoking crack, what was happening between Hallie and Hunter

14:34:22 19    when that happened.

14:34:23 20          And here is why.  I don't know if you noticed,

14:34:28 21    but everyone stood every time you come in the courtroom and

14:34:33 22    when you leave.  And that we do for Judge Noreika as well.

14:34:39 23    That's because you, too, are the judges, in fact, as the

14:34:42 24    Judge has told you, it is you, and not her, are the judges

14:34:46 25    of the facts.  And that's how important our system depends

14:34:49  1    on you to be the fair and impartial jurors that you swore

14:34:52  2    that you would be.

14:34:54  3            So in that way, I want to thank Judge Noreika

14:34:57  4    and her deputy clerks, and her law clerks, for their 24/7

14:35:03  5    hard work.  I want to thank Mr. Hawkins, our court reporter,

14:35:07  6    for getting it down in evidence when all of us spoke too

14:35:10  7    quickly.  I probably owe him a greater amount of apology

14:35:14  8    than the others.

14:35:15  9            But especially I want to thank you for giving up

14:35:19 10    so much of your time to make sure the system works and that

14:35:23 11    justice be done.

14:35:26 12            Up until now, I, and my amazing colleagues,

14:35:32 13    David, Bella, Dorothy, and Mr. Radic, we have had Hunter's

14:35:38 14    life in our hands.  But now I have to give it to you.  But

14:35:44 15    I'm doing that with a confidence because I know you will

14:35:50 16    remember the rules, you will remember the burdens, you'll

14:35:53 17    remember the requirements, and you'll see through those

14:35:55 18    rules the so many things that the promise the prosecutors

14:35:59 19    made for proof beyond a reasonable doubt does not exist.

14:36:02 20            But for all the words that I have spoken, and

14:36:05 21    you know I have spoken so many in this courtroom, you have

14:36:08 22    heard over the past weeks mine were not anywhere as near as

14:36:13 23    good as Hunter's when you heard him say as follows:

14:36:18 24    "Remembering all those things feels like a terrible betrayal

14:36:23 25    of where I am now.  It induces an urge that's completely

14:36:26  1    counter to how far I have come.  When you realize the effect

14:36:30  2    those recollections can have on your body and mind causing

14:36:34  3    them to work against your deepest desire not to be in that

14:36:38  4    place they prompt feelings of shame and guilty."

14:36:43  5             So with all you've heard, ladies and gentlemen,

14:36:46  6    with my last breaths in this case, I ask you for the only

14:36:52  7    verdict that will hold the prosecutors to what the law

14:36:55  8    requires of them, and to come back and to say that Hunter is

14:37:01  9    not guilty.

14:37:03 10             Thank you so much.

14:37:09 11             THE COURT:  How long do you think it's going to

14:37:12 12    be?

14:37:12 13             MR. HINES:  Probably about fifteen minutes.

14:37:14 14             THE COURT:  Fifteen minutes, do you have

14:37:15 15    fifteen minutes or do you want to take a break?

14:37:19 16             A JUROR:  Can I run to the restroom?

14:37:20 17             THE COURT:  I think they need a restroom break.

14:37:23 18    Let's take fifteen minutes.

14:37:25 19             COURTROOM DEPUTY:  All rise.

14:37:28 20             (Jury exiting the courtroom at 2:37 p.m.)

14:38:06 21             MR. LOWELL:  Your Honor, fifteen?

14:38:07 22             THE COURT:  Yes.

14:38:11 23             MR. HINES:  May we be excused, Your Honor?

14:38:13 24             THE COURT:  You may.  I'm sorry, I know I'm

14:38:16 25    delaying this.

14:38:16  1              MR. LOWELL:  Fifteen minute break.

14:38:17  2              THE COURT:  Yes.

14:38:18  3              MR. LOWELL:  Thank you.

14:38:19  4              (A brief recess was taken.)

14:55:40  5              COURTROOM DEPUTY:  All rise.

14:55:47  6              (Jury entering the courtroom at 2:55 p.m.)

14:55:53  7              THE COURT:  All right.  Welcome back.  All

14:56:13  8  right.  Everyone else may be seated.

14:56:15  9              Mr. Hines.

14:56:17 10              MR. HINES:  Thank you, Your Honor.

14:56:18 11              Before he concluded, Mr. Lowell suggested that I

14:56:22 12  would come up here and go over and over everything that

14:56:25 13  Mr. Wise discussed with you over the course of his hour long

14:56:30 14  presentation.  I don't need to do that.  Nothing that

14:56:33 15  Mr. Lowell said undermines what Mr. Wise said in his

14:56:38 16  closing.  We went over meticulously the facts and the law.

14:56:42 17  The issues that you are actually considering when you go

14:56:45 18  back into that jury deliberation room.

14:56:48 19              At the outset, there were a number of things

14:56:51 20  that the defense said, which were completely unfair.

14:56:54 21  Mr. Lowell suggested you have this man's life in your hands.

14:56:58 22  You don't have his life in your hands, that's not what

14:57:01 23  you're being asked to do.  You're asked to make a

14:57:04 24  determination of the facts and apply the Judge's law.

14:57:08 25  That's it.  Nothing more, nothing less.  That's what a

14:57:13 1    verdict is.  It means to speak the truth, than make a

14:57:17 2    finding about what happened.  Was he an addict?  Did he know

14:57:20 3    he was an addict?  That's what you're going back there to

14:57:23 4    do.  Anything else, that's up to Her Honor moving forward.

14:57:27 5    She'll take that into consideration.

14:57:29 6            Now, Mr. Lowell has used this phrase over and

14:57:35 7    over and I think it's correct, I think it fits exactly what

14:57:39 8    the defense has done in this case.  He keeps saying he's

14:57:42 9    telling you a story, remember that?  Remember that from his

14:57:46 10   opening?  He said this is the story of this, and this is the

14:57:49 11   story of that.  That's exactly what he's done in this case.

14:57:54 12   It's simply a story, a fictional story, it's not supported

14:57:58 13   by the evidence.  And that's why the words of lawyers,

14:58:01 14   including myself, but Mr. Lowell as well, are not evidence

14:58:05 15   that you will be asked to determine in this case, the

14:58:08 16   evidence is what you hear from that witness stand.

14:58:11 17           Now, we're going to go through some of the

14:58:21 18   stories that Mr. Lowell told.

14:58:23 19           First, Mr. Lowell pretended as if he was quoting

14:58:27 20   the defendant saying hi, I'm Hunter Biden and I'm an addict.

14:58:32 21   Start with this.  That's not evidence you heard from that

14:58:36 22   witness stand.  No witness got up there and said those

14:58:40 23   words.

14:58:41 24           That's not evidence that you can consider in

14:58:44 25   this case.

And what Mr. Lowell is doing by saying that over and over and throwing it out there is he's cheapening those words. As you heard from Hallie Biden, those words mean something. When you say it, you mean it. What Mr. Lowell could have said, but left out, was he could have said, "Hi. My name is Hunter Biden and I am an addict. And I chose to lie and buy a gun." Because that's why we're here. He went that additional step and chose to buy a gun on October 12th, 2018. Had he just been an addict, had he been troubled, had he continued to use narcotics, smoke crack every fifteen minutes throughout 2018 and decided not to buy a gun, we wouldn't be here in this courtroom. Choices have consequences and that's why we're here.

Now, Mr. Lowell suggested that it was unfair and that we were playing portions of the defendant's book in this trial. We played about an hour of audio in this case. And he made two different arguments regarding that audio. First of all, he said we picked and choose out of context what we were playing. Well, we played a full hour. Would you like to have heard more of that audio book?

And second, he suggested it was sort of unfair that we were playing this book, which was evidence of the defendant's addiction. He spoke those words. He's the one who chose to release an audio book in this case about his life and about his addiction and his troubles in the year

15:00:20  1   2018, the year he chose to buy a gun.  That evidence is

15:00:24  2   important evidence because it shows you throughout that time

15:00:27  3   period, throughout 2018, including October that the

15:00:29  4   defendant was in fact using crack cocaine.

15:00:33  5           Mr. Lowell also said that the testimony of Naomi

15:00:41  6   Biden was cruel, those are his words, cruel.  Who called the

15:00:46  7   defendant's daughter as a witness in this case?  Not us.

15:00:50  8   The defendant called Naomi Biden as a witness in case.  And

15:00:54  9   you saw up there on the stand how uncomfortable she was.

15:00:58 10   The anguish sitting there knowing she was testifying as a

15:01:02 11   defense witness, but she had to tell the truth.  Right?  You

15:01:07 12   know that she was up there completely uncomfortable, you

15:01:10 13   could see it.  She couldn't vouch for the defendant's

15:01:14 14   sobriety throughout that month of October.  She couldn't do

15:01:17 15   it on that witness stand.

15:01:19 16           So sometimes when you see a witness up there and

15:01:21 17   how they're acting, you can take your real life tools that

15:01:25 18   you use to evaluate credibility and assess what people are

15:01:31 19   saying and that means something, you know exactly what she

15:01:36 20   was saying when she was up there on that witness stand.

15:01:39 21   Mr. Lowell referenced this lockbox over and over again,

15:01:42 22   accused us of not putting it in to evidence, although we

15:01:46 23   brought it here to the courtroom for him to use.  It's a

15:01:49 24   piece of plastic.  I don't understand what the reference is

15:01:52 25   over and over.

15:01:53  1          The defendant walked into StarQuest Shooter,

15:01:55  2   walked out with a revolver, walked out with a speed loaded

15:02:01  3   that would rapidly reload that revolver, walked out with

15:02:05  4   hollow point ammo, the kind of ammo that widens when it

15:02:07  5   comes in to contact, ripping to shreds a diameter anything

15:02:11  6   it comes into contact with.  He's talking about the plastic

15:02:14  7   case.

15:02:14  8          The evidence in this case, at the end, in

15:02:16  9   October, October 23rd, that gun isn't in that plastic case,

15:02:20 10   that gun is not in a lockbox that locked in your vehicle.

15:02:25 11   He's keeping it in a Raptor, his vehicle.  You have seen the

15:02:28 12   evidence from his book and elsewhere that he's continuing to

15:02:31 13   meet drug dealers for his fix.  He even told you in his book

15:02:36 14   that he would go to these drug deals, show up to them, he

15:02:41 15   had a gun pointed in his face on prior occasions.  He told

15:02:44 16   you in his book he learned how to protect himself.

15:02:47 17          A plastic lockbox means nothing.  The defendant

15:02:50 18   was a crack addict and a drug user and he had a gun, that's

15:02:54 19   a violation of the law.

15:02:56 20          Mr. Lowell said -- he accused us of not

15:03:02 21   presenting the knowing, knowingly element.  I mean, I can't

15:03:06 22   tell you how many times Mr. Wise stood up here, how many

15:03:10 23   slides were addressed to the knowingly element.  The

15:03:14 24   evidence clearly shows the defendant knew he was a drug

15:03:17 25   addict, we proved that beyond a reasonable doubt seven ways

15:03:21   1    to Sunday.

15:03:21   2         It may seem obvious, but someone who holds a

15:03:25   3    crack pipe to their mouth every fifteen minutes knows

15:03:29   4    they're a drug user and a drug addict.  But he also said, he

15:03:33   5    said it in his book, and he said it in his text messages

15:03:36   6    over and over and over again.

15:03:38   7         Mr. Lowell, one thing I did agree with him using

15:03:43   8    was this accordion analogy, he used an analogy saying that

15:03:47   9    the government is playing this accordion and it's opening

15:03:51  10    and closing.  That's consistent with the law, what

15:03:56  11    Mr. Lowell wants to do is he wants to make music from the

15:04:00  12    accordion by keeping it compressed, he doesn't want to

15:04:03  13    expand it, but that music doesn't play unless you open the

15:04:06  14    bag and fill it with air and close the bag and let the air

15:04:10  15    come out while you're playing the keys.  That's exactly what

15:04:13  16    the law says in this case.

15:04:14  17         As Your Honor has instructed you with respect to

15:04:18  18    the definition of an unlawful user of a controlled

15:04:20  19    substance, use of a controlled substance is not limited to

15:04:22  20    use of drugs on a particular day.  This is on page 18 of

15:04:26  21    your instructions.  Or within a matter of days, or weeks,

15:04:30  22    before, but rather that the unlawful use has occurred

15:04:34  23    recently enough to indicate that the individual is actively

15:04:37  24    engaged in such conduct.  An inference that a person was a

15:04:42  25    user of a controlled substance may be drawn from evidence of

15:04:45  1    a pattern of use or possession of a controlled substance

15:04:48  2    that reasonably covers a time period that the firearm was

15:04:52  3    possessed.

15:04:52  4            So what Mr. Lowell has sought to do in this case

15:04:55  5    is have you look with myopic focus on a narrow window of

15:05:00  6    time without looking at the big picture.  That's not what

15:05:02  7    the law is.  Her Honor has instructed you exactly as I just

15:05:08  8    read to you, pattern of use is probative of whether or not

15:05:11  9    he was using and whether or not he was an addict when he

15:05:14 10    checked that box on that form on October 12th, 2018.

15:05:19 11            Through that lens, the myopic focus like an

15:05:33 12    accordion that's not expanding that Mr. Lowell has applied

15:05:37 13    this case, he seeks you to view the text messages that you

15:05:41 14    saw where there are numerous messages in the month of

15:05:44 15    October, numerous messages in which the defendant is clearly

15:05:47 16    saying he's smoking crack, you saw the chart Mr. Wise put up

15:05:51 17    and the comparison from the summer of 2018, and how there

15:05:54 18    are actually more messages in October than we put up for

15:05:57 19    July of 2018 in this case.

15:06:01 20            Remember that the absence of a message on any

15:06:05 21    given day does not mean -- does not equate the defendant was

15:06:09 22    not a drug user or drug addict.  Think about your real life

15:06:13 23    experiences, do you ever go to the grocery store and get

15:06:16 24    milk, do you ever have a spouse or family member or father,

15:06:21 25    a mother, a child who has asked you to go to the grocery

15:06:24  1   store to get milk, you do it routinely, I do the shopping in

15:06:29  2   my family for milk for my little son who downs it, sometimes

15:06:34  3   my wife will text me, sometimes she'll call me, sometimes I

15:06:37  4   know to go pick it up, I know if I look at my phone, I can

15:06:41  5   see one message on my phone to go get whole milk in the last

15:06:45  6   month, that doesn't mean I didn't go get whole milk every

15:06:49  7   other day, my son didn't starve.  Think about the real life

15:06:49  8   experiences when you evaluate that evidence and you can

15:06:52  9   apply that in this case.  The absence of a message on any

15:06:53 10   given day does not mean that the defendant suddenly was not

15:06:56 11   a drug user or a drug addict.

15:07:00 12            Similarly with the photographs that we saw on

15:07:04 13   the screen.  Zoe Kestan has an incredible camera roll, her

15:07:07 14   camera roll documented over the course of months her

15:07:10 15   interactions with the defendant over and over and over

15:07:12 16   again, you saw drug use in some of those photos, but we also

15:07:16 17   saw photos where there wasn't evidence of drug use, and she

15:07:20 18   testified about that.  If you look at her testimony it

15:07:22 19   matches with what the defendant said in his book when he was

15:07:24 20   on this month's long rolling party throughout the summer of

15:07:28 21   2018, she's along there, she's with him every step of the

15:07:31 22   way, right?  The only photos that don't show crack that the

15:07:36 23   defendant has highlighted are those that are in September of

15:07:39 24   2018 when they're at Malibu, but again, just because you

15:07:43 25   don't have a photo of something doesn't mean it didn't

15:07:46 1  happen.  Do you take photos of every meal you eat during the

15:07:50 2  day?  Perhaps not.  That doesn't mean you didn't eat

15:07:53 3  breakfast this morning, right?  Zoe was photographing things

15:07:57 4  throughout her course of dealings with the defendant, but

15:07:58 5  the absence of one photograph on any given day does not mean

15:08:01 6  that her testimony was false.

15:08:03 7          We showed you some messages this morning where

15:08:09 8  the defendant was meeting individuals at the 7-Eleven

15:08:15 9  before, during, the gun purchase, and you also saw how he

15:08:20 10 described in his book meeting drug associates at 7-Eleven's.

15:08:25 11 Again, the story that Mr. Lowell told you was that he

15:08:29 12 suggested that he was there merely to get a cup of coffee,

15:08:32 13 but I don't know about you, when you get a cup of coffee, do

15:08:36 14 you have to text in that manner where you can't actually

15:08:39 15 describe to the individual that you're talking to what

15:08:41 16 you're getting, in cryptic code about meeting up at a

15:08:46 17 7-Eleven in the middle of the night.

15:08:48 18         Again, in that jury box, you can use your common

15:08:50 19 sense and the tools you have in real life to know that what

15:08:54 20 the defense is telling you is just a story, not supported by

15:08:57 21 the evidence.

15:08:58 22         Mr. Lowell attacked Mr. Cleveland as the whale

15:09:07 23 hunter in this case for selling the defendant a firearm.  He

15:09:10 24 is a man who is a salesman at a gun store.  On that day,

15:09:14 25 Mr. Biden decided to walk into that gun store.  He knew what

15:09:17  1    he was getting into.  You saw the front of that store, you

15:09:20  2    know exactly what was on that store.  That was his choice,

15:09:23  3    nobody forced him to go in there.  He could have gone to the

15:09:26  4    AT&T store and gone home, not gone to that gun store, like I

15:09:31  5    told you a moment ago, we wouldn't be here today, that was

15:09:34  6    his choice to walk in there, remember what Mr. Cleveland

15:09:39  7    told you.  When Mr. Biden went in that store it was him, the

15:09:42  8    defendant, that said he wanted a revolver.  The fact that

15:09:44  9    the Mr. Cleveland talked about the different types of

15:09:48 10    revolvers that were available is of no moment.

15:09:50 11            When Mr. Biden decided to misrepresent and lie

15:09:53 12    on that form, that's when the crime was completed, it

15:09:56 13    doesn't matter what type of gun he bought at that moment, he

15:09:59 14    was a drug user and a drug addict.

15:10:01 15            Now, one of the other stories that Mr. Lowell

15:10:05 16    has said is he's asked you to look at the form, past Section

15:10:12 17    A, Section A is the portion of the form that the defendant

15:10:14 18    filled out, and that's where the crime occurred, he's asked

15:10:18 19    you to look past that at the instructions at the very end of

15:10:22 20    the form and look and see whether or not drug user or addict

15:10:26 21    is defined in some manner.

15:10:30 22            Well, first of all, some things in life don't

15:10:33 23    need an explanation.  Right?  Some things are so obvious you

15:10:36 24    don't need to know what that means.  Are you hungry?  You

15:10:39 25    don't need a definition for that.  Is your stomach rumbling?

15:10:43 1    Well, that means you're hungry.  You don't need to go to the

15:10:47 2    novice section to figure out whether you're a drug user or

15:10:50 3    drug addict.

15:10:50 4             The other suggestion that the defense has made

15:10:52 5    is that Gordon Cleveland, the man who runs -- drives a trash

15:10:57 6    truck during the day and works at the StarQuest Shooters in

15:11:00 7    the evening to make some additional cash had to explain to

15:11:04 8    Yale educated defendant Hunter Biden what the words unlawful

15:11:09 9    user and crack addict meant.  That's just a preposterous

15:11:13 10   notion.  Those words are plain as day.  The evidence shows

15:11:17 11   he knew what those words meant.  He knew what those words

15:11:21 12   meant.  You can see that reflected in his book as he writes

15:11:25 13   about his experience and knows at that time he was a drug

15:11:27 14   user and a drug addict.

15:11:29 15            Mr. Lowell has asked to you discuss just on one

15:11:37 16   piece of evidence here on the brown leather pouch, and has

15:11:40 17   built this out to suggest that where did the cocaine come

15:11:43 18   from, who done it, as if it's some mystery.  Inside the

15:11:48 19   defendant's brown leather pouch was a white residue.  That

15:11:52 20   brown leather pouch sat in an evidence vault for five years

15:11:56 21   and was tested by the FBI and confirmed to be cocaine.

15:11:59 22   There is no mystery about whose cocaine it was.  There is no

15:12:03 23   mystery about whose brown leather pouch it was.  You saw

15:12:07 24   text messages from Hallie Biden in which she discussed with

15:12:10 25   the defendant that he had brown leather pouches and he had

15:12:12  1    crack stems in them and they were near her children, and she

15:12:16  2    asked him to get rid of them.  You saw that evidence in this

15:12:18  3    case.  You heard her testimony that she put the revolver in

15:12:21  4    the brown leather pouch that was his that he used to store

15:12:24  5    drugs, and that she put it in the trash can in the bag.  And

15:12:28  6    then you heard Mr. Banner talked about retrieving that brown

15:12:32  7    leather pouch from the trash can, inside of it was some

15:12:35  8    cocaine.

15:12:36  9          That cocaine that was tested by Dr. Brewer and

15:12:39 10    confirmed to be cocaine is evidence that the defendant was

15:12:42 11    using drugs during the time period he possessed the gun.

15:12:45 12    There is no evidence, no evidence, what Mr. Lowell says is

15:12:48 13    just a story, just like what I say is just argument, there

15:12:52 14    is no evidence that the brown leather pouch is anybody

15:12:55 15    else's in this case, period, and there is no evidence that

15:12:57 16    someone else put cocaine in the defendant's brown leather

15:13:01 17    pouch.

15:13:01 18          So Mr. Lowell talked about reasonable doubt

15:13:11 19    during his closing and he put up a slide, I would submit to

15:13:15 20    you that none of those things on that slide equate to

15:13:18 21    reasonable doubt.

15:13:18 22          I want to go through a couple of things that I

15:13:22 23    would submit to you, you would have to believe to find that

15:13:26 24    there was reasonable doubt in this case, and the evidence

15:13:28 25    just doesn't support that there is reasonable doubt.

The first thing you would have to believe is that Zoe Kestan lied about seeing Hunter Biden use crack every twenty minutes when she was with him. Now he said in his book he used crack every fifteen minutes. She saw him at The Freehand and at the Malibu house in September 2018, and observed him smoking crack again and again several weeks after his rehab.

Ms. Kestan's testimony about events just weeks before the gun purchase is in and of itself enough to find the defendant guilty in this case. It was not undermined in any way, shape, or form merely because she didn't happen to have a photo of him smoking crack during this same time period.

Ask yourself why would the defendant if he was truly in rehab, truly trying to turn the corner and stay sober and be sober, why would he invite back Zoe Kestan, someone who tolerated his crack use month after month after month throughout 2018, why would he have her come out and visit in Malibu, and why was he withdrawing hundreds and hundreds and sometimes thousands of dollars a day in cash and that -- speaking of cash for a moment, that narrative completely fell apart from the defense in this case. What they said in opening about stays, Airbnb stays, liquor purchases, things of that nature, payments for treatment, we showed you the bank statements in this case, all of that is

15:14:59  1   documented on the check card, as you would expect.  There is

15:15:02  2   no evidence that any cash was ever used for any of those

15:15:05  3   purchases.

15:15:05  4           So what's the $151,000 used for in this case?

15:15:09  5   You can see in the bank statement, all the purchases you

15:15:13  6   would expect someone to make are documented by the check

15:15:15  7   card as Agent Romig testified, and as you heard Agent Jensen

15:15:20  8   testify, those cash withdrawals are indicative of the

15:15:24  9   continual significant drug use that the defendant described

15:15:26 10   in his book.

15:15:28 11           The second thing you would have to believe in

15:15:31 12   addition to -- well, before I leave Zoe for a minute, the

15:15:35 13   defense has suggested that because she had an immunity

15:15:38 14   agreement that that somehow undermines her testimony.  The

15:15:42 15   immunity that you heard her testify about requires her to

15:15:45 16   tell the truth.  What's the one thing that could get her in

15:15:48 17   trouble here in this courtroom?  If she lied.  If she lied

15:15:52 18   and said something that wasn't true.

15:15:54 19           So I submit to you an immunity agreement is not

15:15:58 20   a license to lie, it's an agreement to tell the truth.

15:16:03 21   There is no evidence that Zoe Kestan felt like she should

15:16:07 22   lie in this courtroom and risk being prosecuted for those

15:16:10 23   lies, period.  No evidence whatsoever in this case.

15:16:14 24           The second thing you would have to believe if

15:16:18 25   you felt like there was reasonable doubt was that Hunter

Biden lied to Hallie Biden in his text messages in October of 2018.  They want you to believe that the defendant is a liar.  He literally wrote to Hallie and sent incriminating message after incriminating message.  But as Mr. Wise said in closing, why would you do that if you were trying to lie?  If you saw the relationship that the two of them had and Hallie testified to that on the stand.  Did the person that's trying to help you and get you sober, why would you tell that person that you were on a car smoking crack or at a 7-Eleven, indeed we saw him at a 7-Eleven around that time period, why would you do that if in fact you were lying, just say you were off in D.C., say you were at the office, say you're at the bar, say you were somewhere else, he didn't say any of those things, he said he was smoking crack.  There is no evidence whatsoever that he was lying in those messages.  Indeed the defendant's own words were there, "is my truth."

        The third thing you would also have to believe is that the defendant lied in his book, Beautiful Things, lied throughout the book.  You would have to believe that he lied in the prologue when he described himself as a drug addict.  You have to believe he lied in Chapter 7, Cracked, when the defendant discussed smoking crack around the clock every day, still making his meetings sometimes, still returning calls sometimes, but nonetheless describing

himself as an addict.  You would have to believe that the defendant described himself incorrectly when he said those things.  Again, there is no story that Mr. Lowell has given in this case under mines this message.  The defendant's words were true in his book.

You would also have to believe that the defendant lied at the end of Chapter 8 when he stated that he stayed clean for only two weeks after the August stint to a rehab center, meaning he was using again by mid September.  Zoe Kestan confirmed that.  You also have to believe he was lying in his book when he said he had relapsed, after describing his heavy use of crack in that same chapter.

And speaking of stories, what the defendant said in his book, if you'll recall, right before coming back to Delaware, he says I told family back in Delaware I was working on my sobriety, whatever the hell that meant at this point.  Here is what it meant, nothing, "I got good at telling stories like that."  Consistent with the defense in this case.

So ask yourself when you look at the words in that book, and you look at the end of the chapter that begins California Odyssey, detailing the months leading up to October 2018, and then you look at the beginning of the next chapter that details his return to Delaware, you will see the defendant say he had the hope of getting sober, not

staying sober, you see the defendant say he was in full
blown addiction, not alcohol only, anything like that, but
his words, believe his words in his book, because what those
words show is that he knew he had used crack cocaine, he had
relapsed, he was an addict, and an unlawful user.

The fourth thing you would have to believe is
that all that cash was withdrawn for some reason other than
drugs, $151,000, that that was used for something other than
drugs.  There is no evidence that it was used for anything
but drugs in this case, and at least a portion of that money
went to fund his drug purchases.

The fifth thing you would have to believe if you
found that the government had not met its burden was that
Naomi Biden lied when she said her father was unreachable
and was only reaching out to her in the middle of the night
after he was in New York City for several days.  You would
have to find out he was blowing her off for some other
reason other than using drugs and partying all night, which
is what those messages show that we introduced this morning.
There is no evidence of any other reason, that's what he was
doing up there in New York, and you saw the anxiousness on
her face when she testified to that on the witness stand.

The sixth thing you would have to believe that
is that Hallie Biden was lying for some unexplained reason,
lying about finding drugs in the defendant's truck on the

15:20:52  1    day in question.  She like Zoe, has immunity, again immunity

15:20:57  2    requires her to tell the truth.  That's the one, lying is

15:21:00  3    the one thing that could risk her getting into trouble in

15:21:03  4    this case.  If she had lied, she could be prosecuted for

15:21:07  5    lying.

15:21:07  6         I submit to you that given her prior personal

15:21:11  7    relationship with the defendant, if anything, she would have

15:21:14  8    had an incentive to shave the truth in his favor, not

15:21:19  9    testify against him.  There is no evidence that contradicts

15:21:23  10   her testimony in this case.  Again, the story that

15:21:26  11   Mr. Lowell has said is not evidence from that witness stand.

15:21:32  12        The seventh thing you'd have to believe is that

15:21:35  13   someone other than Hunter Biden put the cocaine in his brown

15:21:38  14   leather pouch.  Who was it?  Was it Mr. Banner?  Was it some

15:21:42  15   other intermediary that we don't know, was it the police?

15:21:47  16   There is no evidence of any of that.  It was the defendant's

15:21:50  17   brown leather pouch, and inside that leather pouch, it was

15:21:53  18   his cocaine as Hallie Biden testified, when she found the

15:21:56  19   items in his truck, she found drug remnants and drug

15:22:00  20   paraphernalia and consistent with that, in the very pouch

15:22:04  21   where he stored his drugs, there was cocaine residue.

15:22:07  22        So I submit to you to believe that the

15:22:11  23   government has not met its burden you would have to believe

15:22:14  24   all of those seven things.  What a miraculous trial this

15:22:20  25   would have been if all those seven things were to have

15:22:22  1    occurred.  Did everybody take that stand and lie?  I submit

15:22:25  2    to you the evidence shows overwhelmingly they did not.

15:22:30  3    There is overwhelming evidence in this case of the

15:22:34  4    defendant's guilt beyond a reasonable doubt.

15:22:36  5             When Mr. Lowell was talking about the lock box

15:22:45  6    and the gun and keeping it safe, he sort of minimized the

15:22:55  7    defendant's possession of the gun during this time frame.

15:22:59  8    He had control of that firearm the entire time, even during

15:23:03  9    his brief couple of days up in New York, where ever that

15:23:07 10    firearm was, it was his, he never transferred ownership of

15:23:10 11    it, you didn't see any documentation of that, there is no

15:23:13 12    evidence he gave it to somebody else, even if it was at his

15:23:16 13    home in Delaware or some other location, he clearly came

15:23:19 14    back and got it, he had it in the trunk of his car on

15:23:22 15    October 23rd, 2018, that's possession, that meets the law

15:23:25 16    that Her Honor has instructed you, he exercised control over

15:23:30 17    it, he had control over that firearm at all given times and

15:23:34 18    therefore he possessed it.

15:23:35 19             In his book, the defendant said that the

15:23:41 20    desperation of crack can "most certainly induce violent

15:23:47 21    behavior."  The law as we have and the laws that are at

15:23:52 22    issue in this case exist to prohibit crack users and crack

15:23:57 23    addicts and drug users from owning guns.  We didn't make the

15:24:02 24    laws, congress makes the laws.  We enforce the laws.  You

15:24:07 25    decide whether the law is broken.  It's plain and simple.

15:24:11  1    These same laws apply to the defendant just like they would

15:24:15  2    to anybody else.

15:24:17  3            You have heard overwhelming evidence in this

15:24:22  4    case, the defendant was a crack addict and an unlawful user

15:24:26  5    and illegally owned a gun.  If this evidence did not

15:24:29  6    establish that Hunter Biden was a crack addict, and an

15:24:32  7    unlawful user, then no one is a crack addict or an unlawful

15:24:37  8    user.

15:24:37  9            We ask that you return the only verdict during

15:24:41  10   your deliberations, the only verdict that is supported by

15:24:44  11   the evidence in this case, all three counts, there is

15:24:48  12   overwhelming evidence of the defendant's guilt, and in the

15:24:51  13   end of this case, we ask that you find that the law applies

15:24:56  14   equally to this defendant just like it would to anybody else

15:24:59  15   because when he had a choice to make on October 12th, 2018,

15:25:03  16   he chose to lie and buy a gun, he violated the law.  So

15:25:07  17   we'll ask that you return the only verdict that is supported

15:25:10  18   by the evidence and that is a verdict of guilty on all three

15:25:13  19   counts.

15:25:14  20           THE COURT:  All right.  Thank you.  Members of

15:25:17  21   the jury, I'm just going to pick up at the end of the

15:25:20  22   instructions and then let you get to your deliberations.

15:25:23  23           Let me explain some things about your

15:25:26  24   deliberations and your possible verdicts.

15:25:28  25           First, by custom of this Court, Juror Number 1

is the jury foreperson.  Congratulations, you won the lottery.  This person will speak for the jury here in court. She will also preside over your discussions.  However, the views and the votes of the foreperson are entitled to no greater weight than those of any other juror.

Second, I want to remind you that your verdict whether it is guilty or not guilty must be unanimous.  To find the defendant guilty of an offense, every one of you must agree that the government has overcome the presumption of innocence with evidence that proves each element of that offense beyond a reasonable doubt.  To find the defendant not guilty, every one of you must agree that the government has failed to convince you beyond a reasonable doubt.

Third, if you decide that the government has proved the defendant guilty beyond a reasonable doubt, then it will be my responsibility to decide what the appropriate punishment should be.  You should never consider the possible punishment in reaching your verdict.

Fourth, as I have said before, your verdict must be based only on the evidence received in the case and the law I have given you.  You should not take anything I may have said or done during this trial as indicating that I think -- what I think of the evidence or what I think your verdict should be.  What the verdict should be is the exclusive responsibility of the jury.

15:26:47  1          **Fifth, now that all the evidence is in, the**

15:26:49  2  **arguments are complete, and once I finished these**

15:26:51  3  **instructions, you are free to talk about the case in the**

15:26:53  4  **jury room.  In fact, it is your duty to do so and to talk**

15:26:57  5  **with each about the evidence, and to make every reasonable**

15:26:59  6  **effort you can to reach unanimous agreement.  Talk with each**

15:27:03  7  **other, listen carefully and respectfully to each other's**

15:27:06  8  **views and keep an open mind as you listen to what your**

15:27:09  9  **fellow jurors have to say.  Do not hesitate to change your**

15:27:12  10  **mind if you are convinced that other jurors are right and**

15:27:14  11  **that your original position was wrong, but do not ever**

15:27:17  12  **change your mind because other jurors see things**

15:27:20  13  **differently, or just to get the case over with.  In the end,**

15:27:23  14  **your vote must be that, your own vote, it is important for**

15:27:26  15  **you to reach unanimous agreement, but only if you can do so**

15:27:30  16  **honestly and in good conscious, listen carefully to what the**

15:27:34  17  **other jurors have to say and then decide for yourself if the**

15:27:34  18  **government has proved the defendant guilty beyond a**

15:27:34  19  **reasonable doubt.**

15:27:36  20          **No one will be allowed to hear your discussions**

15:36:10  21  **in the jury room, and no record will be made of what you**

15:36:10  22  **say, so you should all feel free to speak your minds.**

15:36:10  23          **Remember that if you elected to take notes**

15:36:10  24  **during the trial, your notes should be only be used as**

15:36:10  25  **memory aids.  You should not give your notes greater weight**

15:36:10 1   than your independent recollection of the evidence.  You

15:36:10 2   should rely upon your own independent recollection of the

15:36:10 3   evidence or lack of evidence and you should not be unduly

15:36:10 4   influenced by the notes of other jurors, do not give any

15:36:10 5   more or less weight to the views of a fellow juror just

15:36:10 6   because a juror did or did not take notes.  Do not assume

15:36:10 7   that just because something is in someone's notes that it

15:36:10 8   necessarily occurred in court.  It is just as easy to write

15:36:10 9   down something incorrectly as it is to hear or remember it

15:36:10 10  incorrectly.  Notes are not entitled to any more weight than

15:36:10 11  the memory and impression of each juror.

15:36:11 12          Sixth.  Once you start deliberating, do not

15:36:11 13  talk, communicate with, or provide any other information

15:36:11 14  about this case by any means to the court officials, or to

15:36:11 15  me, or to anyone else except each other.  During your

15:36:11 16  deliberations, you may not use any electronic device or

15:36:11 17  media, such as a telephone, cell phone, smart phone, iPhone,

15:36:11 18  Blackberry or computer; the internet, any internet service,

15:36:11 19  or any text or instant messaging service; or any internet

15:36:11 20  chat room, blog, or website such as Facebook, MySpace,

15:36:11 21  LinkedIn, YouTube, Twitter or X, TikTok, Instagram,

15:36:11 22  What'sApp or SnapChat, or anything else you can think of to

15:36:11 23  communicate to anyone any information about this case or to

15:36:11 24  conduct any research about this case.

15:36:11 25          Seventh.  If you have any questions or messages,

your foreperson should write them down on a piece of paper, sign the piece of paper, and give the piece of paper to the court official who will then give them to me.  I will first talk with the lawyers about what you have asked and will respond as soon as I can.  In the meantime, if possible, continue with your deliberations on another subject.

You will have exhibits with you in the jury room.  To the extent there are other exhibits, like physical exhibits that were admitted into evidence that you don't have, you may send a message to me and if I can legally do so, I will have the exhibits provided to you.

One more thing about messages.  Do not ever write down or tell anyone how you or anyone else voted.  That should stay secret until you have finished your deliberation.  If you have occasions to communicate with me, the Court, while you are deliberating, do not disclose the number of jurors who have voted to convict or acquit on any offense.

Let me end this section with what I said in the preliminary instructions.  Perform your duties fairly and impartially.  Do not allow sympathy, prejudice, political, or other beliefs, public opinion, or any other factor other than the law and the evidence influence your decision.

A verdict form has been prepared for you that you should use to record your verdict.  There are three

15:36:11 1   questions on the verdict form, one for each of the counts.

15:36:11 2   Take the form with you into the jury room.  When you have

15:36:11 3   reached unanimous verdicts, the foreperson should write the

15:36:11 4   verdicts on the form, date it, and sign it.  I think there

15:36:12 5   is a space for each of you to sign the form, and then return

15:36:12 6   -- then you can let us know that you have a verdict.  At

15:36:12 7   that point you'll return to the courtroom where you will

15:36:12 8   read the verdict out loud.

15:36:12 9          If you decide that the government has proved the

15:36:12 10  defendant guilty of any or all of the offenses charged

15:36:12 11  beyond a reasonable doubt, you will say so by having your

15:36:12 12  foreperson mark the appropriate place on the form guilty.

15:36:12 13  If you decide the government has not proved the defendant

15:36:12 14  guilty of some or all of the offenses charged beyond a

15:36:12 15  reasonable doubt, you say so by marking the form in the

15:36:12 16  appropriate place, not guilty.

15:36:12 17         And I will just remind you when you're looking

15:36:12 18  at the jury verdict form for each of the counts that is on

15:36:12 19  there, you should look back to the instructions relating to

15:36:12 20  those counts in order to see what the law is.

15:36:12 21         Let me finish up by saying something I have said

15:36:12 22  to you before at the beginning of the case.  I think I said

15:36:12 23  it to you just two minutes ago.  Nothing that I have said or

15:36:12 24  done during this trial was meant to influence your decision

15:36:12 25  in any way.  You have to decide this case for yourselves

15:36:12 1    based on the evidence presented and the law I have given

15:36:12 2    you.

15:36:12 3         So that is the end of the instructions.  We're

15:36:12 4    going to bring the jury officer forward.  But before I do

15:36:12 5    that, let me just say, jurors, number 13, 14, and 15, you

15:36:12 6    are alternate jurors.  You are here in case during the

15:36:12 7    deliberations any of jurors numbers 1 through 12 are unable

15:36:12 8    to continue.  So you are not going to deliberate at this

15:36:12 9    point.  Instead, Mr. Buckson or Ms. Smith will take you into

15:36:12 10   a different place in the courthouse where you can wait for a

15:36:12 11   while.  I don't want to send you home because then we waste

15:36:12 12   time if it turns out that we need you to come back.  So

15:36:12 13   we'll find you a more comfortable room where you can stay.

15:36:12 14        Mr. Buckson will collect your notes and put them

15:36:12 15   in a sealed envelope to the extent that you are called upon

15:36:12 16   and need them, you will then get them back.  And the other

15:36:12 17   twelve jurors at this point will go back and begin their

15:36:12 18   deliberations.  So let's have the Jury Officer come forward.

15:36:12 19        COURTROOM DEPUTY:  Please raise your right hand.

15:36:12 20   Do you solemnly swear that you will keep this jury in some

15:36:12 21   quiet and convenient place, that you will not suffer anyone

15:36:12 22   to speak to them nor speak to them yourself touching the

15:36:13 23   issue before them unless it be to ask them if they have

15:36:13 24   agreed upon their verdict.

15:36:13 25        JURY OFFICER:  I do.

15:36:13 1          THE COURT:  All right.  You have may go back to

15:36:13 2     the jury room.

15:36:13 3          COURTROOM DEPUTY:  All rise.

15:36:13 4          (Jury exiting the courtroom at 3:33 p.m.)

15:36:13 5          THE COURT:  All right.  Anything we need to

15:36:13 6     address?

15:36:13 7          MR. HINES:  I don't think so, Judge.

15:36:13 8          MR. LOWELL:  I don't see that there was a

15:36:13 9     sentence, I don't think there was for those alternates,

15:36:13 10    they're not supposed to be deliberating among the three of

15:36:13 11    them.  I don't think it matters, but I forgot once you said

15:36:13 12    it.

15:36:13 13         THE COURT:  If you want, I can instruct them of

15:36:13 14    that.

15:36:13 15         MR. LOWELL:  What's your normal practice?

15:36:13 16         THE COURT:  I don't -- I haven't ever done that

15:36:13 17    before because I always assume that they don't talk to

15:36:13 18    anyone still applies to them.

15:36:13 19         MR. LOWELL:  You can do that, I just wanted to

15:36:13 20    raise that.

15:36:13 21         THE COURT:  All right.  And then how do you want

15:36:13 22    handle, what I usually do with the jurors is I tell them if

15:36:13 23    you want to leave at 4:30, you can tell us, if you think you

15:36:13 24    want to keep deliberating, you can tell us.  But usually I

15:36:13 25    just let them leave.  Do you want me to do anything

15:36:13  1   different and say remember you can't talk to anybody?  What

15:36:13  2   is it that you want to do?

15:36:13  3               MR. HINES:  Nothing different.  We think that

15:36:13  4   the Court's ordinary practice is fine.

15:36:13  5               THE COURT:  Okay.  And then in the morning when

15:36:13  6   they come in, is that you want me to follow that same

15:36:13  7   practice.  Normally I would just let them -- when they get

15:36:13  8   here and they are deliberating, as soon as all of the jurors

15:36:13  9   are there to deliberate, I let them begin deliberating

15:36:13 10   without bringing them back into the courtroom or anything.

15:36:13 11               MR. HINES:  That's fine with us.

15:36:13 12               MR. LOWELL:  It would be overkill I think at

15:36:13 13   this point after how many times you have given them that

15:36:13 14   instruction, so we have to assume they'll follow your

15:36:13 15   instruction.

15:36:13 16               THE COURT:  Thank you.  We'll let you know if we

15:36:13 17   get any questions or anything.  Usually you can just hang

15:36:13 18   out for a little while in case something quickly comes up.

15:36:13 19               MR. LOWELL:  Okay.

15:36:13 20               COURTROOM DEPUTY:  Court is adjourned.

15:36:13 21               (Court adjourned at 3:36 p.m.)

22               I hereby certify the foregoing is a true and
      accurate transcript from my stenographic notes in the proceeding.

23

24                              /s/ Dale C. Hawkins
                              Official Court Reporter
25                              U.S. District Court